**BRYAN WESTERFELD (S.B. # 218253)**
bwesterfeld@calemployerlaw.com
**NICOLE E. WURSHER (S.B # 245879)**
nwurscher@calemployerlaw.com
**WALRAVEN & WESTERFELD LLP**
101 Enterprise, Suite 350
Aliso Viejo, CA 92656
Telephone:   (949) 215-1997
Facsimile:    (949) 215-1999

**R.J. ZAYED (MN ID #0309849)**
zayed.rj@dorsey.com
*Pro hac vice admission pending*
**DORSEY & WHITNEY LLP**
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:   (612) 340-2600
Facsimile:    (612) 340-2868

Attorneys for Defendant UnitedHealth Group, Inc.;
and Defendants/Counterclaim Plaintiffs
United Healthcare Services, Inc., UnitedHealthcare
Insurance Company; OptumInsight, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company; BAKERSFIELD SURGERY INSTITUTE, LLC, a California limited liability company; INDEPENDENT MEDICAL SERVICES, INC., a California corporation; MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC., a California corporation; NEW LIFE SURGERY CENTER, LLC, a California limited liability company, dba BEVERLY HILLS SURGERY CENTER, LLC; ORANGE GROVE SURGERY CENTER, LLC, a California limited liability company; SAN DIEGO AMBULATORY SURGERY CENTER, LLC, a California limited liability company; SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, INC., a California corporation; VALENCIA AMBULATORY SURGERY CENTER, LLC, a California limited liability company; WEST HILLS SURGERY CENTER, LLC, a California limited liability company, **PLAINTIFFS,** | Case No 2:14-cv-03053-MWF(VBKx) **AMENDED ANSWER AND COUNTERCLAIM** (Superior Court of the State of California, County of Los Angeles, Central District Case Number: BC540056) Complaint filed:  March 21, 2014 |

1   v.

2   UNITEDHEALTH GROUP, INC.; UNITED
    HEALTHCARE SERVICES, INC.,
3   UNITEDHEALTHCARE INSURANCE
    COMPANY; OPTUMINSIGHT, INC., AND
4   DOES 1 THROUGH 20,

5              Defendants**.**

6

7   _____

    UNITED HEALTHCARE SERVICES,
8   INC.; UNITEDHEALTHCARE
    INSURANCE COMPANY;
9   OPTUMINSIGHT, INC.,

10           Counterclaim Plaintiffs,

11   v.

12   ALMONT AMBULATORY SURGERY
    CENTER, LLC, a California limited liability
13   company; BAKERSFIELD SURGERY
    INSTITUTE, LLC, a California limited
14   liability company; INDEPENDENT
    MEDICAL SERVICES, INC., a California
15   corporation; MODERN INSTITUTE OF
    PLASTIC SURGERY & ANTIAGING,
16   INC., a California corporation; NEW LIFE
    SURGERY CENTER, LLC, a California
17   limited liability company, dba BEVERLY
    HILLS SURGERY CENTER, LLC;
18   ORANGE GROVE SURGERY CENTER,
    LLC, a California limited liability company;
19   SAN DIEGO AMBULATORY SURGERY
    CENTER, LLC, a California limited liability
20   company; SKIN CANCER &
    RECONSTRUCTIVE SURGERY
21   SPECIALISTS OF BEVERLY HILLS,
    INC., a California corporation; VALENCIA
22   AMBULATORY SURGERY CENTER,
    LLC, a California limited liability company;
23   WEST HILLS SURGERY CENTER, LLC,
    a California limited liability
24   company,KAMBIZ BENJAMIN OMIDI
    (A/K/A JULIAN OMIDI, COMBIZ OMIDI,
25   KAMBIZ OMIDI, COMBIZ JULIAN
    OMIDI, KAMBIZ BENIAMIA OMIDI,
26   JULIAN C. OMIDI); MICHAEL OMIDI,
    M.D.; ALMONT AMBULATORY
27   SURGERY CENTER, A MEDICAL
    CORPORATION; BAKERSFIELD
28   SURGERY INSTITUTE, INC.; CIRO
    SURGERY CENTER, LLC; EAST BAY

AMBULATORY SURGERY CENTER,
LLC; SKIN CANCER &
RECONSTRUTIVE SURGERY
SPECIALISTS OF WEST HILLS, INC.;
VALLEY SURGICAL CENTER, LLC;
TOP SURGEONS, INC.; TOP SURGEONS,
LLC; PALMDALE AMBULATORY
SURGERY CENTER, A MEDICAL
CORPORATION; 1 800 GET THIN, LLC;
DOES 1-200,

                Counterclaim Defendants.

For their Answer to Plaintiffs' Complaint, UnitedHealth Group, Inc., United HealthCare Services, Inc., United Healthcare Insurance Company, and OptumInsight, Inc. ("United") state, deny, and allege as follows:

1.      With respect to the allegations in Paragraph 1 of the Complaint, admit that the Plaintiffs make allegations as referenced therein, but deny any liability with respect to such allegations.

2.      Deny the allegations in Paragraph 2 of the Complaint.

3.      Are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and therefore deny the same, except admit that United advertises the benefits of its PPO policy to include: "The freedom to choose any doctor for your health care needs."

4.      Deny the allegations in Paragraph 4 of the Complaint.

5.      Deny the allegations in Paragraph 5 of the Complaint, except admit that, in some cases, United has not paid claims of patients treated by Plaintiffs, allege that other claims have been paid, and that any authorizations by United for procedures were subject to, among other things, the terms of the patients' respective plans.

6.      Deny the allegations in Paragraph 6 of the Complaint, except admit that United has not paid some claims of patients treated by Plaintiffs, allege that other claims have been paid, and that any authorizations by United for services were subject to, among other things, the terms of the patients' respective plans.

7.      Deny the allegations in Paragraph 7 of the Complaint.

8.      Deny the allegations in Paragraph 8 of the Complaint.

9.      Deny the allegations in Paragraph 9 of the Complaint.

10.     Deny the allegations in Paragraph 10 of the Complaint, and allege that Plaintiffs have promised their patients that they would not be liable services not covered by patients' benefit plans.

11.     Deny the allegations in Paragraph 11 of the Complaint, except admit that some patients of Plaintiffs may need adjustments to their Lap Bands.

12.     Deny the allegations in Paragraph 12 of the Complaint.

13.     Deny the allegations in Paragraph 13 of the Complaint except to the extent they state legal conclusions to which no responsive pleading is required.

14.     With respect to the allegations in Paragraph 14 of the Complaint, admit that Plaintiffs purport to bring these claims in their own right and not based on any assignment of benefits, and state that the plaintiffs elsewhere allege that they did receive assignments for claims that are the subject of this lawsuit.

15.     Deny the allegations in Paragraph 15 of the Complaint.

16.     With respect to the allegations in Paragraph 16 of the Complaint, admit that Plaintiffs' operate in coordinated and confederated ways toward common goals under the direction or control, directly and indirectly, of common owners that describe themselves as a network of health care providers specializing in Lap Band surgery and related surgical procedures.

17.     Admit the allegations in Paragraph 17 of the Complaint.

18.     Deny the allegations in Paragraph 18 of the Complaint, and admit that at various points prior to, during or after 2010, some or all of Plaintiffs, or persons or entities associated with or acting in connection with them, have performed Lap Band surgeries and provided related medical services to patients, many of whom they identify as morbidly obese.

19.     Neither admit nor deny the allegations in Paragraph 19 of the Complaint, which are legal conclusions to which no responsive pleading is required.

20.     Are without information sufficient to form a belief with respect to the truth or falsity of the allegations in Paragraph 20 of the Complaint, except neither admit nor deny the allegations about the language of the blog post referred to therein, which speaks for itself and does not require a response, and specifically deny Plaintiffs' allegations insofar as they allege that United engaged in unlawful discrimination.

21.     Deny the allegations in Paragraph 21 of the Complaint.

22.     Deny the allegations in Paragraph 22 of the Complaint, except admit that Plaintiffs are not in-network providers for United.

23.     Deny the allegations in Paragraph 23 of the Complaint, and allege that United has paid various claims submitted by Plaintiffs and has denied claims for a variety of reasons, including lack of proper documentation or lack of assignments.

24.     Deny the allegations in Paragraph 24 of the Complaint, and allege that United has paid various claims submitted by Plaintiffs and has denied claims for a variety of reasons, including lack of proper documentation or lack of assignments.

25.     Deny the allegations in Paragraph 25 of the Complaint.

26.     Deny the allegations in Paragraph 26 of the Complaint, except state that no responsive pleading is required with respect to the legal conclusions stated therein.

27.     Deny the allegations in Paragraph 27 of the Complaint.

28.     Deny the allegations in Paragraph 28 of the Complaint.

29.     Deny the allegations in Paragraph 29 of the Complaint.

30.     Deny the allegations in Paragraph 30 of the Complaint, and allege that the plan provisions speak for themselves and do not require a response.

31.     Deny the allegations in Paragraph 31 of the Complaint.

32.     Deny the allegations in Paragraph 32 of the Complaint.

33.     Are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and therefore deny the same.

34.     Deny the allegations in Paragraph 34 of the Complaint.

35.     Deny the allegations in Paragraph 35 of the Complaint.

36.     Deny the allegations in Paragraph 36 of the Complaint.

37.     Deny the allegations in Paragraph 37 of the Complaint.

38.     Deny the allegations in Paragraph 38 of the Complaint.

39.     Deny the allegations in Paragraph 39 of the Complaint, and allege that United administered various plans in conformance with their terms, which sometimes imposed certain conditions for treatments to be covered.

40.     Deny the allegations in Paragraph 40 of the Complaint, except allege that language in the studies referred to therein speaks for itself and does not require a response.

41.     Deny the allegations in Paragraph 41 of the Complaint.

42.     Deny the allegations in Paragraph 42 of the Complaint, except admit that with respect to many of Plaintiffs' patients, United was designated as the claims administrator of the patients' employer-sponsored plans, and that it administered claims pursuant to the provisions of those plans.

43.     Deny allegations in Paragraph 43 of the Complaint.

44.     Are without information sufficient to form a belief as to the truth of the allegations in Paragraph 44(a-i) of the Complaint, except admit that Plaintiffs operate surgery centers that are located in California with their principal places of business in California, or that they are not in-network providers of United.

45.     Deny the allegations in Paragraph 45 of the Complaint, except admit that Plaintiff Independent Medical Services ("IMS") is a California professional corporation with its principal place of business in California, and that IMS was not an in-network provider of United.

46.     Admit the allegations in Paragraph 46 of the Complaint, except state that the proper name of the defendant is UnitedHealth Group Incorporated, and deny that UnitedHealth Group Incorporated's corporate headquarters are located in Minneapolis, Minnesota, and allege that its corporate headquarters are located in Minnetonka, Minnesota.

47.     Admit the allegations in Paragraph 47 of the Complaint.

48.     Admit the allegations in Paragraph 48 of the Complaint, except deny that United HealthCare Services, Inc.'s corporate headquarters are located in Minneapolis, Minnesota, and allege that its corporate headquarters are located in Minnetonka, Minnesota, and deny that United HealthCare Services, Inc. is licensed to conduct insurance operations, but allege that it is licensed as a third party administrator.

49.     Admit the allegations in Paragraph 49 of the Complaint, except deny the second sentence, and allege that Ingenix, Inc. changed its name to OptumInsight, Inc. on or about June 1, 2011.

50.     Paragraph 50 of the Complaint makes no allegations to which a response is required.

51.     Deny the allegations in Paragraph 51 of the Complaint, except admit that United performed certain of the services with respect to some of the claims as alleged in the Complaint.

52.     Admit the allegations in Paragraph 52 of the Complaint, except without information sufficient to form a belief as to the truth or falsity of the term "claim pricing," and therefore deny the same.

53.     Admit the allegations in Paragraph 53 of the Complaint.

54.     Admit the allegations in Paragraph 54 of the Complaint.

55.     With respect to  the allegations in Paragraph 55 of the Complaint, admit that providers other than Plaintiffs are in-network providers of United, and

allege that the allegations regarding the language in the written contracts speaks for itself and does not require a response.

56. With respect to the allegations in Paragraph 56 of the Complaint, admit that the Plaintiffs do not have any direct written contracts with United, but deny the remaining allegations in Paragraph 56 of the Complaint.

57. With respect to the allegations in Paragraph 57 of the Complaint, admit that United pays in-network providers amounts as provided by agreement, that such amounts are in many cases lower than what those providers would otherwise charge, and that the allegations regarding the language of the plans referred to therein speaks for itself, and does not require a response.

58. Deny the allegations in Paragraph 58 of the Complaint.

59. With respect to the allegations in Paragraph 59 of the Complaint, admit that bills from in-network and out-of-network providers are supposed to reflect the actual billed charges for any services actually provided, and that United has a significant amount of historical charge data, but deny the remaining allegations in Paragraph 59 of the Complaint.

60. Deny the allegations in Paragraph 60 of the Complaint.

61. Deny the allegations in Paragraph 61 of the Complaint.

62. Deny the allegations in Paragraph 62 of the Complaint.

63. Deny the allegations in Paragraph 63 of the Complaint.

64. Deny the allegations in Paragraph 64 of the Complaint.

65. Deny the allegations in Paragraph 65 of the Complaint.

66. Deny the allegations in Paragraph 66 of the Complaint.

67. Deny the allegations in Paragraph 67 of the Complaint.

68. Deny the allegations in Paragraph 68 of the Complaint, except admit that defendants have denied numerous claims that Plaintiffs have submitted, but allege that those denials are in compliance with the provisions of the respective plans and ERISA.

69.     Deny the allegations in Paragraph 69 of the Complaint, except with respect to the quoted conversations as alleged therein, which speak for themselves and do not require a response.

70.     Deny the allegations in Paragraph 70 of the Complaint.

71.     Deny the allegations in Paragraph 71 of the Complaint.

72.     Deny the allegations in Paragraph 72 of the Complaint.

73.     Deny the allegations in Paragraph 73 of the Complaint.

74.     Deny the allegations in Paragraph 74 of the Complaint, except admit that there is a Facility Reasonable Charge Determination program that plans may choose to purchase.

75.     Deny the allegations in Paragraph 75 of the Complaint.

76.     Deny the allegations in Paragraph 76 of the Complaint.

77.     Deny the allegations in Paragraph 77 of the Complaint.

78.     Deny the allegations in Paragraph 78 of the Complaint.

79.     Deny the allegations in Paragraph 79 of the Complaint.

80.     Deny the allegations in Paragraph 80 of the Complaint.

81.     Deny the allegations in Paragraph 81 of the Complaint.

82.     Deny the allegations in Paragraph 82 of the Complaint.

83.     Deny the allegations in Paragraph 83 of the Complaint except to the extent they state legal conclusions to which no responsive pleading is required.

84.     Deny the allegations in Paragraph 84 of the Complaint except to the extent they state legal conclusions to which no responsive pleading is required.

85.     Deny the allegations in Paragraph 85 of the Complaint, except to the extent that they state legal conclusions regarding the provisions of the U.S. Code to which no responsive pleading is required.

86.     Deny the allegations in Paragraph 86 of the Complaint.

87.     Deny the allegations in Paragraph 87 of the Complaint.

88.     Deny the allegations in Paragraph 88 of the Complaint, except admit that certain patients Plaintiffs treated were morbidly obese.

89.     Deny the allegations in Paragraph 89 of the Complaint.

90.     With respect to the allegations in Paragraph 90 of the Complaint, state that the language in the document referenced therein speaks for itself and does not require a response, and deny Plaintiffs' allegations to the extent they are inconsistent or incomplete with respect thereto.

91.     With respect to the allegations in Paragraph 91 of the Complaint, state that the language in the document referenced therein speaks for itself and does not require a response, and deny Plaintiffs' allegations to the extent they are inconsistent or incomplete with respect thereto.

92.     With respect to the allegations in Paragraph 92 of the Complaint, state that the language in the document referenced therein speaks for itself and does not require a response, and deny Plaintiffs' allegations to the extent they are inconsistent or incomplete with respect thereto.

93.     With respect to the allegations in Paragraph 93 of the Complaint, state that the language in the document referenced therein speaks for itself and does not require a response, and deny Plaintiffs' allegations to the extent they are inconsistent or incomplete with respect thereto.

94.     With respect to the allegations in Paragraph 94 of the Complaint, state that the language in the document referenced therein speaks for itself and does not require a response, and deny Plaintiffs' allegations to the extent they are inconsistent or incomplete with respect thereto.

95.     With respect to the allegations in Paragraph 95 of the Complaint, state that the language in the document referenced therein speaks for itself and does not require a response, and deny Plaintiffs' allegations to the extent they are inconsistent or incomplete with respect thereto.

96.     With respect to the allegations in Paragraph 96 of the Complaint, state that the language in the document referenced therein speaks for itself and does not require a response, and deny Plaintiffs' allegations to the extent they are inconsistent or incomplete with respect thereto.

97.     Deny the allegations in Paragraph 97 of the Complaint, except admit that certain plans that United administered do not provide coverage for services for which Plaintiffs sought reimbursement.

98.     Deny the allegations in Paragraph 98 of the Complaint.

99.     Deny the allegations in Paragraph 99 of the Complaint.

100.    Deny the allegations in Paragraph 100 of the Complaint, and allege that Plaintiffs have in fact represented to their patients that they would accept what their insurance covers as payment in full all charges for services provided, and that all co-pays, co-insurance or other patient responsibility would be waived.

101.    Deny the allegations in Paragraph 101 of the Complaint.

102.    Despite stating in their Complaint that they would provide information identifying Patients "A" through "C," as alleged in Paragraph 102, and despite stating again that they would provide such information within three weeks of March 31, 2014, Plaintiffs have not provided the identities of Patients "A" through "C," and as a result, Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the matters alleged regarding Patients "A" through "C" in Paragraph 102, and therefore deny the same.

103.    Allege that Plaintiffs have not provided the identity of the patient identified as "A," and therefore are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and deny the same.

104.    Allege that Plaintiffs have not provided the identity of the patient identified as "A," and therefore are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and deny the same.

105.   Allege that Plaintiffs have not provided the identity of the patient identified as "A," and therefore are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and deny the same.

106.   Allege that Plaintiffs have not provided the identity of the patient identified as "A," and therefore are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and deny the same.

107.   Allege that Plaintiffs have not provided the identity of the patient identified as "A," and therefore are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and deny the same.

108.   Allege that Plaintiffs have not provided the identity of the patient identified as "B," and therefore are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and deny the same.

109.   Allege that Plaintiffs have not provided the identity of the patient identified as "B," and therefore are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and deny the same.

110.   Allege that Plaintiffs have not provided the identity of the patient identified as "C," and therefore are without information sufficient to form a belief as to the truth or falsity of the matters alleged therein, and deny the same.

111.   United incorporates the prior paragraphs as though fully set forth herein.

112.   Neither admit nor deny the allegations in Paragraph 112 of the Complaint, which are legal conclusions to which no responsive pleading is required.

113.   Deny the allegations in Paragraph 113 of the Complaint.

114.   Deny the allegations in Paragraph 114 of the Complaint.

115.   Deny the allegations in Paragraph 115 of the Complaint.

116.   Deny the allegations in Paragraph 116 of the Complaint.

117.   With respect to the allegations in Paragraph 117, admit that Plaintiffs seek remedies as alleged therein, deny that United is liable to Plaintiffs in any way, and neither admit nor deny the legal summary of business and professions code Section 17203 which reflects legal conclusions to which no responsive pleading is required.

118.   Deny the allegations in Paragraph 118 of the Complaint.

119.   United incorporates the prior paragraphs as though fully set forth herein.

120.   Deny the allegations in Paragraph 120 of the Complaint.

121.   Deny the allegations in Paragraph 121 of the Complaint.

122.   Deny the allegations in Paragraph 122 of the Complaint, except admit that, in some cases, Plaintiffs sought confirmation that a patient was an eligible member of one of Defendants' plans by contacting United, and inquired as to which services required prior authorization by United, and which services did not require prior authorization, and allege that any authorizations by United for procedures were subject to, among other things, the terms of the patients' respective plans.

123.   Deny the allegations in Paragraph 123 of the Complaint.

124.   With respect to the allegations in Paragraph 124 of the Complaint, are without information sufficient to admit or deny whether Plaintiffs made notes of calls to United for insurance verification purposes, the contents of those notes, and allegations about Plaintiffs' own information or belief, and therefore deny the same.

125.   Deny the allegations in Paragraph 125 of the Complaint, except admit that Plaintiffs sought and received prior authorization for some services, which authorization was subject to, among other things, the terms of the patients' respective plans.

126.   Deny the allegations in Paragraph 126 of the Complaint.

127.   With respect to the allegations in Paragraph 127 of the Complaint, are without information sufficient to form a belief about the truth or falsity of

AMENDED ANSWER AND COUNTERCLAIM

Plaintiffs' allegations about their own information or belief, and therefore deny the same, except admit that United has records of calls seeking verification of coverage.

128.    Deny the allegations in Paragraph 128 of the Complaint.

129.    Deny the allegations in Paragraph 129 of the Complaint, except are without information sufficient to form a belief as to which "Plaintiff" is referred to therein, and allege that claims for coverage were subject to the provisions of the participants' respective plans.

130.    Deny the allegations in Paragraph 130 of the Complaint, allege that claims for coverage were subject to the provisions of patients' respective plans.

131.    Deny the allegations in Paragraph 131 of the Complaint.

132.    Deny the allegations in Paragraph 132 of the Complaint.

133.    Deny the allegations in Paragraph 133 of the Complaint.

134.    United incorporates the prior paragraphs as though fully set forth herein.

135.    Deny the allegations in Paragraph 135 of the Complaint, except admit that United generally provides information to providers who call in to ask about out-of-network benefits for some patients, allege that any authorizations by United for services were subject to the terms of the patients' respective plans.

136.    Deny the allegations in Paragraph 136 of the Complaint.

137.    Deny the allegations in Paragraph 137 of the Complaint, except admit that Plaintiffs may have sought and received prior authorization for certain services, and allege that any authorizations by United for services were subject to the terms of the patients' respective plans.

138.    Deny the allegations in Paragraph 138 of the Complaint.

139.    With respect to the allegations in Paragraph 139 of the Complaint, state that the language referenced the document referred to therein speaks for itself

and does not require a response, and deny Plaintiffs' allegations to the extent they are inconsistent or incomplete with respect thereto.

140.   Deny the allegations in Paragraph 140 of the Complaint.

141.   Deny the allegations in Paragraph 141 of the Complaint.

142.   Deny the allegations in Paragraph 142 of the Complaint.

143.   Deny the allegations in Paragraph 143 of the Complaint.

144.   United incorporates the prior paragraphs as though fully set forth herein

145.   With respect to the allegations in Paragraph 145 of the Complaint, admit that Plaintiffs allege the claim as set forth therein, but deny any liability with respect to thereto.

146.   Deny the allegations in Paragraph 146 of the Complaint.

147.   Deny the allegations in Paragraph 147 of the Complaint.

148.   Deny the allegations in Paragraph 148 of the Complaint.

149.   Deny the allegations in Paragraph 149 of the Complaint.

150.   Deny the allegations in Paragraph 150 of the Complaint.

151.   Deny the allegations in Paragraph 151 of the Complaint.

152.   Deny the allegations in Paragraph 152 of the Complaint.

153.   United incorporates the prior paragraphs as though fully set forth herein.

154.   With respect to the allegations in Paragraph 154, admit that Plaintiffs and the Defendants disagree as to Plaintiffs' rights to payment from United, but deny the remaining allegations in this paragraph of the Complaint.

155.   With respect to the allegations in Paragraph 155, admit that Plaintiffs seek the relief alleged therein, and deny any liability to Plaintiffs.

156.   Deny each and every allegation in the Complaint unless expressly admitted or qualified herein.

# AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

1.     Said causes of action, and each of them, fail to state facts sufficient to constitute a cause of action.

## SECOND AFFIRMATIVE DEFENSE

2.     Said causes of action, and each of them, fail to state facts sufficient to constitute a cause of action as against these answering defendants.

## THIRD AFFIRMATIVE DEFENSE

3.     Said causes of action, and each of them, are barred, in whole or in part, by the statute of limitations as codified in California Code of Civil Procedure sections 337 and 339.

## FOURTH AFFIRMATIVE DEFENSE

4.     Some or all of Plaintiffs' claims are completely and expressly preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001, *et seq.*, ("ERISA").

## FIFTH AFFIRMATIVE DEFENSE

5.     Said causes of action, and each of them, are barred by ERISA, in that Plaintiffs have failed to comply with the requirements of ERISA and have failed to exhaust, in whole or in part, the administrative claims procedures pursuant to ERISA.

## SIXTH AFFIRMATIVE DEFENSE

6.     If Plaintiffs were entitled to recover on these claims, although such is not admitted hereby or herein, Plaintiffs' claims must be reduced in accordance with the respective limitations on the amount of benefits payable under the specific provisions of the relevant patient benefit plan(s), including but not limited to reduction of charges consistent with "eligible expenses" under the provisions of the relevant patient benefit plan(s), application of deductibles and co-payments, and

application of lifetime, annual and/or per visit or per occurrence maximums under the plans.

## SEVENTH AFFIRMATIVE DEFENSE

7.     Plaintiffs' claims are in the nature of benefit claims, and Defendants' actions of which Plaintiffs complain were neither arbitrary nor capricious.

## EIGHTH AFFIRMATIVE DEFENSE

8.     Said causes of action, and each of them, are barred, in whole or in part, by the defense of unclean hands.

## NINTH AFFIRMATIVE DEFENSE

9.     Said causes of action, and each of them, are barred in whole or in part by the defense of accord and satisfaction.

## TENTH AFFIRMATIVE DEFENSE

10.     Said causes of action, and each of them, are barred, in whole or in part, by the defense of waiver, fraud, or estoppel.

## ELEVENTH AFFIRMATIVE DEFENSE

11.     Said causes of action, and each of them, are barred, in whole or in part, by the defense of payment.

## TWELFTH AFFIRMATIVE DEFENSE

12.     If Defendants did breach a contract with Plaintiffs, although such is not admitted hereby or herein, any failure of Defendants to perform the conditions of the contract resulted from Plaintiffs' failure to perform and such performance by Plaintiffs was a condition precedent to or concurrent with performance by Defendants.

## THIRTEENTH AFFIRMATIVE DEFENSE

13.     If Defendants did breach a contract with Plaintiffs, although such is not admitted hereby or herein, any failure of Defendants to perform the conditions of the contract was excused by the Plaintiffs' breach of the terms and conditions of the contract.

## FOURTEENTH AFFIRMATIVE DEFENSE

14.   Any loss or damage that Plaintiffs allege is due to the fault or responsibility of persons and entities over whom Defendants have no control, including Plaintiffs.

## FIFTEENTH AFFIRMATIVE DEFENSE

15.   Plaintiffs' claims are barred for failure to mitigate damages.

## SIXTEENTH AFFIRMATIVE DEFENSE

16.   Plaintiffs' claims are barred because they have failed to raise their claims within the time frame required by ERISA's statute of limitations, or the limitations periods referenced in the various plan documents.

## SEVENTEETH AFFIRMATIVE DEFENSE

17.   Plaintiffs' claims are barred because they seek to recover amounts for services reimbursed that are unreasonable or not medically necessary, including, for example, claims that were wrongful, unnecessary, or claims for which Plaintiffs did not collect copays or coinsurance.

## EIGHTEENTH AFFIRMATIVE DEFENSE

18.   To the extent that Plaintiffs have suffered damages, United is entitled to set off and recoupment against any such damages equal to amounts Plaintiffs owe to United (or the plans for which United acts as agent or claims administrator) for wrongful claims previously submitted by Plaintiffs and paid by United or the health plans in question.

## NINETEETH AFFIRMATIVE DEFENSE

19.   Plaintiffs' alleged reliance on information allegedly provided by United during the telephone calls referenced in the Complaint was neither reasonable nor foreseeable because, among other things, United made clear that any payment it would provide to the Plaintiffs' was contingent on the patient's qualifying for benefits under the term of his or her health plan.

1

## **TWENTIETH AFFIRMATIVE DEFENSE**

2        20.    Plaintiffs' claims are barred by latches/estoppel, or as a result of

3   Plaintiffs' wrongful behavior.

4

## **TWENTY FIRST AFFIRMATIVE DEFENSE**

5        21.    Defendants are informed and believe and on such basis allege that they

6   may have additional defenses available to them, which are not now fully known and

7   of which they are not now aware.  Defendants reserve the right to raise and assert

8   such additional defenses once such additional defenses have been ascertained.

9        WHEREFORE, Defendants pray for judgment as follows:

10        (1)    That Plaintiffs' Complaint and each cause of action thereof be

11             dismissed with prejudice;

12        (2)    That Plaintiffs take nothing by their Complaint;

13        (3)    That Defendants be awarded their costs incurred herein, including

14             attorneys' fees; and

15        (4)    That the Court order such other and further relief for Defendants as the

16             Court may deem just and proper.

17

18

19

20

21

22

23

24

25

26

27

28

# **COUNTERCLAIM**

Counterclaim Plaintiffs UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY, AND OPTUMINSIGHT, INC., (collectively "United") allege, upon personal knowledge and upon information and belief, as follows:

## **SUMMARY OF ACTION**

1.     United seeks to recover millions of dollars paid to brothers Julian and Michael Omidi through their 1-800-GET-THIN referral network and their network of ambulatory surgical centers as a result of their unlawful scheme and artifice to defraud United and to illegally enrich themselves through false and fraudulent pretenses, representations, and promises.

2.     For years, the Omidis and their network of corporations and business entities have illegally conspired to induce patients who were participants in health plans insured or administered by United to obtain medical services by illegally promising to waive copayments, coinsurance, and other participant financial obligations for their out-of-network services.  These standard forms of patient responsibility, which operate as a check on out-of-network providers that do not have rate contracts with the insurance company, are a predicate to a health plan's responsibility to cover any benefit—if a provider waives the patient's responsibility to pay his share, the patient's insurer likewise bears no responsibility.  The Omidis and their network promised on a routine basis that they would accept, as payment in full, whatever amount a patient's insurance paid—removing any stake that the patient may have in ensuring the care is medically appropriate, necessary, and cost-effective.

3.     Because health benefit plans generally exclude from coverage medical services where the provider has waived any co-pays, coinsurance, or other patient financial obligations, this scheme induced United to approve claims that were invalid under the terms of the Plan.  The scheme also resulted in higher utilization

of costly out-of-network health services, as patients were induced into either receiving treatments for services that they otherwise would not have sought had they been obligated to pay co-pays, deductibles, or co-insurance. Further, patients who would have nevertheless elected to receive treatment despite the cost, would likely have received such care in lower cost in-network facilities, with whom United had contracts limiting the amount such providers could charge for these services.

4.    Furthermore, after inducing patients to undergo medical treatments at their clinics by promising free services, the Omidis and their network of surgical centers conspired to submit fraudulent claims to induce United to pay for Lap Band services that were not covered by insurance. For example, through their Beverly Hills Surgery Center clinic, the Omidis manufactured a reason to perform hernia surgeries only after requests for Lap Band surgeries were denied, and then received payment for Lap Band surgeries that were not covered by insurance by disguising the surgery as hernia repair on claims submitted to United. In other instances, Counterclaim Defendants fraudulently manipulated the reported height and weight of United members in an  attempt to ensure that they qualified for Lap Band surgery under the terms of their respective health benefit plans.

5.    United therefore seeks damages on behalf of itself (as insurer) and the health benefit plans for sums fraudulently or erroneously paid to the Counterclaim Defendants as a result of their fraudulent scheme. United also seeks injunctive relief to stop Counterclaim Defendants from continuing their wrongful conduct, as well as a declaration that any unpaid claims submitted by Counterclaim Defendants that arose out of the fraudulent or illegal practices are not payable, and injunctive relief precluding the Counterclaim Defendants from profiting from their promise to induce participants into receiving care by promising to waive co-pays, co-insurance and other forms of patient responsibility in return for the United members' decision to obtain services.

## PARTIES

**I.    United**

6.    Counterclaim Plaintiff UNITED HEALTHCARE SERVICES, INC. is a Minnesota Corporation with its principal place of business in Minnetonka, Minnesota.

7.    Counterclaim Plaintiff UNITEDHEALTHCARE INSURANCE COMPANY is a Connecticut Corporation with its principal place of business in Hartford, Connecticut.

8.    Counterclaim Plaintiff OPTUMINSIGHT, INC. is a Delaware Corporation with its principal place of business in Eden Prairie, Minnesota.

**II.    Counterclaim Defendants**

9.    Upon information and believe ALMONT AMBULATORY SURGERY CENTER, LLC, is a California limited liability company with its principal place of business in Beverly Hills, California.

10.    Upon information and belief, ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION, is a California corporation with its principal place of business in California and is a predecessor to ALMONT AMBULATORY SURGERY CENTER, LLC.  Collectively these entities will be referred to herein as "Almont ASC."

11.    Upon information and belief, BAKERSFIELD SURGERY INSTITUTE, LLC, is  a California limited liability company with its principal place of business in California.

12.    Upon information and belief, BAKERSFIELD SURGERY INSTITUTE, INC., is a California corporation with its principal place of business in California and is a predecessor to BAKERSFIELD SURGERY INSTITUTE, LLC. Collectively these entities will be referred to herein as "Bakersfield Surgery Center."

AMENDED ANSWER AND COUNTERCLAIM

13.     Upon information and belief, CIRO SURGERY CENTER, LLC, is a California limited liability company with its principal place of business in California.

14.     Upon information and belief, EAST BAY AMBULATORY SURGERY CENTER, LLC, is a California limited liability company with its principal place of business in California.

15.     Upon information and belief, INDEPENDENT MEDICAL SERVICES, INC. (hereinafter "Independent Medical Services"), is a California corporation with its principal place of business in California.

16.     Upon information and belief, MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC. (hereinafter "Modern Institute"), is a California corporation with its principal place of business in Beverly Hills, California.

17.     Upon information and belief, NEW LIFE SURGERY CENTER, LLC (hereinafter "New Life Surgery Center"), is a California limited liability company, d/b/a BEVERLY HILLS SURGERY CENTER, LLC (hereinafter "Beverly Hills Surgery Center") with its principal place of business in Beverly Hills, California.

18.     Upon information and belief, ORANGE GROVE SURGERY CENTER, LLC (hereinafter "Orange Grove Surgery Center") is a California limited liability company with its principal place of business in California.

19.     Upon information and belief, PALMDALE AMBULATORY SURGERY CENTER, LLC, is a California limited liability corporation with its principal place of business in California.

20.     Upon information and belief, SAN DIEGO AMBULATORY SURGERY CENTER, LLC (hereinafter "San Diego ASC"), is a California limited liability company with its principal place of business in California.

21.     Upon information and belief, SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, LLC, is

a California limited liability company with its principal place of business in Beverly Hills, California.

22.    Upon information and belief, SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF WEST HILLS, INC., is a California corporation with its principal place of business in California and is a predecessor to SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, LLC.  Collectively these entities will be referred to herein as "Skin Cancer Surgery Specialists."

23.    Upon information and belief, VALENCIA AMBULATORY SURGERY CENTER, LLC (hereinafter "Valencia ASC"), is a California limited liability company with its principal place of business in California.

24.    Upon information and belief, VALLEY SURGICAL CENTER, LLC (hereinafter "Valley Surgical Center"), is a California limited liability company, with its principal place of business in California.

25.    Upon information and belief, WEST HILLS SURGERY CENTER, LLC (hereinafter "West Hills Surgery Center"), is a California limited liability company with its principal place of business in California.

26.    Upon information and belief, TOP SURGEONS, LLC, is a California limited liability company with its principal place of business in California.

27.    Upon information and belief, TOP SURGEONS, INC., is a California corporation with its principal place of business in California and is a predecessor to TOP SURGEONS, LLC.  Collectively, these entities will be referred to herein as "Top Surgeons."

28.    Upon information and belief, 1-800-GET-THIN, LLC ("1-800-GET-THIN"), is a California limited liability company with its principal place of business in California.

29.    KAMBIZ BENJAMIN OMIDI A/K/A JULIAN OMIDI, COMBIZ OMIDI, KAMBIZ OMIDI, COMBIZ JULIAN OMIDI, KAMBIZ BENIAMIA

OMIDI, JULIAN C. OMIDI (hereinafter "Julian Omidi") is an individual who, upon information and belief, is a citizen of California. United is further informed and believes that the Medical Board of the State of California revoked Julian Omidi's physician and surgical license on June 19, 2009. Among other things, the Medical Board of the State of California found that Julian Omidi (1) "perpetrated a fraud" on the Board by failing to disclose information; (2) committed "misrepresentation and dishonesty . . .go[ing] to the core of his ability to practice his profession"; and (3) has a "penchant for dishonesty, to bend his position and shade his statements to suit his needs, without consistent regard for the truth."

30. MICHAEL OMIDI, M.D. is an individual who, upon information and belief, is a citizen of California. United is informed and believes that Michael Omidi holds a current physician and surgical license in the State of California. United is further informed and believes that on June 19, 2008, the State of California revoked Michael Omidi's physician and surgical license, but the revocation was stayed pending successful completion of a three-year probationary period which Michael Omidi, upon information and belief, successfully completed. In April 2013, the Medical Board of the State of California formally accused Michael Omidi of "repeated acts of negligence in the care and treatment of patient G.B." These allegations are still pending.

31. The true names and capacities, whether individual, corporate, associate or otherwise, of Does 1-200, inclusive, are unknown to United, who therefore sues these parties by such fictitious names. United is informed and believes that each of the entities designated as a Doe is a resident of, or business entity doing business in, the State of California and is responsible in some manner for the events and happenings referred to herein, and proximately caused injury and damages to United as hereinafter alleged.

32. All of the parties listed in Paragraphs 9-31 above shall be collectively referred to as the "Counterclaim Defendants." All of the Counterclaim Defendants

acting as a corporation, limited liability company, or other association, including those referred to in Paragraphs 9-28 shall be referred to collectively as the "Corporate Counterclaim Defendants."

## JURISDICTION AND VENUE

33.     Because several of the counterclaims raised in this matter arise under federal law, this Court has jurisdiction to hear them under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).  Further, because the counterclaims arise out of the same transaction or occurrence that are the subject matter of the Plaintiffs' Complaint, this Court has jurisdiction over the claims set forth in the counterclaim pursuant Fed. R. Civ. P. 13 and the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

34.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because any or all of the Counterclaim Defendants reside in this judicial district, all defendants are residents of the State of California, and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

35.     Counterclaim Plaintiffs have submitted to personal jurisdiction of this Court by filing their Counterclaim in this Court.

## FACTUAL ALLEGATIONS

### I.     United and Its Members

36.     United is an insurer and third party claims administrator of claims for employee health benefit plans, which are sponsored by employers and provide health benefits to their members. The health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 1001 *et. seq* (the "ERISA Plans"), while those sponsored by governmental employers are exempted from ERISA's jurisdiction. United provides insurance and/or administrative services to these employer-sponsored health benefit plans (collectively, the "health benefit plans"), including (depending upon the terms of United's individual contract) the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans ("United members").  For those benefit plans that are insured directly

by United ("insured plans"), benefit payments are made from United's own funds. For those benefit plans for which United acts as a third party claims administrator ("self-funded plans"), benefit payments are made from plan funds provided by the employer-sponsor of the self-funded plans. United's contractual agreement with the employer-sponsor of such self-funded plans specifically grants United the authority to recover overpayments, including through litigation, on behalf of the self-funded plans.

37.    The terms of the specific health benefit plan through which a United member is covered determines whether medical services are covered by the plan and thus are reimbursable ("Covered Services"). The plan also determines the extent to which the United member bears responsibility for a portion of the charge through a copayment, coinsurance, deductible amount, or other cost sharing (referred to herein as the "Member Responsibility Amounts").

38.    The amount paid by a health benefit plan for Covered Services also depends on whether the services were provided by an in-network or out-of-network provider. In-network providers generally accept a discounted rate from United in exchange for participation in United's network. Members who choose an in-network provider are generally assured that, for covered services, their responsibility for payment is limited to any applicable copayment, coinsurance and deductible amount provided in their plan. Out-of-network benefits do not include this assurance. Different health benefit plans include different provisions for the rate at which out-of-network services will be reimbursed. For example, some health benefit plans contain a provision limiting the amount they will reimburse out-of-network providers to the usual, customary, and reasonable charges for the services at issue. These health benefit plans generally define such charges to mean the prevailing rate for the procedure in the area and/or the rate generally accepted by providers. In addition to any applicable Member Responsibility Amounts, United will only compensate providers for the amount allowed by the health benefit

plan for out-of-network services.  The amount allowed for out-of-network services is often referred to as "eligible expenses" or the "allowed amount."

39.    Unlike in-network providers, out-of-network providers generally do not have a contract that gives them the right, as providers, to seek payment for their services directly from a member's health benefit plan, insurer, or claims processor. Instead, out-of-network providers contract with the member to provide medical services for an agreed upon charge.  The member then has the right to seek reimbursement from his or her health benefit plan for the eligible expenses incurred by the member for Covered Services, as provided by their specific plan.

40.    If an out-of-network provider has received a proper assignment of rights from a United member and the member's health benefit plan does not prohibit such an assignment, generally the provider may seek reimbursement for Covered Services directly from United by submitting a claim form on behalf of the member to United indicating the procedure(s) provided and the amount the provider actually charged the member for these services.  United then determines the amount of reimbursement to the provider and the member's responsibility, if any, by considering, among other things, the services provided, the amount charged to the member, and the health benefit plan's terms.

41.    As is customary, upon information and belief, at all relevant times, Counterclaim Defendants utilized either (1) a standard CMS-1500 (formerly HFCA-1500) health insurance claim form that requires providers to describe the services provided to members using a specific Current Procedural Terminology code (a "CPT Code") or (2) a UB-04 (formerly UB-92) form that requires the use of a revenue codes for certain facility services.

42.    The American Medical Association publishes and licenses an annual compendium of CPT Codes, which has become the standard source for coding procedures for billing purposes in the health care industry.  The CPT Code is the

standard means for describing the health care services rendered by a provider when it submits a claim for payment to health plans or the federal government.

43.    Thus, a claim for benefits must include a description of the services provided to the member.  Providers describe the services by assigning a CPT Code and/or revenue code to each service rendered.  The claim form also includes a representation from the provider of the amount the provider charged to the member for the described services.

44.    As described in more detail, *infra*, United receives nearly two million health care claims per day and must comply with various state laws and regulations mandating that such claims be paid within a short period of time.  By necessity, United must rely in good faith on the veracity of the descriptions of the services rendered as stated on the claims form and the amount of the bills submitted by the provider for each service.

## II.    **The Omidis Exercise Control Over the Counterclaim Defendants' Activities to Coordinate Their Scheme to Defraud**

45.    United is informed and believes that for a number of years, and continuing today, Julian and Michael Omidi (collectively the "Omidis") operated, either individually or through corporate entities such as Top Surgeons, a network of surgical centers and affiliated health care and service providers, including all of the Counterclaim Defendants in this matter.  These entities provided medical and administrative services to United members throughout Southern California.  Upon information and belief, the Counterclaim Defendants receive referrals for United members who responded to the 1-800-GET-THIN marketing campaign, which is, upon information and belief, operated and controlled by the Omidis.

46.    United is informed and believes that the Omidis control the activities of all other Counterclaim Defendants in this matter, though their individual actions and their ownership of various corporate entities including Top Surgeons, which,

along with a variety of other Counterclaim Defendants, is located at 9001 Wilshire Blvd., Suite 106, Beverly Hills, CA 90211.

47.    The Omidis have used various corporate entities in order to perpetrate their scheme to defraud United, as set forth below.  As an example of the shifting corporate structure that United believes to be pervasive throughout the Omidi enterprise, United is informed and believes that the Omidis operated Counterclaim Defendant Almont ASC at 9001 Wilshire Blvd., Suite 106, Beverly Hills, CA 90211 beginning in 2005.  After conducting an inspection of Almont ASC's facility in 2009, the United States Department of Health and Human Services (Centers for Medicare & Medicaid Services) uncovered numerous deficiencies including, unsanitary conditions, deficient hiring and training of medical personnel, deficient storage and collection of medical records, and a failure of the facility to assess "the quality of care provided, including the medical necessity of the procedures performed."  As a result of these deficiencies, Almont ASC was terminated from the Medicare program.  Nonetheless, the Omidis, upon information and belief, continued operating the center at the same address under a new name, Beverly Hills Surgery Center, LLC, a/k/a New Life Surgery Center, LLC.  United is further informed and believes that the Omidis have repeatedly used this shifting corporate structure and the various corporate entities controlled by the Omidis, including the Corporate Counterclaim Defendants, to perpetrate their scheme to defraud United to, among other things, evade United's fraud detection activities and induce United to pay claims that would otherwise not have been paid.  The identities of many of these related entities are not known by United at this time and are named in the Counterclaim as Does 1-200.

48.    As further evidence of the Omidis' control over the various Corporate Counterclaim Defendants, as well as their integration into a network of cooperating providers, United alleges:

a)      Based on California Secretary of State records, United is informed and believes that certain Counterclaim Defendant surgical centers, including New Life Surgery Center, Beverly Hills Surgery Center, Orange Grove Surgery Center, San Diego ASC, Valencia ASC, Valley Surgical Center, Independent Medical Services, and West Hills Surgery Center, share a principal executive office at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212.

b)      United is informed and believes that various Corporate Counterclaim Defendants, including Almont ASC, New Life Surgery Center, Beverly Hills Surgery Center, Skin Cancer Surgery Specialists, and Top Surgeons, conduct medical treatments, including Lap Band surgeries, or other business activities at 9001 Wilshire Blvd., Suite 106, Beverly Hills, CA 90211.

c)      United is informed and believes that individually or through Top Surgeons, the Omidis executed contracts with various surgeons (including Dr. Brian West and Dr. Ihsan Najib Shamaan), who then performed medical procedures at Counterclaim Defendant surgical centers and affiliated medical providers.

d)      Michael Omidi is identified on an organizational chart as the head of Independent Medical Services and associated ambulatory surgical centers.

e)      Based on reports from the Joint Commission, an organization that accredits ambulatory surgical centers, United is informed and believes that the Omidis designated Elliot Alpert as the "owner" of various corporate entities, including Counterclaim Defendant surgical centers New Life Surgery Center d/b/a Beverly Hills Surgery Center, Orange Grove Surgery Center, San Diego ASC, Valencia ASC, Valley Surgical Center, and Bakersfield Surgery Institute.  Records also reflect that Dr. Alpert served as a physician at Counterclaim Defendant surgical centers.

f)      United is informed and believes that the Omidis use these corporate entities and their identifying information, such as Tax Identification Numbers and addresses, interchangeably on insurance claims, business cards,

letterhead, invoices, and other documents and records as, among others, to confuse or defraud patients and insurance company payors.

g)      United is informed and believes that Counterclaim Defendants jointly own, manage, operate, administer, direct, use or control a centralized billing and collections organization that submits medical claims on behalf of Counterclaim Defendant to insurers and claims administrators, including United.

h)      United is informed and believes that medical claims for patients referenced herein were submitted by Counterclaim Defendants' centralized billing organization on behalf of, among others, Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists which, according to medical and claims records, share a billing and physical address at 9001 Wilshire Blvd., Suite 106, Beverly Hills, CA 90211.

i)      United is informed and believes that Araminta Salazar performed billing services for Counterclaim Defendants at relevant times alleged herein.  Salazar has testified in other matters that, as part of her duties, she submits medical records and claims "in every case,"  and that she has performed these same billing services and used the same process for "tens of thousands" of claims and appeals with respect to Counterclaim Defendants, including, but not limited to Independent Medical Services, Modern Institute, Valley Surgical Center, and Orange Grove Surgical Center.

j)      United is informed and believes that Yesenia F. also performs billing services for Counterclaim Defendants at relevant times alleged herein.  As part of her duties, Yesenia F. provided to United accreditation confirmation for certain Counterclaim Defendants, including Modern Institute and New Life Surgery Center d/b/a Beverly Hills Surgery Center.

k)      United is informed and believes that Counterclaim Defendants regularly commingle insurance funds between each entity's bank accounts.  For example, Counterclaim Defendants routinely deposit checks written to Almont

1   ASC, Skin Cancer Surgery Specialists, and Beverly Hills Surgery Specialists into

2   an account owned and controlled by Top Surgeons.

3           l)    Based on testimony provided by a surgeon who performed

4   medical services for the Omidis at the Counterclaim Defendants surgical centers,

5   United is informed and believes that the Omidis jointly own, manage, operate,

6   administer, direct, or control a centralized repository or office that houses

7   Defendants' medical and patient records.

8           m)    Based on testimony provided by a surgeon who performed

9   medical services for the Omidis at the Counterclaim Defendant surgical centers,

10  United is informed and believes that the Omidis, on behalf of Counterclaim

11  Defendants, jointly own, manage, operate, administer, direct, or control a

12  centralized patient-scheduling organization.  United is further informed and

13  believes that physician scheduling requests are routed through either the Omidis or

14  Maria Abaca, Counterclaim Defendants' bariatric program coordinator.

15          n)    United is informed and believes that the Omidis jointly manage,

16  administer, direct, or control many of the medical decisions made at Counterclaim

17  Defendant surgical centers.  Based on testimony provided by a surgeon who

18  performed medical services for the Omidis at the Counterclaim Defendant surgical

19  centers, United is informed and believes that in furtherance of their control over

20  medical decisions, the Omidis mandate that physicians shall not disclose to patients

21  all known risks associated with surgical procedures such as the gastric Lap Band.

22  United is further informed and believes that the Omidis do not provide all necessary

23  or sanitary equipment, tools, or surgical instruments for physician use during many

24  types of procedures at Counterclaim Defendant surgical centers.

25          o)    Based on testimony provided by surgeons who performed

26  medical services for the Omidis at the Counterclaim Defendant surgical centers,

27  United is informed and believes that Defendants jointly own, manage, operate,

28

administer, direct, or control a centralized finance and accounting organization. This organization is responsible, in part, for physician payment and reimbursement.

p) United is informed and believes that the Omidis exercise control over medical professionals affiliated with the Corporate Counterclaim Defendants, including directing affiliated physicians and surgeons to falsify records to be submitted to insurers for reimbursement. In testimony provided as part of wrongful death lawsuit, one such surgeon, Dr. Ishan Najib Shamaan, explained that Julian Omidi instructed him to sign approximately 600 "preprinted" form letters seeking insurer approval for surgery. These letters were then sent to health insurers to demonstrate that surgery was medically necessary. Dr. Shamaan further testified that (1) he had not actually examined these patients before signing these approval letters; (2) the portion of the letter that supposedly described the patient's particular medical condition was actually pre-printed boilerplate; and (3) he recognized this practice was "fraud." Also in furtherance of their control over medical decision-making, United is informed and believes that the Omidis instruct physicians to perform medically unnecessary surgical procedures, such as liver biopsies and sleep tests, to artificially inflate claims to insurers and third party administrators such as United.

49. Upon information and belief, the Omidis have directed or controlled Counterclaim Defendant 1-800-GET-THIN. United is informed and believes that the Omidis controlled Robert Silverman, who at times relevant hereto worked closely with and served as counsel for the Omidis and their enterprise. In turn, United is informed and believes that Robert Silverman served as an executive at 1-800-GET-THIN and operated 1-800-GET-THIN at the direction of and under the control of the Omidis.

50. United is informed and believes that each Counterclaim Defendant was the agent, servant, employee, partner and/or joint venture of each of the other Counterclaim Defendants and that the acts of each Counterclaim Defendant were

within the scope of such agency, service, and/or employment.  In doing the acts and omissions alleged herein, each Counterclaim Defendant acted with the knowledge, permission, and/or consent of every other Counterclaim Defendant, and each Counterclaim Defendant aided, abetted, and/or conspired with the other Counterclaim Defendants in the acts and omissions alleged herein.  This interrelated network of health care providers, employees, and administrators will be referred to as the "Omidi Network."

51.     United is further informed and believes that the Counterclaim Defendants and Does 1 through 200, inclusive, are the successor, predecessor, affiliate, and/or alter egos of the Omidis, and are and have been controlled by the Omidis at all relevant times alleged herein.  United is further informed and believes that the Omidis, and each of them, administrated, governed, controlled, managed and directed all of the necessary functions, activities and operations of the above-referenced alter-ego Counterclaim Defendants, including the medical, surgical, and nursing services provided to United members.

52.     United is further informed and believes that there is a unity of interest between and among the Omidis on the one hand, and the Counterclaim Defendants on the other hand.  United is further informed and believes that in light of the unity of interest and control, if the Omidis are not held liable for the debts and obligations of the other Counterclaim Defendants, a fraud and injustice would result upon United.  Accordingly, United seeks judgment against each of the above-named Counterclaim Defendants.

///

///

///

**III.    Defendants Conspired to Fraudulently Induce United Members to Seek Lap Band Procedures Through Illegal Promises to Waive Member Responsibility Requirements of the Plan, and Then Submitting False Claims to United.**

**A.    The Omidis Used the 1-800-GET-THIN Campaign to Promote Their Integrated Network of Lap Band Surgery Centers.**

53.    The Omidis used the Omidi Network to create a lucrative illegal enterprise that has defrauded the public, United,  and the health benefit plans out of millions of dollars though a web of fraudulent practices, in violation of various state and federal laws.

54.    More specifically, upon information and belief, the medical providers in the Omidi Network were ambulatory surgery centers that specialized in outpatient laparoscopic gastric banding surgeries – a short, outpatient surgery by which a silicon "Lap Band" is inserted laparoscopically around the patient's stomach in order to control hunger.  Through these ambulatory surgery centers, as well as other affiliated clinics situated throughout Southern California, Counterclaim Defendants also provided ancillary services that were often promoted and recommended to patients as related to, or in preparation for, the Lap Band surgery, including lab testing, sleep studies, ultrasounds, and EGDs.

55.    To funnel patients into their network, the Omidis advertised their services though their 1-800-GET THIN telephone number throughout Southern California on billboards, TV, radio, print ads, the internet, and social media.  In a series of articles about the Omidi Network, the *Los Angeles Times* referred to the ads as "blanket[ing] Southern California freeway billboards and broadcast airwaves," and stated that the ad campaign was "as inescapable . . . as smog in summer."  The Omidis advertising campaign touts, among other things, that prospective patients will receive high-quality Lap Band procedures.

56.    When a prospective patient calls this telephone number, the call is directed to a call center, the operations of which, upon information and belief, are

controlled by one or more of the Omidis.  Call center employees then direct potential patients to attend "free" informational seminars.  United is informed and believes that these "free" informational seminars feature a physician who speaks to the benefits of the Lap Band surgery.

57.     As described in further depth below, United is informed and believes that at these "free" informational meetings, the Omidis (through their agents) induce potential patients to obtain medical treatments, including Lap Band surgery, through, among other things, illegal promises to waive applicable co-pays or co-insurance, and to accept as full payment for the patients' services whatever amounts the Counterclaim Defendants obtain from the insurer/benefit plans.

58.     As discussed in greater depth below, once the Counterclaim Defendants convinced a prospective patient to receive their health services, the Counterclaim Defendants conspired with one another to engage in various fraudulent practices designed to manipulate health benefit plans to pay for services that were not covered by the terms of these plans, as well as submitting grossly excessive claims to United (including over $140,000 for a service that usually costs between $14,000-$20,000), and fraudulently generating and manipulating medical records and claims forms to hide services that would not be Covered Services under the terms of the ERISA Plans.

59.     In addition to the named Counterclaim Defendants, Does 1-200 are unnamed LLCs and Corporations used by the Omidis to further their conspiracy to defraud patients and insurers by using new business organizations in an attempt to avoid anti-fraud systems used by insurers such as United and to induce United to pay claims that would otherwise not have been paid.

60.     In fact, these affiliated entities and the Omidis have been the subject of at least nine lawsuits, including several wrongful death and personal injury lawsuits, two whistleblower lawsuits brought by former employees, and one lawsuit for identity theft brought by four physicians formerly affiliated with the Omidi

Network.  According to the *Los Angeles Times*, the Omidis are currently the subject of investigations by the FBI, the U.S. Food and Drug Administration, the California Department of Insurance, and the Los Angeles Police Department.

61.     United seeks damages under state law for, *e.g*., fraud, intentional interference with contractual relationships, and for violations of various state statutes, to recover assets of the health benefit plans that were incorrectly and fraudulently distributed to the Counterclaim Defendants, to apply any such sums as a set off to any sums that would otherwise be covered under the Plans, to seek injunctive relief to preclude the Counterclaim Defendants from continuing their fraudulent behavior, as well as equitable relief estopping the Counterclaim Defendants from profiting from their promises to waive co-pays and patient responsibility obligations from United members.

## B.   Defendants Misrepresented Charges By Failing To Disclose Their Routine Waiver of Coinsurance, Copayment and Other Member Responsibility Amounts

62.     The typical design of the health benefit plans insured or administered by United provides significant financial incentives for members to use in-network providers, instead of out-of-network providers.  These health plans typically have lower Member Responsibility Amounts for services received from in-network providers.  For example, a common design of the health plan insured or administered by United specifies 30% or 40% coinsurance for out-of-network services, and either 10% or 20% coinsurance for in-network services.  Annual deductibles may also be higher for out-of-network services.

63.     Members of health plans insured or administered by United are also protected from "balance billing" when they utilize in-network providers, who have agreed to accept as full payment the combination of the contracted rates paid under the health plans, together with the patient's in-network Member Responsibility Amounts.  In contrast, out-of-network providers are generally free to balance bill

patients for any difference between their actual charges and the amounts paid under the plan.

64.    To induce United members to forgo the significant cost-saving benefits of using in-network providers, the Counterclaim Defendants, who were not part of United's provider network, routinely waived all Member Responsibility Amounts, including copayments and co-insurance.  Counterclaim Defendants routinely told United members that they would not be responsible for any out-of-pocket costs and that the Counterclaim Defendants would accept as full payment whatever amounts insurance would pay.  In this way, Defendants eliminated the financial incentives for United members to use in-network providers by assuring United members that the actual cost to them for Counterclaim Defendants' out-of-network services would be zero.  They also induced participants to receive services from the Omidi Network when they otherwise would have simply forgone the treatment (even at less expensive in-network providers), found another form of weight loss treatment, or, alternatively, sought treatment from an in-network provider that would (but for the waiver of the Member Responsibility Amounts) have been less expensive.

65.    Consistent with their promises to United members to waive Member Responsibility Amounts, the Counterclaim Defendants routinely failed to collect such amounts from thousands of United members.

66.    The routine waiver by the Counterclaim Defendants of Member Responsibility Amounts resulted in a further intentional misrepresentation of the amounts billed on the claim forms submitted by Defendants to United.  As described above, the claim forms represent the amount Counterclaim Defendants purport to have charged the United members for their services.  When Counterclaim Defendants routinely waived Member Responsibility Amounts, they effectively reduced the amount that they were charging the members for their services by the amount of the waived member responsibility.  Counterclaim Defendants did not reflect that reduction in the amount billed on their claim forms to United, however,

and further failed to disclose to United its routine waiver of member responsibility.

67.   United is informed and believes that the Counterclaim Defendants were willing to waive Member Responsibility Amounts because they both desired to obtain new patients and because they intended to submit inflated billed charge amounts to United that greatly exceeded both what the Counterclaim Defendants would charge to cash paying patients, and what the majority of providers in the relevant geographical region would charge for the same services.  United is informed and believes that Counterclaim Defendants concealed their inflated billed charge amounts by failing to timely  invoice the members for any services rendered. Members were shocked to discover the amounts charged when Counterclaim Defendants finally sent bills to members, in many cases, years after the procedures were allegedly performed.

68.   In addition, most of the relevant health benefit plans provide that no benefit is due under the plan if the United Member is not legally obligated to pay such sums (such as when a provider agrees to accept whatever payment the insurance company will pay as full payment for all services), or if the provider waives Member Responsibility Amounts. Counterclaim Defendants intentionally failed to disclose their routine waiver of these amounts so that they could circumvent these restrictions on benefits and obtain payment for claims based on assignments from the members.

69.   The following patients, and the specific factual allegations related thereto, serve as exemplars of Counterclaim Defendants' routine practice of promising to waive Member Responsibility Amounts and accept as full payment what a patient's insurance company would pay.

### i.   United Member 1[1]

70.   For example, during the times relevant hereto, United Member 1 was covered by an employer sponsored health benefit plan for which United serves as a

---

[1] Due to privacy concerns, United has removed all private health information for patients referenced herein and will refer to patients as United Member 1, United Member 2, *etc.*

claims administrator.  The terms of this health benefit plan specifically excluded from coverage any "expenses for health services and supplies" for which the member has "no legal responsibility to pay" or for which an out-of-network provider "waives the Copay, Annual Deductible or Coinsurance amounts."

71.    Counterclaim Defendants, through Beverly Hills Surgery Center, submitted facility claims to United for a total of $88,825 for Lap Band surgery provided to United Member 1 on XX, 2010[2], including the following:

      a)    $75,890 Lap Band (CPT code 43770), broken down as:

            i.    $32,000 – Recovery Room

           ii.    $31,000 – Operating Room

         iii.    $8,480 – Surgical Tray

         iv.    $2,950 – Anesthesia Supplies

          v.    $750 – Pre-Op Room

         vi.    $710 – Administration of Drugs

      b)    $12,935 – Anesthesia

72.    Separately, Skin Cancer & Reconstructive Surgery Specialists LLC submitted a claim to United with billed charges of $6,500 (CPT code 43770) for professional fees for the Lap Band placed on XX, 2010.

73.    Despite the fact that Counterclaim Defendants have submitted claims in excess of $95,000 for United Member 1's Lap Band surgery, this procedure is a laparoscopic outpatient procedure. According to the NIH, laparoscopic gastric banding surgery "is done using a tiny camera that is placed in [the patient's] belly," which allows the surgeon to see inside the belly. http://www.nlm.nih.gov/medlineplus/ency/article/007388.htm.  Generally, the surgeon makes one to five small surgical cuts in the patient's abdomen and places a camera and the surgical instruments inside these cuts.  The surgeon then places a Lap Band around the upper corner of the patient's stomach to separate it from the

---

[2] All dates of service have been redacted pursuant to HIPAA and will be provided to Counterclaim Defendants at a future date.

lower part.  This creates a small pouch that has a narrow opening that goes into the larger, lower part of the patient's stomach.  The surgery does not involve any cutting or stapling inside the belly.  The purpose of this surgery is to restrict food intake—when the patient eats after the surgery, the small pouch will fill up quickly, and the patient will feel full after eating just a small amount of food. After the surgery, a physician can adjust the band to make food pass more quickly or slowly through the patient's stomach.

74.     Medical records show United Member 1's Lap Band surgery lasted 32 minutes—for which United Member 1 was reportedly charged a $31,000 operating room fee.  Further, despite being charged $32,000 for use of Beverly Hills Surgical Center's recovery room, United Member 1's medical records show that United Member 1 was discharged just 80 minutes after United Member 1's anesthesia ended.

75.     The charges submitted for United Member 1's Lap Band are dramatically higher than the reasonable cost for such services. For example, as described more fully below, United is informed and believes the Counterclaim Defendants charged $18,000 to patients who paid cash for such services.

76.     United processed United Member 1's claims, paying $1,928.03 for the anesthesia, for which United Member 1's coinsurance obligation was $396.05, and paying $1,904 for the professional fees, for which United Member 1's coinsurance obligation was $816.  United did not approve any payment on the excessive $75,890 bill.

77.     Consistent with their promises to patients to waive Member Responsibility Amounts that were not disclosed to United, the Counterclaim Defendants did not collect the $1,212.05 in coinsurance owed by United Member 1. United Member 1 has informed United that United Member 1 was told, prior to receiving services from Counterclaim Defendants, that there would be "absolutely" no out-of-pocket expense relating to Defendants' services.  Indeed, United Member

1 would never have agreed to undergo Lap Band surgery if United Member 1 had known United Member 1 would be responsible for a co-payment.

78.     Given Counterclaim Defendants' undisclosed waiver of Member Responsibility Amounts, under the terms of United Member 1's plan, United owed Counterclaim Defendants nothing for these services.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $3,832.03, plus interest and attorneys' fees.  United is also entitled to a declaration that the Counterclaim Defendants are not entitled to receive any payment on the $75,890 bill for these services.  In addition (and alternatively), the Counterclaim Defendants are liable to reimburse United for any other payments made to the Counterclaim Defendants (or costs incurred by United) for services provided to United Member 1 that would not have been provided but for the promises of the Counterclaim Defendants to waive any obligation to pay anything beyond what Untied would pay.

79.     Despite inducing United Member 1 to undertake these out-of-network services by falsely assuring no Member Financial Responsibility, United is informed and believes that the Counterclaim Defendants are now improperly seeking to collect the balance of the bills for the XX, 2010 services directly from the patient.  Not only should this balance billing not be allowed as it is inconsistent with the Counterclaim Defendants' prior promises to United Member 1, it  also highlights the Counterclaim Defendants' divergence of interests from those of their patients.

### ii.  United Member 2

80.     During the times relevant hereto, United Member 2 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator.  United Member 2's health benefit plan specifically excludes from coverage "Health services for which you have no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the

Plan" and also provides that "[i]n the event that a Non-Network provider waives Copayments and/or the Annual Deductible for a particular health service, no Benefits are provided for" such health services.

81.     Counterclaim Defendants, through San Diego ASC, submitted a claim to United with billed charges of $13,890 for an EGD procedure (CPT code 43239) performed on United Member 2 on XX, 2010. Separately, Skin Cancer Surgery Specialists submitted claims to United with billed charges of $650 and $375 for an office consultation and electrocardiogram on this same date.

82.     United processed these claims, with the amounts allowed for the office consultation and electrocardiogram being $300 and $103, which were supposed to be paid entirely by United Member 2 as part of the out-of-network deductible.  United paid $9,726.60 for the EGD, and United Member 2 was obligated by the terms of the plan to pay $4,163.40 in coinsurance for the EGD, bringing United Member 2's Member Responsibility Amounts to a total of $4,566.40 for this date of service.

83.     However, consistent with their promises to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $4,566.40 owed by United Member 2.  Accordingly, under the terms of United Member 2's plan, United owed Counterclaim Defendants nothing for these services.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant health benefit plan, $9,726, plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 2 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts, or for which United Member 2 had no legal responsibility to pay.

84.     Further, even if the terms of United Member 2's plan did not require the Counterclaim Defendants to return all amounts paid for services provided to United Member 2, the Counterclaim Defendants are liable to return all amounts paid for services provided to United Member 2 based on the fraudulent misrepresentation.  Alternatively, the excess amounts received for the EGD performed on XX, 2010, due to the inflated billed charge amount submitted for the EGD performed on that date.

85.     Specifically, the EGD (also known as an Upper GI Endoscopy or Esophagogastroduodenoscopy) for which Counterclaim Defendants sought more than $13,890 from United, is a short outpatient procedure that Counterclaim Defendant surgical centers commonly bill United for.  The National Institutes of Health ("NIH") describes an EGD as a test "to examine the lining of the esophagus (the tube that connects your throat to your stomach), stomach, and first part of the small intestine.  It is done with a small camera (flexible endoscope) that is inserted down the throat." http://www.nlm.nih.gov/medlineplus/ency/article/003888.htm. NIH states that the patient can usually expect to receive a sedative and a painkiller, a local anesthetic sprayed into the mouth to prevent coughing or gagging when the endoscope is inserted, and an IV to administer medicine during the procedure. After the sedatives have taken effect, the endoscope is inserted through the esophagus to the stomach and duodenum.  The doctor examines the lining of the esophagus, stomach, and upper duodenum, and may take a biopsy through the endoscope.  Additional treatments, such as stretching or widening a narrow area of the esophagus, may also be done when indicated.

86.     The Counterclaim Defendants' billed charge of $13,890 for the EGD greatly exceeds a reasonable or appropriate charge for this procedure.  A reasonable or appropriate billed charge for this EGD would be less than half of this amount, with the precise amount to be proven at trial.  Thus, alternatively, if the Counterclaim Defendants are not liable to reimburse United, on behalf of United

Member 2's plan, for the entire amount paid, they are liable to reimburse United for the excess amount paid due to the submission by the Counterclaim Defendants of an inflated billed charge and receipt of payment beyond that authorized by the terms of the plan, including the limitations therein on eligible expenses.

### iii.  United Member 3

87.     During the times relevant hereto, United Member 3 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator.  United Member 3's benefit plan excludes from coverage "Health services for which you have no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Plan," and excludes from coverage services "for which a non-Network Provider waives the Copay, Annual Deductible, or Coinsurance amounts."

88.     Counterclaim Defendants, through Valencia ASC, submitted a claim to United with billed charges totaling $13,790 for an EGD procedure (CPT code 43239) performed on United Member 3 on XX, 2010, including:

        a)     EGD (CPT code 43239)

            i.   $6,000 – Operating Room

           ii.   $5,000 – Recovery Room

         iii.   $1,110 – Sterile Supplies

         iv.   $1,080 – Anesthesia Supplies

          v.   $350 – Administration of Drugs

         vi.   $250 – Pre-Op Room

89.     United processed this claim, and paid $12,979.16 for the EGD; United Member 3 was obligated by the terms of the plan to pay $810.84 in coinsurance for the EGD.

90.     However, consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $810.84 owed by United

Member 3.  Accordingly, under the terms of United Member 3's plan, United owed Counterclaim Defendants nothing for the services provided on this date.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $12,979.16, plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 3 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

91.     The Counterclaim Defendants' billed charge of $13,890 for the EGD greatly exceeds a reasonable or appropriate charge for this procedure.  A reasonable or appropriate billed charge for this EGD would be less than half of this amount, with the precise amount to be proven at trial.  Thus, alternatively, if the Counterclaim Defendants are not liable to reimburse United, on behalf of United Member 3's plan, for the entire amount paid, they are liable to reimburse United for the excess amount paid due to the submission by the Counterclaim Defendants of an inflated billed charge and receipt of payment beyond that authorized by the terms of the plan, including the limitations therein on eligible expenses.

**C.      In Addition to Waiving Member Responsibility Amounts, the Counterclaim Defendants Performed Unnecessary Services, Submitted Fraudulent Bills and/or Inflated Charges to Secure Reimbursement for Uncovered Services**

92.     A number of the health benefit plans administered by United either exclude coverage for Lap Band surgery or place limitations on coverage for such surgery.  When the Counterclaim Defendants encountered such exclusions or limitations, they, on a number of occasions, performed unnecessary services, submitted false bills and inflated charges, and falsely represented patients' BMI, in order to secure reimbursement from United for uncovered services.

### i.  United Member 4

93.     United Member 4 was covered by an employer sponsored health benefit plan for which United served as a claims administrator.

94.     On XX, 2009, United Member 4 underwent an EGD with Biopsy at the Beverly Hills Surgery Center clinic in preparation for contemplated Lap Band surgery.

95.     Dr. Arman Feliksovich Karapetyan, M.D.'s report from this same date, labeled "Medical Clearance Form: Initial Preoperative Evaluation," states that this patient  "has elected to proceed with the lap band procedure pending the clearances requested by [United Member 4's] surgeon and is here today for a comprehensive pre-operative evaluation and medical clearance in order to proceed with United Member 4's bariatric procedure."  Notably, this report further states that United Member 4 did not have any hernias, and that the abdomen was "soft, Non Tender to palpation and Normal BS."

### a.     United Denies Authorization for Lap Band Surgery in 2009

96.     On XX, 2009, United sent a letter to United Member 4 and Beverly Hills Surgery Center denying coverage for the requested Lap Band procedure because it was not covered under United Member 4's health plan.  The letter stated, "Based on the information submitted and your health benefit plan, we determined that the health care services are not covered.  The services are not eligible expenses under your plan."

### b.     Counterclaim Defendants Perform A *Second* EGD in 2010

97.     On XX, 2010, the month after Counterclaim Defendants were notified that United Member 4's Lap Band surgery would not be covered, Counterclaim Defendants Beverly Hills Surgical Center and Skin Cancer Surgery Specialists, together with Dr. Atul Madan, performed a second EGD on United Member 4.  The

Anesthesia Record for this EGD shows that this patient was under anesthesia for a total of seven minutes, and that the procedure lasted only two minutes.  The Recovery Room records reflect that United Member 4 was discharged just over 30 minutes later.  The Operative Report now recorded a hiatal hernia with a recommendation for hernia surgery.

98.     United is informed and believes that this second, two-minute EGD procedure, which came less than three months after the first EGD, was unnecessary.  The second EGD was performed in order to manufacture and document a reason to perform a hiatal hernia repair surgery, which would then allow the Counterclaim Defendants to simultaneously place a Lap Band, and secure reimbursement for the uncovered Lap Band by the submission of bills that contained inflated charges for the hernia repair surgery, but omitted all reference to the simultaneously-performed Lap Band surgery.

99.     United, on behalf of United Member 4's health plan, paid $5,338.54 for the unnecessary services performed on this date.

### c.     **Counterclaim Defendants Subsequently Perform Combined Lap Band and Hernia Repair Surgery**

100.   Medical records and claims records show that subsequently, on XX, 2010, United Member 4 underwent Lap Band and hiatal hernia surgery.

101.   Having been notified only months earlier that the proposed Lap Band surgery was not covered by United Member 4's plan, Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists fraudulently omitted from the claim forms submitted for the services provided on XX, 2010 any mention of the surgical Lap Band placement, despite the fact that the Lap Band was the primary purpose for the XX, 2010 treatment.  The omission of the Lap Band surgery from these claim forms makes them false and misleading.

102.   The Counterclaim Defendants submitted such fraudulent claim forms in order to secure reimbursement for the uncovered Lap Band placement through the submission of highly inflated charges for the hernia surgery.

103.   Counterclaim Defendant Beverly Hills Surgical Center submitted facility claims of $37,860 under CPT code 39520 for the hernia repair surgery, including:

a)   $16,500 – Operating Room;

b)   $15,500 – Recovery Room;

c)   $2,950 – Anesthesia Supplies;

d)   $2,150 – Sterile Supplies;

e)   $410 – Administration of Drugs; and

f)   $350 – Pre-Op Hiatal.

Beverly Hills Surgical Center also billed $9,350 for the anesthesiologist, and $2,440 for tissue examination.  Counterclaim Defendant Skin Cancer Surgery Specialists billed $17,500 for professional fees, bringing the total submitted billed charges to $67,150 for what was, as billed, supposedly only a hernia repair surgery.

104.   The facility billed charges of $37,860 submitted by Beverly Hills Surgical Center were highly inflated because they really included charges for the unbilled and uncovered Lap Band surgery.  Ordinarily, when the Counterclaim Defendants performed combined Lap Band surgery and hernia repair surgery, and both were covered by the health plan in question, the facility charges for the hernia repair surgery would be much less.

105.   Relying on the representation that only hernia repair surgery had been performed on XX, 2010, and that the charges submitted were for that surgery only, United processed the facility claim with billed charges of $37,860 and paid, on behalf of United Member 4's plan, $20,111.26 to Beverly Hill Surgical Center, with United Member 4's coinsurance obligation being $888.74.  United also paid $6,008.29 on the other bills for what supposedly was only a hernia repair surgery.

106.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants did not, on information and belief, collect the $888.74 owed by United Member 4.

107.   As a result of the fraudulent billing by the Counterclaim Defendants for the services provided to United Member 4 on XX, 2010, and the unnecessary services provided earlier on XX, 2010, United Member 4's plan has been damaged in an amount to be proven at trial.  In addition, under the terms of United Member 4's plan, nothing was owed for XX, 2010 services, due to the waiver of Member Responsibility Amounts.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, all amounts paid for the XX, 2010 services, as well as any other payments made to the Counterclaim Defendants for services provided to United Member 4, which would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

**ii.  <u>United Member 5</u>**

108.   United Member 5 was covered by an employer sponsored health benefit plan for which United served as a claims administrator.

109.   On XX, 2009, United Member 5 underwent an EGD with Biopsy at the Beverly Hills Surgery Center clinic in preparation for contemplated Lap Band surgery.  Dr. Elliot Alpert's Operative Report for this procedure shows that the purpose of this procedure was to "rule out any upper GI lesion in preparation for Lap-Band surgery."  The Operative Report also reflects that United Member 5's duodenum and stomach, including the fundus, body, and antrum "appeared normal."  This report concluded: "Normal upper GI tract."

       a.    **United Denies Pre-Authorization for Lap Band Surgery**

110.   Shortly after United Member 5's EGD, Counterclaim Defendants requested pre-authorization from United to perform a Lap Band surgery.  However, United notified "Julian" (whom United is informed and believes to be Julian Omidi) by telephone conference that a Lap Band was not an eligible expense under United Member 5's plan.  United also notified United Member 5 of this determination.

       b.    **Counterclaim Defendants Submit Claims Totaling $24,494 For A Second EGD procedure**

111.   Similar to United Member 4, after Counterclaim Defendants received notice that United Member 5's Lap Band surgery would not be covered by the employer-sponsored health plan, Counterclaim Defendants conducted an unnecessary second EGD on XX, 2010.  The second EGD was performed in order to manufacture and document a reason to perform a hiatal hernia repair surgery, which would then allow the Counterclaim Defendants to simultaneously place a Lap Band, and secure reimbursement for the uncovered Lap Band by the submission of bills that contained inflated charges for the hernia repair surgery, but omitted all reference to the simultaneously-performed Lap Band surgery.

112.   United received claims for $24,494 for the unnecessary EGD and related procedures from Beverly Hills Surgery Center and Skin Cancer Surgery Specialists: $12,200 for the Beverly Hills Surgery Center facility charge; $4,244 for the professional endoscopic services of Atul Madan, M.D.; $3,800 for the anesthesia services of Eva Toth, CRNA; and an additional $4,250 for an ultrasound conducted by George Mednik, M.D.

113.   United, on behalf of United Member 5's health plan, paid $14,142.63 for the unnecessary services performed on this date of service.

c.   **Counterclaim Defendants Misrepresent Services Provided On Claims In Order to Receive Payment for Unauthorized Lap Band Services**

114.   Medical records and claims records show that on XX, 2010, United Member 5 underwent Lap Band and hiatal hernia surgery.

115.   Having been notified in 2009 that the proposed Lap Band surgery was not covered by United Member 5's plan, Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists fraudulently omitted from the claim forms submitted for the services provided on XX, 2010, any mention of the surgical Lap Band placement, despite the fact that the Lap Band was the primary purpose of the XX, 2010 treatment.  The omission of the Lap Band surgery from these claim forms makes them false and misleading.  The Counterclaim Defendants submitted such fraudulent claim forms in order to secure reimbursement for the uncovered Lap Band placement through the submission of highly inflated charges for the hernia surgery.

116.   As with United Member 4, Counterclaim Defendant Beverly Hills Surgical Center submitted facility claims with billed charges of $37,860 under CPT code 39520 for the hernia repair surgery for United Member 5, and billed charges of $2,440 for tissue examination.  As with United Member 4, Counterclaim Defendant Skin Cancer Surgery Specialists billed $17,500 for professional fees for the hernia repair surgery for United Member 5.

117.   The facility billed charges of $37,860 submitted by Beverly Hills Surgical Center were highly inflated because they really included charges for the unbilled and uncovered Lap Band surgery.  Ordinarily, when the Counterclaim Defendants performed combined Lap Band surgery and hernia repair surgery, and both were covered by the health plan in question, the facility charges for the hernia repair surgery would be less than $4,000.

118.   Relying on the representation that only hernia repair surgery had been performed on XX, 2010, and that the charges submitted were for that surgery only,

United processed the facility claim with billed charges of $37,860 and paid, on behalf of United Member 5's plan, $22,000 to Beverly Hill Surgical Center.  United also paid $12,727.00 on the other bills for what supposedly was only a hernia repair surgery on XX, 2010.

119.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants did not, on information and belief, collect any Member Responsibility Amounts owed by United Member 5.

120.   As a result of the fraudulent billing by the Counterclaim Defendants for the services provided United Member 5 on XX, 2010, and the unnecessary services provided earlier on XX, 2010, United Member 5's plan has been damaged in an amount to be proven at trial.  In addition, under the terms of United Member 5's plan, nothing was owed for any services provided to United Member 5 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

### iii.  United Member 6

121.   United Member 6 was covered by an employer sponsored health benefit plan for which United served as a claims administrator.

122.   On XX, 2009, United Member 6 underwent an EGD with biopsies at Counterclaim Defendant Beverly Hills Surgery Center in advance of planned Lap Band surgery.  The comments section of the Initial Preoperative Evaluation report dated XX, 2009 signed by Dr. Arman F. Karapetyan, M.D. states that the patient needs to sign informed consent with the surgeon for "off-label placement" of the Lap Band.

123.   However, United Member 6 did not meet the requirements for coverage of Lap Band services under United Member 6's health plan.  The Initial Preoperative Evaluation Report dated XX, 2009 indicates that United Member 6's height is 5'10" and weight is 235, putting BMI at 33.7.  United Member 6's Plan

does not provide coverage for Lap Band surgery for individuals whose BMI is less than 35.  Even if United Member 6 met the plan's BMI requirements, bariatric services such as Lap Band surgeries "must be received at a designated Center of Excellence facility to be covered."  However, none of the Counterclaim Defendant surgical facilities has ever been designated a Center of Excellence, as that term is used in the relevant health plan.  Thus, coverage under United Member 6's plan would not have been available for a Lap Band at the Beverly Hills Surgery Center even if the BMI requirement of 35 or higher had been satisfied.

a.  **Counterclaim Defendants Perform Lap Band Surgery On United Member 6 And Bill United $61,360 For A Hiatal Hernia Surgery**

124.   Claims submitted by Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists show that on XX, 2010, United Member 6 underwent Lap Band and hiatal hernia surgery.

125.   Because, as the Counterclaim Defendants were aware, United Member 6 was not covered for Lap Band surgery at Beverly Hills Surgical Center, Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists fraudulently omitted from the claim forms submitted for the services provided on XX, 2010 any mention of the surgical Lap Band placement, despite the fact that the Lap Band was the primary purpose of this treatment.  The omission of the Lap Band surgery from these claim forms makes them false and misleading.  The Counterclaim Defendants submitted such fraudulent claim forms in order to secure reimbursement for the uncovered Lap Band placement through the submission of highly inflated charges for the hernia surgery.

126.   As with United Members 4 and 5, Counterclaim Defendant Beverly Hills Surgery Center submitted facility claims with billed charges of $37,860 under CPT code 39520 for the hernia repair surgery for United Member 6, and professional claims with billed charges of $6,000 for the anesthesiologist fees.  As with United Members 4 and 5, Counterclaim Defendant Skin Cancer Surgery

Specialists billed $17,500 for professional fees for the hernia repair surgery for United Member 6.

127.    The facility billed charges of $37,860 submitted by Beverly Hills Surgical Center were highly inflated because they really included charges for the unbilled and uncovered Lap Band surgery.  Ordinarily, when the Counterclaim Defendants performed combined Lap Band surgery and hernia repair surgery, and both were covered by the health plan in question, the facility charges for the hernia repair surgery would be less than $4,000.

128.    Relying on the representation that only hernia repair surgery had been performed on XX, 2010, and that the charges submitted were for that surgery only, United processed the facility claim with billed charges of $37,860 and paid, on behalf of United Member 6's plan, $20,225.12 to Beverly Hills Surgery Center for facility charges.  United also paid $11,744.89 on the other bills for what supposedly was only a hernia repair surgery on  this date of service.  To further conceal their fraud, Counterclaim Defendants submitted an operative report to United relating to the hernia repair procedure.  However, in subsequent submissions of medical records, Counterclaim Defendants submitted to United a second, separate operative report showing that a Lap Band had been placed in addition to the hernia repair.

129.    Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants did not, on information and belief, collect any Member Responsibility Amounts owed by United Member 6.

130.    As a result of the fraudulent billing by the Counterclaim Defendants for the services provided United Member 6 on XX, 2010, United Member 6's plan has been damaged in an amount to be proven at trial.  In addition, under the terms of United Member 6's plan, nothing was owed for any services provided to United Member 6 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

131.   The fraudulent billing for United Member 6 continued for services after the XX, 2010 Lap Band surgery.  Bills were submitted to United for the services of Dr. Madan for outpatient office visits in XX, XX, and XX, 2010.  Medical records show, however, that the purpose of each of these visits was to provide a Lap Band adjustment.  United Member 6 would not have sought these outpatient services had he not received the Lap Band.  Defendants falsely represented the nature of these visits in an attempt to obtain payment for unauthorized Lap Band services.  United Member 6's plan has been damaged by this fraud because of the payments made for such services, in an amount to be proven at trial, which would not have been paid had they been accurately represented as uncovered Lap Band services.

### iv.  <u>Counterclaim Defendants Fraudulently Inflated Patients' BMI In An Attempt To Justify Lap Band Services</u>

132.   Medical records show that Counterclaim Defendants also submitted fraudulent medical records to United that manipulated the height and weight of individual patients in order to, upon information and belief, inflate the patient's BMI and, in some cases, get prior authorization for Lap Band surgery.

133.   For example, medical and claim records show that on XX, 2010, United Member 7 was examined to determine candidacy for a Lap Band.  At the time, the provider recorded United Member 7's height as 5'3" and her weight at 200 pounds, resulting in a calculated BMI of 35.4.  Dr. Au Lee signed United Member 7's Bariatric Surgery History & Physical Examination Form and recommended that United Member 7 undergo a Lap Band procedure.

134.   However, records further show that on XX, 2010, the day United Member 7 underwent Lap Band surgery, Counterclaim Defendants measured United Member 7 as standing a full two inches taller—at 5'5"—and weighing 204 pounds, resulting in a calculated BMI of just 33.9.  This height is consistent with a declaration submitted by United Member 7 in earlier litigation stating that United

Member 7 stood at 5'5".  In addition, at the time of the Lap Band procedure, United

Member 7's driver's license stated that United Member 7 was 5'6".

135.   Had Dr. Au recorded United Member 7's true height of at least 5'5"

during the pre-operation examination, he would have calculated United Member 7's

BMI at 33.3.  Further, had United Member 7's BMI been accurately measured and

recorded, United Member 7 would not have qualified for bariatric surgery benefits

under United Member 7's health plan, and United would not have been responsible

for any expenses associated with the Lap Band surgery.

136.   As a result of the fraudulent BMI calculation, United Member 7

underwent a Lap Band procedure at Valley Surgical Center on XX, 2010.  The

surgical center subsequently submitted facility claims of at least $79,990, in

addition to charges for professional services.  United processed these claims, paying

Valley Surgical Center $79,490, on behalf of United Member 7's health plan, with

United Member 7 being responsible for a $500 deductible.  United also paid $1,785

to West Hills Surgery LLC for the XX, 2010 Lap Band.  Consistent with their

promises to patients to waive Member Responsibility Amounts, which were not

disclosed to United, the Counterclaim Defendants did not, on information and

belief, collect any Member Responsibility Amounts owed by United Member 7.

Under the terms of United Member 7's plan, nothing was owed for any services

provided to United Member 7 that would not have been provided but for the

promises of the Counterclaim Defendants to waive Member Responsibility

Amounts.

137.   Following surgery, United Member 7 had numerous adjustments and

other Lap Band-related procedures such as a barium swallow and fluoroscopy.  Had

United Member 7's BMI been accurately measured and recorded during the initial

consultation, United Member 7 would not have qualified for a bariatric surgery

benefit under United Member 7's health plan.  As a result of the fraudulent BMI

calculation by the Counterclaim Defendants, United Member 7's plan has been

damaged in an amount to be proven at trial.  Moreover, United would not be responsible for any post-operative expenses incurred.

138.   In another example, medical and claim records also show that Counterclaim Defendants fraudulently inflated United Member 6's BMI.  Indeed, on XX, 2009 during the pre-operative examination, Counterclaim Defendants measured United Member 6 as standing 5'10" and weighing 235 pounds.  Although Counterclaim Defendants did not calculate United Member 6's BMI that day, they would have learned that United Member 6's BMI was only 33.7, thus disqualifying United Member 6 from any bariatric surgery benefits under United Member 6's plan.

139.   Even though United Member 6 did not qualify for bariatric surgery benefits, Counterclaim Defendants scheduled and performed a Lap Band procedure on XX, 2010.  In the corresponding operative note, Dr. Madan erroneously recorded United Member 6's height as a full inch shorter—5'9"—and calculated United Member 6's BMI at 40.  While there is no weight recorded for United Member 6 on the day of surgery, United Member 6's pre-operative weight, 235, combined with United Member 6's new height, results in a BMI of just 34.7.  Even assuming United Member 6 stood 5'9", United Member 6 would have had to *gain* 36 pounds in preparation for weight loss surgery in order to reach a BMI of 40.

140.   At the time of the surgery, United Member 6 carried a driver's license that listed United Member 6 as standing 5'10" and weighing 220 pounds, a height/weight combination that translates to a BMI of 31.6.

141.   As described in full detail above, Counterclaim Defendants subsequently billed United more than $60,000 in total charges related to the Lap Band surgery (that was fraudulently billed as hiatal hernia surgery) and for several Lap Band follow-up examinations and adjustments.

142.   United Members 6 and 7 are exemplars that are representative of Counterclaim Defendants' routine and ongoing fraudulent billing practices designed to obtain payment from United for unauthorized services.

143.   Members have also informed United that they received bills from the Counterclaim Defendants for services that never happened or from clinics where they were never treated; that they were double billed by the Counterclaim Defendants for services they received only once; that they were billed for office visits that actually took place over the phone; and that they were billed for extended appointments that in fact were much shorter.

144.   In sum, the Counterclaim Defendants engaged in a pattern and practice of submitting false and fraudulent bills to United that (a) were fraudulently inflated due to the Counterclaim Defendants' waiver of co-pays and other patient responsibility obligations; (b) were illegally induced by the Counterclaim Defendants' agreement to waive copays and other patient responsibility obligations, which resulted in the United members receiving either medically unnecessary care, or care that would have been provided by an in-network provider at lower cost to the health benefit plans or United had this waiver not occurred; (c) submitting claims to United for medical services rendered, where the Counterclaim Defendants knew that the health plans would not make payments for charges where the provider waived the copays and other Member Responsibility Amounts; (d) fraudulently inflating the cost of certain procedures, in situations where the Counterclaim Defendants were informed that the United member did not have coverage for the Lap Band surgery; and (e) attempting to mask the cost and expense of Lap Band surgeries by labeling the procedures as another, purportedly medically necessary and covered, procedure, and submitting falsified medical records to further cover up the fraud.

### v. **United Made Payments That Were Greater Than the Counterclaim Defendants' Normal Rates or the Usual, Customary, and Reasonable Charges for the Same Procedures.**

145.   During the time relevant to this action, the Counterclaim Defendants were out-of-network providers with respect to United, meaning United did not have a contract with the Counterclaim Defendants governing reimbursement for the services they rendered to United members.

146.   As noted earlier, all or virtually all health benefit plans administered by United limit reimbursement of out-of-network providers to a specified percentage of "eligible" or "usual, customary and reasonable" charges.

147.   Beginning in 2008, the Counterclaim Defendants routinely submitted excessive and unreasonable charges to United for a variety of procedures and visits, including but not limited to Lap Band and other endoscopy procedures (CPT codes 43239, 43770 & 47562), in an attempt to induce United to authorize payment to the Counterclaim Defendants for amounts well in excess of the "eligible" or "usual, customary and reasonable" charges covered under the terms of the plans administered by United as claims administrator.

148.   For example, the Counterclaim Defendants, including Almont ASC, Beverly Hills Surgery Center, Modern Institute, and Valley Surgical Center, routinely submitted bills to United for Lap Band placements (CPT code 43770) with charge amounts in excess of $60,000, which is more than 300% greater than a reasonable charge for this procedure.  The Counterclaim Defendants felt free to submit such excessive and unreasonable charges, having told their patients that they would not have to pay copays or otherwise pay for the care being provided.

149.   Further, United is informed and believes that Counterclaim Defendants billed Lap Band patients willing to pay cash substantially less than patients with insurance.  Indeed, upon information and belief, Counterclaim Defendants charged cash patients only $18,000 for Lap Band surgery while they simultaneously charged

some patients covered by health plans more than $90,000 or $100,000 in facility charges and professional fees for such surgery.  United is further informed and believes that former Lap Band manufacturer Allergan estimated that a Lap Band procedure should cost between $12,000 and $20,000.

150.   The Counterclaim Defendants succeeded in their attempts to induce United to authorize payment to the Counterclaim Defendants for amounts well in excess of the "eligible" or "usual, customary and reasonable" charges covered under the terms of the plans administered by United as claims administrator.

151.   For example, for CPT codes 43239, 43770 & 47562, the aggregate overpayments received by the Counterclaim Defendants exceed $10,000,000.  Accordingly, if the waiver of Member Responsibility Amounts did not eliminate altogether the obligation to make any payment to the Counterclaim Defendants under the terms of the plans administered by United as claims administrator, the Counterclaim Defendants would still be liable to reimburse United, on behalf of the plans administered by United as claims administrator, for such overpayments, with the precise amount of overpayments to be proven at trial.

152.   Because these overpayments were in excess of what was required to be paid under the terms of the plans administered by United, United seeks restitution of these overpayments.

**vi.  United Paid Numerous Claims In Good Faith Based On Defendants' Misrepresentations**

153.   United reasonably relied on the misrepresentations contained on the claim forms submitted by Counterclaim Defendants, and in good faith paid not only the claims of the exemplars above, but also thousands of claims based on those misrepresentations.  Just as with the exemplars, Counterclaim Defendants submitted intentionally misleading and fraudulent claims that: (i) inflated the claimed amount because of Counterclaim Defendants' waiver of co-pays and other Member Responsibility Amounts; (ii) were for medical procedures that (as

Counterclaim Defendants knew) were not eligible for coverage under the health benefit plans because of the Counterclaim Defendants decision to waive Member Responsibility Amounts, and promise to accept whatever United paid as full payment for the services; (iii) failed to disclose that co-payments and other forms of patient responsibility had been waived; (iv) sought payment for unnecessary services; (v) masked the cost and expense of Lap Band surgeries by labeling the procedures as a different, covered expense and submitting inflated claims for the covered procedures; and (vi) sought exorbitant payments.  Counterclaim Defendants also submitted intentionally misleading and fraudulent claims for medical procedures that they knew would not be covered by the health plans because of their decision to waive co-pays and other patient responsibilities.

**FIRST CAUSE OF ACTION**
**(Fraud)**
**(Against All Counterclaim Defendants)**

154.   United realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 153, inclusive, hereinabove.

155.   Counterclaim Defendants did knowingly and willfully execute a scheme and artifice to defraud United by submitting, and collecting on, fraudulent health insurance claims, and to obtain by means of false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of United, in connection with the delivery of or payment for health care benefits, items, or services.

156.   Counterclaim Defendants had knowledge of the wrongful scheme and intended to defraud United, despite their legal duty to submit timely and accurate insurance claims.

157.   In furtherance of the scheme and artifice to defraud, Counterclaim Defendants submitted:

a)      Fraudulent claims that failed to disclose that Defendants had waived some or all of the member's co-pay, deductible, or other financial responsibility;

b)      Fraudulent claims that misrepresented the nature of the procedure performed, or in some cases, completely failed to disclose that the member received a gastric Lap Band;

c)      Fraudulent claims that inflated the member's BMI in order to receive secure coverage for the Lap Band surgery; and

d)      Fraudulent claims that demanded exorbitant fees far in excess of the usual and customary rate.

158.   Defendants' scheme and artifice to defraud succeeded in inducing United to pay these fraudulent claims.  As a direct and proximate cause of this scheme, United paid millions in fraudulent claims.

159.   Counterclaim Defendants made false representations of material fact to United in submitting claim forms to United.  Specifically, Counterclaim Defendants submitted intentionally misleading and fraudulent claims that: (i) inflated the claimed amount because of Counterclaim Defendants' waiver of co-pays and other patient responsibility obligations; (ii) failed to disclose the waived Member Responsibility Amount; (iii) inflated the cost of the procedures by failing to discount the cost in the amount of the waived Member Responsibility Amount; (iv) inflated the cost of certain covered procedures, in situations where the Counterclaim Defendants were informed that the United member did not have coverage for the Lap Band surgery; and (iv) masked the cost and expense of Lap Band surgeries by labeling the procedures as another, purportedly medically necessary and covered procedure.  Counterclaim Defendants also submitted to United intentionally misleading and fraudulent claims and medical records for medical procedures that they knew would not be covered by the health plans because of their decision to waive co-pays and other patient responsibilities.

160.   At the time Counterclaim Defendants submitted these materially misleading and fraudulent claims and medical records to United, Counterclaim Defendants knew the falsity of such representations.  Counterclaim Defendants (for example) knew at the time they submitted such claims that the Counterclaim Defendants had not actually charged the members the amounts stated in the claims as the billed charge and that the members had not agreed to pay such amounts if Counterclaim Defendants did not receive payment from United.

161.   Counterclaim Defendants submitted the claims to United with the intent to induce United to rely on the false statements as to the amount charged to the members and, therefore, pay to Counterclaim Defendants an amount that was (in the aggregate) millions in excess of the actual amount charged to the members or the rate regularly charged by the Counterclaim Defendants to cash-paying patients.  United reasonably relied on the false statements contained in the claims submitted by Counterclaim Defendants as to the amount charged to the members. Based upon such reliance, United paid to Counterclaim Defendants amounts based on the billed charges in the claims, when, in fact, the Counterclaim Defendants had not actually charged such amounts to the members.

162.   As a result of Counterclaim Defendants' fraudulent conduct, United has been damaged by paying to Counterclaim Defendants amounts far in excess of the amount actually charged to the members.  The total amount of such damage will be proven at trial.

163.   Counterclaim Defendants further made false representations of material fact to United in submitting claim forms and medical records to United that sought payment for unauthorized Lap Band surgeries and adjustments by concealing the Lap Band treatments as other treatments, *i.e.*, hernia surgeries and general office visits.

164.   At the time Counterclaim Defendants submitted these materially misleading and fraudulent claims and medical records to United, Counterclaim

Defendants knew the falsity of such representations.  Counterclaim Defendants knew that the claims seeking payment for hernia surgery and/or office visits *actually* sought payment for unauthorized Lap Band treatments. Counterclaim Defendants submitted the claim forms and falsified medical records to United with the intent to induce United to rely on the false statements as to the services provided to the members and, therefore, pay to Counterclaim Defendants an amount that was tens of thousands of dollars in excess of the actual amount charged for hernia surgery and follow-up visits.

165.   United reasonably relied on the false statements contained in the claims submitted by Counterclaim Defendants as to the amount charged to the members.  Based upon such reliance, United paid to Counterclaim Defendants amounts based on the billed charges in the claims, when, in fact, the Counterclaim Defendants had not actually charged such amounts to the members.  As a result of Counterclaim Defendants' fraudulent conduct, United has been damaged by paying to Counterclaim Defendants amounts far in excess of the amount actually charged to the members.  The total amount of such damage will be proven at trial.

166.   United is informed and believes that Counterclaim Defendants acted intentionally in conscious disregard of the rights of United, with malice, oppression, and fraud in that Counterclaim Defendants knew that its acts and conduct, as alleged hereinabove, were fraudulent and unjustified and would result in severe financial and economic injury to United.  Accordingly, United is entitled to an award of punitive damages against Counterclaim Defendants for the sake of example and by way of punishing Counterclaim Defendants.  The amount of such punitive damages should be determined at the time of trial of this action.

## SECOND CAUSE OF ACTION
### (Unfair Business Practices, Business & Professions Code § 17200)
### (Against All Counterclaim Defendants)

167.   United realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 166, inclusive, hereinabove.

168.   Counterclaim Defendants' schemes for intentionally inflating the billing and routinely waving member responsibility for claims submitted to United constitute unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200, *et seq*.  These fraudulent practices violate various state and federal prohibitions on the submission of false claims to insurers/health plans, including Cal. Bus & Prof. Code § 810,  Cal. Penal Code §§ 532, 550, 18 U.S.C. § 1347, and HIPAA.

169.   In addition to being false and fraudulent, the amounts purported to be charged by the Counterclaim Defendants were unconscionable in that they are so exorbitant and wholly disproportionate to the services performed as to shock the conscience of physicians of ordinary prudence practicing in the same community.

170.   As a party harmed by the Counterclaim Defendants' actions, United is entitled to obtain damages resulting from Counterclaim Defendants' breaches, as well as injunctive relief against Counterclaim Defendants.

**THIRD CAUSE OF ACTION**
**(Conspiracy to Commit Fraud)**
**(Against All Counterclaim Defendants)**

171.   United realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 170, inclusive, hereinabove.

172.   For many years prior, and continuing through the present, Counterclaim Defendants did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown, to execute a scheme and artifice to defraud United by submitting and collecting on fraudulent health insurance claims and medical records, and to obtain by means of false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of United, in connection with the delivery of or payment for health care benefits, items, or services.

173.    Counterclaim Defendants orchestrated the wrongful scheme and intended to defraud United, despite their legal duty to submit timely and accurate insurance claims.

### Purpose of the Conspiracy

174.    It was a purpose of the conspiracy for Counterclaim Defendants to unlawfully enrich themselves by, among other things, submitting intentionally misleading and fraudulent claims that:

a) Inflated the claimed amount because of Counterclaim Defendants' waiver of co-pays and other patient responsibility obligations;

b) Omitted a disclosure regarding the waived co-pays and patient responsibilities;

c) Inflated the cost and concealed the performance of certain procedures, in situations where the Counterclaim Defendants were informed that the United member did not have coverage for the Lap Band surgery;

d) Masked the cost and expense of Lap Band surgeries by labeling the procedures as another, purportedly medically necessary and covered procedure;

e) Concealed the fact that Counterclaim Defendants knew that the submitted claim was not covered by the health plans because of their decision to waive co-pays and other patient responsibilities.

### Manner and Means of the Conspiracy

175.    The manner and means by which Counterclaim Defendants and other co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

a) United is informed and believes that the Omidis conspired to create TopSurgeons, Inc., Top Surgeons, LLC, and 1-800-GET-THIN,

LLC as organizations to fraudulently market and sell Lap Band surgeries.

b) Top Surgeons, Inc., Top Surgeons, LLC, 1-800-Get-Thin, LLC and/or other corporate entities owned, operated, or controlled by the Omidis employs call center staff to encourage prospective patients to attend "free" orientations, consultations, and examinations.

c) These initial "free" meetings with prospective patients are ostensibly to determine whether the prospective patient is a suitable candidate for Lap Band surgery.  In furtherance of the conspiracy, United is informed and believes that the primary purpose of these initial sessions is to determine whether the prospective patient carries adequate health insurance.

d) Although the initial orientation, consultation, and examination was "free" to the prospective patient, Counterclaim Defendants submit insurance claims for as much as $600 to cover the cost of these sessions.

e) Once a prospective patient is identified and cleared to undergo surgery, the Omidis, and the corporate entities that they own, manage, and/or control, conspire to refer these patients to physicians who are under contract with Top Surgeons, Inc., Top Surgeons, LLC, 1-800-Get-Thin, LLC, or other co-conspirators known or unknown.  United is informed and believes that these physicians perform subsequent examinations and procedures at Counterclaim Defendant surgical centers that are owned, managed, operated, or controlled by the Omidis.

f) In furtherance of the conspiracy, United is informed and believes that the Omidis instruct their affiliated physicians to perform medically unnecessary, costly, and unauthorized surgical

procedures, such as EGDs, as a means to artificially and fraudulently inflate claims to insurers such as United.

g) Following a surgical procedure, Counterclaim Defendants submit or cause to be submitted fraudulent insurance claims to United for unnecessary medical procedures or procedures that are not fully documented.  Counterclaim Defendants also submit insurance claims and/or medical records that fraudulently misrepresent a member's BMI or other pertinent information that bears upon United's obligation to pay benefits under the member's health plan.

176.   Counterclaim Defendants' conspiracy succeeded in inducing United to pay these fraudulent claims.  As a direct and proximate cause of this conspiracy, United paid millions in fraudulent claims.

**FOURTH CAUSE OF ACTION**
**(Intentional Interference with**
**Contractual Relationships)**
**(Against All Counterclaim Defendants)**

177.   United realleges and incorporates by reference Paragraphs 1 through 176 as though fully set forth herein.

178.   As alleged above, the Counterclaim Defendants were aware that health benefit plans generally include provisions precluding participants from accepting services from providers in return for a waiver of Member Responsibility Amounts. By nevertheless inducing United members to accept services with the Counterclaim Defendants by promises that they would waive patient responsibilities and accept whatever payment their health benefit plan would pay – in most instances without the United member even knowing that this relationship was illegal or a violation of Plan terms – the Counterclaim Defendants caused the United members to violate the terms of their health benefit plans.   By doing so, Plaintiffs' illegally interfered with the contract between United members, United (as their insurer), and the Plans.

179.   Further, by accepting assignments from, and acting as authorized representatives of the United members, and then submitting false or inflated bills for services, the Counterclaim Defendants illegally interfered with the contractual relationship between United and its members

180.   United therefore seeks all damages incurred as a result of the Counterclaim Defendants' intentional interference, including (but not limited to) damages in the amount of overuse of health plan benefits resulting from the illegal inducement, as well as damages in the amount of the fraudulent billings.

### FIFTH CAUSE OF ACTON
### (Restitution under ERISA § 502(a)(3))
### (Against All Counterclaim Defendants)

181.   United realleges and incorporates by reference Paragraphs 1 through 180 as though fully set forth herein.

182.   The ERISA Plans are employee health and welfare benefit plans that are insured or administered by United, and for which United provides administrative services.  The ERISA Plans are non-governmental plans that exist, are established, and maintained by employers for the benefit of their respective employees, and do not fall within any ERISA safe-harbor provisions.

183.   In connection with its duties as a claims administrator, United is a fiduciary as that term is defined in ERISA § 3(21) for many of the ERISA Plans. As reflected in administrative services agreements executed between United and the Plan, United's authority includes the authority to review claims, and also to file suit to recover overpayments that are made to patients and medical providers, whether those payments result from fraudulent behavior or otherwise.  As such, for these Plans, United has standing to sue under ERISA § 502(a)(3), to obtain equitable relief to redress violations of such ERISA Plans, or to enforce the terms of the ERISA Plans.

184.    The ERISA Plans in question typically include language requiring that any overpayments that are made to patients, or (on their behalf) to providers must be returned.  For example, one typical ERISA Plan states that "[t]he Plan reserves the right to recover any payments made by the Plan that were  . . . [m]ade in error; or . . . [m]ade to any Covered Person or any party on a Covered Person's behalf where the Plan Sponsor determines the payment to the Covered Person or any party is greater than the amount payable under this Plan.  The Plan has the right to recover against Covered Persons if the Plan has paid them or any other party on their behalf."

185.    As alleged above, Counterclaim Defendants have engaged in a scheme of  submitting intentionally misleading and fraudulent claims that: (i) inflated the claimed amount because of Counterclaim Defendants' waiver of Member Responsibility Amounts; ((ii) were for medical procedures that (as Counterclaim Defendants knew) were not eligible for coverage under the health benefit plans because of the Counterclaim Defendants decision to waive Member Responsibility Amounts, and promised to accept whatever United paid as full payment for the services; (iii) failed to disclose that co-payments and other forms of patient responsibility had been waived; (iv) sought payment for unnecessary services; (v) masked the cost and expense of Lap Band surgeries by labeling the procedures as a different, covered expense and submitting inflated claims for the covered procedures; and (vi) sought exorbitant payments.  Based upon the inflated claims submitted to United, Counterclaim Defendants received amounts in excess of the amounts that they actually charged for those services, and that would have been incurred by United members.

186.    Further, even to the extent that the Counterclaim Defendants did not knowingly and intentionally submit false or inflated bills to United, Counterclaim Defendants submitted claims of Plan Members of ERISA Plans pursuant to contractual assignments received from those Plan Members.  By doing so,

Counterclaim Defendants stood in the shoes of the plan members, accepting the terms of the ERISA Plans and submitting their claims subject to those terms. Further, by knowingly accepting payments from the Plan, the Counterclaim Defendants became bound by the Plan's terms and conditions, including conditions related to overpayments.  The ERISA Plans, by their terms, require the return of overpayments and amounts that were erroneously paid.  Thus, even to the extent that the Counterclaim Defendants did not intentionally overcharge United, United is still entitled to equitable relief to enforce the terms of the Plan and recover these overpayments.

187.   As a result of the fraudulent scheme to inflate their charges and waive in full or in part Member Responsibility Amounts, Counterclaim Defendants induced United on its own behalf and on behalf of ERISA Plans to overpay each and every claim submitted by Counterclaim Defendants.  United is entitled to recover its overpayments and seeks restitution of the amounts it overpaid.  Among other things, United seeks damages in the total amount of the payments made to Counterclaim Defendants on behalf of patients to whom the Counterclaim Defendants promised that they would waive any Member Responsibility Amounts. United also (and alternatively) seeks to recover the amounts paid to the Counterclaim Defendants resulting from their fraudulent invoices, such as for unnecessary care, or invoices that mask the actual services provided.  United further seeks to recover for sums paid in excess of the usual, customary, or reasonable fees, for payments that exceed the cost of Counterclaim Defendant's actual, normal charges, or payments that were otherwise not consistent with the terms of the Plan.

188.   United is entitled to the imposition of a constructive trust on the sums it paid to Defendants on its own behalf and on behalf of ERISA Plans in reliance on the fraudulent claims Counterclaim Defendants submitted to United, as well as on any profits or income made by Counterclaim Defendants through the use of those amounts held in constructive trust.  United is also entitled to an Order restoring to

United on its own behalf and on behalf of ERISA Plans the sums held in constructive trust by Counterclaim Defendants.  Upon information and belief, United believes that the sums that the Plaintiffs overcharged United are still in the possession, custody or control of the Counterclaim Defendants.

189.   Further, an equitable lien, either implied or by agreement, exists on the amounts United overpaid or paid in error on its own behalf and on behalf of ERISA Plans to Counterclaim Defendants in reliance on the fraudulent claims based on the language in the ERISA Plans requiring return of overpayments and amounts paid in error.  Upon information and belief, United believes that the sums that the Plaintiffs overcharged United are still in the possession, custody or control of the Counterclaim Defendants.

190.   Restitution and trust remedies include, among other things, return of the amounts paid by United based on the fraudulent claims.  United seeks return of monies paid to Counterclaim Defendants on behalf of the ERISA Plans that constituted overpayments or erroneous payments.

### SIXTH CAUSE OF ACTION
### (For Declaratory and Injunctive Relief under ERISA §502(a)(3))
### (Against All Counterclaim Defendants)

191.   United realleges and incorporates by references Paragraphs 1 through 190 as though fully set forth herein.

192.   United acts as claims fiduciary for many of the ERISA Plans and has standing to sue under ERISA § 502(a)(3) for injunctive relief to redress violations of such ERISA Plans or to enforce any provisions of these ERISA Plans.

193.   Defendants have engaged in a scheme to defraud United into paying amounts to Counterclaim Defendants in excess of the amounts owed under the ERISA Plans, as discussed above.

194.   United is entitled to a judicial declaration pursuant to ERISA § 502(a)(3) that Counterclaim Defendants are not entitled to any additional

payments from United or the ERISA Plans unless and until they reimburse United and the ERISA Plans for all amounts they wrongfully obtained as a result of their scheme to defraud United.

195.   United further seeks a declaratory judgment decreeing the right, duties and obligations of the parties under the ERISA Plans.

196.   United also seeks an order enjoining Counterclaim Defendants from billing United for amounts for which the Counterclaim Defendants had indicated they would waive Member Responsibility Amounts or otherwise accept payments from United or the Plans as full compensation for their services, or alternatively for an order enjoining the Counterclaim Defendants from billing United/the ERISA Plans for amounts which do not reflect the failure to collect Member Responsibility Amounts, or that in any other way artificially inflate amounts.

197.   United also seeks a constructive trust or equitable lien on the monies currently held by Counterclaim Defendants as a result of the overpayments by United, an order restoring the overpayments currently being held by Counterclaim Defendants in constructive trust or pursuant to an equitable lien, and other appropriate equitable relief.

198.   Finally, United requests injunctive relief precluding the Counterclaim Defendants from profiting from their promise to waive Member Responsibility Amounts, or from seeking to recover sums that would be inconsistent with those promises.

## PRAYER FOR RELIEF

WHEREFORE United prays for the following relief:

1.      That judgment be entered in favor of United on its counterclaims against the Counterclaim Defendants in an amount exceeding $75,000.

2.      That the Court issue equitable relief requiring the Counterclaim Defendants to return or replay all sums that were fraudulently or inappropriately paid to the Counterclaim Defendants.

3.    For an injunction precluding the Defendants from submitting future false or fraudulent requests for payment including all requests for payment related to patients to whom the Counterclaim Defendants agreed they would waive Member Responsibility Amounts or would otherwise  not balance bill the patient.

4.    For an order and injunction precluding the Counterclaim Defendants from profiting from their illegal promises to waive Patient Responsibility Amounts, including by seeking to enforce claims inconsistent with those promises.

5.    For declaratory relief adjudicating the amounts owed to United, and that United is not obligated to pay for care or services that were illegally induced by the Counterclaim Defendants' promises to waive Member Responsibility Amounts, as well as a set off from any sums due to Plaintiffs.

6.    That the Court award reasonable attorneys' fees and costs to United.

7.    Such other legal and equitable relief as this Court deems just and proper.

Dated:  May 12, 2014                          **WALRAVEN & WESTERFELD LLP**

                                              /s/ Bryan S. Westerfeld
                                          By: BRYAN S. WESTERFELD

                                          Attorneys for Defendant UnitedHealth
                                          Group, Inc., and Counterclaim
                                          Plaintiffs/Defendants United Healthcare
                                          Services, Inc., UnitedHealthcare
                                          Insurance Company, and OptumInsight,
                                          Inc.

Dated:  May 12, 2014                          **DORSEY & WHITNEY LLP**

                                              /s/ R.J. Zayed
                                          By: R.J. ZAYED

                                          *Pro Hac Vice Admission Pending*
                                          Attorneys for Defendant UnitedHealth
                                          Group, Inc., and Counterclaim
                                          Plaintiffs/Defendants United Healthcare
                                          Services, Inc., UnitedHealthcare
                                          Insurance Company, and OptumInsight,
                                          Inc.

1

## PROOF OF SERVICE

2  STATE OF CALIFORNIA          )
                                ) ss
3  COUNTY OF ORANGE             )

4          I am employed in the County of Orange, State of California.  I am over

5  the age of 18 years and not a party to the within action.  My business address is 101

6  Enterprise, Suite 350, Aliso Viejo, CA 92656.

7          On May 12, 2014, I served the foregoing document(s) described as

8  **AMENDED ANSWER AND COUNTERCLAIM**

9  on all interested parties in this action as follows (or as on the attached service list):

10  DARON L. TOOCH                    E-Mail:
                                      dtooch@health-law.com
11  BRYCE WOOLLEY
    **HOOPER, LUNDY & BOOKMAN, P.C.**  bwoolley@health-law.com
12  1875 Century Park East, Suite 1600
13  Los Angeles, California 90067-2517

14  ☒      BY CM/ECF NOTICE OF ELECTRONIC FILING: I electronically filed the
    document(s) with the Clerk of the Court by using the *CM/ECF* system. Participants in
15  the case who are registered *CM/ECF* users will be served by the *CM/ECF* system.
    Participants in the case who are not registered *CM/ECF* users will be served by mail or
16  by other means permitted by the court rules.

17  AND

18  ☒      (VIA U.S. MAIL) I served the foregoing document(s) by U.S. Mail, as follows: I
    placed true copies of the document(s) in a sealed envelope addressed to each interested party
19  as shown above.  I placed each such envelope with postage thereon fully prepaid, for
    collection and mailing at Walraven & Westerfeld LLP, Aliso Viejo, California.  I am readily
20  familiar with Walraven & Westerfeld LLP's practice for collection and processing of
    correspondence for mailing with the United States Postal Service.  Under that practice, the
21  correspondence would be deposited in the United States Postal Service on that same day in
    the ordinary course of business.

22

23

24          I declare under penalty of perjury under the laws of the State of California

25  that the above is true and correct.

26          Executed on May 12, 2014, at Aliso Viejo, California.

27

28
                                        Jessica M. Ridley