**BRYAN WESTERFELD (S.B. # 218253)**
bwesterfeld@calemployerlaw.com
**NICOLE E. WURSHER (S.B # 245879)**
nwurscher@calemployerlaw.com
**WALRAVEN & WESTERFELD LLP**
101 Enterprise, Suite 350
Aliso Viejo, CA 92656
Telephone:   (949) 215-1997
Facsimile:    (949) 215-1999

**R.J. ZAYED (MN ID #0309849)**
zayed.rj@dorsey.com
**STEPHEN P. LUCKE (MN ID #151210)**
lucke.steve@dorsey.com
**TIMOTHY BRANSON (MN ID #174713)**
branson.tim@dorsey.com
*Admitted pro hac vice admission pending*
**DORSEY & WHITNEY LLP**
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:   (612) 340-2600
Facsimile:    (612) 340-2868

Attorneys for Defendant UnitedHealth Group, Inc.;
and Defendants/Counterclaim Plaintiffs
United Healthcare Services, Inc., UnitedHealthcare
Insurance Company; OptumInsight, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company; BAKERSFIELD SURGERY INSTITUTE, LLC, a California limited liability company; INDEPENDENT MEDICAL SERVICES, INC., a California corporation; MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC., a California corporation; NEW LIFE SURGERY CENTER, LLC, a California limited liability company, dba BEVERLY HILLS SURGERY CENTER, LLC; ORANGE GROVE SURGERY CENTER, LLC, a California limited liability company; SAN DIEGO AMBULATORY SURGERY CENTER, LLC, a California limited liability company; SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, INC., a California corporation; VALENCIA AMBULATORY SURGERY CENTER, LLC, a California limited liability company; WEST HILLS SURGERY CENTER, LLC, a | Case No 2:14-cv-03053-MWF(VBKx)<br><br>**FIRST AMENDED COUNTERCLAIM**<br><br>(Superior Court of the State of California, County of Los Angeles, Central District Case Number: BC540056)<br><br>Complaint filed:  March 21, 2014 |

California limited liability company,

PLAINTIFFS,

v.

UNITEDHEALTH GROUP, INC.; UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY; OPTUMINSIGHT, INC., AND DOES 1 THROUGH 20,

Defendants.

_____

UNITED HEALTHCARE SERVICES, INC.; UNITEDHEALTHCARE INSURANCE COMPANY; OPTUMINSIGHT, INC.,

Counterclaim Plaintiffs,

v.

ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company; BAKERSFIELD SURGERY INSTITUTE, LLC, a California limited liability company; BEVERLY HILLS SURGERY CENTER, LLC; INDEPENDENT MEDICAL SERVICES, INC., a California corporation; MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC., a California corporation; NEW LIFE SURGERY CENTER, LLC, a California limited liability company, dba BEVERLY HILLS SURGERY CENTER, LLC; ORANGE GROVE SURGERY CENTER, LLC, a California limited liability company; SAN DIEGO AMBULATORY SURGERY CENTER, LLC, a California limited liability company; SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, INC., a California corporation; VALENCIA AMBULATORY SURGERY CENTER, LLC, a California limited liability company; WEST HILLS SURGERY CENTER, LLC, a California limited liability company, KAMBIZ BENJAMIN OMIDI (A/K/A JULIAN OMIDI, COMBIZ OMIDI, KAMBIZ OMIDI, COMBIZ JULIAN OMIDI, KAMBIZ BENIAMIA OMIDI, JULIAN C. OMIDI); MICHAEL OMIDI,

1  M.D.; ALMONT AMBULATORY
   SURGERY CENTER, A MEDICAL
2  CORPORATION; BAKERSFIELD
   SURGERY INSTITUTE, INC.; CIRO
3  SURGERY CENTER, LLC; EAST BAY
   AMBULATORY SURGERY CENTER,
4  LLC; SKIN CANCER &
   RECONSTRUTIVE SURGERY
5  SPECIALISTS OF WEST HILLS, INC.;
   VALLEY SURGICAL CENTER, LLC;
6  TOP SURGEONS, INC.; TOP SURGEONS,
   LLC; TOP SURGEONS LLC (NEVADA);
7  WOODLAKE AMBULATORY;
   PALMDALE AMBULATORY SURGERY
8  CENTER, A MEDICAL CORPORATION;
   1 800 GET THIN, LLC; SURGERY
9  CENTER MANAGEMENT; DOES 1-200,

10              Counterclaim Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

FIRST AMENDED COUNTERCLAIM ................................................................... 1

SUMMARY OF ACTION ................................................................................. 1

PARTIES ........................................................................................................ 5

    I.     UNITED .......................................................................................... 5

    II.    COUNTERCLAIM DEFENDANTS ................................................. 5

          A.    The Omidis .............................................................................. 5

          B.    Top Surgeons .......................................................................... 6

          C.    Billing Entities ........................................................................ 7

          D.    1-800-GET-THIN ................................................................... 7

          E.    Surgery Centers ...................................................................... 8

JURISDICTION AND VENUE ...................................................................... 13

FACTUAL ALLEGATIONS ......................................................................... 13

    I.     COUNTERCLAIM DEFENDANTS' WAIVER OF MEMBER RESPONSIBILITY AMOUNT MISLEADS UNITED ................... 13

    II.    COUNTERCLAIM DEFENDANTS' CONSPIRACY AND SCHEME TO DEFRAUD UNITED AND THE UNITED PLANS THROUGH THE OMIDI NETWORK ............................... 17

          A.    Counterclaim Defendants Funnel Patients Into The Vast Omidi Network of Lap Band Surgery Centers and Associated Providers Through 1-800-GET-THIN ................. 17

          B.    The Omidis Exercise Control Over the Counterclaim Defendants and the Omidi Network in The Scheme to Defraud .............................................................................. 20

                i.    The Omidis Operate Counterclaim Defendants Through a Wide Array of Corporate Entities and a Close Circle of Individuals ........................................... 20

                ii.    The Hub of the Omidi Network: 9001 Wilshire Boulevard, Suite 106 ...................................... 27

                iii.    The Counterclaim Defendants' Business Addresses at "The Beverly Hills Postal Place" ............................... 29

                iv.    The Counterclaim Defendants Used This Web of Corporate Entities to Control and Conceal Payments from United ................................................ 32

                     1.    Members of the Omidi Network Regularly

Endorse Checks Written to Other Entities or Individuals in the Omidi Network ...................... 39

2. Payments to the Counterclaim Defendants Were Routinely Commingled With Other Omidi-Network Entities........................................ 45

v. The Omidis and Their Company, Top Surgeons, Control the Day to Day Operations of the Counterclaim Defendants and Persons and Entities in the Omidi Network........................................ 48

C. Counterclaim Defendants Misrepresented Charges By Failing to Disclose Their Routine Waiver Member Responsibility Amounts, and Performed Unnecessary Services, Submitted Fraudulent Bills, and/or Inflated Charges to Secure Reimbursement for Uncovered Services ................................................................................... 55

i. Counterclaim Defendants Routinely Waived Patient Responsibility Amounts and Engaged in Other Improper Practices............................................................ 58

1. United Member 8 .................................................. 58

2. United Member 1 .................................................. 66

3. United Member 2 .................................................. 70

4. United Member 3 .................................................. 72

5. United Member 9  ................................................. 74

6. United Member 10 ................................................ 76

7. United Member 11 ................................................ 77

8. United Member 12  ............................................... 79

9. United Member 13 ................................................ 81

10. United Member 15 ................................................ 83

ii. Counterclaim Defendants Concealed Lap Band Surgery on Claims Forms and Instead Billed United Inflate Charges For Hernia Surgery .............................. 84

1. United Member 4 .................................................. 84

2. United Member 5 .................................................. 88

3. United Member 6 .................................................. 91

iii. Counterclaim Defendants Inflated Patients' BMI  In An Attempt To Obtain Coverage for Lap Band Services ................................................................................... 94

1.    United Member 7 ................................................... 94

2.    United Member 6 ................................................... 96

3.    United Member 14 ................................................ 99

i.    Counterclaim Defendants Submitted Claims and Wrongfully Induced United to Pay Amounts That Were Greater Than their Normal Cash Charges or the Usual, Customary, and Reasonable Charges for the Same Procedures ...................................................... 99

ii.    United Paid Numerous Claims In Good Faith Based On Defendants' Misrepresentations ............................ 101

FIRST CAUSE OF ACTION (Fraud) .................................................. 102

SECOND CAUSE OF ACTION (Unfair Business Practices, Business & Professions Code § 17200) ........................................................ 105

THIRD CAUSE OF ACTION (Conspiracy to Commit Fraud) ........................... 107

FOURTH CAUSE OF ACTION (Intentional Interference with Contractual Relationships) ......................................................... 111

FIFTH CAUSE OF ACTION (Restitution under ERISA § 502(a)(3)) ............... 112

SIXTH CAUSE OF ACTION (For Declaratory and Injunctive Relief under ERISA § 502(a)(3)) ....................................................... 118

PRAYER FOR RELIEF ....................................................... 120

## FIRST AMENDED COUNTERCLAIM

Counterclaim Plaintiffs UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY, AND OPTUMINSIGHT, INC., (collectively "United") allege, upon personal knowledge and upon information and belief, as follows:

## SUMMARY OF ACTION

1.      United seeks to recover millions of dollars paid to brothers Julian and Michael Omidi (the "Omidis") through their 1-800-GET-THIN referral network and network of ambulatory surgical centers and related entities as a result of their unlawful scheme and artifice to defraud United and the health plans insured or administered by United (the "United Plans") and to illegally enrich themselves through false and fraudulent pretenses, representations, and promises.

2.      In its capacities as an insurer and a claims administrator, United is responsible for administering the hundreds of millions of health care claims it receives every year.  United is responsible for making efforts to safeguard and protect itself, its members, and the various employer group health benefit plans from fraud, waste, and abuse—like the fraud at issue here.  In many instances, however, United must comply with varying and complex laws and regulations dictating the speed at which United must pay these claims.  By practical necessity, United reasonably relies in good faith on the claims submitted to it by providers, including Counterclaim Defendants.  By submitting the fraudulent and otherwise exorbitant health care claims described in this Counterclaim, Counterclaim Defendants knowingly took advantage of United's obligations to promptly pay claims.

3.      For years, the Counterclaim Defendants acted under the control of the Omidis and in concert with each other to induce (or conspire to induce) patients covered under the United Plans to obtain medical services from them on an out-of-network basis by promising to waive copay, coinsurance, deductibles, and other

patient financial responsibility amounts ("Member Responsibility Amounts"), and then submitting bills to United with overstated and unreasonable charges for these out-of-network services, which included the secretly-waived patient-responsibility amounts.

4.     Consistent with industry practice, the United Plans are commonly designed with higher patient-responsibility amounts for out-of-network services. These higher amounts incentivize patients to obtain services on a (less costly) in-network basis, and serve as a check on the higher charges of out-of-network providers, who have not otherwise contracted with United for their rate of reimbursement.  To ensure that the United Plans function as intended, the patient-responsibility amounts are typically a predicate to any responsibility of a United Plan to provide coverage for services.  Thus, if a provider undermines the operation of the health plan by waiving patient-responsibility, the provider has likewise negated coverage under the member's United Plan.

5.     The Counterclaim Defendants promised patients on a routine basis that they would waive patient-responsibility amounts and accept, as payment in full, whatever amount would be paid under their health plan, thereby removing the patient's financial incentive to ensure the care is medically appropriate, necessary, and cost-effective.  The Counterclaim Defendants did not disclose these routine waivers to United and, instead, submitted falsified claim forms that overstated the total charges for the procedure by, among other things, including the patient-responsibility amounts as charges, even though the patients would not be charged.  As a direct result of—and in justifiable reliance upon—this false billing, United was induced to approve claims for payment under the United Plans totaling many millions of dollars when, in reality, such claims were not covered.  The scheme also resulted in higher utilization of costly out-of-network health services, as patients were induced to obtain treatments for services that they otherwise would not have

sought or paid for, or obtain services at a higher out-of-network cost than they otherwise would have incurred.

6.     For example, as alleged in greater detail below, Counterclaim Defendants told one patient, referred to herein as United Member 8, that her health benefit plan covered all costs associated with her Lap Band surgery, even though Counterclaim Defendants learned after checking with United that United Member 8's plan did not cover Lap Band surgery.  Counterclaim Defendants, however, told United Member 8 that her plan covered Lap Band surgery and that she needed to undergo a variety of costly medical services "in preparation for" such surgery.  In reliance on this representation, United Member 8 underwent an endoscopy and suffered severe injury.  Counterclaim Defendants then billed United an exorbitant and excessive amount for the endoscopy procedure, which included the waived Member Responsibility Amounts.  Further, Counterclaim Defendants submitted multiple claims for services that were never rendered, including a nutritionist consultation, a psychological examination, psychological testing, and an ultrasound, and inflated the CPT codes billed for other services.

7.     Likewise, on numerous occasions, Counterclaim Defendants waived Member Responsibility Amounts and submitted claims for procedures they never performed, including with respect to United Members 1, 2, 3, 9, 10, 11, 12, 13, and 15 discussed herein.

8.     In addition to submitting false bills that surreptitiously and fraudulently charged United for amounts due from the members, the Counterclaim Defendants conspired to—and did—submit fraudulent claims to induce United to pay for Lap Band services that were not covered, never performed, or substantiated by false medical records.  For example, through their Beverly Hills Surgery Center clinic, the Counterclaim Defendants devised a reason to perform hernia surgeries on United Members 4 and 5 only after United advised them that Lap Band surgeries were not covered under plans at issue, and then received payment for the

unauthorized Lap Band surgeries  by disguising the surgery as hernia repair on claims submitted to United.  On claims forms submitted to United, Counterclaim Defendants fraudulently concealed that Lap Bands were placed in United Members 4, 5, and 6.  In other instances, as with United Members 6, 7, and 14, Counterclaim Defendants manipulated the reported height, weight, or BMI calculation of United members to substantiate the performance of Lap Band surgery, when Counterclaim Defendants knew the United Members' BMI did not meet the coverage provisions of the plans at issue.

9.     The Counterclaim Defendants concealed their scheme through various means, including the creation of hundreds of business organizations, the use of sham and shifting business addresses and names, and the commingling of funds paid by United among various entities and bank accounts controlled by the Omidis or the Counterclaim Defendants, acting in concert with each other.  These organizations operate out of a small number of shared spaces, including the Omidis' central office at 9001 Wilshire Boulevard, Suite 106, in Beverly Hills, California, as well as a series of mailboxes rented from public mail and copy stores.

10.     Unbeknownst to United, Counterclaim Defendants, using the deceptive corporate and billing practices alleged herein, continued to submit and receive payment for fraudulent claims, with some claims submitted as late as 2013.

11.     For these and other acts and omissions as alleged herein, United seeks damages, restitution, and other relief on behalf of itself and the health plans it administers for all sums paid to the Counterclaim Defendants as a direct result of their fraudulent scheme and billings to United as set forth more fully herein.  United also seeks (1) injunctive relief to stop Counterclaim Defendants from continuing their wrongful conduct, (2) a declaration that any unpaid claims submitted by Counterclaim Defendants are not payable, and (3) injunctive relief precluding the Counterclaim Defendants from profiting from their promise to induce participants

into receiving care by promising to waive co-pays, co-insurance and other forms of patient responsibility in return for the United members' decision to obtain services.

## PARTIES

### I.   UNITED

12.   Counterclaim Plaintiff UNITED HEALTHCARE SERVICES, INC. is a Minnesota Corporation with its principal place of business in Minnetonka, Minnesota.

13.   Counterclaim Plaintiff UNITEDHEALTHCARE INSURANCE COMPANY is a Connecticut Corporation with its principal place of business in Hartford, Connecticut.

14.   Counterclaim Plaintiff OPTUMINSIGHT, INC. is a Delaware Corporation with its principal place of business in Eden Prairie, Minnesota.

### II.   COUNTERCLAIM DEFENDANTS

#### A.   **The Omidis**

15.   KAMBIZ BENJAMIN OMIDI A/K/A JULIAN OMIDI, COMBIZ OMIDI, KAMBIZ OMIDI, COMBIZ JULIAN OMIDI, KAMBIZ BENIAMIA OMIDI, JULIAN C. OMIDI ("Julian Omidi") is an individual who is a citizen of California. Julian Omidi was at one time licensed to practice, and did practice, medicine in the State of California, but the Medical Board of the State of California revoked Julian Omidi's physician and surgical license in June 2009.  Among other things, the Medical Board of the State of California found that Julian Omidi (1) "perpetrated a fraud" on the Board by failing to disclose information; (2) committed "misrepresentation and dishonesty . . .go[ing] to the core of his ability to practice his profession"; and (3) has a "penchant for dishonesty, to bend his position and shade his statements to suit his needs, without consistent regard for the truth."

16.   MICHAEL OMIDI, M.D. is an individual who is a citizen of California.  United is informed and believes that Michael Omidi holds a current physician and surgical license in the State of California.  In June 2008, the State of

California revoked Michael Omidi's physician and surgical license, but the revocation was stayed pending successful completion of a three-year probationary period which Michael Omidi, upon information and belief, successfully completed. In April 2013, the Medical Board of the State of California formally accused Michael Omidi of "repeated acts of negligence in the care and treatment of patient G.B." These allegations are still pending.

17.     As alleged below in more detail, the Omidis have used a sophisticated network of health care providers and other corporate entities, along with a close circle of individuals, to create a lucrative enterprise that defrauded the public, United, and health plans out of millions of dollars through a web of fraudulent practices. This network of corporate entities, health care providers, employees, administrators, agents, and co-conspirators will be referred to as the "Omidi Network." Each of the Counterclaim Defendants is operated or controlled by the Omidis and acts in concert with and is part of this Network.

**B.     Top Surgeons**

18.     TOP SURGEONS, INC. is a California corporation with its principal place of business in California.   According to Secretary of State records signed by Michael Omidi, TOP SURGEONS, INC. was organized and incorporated in 2006 by Michael Omidi, who is also the CEO. His brother, Julian Omidi, is the registered agent.

19.     As Organizer/Incorporator, Michael Omidi converted TOP SURGEONS, INC. to TOP SURGEONS, LLC, a California limited liability company with its principal place of business in California, in 2008. TOP SURGEONS, LLC operated at the same business address as its predecessor.

20.     TOP SURGEONS, LLC ("Top Surgeons Nevada") is a Nevada limited liability company. According to Nevada Secretary of State records signed by Julian Omidi, Top Surgeons Nevada was organized by its Manager, Julian Omidi, in December of 2008. In January of 2009, Julian Omidi was also registered with the

Nevada Secretary of State as the President and Registered Agent for Top Surgeons Nevada.   Subsequent Secretary of State filings signed by Julian Omidi in September 2009 and February 2011 confirm that Julian Omidi remained the Manager of Top Surgeons Nevada through at least the end of 2011.

21.   Collectively, these entities will be referred to herein as "Top Surgeons."

### C.   Billing Entities

22.   INDEPENDENT MEDICAL SERVICES, INC. ("IMS") is a California corporation with its principal place of business in California.  Records maintained by the National Provider Identifier ("NPI") Registry[1] and the California Medical Board reflect that Michael Omidi is the President of IMS and that IMS operates out of the same business address as many of the other Counterclaim Defendants.  Further, Secretary of State records reflect that IMS is organized or operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

23.   SURGERY CENTER MANAGEMENT, LLC ("Surgery Center Management") is a California limited liability company with its principal place of business in California.  Records maintained by the California Secretary of State reflect that Surgery Center Management operates out of the same address as many of the other Counterclaim Defendants and is organized or operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

### D.   1-800-GET THIN

24.   1-800-GET-THIN, LLC ("1-800-GET-THIN") is a California limited liability company with its principal place of business in California.  Records

---

[1] The National Provider Identifier ("NPI") is a unique, 10-digit identification number that the Center for Medicaid and Medicare Services assigns to every covered health care provider in the country.  The NPI Registry allows the public to search for a provider's name, address, authorized official, and other information associated with a specific NPI number.

maintained by the California Secretary of State reflect that 1-800-GET-THIN and is organized or operated by persons or entities who are part of the Omidi Network.

### E.    Surgery Centers

25.    ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION is a California corporation with its principal place of business in California.  According to Secretary of State records signed by Michael Omidi, Michael Omidi is the CEO of ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION and his mother, Cindy Omidi, is the registered agent.  Records maintained by the NPI Registry reflect that Michael Omidi is the President of Almont Ambulatory Surgery Center, Inc. d/b/a Top Surgeons, which is, upon information and belief, the same corporate entity as ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION.

26.    On December 16, 2009, ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION was converted to ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company with its principal place of business in Beverly Hills, California. ALMONT AMBULATORY SURGERY CENTER, LLC operates at the same business address as its predecessor.  Collectively these entities will be referred to herein as "Almont ASC."

27.    BAKERSFIELD SURGERY INSTITUTE, INC.is a California corporation with its principal place of business in California.  According to Secretary of State records, Michael Omidi is the Organizer/Incorporator and CEO of BAKERSFIELD SURGERY INSTITUTE,  INC.  His mother, Cindy Omidi, is the registered agent.

28.    On June 20, 2008, Michael Omidi, as Organizer/Incorporator, converted BAKERSFIELD SURGERY INSTITUTE, INC. to BAKERSFIELD SURGERY INSTITUTE, LLC, a California limited liability company with its principal place of business in California.  Records maintained by the NPI Registry

reflect that these entities have the same mailing address. Collectively these entities will be referred to herein as "Bakersfield Surgery Institute."

29.     BEVERLY HILLS SURGERY CENTER, LLC ("Beverly Hills Surgery Center") is a California limited liability company with its principal place of business in California.  Records maintained by the NPI Registry reflect that Beverly Hills Surgery Center operates out of the same business address as many of the other Counterclaim Defendants.  Further, California Secretary of State records reflect that Beverly Hills Surgery Center is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

30.     CIRO SURGERY CENTER, LLC ("Ciro Surgery Center"), is a California limited liability company with its principal place of business in California.  Records maintained by the California Secretary of State reflect that Ciro Surgery Center operates out of the same business address as many of the other Counterclaim Defendants, and is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

31.     EAST BAY AMBULATORY SURGERY CENTER, LLC ("East Bay ASC"), is a California limited liability company with its principal place of business in California.  Secretary of State records reflect that East Bay ASC is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

32.     MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC. ("Modern Institute"), is a California corporation with its principal place of business in Beverly Hills, California.  Secretary of State records reflect that Modern Institute is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

33.     NEW LIFE SURGERY CENTER, LLC d/b/a BEVERLY HILLS SURGERY CENTER, LLC ("New Life Surgery Center"), is a California limited liability company with its principal place of business in Beverly Hills, California.

Records maintained by the California Secretary of State and the NPI Registry reflect that New Life Surgery Center is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

34.    ORANGE GROVE SURGERY CENTER, LLC ("Orange Grove Surgery Center") is a California limited liability company with its principal place of business in California.  Records maintained by the California Secretary of State reflect that Orange Grove Surgery Center operates out of the same business address as many of the other Counterclaim Defendants, and is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

35.    PALMDALE AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION is a California corporation with its principal place of business in California. Records maintained by the California Secretary of State reflect that Michael Omidi organized/incorporated PALMDALE AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION and serves as its CEO.  The NPI Registry also reflects that Michael Omidi is the Owner of Palmdale Ambulatory Surgery Center, which is, upon information and belief, the same corporate entity.

36.    On June 20, 2008, Michael Omidi, as Organizer/Incorporator, converted PALMDALE AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION  to PALMDALE AMBULATORY SURGERY CENTER, LLC, a California limited liability corporation with its principal place of business in California.  PALMDALE AMBULATORY SURGERY CENTER, LLC operated at the same business address as its predecessor.  Collectively, these entities will be referred to herein as "Palmdale ASC."

37.    SAN DIEGO AMBULATORY SURGERY CENTER, LLC ("San Diego ASC"), is a California limited liability company with its principal place of business in California.  Records maintained by the California Secretary of State reflect that San Diego ASC operates out of the same business address as many of

the other Counterclaim Defendants and is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

38.     SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, LLC, is a California limited liability company with its principal place of business in Beverly Hills, California.  Records maintained by the California Secretary of State and the NPI Registry reflect that SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, LLC was organized/incorporated by its "owner" Michael Omidi.

39.     SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF WEST HILLS, INC., is a California corporation with its principal place of business in California.  Records maintained by the California Secretary of State and the NPI  Registry reflect that SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF WEST HILLS, LLC was organized/incorporated by its "Medical Director" Michael Omidi.  Collectively these entities will be referred to herein as "Skin Cancer Surgery Specialists."

40.     VALENCIA AMBULATORY SURGERY CENTER, LLC ("Valencia ASC"), is a California limited liability company with its principal place of business in California.  Records maintained by the California Secretary of State and the NPI Registry reflect that Valencia ASC was organized/incorporated by Julian Omidi, and that his mother, Cindy Omidi, serves as its Executive Director.

41.     VALLEY SURGICAL CENTER, LLC ("Valley Surgical Center"), is a California limited liability company, with its principal place of business in California.  Records maintained by the California Secretary of State reflect that Valley Surgical Center operates out of the same business address as many of the other Counterclaim Defendants, and is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

42.     WEST HILLS SURGERY CENTER, LLC ("West Hills Surgery Center"), is a California limited liability company with its principal place of

business in California.  Records maintained by the California Secretary of State and the NPI Registry reflect that West Hills Surgery Center operates out of the same business addresses as many of the other Counterclaim Defendants and is operated by persons or entities who are, as described below, associated with and controlled by the Omidis.

43.     WOODLAKE AMBULATORY SURGERY CENTER, A MEDICAL CORP. is a California corporation with its principal place of business in California . Records maintained by the California Secretary of State and the NPI Registry reflect that WOODLAKE AMBULATORY SURGERY CENTER, A MEDICAL CORP. was organized/incorporated by Michael Omidi, its CEO and Owner/Operator.

44.     WOODLAKE AMBULATORY SURGERY CENTER, LLC is a California limited liability company with its principal place of business in California and was organized/incorporated by Michael Omidi, its Owner Operator. WOODLAKE AMBULATORY SURGERY CENTER, LLC is, upon information and belief, the successor to WOODLAKE AMBULATORY SURGERY CENTER, A MEDICAL CORP.  Collectively, these entities will be referred to as "Woodlake ASC."

45.     The true names and capacities, whether individual, corporate, associate or otherwise, of Does 1-200, inclusive, are unknown to United, who therefore sues these parties by such fictitious names.  United is informed and believes that each of the entities designated as a Doe is a resident of, or business entity doing business in, the State of California, is part of the Omidi Network, is responsible in some manner for the events and happenings referred to herein, and proximately caused injury and damages to United.

46.     All of the parties listed in Paragraphs 15-45 above shall be collectively referred to as the "Counterclaim Defendants."  All of the Counterclaim Defendants acting as a corporation, limited liability company, or other association, including

those referred to in Paragraphs 18-44 shall be referred to collectively as the "Corporate Counterclaim Defendants."

47.     Each of the Corporate Counterclaim Defendants is under the operation, direction, or control of the Omidis.

## JURISDICTION AND VENUE

48.     Because several of the counterclaims raised in this matter arise under federal law, this Court has jurisdiction to hear them under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).  Further, because the counterclaims arise out of the same transaction or occurrence that are the subject matter of the Plaintiffs' Complaint, this Court has jurisdiction over the claims set forth in the counterclaim pursuant Fed. R. Civ. P. 13 and the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

49.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because any or all of the Counterclaim Defendants reside in this judicial district, all Counterclaim Defendants are residents of the State of California, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

50.     Counterclaim Plaintiffs have submitted to personal jurisdiction of this Court by filing their Counterclaim in this Court.

## FACTUAL ALLEGATIONS

**I.      COUNTERCLAIM DEFENDANTS' WAIVER OF MEMBER RESPONSIBILITY AMOUNTS MISLEADS UNITED**

51.     United is an insurer and third party claims administrator for employer group health plans, which are sponsored by employers and provide health benefits to their covered employees and dependents. The health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 1001 *et. seq* (the "ERISA Plans"), while those sponsored by governmental employers and certain religious organizations are exempted from ERISA's jurisdiction. United provides insurance and/or administrative services to these employer-sponsored health  plans, including

(subject to the terms of the individual's plan and associated agreements) the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans ("United members").  For the United Plans that are insured directly by United ("insured plans"), benefit payments are made from United's own funds.  For those self-funded benefit plans for which United acts only as claims administrator, and not insurer, benefit payments are made from plan funds provided by the employer-sponsor of the self-funded plans.  United's contractual agreements with the employer-sponsors of such self-funded plans typically specifically grant United the authority to recover overpayments, including through litigation, on behalf of the self-funded plans.

52.     The terms of the specific health benefit plan through which a United member is covered, when United is the insurer or claims administrator, determines whether medical services are covered by the plan and thus are reimbursable ("Covered Services").  The plan also determines the extent to which the United member bears responsibility for a portion of the charge through a copayment, coinsurance, deductible amount, or other Member Responsibility Amounts.

53.     The amount paid by United for Covered Services also depends on whether the services were provided by an in-network or out-of-network provider.  In-network providers have generally agreed to accept a contracted rate from United in exchange for participation in United's network.  Members who choose an in-network provider are generally assured that, for covered services, their responsibility for payment is limited to any applicable copayment, coinsurance and deductible amount provided in their plan.  Out-of-network benefits do not include this assurance.   Accordingly, patients may be "balance billed" by their out-of-network providers for the difference between their charges and any reimbursement paid by United.  Moreover, Member Responsibility Amounts are typically lower for in-network services than for out-of-network services.

54.     Although there are some differences under the various health benefit plans, out-of-network providers are generally reimbursed by United for a certain percentage of "eligible expenses," which are determined based on the total amount charged and the usual, customary, and reasonable charges in the relevant area for the services at issue, as determined by United in its discretion, or a percentage of the Medicare-approved rate, or a percentage of the billed charges, or an applicable industry agreement.

55.     The Counterclaim Defendants submitted numerous bills to United using either a standard (1) CMS-1500 claim form (formerly HFCA-1500) or (2) UB-04 claim form (formerly UB-92), both of which require providers to describe the services provided and procedures performed using certain mandated coding regimes.  These are forms approved and generated in connection with the federal Medicare program, and it is common in the health care industry for these same forms to be used in connection with other governmental and non-governmental insurance.

56.     The CMS-1500 and UB-04 forms also call for the provider to submit its "Charges" or "Total Charge(s)" for each service or procedure and list the "balance due" or "est. amount due."  The Counterclaim Defendants routinely submitted CMS-1500 and UB-04 claim forms to United with amounts for "Charges" or "Total Charge(s)" that included the Member Responsibility Amounts, even though the Counterclaim Defendants had previously told the patients that Member Responsibility Amounts would be waived.  These claim forms and the misrepresentations therein by the Counterclaim Defendants regarding their "Charges" or "Total Charge(s)" were false and misleading.  The Counterclaim Defendants submitted these forms to United, intending for United to rely on the truth and accuracy of the information submitted.

57.     The Office of Inspector General for the Department of Health and Human Services has issued a Special Fraud Alert, specifying that a Medicare

provider who routinely waives patient responsibility amounts and then submits its charges on CMS-1500 and UB-04 claim forms, which include the waived amounts, is misstating its charge and committing fraud.  These same practices by the Counterclaim Defendants and the same misstatement of their charges on the same CMS-1500 and UB-04 claim forms submitted to United were likewise fraudulent, just as they are for patients who are covered by Medicare.

58.    United reasonably relied on the false and misleading claim information submitted by the Counterclaim Defendants regarding their charges and the procedures performed, which resulted in the approval of payments to the Counterclaim Defendants totaling more than $43,000,000 that would not otherwise have been approved.  United did so without knowledge of the routine promises by the Counterclaim Defendants to their patients to waive Member Responsibility Amounts.  Such promises generally negate the purpose of Member Responsibility Amounts under the United Plans, meaning that the Counterclaim Defendants received millions of dollars for services that are not, in fact, covered by health benefit plans under which such payments were made.

59.    United receives nearly two million health care claims per day and must comply with various laws and regulations mandating that such claims be paid within a short period of time.  By practical necessity, United must reasonably and in good faith rely on the veracity of the descriptions of the services rendered as stated on the claims form and the amount of the bill submitted by the provider for each service.  The Counterclaim Defendants took advantage of United's efforts to process claims expeditiously and in compliance with such laws and regulations by repeatedly submitting false and misleading claim forms to United that intentionally overstated the amount charged.  United relied upon the veracity and truthfulness of the Counterclaim Defendants' communications about their billed charges in making these payments.

60.     The Counterclaim Defendants also used their routine waiver of Member Responsibility Amounts to inflate their bills..  Having been lured to the Omidi Network by the promise of having no responsibility to pay for a portion of the medical services, the patients no longer acted as a check on the charges of the Counterclaim Defendants or the use of their services, as they would have if the patients had an obligation to contribute up to 20%-50% of the payment to the Counterclaim Defendants.

61.     United has previously provided to counsel for the Counterclaim Defendants a confidential electronic spreadsheet of claims listing claims totaling over $43,000,000 that were paid as a direct result of the waiver of Member Responsibility Amounts, as well as the other fraudulent billings as alleged below, by the Counterclaim Defendants.  This spreadsheet included the patient name, date of service, procedure code, and amount paid for each claim.  A non-confidential version of this spreadsheet, with columns reflecting patient names and provider TIN numbers removed, is attached as Appendix I hereto.  This Appendix also includes the policy or plan name under which each patient was covered.  Due to the Omidis' fraudulent scheme, United is continuing to uncover additional claims and payments which may supplement those disclosed to Counterclaim Defendants and contained on Appendix I.

## II.     COUNTERCLAIM DEFENDANTS' CONSPIRACY AND SCHEME TO DEFRAUD UNITED AND THE UNITED PLANS THROUGH THE OMIDI NETWORK

### A.     Counterclaim Defendants Funnel Patients Into The Vast Omidi Network of Lap Band Surgery Centers and Associated Providers Through 1-800-GET-THIN

62.     Since at least 2006, the Omidis used their vast network of corporate entities, including Counterclaim Defendants, to create a lucrative illegal enterprise that has defrauded the public, United, and the United Plans out of millions of

dollars though a web of fraudulent practices, in violation of various state and federal laws.

63.     More specifically, the medical providers in the Omidi Network are ambulatory surgery centers that specialize in outpatient laparoscopic gastric banding surgeries – a short, outpatient surgery by which a silicon "Lap Band" is inserted laparoscopic ally around the patient's stomach to control hunger.  Through these ambulatory surgery centers, as well as other affiliated clinics, labs, and other healthcare service providers situated throughout Southern California, Counterclaim Defendants also provided ancillary services that were often promoted and recommended to patients as related to, or in preparation for, the Lap Band surgery, including lab testing, sleep studies, ultrasounds, esophagogastroduodenoscopies (also known as "EGDs"), and cosmetic surgery.

64.     To funnel patients into the Omidi Network, the Counterclaim Defendants have long advertised their services to consumers on billboards, TV, radio, print ads, the internet, and social media across Southern California though the "1-800-GET THIN" marketing campaign.   In a series of articles about the Omidi Network, the *Los Angeles Times* referred to the ads as "blanket[ing] Southern California freeway billboards and broadcast airwaves," and stated that the ad campaign was "as inescapable . . . as smog in summer."  This advertising campaign touts, among other things, that prospective patients will receive high-quality Lap Band procedures.

65.     When a prospective patient calls the 1-800-GET-THIN telephone number, the call is directed to a call center, which is, upon information and belief, operated and controlled by the Omidis and the Counterclaim Defendants through the Omidi Network.  Call center employees then direct potential patients to attend "free" informational "seminars," which feature a physician contracted with the Counterclaim Defendants who speaks to the benefits of the Lap Band surgery.

66.     At these "free" informational meetings, the Counterclaim Defendants

(through the Omidi Network) induce potential patients to obtain medical treatments, including Lap Band surgery, through, among other things, unlawful promises to provide the medical services free of charge to patients, thereby waiving all coinsurance, deductible, and copay amounts, and to accept as full payment for the patients' services whatever amounts the Counterclaim Defendants obtain from the patients' United Plans.

67.     Once the Counterclaim Defendants convince a prospective patient to receive health services, Counterclaim Defendants perform a series of pre-determined medical services, including sleep studies, EGDs, abdominal ultrasounds, and myriad lab tests.  Counterclaim Defendants (through the Omidi Network) told patients and United Members that these services were necessary as part of the preparation for the Lap Band surgery.

68.     After a patient has called to inquire about treatment from Counterclaim Defendants, the Counterclaim Defendants conspire to engage in various fraudulent practices designed to manipulate United to pay for services that were not medically necessary, never provided, or not covered by the terms of the United Plans.  For instance, as demonstrated through the exemplar United Members 1-15 identified herein, Counterclaim Defendants misrepresented the services performed by billing for services that were never provided or billing under an incorrect CPT code, hid services that would not be Covered Services under the terms of the United Plans, and misrepresented the patients' BMI calculations on medical records submitted to United.  The Counterclaim Defendants also submitted grossly excessive claims to United (including in many cases over $140,000 for a service that usually costs between $14,000-$20,000).

69.     While some patients terminated their medical relationship with Counterclaim Defendants without undergoing the Lap Band surgery, many United Members underwent Lap Band surgery at the Counterclaim Defendants' surgery centers.

2:14-CV-03053-MWF (VBKx)

FIRST AMENDED COUNTERCLAIM

70.     In addition to the named Counterclaim Defendants, Does 1-200 are unnamed LLCs and Corporations used by the Omidis to further their conspiracy to defraud patients, claims administrators, health plans, and insurers by using new business organizations in an attempt to evade detection by insurers and claims administrators such as United and to induce United to pay claims that would otherwise not have been paid.

**B.     The Omidis Exercise Control Over the Counterclaim Defendants and the Omidi Network in The Scheme to Defraud**

**i.   The Omidis Operate Counterclaim Defendants Through a Wide Array of Corporate Entities and a Close Circle of Individuals**

71.     For a number of years, and continuing today, Julian and Michael Omidi have operated, either individually or through corporate entities such as Top Surgeons, a network of surgical centers and affiliated health care and service providers, including all of the Counterclaim Defendants in this matter.  These entities have provided medical and administrative services to United members throughout Southern California since at least 2006.  The Counterclaim Defendants receive referrals for United members who respond to the 1-800-GET-THIN marketing campaign, which is, upon information and belief, operated and controlled by the Omidis and the Counterclaim Defendants through the Omidis.  As alleged herein, the Counterclaim Defendants bill for these services through Counterclaim Defendants IMS and Surgery Center Management, among others.  The Omidis control the activities of all other Counterclaim Defendants in this matter, through their individual actions, and their ownership and control of various entities and individuals.

72.     As discussed in more detail below, the Omidis have established hundreds of corporate entities intended to conduct and conceal the fraudulent activities of Counterclaim Defendants, including the Omidis.  The Omidis have

used this collection of corporate entities, which operate as a single network, to conceal and commingle fraudulently-obtained funds, including funds paid by United.

73.    As is further detailed below, United is informed and believes that the Omidis, Top Surgeons, associated individuals, and related corporate entities, own and operate clinics and health care providers in violation of California's statutes precluding the corporate practice of medicine.

74.    In fact, these affiliated entities and the Omidis have been the subject of at least nine lawsuits, including several wrongful death and personal injury lawsuits, two whistleblower lawsuits brought by former employees, and one lawsuit brought by four physicians formerly affiliated with the Omidi Network.  According to the *Los Angeles Times*, the Omidis are currently the subject of investigations by the FBI, the U.S. Food and Drug Administration, the California Department of Insurance, and the Los Angeles Police Department.

75.    The Omidis have carried out their conspiracy and scheme and artifice to defraud United through a wide-reaching network of hundreds of health care service providers, corporate entities, and individuals that expands far beyond the entities that are named in this action.

76.    The Omidis have maintained a close circle of individuals who conspired with and aided and abetted the Omidis to defraud United, the United Plans, and other health plans and insurers.   The Omidis and their agents, including Thomas Cloud, Maureen Jaroscak, Charles Klasky, Robert Macatangay, Araminta Salazar, Dr. Elliot Alpert, Dr. Ryan Stanton, Cindy Omidi, Shawn Pezeshk, Robert Silverman, and Alexander Weisse, who, on information and belief, have acted in concert and conspired to create a complicated network of hundreds of corporate entities designed to, among other things, conceal the true nature of their activities (including the fraudulent billing scheme alleged herein), conceal payments, conceal assets, and conceal the Omidis' ownership and control of the enterprise.  United is

informed and believes that these activities were all undertaken for the purpose of furthering the Omidis' fraud on United, other insurance companies, and other health plans.

77.     Cloud, Jaroscak, Macatangay, Salazar, Alpert, Stanton, Klasky, Pezeshk, Silverman, and Cindy Omidi are named in corporate records as incorporators, owners, CEOs, Presidents, Managers, and Executive Directors for many of the Counterclaim Defendants, including:

a)     Bakersfield Surgery Institute (Michael Omidi – Organizer/Incorporator, Alpert – CEO, Cloud – Director),

b)     Beverly Hills Surgery Center (Cloud – Organizer/Incorporator, Macatangay – CEO, Salazar – Administrator, Abaca – Manager),

c)     Ciro Surgery Center (Jaroscak – signatory on Secretary of State records, Alpert – CEO),

d)     East Bay ASC (Jaroscak – signatory on Secretary of State records, Pezeshk – CEO, Cindy Omidi – Executive Director),

e)     IMS (Jaroscak – signatory on Secretary of State records, Alpert – CEO and Medical Director, Michael Omidi – President),

f)     Modern Institute (Stanton – President & CEO),

g)     New Life Surgery Center (Jaroscak – signatory on Secretary of State records, Pezeshk – CEO, Cindy Omidi – Executive Director),

h)     Orange Grove Surgery Center (Jaroscak – signatory on Secretary of State records, Pezeshk – CEO, Robert Silverman – Attorney),

i)     San Diego ASC (Jaroscak – signatory on Secretary of State records, Pezeshk – CEO, Cindy Omidi – Executive Director),

j)     Skin Cancer Surgery Specialists (Michael Omidi – Organizer/Incorporator and Owner,  Jaroscak – signatory on Secretary of State records, Pezeshk – CEO),

k)     Surgery Center Management (Klasky – CEO),

l)     Valencia ASC (Julian Omidi – Organizer/Incorporator, Jaroscak – signatory on Secretary of State records, Pezeshk – CEO, Cindy Omidi – Executive Director),

m)     Valley Surgical Center (Jaroscak – signatory on Secretary of State records, Pezeshk – CEO, Cindy Omidi – Executive Director, Alpert - Member), and

n)     West Hills Surgery Center (Jaroscak – signatory on Secretary of State records, Pezeshk – CEO, Salazar – Administrator).

78.     These individuals also serve as corporate representatives for hundreds of additional entities that have acted in concert with the Counterclaim Defendants to defraud United and that are ultimately controlled by the Omidis. Many of these entities are identified on **Exhibits A and B** hereto, and share bank accounts with Counterclaim Defendants other entities within the Omidi Network, as reflected on **Exhibit E**.  Upon information and belief, these entities were also used to conceal ownership, activities, payments, assets, and further the fraud on United.

a)     For example, United is informed and believes that the Omidis conspired with Alpert, Jaroscak, Weisse, and others to create dozens of shell companies that were used to elude detection by United and conceal their fraudulent scheme.

i.     These corporations, which have been registered with the California Medical Board, the California Secretary of State, and the NPI Registry, are each named using the first two letters of an Omidi physician's first and last name (*e.g.*, ATMA Medical, Inc. for Atul Madan, M.D.),  and are registered with the California Medical Board as fictitiously-named, physician-owned corporations run by Dr. Elliot Alpert.

ii.     Separately, the Omidis obtained authorization from the physicians, surgeons, and other medical professionals working in their clinics to submit claims on behalf of the medical professionals to insurers, including United,

and further obtained the medical professionals' assignment of all payments related to such claims.

iii.    The Omidis or others under their control then used these shell companies to submit claims to United for reimbursement for services provided at Counterclaim Defendant surgical centers by medical professionals who had separately assigned payments for such claims to the Omidis.  This arrangement effectively enabled the Omidis to conceal the true source of claims submitted to United while at the same time allowing the Omidis to collect United's payment for such claims.

iv.    Unaware of this fraudulent scheme, United wrote checks to a number of these entities, including, for example:

a.  ATMA Medical, Inc., purportedly for the services of Atul Madan, M.D.;

b.  GEME Ultrasound, Inc., purportedly for the services of George Mednik MD;

c.  IRSC Medical, Inc., purportedly for the services of Ira Schwals, M.D.;

d.  JODE Medical, Inc., purportedly for the services of John Debranto, M.D.;

e.  JOOG Medical, Inc., purportedly for the services of John Ogai, M.D.;

f.  JUGE Medical, Inc., purportedly for the services of Julius Wah Gee, D.O.;

g.  RASH Medical, Inc., purportedly for the services of Ramin Shamtob, M.D.; and

h.  ROAZ Medical, Inc., purportedly for the services of Robert Azizi, M.D.

v.      United's checks written to these entities were funneled into bank accounts shared with other Counterclaim Defendants and members of the Omidi Network, including Wells Fargo Account N (as referenced herein).

vi.      Further, California Secretary of State records show that Omidi co-conspirator Alexander Weisse organized/incorporated each of these entities, Omidi co-conspirator Maureen Jaroscak signed their corporate registration papers, and Omidi co-conspirator Dr. Elliot Alpert served as their CEO, and that each of these entities maintain their "principal executive office" at a rented mailbox at the Beverly Hills Postal Place, 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212.  Further, records maintained by the NPI Registry and the California Medical Board show that Dr. Elliot Alpert is the "President" of each of these entities and that they operate from the Omidi hub at 9001 Wilshire Avenue, Suite 106, Beverly Hills, CA 90211.  In fact, none of the servicing physicians are NPI authorized officials for these entities, and certain of these physicians have filed a lawsuit challenging the establishment and operation of these entities.

b)      By further example, Julian Omidi organized and incorporated Pacific West Dermatology, Inc., a Medical Corp., with the California Secretary of State in April 2001; Michael Omidi was the CEO, and their mother, Cindy Omidi, was the registered agent.  Julian Omidi also registered with the NPI Registry as "Owner Operator."  This entity, which operated from the Omidi "hub" at 9001 Wilshire Boulevard, was dissolved in 2008, but, in 2010, Cloud registered Pacific West Dermatology LLC with the California Secretary of State, with Klasky as the named member.  The LLC entity operated from a rented mailbox at the Beverly Hills Postal Place, located at 269 S. Beverly Drive.  United has made multiple payments to Pacific West Dermatology, including one payment with the alternate payee as Alexander Weisse, Esq.

c)      Finally, Robert Silverman, who at times relevant hereto operated Counterclaim Defendant 1-800-GET-THIN, also served as the NPI "authorized

official" for Counterclaim Defendant Orange Grove Surgery Center, which was organized by Omidi associates Jaroscak and Pezeshk.  Additionally, Silverman serves as the NPI authorized official Bay Sleep Centers, LLC and FAZA Dietetics, LLC, both of which were organized by Omidi associates, including Weisse, Jaroscak, and Klasky.

79.     As discussed in more detail below and demonstrated on **Exhibits A and B**, many of the unnamed co-conspirator entities received payments from United for services associated with the 1-800-GET-THIN campaign and the Counterclaim Defendant surgery centers, or were operated out of the Omidis' office.  United is informed and believes that these corporate entities are all controlled by the Omidis and Counterclaim Defendants and have acted in concert and conspired to conceal fraudulent activities from United, to submit fraudulent bills to United, and to funnel funds paid by United to the Counterclaim Defendants, in furtherance of the wide-ranging fraud on United.  United has discovered more than 240 of these entities, many of which are identified throughout this Counterclaim.

80.     Even today, Counterclaim Defendants continue to obfuscate the true nature of their corporate enterprise. In March 2014, the Omidis, or others under their direction and control, registered a number of new entities with the NPI Registry, listing Maureen Jaroscak as the Chief Financial Officer.  The "Business Address" for each of these entities is a single mailbox, number 479, rented from "Mail Box Times" located at 9461 Charleville Blvd., Beverly Hills, CA, 90212.  The "Practice Address" registered for each of these entities corresponds with the address of one of the Counterclaim Defendant surgery centers.  For example, Meadow Surgical Center LLC's registered Practice Address is 25776 McBean Pkwy, Suite 108, Valencia, CA 91355—the location of Counterclaim Defendant Valencia ASC.  Likewise, Salus Medical Services, Inc.'s registered Practice Address is 1980 N. Orange Grove Ave, Pomona, CA 91767—the location of

Counterclaim Defendant Orange Grove Surgery Center.  And, Springhill Surgery Center, LLC's registered "Practice Address" is 9610 Stockdale Hwy Suite A, Bakersfield, CA 93311—the location of Counterclaim Defendant Bakersfield Surgery Institute.

### ii.  The Hub of the Omidi Network: 9001 Wilshire Boulevard, Suite 106

81.    9001 Wilshire Blvd., Beverly Hills, CA 90211, is a three-story medical office building.  As demonstrated in further detail below, continuously from at least August of 2005 to the present, Suite No. 106 at 9001 Wilshire Boulevard has been occupied by the Omidis and members of the Omidi Network, and has served as the hub of the Omidi Network and its illegal and fraudulent activities.  The complete list of Omidi Network entities that United has thus far uncovered as having operated from Suite 106, at some point between August 2005 to the present, is attached hereto as **Exhibit A**.

a)    The Omidis' business, Top Surgeons, has been operating from Suite 106 since 2006 and continues to operate from that address today.

b)    Since at least 2007, both Michael and Julian Omidi have listed Suite 106 as their individual "Practice Address" with the NPI Registry.

c)    Between August 2005 to 2013, Counterclaim Defendant surgery centers Almont ASC, Beverly Hills Surgery Center, Skin Cancer Surgery Specialists, and New Life Surgery Center operated from and performed a variety of medical services at Suite 106.

d)    During this same time period, United communicated through claim forms, explanations of benefits, correspondence, and accreditation records, with various Counterclaim Defendants at Suite No. 106.

e)    The building's directory shows that Suite No. 106 is currently occupied by Counterclaim Defendant Independent Medical Services.

f)      Counterclaim Defendant surgical centers East Bay ASC, San Diego ASC, Bakersfield Surgery Institute, and Palmdale ASC have reported on documents submitted to the California Secretary of State and/or the NPI Registry that Suite No. 106 is their mailing address or principal executive office address.

g)      Additionally, records maintained by the NPI registry and the California Secretary of State show that Suite 106 is the practice location, business address, principal executive office, or mailing address for more than one hundred additional entities, as reflected on **Exhibit A**.  Many of these records were signed by the Omidis themselves, including the records establishing the Top Surgeons entities.

82.    As described above and reflected on **Exhibit A** hereto, Julian Omidi, Michael Omidi, or one of their co-conspirators is listed on corporate records as the President, CEO, owner, or operator of all of these entities.

83.    The Counterclaim Defendants were able to use this wide network of like-named, shifting entities to submit claims for services to elude detection by United as being fraudulent or not covered.

a)      As an example of the shifting corporate structure that United believes to be pervasive throughout the Omidi enterprise, the Omidis operated Counterclaim Defendant Almont ASC at 9001 Wilshire Blvd., Suite 106, Beverly Hills, CA 90211 beginning in 2005.  After conducting an inspection of Almont ASC's facility in 2009, the United States Department of Health and Human Services (Centers for Medicare & Medicaid Services) uncovered numerous deficiencies, including unsanitary conditions, deficient hiring and training of medical personnel, deficient storage and collection of medical records, and a failure of the facility to assess "the quality of care provided, including the medical necessity of the procedures performed."  As a result of these deficiencies, Almont ASC was terminated from the Medicare program.  Nonetheless, the Omidis continued operating the center at the same address under a new name, Beverly Hills

Surgery Center, LLC, a/k/a New Life Surgery Center, LLC.  United is further
informed and believes that the Omidis have repeatedly used this shifting corporate
structure and the various corporate entities under their control, including the
Corporate Counterclaim Defendants, to elude detection by United and induce
United to pay claims that would otherwise not have been paid.

      b)     The Counterclaim Defendants and the Omidis also use these
corporate entities and their identifying information, such as names, addresses, Tax
Identification Numbers and NPI numbers, interchangeably on insurance claims,
business cards, letterhead, invoices, and other documents and records to confuse or
defraud patients and insurance company payors.  For example, while NPI numbers
are assigned to each unique provider, Beverly Hills Surgery Center and IMS have
submitted claims forms to United purporting to bill under Michael Omidi's NPI
number.  Likewise, Beverly Hills Surgery Center and Skin Cancer Surgery
Specialists have submitted claims forms to United purporting to bill under
Counterclaim Defendant Almont ASC's NPI number.  Further, with respect to
United Member 8 discussed herein, Counterclaim Defendants submitted the same
claim under different provider names in an attempt to receive payment for claims
that had already been denied.  United is still uncovering additional corporate
entities which use the NPI numbers assigned to the Counterclaim Defendants
surgical centers on bills submitted to United.

### iii.  The Counterclaim Defendants' Business Addresses at "The Beverly Hills Postal Place"

      84.     Counterclaim Defendants and the larger Omidi Network use rented
mailboxes at 269 South Beverly Drive, Beverly Hills, California, 90212, to further
operate their network of hundreds of corporations and health care service providers.

      85.     As reflected on **Exhibit B** hereto, the following Counterclaim
Defendants have reported to the California Secretary of State that, at some point
between 2005 to the present, their principal executive office is 269 S. Beverly

Drive, Suite 1409, Beverly Hills, CA 90212: Beverly Hills Surgery Center, East Bay ASC, IMS, New Life Surgery Center, Orange Grove Surgery Center, San Diego ASC, Skin Cancer & Reconstructive Surgery Specialists of Beverly Hills, Skin Cancer & Reconstructive Surgery Specialists of West Hills, Valencia ASC, Valley Surgical Center, and West Hills Surgery Center.  Counterclaim Defendants have also purported to submit claims and correspondence to United from this address.

86.     However, 269 South Beverly Drive is not a medical office building or a surgical clinic.  It is a publicly accessible business known as "Beverly Hills Postal Place."  It is located approximately one mile from the Omidis' primary office at 9001 Wilshire Boulevard, Suite 106.  In addition to the various mail and copy services offered by the Beverly Hills Postal Place, the public can rent "private" mailboxes "with a prestigious Beverly Hills street address."  The website for Beverly Hills Postal Place, www.mailboxesbeverlyhills90212.com, states:

> Our most popular service is the private mail boxes with an impressive Beverly Hills street address (not a P.O. box number) in either the well known 90210 or 90212 zip codes – all with 24/7 access and worldwide mail forwarding. …
> When you rent a private mailbox at Beverly Hills Postal Place, your address is:
>           269 South Beverly Drive. # _____
>           Beverly Hills, CA  90212

87.     As further reflected on **Exhibit B**, this same mailbox at the Postal Place was also used as the "principal executive office" address for nearly 100 additional corporate entities during this same time period, all of which were, upon information and belief, operated and controlled by the Omidis or Counterclaim Defendants and used to further the Counterclaim Defendants' scheme to defraud United.

88. The Counterclaim Defendants and other members of the Omidi Network have also conducted significant business from mailbox number 353 at the Beverly Hills Postal Place.

a) For example, Counterclaim Defendants have submitted documents to United authorizing checks for payment of Counterclaim Defendants' services to be written to individual patients and mailed to 269 S. Beverly Drive, Suite 353, Beverly Hills, CA 90212 in an effort to further conceal the Omidis' ownership of these entities and their assets. For instance, Counterclaim Defendants submitted a form titled "MAILING ADDRESS FOR PAYMENT OF ALL CHECKS - READ – VERY IMPORTANT," states that all checks payable for "the professional, medical, facility or any other expenses" of United Members should be mailed, without an "attention" or "to" line or even a corporate entity name, to Suite 353 at the Postal Place.

b) Further, mailbox number 353 has served as the home of Counterclaim Defendants IMS (mailing address), Modern Institute (mailing address), Surgery Center Management (corporate address), Top Surgeons LLC (corporate address), and Woodlake ASC (business address), and the following Omidi owned entities: McBean Surgery Center LLC (business address); Young Image (business address); Weight Loss Center (business address); Gynecology Specialists LLC (business address); No More Poverty, Inc. (corporate address); Pacific West Dermatology LLC (mailing address); American Medical Diagnostics Lab, Inc. (mailing address); Best Insurance Service LLC (business address); and Caring Health Services LLC (business address).

89. Unbeknownst to United at the time, United was induced into paying fees to many of the entities operating out of the mailboxes at the Beverly Hills Postal Place.

#### iv.  **The Counterclaim Defendants Used This Web of Corporate Entities to Control and Conceal Payments from United.**

90.    Since at least 2008, United has paid tens of millions of dollars to the Counterclaim Defendants.  While United continues to investigate and discover additional entities that are part of the Omidi Network, and additional payments made to Omidi Network entities, United has issued checks to Michael and Julian Omidi, the Corporate Counterclaim Defendants, and dozens of entities and individuals which are, upon information and belief, owned, operated, controlled by, or acted in concert with the Omidis.  Following is a table showing the Omidi Network payees United has uncovered so far:

| Payee | No. of Checks | Amount |
|---|---|---|
| ALJO MEDICAL INC | 3 | $37,437.09 |
| ALMONT AMBULATORY SURGERY CENTER | 660 | $8,197,712.24 |
| ANESTHESIA SPECIALIST LLC | 6 | $19,947.40 |
| ARBO MEDICAL INC | 1 | $1,550.00 |
| ATMA MEDICAL INC | 13 | $126,529.66 |
| BAKERSFIELD SURGERY INSTITUTE | 2 | $6,232.55 |
| BAKERSFIELD SURGICAL CENTER | 5 | $38,100.61 |
| BEVERLY HILLS ANESTHESIA LLC | 25 | $121,964.51 |
| BEVERLY HILLS ANESTHESIA LLC /SCOTT C BICKMAN MD | 2 | $14,687.30 |
| BEVERLY HILLS ANESTHESIA LLC /YVONNE F SIAS RNA | 3 | $6,485.44 |
| BEVERLY HILLS ANESTHESIA LLC/STEVEN L MANDEL MC | 3 | $6,549.95 |
| BEVERLY HILLS GASTROENTEROLGY/PEDRAM J ENAYATI MD | 36 | $127,073.26 |
| BEVERLY HILLS GASTROENTEROLOGY | 20 | $56,314.71 |
| BEVERLY HILLS GASTROENTEROLOGY/ATUL MADAN MD | 3 | $11,639.60 |
| BEVERLY HILLS GASTROENTEROLOGY/OMID SHAYE MD | 41 | $167,532.95 |
| BEVERLY HILLS LABORATORY LLC | 32 | $135,235.29 |
| BEVERLY HILLS SURGERY CENTER LLC | 822 | $12,907,890.19 |
| BEVERLY HILLS SURGERY CENTER LLC /GEORGE MEDNIK MD | 30 | $88,314.27 |
| BEVERLY HILLS SURGERY CENTER LLC/ DAVAR ARAM MD | 2 | $9,932.44 |
| BEVERLY HILLS SURGERY CENTER LLC/KIKI L HURT MD | 5 | $15,710.16 |
| BEVERLY HILLS SURGERY LLC | 45 | $531,598.78 |
| BEVERLY HILLS SURGERY LLC/ATUL MADAN MD | 4 | $11,189.25 |
| BEVERLY HILLS UNTRASOUND LLC / GEORGE MEDNIK MD | 4 | $13,893.99 |
| BYCH MEDICAL INC | 1 | $1,870.00 |
| CIRO SURGERY CENTER LLC | 17 | $120,552.37 |
| CORRECTIVE SURGERY SPECIALISTS | 5 | $26,486.38 |
| CYCH MEDICAL INC | 1 | $2,370.00 |

| | | |
|---|---|---|
| CYCH MEDICAL INC/CYNTHIA S CHINN CSW | 1 | $3,489.32 |
| DECH MEDICAL INC | 1 | $1,820.00 |
| EAST BAY ASC LLC | 5 | $108,829.07 |
| ELAL MEDICAL INC | 2 | $6,679.90 |
| ENDOSCOPY SPECIALISTS LLC | 19 | $46,650.07 |
| GASTROINSTESTINAL MED CTR | 2 | $3,680.01 |
| GEME ULTRASOUND INC | 3 | $11,563.38 |
| GEME ULTRASOUND INC/GEORGE MEDNIK MD | 1 | $4,452.14 |
| GEORGE MEDNIK MD | 5 | $40,797.43 |
| GETA MEDICAL INC | 3 | $10,368.75 |
| GETA MEDICAL INC/KEVORK G TASHJIAN MD | 3 | $13,423.13 |
| GYNECOLOGY SPECIALISTS LLC | 2 | $13,113.00 |
| GYNECOLOGY SPECIALISTS LLC/ARAM BONNI MD | 2 | $7,091.59 |
| HEDU MEDICAL INC/HERVE J DUMONT MD | 1 | $1,548.93 |
| HOKA MEDICAL INC | 18 | $83,780.08 |
| HOLI MEDICAL INC | 1 | $1,567.92 |
| HRSC MEDICAL INC | 2 | $19,455.24 |
| INDEPENDENT MEDICAL SERVICES INC | 13 | $89,849.18 |
| INDEPENDENT MEDICAL SERVICES INC/CATALIN G MARINESCU MD | 5 | $30,799.01 |
| IRSC MEDICAL INC/IRA J SCHWALS MD | 1 | $4,050.00 |
| JAMES I RODRIGUEZ | 2 | $9,677.99 |
| JODE MEDICAL INC/JOHN R DEBANTO MD | 6 | $17,551.64 |
| JOOG MEDICAL INC/JOHN OGAI MD | 3 | $14,367.76 |
| JOSE MEDICAL INC | 1 | $2,805.00 |
| JOSEPH HOUSHMAND NAIM MD | 18 | $139,656.62 |
| JOSI MEDICAL INC | 1 | $1,576.32 |
| JUGE MEDICAL INC/JULIUS WAH GEE DO | 4 | $14,082.90 |
| JULIAN OMIDI | 1 | $4,162.72 |
| LABORATORY SPECIALISTS LLC | 7 | $20,294.25 |
| LAPBAND SPECIALISTS LLC | 7 | $62,221.50 |
| LAPBAND SPECIALISTS LLC/ATABAK ALLAEI MD | 1 | $1,644.00 |
| LAPBAND SPECIALISTS LLC/ATUL MADAN MD | 35 | $96,845.25 |
| LAPBAND SPECIALISTS LLC/GEORGE KEVORK TASHJIAN MD | 54 | $195,582.89 |
| LAPBAND SPECIALISTS LLC/JAMES A HARTLEROAD MD | 3 | $4,932.00 |
| LAPBAND SPECIALISTS LLC/JULIUS WAH GEE DO | 10 | $20,963.35 |
| LAPBAND SPECIALISTS LLC/STEVEN W LUTZKER MD | 1 | $3,300.00 |
| LEAU MEDICAL INC | 2 | $3,459.39 |
| LIU, PERRY | 3 | $179,119.55 |
| MAFL MEDICAL | 5 | $13,360.17 |
| MICHAEL OMIDI | 11 | $44,566.87 |
| MISE MEDICAL INC | 3 | $7,134.95 |
| MODERN INSTITUTE OF PLASTIC SURGERY | 76 | $2,458,669.16 |
| MODERN INSTITUTE OF PLASTIC SURGERY & ANTI AGING | 55 | $1,143,408.87 |
| NEW LIFE SURGERY CENTER LLC | 14 | $385,589.08 |

| | | |
|---|---:|---:|
| ORANGE GROVE SURGERY CENTER LLC | 10 | $92,565.27 |
| PACIFIC WEST DERMATOLOGY A MED | 22 | $51,555.57 |
| PACIFIC WEST DERMATOLOGY A MED/ALEXANDER WEISSE ESQ | 1 | $1,660.13 |
| PACIFIC WEST DERMATOLOGY A MED/JULIAN C OMIDI MD | 5 | $11,671.26 |
| PACIFIC WEST DERMATOLOGY ATTN LEVI GREEN | 1 | $12,995.88 |
| PALMDALE AMBULATORY SURGERY CTR | 9 | $39,263.82 |
| RASH MEDICAL INC | 1 | $3,867.50 |
| RASH MEDICAL INC/RAMIN R SHAMTOB MD | 6 | $29,810.01 |
| RECONSTRUCTIVE SURGERY SPECIAL/BRIAN R WEST MD | 1 | $1,740.00 |
| RECONSTRUCTIVE SURGERY SPECIAL/BURR VON MAUR MD | 1 | $10,904.64 |
| RECONSTRUCTIVE SURGERY SPECIAL/OLLIE J JACKSON MD | 13 | $111,874.73 |
| RECONSTRUCTIVE SURGERY SPECIALISTS | 13 | $53,124.32 |
| RECONSTRUCTIVE SURGERY SPECIALISTS/BRUCE M ASCOUGH MD | 2 | $9,239.00 |
| ROAZ MEDICAL INC/ROBERT AZIZI MD | 1 | $3,225.00 |
| SAN DIEGO ANESTHESIA LLC | 3 | $13,795.14 |
| SAN DIEGO ANESTHESIA LLC / DANIEL S SHIN MD | 1 | $1,766.40 |
| SAN DIEGO ASC LLC | 8 | $70,281.49 |
| SAN DIEGO GASTROENTEROLOGY LLC | 1 | $1,630.00 |
| SAN DIEGO LABORATORY LLC | 7 | $31,071.21 |
| SEPA MEDICAL INC | 3 | $9,004.01 |
| SHHI MEDICAL INC | 2 | $7,558.40 |
| SKIN CANCER & RECONSTRUCTIVE | 636 | $3,438,518.41 |
| SKIN CANCER & RECONSTRUCTIVE S/GEORGE KEVORK TASHJIAN MD | 8 | $94,950.00 |
| SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS | 12 | $55,205.89 |
| SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS / JULIAN C OMIDI MD | 1 | $2,351.00 |
| SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS/NADIA I KIHICZAK | 3 | $11,588.40 |
| SKIN CANCER & RECONSTRUCTIVE/ATUL MADAN MD | 20 | $198,633.90 |
| SKIN CANCER & RECONSTRUCTIVE/GEORGE KEVORK TASHJIAN MD | 65 | $634,526.32 |
| SKIN CANCER & RECONSTRUCTIVE/NADIA I KIHICZAK | 19 | $47,308.89 |
| SKIN CANCER & RECONSTRUCTIVE/OLLIE J JACKSON MD | 1 | $13,000.00 |
| SKIN CANCER & RECONSTRUCTIVE/PEJMAN SAMOUHA MD | 30 | $111,408.76 |
| SKIN CANCER & RECONSTRUCTIVE/STEVEN W LUTZKER MD | 15 | $36,505.80 |
| SKIN CANCER & RECONSTUCTIVE SURGERY | 2 | $3,255.00 |
| ULTRASOUND SPECIALISTS LLC/GEORGE MEDNIK MD | 27 | $122,604.51 |
| VALENCIA A S C CENTER LLC | 20 | $494,044.70 |
| VALENCIA ANESTHESIA LLC | 7 | $23,081.36 |
| VALENCIA ANESTHESIA LLC / STEVEN L MANDEL MD | 1 | $2,308.32 |
| VALENCIA GASTROENTEROLOGY LLC | 6 | $32,141.78 |
| VALENCIA GASTROENTEROLOGY LLC/MARVIN A PERER MD | 2 | $3,536.00 |

2:14-CV-03053-MWF (VBKx)

FIRST AMENDED COUNTERCLAIM

| | | |
|---|---|---|
| VALENCIA GASTROENTEROLOGY LLC/ATUL MADAN LD | 1 | $1,568.00 |
| VALENCIA GASTROENTEROLOGY LLC/MARVIN A PERER MD | 1 | $1,559.70 |
| VALENCIA GASTROENTROLOGY LLC/MARVIN A PERER MD | 5 | $23,385.85 |
| VALENCIA LABORATORY LLC | 59 | $410,144.17 |
| VALENCIA LABORATORY LLC/GEORGE MEDNIK MD | 2 | $8,600.00 |
| VALENCIA SURGICAL CENTER | 4 | $15,325.80 |
| VALENCIA ULTRASOUND LLC | 9 | $37,054.60 |
| VALENCIA ULTRASOUND LLC/GEORGE MEDNIK MD | 11 | $48,556.17 |
| VALLEY SURGICAL CENTER LLC | 154 | $4,826,603.75 |
| VIMA MEDICAL INC | 1 | $1,785.00 |
| WEST HILLS ANESTHESIA LLC | 86 | $369,875.31 |
| WEST HILLS ANESTHESIA LLC/ANNA STEINER MD | 1 | $3,484.57 |
| WEST HILLS ANESTHESIA LLC/DANIEL S SHIN MD | 2 | $4,167.95 |
| WEST HILLS ANESTHESIA LLC/DEDRICK S KON MD | 4 | $8,361.89 |
| WEST HILLS ANESTHESIA LLC/SEAN SHAHRIAR SHAHANGIAN MD | 2 | $9,676.97 |
| WEST HILLS ANESTHESIA LLC/STEVEN L MANDEL MD | 3 | $8,478.72 |
| WEST HILLS ANESTHESIA LLC/YVONNE F SIAS RNA | 2 | $6,867.35 |
| WEST HILLS GASTROENTEROLOGY LLC | 41 | $152,595.51 |
| WEST HILLS GASTROENTEROLOGY LLC/MORTON E ALPERT MD | 13 | $41,724.13 |
| WEST HILLS LABORATORY LLC | 60 | $373,589.67 |
| WEST HILLS SURGERY LLC | 33 | $443,865.62 |
| WEST HILLS SURGERY LLC/ATUL MADAN MD | 1 | $13,269.00 |
| WEST HILLS SURGERY LLC/DENNIS CHAMBI MD | 1 | $8,062.50 |
| WEST HILLS SURGERY LLC/JULIUS WAH GEE DO | 1 | $11,750.00 |
| WEST HILLS SURGERY LLC/KEVORK G TASHJIAM MD | 3 | $70,637.54 |
| WEST HILLS ULTRASOUND LLC | 31 | $169,418.11 |
| WOODLAKE AMBULATORY SURGERY | 47 | $955,450.76 |
| **Grand Total** | **3768** | **$42,072,212.23** |

91.     This payment table does not include the payments United made to Counterclaim Defendants by electronic transfer, or other payments that United has not yet discovered.

92.     Many of these checks were written and deposited in 2012 and 2013, including checks written to Counterclaim Defendants Almont ASC, Beverly Hills Surgery Center (a/k/a Beverly Hills Surgical Center), Ciro Surgery Center, East Bay ASC, IMS, Modern Institute, New Life Surgery Center, Orange Grove Surgery Center, and Valley Surgery Center.

93.     These checks were deposited into accounts that have been identified by United.

a)     For example, United has uncovered more than $31 million in check payments to Counterclaim Defendants that have been deposited into accounts with Wells Fargo Bank, including but not limited to the following accounts:

    i.  Account A[1], which received checks written to, among others, Counterclaim Defendants Michael Omidi, Almont ASC, Modern Institute, New Life Surgery Center, Palmdale ASC, Skin Cancer Surgery Specialists, and Valley Surgical Center;

    ii.  Account B, which received checks written to, among others, Counterclaim Defendants Almont ASC and Michael Omidi;

    iii. Account C, which received checks written to, among others, Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists;

    iv.  Account D, which received checks written to, among others, Counterclaim Defendants Almont ASC, Michael Omidi, and Skin Cancer Surgery Specialists;

    v.  Account E, which received checks written to, among others, Counterclaim Defendants Almont ASC, Michael Omidi, and Skin Cancer Surgery Specialists;

    vi.  Account F, which received checks written to, among others, Counterclaim Defendant Valley Surgical Center;

    vii.    Account G, which received checks written to, among others, Counterclaim Defendants Almont ASC, Bakersfield

---

[1] United has redacted the account numbers associated with the bank accounts listed herein for confidentiality purposes, and refers to them as "Account A, Account B," etc.  United will provide Counterclaim Defendants a list of the referenced accounts under separate cover.

Surgery Center, Beverly Hills Surgery Center, and Skin Cancer Surgery Specialists;

viii.   Account H, which received checks written to, among others, Counterclaim Defendant Skin Cancer Surgery Specialists;

ix. Account I, which received checks written to, among others, Counterclaim Defendant Woodlake ASC;

x.  Account J, which received checks written to Counterclaim Defendant Palmdale ASC;

xi. Account K, which received checks written to Modern Institute;

xii.   Account L, which received checks written to, among others, Almont ASC, Beverly Hills Surgery Center, and Skin Cancer Surgery Specialists;

xiii.   Account M, which received checks written to Almont ASC;

xiv.   Account N, which received checks written to, among others, Counterclaim Defendant IMS;

xv. Account O, which received checks written to, among others, Counterclaim Defendants Almont ASC, Skin Cancer Surgery Specialists, Woodlake ASC, and Skin Cancer Surgery Specialists/Julian Omidi, M.D.;

xvi.   Account P, which received checks written to Counterclaim Defendants Almont ASC, Beverly Hills Surgery Center, Michael Omidi, Skin Cancer Surgery Specialists, Woodlake ASC, and Palmdale ASC;

xvii.   Account Q, which received checks written to Counterclaim Defendant San Diego ASC;

xviii.  Account R, which received checks written to Counterclaim Defendant Valencia Surgery Center;

xix.    Account S, which received checks written to Counterclaim Defendant West Hills Surgery Center;

xx. Account T, which received checks written to Counterclaim Defendants Modern Institute and New Life Surgery Center; and

xxi.    Account U, which received checks written to Counterclaim Defendant Beverly Hills Surgery Center.

b)     As discussed in further detail below, many of these Wells Fargo accounts also received checks written by United to other entities within the Omidi Network, including, for instance, Anesthesia Specialists LLC, Endoscopy Specialists LLC, Gynecology Specialists LLC, Ultrasound Specialists LLC, Pacific West Dermatology, Beverly Hills Anesthesia LLC, Beverly Hills Gastroenterology LLC, Beverly Hills Laboratory LLC, Lapband Specialists LLC, Laboratory Specialists LLC, GETA Medical, Inc., MAFL Medical, Inc., RASH Medical, Inc., and many others.

c)     Further, United has uncovered other check payments that were deposited into accounts maintained at 1st Century Bank, Bank of America, Chase Bank, City National Bank, and JP Morgan Chase .

94.    As described below, it is evident from these checks that the Omidis and the Counterclaim Defendants regularly disregard established corporate formalities practices in their handling of amounts paid by United, and treat such amounts as though they belonged to an enterprise acting under common direction and control.

1. **Members of the Omidi Network Regularly Endorse Checks Written to Other Entities or Individuals in the Omidi Network**

95.   Many of United's checks to persons and entities in the Omidi Network have been endorsed by members of the Omidi Network, including Julian and Michael Omidi, who are not the named payees.

96.   For example, attached hereto as **Exhibit F** is a sample of the signature of Julian Omidi on a Top Surgeons corporate document, and a check written by United to Counterclaim Defendant Beverly Hills Surgical Center that he endorsed. Upon information and belief, Michael Omidi endorsed checks that United wrote to entities and individuals in the Omidi Network as well. These checks serve as a mere sample of the dozens of endorsements made by the Omidis on checks written by United.

97.   As reflected on **Exhibit C**, Michael or Julian Omidi endorsed checks written by United to the following 55 persons or entities:

        a)   Almont ASC;

        b)   Anesthesia Specialist LLC;

        c)   Bakersfield Surgery Institute;

        d)   Bakersfield Surgical Center;

        e)   Beverly Hills Anesthesia LLC;

        f)   Beverly Hills Anesthesia LLC/Scott Bickman, MD;

        g)   Beverly Hills Gastroenterology/Atul Madan, MD;

        h)   Beverly Hills Laboratory LLC;

        i)   Beverly Hills Surgery Center LLC;

        j)   Beverly Hills Ultrasound LLC/George Mednik, MD;

        k)   Ciro Surgery Center LLC;

        l)   Corrective Surgery Specialists;

        m)   George Mednik, MD;

n)      Gynecology Specialists LLC/Aram Bonni, MD;

o)      Julian Omidi;

p)      Lapband Specialists LLC;

q)      Lapband Specialists LLC/Atabak Allaei, MD;

r)      Lapband Specialists LLC/Atul Madan, MD;

s)      Lapband Specialists LLC/George Kevork Tashjian, MD;

t)      Lapband Specialists LLC/James Harleroad, MD;

u)      Michael Omidi;

v)      Modern Institute of Plastic Surgery;

w)      Nadia I. Kihiczak, M.D.

x)      New Life Surgery Center, LLC;

y)      Pacific West Dermatology, A Medical Corp.;

z)      Pacific West Dermatology/Julian C. Omidi, MD;

aa)     Reconstructive Surgery Specialists/Brian R. West, MD;

bb)     Reconstructive Surgery Specialists/Ollie J Jackson, MD;

cc)     Reconstructive Surgery Specialists;

dd)     Skin Cancer & Reconstructive;

ee)     Skin Cancer & Reconstructive Surgery Specialists;

ff)     Skin Cancer & Reconstructive/Nadia I Kihiczak;

gg)     Ultrasound Specialists LLC/George Mednik, MD;

hh)     Valencia Anesthesia LLC

ii)     Valencia Anesthesia LLC/Steven L Mandel, MD;

jj)     Valencia Gastroenterology LLC;

kk)     Valencia Gastroenterology LLC/Marvin A Perer MD;

ll)     Valencia Gastroenterology LLC/Atul Madan MD;

mm)     Valencia Laboratory LLC;

nn)     Valencia Laboratory LLC/George Mednik;

oo)     Valencia ASC;

pp)    Valencia Ultrasound LLC;

qq)    Valencia Ultrasound LLC/George Mednik MD;

rr)    Valley Surgical Center LLC;

ss)    West Hills Anesthesia LLC;

tt)    West Hills Anesthesia LLC/Daniel S Shin MD;

uu)    West Hills Anesthesia LLC/Sean Shahriar Shahangian MD;

vv)    West Hills Anesthesia LLC/Steven Mandel MD;

ww)    West Hills Gastroenterology LLC;

xx)    West Hills Gastroenterology LLC/Morton E. Alpert MD;

yy)    West Hills Laboratory LLC;

zz)    West Hills Surgery LLC;

aaa)    West Hills Surgery LLC/Kevork G Tashjian MD;

bbb)    West Hills Ultrasound LLC; and

ccc)    Woodlake Ambulatory Surgery.

98.    Further, as reflected on **Exhibit D**, Top Surgeons endorsed more than $7 million in checks written by United to other Counterclaim Defendants and corporate entities that are owned, operated, or controlled by the Omidis.

a)    Top Surgeons Nevada, which was incorporated by Julian Omidi, has endorsed $6,725,741.15 in checks written by United to the following entities and individuals: Michael Omidi, Almont ASC, Beverly Hills Surgery Center, Palmdale ASC, Skin Cancer & Reconstructive Surgery Specialists, Woodlake ASC, Reconstructive Surgery Specialists/Ollie J Jackson, M.D., Beverly Hills Surgery Center/Kiki L Hurt M.D., LLC, Pacific West Dermatology ATTN Levi Green, Beverly Hills Anesthesia LLC, Skin Cancer & Reconstructive/Nadia I Kihiczak, Beverly Hills Gastroenterology/Pedream J Enatayi, M.D., and Beverly Hills Gastroenterology/Omid Avraham Shaye, M.D.

b)    Top Surgeons, Inc., which was incorporated by Michael Omidi, has endorsed $460,095.02 in checks written by United to the following entities and

individuals: Almont ASC, Skin Cancer & Reconstructive, Woodlake ASC, Skin Cancer & Reconstructive Surgery Specialists, Skin Cancer & Reconstructive Surgery Specialists, Skin Cancer & Reconstructive Surgery Specialists/Nadia I Kihiczak, Reconstructive Surgery Specialists/Ollie J Jackson MD, Skin Cancer & Reconstructive Surgery Specialists/Julian C. Omidi MD, and Skin Cancer & Reconstructive/Nadia I Khiczak.

c)      Finally, Top Surgeons, LLC (California), which was registered by Michael Omidi, has endorsed $154,367.36 in checks written by United to the following entities and individuals: Michael Omidi, Almont ASC, Anesthesia Specialist LLC, Endoscopy Specialists LLC, Gynecology Specialists LLC, Laboratory Specialists LLC, Pacific West Dermatology/Alexander Weisse Esq., Reconstructive Surgery Specialists/Ollie J Jackson MD, Ultrasound Specialists LLC/George Mednik MD.

99.   Checks written to Michael Omidi were endorsed by Michael Omidi himself, but also by Skin Cancer & Reconstructive Surgery Specialists of Beverly Hills, Skin Cancer & Reconstructive Surgery Specialists of West Hills, Surgery Center Management LLC, Top Surgeons LLC (California), and Top Surgeons Nevada.

100.   This practice of cross-endorsing checks extends to the Counterclaim Defendant surgery centers as well.

a)      For instance, United wrote more than $8.1 million in checks to Counterclaim Defendant Almont ASC.  Of this amount, Almont ASC endorsed checks totaling only $832,608.87, while Top Surgeons Nevada endorsed checks totaling $3,417,079.95.  Additional endorsees include, Bakersfield Surgery Institute ($1,118,706.33), Top Surgeons, Inc. ($291,340.16), Top Surgeons LLC (California) ($66,400.08), Surgery Center Management, LLC ($104,381.02), Skin Cancer & Reconstructive Surgery Specialists of Beverly Hills ($59,000.00), and Skin Cancer & Reconstructive Surgery Specialists of West Hills ($8,053.16).

b)      By further example, United wrote more than $3.6 million in checks to Counterclaim Defendant Modern Institute.  Of these, however, Modern Institute endorsed checks totaling only $424,908.87.  However, an entity called Medical Payment Processing LLC, which was organized by Omidi associates Alexander Weisse, Maureen Jaroscak, and Shawn Pezeshk and is, upon information and belief, operated and controlled by the Omidis, endorsed $1,034,777.10 of these checks, and Surgery Center Management endorsed $1,680,504.71—more than one-third of the amounts United paid to Modern Institute.  The remaining checks were signed by the Omidis and other unknown individuals or entities.

c)      Additionally, United wrote more than $13.0 million in checks to Beverly Hills Surgery Center, LLC.  Of these, Beverly Hills Surgery Center LLC endorsed checks totaling $7,443,536.21, while Top Surgeons LLC Nevada endorsed checks totaling $2,390,395.11.  Almont ASC endorsed checks totaling $139,498.24; Bakersfield Surgery Institute, Inc. endorsed checks totaling $770,329.93; and Top Surgeons LLC/Beverly Hills Surgery Center LLC endorsed $37,671.69.

d)      Finally, Counterclaim Defendants obtained authorizations from United Members to deposit insurance checks "for services provided by PROVIDER(s) and/or FACILITY(s) and their affiliates" into accounts maintained by Surgery Center Management, which has endorsed $6,519954.88 in checks written by United to the following 37 persons or entities:

      i.   Almont ASC;

      ii.   Anesthesia Specialists LLC;

      iii.   ARBO Medical, Inc.;

      iv.   Beverly Hills Surgery LLC;

      v.   Corrective Surgery Specialists;

      vi.   Endoscopy Specialists LLC;

      vii.   GETA Medical, Inc.;

       viii.  Laboratory Specialists LLC;

       ix.  Lapband Specialists LLC;

       x.  Lapband Specialists LLC/Atul Madan MD;

       xi.  Lapband Specialists LLC/George Kevork Tashjian MD;

       xii.  Lapband Specialists LLC/James Hartleroad MD;

       xiii.  Lapband Specialists LLC/Julius Wah Gee DO;

       xiv.  MAFL Medical;

       xv.  Michael Omidi;

       xvi.  Modern Institute of Plastic Surgery;

       xvii.  Modern Institute of Plastic Surgery & Anti-Aging;

       xviii.  New Life Surgery Center LLC;

       xix.  Palmdale ASC;

       xx.  RASH Medical, Inc./Ramin R. Shamtob MD;

       xxi.  Reconstructive Surgery Specialists/Burr Von Maur MD;

       xxii.  Reconstructive Surgery Specialists/Ollie J Jackson MD;

       xxiii.  Skin Cancer & Reconstructive/Ollie J Jackson MD;

       xxiv.  Ultrasound Specialists LLC/George Mednik MD;

       xxv.  Valley Surgical Center LLC;

       xxvi.  West Hills Anesthesia LLC;

       xxvii.  West Hills Anesthesia LLC/Anna Steiner MD;

       xxviii.  West Hills Anesthesia LLC/Daniel S Shin MD;

       xxix.  West Hills Anesthesia LLC/Dedrick S Kon MD;

       xxx.  West Hills Anesthesia LLC/Steven L Mandel MD;

       xxxi.  West Hills Gastroenterology LLC;

xxxii.  West Hills Gastroenterology LLC/Morton E Alpert MD;

xxxiii.  West Hills Laboratory LLC;

xxxiv.  West Hills Surgery LLC;

xxxv.  West Hills Surgery LLC/Atul Madan MD;

xxxvi.  West Hills Surgery LLC/Julius Wah Gee DO; and

xxxvii.  West Hills Ultrasound LLC.

101.   This pattern of disregarding accepted corporate practices and endorsing checks written to other individuals or entities within the Omidi Network is not limited to the examples above.  It is pervasive throughout the Omidi Network, and applies to many if not all of the payees who have received checks from United.

## 2. **Payments to the Counterclaim Defendants Were Routinely Commingled With Other Omidi-Network Entities**

102.   Additionally, Counterclaim Defendants routinely and without regard to accepted corporate formalities commingled United's funds between various entities and treated such amounts as though they belonged to an enterprise acting under common control and direction.

103.   United's checks have been deposited into dozens of bank accounts with at least six different financial institutions.  In many instances, these accounts received checks written to a multitude of different payees.

a)   For example, as reflected on **Exhibit E**, checks totaling $6,570,315.63 written by United to the following 37 entities and individuals were all deposited into a single bank account, Account A, maintained at Wells Fargo Bank:

i.   Almont ASC;

ii.   Anesthesia Specialist LLC;

iii.  ARBO Medical, Inc.;

iv.  Beverly Hills Surgery LLC;

v.  Corrective Surgery Specialists;

vi.  Endoscopy Specialists LLC;

vii.  GETA Medical, Inc.;

viii.  Laboratory Specialists LLC;

ix.  Lapband Specialists LLC;

x.  Lapband Specialists LLC/Atul Madan MD;

xi.  Lapband Specialists LLC/Julius Wah Gee DO;

xii.  Lapband Specialists LLC/Kevork G Tashjian MD;

xiii.  Lapband Specialists LLC/James A Hartleroad MD;

xiv.  MAFL Medical;

xv.  Michael Omidi;

xvi.  Modern Institute of Plastic Surgery;

xvii.  Modern Institute of Plastic Surgery & Anti Aging;

xviii.  New Life Surgery Center LLC;

xix.  Palmdale ASC;

xx.  RASH Medical Inc./Ramin R Shamtob MD;

xxi.  Reconstructive Surgery Specialists/Ollie J Jackson MD;

xxii.  Reconstructive Surgery Specialists/Burr von Maur MD;

xxiii.  Skin Cancer & Reconstructive Specialists/Ollie J Jackson MD;

xxiv.  Ultrasound Specialists LLC/George Mednik MD;

xxv.  Valley Surgical Center LLC;

xxvi.  West Hills Anesthesia LLC;

xxvii.  West Hills Anesthesia LLC/Daniel S Shin MD;

xxviii.  West Hills Anesthesia LLC/Dedrick S Kon MD;

xxix.  West Hills Anesthesia LLC/Anna Steiner MD;

xxx.  West Hills Anesthesia LLC/Steven Mandel MD;

xxxi.  West Hills Gastroenterology LLC;

xxxii.  West Hills Gastroenterology LLC/Morton E Alpert MD;

xxxiii.  West Hills Laboratory LLC;

xxxiv.  West Hills Surgery LLC;

xxxv.  West Hills Surgery LLC/Atul Madan MD;

xxxvi.  West Hills Surgery LLC/Julius Wah Gee DO;

xxxvii.  West Hills Ultrasound LLC;

ii.  Meanwhile, $8,038,978.89 in checks written by United to the following 13 entities and individuals were deposited into Account C: Beverly Hills Anesthesia LLC; Beverly Hills Anesthesia LLC/Scott C Bickman MD; Beverly Hills Anesthesia LLC/Yvonne F Sias RNA; Beverly Hills Anesthesia LLC/Steven L Mandel MC; Beverly Hills Gastroenterology/Atul Madan MD; Beverly Hills Laboratory LLC; Beverly Hills Surgery Center LLC; Beverly Hills Surgery Center LLC/George Mednik MD; Beverly Hills Surgery LLC; LapBand Specialists LLC/Julius Wah Gee DO; Skin Cancer & Reconstructive; Skin Cancer & Reconstructive/George Kevork Tashjian MD; Skin Cancer & Reconstructive/Pejman Samouha MD.

iii. Finally, $6,830,113.86 in checks written by United to the following 15 entities and individuals were deposited into Account P: Almont ASC, Beverly Hills Anesthesia LLC, Beverly Hills Gastroenterology/Pedream J Enayati MD, Beverly Hills Gastroenterology/Omid Shaye MD, Beverly Hills Surgery Center LLC, Beverly Hills Surgery Center LLC/George Mednik MD, Beverly Hills Surgery Center/Kiki L Hurt MD, Endoscopy Specialists LLC, Michael Omidi, Pacific West Dermatology ATTN Levi Green, Palmdale ASC, Reconstructive Surgery

Specialists/Ollie J Jackson MD, Skin Cancer & Reconstructive, Skin Cancer & Reconstructive/Nadia I Kihiczak, and Woodlake ASC.

104.   This pattern of disregarding accepted corporate practices and depositing checks written to other individuals or entities into the accounts of different individuals or entities as though they are under common ownership and control is not limited to the examples above.  It is pervasive throughout the Omidi Network, and applies to many if not all of the checks from United.

### v.   The Omidis and Their Company, Top Surgeons, Control the Day to Day Operations of the Counterclaim Defendants and Persons and Entities in the Omidi Network.

105.   The Omidis and their company, Top Surgeons, control the day-to-day operations of the Counterclaim Defendants  and persons and Entities in the Omidi Network

106.   As is further detailed below, United is informed and believes that the Omidis, Top Surgeons, associated individuals, and related corporate entities, own and operate clinics and health care providers in violation of California's statutes precluding the corporate practice of medicine.  Privately enforced through California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, the corporate practice of medicine doctrine prohibits unlicensed physicians from practicing medicine and unlicensed physicians from owning any portion of a medical practice.  California law also permits only a limited number of corporate forms under which a licensed physician can practice, and further proscribes incentive payments to physicians.  This scheme, where the Omidis, Top Surgeons, and associated individuals and entities own and operate surgical centers, violated California's laws prohibiting the corporate practice of medicine.

107.   The Omidis and others under their control jointly manage, administer, direct, or control many of the medical decisions made at Counterclaim Defendant

surgical centers.  They also exercise control over the medical professionals affiliated with the Corporate Counterclaim Defendants.

a)      Despite the fact that Julian Omidi lost his medical license in June 2009, Julian and Michael Omidi recruited physicians and surgeons to perform professional medical services at their network of clinics and surgery centers, and negotiated the terms of their contracts.  The contracts signed by these physicians provide that Top Surgeons, Inc. (usually referred to in the contracts as the "Medical Group"), as counterparty to the agreement, "owns and operates a medical practice with various locations in California," including the locations of many of the Counterclaim Defendant surgical centers.  The signature block on these contracts reflect that Julian or Michael Omidi is the signing representative for Top Surgeons, Inc.

b)      Dr. Ishan Najib Shamaan, a surgeon who performed medical services for the Omidis at the Counterclaim Defendant surgical centers and who did not join the Omidi Network until after Julian Omidi lost his medical license, testified under oath that the Omidis mandate that physicians shall not disclose to patients all known risks associated with surgical procedures such as the gastric Lap Band, and that the Omidis do not provide all necessary or sanitary equipment, tools, or surgical instruments for physician use during many types of procedures at Counterclaim Defendant surgical centers.

c)      This same physician testified that Julian Omidi instructed him to sign approximately 600 "preprinted" form letters seeking insurer approval for surgery.  These letters were then sent to health insurers to demonstrate that surgery was medically necessary.  Dr. Shamaan further testified that (1) he had not actually examined these patients before signing these approval letters; (2) the portion of the letter that supposedly described the patient's particular medical condition was actually pre-printed boilerplate; and (3) he recognized this practice was "fraud."

d)      Counterclaim Defendants asked patients to sign attestations acknowledging that the surgery centers are "fully accredited multispecialty surgery center[s]" of which Dr. Michael Omidi is a part owner, and that "Dr. Michael Omidi will be receiving compensation for the procedures performed." These attestations also specifically reference 1-800-GET-THIN and Top Surgeons.

e)      Michael Omidi is identified on an organizational chart as the head of Counterclaim Defendant IMS and its associated ambulatory surgical centers.

f)      United is informed and believes that the Omidis own, operate, and control a centralized repository or office that houses Defendants' medical and patient records, a centralized patient-scheduling organization, and a centralized finance and accounting organization.

i.   Under this centralized structure, which is tightly controlled by the Omidis, physicians do not have direct access or control over their patients' medical records.

ii.   Under this structure, physicians' schedules are controlled by either Julian or Michael Omidi or Maria Abaca, Counterclaim Defendants' bariatric program coordinator.

iii.   Finally, this centralized organization is responsible for physician payment and reimbursement and patient billing, over which the servicing physicians have no involvement or control.  The patient billing organization is administered, in part, by Counterclaim Defendants' representatives Araminta Salazar and Yesenia F., who performed billing services for Counterclaim Defendants at relevant times alleged herein.  Salazar has testified in other matters that, as part of her duties, she submits medical records and claims "in every case," and that she has performed these same billing services and used the same process for "tens of thousands" of claims and appeals with respect to Counterclaim Defendants, including IMS, Modern Institute, Valley Surgical Center, and Orange

Grove Surgical Center.  As part of her duties, Yesenia F. provided to United accreditation confirmation for certain Counterclaim Defendants, including Modern Institute and New Life Surgery Center.

108.   Further, the physicians contracting with Top Surgeons and practicing at the Counterclaim Defendant surgery centers are promised bonuses, on a per-procedure basis, for performing a certain number of procedures, in violation of California's ban on incentivization of patient referrals.

a)   For example, Dr. Marvin Perer, M.D., who performed professional medical services at a number of the Counterclaim Defendant surgery centers, executed an Independent Contractor Agreement for Part-Time Gastroenterologist Services with Top Surgeons, Inc. on July 27, 2009.  Julian Omidi, M.D., CEO, is named as Top Surgeons' representative for the agreement. The contract states that Dr. Perer "shall provide various professional medical services as an independent contractor Gastroenterologist for the Medical Group," and that he "shall" perform these services "on an as needed basis at Medical Group's various locations, including, but not limited to, Medical Group's Beverly Hills, West Hills, Valencia, Palmdale, Bakersfield, Apple Valley, Covina, Long Beach, San Bernardino, Orange County and San Diego locations."   Exhibit B to the Agreement sets forth Dr. Perer's compensation.  It states that three to four patients will be scheduled for EGD procedures per hour.  In addition to an annual salary, the contract provides that Dr. Perer will receive a bonus of "an additional $110" for each EGD over 60 that he performs in a week, and an additional $110 per EGD to cover for another physician.  As noted below, the amount that Counterclaim Defendants charged patients for an EGD procedure greatly exceeded these amounts.

b)   Likewise, Dr. Ihsan Najib Shamaan, M.D., executed a similar contract, titled Independent Contractor Agreement for General Surgery Services, Director of Surgery Center, Direct of Center of Excellence agreement, with Top

Surgeons, Inc. on August 15, 2009. Like Dr. Perer's contract, Julian Omidi, M.D., CEO, is named as Top Surgeons' representative for the agreement. The contract states that Dr. Shamaan "shall provide various professional and medical services as an independent contractor GENERAL SURGEON for the Medical Group," and that he shall perform the services "on an as needed basis at Medical Group's Facilities, including, but not limited to, Medical Group's Beverly Hills, West Hills, Valencia, Palmdale, Bakersfield, Apple Valley, Covina, Long Beach, San Bernardino, Orange County, and San Diego locations." The contract further provided that Dr. Shamaan shall be paid an annual salary, plus bonuses of (1) $500 per Gastric banding case after the 16th procedure for the month; (2) $500 per laparoscopic cholecystectomy; (3) $250 for approved revisions; and (4) $350 for Gastric banding cases performed in hospital.

c)  Another physician who contracted with Counterclaim Defendants, Dr. Brian West, was paid either a bonus on a per-procedure basis or 20-25 percent of the total amount collected for his fees.

109.  Further, United is informed and believes that after Julian Omidi's medical license was revoked in June 2009, he continued to hire physicians and surgeons, direct medical decision making, and own, operate, and profit from Top Surgeons and its related entities.

110.  United is informed and believes that, in violation of California's prohibition on the practice of medicine by unlicensed individuals, non-physicians, including Robert Macatangay, who is known around the Omidi Network as "Dr. Bobby" but is in fact a lay person and not a licensed medical professional, directed, controlled, and profited from the medical decision making and care given to United Members who received medical services from the Counterclaim Defendant surgery centers.

111.  Further, United is informed and believes that Julian Omidi and these other non-physicians were aided and abetted in their corporate practice of medicine

by Counterclaim Defendant Michael Omidi, who represents himself to the public as the owner of the Counterclaim Defendant surgical centers.

112.   Finally, the corporate structure of the Omidi Network, including Top Surgeons, wherein unlicensed physicians or corporate entities, including Top Surgeons, violates California's rules regarding the corporate practice of medicine.

113.   Upon information and belief, the Omidis have directed or controlled Counterclaim Defendant 1-800-GET-THIN and its representative Robert Silverman, who at times relevant hereto worked closely with and served as counsel for the Omidis and their enterprise.  In turn, United is informed and believes that Robert Silverman served as an executive at 1-800-GET-THIN and operated 1-800-GET-THIN at the direction of and under the control of the Omidis.

114.   United is informed and believes that each Counterclaim Defendant was the agent, servant, employee, partner and/or joint venture of each of the other Counterclaim Defendants and that the acts of each Counterclaim Defendant were within the scope of such agency, service, and/or employment.  In doing the acts and omissions alleged herein, each Counterclaim Defendant acted with the knowledge, permission, and/or consent of every other Counterclaim Defendant, and each Counterclaim Defendant aided, abetted, and/or conspired with the other Counterclaim Defendants in the acts and omissions alleged herein.  As additional evidence of this common control, an entity claiming to be called "ERISA Document Request" sent letters to the employers listed as defendants in the related action captioned *Almont Ambulatory Surgery Center et. al. v. UnitedHealth Group, Inc.,* (CV-14-2139 (MWF/VBK) demanding documents under ERISA Section 104(b) that applied to the exemplar patients' claims listed in Exhibit A of the complaint in that matter.  The requests included some assignments that purported to be executed in favor of some of the claimants in that matter (and Counterclaim Defendants in this matter).  These requests demanded that all responses be sent to the 269 S. Beverly Drive, Suite 353 address referenced above.  Upon information

and belief, "ERISA Document Request" is a fictitious name acting under the control of the Omidi Network (including Julian and Michael Omidi specifically) and acting on behalf of various members of the Omidi Network, and Counterclaim Defendants.

115.   United is further informed and believes that the Counterclaim Defendants and Does 1 through 200, inclusive, are the successor, predecessor, affiliate, and/or alter egos of the Omidis, and are and have been controlled by the Omidis at all relevant times alleged herein.  United is further informed and believes that the Omidis, and each of them, administrated, governed, controlled, managed and directed all of the necessary functions, activities and operations of the above-referenced alter-ego Counterclaim Defendants, including the medical, surgical, and nursing services provided to United members.

116.   United is further informed and believes that there is a unity of interest between and among the Omidis on the one hand, and the Counterclaim Defendants on the other hand.  United is further informed and believes that in light of the unity of interest and control, if the Omidis are not held liable for the debts and obligations of the other Counterclaim Defendants, a fraud and injustice would result upon United.  Specifically, the Omidi Network's shifting corporate structure contributed to eluding from detection by United Counterclaim Defendants' fraudulent scheme and raises the likelihood that a recovery against one person or entity in the Omidi Network would not compensate United or the United Plans for their financial injury.  United cannot therefore secure a just result absent the Omidis' participation in this action.  Accordingly, United seeks judgment against each of the above-named Counterclaim Defendants.

**C.** **Counterclaim Defendants Misrepresented Charges By Failing To Disclose Their Routine Waiver of Member Responsibility Amounts, and Performed Unnecessary Services, Submitted Fraudulent Bills, and/or Inflated Charges to Secure Reimbursement for Uncovered Services**

117.   The typical design of the health benefit plans insured or administered by United provides significant financial incentives for members to use lower cost in-network providers, instead of higher cost out-of-network providers.  These health plans typically have lower Member Responsibility Amounts for services received from in-network providers.  For example, a common design of the health plan insured or administered by United specifies 30% or 40% coinsurance for out-of-network services, and either 10% or 20% coinsurance for in-network services.  Annual deductibles may also be higher for out-of-network services.

118.   Members of health plans insured or administered by United are also protected from "balance billing" when they utilize in-network providers, who have agreed to accept as full payment the combination of the contracted rates paid under the health plans, together with the patient's in-network Member Responsibility Amounts.  In contrast, out-of-network providers are generally free to balance bill patients for any difference between their actual charges and the amounts paid under the plan.

119.   To induce United members to forgo the significant cost-saving benefits of using in-network providers, the Counterclaim Defendants, who were not part of United's provider network, routinely agreed to waive all Member Responsibility Amounts, including copayments, co-insurance, and deductibles, in return for an agreement from the Member to accept services from Counterclaim Defendants. Counterclaim Defendants routinely promised United members that they would not be responsible for any out-of-pocket costs and that the Counterclaim Defendants would accept as full payment whatever amounts insurance would pay.  In this way, Defendants eliminated the financial incentives for United members to use in-

network providers by assuring United members that the actual cost to them for Counterclaim Defendants' out-of-network services would be zero.  They also induced participants to receive services from Counterclaim Defendants when the participant otherwise would have simply forgone the treatment (even at less expensive in-network providers), found another form of weight loss treatment, or, alternatively, sought treatment from an in-network provider that would (but for the waiver of the Member Responsibility Amounts) have been less expensive for both the group health plan and the participant.

120.   Consistent with their promises to United members to waive Member Responsibility Amounts, the Counterclaim Defendants routinely failed to collect such amounts from several thousand United members.

121.   The routine waiver by the Counterclaim Defendants of Member Responsibility Amounts resulted in an intentional misrepresentation of the amounts billed on the claim forms submitted by Defendants to United.  As described above, the claim forms represent the amount Counterclaim Defendants purport to have charged the United members for their services.  When Counterclaim Defendants routinely waived Member Responsibility Amounts, they effectively reduced the amount that they were charging the members for their services by the amount of the waived member responsibility.  Counterclaim Defendants did not reflect that reduction in the amount billed on their claim forms to United, however, and further failed to disclose to United its routine waiver of Member Responsibility Amounts.

122.   United is informed and believes that the Counterclaim Defendants were willing to waive Member Responsibility Amounts because they both desired to obtain new patients and because they intended to submit inflated billed charge amounts to United that greatly exceeded both what the Counterclaim Defendants would charge to cash paying patients, and what the majority of providers in the relevant geographical region would charge for the same services. When, after Counterclaim Defendants failed to obtain reimbursement from United, they

retracted their earlier agreements with and representations to United Members and billed them for their services, in many cases, years after the procedures were allegedly performed.  United Members have been shocked to discover the amounts charged.

123.   In addition, most of the relevant health benefit plans provide that no benefit is due under the plan if the United Member is not legally obligated to pay such sums (such as when a provider agrees to accept whatever payment the insurance company will pay as full payment for all services), or if the provider waives Member Responsibility Amounts. Counterclaim Defendants intentionally failed to disclose their routine waiver of these amounts so that they could circumvent these restrictions on benefits and obtain payment for claims based on purported assignments from the members.

124.   United is further informed and believes that, as is customary in the healthcare industry, Counterclaim Defendants had knowledge of a prospective patient's insurance coverage and benefits prior to providing medical services.

125.   Further, United has discovered multiple instances where Counterclaim Defendants performed unnecessary services, submitted false bills, inflated CPT codes to charge higher amounts, and submitted records with incorrect BMI calculations, to secure reimbursement from United, or to evade the limitations on coverage for bariatric services that are imposed by a number of the United Plans and of which they had received notice prior to the delivery of services through communications with United.

126.   Counterclaim Defendants have carried out this fraud for years by using the vast Omidi Network to disguise the true identities of its billing providers by using generic "surgery center" or "provider" on stationery, medical records, correspondence, and assignments of benefits, billing under various and shifting Tax Identification Numbers and National Provider Identification numbers, and

establishing numerous sham entities, to conceal the conduct underlying this fraudulent scheme and to induce United to pay fraudulent claims as late as 2013.

127.   The following patients, and the specific factual allegations related thereto, serve as examples of Counterclaim Defendants' routine practice of promising to waive Member Responsibility Amounts and accept as full payment what a patient's insurance company would pay.  In addition, these examples reflect instances where Counterclaim Defendants performed unnecessary services, submitted false bills and inflated charges, and submitted records with incorrect BMI calculations in order to secure reimbursement from United.  These examples are representative of the routine, systematic, widespread, and ongoing scheme to defraud United and the health plans it administered.

### i.   Counterclaim Defendants Routinely Waived Patient Responsibility Amounts and Engaged in Other Improper Practices.

#### 1.   United Member 8[1]

128.   United Member 8 was covered by an employer sponsored health benefit plan for which United served as a claims administrator.  The terms of this health benefit plan state: "In the event that a Non-Network provider waives Copayments (and/or the Annual Deductible) for a particular health service, no Benefits are provided for the health service for which the Copayments (and/or Annual Deductible) are waived."

129.   In or around XX, 2010, [2] United Member 8 called the 1-800-GET-THIN telephone line after seeing the billboards and other advertisements in

---

[1] Due to privacy concerns, United has removed all private health information for patients referenced herein and will refer to patients as United Member 1, United Member 2, *etc*.

[2] All dates of service have been redacted pursuant to HIPAA and will be provided to Counsel for Counterclaim Defendants.

Southern California.  The 1-800-GET-THIN operator took her insurance information over the phone, and purported to verify her insurance coverage.

130.   Counterclaim Defendants' records reflect that a representative from "Ambulatory Surgical Center" at the hub of the Omidi Network, 9001 Wilshire Blvd., Suite 106, Beverly Hills, CA, contacted United on XX, 2010 to verify United Member 8's benefits.  The Omidi representative was told that United Member 8 did not have coverage for bariatric surgery, regardless of "medical necessity." Consistent with the computer generated questionnaire that the Omidi representative was, upon information and belief, required to follow when calling United to inquire about United Member 8's insurance benefits and which is attached hereto as **Exhibit G**, the Omidi representative then asked, "Are there out of network benefits for other procedures such as Endoscopy (CPT Code: 43239?)" and "Do you pay the usual & customary fees of the provider?"  Per the questionnaire, the Omidi representative established that United Member 8 had no daily maximum on her policy, that no preauthorization was required for EGD procedures or polysomnography (sleep study), the deductible for out of network benefits was $350, and the plan paid 60% of out-of-network benefits.

131.   This is consistent with the terms of United Member 8's plan, which specifically excludes from coverage "surgical treatment of obesity."

132.   Within the next two days, the Omidi representative contacted United Member 8 and told her that she was covered for the Lap Band and that costs for the entire procedure, including pre-operative testing, would be covered by insurance and would not cost her anything out of pocket.  The Omidi representative then invited United Member 8 to attend a "seminar" for Lap Band candidates at one of the Omidi surgery centers, in order to  learn more about the procedure and fill out paperwork.

133.   At no time did any Counterclaim Defendant, or any of their representatives, ever tell United Member 8 that she did not have coverage for Lap

Band surgery.  Instead, the Counterclaim Defendants led her to believe that the procedures she was undergoing were necessary in order to clear her for the Lap Band surgery.

134.   United Member 8 attended the seminar and completed a series of forms.

a)   With respect to a "Sleep Study" form, United Member 8 did not indicate that she had any symptoms which would necessitate a sleep study, including snoring, sleep apnea, difficulty sleeping, or difficulty breathing, because she was not having any issues with sleep.

b)   Additionally, United Member 8 had given birth just 6-8 weeks before and this was not noted as an issue by the Counterclaim Defendants on any of the medical forms.

c)   Further, United Member 8 was asked to sign a series of generic forms, including a generic Assignment of Rights and Benefits form assigning all insurance rights and benefits to the unspecified "PROVIDER(s) and/or FACILITY(s)," a generic "Authorization" form authorizing Surgery Center Management to deposit payments for services provided by the unspecified "PROVIDER(s) and/or FACILITY(s) and their affiliates," and a blank "Patient Initiated Complaint Form," which reads:

> I filed the attached claim form with the _____ (Insurance Company). To date, it has not been paid or denied.  Benefits were assigned to _____ and, as of today's date, payment has not been received.  I am responsible for payment of this bill.  Please accept this letter as a formal written complaint against the _____ (Insurance Company). Sincerely,
> [United Member 8]

At the time United Member 8 signed this complaint form, she had not yet undergone any medical services by Counterclaim Defendants.

135.   Counterclaim Defendants scheduled United Member 8 for a sleep study and an EGD.

136.   United Member 8 arrived for her sleep study on Monday, XX, 2010 as scheduled, but the building was locked and no one appeared to be at the location. United Member 8 called the phone number on the door but, after several attempts, no one answered.  United Member 8 returned home.

137.   On XX, 2010, United Member 8 reported to Counterclaim Defendant Valencia Surgery Center for her EGD.

138.   Specifically, the EGD (also known as an Upper GI Endoscopy or Esophagogastroduodenoscopy) is a short outpatient procedure that Counterclaim Defendant surgical centers commonly bill United for.  The National Institutes of Health ("NIH") describes an EGD as a test "to examine the lining of the esophagus (the tube that connects your throat to your stomach), stomach, and first part of the small intestine.  It is done with a small camera (flexible endoscope) that is inserted down the throat." http://www.nlm.nih.gov/medlineplus/ency/article/003888.htm. NIH states that the patient can usually expect to receive a sedative and a painkiller, a local anesthetic sprayed into the mouth to prevent coughing or gagging when the endoscope is inserted, and an IV to administer medicine during the procedure. After the sedatives have taken effect, the endoscope is inserted through the esophagus to the stomach and duodenum.  The doctor examines the lining of the esophagus, stomach, and upper duodenum, and may take a biopsy through the endoscope.  Additional treatments, such as stretching or widening a narrow area of the esophagus, may also be done when indicated.

139.   A pre-printed form in her chart indicates that United Member 8 obtained "Medical Clearance by Internist Dr. Nathan [Thusha]."  The two internists whose names had been pre-printed on the form were crossed out and Dr. Nathan's name was handwritten in.

140.   United Member 8 was placed under anesthesia at 7:43 a.m.  The operative note and anesthesia record do not note any complications.  United

Member 8 was diagnosed with a hiatal hernia.  Additionally, the operative note shows that a punch biopsy was taken to be sent to pathology to check for H. pylori.

141.   The EGD was performed by Dr. Perer, who receives a $110 bonus for each EGD procedure, above 60, performed each week, as well as a $110 bonus for any EGD he covers for another physician.  Consistent with Dr. Perer's contract, he was scheduled to perform 19 gastrointestinal surgeries in the six hours between 7 a.m. and 1 p.m. on the date of United Member 8's EGD procedure.  United Member 8's surgery was scheduled to last approximately 15 minutes, and medical records reflect that she was taken into the operating room at 7:50 a.m. and removed from the operating room at 8:00 a.m.

142.   After United Member 8 awoke from anesthesia, she was directed to sit in a chair in the hallway, and a nurse came to check on her.  United Member 8 complained that her throat hurt badly, but the nurse told her it was normal and that she should drink hot tea.  United Member 8 was then sent home.  That weekend, United Member 8 reported to the emergency room where she was diagnosed with a perforated esophagus and a significant secondary infection as a result of her EGD, which required surgical debridement twice.  Ultimately, United Member 8 required a feeding tube for approximately six weeks.

143.   In the interim, United Member 8 received various calls from the Counterclaim Defendants to reschedule her sleep study, claiming she was a "no show."  She contested the allegation that she failed to appear as scheduled, and declined to reschedule.  Additionally, agents from the Omidi network attempted to schedule United Member 8 for a vaginal ultrasound with Dr. Aram Bonni, but she declined that service as well.  On or around XX, 2010, United Member 8 communicated that she was no longer interested in proceeding with bariatric surgery with the Omidi Network.

144.   Consistent with their ongoing scheme to defraud United, Counterclaim Defendants submitted false and fraudulent claims to United for United Member 8's services.

145.   First, United was induced to pay thousands of dollars toward United Member 8's XX, 2010 EGD procedure. Unbeknownst to United, Counterclaim Defendants had not only lied to United Member 8 by telling her she had coverage for the Lap Band surgery and needed to undergo the EGD in preparation for that surgery, they waived thousands of dollars of United Member 8's Member Responsibility Amounts.  Specifically, Counterclaim Defendants submitted a UB-04 claim form to United on or around XX, 2011 reflecting that Valencia Surgery Center's total facility charge for the EGD was $13,790.00.  Of this, United Member 8 was responsible for paying $5,516 in co-insurance (40% of the charge); this amount, however, was not collected from United Member 8.  In reliance on Counterclaim Defendants' representations, however, United paid $8,274.00 toward United Member 8's EGD.  Additionally, between XX 2010 and XX 2011, Counterclaim Defendants submitted claims for twelve different labs and tissue analyses by Valencia Laboratory LLC, all of which were also supposedly undertaken in connection with the EGD and in preparation for the Lap Band surgery. United paid Counterclaim Defendants $474.97 for these services.

146.   Second, Counterclaim Defendants submitted claims for a face-to-face nutrition consultation in preparation for the Lap Band surgery. However, United Member 8 never met with a nutritionist and does not recognize the name of the billing provider.  The examination form reflecting this service was, upon information and belief, populated using responses that United Member 8 gave on her intake paperwork.

147.   Third, Counterclaim Defendants submitted claims and examination records for two types of face-to-face psychological interview and testing.  However, United Member 8 never met with a psychologist or psychiatrist.

a)      Specifically, Counterclaim Defendants submitted claims and medical records for two different psychological services that were supposedly rendered on XX, 2010.  However, the "Psychological Consultation Patient Eligibility for Bariatric Surgery" note is a generic computer-generated form that does not provide the name of the examining psychologist or physician or the location of the consultation.  Further, the information reflected on the form is generic and could have been populated simply by merging the responses United Member 8 gave on her intake forms.

b)      Claims for these "psychological evaluation" services were first submitted to United in XX 2011 under CPT codes 90801 (psychological diagnostic interview examination) and 96101 (psychological testing by psychiatrist or physician).  The claims form reflected total charges of $725 and $610, respectively, for these services.

c)      When the claims for these two psychological services were initially submitted to United in XX 2011, they both listed 1518032218 as the "Billing Provider's NPI."  This NPI, however, is registered to Dr. Ariel Malamud, M.D., an internist/gastroenterologist practicing in Los Angeles.  The claim form names Skin Cancer & Reconstructive Surgery Specialists of Beverly Hills as the "Servicing Provider," but the "Servicing Provider's Address" is that of Valencia Surgery Center—not the Skin Cancer clinic. United responded by requesting additional information to support these claims.  When the claims were re-submitted almost a full year later under the same provider information, United denied the claims for lack of proper documentation and support.

d)      Eleven months later, in or around XX 2012, these claims were submitted again—this time, however, Counterclaim Defendants listed Dr. Martin Alex Perea, 9001 Wilshire Blvd., Suite 106, as the provider, and listed Dr. Perea's NPI number as both the Billing Provider's NPI and the Servicing Provider's NPI.

e)   United did not pay these claims, but they serve as an illustration of the types of deceptive tactics Counterclaim Defendants have utilized in billing United for fraudulent services.

148.   Fourth, Counterclaim Defendants submitted claims stating that United Member 8 underwent two pre-EGD examinations or consultations on XX, 2010. One of these was billed under CPT code 99243, which requires the physician to conduct a detailed history, detailed examination, and engage in low complexity medical decision making. The second of these exams was billed under 99204, a new patient office examination, which requires the physician to conduct a comprehensive history, comprehensive examination, and engage in moderate to complex medical decision making.  However, the examinations performed on United Member 8 in support of these claims consisted primarily of asking whether United Member 8 had fasted and if she was feeling well, and did not qualify for billing at the heightened exam codes.  Nor is there any indication in any of the medical records as to why two separate examinations, at charges of $650 and $600, respectively, were warranted. United paid a small amount toward these claims, which again serve as illustrations of the types of fraudulent billing practices utilized by Counterclaim Defendants.

149.   Finally, Counterclaim Defendants submitted claims for an abdominal ultrasound which was also allegedly conducted on XX, 2010.  However, United Member 8 does not have any knowledge that this procedure was ever performed. The Ultrasound record is a computer print-out with an electronic signature by Dr. Mednik.  In response to a claim form submitted to United on or around XX, 2010, United, who was unaware that United Member 8 would contest the claim, paid Counterclaim Defendants $4,375.00 for this service.

150.   In sum, the Counterclaim Defendants fraudulently induced United Member 8 into obtaining medical services that they knew were not medically necessary and not undertaken for the purpose represented since there was no need

to "clear" United Member 8 for Lap Band surgery.  United Member 8 would never have undergone the EGD procedure, which ultimately caused her severe injury, or any other services, if the Counterclaim Defendants had not told her that she was approved for the Lap Band procedure and that their services would not cost her anything out of pocket. Further, the Counterclaim Defendants fraudulently represented the nature and scope of their services on claims forms submitted to United for payment.

151.   Given Counterclaim Defendants' undisclosed waiver of Member Responsibility Amounts, United owed Counterclaim Defendants nothing for these services.  Furthermore, United should have paid nothing for services which were not rendered.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $8,748.97, plus interest and attorneys' fees.  United is also entitled to a declaration that the Counterclaim Defendants are not entitled to receive any payment on the outstanding bills for services to United Member 8 from United and Patient 8's employer sponsored plan.  In addition (and alternatively), the Counterclaim Defendants are liable to reimburse United for any other payments made to the Counterclaim Defendants for services provided to United Member 8 that would not have been provided but for the promises of the Counterclaim Defendants to waive any obligation to pay anything beyond what United would pay.

## 2.  United Member 1

152.   During the times relevant hereto, United Member 1 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator.  The terms of this health benefit plan specifically excluded from coverage any "expenses for health services and supplies" for which the member has "no legal responsibility to pay" or for which an out-of-network provider "waives the Copay, Annual Deductible or Coinsurance amounts."

153.   United Member 1 had Lap Band surgery on XX, 2010.  On or around XX, 2011, Counterclaim Defendants, through Beverly Hills Surgery Center, submitted facility claims to United for a total of $88,825 for United Member 1's Lap Band surgery , including the following:

a)   $75,890 Lap Band (CPT code 43770), broken down as:

i.   $32,000 – Recovery Room

ii.   $31,000 – Operating Room

iii.   $8,480 – Surgical Tray

iv.   $2,950 – Anesthesia Supplies

v.   $750 – Pre-Op Room

vi.   $710 – Administration of Drugs

b)   $12,935 – Anesthesia

154.   Separately, Skin Cancer & Reconstructive Surgery Specialists LLC submitted a claim to United with billed charges of $6,500 (CPT code 43770) for professional fees for the Lap Band placed on XX, 2010.

155.   Despite the fact that Counterclaim Defendants have submitted claims in excess of $95,000 for United Member 1's Lap Band surgery, this procedure is a laparoscopic outpatient procedure. According to the NIH, laparoscopic gastric banding surgery "is done using a tiny camera that is placed in [the patient's] belly," which allows the surgeon to see inside the belly. http://www.nlm.nih.gov/medlineplus/ency/article/007388.htm.  Generally, the surgeon makes one to five small surgical cuts in the patient's abdomen and places a camera and the surgical instruments inside these cuts.  The surgeon then places a Lap Band around the upper corner of the patient's stomach to separate it from the lower part.  This creates a small pouch that has a narrow opening that goes into the larger, lower part of the patient's stomach.  The surgery does not involve any cutting or stapling inside the belly.  The purpose of this surgery is to restrict food intake—when the patient eats after the surgery, the small pouch will fill up quickly,

and the patient will feel full after eating just a small amount of food. After the surgery, a physician can adjust the band to make food pass more quickly or slowly through the patient's stomach.

156.   Medical records show United Member 1's Lap Band surgery lasted 32 minutes—for which United Member 1 was reportedly charged a $31,000 operating room fee.  Further, despite being charged $32,000 for use of Beverly Hills Surgical Center's recovery room, United Member 1's medical records show that United Member 1 was discharged just 80 minutes after United Member 1's anesthesia ended.

157.   The charges submitted for United Member 1's Lap Band are dramatically higher than the reasonable cost for such services. For example, as described more fully below, United is informed and believes the Counterclaim Defendants charged $18,000 to patients who paid cash for such services.

158.   United processed United Member 1's claims, paying $1,928.03 for the anesthesia, for which United Member 1's coinsurance obligation was $396.05, and paying $1,904 for the professional fees, for which United Member 1's coinsurance obligation was $816.  United did not approve any payment on the excessive $75,890 bill.

159.   Additionally, United paid claims for United Member 1's Lap Band "follow-up" visits on XX, 2010, XX, 2010, and XX, 2011.

a)   Specifically, Counterclaim Defendants submitted claims for two services on XX, 2010—a Lap Band adjustment (CPT Code S2083) and an outpatient office visit (CPT Code 99213) for total charges of $3,300 and $450, respectively.  Both of these claims were submitted on or around XX, 2010 by Counterclaim Defendants on behalf of Dr. Atul Madan, under the NPI numbers for Lapband Specialists, LLC, which was registered by Cloud, Jaroscak, and Pezeshk, and operates out of the Omidis' office at Suite 106, and Dr. Madan, a physician who has performed many services at Counterclaim Defendant surgical centers.

United paid a total of $1,150.80 for these services, while United Member 1's coinsurance obligation was $493.50.

b)      Additionally, Counterclaim Defendants submitted a claim for an additional Lap Band follow-up visit (CPT code 99213) with Dr. Madan on XX, 2010.  This claim was submitted to United on behalf of Dr. Madan, under the NPI numbers for LapBand Specialists, LLC and Dr. Madan, on or around XX, 2010. United paid a total of $100.80 for these services, while United Member 1's coinsurance obligation was $43.20.

c)      Finally, Counterclaim Defendants submitted claims for two services on XX, 2011—a Lap Band adjustment (CPT Code S2083) and an outpatient office visit (CPT Code 99213) for total charges of $3,300 and $450, respectively.  Both of these claims were submitted to United on or around XX, 2011 for services provided by Dr. Madan.  However, the claim was submitted by ATMA Medical, Inc., which is registered with the NPI Registry and the California Medical Board as a physician-owned entity operating out of mailbox 1409 at the Beverly Hills Postal Place and/or Suite 106 at 9001 Wilshire Blvd., as owned by Dr. Elliot Alpert.  United is informed and believes that Counterclaim Defendants submitted these claims under ATMA Medical, Inc. because United had denied similar claims submitted under Dr. Madan's name in the months before this date of service.  United paid $1,274 for these services, while United Member 1's coinsurance obligation was $546.

160.  Consistent with their promises to patients to waive Member Responsibility Amounts that were not disclosed to United, the Counterclaim Defendants did not collect the $2,294.75 in coinsurance owed by United Member 1. United Member 1 has informed United that United Member 1 was told, prior to receiving services from Counterclaim Defendants, that there would be "absolutely" no out-of-pocket expense relating to Counterclaim Defendants' services.  Indeed, United Member 1 has informed United that United Member 1 would never have

agreed to undergo Lap Band surgery if United Member 1 had known United Member 1 would be responsible for a co-payment.

161.   Given Counterclaim Defendants' undisclosed waiver of Member Responsibility Amounts, under the terms of United Member 1's plan, United owed Counterclaim Defendants nothing for these services.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $6,357.63, plus interest and attorneys' fees.  United is also entitled to a declaration that the Counterclaim Defendants are not entitled to receive any payment on the $75,890 bill for these services.  In addition (and alternatively), the Counterclaim Defendants are liable to reimburse United for any other payments made to the Counterclaim Defendants for services provided to United Member 1 that would not have been provided but for the promises of the Counterclaim Defendants to waive any obligation to pay anything beyond what Untied would pay.

162.   Despite inducing United Member 1 to undertake these out-of-network services by falsely assuring no Member Financial Responsibility, United is informed and believes that the Counterclaim Defendants are now improperly seeking to collect the balance of the bills for the XX, 2010 services directly from the patient.  Not only should this balance billing not be allowed as it is inconsistent with the Counterclaim Defendants' prior promises to United Member 1, it  also highlights the Counterclaim Defendants' divergence of interests from those of their patients.

### 3.  __United Member 2__

163.   During the times relevant hereto, United Member 2 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator.  United Member 2's health benefit plan specifically excludes from coverage "Health services for which you have no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Plan" and also provides that "[i]n the event that a Non-Network provider waives

Copayments and/or the Annual Deductible for a particular health service, no Benefits are provided for" such health services.

164.   Counterclaim Defendants, through San Diego ASC, submitted a claim to United with billed charges of $13,890 for an EGD procedure (CPT code 43239) performed on United Member 2 on XX, 2010. Separately, Skin Cancer Surgery Specialists submitted claims to United with billed charges of $650 and $375 for an office consultation and electrocardiogram on this same date.

165.   United processed these claims, with the amounts allowed for the office consultation and electrocardiogram being $300 and $103, which were supposed to be paid entirely by United Member 2 as part of the out-of-network deductible.  United paid $9,726.60 for the EGD, and United Member 2 was obligated by the terms of the plan to pay $4,163.40 in coinsurance for the EGD, bringing United Member 2's Member Responsibility Amounts to a total of $4,566.40 for this date of service.

166.   However, consistent with their promises to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $4,566.40 owed by United Member 2.  Accordingly, under the terms of United Member 2's plan, United owed Counterclaim Defendants nothing for these services.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant health benefit plan, $9,726, plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 2 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts, or for which United Member 2 had no legal responsibility to pay.

167.   Further, even if the terms of United Member 2's plan did not require the Counterclaim Defendants to return all amounts paid for services provided to

FIRST AMENDED COUNTERCLAIM

United Member 2, the Counterclaim Defendants are liable to return all amounts paid for services provided to United Member 2 based on the fraudulent misrepresentation.  Alternatively, the excess amounts received for the EGD performed on XX, 2010, due to the inflated billed charge amount submitted for the EGD performed on that date.

168.   The Counterclaim Defendants' billed charge of $13,890 for the EGD greatly exceeds a reasonable or appropriate charge for this procedure.  A reasonable or appropriate billed charge for this EGD would be less than half of this amount, with the precise amount to be proven at trial.  Thus, alternatively, if the Counterclaim Defendants are not liable to reimburse United, on behalf of United Member 2's plan, for the entire amount paid, they are liable to reimburse United for the excess amount paid due to the submission by the Counterclaim Defendants of an inflated billed charge and receipt of payment beyond that authorized by the terms of the plan, including the limitations therein on eligible expenses.

### 4.  <u>United Member 3</u>

169.   During the times relevant hereto, United Member 3 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator.  United Member 3's benefit plan excludes from coverage "Health services for which you have no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Plan," and excludes from coverage services "for which a non-Network Provider waives the Copay, Annual Deductible, or Coinsurance amounts."

170.   Counterclaim Defendants, through Valencia ASC, submitted a claim to United on or around XX, 2010, with billed charges totaling $13,790 for an EGD procedure (CPT code 43239) performed on United Member 3 on XX, 2010, including:

        a)      EGD (CPT code 43239)

                i.   $6,000 – Operating Room

     ii.  $5,000 – Recovery Room

    iii.  $1,110 – Sterile Supplies

    iv.  $1,080 – Anesthesia Supplies

    v.  $350 – Administration of Drugs

    vi.  $250 – Pre-Op Room

171.   United processed this claim, and paid $12,979.16 for the EGD; United Member 3 was obligated by the terms of the plan to pay $810.84 in coinsurance for the EGD.

172.   United Member 3 underwent Lap Band surgery on XX, 2010, which United covered.  While United covered a number of follow-up visits and Lap Band adjustments for United Member 3, United denied reimbursement for excessive follow-up visits and adjustments billed under Dr. Tashjian's name and NPI number. In response, Counterclaim Defendants began submitting claims for follow-up services performed by Dr. George Tashjian in fall of 2011 under the TIN and NPI number for "GETA Medical, Inc.," a company established by Dr. Alpert, and others under the Omidis' control to collect physician fees that would not otherwise be paid.  On XX, 2012, United paid Counterclaim Defendants $1,820 for an office visit and Lap Band adjustment performed by Dr. Tashjian on XX, 2011.  United Member 3 was responsible paying for $455 on these claims.

173.   However, consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $1,265.84 owed by United Member 3.  Accordingly, under the terms of United Member 3's plan, United owed Counterclaim Defendants nothing for the services provided on this date.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $14,799.16, plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to

United Member 3 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

174.    Further, the Counterclaim Defendants' billed charge of $13,890 for the EGD greatly exceeds a reasonable or appropriate charge for this procedure.  A reasonable or appropriate billed charge for this EGD would be less than half of this amount, with the precise amount to be proven at trial.  Thus, alternatively, if the Counterclaim Defendants are not liable to reimburse United, on behalf of United Member 3's plan, for the entire amount paid, they are liable to reimburse United for the excess amount paid due to the submission by the Counterclaim Defendants of an inflated billed charge and receipt of payment beyond that authorized by the terms of the plan, including the limitations therein on eligible expenses.

### 5.  **United Member 9**

175.    During the times relevant hereto, United Member 9 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator. The terms of this health benefit plan specifically exclude expenses for health services and supplies "for which a non-Network Provider waives the Copay, Annual Deductible or Coinsurance amounts."

176.    In 2009, United Member 9 called the 1-800-GET-THIN phone line after seeing the billboard advertisements.  United Member 9 told the operator he was interested in getting the Lap Band to help him lose weight, and he was referred to Counterclaim Defendants' facility in Covina, California.  United Member 9 attended a seminar at the Covina facility where a doctor described the Lap Band procedure and explained how it worked.  There were three to four other people at the seminar.  When the seminar presentation finished, United Member 9 was told he could schedule the Lap Band procedure.

177.    According to claims submitted to United, United Member 9 underwent a series of services by Counterclaim Defendants on XX, 2009 at one of the clinics located at 9001 Wilshire, Suite 106, Beverly Hills.  United was billed for two

different office consultations, a series of lab tests, and an EGD with biopsy.  In XX 2009, United paid a total of $11,706.55 for these services, while United Member 9 was responsible for at least $2,794.71 in coinsurance and deductible amounts. However, United Member 9 only reported to the Beverly Hills location once—for the Lap Band procedure—and that he did not undergo any pre-Lap Band testing, including an EGD, at any facility.

178.   On XX, 2009, United Member 9 underwent Lap Band surgery at Counterclaim Defendants' 9001 Wilshire Blvd., Suite 106, Beverly Hills, location. He also underwent a series of follow-up visits at the Counterclaim Defendants' Covina facility, where the Lap Band was adjusted. For follow-up visits with Dr. Tashjian on XX, 2010 and XX, 2010, United paid $1,314 while United Member 9 was responsible for $879 in coinsurance for these services.

179.   Like the other United Members referenced herein, Counterclaim Defendants told United Member 9 that his insurance would pay for all expenses associated with the Lap Band surgery and that he would not be responsible for any out of pocket expenses.  Indeed, United Member 9 did not pay any part of the expenses incurred in connection with Counterclaim Defendants' services.

180.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $3,673.71 which would be owed by United Member 9 for these services. Accordingly, under the terms of United Member 9's plan, United owed Counterclaim Defendants nothing for the services provided on this date.  Furthermore, United should have paid nothing for services which were not rendered.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $13,020.55, plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 9 that would not

have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

### 6.  United Member 10

181.   During the times relevant hereto, United Member 10 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator.  Per the terms of this health benefit plan, the plan does not cover "services and supplies for which the [member] is not legally required to pay."

182.   United Member 10 was referred to the Omidi Network by a friend who worked in the same office complex as Counterclaim Defendants' facility in Apple Valley, California. United Member 10 attended a seminar regarding the details of the procedure, and United Member 10 provided insurance information to the Omidi representative working on her account.  Counterclaim Defendants told United Member 10 that United would pay all costs associated with their services and that she would not be responsible for any out of pocket costs.

183.   United Member 10 was immediately provided a litany of services, including two sets of psychological testing, an EGD with biopsy, and multiple consultations.  United Member 10 was told that she needed to undergo these services in order to qualify for the Lap Band surgery.

184.   United Member 10 had Lap Band surgery on XX, 2009 at Almont ASC.  Counterclaim Defendants submitted total billed charges of $102,050.00 for the Lap Band surgery.  United paid $64,400.30 of this, while United Member 10 was responsible for paying at least $1,520 in coinsurance for these services.

185.   However, Counterclaim Defendants told United Member 10 that United would cover all costs relating to the Lap Band surgery, and United Member 10 paid nothing toward the Lap Band surgery.

186.   Post-surgery, Counterclaim Defendants attempted to collect additional payments from United Member 10, including, among others, her co-insurance obligations for the podiatrist services.  United Member 10 was not even aware that

Counterclaim Defendants were out of network providers until after she received the bills. When United Member 10 called Counterclaim Defendants and told them she was told that her insurance would pay for everything and that she would not be financially responsible for any out of pocket expenses, Counterclaim Defendants informed United Member 10 that they would accept United's payment as full payment, and has not tried to bill United Member 10 since.

187. Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $1,520 owed by United Member 10. Accordingly, under the terms of United Member 10's plan, United owed Counterclaim Defendants nothing for the services provided on this date. Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $64,400.30, plus interest and attorneys' fees. In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 10 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

### 7. **United Member 11**

188. During the times relevant hereto, United Member 11 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator. Per the terms of this health benefit plan, the plan does not cover "services and supplies for which the [member] is not legally required to pay."

189. United Member called 1-800-GET-THIN after hearing advertisements on the radio. United Member 11 attended an informational seminar at one of Counterclaim Defendants' facilities regarding information about the Lap Band. A number of other individuals also attended the same seminar. A representative of Counterclaim Defendants took United Member 11's insurance information, and

subsequently told United Member 11 that Counterclaim Defendants had contacted his insurance company and that he was "100 percent covered."  This representative also told him that he did not have to pay for anything, and that he would be responsible for no out of pocket costs or deductibles.  United Member 11 was not told that Counterclaim Defendants were out of network providers prior to receiving medical services.

190.   According to claims records submitted by Counterclaim Defendants, United Member 11 underwent the following services on XX, 2009: (1) a psychological interview (CPT code 90801) with Melissa Baily-Arizpe for total billed charges of $200; (2) an EGD with biopsy (CPT codes 43239 and 740) for total billed charges of $19,970; (3) a "new patient" office consultation in preparation for the EGD (CPT code 99204), for total billed charges of $294; (4) an abdominal ultrasound (CPT code 76700) for total billed charges of $4,250; and (5) lab fees for total billed charges of $703.50.

191.   United paid $13,431.09 for these services, while United Member 11 was responsible for $2,225.91 in coinsurance and deductible amounts.

192.   United Member 11 has informed United that he does not recall having the XX, 2009 psychological examination.

193.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $2,225.91 owed by United Member 11.  Accordingly, under the terms of United Member 11's plan, United owed Counterclaim Defendants nothing for the services provided on this date. Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $13,431.09, plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 11 that would not have been provided but for the

promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

### 8. **United Member 12**

194.   During the times relevant hereto, United Member 12 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator.  The terms of this health benefit plan requires that United (as Claims Administrator) be "advised of any discounts or price adjustments made to [the member] by any provider," and it makes clear that it will only pay based upon the actual charges, and that any such undisclosed price adjustments "constitutes a serious violation of the provisions of the Plan." It also excludes from coverage "charges that would not have been made if [the member] didn't have this coverage," and "charges [the member] is not legally required to pay."

195.   In 2010, United Member 12 was interested in having weight loss surgery.  United Member 12 inquired about weight loss services at various providers and attended seminars put on by two or three different weight loss companies.  The representatives at these seminars informed United Member 12 that he would be charged for the Lap Band surgery.

196.   United Member 12 then called 1-800-GET-THIN after seeing a television advertisement.  He attended the informational seminar and provided Counterclaim Defendants with his insurance information.  Counterclaim Defendants advised United Member 12 that they contacted United and that United Member 12 would have no out-of-pocket expenses or any other costs associated with the Lap Band surgery, and that the providers would accept the amounts paid by United as payment in full.  In reliance on these statements, and, in fact, because the Lap Band surgery would be free of cost, United Member 12 elected to undergo Lap Band surgery with Counterclaim Defendants.

197.   United Member 12 has informed United that, in preparation for the surgery, United Member 12 underwent an EGD procedure, walked on a treadmill,

and had his gallbladder removed after an ultrasound. United Member 12 did not have any sleep apnea tests, psychological testing, or nutritional assessments prior to his Lap Band surgery.

198. Claims submitted by Counterclaim Defendants reflect that, on XX, 2010, United Member 12 underwent an EGD with biopsy (CPT codes 43239 and 740) for total billed charges of $22,330 and two office consultations (CPT codes 99243 and 99204) for total billed charges of $1,250. United paid $5,197 for these services, while United Member 12 was responsible for paying $1,390.50 toward these services.

199. United Member 12 subsequently underwent Lap Band surgery on XX, 2010. After his surgery, United Member 12 began experiencing stomach problems and contacted Counterclaim Defendants, who told him to come in for a follow-up appointment. United Member 12 thought the billed charges for the follow-up appointments were excessive, however, and noticed that the Counterclaim Defendants billed for Lap Band adjustments even when they did not adjust his Lap Band.

200. United paid more than $122,000 to Counterclaim Defendants for services supposedly rendered to United Member 12. However, United Member 12 never paid any amounts toward any services rendered.

201. Further, despite the fact that United Member 12 did not undergo any treatment for sleep apnea or psychological testing, Counterclaim Defendants submitted, on multiple occasions between XX, 2010 and XX, 2012, claims to United for $27,765 in sleep apnea treatment purportedly provided on XX, 2010. Counterclaim Defendants likewise submitted $725 in claims for a psychological examination purportedly conducted on XX, 2010. United did not pay claims for these services, but they are illustrative of Counterclaim Defendants' fraudulent billing practices.

202.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $1,390.50 owed by United Member 12.  Accordingly, under the terms of United Member 12's plan, United owed Counterclaim Defendants nothing for the services provided on this date.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $5,197 plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 12 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

### 9.  Underline United Member 13

203.   During the times relevant hereto, United Member 13 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator. The terms of this health benefit plan requires that United (as Claims Administrator) be "advised of any discounts or price adjustments made to [the member] by any provider," and it makes clear that it will only pay based upon the actual charges, and that any such undisclosed price adjustments "constitutes a serious violation of the provisions of the Plan." It also excludes from coverage "charges that would not have been made if [the member] didn't have this coverage," and "charges [the member] is not legally required to pay."

204.   United Member 13 contacted Counterclaim Defendants to inquire about Lap Band surgery in 2009.  Prior to receiving any services, United Member 13 provided her insurance information to a representative of Counterclaim Defendants.  The representative told her that Counterclaim Defendants' bariatric services, including Lap Band surgery, would be covered entirely by insurance and that United Member 13 would not have to pay any out of pocket expenses. United

Member 13 could not afford to pay for any medical expenses at the time and would not have undertaken the Lap Band surgery had she known she would be responsible for out of pocket expenses.

205.   United Member 13 was initially told by a representative of Counterclaim Defendants that she needed to gain 15 pounds in order to qualify for the Lap Band surgery.  After United Member 13 gained the required 15 pounds, United Member 13 called and arranged to have the Lap Band surgery.

206.   On XX, 2009, United Member 13 underwent an EGD with biopsy (CPT codes 43239 and 740) for total billed charges of $15,500, abdominal ultrasound (CTP code 76700) for total billed charges of $4,250, and an office consultation (CPT code 99204) for total billed charges of $294.  United paid $8,203.42 for these services, while United Member 13 was responsible for paying $916.80 in coinsurance and deductible amounts.

207.   United Member 13 underwent Lap Band surgery on XX, 2009, which United covered.  Additionally, United paid $337.50 toward a $3,300 Lap Band adjustment provided on XX, 2010; United Member 13 was responsible for paying $637.50 toward this claim.

208.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $1,554.30 owed by United Member 13.  Accordingly, under the terms of United Member 13's plan, United owed Counterclaim Defendants nothing for the services provided on this date. Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, $8,540.92 plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 13, including the Lap Band surgery, that would not

have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

## 10. <u>United Member 15</u>

209.   During the times relevant hereto, United Member 15 was covered by an employer sponsored health benefit plan for which United serves as a claims administrator.

210.   United Member 15 contacted Counterclaim Defendants by calling 1-800-GET-THIN after hearing the Lap Band surgery advertised on the radio.  She then attended a consultation at the clinic in 9001 Wilshire Blvd., Suite 106, and was told about the process for getting a Lap Band.  She also discussed insurance with a representative of Counterclaim Defendants, and was told that her insurance covered all costs associated with the Lap Band procedure and that she would not be responsible for any out of pocket costs for the Lap Band or any associated services.

211.   After her Lap Band surgery, for which United Member 15 paid no out-of-pocket expenses, United Member 15 continued to receive services from the Counterclaim Defendants throughout 2012 and 2013.

212.   On XX, 2013, United Member 15 underwent a "Lipodystrophy" from Counterclaim Defendants.  This is a cosmetic procedure where excess skin is removed.  Counterclaim Defendant IMS billed United a total of $20,275 for this procedure under CPT codes 802, 15830, and 99241.  In XX 2014, United paid $4,755.50 for these services, while United Member 15 was responsible for $4,982.50 in coinsurance and deductible for these services.

213.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants affirmatively waived and did not collect the $4,982.50 owed by United Member 15.  Accordingly, under the terms of United Member 15's plan, United owed Counterclaim Defendants nothing for the services provided on this date. Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the

relevant plan, $4,755.50 plus interest and attorneys' fees.  In addition, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, for any other payments made to the Counterclaim Defendants for services provided to United Member 15 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

### ii. **Counterclaim Defendants Concealed Lap Band Surgery on Claims Forms and Instead Billed United Inflated Charges For Hernia Surgery**

214.   In addition to the routine waiver of Member Responsibility Amounts described above, United has identified a unique type of fraudulent billing practice which Counterclaim Defendants engaged in on multiple occasions, including for United Members 4-6.  When faced with a benefit plan that did not provide coverage for Lap Band surgery, Counterclaim Defendants manufactured a reason to perform a hiatal hernia surgery, which is similar to the Lap Band procedure, at which time they also placed a Lap Band.  They then concealed the existence of the Lap Band surgery on claims forms and medical records, and billed United exorbitant amounts for the purported hernia surgery.

### 1. **United Member 4**

215.   United Member 4 was covered by an employer sponsored health benefit plan for which United served as a claims administrator.

216.   On XX, 2009, United Member 4 underwent an EGD with Biopsy at the Beverly Hills Surgery Center clinic in preparation for contemplated Lap Band surgery.

217.   Dr. Arman Feliksovich Karapetyan, M.D.'s report from this same date, labeled "Medical Clearance Form: Initial Preoperative Evaluation," states that this patient  "has elected to proceed with the lap band procedure pending the clearances requested by [United Member 4's] surgeon and is here today for a comprehensive

pre-operative evaluation and medical clearance in order to proceed with United Member 4's bariatric procedure."  Notably, this report further states that United Member 4 did not have any hernias, and that the abdomen was "soft, Non Tender to palpation and Normal BS."

### a.  United Denies Authorization for Lap Band Surgery in 2009

218.   On XX, 2009, United sent a letter to United Member 4 and Beverly Hills Surgery Center denying coverage for the requested Lap Band procedure because it was not covered under United Member 4's health plan.  The letter stated, "Based on the information submitted and your health benefit plan, we determined that the health care services are not covered.  The services are not eligible expenses under your plan."

### b.  Counterclaim Defendants Perform A Second EGD in 2010

219.   On XX, 2010, the month after Counterclaim Defendants were notified that United Member 4's Lap Band surgery would not be covered, Counterclaim Defendants Beverly Hills Surgical Center and Skin Cancer Surgery Specialists, together with Dr. Atul Madan, performed a second EGD on United Member 4.  The Anesthesia Record for this EGD shows that this patient was under anesthesia for a total of seven minutes, and that the procedure lasted only two minutes.  The Recovery Room records reflect that United Member 4 was discharged just over 30 minutes later.  The Operative Report now recorded a hiatal hernia with a recommendation for hernia surgery.

220.   United is informed and believes that this second, two-minute EGD procedure, which came less than three months after the first EGD, was unnecessary. The second EGD was performed in order to manufacture and document a reason to perform a hiatal hernia repair surgery, which would then allow the Counterclaim Defendants to simultaneously place a Lap Band, and secure reimbursement for the

uncovered Lap Band by the submission of bills that contained inflated charges for the hernia repair surgery, but omitted all reference to the simultaneously-performed Lap Band surgery.

221.   United, on behalf of United Member 4's health plan, paid $5,338.54 for the unnecessary services performed on this date.

### c.   Counterclaim Defendants Subsequently Perform Combined Lap Band and Hernia Repair Surgery

222.   Medical records and claims records show that subsequently, on XX, 2010, United Member 4 underwent Lap Band and hiatal hernia surgery.

223.   Having been notified only months earlier that the proposed Lap Band surgery was not covered by United Member 4's plan, Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists fraudulently omitted from the claim forms submitted for the services provided on XX, 2010 any mention of the surgical Lap Band placement, despite the fact that the Lap Band was the primary purpose for the XX, 2010 treatment.  The omission of the Lap Band surgery from these claim forms makes them false and misleading.

224.   The Counterclaim Defendants submitted such fraudulent claim forms in order to secure reimbursement for the uncovered Lap Band placement through the submission of highly inflated charges for the hernia surgery.

225.   Counterclaim Defendant Beverly Hills Surgical Center submitted facility claims of $37,860 under CPT code 39520 for the hernia repair surgery, including:

        a)      $16,500 – Operating Room;

        b)      $15,500 – Recovery Room;

        c)      $2,950 – Anesthesia Supplies;

        d)      $2,150 – Sterile Supplies;

        e)      $410 – Administration of Drugs; and

f)     $350 – Pre-Op Hiatal.

Beverly Hills Surgical Center also billed $9,350 for the anesthesiologist, and $2,440 for tissue examination.  Counterclaim Defendant Skin Cancer Surgery Specialists billed $17,500 for professional fees, bringing the total submitted billed charges to $67,150 for what was, as billed, supposedly only a hernia repair surgery.

226.     The facility billed charges of $37,860 submitted by Beverly Hills Surgical Center were highly inflated because they really included charges for the unbilled and uncovered Lap Band surgery.  Ordinarily, when the Counterclaim Defendants performed combined Lap Band surgery and hernia repair surgery, and both were covered by the health plan in question, the facility charges for the hernia repair surgery would be less than $4,000.

227.   Relying on the representation that only hernia repair surgery had been performed on XX, 2010, and that the charges submitted were for that surgery only, United processed the facility claim with billed charges of $37,860 and paid, on behalf of United Member 4's plan, $20,111.26 to Beverly Hill Surgical Center, with United Member 4's coinsurance obligation being $888.74.  United also paid $6,008.29 on the other bills for what supposedly was only a hernia repair surgery.

228.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants did not, on information and belief, collect the $888.74 owed by United Member 4.

229.   As a result of the fraudulent billing by the Counterclaim Defendants for the services provided to United Member 4 on XX, 2010, and the unnecessary services provided earlier on XX, 2010, United Member 4's plan has been damaged in an amount to be proven at trial.  In addition, under the terms of United Member 4's plan, nothing was owed for XX, 2010 services, due to the waiver of Member Responsibility Amounts.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the relevant plan, all amounts paid for the XX, 2010

services, as well as any other payments made to the Counterclaim Defendants for services provided to United Member 4, which would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

## 2.  United Member 5

230.   United Member 5 was covered by an employer sponsored health benefit plan for which United served as a claims administrator.

231.   On XX, 2009, United Member 5 underwent an EGD with Biopsy at the Beverly Hills Surgery Center clinic in preparation for contemplated Lap Band surgery.  Dr. Elliot Alpert's Operative Report for this procedure shows that the purpose of this procedure was to "rule out any upper GI lesion in preparation for Lap-Band surgery."  The Operative Report also reflects that United Member 5's duodenum and stomach, including the fundus, body, and antrum "appeared normal."  This report concluded: "Normal upper GI tract."

### a.  United Denies Pre-Authorization for Lap Band Surgery

232.   Shortly after United Member 5's EGD, Counterclaim Defendants requested pre-authorization from United to perform a Lap Band surgery.  However, United notified "Julian" (whom United is informed and believes to be Julian Omidi) by telephone conference that a Lap Band was not an eligible expense under United Member 5's plan.  United also notified United Member 5 of this determination.

### b.  Counterclaim Defendants Submit Claims Totaling $24,494 For A Second EGD Procedure

233.   Similar to United Member 4, after Counterclaim Defendants received notice that United Member 5's Lap Band surgery would not be covered by the employer-sponsored health plan, Counterclaim Defendants conducted an

unnecessary second EGD on XX, 2010.  The second EGD was performed in order to manufacture and document a reason to perform a hiatal hernia repair surgery, which would then allow the Counterclaim Defendants to simultaneously place a Lap Band, and secure reimbursement for the uncovered Lap Band by the submission of bills that contained inflated charges for the hernia repair surgery, but omitted all reference to the simultaneously performed Lap Band surgery.

234.   United received claims for $24,494 for the unnecessary EGD and related procedures from Beverly Hills Surgery Center and Skin Cancer Surgery Specialists: $12,200 for the Beverly Hills Surgery Center facility charge; $4,244 for the professional endoscopic services of Atul Madan, M.D.; $3,800 for the anesthesia services of Eva Toth, CRNA; and an additional $4,250 for an ultrasound conducted by George Mednik, M.D.

235.   United, on behalf of United Member 5's health plan, paid $14,142.63 for the unnecessary services performed on this date of service.

   c.   **Counterclaim Defendants Misrepresent Services Provided On Claims In Order to Receive Payment for Unauthorized Lap Band Services**

236.   Medical records and claims records show that on XX, 2010, United Member 5 underwent Lap Band and hiatal hernia surgery.

237.   Having been notified in 2009 that the proposed Lap Band surgery was not covered by United Member 5's plan, Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists fraudulently omitted from the claim forms submitted for the services provided on XX, 2010, any mention of the surgical Lap Band placement, despite the fact that the Lap Band was the primary purpose of the XX, 2010 treatment.  The omission of the Lap Band surgery from these claim forms makes them false and misleading.  The Counterclaim Defendants submitted such fraudulent claim forms in order to secure reimbursement for the

uncovered Lap Band placement through the submission of highly inflated charges for the hernia surgery.

238.   As with United Member 4, Counterclaim Defendant Beverly Hills Surgical Center submitted facility claims with billed charges of $37,860 under CPT code 39520 for the hernia repair surgery for United Member 5, and billed charges of $2,440 for tissue examination.  As with United Member 4, Counterclaim Defendant Skin Cancer Surgery Specialists billed $17,500 for professional fees for the hernia repair surgery for United Member 5.

239.    The facility billed charges of $37,860 submitted by Beverly Hills Surgical Center were highly inflated because they really included charges for the unbilled and uncovered Lap Band surgery.  Ordinarily, when the Counterclaim Defendants performed combined Lap Band surgery and hernia repair surgery, and both were covered by the health plan in question, the facility charges for the hernia repair surgery would be less than $4,000.

240.   Relying on the representation that only hernia repair surgery had been performed on XX, 2010, and that the charges submitted were for that surgery only, United processed the facility claim with billed charges of $37,860 and paid, on behalf of United Member 5's plan, $22,000 to Beverly Hill Surgical Center.  United also paid $12,727.00 on the other bills for what supposedly was only a hernia repair surgery on XX, 2010.

241.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants did not, on information and belief, collect any Member Responsibility Amounts owed by United Member 5.

242.   As a result of the fraudulent billing by the Counterclaim Defendants for the services provided United Member 5 on XX, 2010, and the unnecessary services provided earlier on XX, 2010, United Member 5's plan has been damaged in an amount to be proven at trial.  In addition, under the terms of United Member

5's plan, nothing was owed for any services provided to United Member 5 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

### 3. <u>United Member 6</u>

243. United Member 6 was covered by an employer sponsored health benefit plan for which United served as a claims administrator.

244. On XX, 2009, United Member 6 underwent an EGD with biopsies at Counterclaim Defendant Beverly Hills Surgery Center in advance of planned Lap Band surgery. The comments section of the Initial Preoperative Evaluation report dated XX, 2009 signed by Dr. Arman F. Karapetyan, M.D. states that the patient needs to sign informed consent with the surgeon for "off-label placement" of the Lap Band.

245. However, United Member 6 did not meet the requirements for coverage of Lap Band services under United Member 6's health plan. The Initial Preoperative Evaluation Report dated XX, 2009 indicates that United Member 6's height is 5'10" and weight is 235, putting BMI at 33.7. United Member 6's Plan does not provide coverage for Lap Band surgery for individuals whose BMI is less than 35. Even if United Member 6 met the plan's BMI requirements, bariatric services such as Lap Band surgeries "must be received at a designated Center of Excellence facility to be covered." However, none of the Counterclaim Defendant surgical facilities has ever been designated a Center of Excellence, as that term is used in the relevant health plan. Thus, coverage under United Member 6's plan would not have been available for a Lap Band at the Beverly Hills Surgery Center even if the BMI requirement of 35 or higher had been satisfied.

    a. <u>**Counterclaim Defendants Perform Lap Band Surgery On United Member 6 And Bill United $61,360 For A Hiatal Hernia Surgery**</u>

246.    Claims submitted by Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists show that on XX, 2010, United Member 6 underwent Lap Band and hiatal hernia surgery.

247.    Because, as the Counterclaim Defendants were aware, United Member 6 was not covered for Lap Band surgery at Beverly Hills Surgical Center, Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists fraudulently omitted from the claim forms submitted for the services provided on XX, 2010 any mention of the surgical Lap Band placement, despite the fact that the Lap Band was the primary purpose of this treatment.  The omission of the Lap Band surgery from these claim forms makes them false and misleading. The Counterclaim Defendants submitted such fraudulent claim forms in order to secure reimbursement for the uncovered Lap Band placement through the submission of highly inflated charges for the hernia surgery.

248.    As with United Members 4 and 5, Counterclaim Defendant Beverly Hills Surgery Center submitted facility claims with billed charges of $37,860 under CPT code 39520 for the hernia repair surgery for United Member 6, and professional claims with billed charges of $6,000 for the anesthesiologist fees.  As with United Members 4 and 5, Counterclaim Defendant Skin Cancer Surgery Specialists billed $17,500 for professional fees for the hernia repair surgery for United Member 6.

249.    The facility billed charges of $37,860 submitted by Beverly Hills Surgical Center were highly inflated because they really included charges for the unbilled and uncovered Lap Band surgery.  Ordinarily, when the Counterclaim Defendants performed combined Lap Band surgery and hernia repair surgery, and both were covered by the health plan in question, the facility charges for the hernia repair surgery would be less than $4,000.

250.    Relying on the representation that only hernia repair surgery had been performed on XX, 2010, and that the charges submitted were for that surgery only,

United processed the facility claim with billed charges of $37,860 and paid, on behalf of United Member 6's plan, $20,225.12 to Beverly Hills Surgery Center for facility charges.  United also paid $11,744.89 on the other bills for what supposedly was only a hernia repair surgery on this date of service.  To further conceal their fraud, Counterclaim Defendants submitted an operative report to United relating to the hernia repair procedure.  However, in subsequent submissions of medical records, Counterclaim Defendants submitted to United a second, separate operative report showing that a Lap Band had been placed in addition to the hernia repair.

251.   Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants did not, on information and belief, collect any Member Responsibility Amounts owed by United Member 6.

252.   As a result of the fraudulent billing by the Counterclaim Defendants for the services provided United Member 6 on XX, 2010, United Member 6's plan has been damaged in an amount to be proven at trial.  In addition, under the terms of United Member 6's plan, nothing was owed for any services provided to United Member 6 that would not have been provided but for the promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

253.   The fraudulent billing for United Member 6 continued for services after the XX, 2010 Lap Band surgery.  Bills were submitted to United for the services of Dr. Madan for outpatient office visits in XX, XX, and XX, 2010.  Medical records show, however, that the purpose of each of these visits was to provide a Lap Band adjustment.  United Member 6 would not have sought these outpatient services had he not received the Lap Band.  Defendants falsely represented the nature of these visits in an attempt to obtain payment for unauthorized Lap Band services.  United Member 6's plan has been damaged by this fraud because of the payments made for such services, in an amount to be

proven at trial, which would not have been paid had they been accurately represented as uncovered Lap Band services.

### iii. Counterclaim Defendants Inflated Patients' BMI In An Attempt To Obtain Coverage for Lap Band Services

254.   Body Mass Index, or BMI, is an indicator of body fat and is an important tool for determining the medical necessity of bariatric health services, including Lap Band surgery, for an individual patient. BMI is calculated by dividing a person's weight (in pounds), by their height (in inches) squared, and multiplying by a conversion factor of 703: [weight $\div$ height$^2$] x 703 = BMI.  For example, a person who is 5'5" (65") and weighs 150 pounds has a BMI of 24.96: [150 $\div$ (65)$^2$] x 703 = 24.96.  While many United Plans do not provide any coverage for bariatric services, many United Plans that do offer coverage for bariatric services require that members have a minimum BMI, usually 35 or 40, in addition to other conditions, in order to qualify for those services.  Further, the Lap Band is only FDA-approved for treatment of individuals within a certain BMI range.

255.   Medical records show that in some cases Counterclaim Defendants manipulated the height and weight of individual patients in order to, upon information and belief, inflate the United Member's BMI and, in some cases, get prior authorization for Lap Band surgery.  In other cases, Counterclaim Defendants submitted Lap Band operative reports that did not accurately represent the patients' BMI on the day of surgery, when compared to the height and weight measurements recorded by Counterclaim Defendants on the day of surgery.

### 1. United Member 7

256.   For example, medical and claim records show that on XX, 2010, United Member 7 was examined to determine candidacy for a Lap Band.  At the time, the provider recorded United Member 7's height as 5'3" and her weight at

200 pounds, resulting in a calculated BMI of 35.4.  Dr. Au Lee signed United Member 7's Bariatric Surgery History & Physical Examination Form and recommended that United Member 7 undergo a Lap Band procedure.

257.   However, records further show that on XX, 2010, the day United Member 7 underwent Lap Band surgery, Counterclaim Defendants measured United Member 7 as standing a full two inches taller—at 5'5"—and weighing 204 pounds, resulting in a calculated BMI of just 33.9.  This height is consistent with a declaration submitted by United Member 7 in earlier litigation stating that United Member 7 stood at 5'5".  In addition, at the time of the Lap Band procedure, United Member 7's driver's license stated that United Member 7 was 5'6".

258.   Had Dr. Au recorded United Member 7's true height of at least 5'5" during the pre-operation examination, he would have calculated United Member 7's BMI at 33.3.  Further, had United Member 7's BMI been accurately measured and recorded, United Member 7 would not have qualified for bariatric surgery benefits under United Member 7's health plan, and United would not have been responsible for any expenses associated with the Lap Band surgery.

259.   As a result of the fraudulent BMI calculation, United Member 7 underwent a Lap Band procedure at Valley Surgical Center on XX, 2010.  The surgical center subsequently submitted facility claims of at least $79,990, in addition to charges for professional services.  United processed these claims, paying Valley Surgical Center $79,490, on behalf of United Member 7's health plan, with United Member 7 being responsible for a $500 deductible.  United also paid $1,785 to West Hills Surgery LLC for the XX, 2010 Lap Band.  Consistent with their promises to patients to waive Member Responsibility Amounts, which were not disclosed to United, the Counterclaim Defendants did not, on information and belief, collect any Member Responsibility Amounts owed by United Member 7.  Under the terms of United Member 7's plan, nothing was owed for any services provided to United Member 7 that would not have been provided but for the

promises of the Counterclaim Defendants to waive Member Responsibility Amounts.

260.   Following surgery, United Member 7 had numerous adjustments and other Lap Band-related procedures such as a barium swallow and fluoroscopy.  Had United Member 7's BMI been accurately measured and recorded during the initial consultation, United Member 7 would not have qualified for a bariatric surgery benefit under United Member 7's health plan.  As a result of the fraudulent BMI calculation by the Counterclaim Defendants, United Member 7's plan has been damaged in an amount to be proven at trial.  Moreover, United would not be responsible for any post-operative expenses incurred.

## 2.  United Member 6

261.   In another example, medical and claim records also show that Counterclaim Defendants fraudulently inflated United Member 6's BMI.  Indeed, on XX, 2009 during the pre-operative examination, Counterclaim Defendants measured United Member 6 as standing 5'10" and weighing 235 pounds.  Although Counterclaim Defendants did not calculate United Member 6's BMI that day, they would have learned that United Member 6's BMI was only 33.7, thus disqualifying United Member 6 from any bariatric surgery benefits under United Member 6's plan.

262.   Even though United Member 6 did not qualify for bariatric surgery benefits, Counterclaim Defendants scheduled and performed a Lap Band procedure on XX, 2010.  In the corresponding operative note, Dr. Madan erroneously recorded United Member 6's height as a full inch shorter—5'9"—and calculated United Member 6's BMI at 40.  While there is no weight recorded for United Member 6 on the day of surgery, United Member 6's pre-operative weight, 235, combined with United Member 6's new height, results in a BMI of just 34.7.  Even assuming United Member 6 stood 5'9", United Member 6 would have had to *gain* 36 pounds in preparation for weight loss surgery in order to reach a BMI of 40.

263.   At the time of the surgery, United Member 6 carried a driver's license that listed United Member 6 as standing 5'10" and weighing 220 pounds, a height/weight combination that translates to a BMI of 31.6.

264.   As described in full detail above, Counterclaim Defendants subsequently billed United more than $60,000 in total charges related to the Lap Band surgery (that was fraudulently billed as hiatal hernia surgery) and for several Lap Band follow-up examinations and adjustments.

### 3.  United Member 14

265.   Additionally, United Member 14 underwent Lap Band surgery on XX, 2011.  Counterclaim Defendants submitted claims for Valley Surgical Center, West Hills Surgery Center/Dr. Au Lee, and Dr. Julius Gee in connection with the Lap Band surgery.

266.   The Operative Report submitted in connection with these claims states that United Member 14's BMI on the day of the surgery was 35.3.  However, the report prepared by the anesthesiologist working on behalf of Counterclaim Defendants records show that, on the day of this surgery, United Member 14 was 5'4" and weighed 190 pounds, giving United Member 14 a calculated BMI of 32.6 on the day of the surgery.  United Member 14 would need to weigh a full 15 pounds more to reach the reported BMI of 35.3.

267.   In reliance on the representations made in the operative report, on XX, 2011 United paid $3,100 toward the claim submitted for services provided by assistant surgeon Dr. Julius Gee for this procedure.

268.   Notably, Counterclaim Defendants inflated the BMI calculation of United Member 14 enough to rise above 35.  Had United Member 14's BMI been recorded accurately as 32.6, United Member 14 would not have been eligible for Lap Band surgery under the terms of United Member 14's health benefit plan. United Member 14's actual BMI further fell short of the industry standard minimum BMI of 35-40 that is ordinarily required for Lap Band surgery to be

deemed medically necessary and to qualify as a covered expense, when it is not excluded.

269.    This practice of submitting operative reports and other medical records with false BMI calculations is not limited to these United Members.  United has uncovered many other instances where Members' Lap Band operative notes do not accurately reflect the Members' BMI calculation on the day of surgery, when compared with the height and weight recorded by Counterclaim Defendants and used for anesthesia purposes on the day of surgery.  This includes, for example, one member whose BMI was wrongly recorded as 39, when her BMI on the day of surgery was actually 34.9.  Like the other United Members referenced herein, United Members 6, 7 and 14 are examples that are representative of Counterclaim Defendants' fraudulent billing practices designed to obtain payment from United for unauthorized services.

270.   Additional members not addressed in detail here have also informed United that they were told the Counterclaim Defendants' services would be covered entirely by insurance with no out-of-pocket expenses to the member; that they received bills from the Counterclaim Defendants for services that never happened or from clinics where they were never treated; that they were double billed by the Counterclaim Defendants for services they received only once; that they were billed for office visits that actually took place over the phone; and that they were billed for extended appointments that in fact were much shorter.

271.   Finally, Counterclaim Defendants have purported to submit assignment of benefit forms which were invalid because they were unsigned, undated, or which lacked vital information, including the names of the assignees. These assignment-of-benefits forms are invalid on their face.

272.   In sum, the Counterclaim Defendants engaged in a pattern and practice of submitting false and fraudulent bills to United that (a) were fraudulently inflated due to the Counterclaim Defendants' waiver of co-pays and other patient

responsibility obligations; (b) were illegally induced by the Counterclaim Defendants' agreement to waive copays and other Member Responsibility Amounts, which resulted in the United members receiving either medically unnecessary care, or care that would have been provided by an in-network provider at lower cost to the United Plans or United had this waiver not occurred; (c) submitting claims to United for medical services rendered, where the Counterclaim Defendants knew that the health plans would not make payments for charges where the provider waived the copays and other Member Responsibility Amounts; (d) fraudulently inflating the billed charges for certain procedures, in situations where the Counterclaim Defendants were informed that the United member did not have coverage for the Lap Band surgery; and (e) attempting to mask the performance and expense of Lap Band surgeries by labeling the procedures as another, purportedly medically necessary and covered, and submitting falsified medical records to further cover up the fraud.

### i. Counterclaim Defendants Submitted Claims and Wrongfully Induced United to Pay Amounts That Were Greater Than their Normal Cash Charges or the Usual, Customary, and Reasonable Charges for the Same Procedures

273.   During the time relevant to this action, the Counterclaim Defendants were out-of-network providers with respect to United, meaning United did not have a contract with the Counterclaim Defendants governing reimbursement for the services they rendered to United members.

274.   As noted earlier, all or virtually all health benefit plans administered by United limit reimbursement of out-of-network providers to a specified percentage of "eligible expenses."

275.   Beginning in 2008, the Counterclaim Defendants routinely submitted excessive and unreasonable charges to United for a variety of procedures and visits, including but not limited to Lap Band and other endoscopy procedures (CPT codes

43239, 43770, and 47562), in an attempt to induce United to authorize payment to the Counterclaim Defendants for amounts well in excess of the "eligible" or "usual, customary and reasonable" charges covered under the terms of the plans administered by United as claims administrator.

276.  For example, the Counterclaim Defendants, including Almont ASC, Beverly Hills Surgery Center, Modern Institute, and Valley Surgical Center, routinely submitted bills to United for Lap Band placements (CPT code 43770) with charge amounts in excess of $60,000, which is more than 300% greater than a reasonable charge for this procedure.  The Counterclaim Defendants felt free to submit such excessive and unreasonable charges, having told their patients that they would not have to pay copays or otherwise pay for the care being provided.

277.  Further, United is informed and believes that Counterclaim Defendants billed Lap Band patients willing to pay cash substantially less than patients with insurance.  Indeed, upon information and belief, Counterclaim Defendants charged cash patients only $18,000 for Lap Band surgery while they simultaneously charged some patients covered by health plans more than $90,000 or $100,000 in facility charges and professional fees for such surgery.  United is further informed and believes that former Lap Band manufacturer Allergan estimated that a Lap Band procedure should cost between $12,000 and $20,000.

278.  The Counterclaim Defendants succeeded in their attempts to induce United to authorize payment to the Counterclaim Defendants for amounts well in excess of the "eligible" or "usual, customary and reasonable" charges covered under the terms of the plans administered by United as claims administrator.

279.  For example, for CPT codes 43239, 43770 & 47562, the aggregate overpayments received by the Counterclaim Defendants  are in excess of $10,000,000.  Accordingly, if the waiver of Member Responsibility Amounts did not eliminate altogether the obligation to make any payment to the Counterclaim Defendants under the terms of the plans administered by United as claims

administrator, the Counterclaim Defendants would still be liable to reimburse United, on behalf of the plans administered by United as claims administrator, for such overpayments, with the precise amount of overpayments to be proven at trial.

280.   Because these overpayments were in excess of what was required to be paid under the terms of the plans administered by United, United seeks restitution of these overpayments.

### ii.   United Paid Numerous Claims In Good Faith Based On Counterclaim Defendants' Misrepresentations

281.   United reasonably relied on the misrepresentations contained on the claim forms submitted by Counterclaim Defendants, and in good faith paid not only the claims of the exemplars above, but also thousands of claims based on those misrepresentations.  Just as with the exemplars, Counterclaim Defendants submitted intentionally misleading and fraudulent claims that: (i) inflated the claimed amount because of Counterclaim Defendants' waiver of co-pays and other Member Responsibility Amounts; (ii) were for medical procedures that (as Counterclaim Defendants knew) were not eligible for coverage under the health benefit plans because of the Counterclaim Defendants decision to waive Member Responsibility Amounts, and promise to accept whatever United paid as full payment for the services; (iii) failed to disclose that co-payments and other forms of patient responsibility had been waived; (iv) sought payment for services which were charged using inflated CPT codes; (v) sought payment for services which were never performed; (vi) masked the cost and expense of Lap Band surgeries by labeling the procedures as a different, covered expense and submitting inflated claims for the covered procedures; and (vii) sought exorbitant payments. Counterclaim Defendants also submitted intentionally misleading and fraudulent claims for medical procedures that they knew would not be covered by the health plans because of their decision to waive co-pays and other patient responsibilities. In directing that payments be made to the Counterclaim Defendants, United relied

upon the truthfulness and accuracy of the claims information submitted by the Counterclaim Defendants, which it believed to be correct at the relevant time.

### FIRST CAUSE OF ACTION
#### (Fraud)
#### (Against All Counterclaim Defendants)

282.   United realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 281, inclusive, hereinabove.

283.   Counterclaim Defendants did knowingly and willfully execute a scheme and artifice to defraud United by submitting, and collecting on, fraudulent health insurance claims, and to obtain by means of false and fraudulent pretenses, representations and promises, money and property owned by, or under the custody or control of United, in connection with the delivery of or payment for health care benefits, items, or services.

284.   Counterclaim Defendants had knowledge of the wrongful scheme and intended to defraud United, despite their legal duty to submit timely and accurate insurance claims.

285.   In furtherance of the scheme and artifice to defraud, Counterclaim Defendants submitted:

a)   Fraudulent claims that failed to disclose that Defendants had waived some or all of the member's co-pay, deductible, or other financial responsibility;

b)   Fraudulent claims that misrepresented the nature of the procedure performed, or in some cases, completely failed to disclose that the member received a gastric Lap Band;

c)   Fraudulent claims that sought payment for services which were charged using inflated CPT codes;

d)   Fraudulent claims that sought payment for services which were never performed;

e)      Fraudulent claims that inflated the member's BMI in order to receive secure coverage for the Lap Band surgery; and

f)      Fraudulent claims that demanded exorbitant fees far in excess of the usual and customary rate.

286.   Counterclaim Defendants' scheme and artifice to defraud succeeded in inducing United to pay these fraudulent claims.  As a direct and proximate cause of this scheme, United paid millions in fraudulent claims.

287.   Counterclaim Defendants made false representations of material fact to United in submitting claim forms to United.  Specifically, Counterclaim Defendants submitted intentionally misleading and fraudulent claims that: (i) inflated the claimed amount because of Counterclaim Defendants' waiver of co-pays and other patient responsibility obligations; (ii) failed to disclose the waived Member Responsibility Amount; (iii) inflated the cost of certain covered procedures, in situations where the Counterclaim Defendants were informed that the United member did not have coverage for the Lap Band surgery; (iv) sought payment for services which were charged using inflated CPT codes; (v) sought payment for services which were never performed; and (vi) masked the cost and expense of Lap Band surgeries by labeling the procedures as another, purportedly medically necessary and covered procedure.  Counterclaim Defendants also submitted to United intentionally misleading and fraudulent claims and medical records for medical procedures that they knew would not be covered by the health plans because of their decision to waive co-pays and other patient responsibilities.

288.   At the time Counterclaim Defendants submitted these materially misleading and fraudulent claims and medical records to United, Counterclaim Defendants knew the falsity of such representations.  Counterclaim Defendants (for example) knew at the time they submitted such claims that the Counterclaim Defendants had not actually charged the members the amounts stated in the claims

as the billed charge and that the members had not agreed to pay such amounts if Counterclaim Defendants did not receive payment from United.

289.   Counterclaim Defendants submitted the claims to United with the intent to induce United to rely on the false statements as to the amount charged to the members and, therefore, pay to Counterclaim Defendants an amount that was (in the aggregate) millions in excess of the actual amount charged to the members or the rate regularly charged by the Counterclaim Defendants to cash-paying patients.  United reasonably relied on the false statements contained in the claims submitted by Counterclaim Defendants as to the amount charged to the members. Based upon such reliance, United paid to Counterclaim Defendants amounts based on the billed charges in the claims, when, in fact, the Counterclaim Defendants had not actually charged such amounts to the members.

290.   As a result of Counterclaim Defendants' fraudulent conduct, United (and the group health plans it administers) have been damaged by paying to Counterclaim Defendants amounts far in excess of the amount actually charged to the members.  The total amount of such damage will be proven at trial.

291.   Counterclaim Defendants further made false representations of material fact to United in submitting claim forms and medical records to United that sought payment for unauthorized Lap Band surgeries and adjustments by concealing the Lap Band treatments as other treatments, *i.e.*, hernia surgeries and general office visits.

292.   At the time Counterclaim Defendants submitted these materially misleading and fraudulent claims and medical records to United, Counterclaim Defendants knew the falsity of such representations.  Counterclaim Defendants knew that the claims seeking payment for hernia surgery and/or office visits *actually* sought payment for unauthorized Lap Band treatments. Counterclaim Defendants submitted the claim forms and falsified medical records to United with the intent to induce United to rely on the false statements as to the services provided

to the members and, therefore, pay to Counterclaim Defendants an amount that was tens of thousands of dollars in excess of the actual amount charged for hernia surgery and follow-up visits.

293.   United reasonably relied on the false statements contained in the claims submitted by Counterclaim Defendants.  Based upon such reliance, United paid to Counterclaim Defendants amounts based on the billed charges in the claims, when, for example, the Counterclaim Defendants had not actually charged such amounts to the members, had secretly misrepresented the procedures performed, and inflated charges for such procedures.  As a result of Counterclaim Defendants' fraudulent conduct, United (and the group health plans it administers) have been damaged by paying to Counterclaim Defendants amounts far in excess of what United would have otherwise paid.  The total amount of such damage will be proven at trial.  Alternatively, United requests that the sums that it seeks be awarded as a set off to any amounts United (or the group health plans it administers) owes to Counterclaim Defendants on any outstanding claims.

294.   United is informed and believes that Counterclaim Defendants acted intentionally in conscious disregard of the rights of United and the group health plans it administers, with malice, oppression, and fraud in that Counterclaim Defendants knew that its acts and conduct, as alleged hereinabove, were fraudulent and unjustified and would result in severe financial and economic injury to United. Accordingly, United is entitled to an award of punitive damages against Counterclaim Defendants for the sake of example and by way of punishing Counterclaim Defendants.  The amount of such punitive damages should be determined at the time of trial of this action.

### SECOND CAUSE OF ACTION
#### (Unfair Business Practices, Business & Professions Code § 17200)
#### (Against All Counterclaim Defendants)

295.   United realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 294, inclusive, hereinabove.

296.   Counterclaim Defendants' submission to United of false claims, including waiving Member Responsibility Amounts, is an unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200, *et seq*.  This conduct violates state and federal prohibitions on the submission of false claims to insurers/health plans, including Cal. Bus & Prof. Code § 810, Cal. Penal Code §§ 532, 550, 18 U.S.C. § 1347, and HIPAA.

297.   In addition to being false and fraudulent, the amounts purported to be charged by the Counterclaim Defendants were unconscionable in that they are so exorbitant and wholly disproportionate to the services performed as to shock the conscience of physicians of ordinary prudence practicing in the same community.

298.   Further, Counterclaim Defendants' scheme to own and operate the network of clinics and surgery centers described herein further constitutes unlawful and unfair business practice in violation of California Business & Professions Code § 17200, *et seq*.  This conduct violates state prohibitions on the corporate practice of medicine, including Cal. Bus. & Prof. Code § 2400 *et seq*, which prohibits unlicensed medical professionals from owning and operating a medical practice, and Cal. Bus. & Prof. Code § 2254, which prohibits the aiding and abetting of the unlicensed practice of medicine.

299.   Counterclaim Defendants' payment of incentives to physicians for patient referrals is an unlawful and unfair business practice in violation of Cal. Bus. & Prof. Code § 17200, et seq.  This conduct violates Cal. Bus. & Prof. Code § 650(a), which prohibits the payment of incentives to physicians for patient referrals.  Counterclaim Defendants, including Michael Omidi, offered and delivered compensation to licensed physicians as an inducement to perform procedures at Omidi-owned surgery centers. These illegal incentives interfered with the professional independence of the participating physicians in determining the proper surgical facilities for their patients.

300.   Counterclaim Defendants' conduct and scheme to defraud offends the established public policy of California to protect consumers and is unethical, oppressive, unscrupulous, immoral, and substantially injurious to California consumers.

301.   United and the group health plans it administers have been subjected to and injured by Counterclaim Defendant's unlawful conduct, including Counterclaim Defendants' routine waiver of co-pay or other patient financial responsibility, and the corporate practice of medicine; fraudulent conduct, including falsified medical and claims records which purport to bill for services that were not medically necessary or were never rendered, that conceal services rendered, or that substantiate services based on false BMI measurements; and unfair practices, including promises to patients that they would not incur any out of pocket expenses, regardless of what insurance required, and that the Counterclaim Defendants would look solely to insurance for payment.

302.   As a party harmed by the Counterclaim Defendants' actions, United (and the group health plans it administers) are entitled to obtain restitution from and injunctive relief against Counterclaim Defendants.   Alternatively, United requests that the sums that it seeks be awarded as a set off to any amounts United (or the group health plans it administers) owes to Counterclaim Defendants on any outstanding claims.

**THIRD CAUSE OF ACTION**
**(Conspiracy to Commit Fraud)**
**(Against All Counterclaim Defendants)**

303.   United realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 302, inclusive, hereinabove.

304.   For many years, and continuing through the present, Counterclaim Defendants did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown, to execute a scheme and

artifice to defraud United by submitting and collecting on fraudulent health insurance claims and medical records, and to obtain by means of false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of United, in connection with the delivery of or payment for health care benefits, items, or services.

305.   Counterclaim Defendants orchestrated the wrongful scheme and intended to defraud United, despite their legal duty to submit timely and accurate insurance claims.

## Purpose of the Conspiracy

306.   It was a purpose of the conspiracy for Counterclaim Defendants to unlawfully enrich themselves by, among other things, submitting intentionally misleading and fraudulent claims that:

    a) Inflated the claimed amount because of Counterclaim Defendants' waiver of co-pays and other patient responsibility obligations;

    b) Omitted a disclosure regarding the waived co-pays and patient responsibilities;

    c) Inflated the billed charges and concealed the performance of certain procedures, in situations where the Counterclaim Defendants were informed that the United member did not have coverage for the Lap Band surgery;

    d) Masked the performance and expense of Lap Band surgeries by labeling the procedures as another, purportedly medically necessary and covered procedure;

    e) Sought payment for services which were charged using inflated CPT codes;

    f) Sought payment for services which were never performed; and

g) Concealed the fact that Counterclaim Defendants knew that the submitted claim was not covered by the health plans because of their decision to waive co-pays and other patient responsibilities.

**Manner and Means of the Conspiracy**

307.    The manner and means by which Counterclaim Defendants and other co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

a) United is informed and believes that the Omidis conspired to create Top Surgeons, 1-800-GET-THIN, LLC, Counterclaimant Defendants, and the other members of the Omidi Network as organizations to fraudulently market and sell Lap Band surgeries and related services.

b) Top Surgeons, 1-800-Get-Thin, LLC and/or other corporate entities owned, operated, or controlled by the Omidis (including the Omidi Network) employs call center staff to encourage prospective patients to attend "free" orientations, consultations, and examinations.

c) These initial "free" meetings with prospective patients are ostensibly to determine whether the prospective patient is a suitable candidate for Lap Band surgery.  In furtherance of the conspiracy, United is informed and believes that the primary purpose of these initial sessions is to determine whether the prospective patient carries adequate health insurance.

d) Once a prospective patient is identified and cleared to undergo surgery, the Omidis, and the corporate entities that they own, manage, and/or control (including the Omidi Network and the co-conspirators alleged herein) conspire to refer these patients to physicians who are under contract with Top Surgeons, 1-800-Get-

Thin, LLC, or other co-conspirators known or unknown.  United is informed and believes that these physicians perform subsequent examinations and procedures at Counterclaim Defendant surgical centers that are owned, managed, operated, or controlled by the Omidis, and the Omidi Network.

e)  In furtherance of the conspiracy, United is informed and believes that the Omidis instruct their affiliated physicians to perform medically unnecessary, costly, and unauthorized surgical procedures, such as EGDs, as a means to artificially and fraudulently inflate claims to insurers such as United.

f)  Following a surgical procedure, Counterclaim Defendants submit or cause to be submitted fraudulent insurance claims to United for unnecessary medical procedures or procedures that are not fully documented.  Counterclaim Defendants also submit insurance claims and/or medical records that fraudulently misrepresent the nature and complexity of the services provided, seek payment for services which were never rendered, and misrepresent a member's BMI or other pertinent information that bears upon United's obligation to pay benefits under the member's health plan.

308.   Counterclaim Defendants' conspiracy succeeded in inducing United to pay these fraudulent claims.  As a direct and proximate cause of this conspiracy, United paid millions in fraudulent claims.  United therefore seeks all damages incurred as a result of the Counterclaim Defendants' wrongful conduct on behalf of itself and the group health plans it administers.  Alternatively, United requests that the sums that it seeks be awarded as a set off to any amounts United (or the group health plans it administers) owes to Counterclaim Defendants on any outstanding claims.

**FOURTH CAUSE OF ACTION**
**(Intentional Interference with**
**Contractual Relationships)**
**(Against All Counterclaim Defendants)**

309.   United realleges and incorporates by reference Paragraphs 1 through 308 as though fully set forth herein.

310.   As alleged above, the Counterclaim Defendants were aware that health benefit plans generally include provisions precluding participants from accepting services from providers in return for a waiver of Member Responsibility Amounts. By nevertheless inducing United members to accept services with the Counterclaim Defendants by promises that they would waive patient responsibilities and accept whatever payment their health benefit plan would pay – in most instances without the United member even knowing that this relationship was illegal or a violation of Plan terms – the Counterclaim Defendants caused the United members to violate the terms of their health benefit plans.   By doing so, Plaintiffs' illegally interfered with the contract between United Members, the group health plans in which they participate, and (in certain instances) United as insurer.

311.   In many cases, the actions constituting the tortious interference alleged herein occurred before any of the purported assignments of benefits were effectuated.  Prior to assigning benefits, patients were induced to undergo Lap Band procedures with promises that they would not be responsible for their co-payment or other financial responsibility amounts and by failing to disclose that these patient financial responsibility amounts were being improperly waived.  These actions caused a disruption in, or breach of, the contractual relationship between United and its insured.

312.   Further, many of the assignments of benefits that Counterclaim Defendants purported to submit to United were blank or otherwise invalid.

313.   Additionally, many of the plans for which United serves as insurer or Claims Administrator contain provisions which prohibit the assignment of claims.

314.   Further, by accepting assignments from, and acting as authorized representatives of the United members, and then submitting false or inflated bills for services, the Counterclaim Defendants illegally interfered with the contractual relationship between United and its members.

315.   United (and the group health plans it administers) therefore seeks all damages incurred as a result of the Counterclaim Defendants' intentional interference, including (but not limited to) damages in the amount of overuse of health plan benefits resulting from the illegal inducement, as well as damages in the amount of the fraudulent billings.   Alternatively, United requests that the sums that it seeks be awarded as a set off to any amounts United (or the group health plans it administers) owes to Counterclaim Defendants on any outstanding claims.

**FIFTH CAUSE OF ACTION**
**(Restitution under ERISA § 502(a)(3)**
**(Against All Counterclaim Defendants)**

316.   United realleges and incorporates by reference Paragraphs 1 through 315 as though fully set forth herein.

317.   The Plans listed in Appendix I are all employer sponsored group health plans governed by ERISA.

318.   For all (or virtually all) of the ERISA Plans, one of the United Counterclaimants in this matter has been delegated by the respective plan's Plan Administrator the fiduciary responsibility and discretion to decide claims under the terms of the Plan ("Claims Administrator.").  In all such instance, the Plan document in question will delegate to a United Counterclaimant discretionary authority to resolve participants' claims for benefits under the Plan.  United's authority to decide claims is final and binding, subject only to judicial review (or independent external review mandated by state law or the Affordable Care Act).   In performing its duties as a Claims Administrator United acts as – and explicitly

acknowledges that it is – an ERISA fiduciary as that term is defined in ERISA § 3(21).

319.   For example, one of the exemplar United Members identified herein was covered under the Whole Foods Market Group Benefit Plan.  The Whole Foods Market Group Benefit Plan Document specifically names UnitedHealthcare Insurance Company as the Claims Administrator for the Plan, requires participants to file claims for benefits with UnitedHealthcare Insurance Company, and delegates to UnitedHealthcare Insurance Company the "sole and absolute discretion" to:

- Interpret the terms of the relevant ERISA Plan;
- Interpret the other terms, conditions, limitations and exclusions of the Benefit Program, including this SPD;
- Make factual determinations related to the Benefit Program and Benefits;
- Review claims for benefits under the terms of the Plan, and decide appeals as required by ERISA § 503 (and associated regulations promulgated by the DOL);

320.   Furthermore, under the UnitedHealthcare Insurance Company Administrative Services Agreement with Whole Foods, UnitedHealthcare Insurance Company is appointed "a named, ERISA fiduciary under the Plan with respect to (i) performing claim processing and payment, (ii) performing the fair and impartial review of initial appeals, and (iii) performing the fair and impartial review of final appeals," and is delegated "the discretionary authority to (i) construe and interpret the terms of the Plan, (ii) to determine the validity of charges submitted to [United] under the Plan, and (iii) make final, binding determinations concerning the availability of the Plan benefits." Under its ASA's such as this one, United is accountable to its sponsoring employers for proper performance of its contractual duties.

321.   Further, one of the exemplar United Members identified herein was covered under a medical plan with Travelers, which provides that UnitedHealthcare Insurance Company is the named Claims Fiduciary, with discretionary authority to resolve claims for benefits under the terms of the Plan, and to make all factual and other determinations regarding the availability of plan benefits.  Likewise, the Administrative Services Agreement between United and Traveler's states that UnitedHealthcare Insurance Company is a "Named Claims ERISA Fiduciary" under the Plan  and it has "discretionary authority" to decide claims and appeals of claims under ERISA's claim regulations, and to "(I) make any and all factual determinations and interpret all terms and provisions of the Plan, SPD, and related documents relevant to the issue under consideration, and (II) make final, binding determinations concerning the availability of Plan Benefits."

322.   By further example, one of the exemplar United Members identified herein was covered under a medical plan with Time Warner.  The Plan document in question delegates to UnitedHealthcare Insurance Company the discretionary authority to resolve all claims for benefits under the terms of the plan.  The Administrative Services Agreement between UnitedHealthcare Insurance Company and AOL Time Warner, Inc. provides that UnitedHealthcare Insurance Company is a "named, ERISA fiduciary under the Plan with respect to Plan claims adjudication activities…including performing claim processing and payment" including prospective fraud and abuse detection and control. Further, UnitedHealthcare Insurance Company is delegated "the discretionary authority to (a) construe and interpret the terms of the Plan, (b) to determine the validity of charges submitted to us under the Plan, and (c) make final, binding determinations concerning the availability of Plan benefits."

323.   The ERISA Plans in question typically include language requiring that any overpayments that are made to patients, or (on their behalf) to providers must be returned.  For example, one typical ERISA Plan states that "[t]he Plan reserves

the right to recover any payments made by the Plan that were . . . [m]ade in error; or . . . [m]ade to any Covered Person or any party on a Covered Person's behalf where . . . the payment to the Covered Person or any party is greater than the amount payable under this Plan.  The Plan has the right to recover against Covered Persons if the Plan has paid them or any other party on their behalf."

324.   As a part of its duties as a Claims Administrator, the relevant United entity also has the contractual duty to not only review claims, but also to attempt to recover overpayments made by the ERISA plans, including those made to patients and medical providers, whether these payments result from fraudulent behavior or otherwise.  For example, UnitedHealthcare Insurance Company's Agreement with AOL Time Warner gives United the authority to engage in "recovery services for Overpayments" for AOL Time Warner's plan. Its duties as a Claims Administrator thus give it the right and responsibility to ensure that the Plan is properly administered, that only proper payments are made on behalf of the plans, and to ensure that overpayments made to providers are recovered.

325.   These, or materially indistinguishable, terms are included in the Plan documents and ASAs for all (or virtually all) of the ERISA Plans included in Appendix I.

326.   As a result of the wrongful behavior listed above, United has paid out millions in benefits to the Counterclaim Defendants.  United acts (among other things) as a fiduciary of the Plan and as a party with an interest in the proper administration of the Plan and its duties under the terms of the group health plans and the applicable ASAs.  As such, United has standing to sue under ERISA § 502(a)(3) for the ERISA Plans, to obtain equitable relief to redress violations of such ERISA Plans, or to enforce the terms of the ERISA Plans.

327.   As alleged above, Counterclaim Defendants have engaged in a scheme of  submitting intentionally misleading, and fraudulent claims that: (i) inflated the claimed amount because of Counterclaim Defendants' waiver of co-pays and other

Member Responsibility Amounts; (ii) were for medical procedures that (as Counterclaim Defendants knew) were not eligible for coverage under the health benefit plans because of the Counterclaim Defendants decision to waive Member Responsibility Amounts, and promise to accept whatever United paid as full payment for the services; (iii) failed to disclose that co-payments and other forms of patient responsibility had been waived; (iv) sought payment for services which were charged using inflated CPT codes; (v) sought payment for services which were never performed; (vi) masked the cost and expense of Lap Band surgeries by labeling the procedures as a different, covered expense and submitting inflated claims for the covered procedures; and (vii) sought exorbitant payments.  Based upon the inflated claims submitted to United, Counterclaim Defendants received amounts in excess of the amounts that they actually charged for those services, and that would have been incurred by United Members.

328.   Further, even to the extent that the Counterclaim Defendants did not knowingly and intentionally submit false or inflated bills to United, United is entitled to equitable relief to enforce the terms of the Plans and recover these overpayments. This is particularly true where the Counterclaim Defendants submitted claims of Plan Members of ERISA Plans pursuant to valid contractual assignments (or authorized representation agreements) received from United Members.   In such instances, the Counterclaim Defendants accepted the terms of the ERISA Plans and submitted their claims subject to those terms.  Further, by knowingly accepting payments from the Plan, the Counterclaim Defendants became bound by the Plan's terms and conditions, including conditions related to overpayments.  The ERISA Plans, by their terms, require the return of overpayments and amounts that were erroneously paid.  Thus, even to the extent that the Counterclaim Defendants did not intentionally overcharge United, United is still entitled to equitable relief to enforce the terms of the Plan and recover these overpayments.

329.   As a result of the fraudulent scheme to inflate their charges and waive in full or in part Member Responsibility Amounts, Counterclaim Defendants induced United to overpay each and every of such claims submitted by Counterclaim Defendants.  United (on behalf of the ERISA Plans it administers) is entitled to recover these overpayments and seeks restitution of the amounts it overpaid.  Among other things, United seeks restitution in the total amount of the payments made to Counterclaim Defendants on behalf of patients to whom the Counterclaim Defendants promised that they would waive any Member Responsibility Amounts.  United also (and alternatively) seeks to recover the amounts paid to the Counterclaim Defendants resulting from their fraudulent invoices, such as for unnecessary care, or invoices that mask the actual services provided.  United further seeks to recover all amounts paid in excess of the usual, customary, or reasonable charges for the services at issue, for payments that exceed the Counterclaim Defendants' discounted, cash price for the services at issue, or payments that were otherwise not consistent with the terms of the Plan, as well as any other excessive payments made as detailed in greater depth above.

330.   The various overpayments referenced above paid by United to Counterclaim Defendants were deposited into bank accounts that have been identified by United.

331.   As detailed above, these payments have deposited into accounts with Wells Fargo Bank, including the accounts identified previously in this Counterclaim.

332.   United is informed and believes that some or all of the overpayments/payments procured by fraud remain in these accounts.  To the extent that some portion of these payments have been removed from these accounts, those exact same sums were transferred to, and remain in, other bank accounts within the possession, custody, and control of the Counterclaim Defendants.

333.   United is entitled to the imposition of a constructive trust on the assets that the Counterclaim Defendants received through fraud or as a result of excessive or inflated payments, as well as on any profits or income made by Counterclaim Defendants through the use of those amounts held in constructive trust.  United is also entitled to an Order restoring to United on its own behalf and on behalf of ERISA Plans the sums held in constructive trust by Counterclaim Defendants.  As noted, upon information and belief, United believes that the sums that the Counterclaim Defendants overcharged United are still in the possession, custody or control of the Counterclaim Defendants.

334.   Further, an equitable lien, either implied or by agreement, exists on the amounts United overpaid or paid in error to Counterclaim Defendants in reliance on the fraudulent claims.  Upon information and belief, United believes that the sums that the Plaintiffs overcharged United are still in the possession, custody or control of the Counterclaim Defendants.

335.   Restitution and trust remedies include, among other things, return of the amounts paid by United based on the fraudulent claims.  United seeks return of monies paid to Counterclaim Defendants on behalf of the ERISA Plans that constituted overpayments or erroneous payments.  Alternatively, United requests that the sums that it seeks be awarded as a set off to any amounts United (or the group health plans it administers) owes to Counterclaim Defendants on any outstanding claims.

**SIXTH CAUSE OF ACTION**
**(For Declaratory and Injunctive Relief**
**under ERISA§502(a)(3))**
**(Against All Counterclaim Defendants)**

336.   United realleges and incorporates by references Paragraphs 1 through 335 as though fully set forth herein.

337.   United acts as claims fiduciary nearly all of the ERISA Plans included on Appendix I and has standing to sue under ERISA § 502(a)(3) for injunctive

relief to redress violations of such ERISA Plans or to enforce any provisions of these ERISA Plans.

338.   Defendants have engaged in a scheme to defraud United into paying amounts to Counterclaim Defendants in excess of the amounts owed under the ERISA Plans, as discussed above.

339.   United is entitled to a judicial declaration pursuant to ERISA § 502(a)(3) that Counterclaim Defendants are not entitled to any additional payments from United or the ERISA Plans unless and until they reimburse United and the ERISA Plans for all amounts they wrongfully obtained as a result of their scheme to defraud United.

340.   United further seeks a declaratory judgment decreeing the right, duties and obligations of the parties under the ERISA Plans.

341.   United also seeks an order enjoining Counterclaim Defendants from billing United for amounts for which the Counterclaim Defendants had indicated they would waive Member Responsibility Amounts or otherwise accept payments from United or the Plans as full compensation for their services, or alternatively for an order enjoining the Counterclaim Defendants from billing United/the ERISA Plans for amounts which do not reflect the failure to collect Member Responsibility Amounts that are in violation of any plan terms or provisions, or that in any other way artificially inflate amounts.

342.   United also seeks a constructive trust or equitable lien on the monies currently held by Counterclaim Defendants as a result of the overpayments by United, an order restoring the overpayments currently being held by Counterclaim Defendants in constructive trust or pursuant to an equitable lien, and other appropriate equitable relief.

343.   Finally, United requests injunctive relief precluding the Counterclaim Defendants from profiting from their promise to waive Member Responsibility Amounts, or from seeking to recover sums that would be inconsistent with those

promises.   Alternatively, United requests that the sums that it seeks be awarded as a set off to any amounts United (or the group health plans it administers) owes to Counterclaim Defendants on any outstanding claims.

## PRAYER FOR RELIEF

WHEREFORE United prays for the following relief:

1.      That judgment be entered in favor of United on its counterclaims against the Counterclaim Defendants in an amount exceeding $75,000, exclusive of interests or costs.

2.      That the Court issue equitable relief requiring the Counterclaim Defendants to return or repay to United all sums that were fraudulently or inappropriately paid to the Counterclaim Defendants, including, as appropriate, any set-off or recoupment against any amount recovered by Counterclaim Defendants in its Complaint.

3.      For an injunction precluding the Defendants from submitting or receiving payment on false or fraudulent requests for payment, including all requests for payment related to patients to whom the Counterclaim Defendants represented or otherwise agreed that they would waive Member Responsibility Amounts or would otherwise not balance bill the patient.

4.      For an order and injunction precluding the Counterclaim Defendants from profiting from their illegal promises to waive Patient Responsibility Amounts, including by seeking to enforce claims inconsistent with those promises.

5.      For declaratory relief adjudicating the amounts owed to United, and that United is not obligated to pay for care or services that were illegally induced by the Counterclaim Defendants' promises to waive Member Responsibility Amounts, as well as a set off from any sums due to Counterclaim Defendants in this litigation or on any other outstanding claims.

6.      That the Court award reasonable attorneys' fees, interest, and costs to

1   United.

2        7.    Such other legal and equitable relief as this Court deems just and

3   proper.

4

5

6   Dated:  September 3, 2014              **WALRAVEN & WESTERFELD LLP**

7

8                                              /s/ Bryan S. Westerfeld
                                    By:   BRYAN S. WESTERFELD
9
                                    Attorneys for Defendant UnitedHealth
10                                   Group, Inc., and Counterclaim
                                    Plaintiffs/Defendants United Healthcare
11                                   Services, Inc., United Healthcare
                                    Insurance Company, and OptumInsight,
12                                   Inc.

13  Dated:  September 3, 2014              **DORSEY & WHITNEY LLP**

14

15                                             /s/ STEPHEN P. LUCKE
                                    By:   STEPHEN P. LUCKE
16
                                    *Admitted Pro Hac Vice*
17                                   Attorneys for Defendant UnitedHealth
                                    Group, Inc., and Counterclaim
18                                   Plaintiffs/Defendants United Healthcare
                                    Services, Inc., United Healthcare
19                                   Insurance Company, and OptumInsight,
                                    Inc.
20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE**

STATE OF CALIFORNIA      )
                         )  ss
COUNTY OF ORANGE         )

   I am employed in the County of Orange, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 101 Enterprise, Suite 350, Aliso Viejo, CA 92656.

   On September 3, 2014, I served the foregoing document(s) described as

### **COUNTERCLAIM**

on all interested parties in this action as follows (or as on the attached service list):

DARON L. TOOCH
BRYCE WOOLLEY
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517

E-Mail:
dtooch@health-law.com
bwoolley@health-law.com

☒ BY CM/ECF NOTICE OF ELECTRONIC FILING: I electronically filed the document(s) with the Clerk of the Court by using the *CM/ECF* system. Participants in the case who are registered *CM/ECF* users will be served by the *CM/ECF* system. Participants in the case who are not registered *CM/ECF* users will be served by mail or by other means permitted by the court rules.

AND

☒ (VIA U.S. MAIL) I served the foregoing document(s) by U.S. Mail, as follows:  I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above.  I placed each such envelope with postage thereon fully prepaid, for collection and mailing at Walraven & Westerfeld LLP, Aliso Viejo, California.  I am readily familiar with Walraven & Westerfeld LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service.  Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

   Executed on September 3, 2014, at Aliso Viejo, California.

Kim Sullivan