**BRYAN WESTERFELD (S.B. # 218253)**
bwesterfeld@calemployerlaw.com
**NICOLE E. WURSHER (S.B # 245879)**
nwurscher@calemployerlaw.com
**WALRAVEN & WESTERFELD LLP**
101 Enterprise, Suite 350
Aliso Viejo, CA 92656
Telephone:   (949) 215-1997
Facsimile:    (949) 215-1999

**R.J. ZAYED (MN ID #0309849)**
zayed.rj@dorsey.com
**STEPHEN P. LUCKE (MN ID #151210)**
lucke.steve@dorsey.com
**TIMOTHY BRANSON (MN ID #174713)**
branson.tim@dorsey.com
*Admitted pro hac vice admission pending*
**DORSEY & WHITNEY LLP**
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:   (612) 340-2600
Facsimile:    (612) 340-2868

Attorneys for Defendant UnitedHealth Group, Inc.;
and Defendants/Counterclaim Plaintiffs
United Healthcare Services, Inc., UnitedHealthcare
Insurance Company; OptumInsight, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company; BAKERSFIELD SURGERY INSTITUTE, LLC, a California limited liability company; INDEPENDENT MEDICAL SERVICES, INC., a California corporation; MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC., a California corporation; NEW LIFE SURGERY CENTER, LLC, a California limited liability company, dba BEVERLY HILLS SURGERY CENTER, LLC; ORANGE GROVE SURGERY CENTER, LLC, a California limited liability company; SAN DIEGO AMBULATORY SURGERY CENTER, LLC, a California limited liability company; SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, INC., a California corporation; VALENCIA AMBULATORY SURGERY CENTER, LLC, a California limited liability company; | Case No 2:14-cv-03053-MWF(VBKx)<br><br>**COUNTERCLAIM PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO OMIDIS' MOTION TO DISMISS THE FIRST AMENDED COUNTERCLAIM**<br><br>**DATE:   DECEMBER 8, 2014**<br>**TIME:    10:00 AM**<br>**DEPT.:   CTRM 16**<br><br>(Superior Court of the State of California, County of Los Angeles, Central District Case Number: BC540056)<br><br>Complaint filed:  March 21, 2014 |

1 | WEST HILLS SURGERY CENTER, LLC, a
California limited liability company,

2 |                 PLAINTIFFS,

3 | v.

4 | UNITEDHEALTH GROUP, INC.; UNITED

5 | HEALTHCARE SERVICES, INC.,
UNITEDHEALTHCARE INSURANCE

6 | COMPANY; OPTUMINSIGHT, INC., AND
DOES 1 THROUGH 20,

7 |             Defendants.

8 |

9 | ——————————————————

10 | UNITED HEALTHCARE SERVICES,
INC.; UNITEDHEALTHCARE

11 | INSURANCE COMPANY;
OPTUMINSIGHT, INC.,

12 |                Counterclaim Plaintiffs,

13 | v.

14 | ALMONT AMBULATORY SURGERY

15 | CENTER, LLC, a California limited liability
company; BAKERSFIELD SURGERY

16 | INSTITUTE, LLC, a California limited
liability company; BEVERLY HILLS

17 | SURGERY CENTER, LLC;
INDEPENDENT MEDICAL SERVICES,

18 | INC., a California corporation; MODERN
INSTITUTE OF PLASTIC SURGERY &

19 | ANTIAGING, INC., a California
corporation; NEW LIFE SURGERY

20 | CENTER, LLC, a California limited liability
company, dba BEVERLY HILLS

21 | SURGERY CENTER, LLC; ORANGE
GROVE SURGERY CENTER, LLC, a

22 | California limited liability company; SAN
DIEGO AMBULATORY SURGERY

23 | CENTER, LLC, a California limited liability
company; SKIN CANCER &

24 | RECONSTRUCTIVE SURGERY
SPECIALISTS OF BEVERLY HILLS,

25 | INC., a California corporation; VALENCIA
AMBULATORY SURGERY CENTER,

26 | LLC, a California limited liability company;
WEST HILLS SURGERY CENTER, LLC,

27 | a California limited liability company,
KAMBIZ BENJAMIN OMIDI (A/K/A

28 | JULIAN OMIDI, COMBIZ OMIDI,

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE OMIDIS' MOTION TO DISMISS

1  KAMBIZ OMIDI, COMBIZ JULIAN
   OMIDI, KAMBIZ BENIAMIA OMIDI,
2  JULIAN C. OMIDI); MICHAEL OMIDI,
   M.D.; ALMONT AMBULATORY
3  SURGERY CENTER, A MEDICAL
   CORPORATION; BAKERSFIELD
4  SURGERY INSTITUTE, INC.; CIRO
   SURGERY CENTER, LLC; EAST BAY
5  AMBULATORY SURGERY CENTER,
   LLC; SKIN CANCER &
6  RECONSTRUTIVE SURGERY
   SPECIALISTS OF WEST HILLS, INC.;
7  VALLEY SURGICAL CENTER, LLC;
   TOP SURGEONS, INC.; TOP SURGEONS,
8  LLC; TOP SURGEONS LLC (NEVADA);
   WOODLAKE AMBULATORY;
9  PALMDALE AMBULATORY SURGERY
   CENTER, A MEDICAL CORPORATION;
10 1 800 GET THIN, LLC; SURGERY
   CENTER MANAGEMENT; DOES 1-200,
11
                Counterclaim Defendants.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE OMIDIS' MOTION TO DISMISS

# <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................... 1

UNITED'S CLAIMS AGAINST THE OMIDIS .................................................... 1

ARGUMENT ........................................................................................................... 3

I.     Standard For Motion To Dismiss ................................................................ 3

II.    United Adequately Alleges Grounds For The Omidis' Personal Liability ........ 4

III.   United Has Properly Alleged Fraud And Conspiracy ................................. 9

       A.     United adequately pleads each of its fraud theories ............................... 10

       B.     United justifiably relied upon the misrepresentations ........................... 14

       C.     United's fraud and conspiracy claims are not time-barred .................... 16

       D.     United's conspiracy allegations are sufficient ....................................... 16

IV.    United Properly Alleges UCL Claims ....................................................... 17

       A.     United Properly Alleged Wrongful Conduct Under the UCL ............... 17

       B.     United Has Viable UCL Remedies Against The Omidis ....................... 19

V.     United Has Properly Alleged Intentional Interference .................................. 20

VI.    All Of United's State Law Counts Are Timely ............................................. 21

CONCLUSION ..................................................................................................... 25

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

5

*Agustina Sanchez v. S. Hoover Hosp.*,
    18 Cal. 3d 93 (1976) ................................................................................ 24

6

*Aryeh v. Canon Bus. Solutions, Inc.*,
    55 Cal. 4th 1185 (2013) ........................................................ 22, 23, 24, 25

7

8

*Bernson v. Browning-Ferris Indus.*,
    7 Cal. 4th 926 (1994) .............................................................................. 25

9

*Brandon G. v. Gray*,
    111 Cal. App. 4th 29 (2003) ................................................................... 22

10

11

*Brawthen v. H.& R. Block, Inc.*,
    28 Cal. App. 3d 131 (Oct. 16, 1972) ...................................................... 11

12

13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ............................................................................ 17

14

15

*Carolina Ins. Co. v. Team Equip. Inc.*,
    741 F.3d 1082 (9th Cir. 2014) .................................................................. 7

16

17

*Casault v. Fed. Nat'l Mortg. Ass'n*,
    915 F. Supp. 2d 1113 (C.D. Cal. 2012) .................................................. 18

18

19

*Cervantes v. City of San Diego*,
    5 F.3d 1273 (9th Cir. 1993) .................................................................... 23

20

21

*Choate v. Cnty. of Orange*,
    86 Cal. App. 4th 312 (2001) ................................................................... 17

22

23

*Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co.*,
    29 Cal.4th 189 (2002) ............................................................................. 16

24

25

*Cybersitter, LLC v. Google Inc.*,
    905 F. Supp. 2d 1080 (C.D. Cal. 2012) .................................................... 3

26

27

*Feiler v. N.J. Dental Ass'n*,
    467 A.2d 276 (N.J. Super. Ct. Ch. Div. 1983) ...................................... 15

28

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE OMIDIS' MOTION TO DISMISS

*Fife v. Facebook, Inc.*,
  905 F. Supp. 2d 989 (N.D. Cal. 2012) ................................................... 18

*Grisham v. Philip Morris, Inc.*,
  670 F. Supp. 2d 1014 (C.D. Cal. 2009) ................................... 22, 23, 24

*Grisham v. Philip Morris U.S.A., Inc.*,
  40 Cal. 4th 623 (2007) ........................................................................ 24

*Greenwood v. Mooradian*,
  137 Cal. App. 2d 532 (1955) ............................................................... 17

*Hennighan v. Insphere Ins. Solutions, Inc.*,
  2013 WL 6019486 (N.D. Cal. Nov. 13, 2013) ...................................... 9

*Kohler v. CJP, Ltd.*,
  818 F. Supp. 2d 1169 (C.D. Cal. 2011) ........................................... 3, 4

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*,
  235 Cal. App. 3d 1220 (1991) .............................................................. 9

*Lazar v. Superior Court*,
  12 Cal. 4th 631 (1996) .......................................................................... 9

*Livett v. F.C. Fin. Assocs.*,
  124 Cal. App. 3d 413 (1981) ............................................................... 23

*Madrid v. Perot Sys. Corp.*,
  130 Cal. App. 4th 440 (2005) .............................................................. 20

*McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*,
  89 Cal. App. 4th 746 (2001) ........................................................ 5, 6, 8

*Molko v. Holy Spirit Ass'n*,
  46 Cal. 3d 1092 (1988) ....................................................................... 23

*In re Netopia, Inc., Sec. Litig.*,
  2005 WL 3445631 (N.D. Cal. Dec. 15, 2005) ......................... 4, 21, 22

*N. Cnty. Commc'ns. Corp. v. Verizon Global Networks, Inc.*,
  685 F. Supp. 2d 1112 (S.D. Cal. 2010) ............................................... 24

*Nutrishare, Inc. v. Conn. Gen'l Life Ins. Co.*,
  2014 WL 1028351 (E.D. Cal. Mar. 14, 2014) ......................... 13, 14, 15

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE OMIDIS' MOTION TO DISMISS

*Paul Haggis, Inc. v. Yari*,
    2014 WL 406828 (Cal. Ct. App. Jan. 31, 2014) (unpublished) ............................ 8

*People v. Beaumont Inv., Ltd.*,
    111 Cal. App. 4th 102 (2003) ................................................................. 16

*People v. Bestline Prods., Inc.*,
    61 Cal. App. 3d 879 (1976) .................................................................... 20

*People v. Orange Cnty. Charitable Servs.*,
    73 Cal. App. 4th 1054 (1999) ................................................................. 20

*Petrie v. Elec. Game Card, Inc.*,
    761 F.3d 959 (9th Cir. 2014) .................................................................... 4

*Podolsky v. First Healthcare Corp.*,
    50 Cal. App. 4th 632 (1996) ................................................................... 19

*Raceway Props., LLC v. LSOF Carlsbad Land L.P.*,
    157 Fed. App'x. 959 (9th Cir. 2005) ...................................................... 23

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*,
    55 Cal. 4th 1169 (2013) .................................................................. 11, 12

*RRX Indus., Inc. v. Lab-Con, Inc.*,
    772 F.2d 543 (9th Cir. 1985) ................................................................ 5, 6

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) ............................................................... 18

*Sandoval v. Ali*,
    2014 WL 1311776 (N.D. Cal. Mar. 28, 2014) ...................................... 8, 9

*Saunders v. Superior Court*,
    27 Cal. App. 4th 832 (1994) .................................................................. 16

*Snow v. A.H. Robins Co.*,
    165 Cal. App. 3d 120 (1985) ................................................................. 23

*Stapley v. Pestalozzi*,
    733 F.3d 804 (9th Cir. 2013) ................................................................... 3

*In re Sunset Bay Assocs.*,
    944 F.2d 1503 (9th Cir. 1991) .......................................................... 16, 17

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE OMIDIS' MOTION TO DISMISS

*Supermail Cargo, Inc. v. United States*,
    68 F.3d 1204 (9th Cir. 1995) ..................................................................... 23

*Talbot v. Fresno-Pac. Corp.*,
    181 Cal. App. 2d 425 (1960) ....................................................................... 6

*Thrifty Payless, Inc. v. Americana at Brand, LLC*,
    218 Cal. App. 4th 1230 (2013) ........................................................... 14, 15

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) .............................................................................. 18

*Troyk v. Farmers Group, Inc.*,
    171 Cal. App. 4th 1305 (2009) .................................................................... 5

*United States v. Nguyen*,
    Case no. 14-cr-00110, Indictment (C.D. Cal. July 16, 2014) ............................... 12

*United States v. Patel*,
    485 Fed. App'x 702 (5th Cir. 2012) ......................................................... 12

*Wyatt v. Union Mortg. Co.*,
    24 Cal. 3d 773 (1979) .............................................................................. 23

**Statutes**

Cal. Bus. & Prof. Code § 650(a) .................................................................. 18, 19

Cal. Bus. & Prof. Code § 17200 ...................................................................... 17

Cal. Bus. & Prof. Code § 17203 ...................................................................... 19

Cal. Bus. & Prof. Code § 17208 ...................................................................... 21

Cal. Civ. Code § 338(d) ................................................................................... 21

Cal. Civ. Code § 339(1) ............................................................................ 21, 25

**Other Authorities**

Fed. R. Civ. P. 9(b) .......................................................................................... 10

Fed. R. Civ. P. 12(b)(6) ................................................................................. 3, 4

1    **INTRODUCTION**

2           The Counterclaim-Plaintiffs (collectively "United") request that the Court deny

3    the motion to dismiss the First Amended Counterclaim ("FAC") brought by Michael

4    and Julian Omidi (the "Omidis"). The Motion begins by attacking the insurance

5    industry as hostile to out-of-network providers, an issue irrelevant to the motion.[1] More

6    substantively, it misstates United's theories and ignores key facts. Its own unsupported

7    assertions cannot trump the facts pled in the FAC. The FAC alleges a factual and legal

8    basis for United's claims and provides a valid basis to proceed forward with discovery

9    and the eventual resolution of the claims on the merits.

10          **UNITED'S CLAIMS AGAINST THE OMIDIS**

11          Although the Omidis seek to distance themselves from United's allegations

12   against the Providers, they are liable on those same claims, because they initiated,

13   directed, controlled, and benefited from the fraudulent and otherwise wrongful conduct

14   of the providers and other Omidi Network members. The nature of those fraudulent

15   schemes is described in detail in the FAC and addressed further in the brief opposing

16   the Provider Motion to Dismiss.

17          Julian and Michael were directly involved in the fraudulent conduct. Michael is

18   the provider on 69 of the fraudulent claims (*see* FAC Appendix I), and Julian and

19   Michael individually received payments from United for fraudulent claims (*see* FAC

20   ¶ 90 (table)). Five United checks were written to Julian and his business, Pacific West

21   Dermatology, which recently attracted the attention of federal prosecutors in a bank

22   structuring action against his mother, Cindy Omidi, a co-conspirator in the fraudulent

23   scheme and a representative of Pacific West. (*Id.* ¶¶ 76-78, 90.)

24

25   _____

26   [1]   The Omidis claim that the FAC is part of a "campaign" by the insurance industry
     "to eradicate out-of-network providers" because United was "annoyed" by them
27   and could not "control" them. Omidi MTD at 1. This has nothing to do with the
     allegations in the FAC and provides no basis for assessing the FAC's sufficiency.

28

1    The Omidis' primary role, however (especially since Julian lost his medical
2    license), was as chief co-conspirators.  The Omidis, and their confederates, created a
3    vast array of corporations (far beyond what any legitimate enterprise could possibly
4    need), controlled and operated with the classic indicia of corporate alter egos.  Over 100
5    of them purportedly share a single office suite, while 116 share a single mailbox at
6    Beverly Hills Postal Place.  Another Postal Place mailbox, rented by Julian Omidi under
7    the name "Surgery Center Management," services at least 14 Omidi entities, and the
8    Omidi Network directed United to send all checks there.  (*Id.* ¶ 88(b).)

9    These entities and individuals regularly commingled the very funds that are the
10   subject of the FAC, with various Omidi-controlled accounts receiving checks written to
11   numerous entities and individuals.  A significant portion of the check payments at issue
12   was deposited in just three Wells Fargo accounts.  Checks totaling more than $6.5
13   million, to *37 different* Omidi Network entities or individuals, went into one such
14   account.  A second received more than $8 million in checks to 13 different Omidi-
15   owned entities or individuals, and a third received more than $6.8 million in checks
16   written to 15 different Omidi-owned entities or individuals, including Michael.  (*Id.*
17   ¶ 103.)  Counterclaim Defendants often endorsed checks written to different entities.
18   The Omidis themselves endorsed checks written by United to 55 different entities.  (*Id.*
19   ¶ 97.)  Top Surgeons Nevada, owned and operated by Julian, endorsed more than $6.7
20   million in checks to other providers from United's account.  (*Id.* ¶ 98(a).)

21   This complex web of companies made it extremely difficult for United to know
22   just whom it was dealing with.  The Providers bill for medical services under each
23   other's TIN numbers and NPI numbers, (*id.* ¶¶ 83(b), 126), using medical records and
24   blank stationery that generically identify the Provider only as Surgery Center.  Many of
25   these "provider" entities provide no independent services at all, but were created for the
26   sole purpose of submitting and collecting fraudulent bills that United would not
27   otherwise pay.  In some instances, when United denied a claim submitted by one
28   provider, the Omidi Network resubmitted the claim under the name and NPI of a

1  different provider in an attempt to obtain payment. (*Id.* ¶ 83(b).)  This scheme made

2  detection of fraud difficult as well.  When Almont Ambulatory Surgery Center, was

3  shut down due to health, safety, and other violations, the Omidis simply renamed the

4  facility and continued the same business at the same location.

5       The scheme itself continues—in March 2014, the Omidis registered more new

6  entities with the NPI registry, many of them operating from an existing Omidi Network

7  surgery center, including "Meadow Surgical Center," operating from Valencia

8  Ambulatory Surgery Center; "Salus Medical Services, Inc.," from Orange Grove

9  Surgery Center; and "Springhill Surgery Center LLC," from Bakersfield Surgery

10 Institute.  But each of the "new" entities receives mail at the same rented mailbox at

11 "Mail Box Times."  (*Id.* ¶ 80.)

12      At the top, controlling the Omidi Network, were the Omidi brothers, aided and

13 abetted by a few close associates.  The frauds committed by various Provider entities

14 were conceived and managed by the Omidis, and for their ultimate benefit.

15      We address the specific arguments in the Omidi MTD below, but the basic

16 point is critical: the law does not permit the Omidis to escape liability by erecting a wall

17 of corporate entities to shield their wrongdoing.  Their motion should be denied, and

18 their conduct further illuminated through discovery and, eventually, at trial.

19                              **ARGUMENT**

20 **I.    Standard For Motion To Dismiss**.

21      Rule 12(b)(6) requires a court to determine whether claims "contain sufficient

22 factual matter" to state a claim for relief.  *Stapley v. Pestalozzi*, 733 F.3d 804, 809 (9th

23 Cir. 2013); *Kohler v. CJP, Ltd.*, 818 F. Supp. 2d 1169, 1176 (C.D. Cal. 2011).  The

24 court must accept all factual allegations in the complaint as true, and draw all

25 reasonable inferences in favor of the nonmoving party.  *Kohler*, 818 F. Supp. 2d at

26 1175-76.  Courts should dismiss a claim only for "lack of a cognizable legal theory" or

27 "lack of sufficient facts alleged under a cognizable legal theory."  *Cybersitter, LLC v.*

28 *Google Inc.*, 905 F. Supp. 2d 1080, 1085 (C.D. Cal. 2012) (citation omitted).  *See also*

1  *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 971  (9th Cir. 2014) (reversing and

2  remanding after determining complaint adequately pleaded falsity and scienter); *Kohler*,

3  818 F. Supp. 2d at 1176-77 (denying motion to dismiss).

4      As shown below, much of the Omidis' motion effectively asks this Court to

5  draw all possible inferences *in their favor*, instead of against them as the law requires.

6  For example, the Omidis argue that the pattern of inaccurate BMI measurements in the

7  medical records must have been innocent mistakes rather than fraud, or that United's

8  decisions not to pay *some* claims in 2010 definitively proves knowledge of fraud with

9  respect to *all* claims submitted then or later.  A motion to dismiss simply is not the

10  place to argue for inferences in the moving party's favor.

11      Critically, Rule 12(b)(6) does not provide for dismissal of only portions of a

12  cause of action; it is all or nothing.  *In re Netopia, Inc., Sec. Litig.*, 2005 WL 3445631,

13  at *3 (N.D. Cal. Dec. 15, 2005) ("'[F]ailure to state a claim' means the rule should not

14  be used on subparts of claims; *a cause of action either fails totally or remains in the*

15  *complaint* under Fed. R. Civ. P. 12(b)(6)." (emphasis added)).  Both the Omidis and

16  Providers make arguments that apply only to some allegations in each Count of the

17  FAC.  For example, the Omidis raise limitations arguments that, they admit, apply only

18  to some claims, while Providers challenge standing as to some, but not all, Plans.  The

19  FAC's six Counts each include numerous individual claims.  If some claims in a Count

20  state a claim, the blunt instrument of Rule 12(b)(6) should not be used to dismiss a

21  subset of claims in that Count.  After discovery, the Omidis can bring a motion as

22  appropriate, but at this stage, the motion to dismiss should be denied.

23  **II.    United Adequately Alleges Grounds For The Omidis' Personal Liability**.

24      Under the alter-ego doctrine, sophisticated manipulators of the corporate form,

25  such as the Omidis, cannot escape personal liability.  California applies the alter-ego

26  doctrine when "(1) such a unity of interest and ownership exists that the personalities of

27  the corporation and individual are no longer separate, and (2) an inequitable result will

28  follow if the acts are treated as those of the corporation alone." *RRX Indus., Inc. v. Lab-*

1   *Con, Inc.*, 772 F.2d 543, 545 (9th Cir. 1985).  Because United's allegations satisfy both

2   elements, this Court should "*disregard the corporate entity* and treat the acts as if they

3   were done by the individuals themselves."  *McClellan v. Northridge Park Townhome*

4   *Owners Ass'n, Inc.*, 89 Cal. App. 4th 746, 752-53 (2001).

5          The unity-of-interest prong encompasses a non-exhaustive list of factors such as

6   "commingling of funds and assets . . ., identical equitable ownership . . ., use of the

7   same offices and employees, disregard of corporate formalities, identical directors and

8   officers, and use of one as a mere shell or conduit for the affairs of the other."  *Troyk v.*

9   *Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1342 (2009).  United offers dozens of

10  allegations to satisfy this prong.  (*See* FAC ¶¶ 71-116.)  For example:

11  •   The Providers are owned, managed, and directed by the Omidis, (*id.* ¶¶ 71-73; 105-

12      06) (identical ownership, officers, and directors);

13  •   Checks to one provider are routinely deposited into the accounts of other providers,

14      (*id.* ¶¶ 95-104), one account received United checks to 37 different entities (*id.* ¶

15      103(a)) (commingling[2] of funds and disregarding corporate formalities);

16  •   Michael and Julian Omidi endorsed checks written by United to at least 55 affiliated

17      surgical centers or physicians, (*id.* ¶ 97);

18  •   Providers use names, addresses, TINs, and NPIs interchangeably on medical records

19      and claims forms, (*id.* ¶ 83(b)) (disregarding corporate formalities);

20  •   Stationery, business cards, medical records, letters, and assignments of benefits

21      forms are generic forms across the Omidi Network that identify provider only as

22      "Surgery Center", (*id.* ¶ 126) (disregarding corporate formalities);

23  •   As many as 116 Omidi Network entities share a principal executive office at 269 S.

24      Beverly Drive (actually the "Postal Place" mail-drop), (*id.* ¶¶ 84-89; Ex. B), while

25

26  [2]   The Omidis claim the FAC does not allege facts showing commingling, but there

27      are detailed allegations of checks written to multiple parties all being deposited
        into the same account.  That is "commingling."

28

over 100 entities and individuals in the Omidi Network have shared an office at 9001 Wilshire Blvd., Suite 106, (*id.* ¶¶ 81-83; Ex. A) (same office);

- The Providers share personnel, offices, and resources for such corporate functions as medical services, billing, collections, patient scheduling, and records management, (*id.* ¶¶ 107(a)-(f)) (same employees); and

- Employees at the centralized billing office work on behalf of various, purportedly independent, Providers, (*id.* ¶ 107(f)(iii)) (same employees).

California has imposed alter-ego liability based on more general allegations than these. In *McClellan*, a successor homeowners' association was jointly liable with the former association because both entities had the same membership, same board of directors, and same management company. *McClellan*, 89 Cal. App. 4th at 756.

Here, United's allegations go far beyond the identity of ownership and boards of directors. The Omidi Network commingled funds, disregarded corporate formalities, created a shifting[3] corporate structure, and shared office space and personnel. *See also RRX Indus.*, 772 F.2d at 545-46 (affirming alter-ego liability when individual was sole officer, director, and shareholder; individual disregarded corporate formalities; and corporation was undercapitalized); *Talbot v. Fresno-Pac. Corp.*, 181 Cal. App. 2d 425, 428 (1960) (individual defendant was the sole owner of multiple entities, regularly commingled assets, shared personnel and office space, and improperly transferred the assets of one entity to another to avoid creditors).

The Omidis mischaracterize United's allegations as pleaded on information and belief in "[v]irtually all" instances. Omidi MTD at 6. First, this is untrue. The FAC cites extensively to extrinsic evidence, including sworn testimony from two former Omidi Network physicians (FAC ¶¶ 107(b)-(c), 108(b)-(c)); sworn declarations from

---

[3] The Omidis constantly created new entities to make detection of wrongdoing more difficult. A classic example is the continuation of the business of Almont ASC in the same location, but under a new name, after numerous violations caused Medicare to terminate Almont from the Medicare program. (FAC ¶ 83(a).)

1    other litigation against the Omidis (*id.* ¶ 107(f)(iii)); California Secretary of State

2    records (*id.* ¶¶ 71-89, Ex. A-B); banking records (*id.* ¶¶ 90-104, Ex. C-F); and other

3    Omidi Network documents (*id.* ¶¶ 83(b), 107(e), 108(a)-(c), Ex. G).

4         Second, it is immaterial.  There is no general bar to pleading on information and

5    belief.  *See Carolina Ins. Co. v. Team Equip. Inc.*, 741 F.3d 1082, 1087 (9th Cir. 2014)

6    ("*Carolina* should have been permitted to plead its allegations on the basis of

7    information and belief").  United alleges detailed facts showing unity of interest

8    between the Omidis and Providers; discovery will shed further light on the Omidis' role

9    in the scheme to defraud United—a scheme the Omidis have attempted to conceal.

10         The Omidis also erroneously suggest that United's allegations are deficient

11    because the Omidis themselves are not alleged to have acted directly, by treating

12    patients or submitting reimbursement claims.  First, that is not accurate.  The FAC has

13    numerous allegations of direct acts by the Omidis.  Michael is the provider on 69 claims

14    at issue in the FAC. (FAC Appendix I.)  Julian was the payee on at least one check paid

15    by United for services at issue.  (FAC ¶ 90.)  The *Omidis* established hundreds of

16    corporate entities intended to conduct and conceal their fraudulent activities.  (*Id.* ¶ 72.)

17    The *Omidis* used these entities to conceal and commingle fraudulently obtained funds

18    paid by United.  (*Id.*)  The *Omidis*, through Top Surgeons, executed contracts with

19    surgeons who perform all of their surgeries at *Omidi*-owned surgical centers.  (*Id.* ¶

20    108.(a)-(b).)  *Michael* is the head of Independent Medical Services and all of the

21    surgical centers.  (*Id.* ¶ 107(e).)  The commingled funds are often deposited in the

22    *Omidi*-owned Top Surgeons bank account, (*id.* ¶ 98(a)-(c)), among numerous entities

23    affiliated with the Omidi Network, (*id.* ¶¶ 95-104).  Most troublingly, the *Omidis* dictate

24    doctor and patient scheduling, (*id.* ¶ 107(f)(ii)), medical decision-making, (*id.* ¶¶ 107;

25    107(b)-(c)), and physician record-keeping, (*id.* ¶ 107(f)(i)).  Taken together, these

26    allegations illustrate just how deeply the *Omidis* are directly embedded in the fraud

27    against United.

28

1    Second, where the Omidis acted indirectly through alter egos, that is not

2    exculpatory; *it is precisely the point of any alter ego scheme*.  Of course the Omidis

3    tried to limit their direct involvement in the scheme and cover their tracks, and Julian

4    lost his license to practice medicine long ago.  Individuals operating corporate alter egos

5    naturally attempt to shift legal responsibility to the corporate entities.  The Omidis

6    operated through the Omidi Network, as described in great detail in the FAC.  They are

7    legally responsible for the actions of the Omidi Network.

8    United's FAC also satisfies the second prong of the alter-ego test, inequitable

9    results if the individuals are not held responsible for corporate acts.  Such inequity

10    would follow if the individual Omidis were not held personally liable for the fraud

11    perpetrated at their behest and for their benefit.  To satisfy the second prong, United

12    must (and does) allege that the Omidis engaged in "conduct amounting to bad faith

13    [that] makes it inequitable for the corporate owner to hide behind the corporate form."

14    *Sandoval v. Ali*, 2014 WL 1311776, at *5 (N.D. Cal. Mar. 28, 2014).  Put differently,

15    "when a corporation 'is used by an individual or individuals . . . to perpetrate a fraud,

16    circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court

17    may *disregard the corporate entity*.'"  *McClellan*, 89 Cal. App. 4th at 752-53.[4]

18    The Omidis claim that because none of their entities are formally insolvent,

19    there can be no inequitable result, but that is not true.  The Omidis change corporate

20    entities to avoid fraud detection by regulators and insurers, a clear instance of bad faith.

21    (FAC ¶¶ 70, 83(a)-(b).)  The fraud is made possible by the multiplicity of shell

22    corporations and newly-renamed Providers.  For example, after the U.S. Department of

23    Health and Human Services uncovered numerous deficiencies at Almont Ambulatory

24    Surgical Center, the Omidis continued operating the ASC, but under a new name,

---

25    [4]    The alter-ego doctrine is designed for tort claims, especially fraud.  Courts often
26    comment that the "alter ego doctrine should be applied more sparingly in contract
    cases than in tort or other third-party liability cases" because contracting parties
27    have willfully chosen with whom to contract. *See Paul Haggis, Inc. v. Yari*, 2014
    WL 406828, at *2 (Cal. Ct. App. Jan. 31, 2014) (unpublished).

28

1  Beverly Hills Surgery Center, LLC, a/k/a New Life Surgery Center, LLC.  (*Id.* ¶ 83(a).)

2  This shape-shifting corporate structure is precisely what prevents United from securing

3  a just result absent the individual Omidis' participation in this action.

4        Moreover, the alter-ego doctrine is primarily designed for those cases where "it

5  would be unjust to permit those who control companies to treat them as a single or

6  unitary enterprise and then assert their corporate separateness *in order to commit frauds*

7  *and other misdeeds with impunity.*"  *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*,

8  235 Cal. App. 3d 1220, 1249 (1991) (emphasis added).  And unlike the non-fraud

9  allegations in *Sandoval*, 2014 WL1311776, at *1, and *Hennighan v. Insphere Ins.*

10  *Solutions, Inc.*, 2013 WL 6019486, at *4 (N.D. Cal. Nov. 13, 2013)—two cases heavily

11  relied upon by the Omidis—Providers' fraud and the Omidis' direction and control over

12  nearly every aspect of Providers' business is precisely the type of *fraud* the doctrine

13  was designed to remedy.  Because it would be inequitable to permit this fraud to

14  continue, the Court should prevent the Omidis from hiding behind (and abusing) the

15  corporate form as a means of escaping personal liability.

16        There is no factual support for the Omidis' assertion that none of the entities are

17  incapable of paying a judgment.  The FAC alleges multi-million dollar fraud.  The

18  Omidi Network included dozens of corporate entities.  If the Omidis contend that each

19  of these entities (or any of them, or even all of them together) could pay a multi-million

20  dollar judgment, let them prove it.

21  **III.   United Has Properly Alleged Fraud And Conspiracy**.

22        United also properly pleads the Omidi Network's fraudulent scheme and

23  accompanying conspiracy.  California fraud claims require: "(a) misrepresentation

24  (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or

25  'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e)

26  resulting damage."  *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).  The Omidis

27  focus on the first element (misrepresentation) and fourth element (justifiable reliance)

28  of United's fraud claim, but their arguments do not negate the particularized allegations

1    showing that Counterclaim Defendants defrauded United.[5]

2        A.    **United adequately pleads each of its fraud theories**.

3        In disputing the sufficiency of United's fraud claim, the Omidis rehash the same

4    co-pay waiver arguments made by the Providers, and similarly distort the actual fraud

5    theory presented in the FAC.  As discussed in United's opposition to the Provider

6    MTD, routine co-pay waivers, particularly accompanied by misrepresentation of the

7    Providers' total charges, are recognized as fraudulent by California courts, other states'

8    courts, the Department of Health and Human Services, and the AMA.  United further

9    responds to the Omidis' additional points as follows:

10       The Omidis misconstrue United's actual fraud theory when they claim that the

11   FAC does not allege that the Omidis "ever falsely stated that a co-pay or deductible had

12   been collected when it had not."  Omidi MTD at 8.  The claim forms submitted by the

13   Providers in the Omidi Network affirmatively overstated the actual, total charges for the

14   lap band surgery (and other procedures) because those charges purportedly included

15   patient responsibility amounts, but the Omidi Network had already waived that portion

16   of the charges.  That is a fraudulent misrepresentation.

17       The Omidis chide United for alleging that the Providers (i) waived co-pays; and

18   (ii) eventually attempted to balance bill the patient.  Omidi MTD at 10.  They claim that

19   co-pays were not waived and that attempts are now being made to collect from patients.

20   They introduce and improperly rely on facts outside the FAC, arguing that the forms

21   signed by Omidi Network patients did not waive co-pays.[6]  But even if considered at

22   _____

[5]   The Omidis also argue that United has not linked them to the surgical centers with
23   enough specificity to satisfy Fed. R. Civ. P. 9(b).  As detailed in Section II, *supra*,
     United offers detailed allegations showing the Omidis' ownership, control, and
24   management over the Omidi Network and its scheme.  The FAC contains more
     than enough detail.

25   [6]   On a motion to dismiss, the Court can consider documents referenced in the
     pleading, but this would not include the written patient forms.  The detailed facts
26   alleged with respect to the "exemplar" patients make clear that United is alleging
     *oral* waiver of co-pays by the Omidi Network, not written waiver.  (*See, e.g.*, FAC
27   ¶¶ 132 (United Member 8); 160 (United Member 1); 166 (United Member 2).)

28

1    this stage, the content of signed forms is not dispositive.  The argument that the *forms*

2    signed by the patients require them to make co-pays does not defeat the factual

3    allegation that the Providers promised not to collect co-pays.  The allegations of the

4    FAC (promises to waive co-pays) are presumed to be true on this motion.  That the

5    Omidis somehow induced patients to sign forms that are inconsistent with the Omidis'

6    promises to waive co-pays, through a process not described anywhere in the record,

7    simply shows how they successfully deceived their own patients as well as United.  The

8    form does not disprove the fraud; the form is part of the fraud.

9            On a motion to dismiss, with United entitled to all favorable inferences, the

10   written forms are not even enforceable in light of the Providers' oral promise of waiver.

11   *See Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th

12   1169, 1174 (2013) (extrinsic evidence may defeat enforceability of a written agreement

13   that was the product of fraud).  A fact-intensive inquiry into the forms' enforceability is

14   of course improper on a motion to dismiss.

15          Even if the Court could review the assignments on a motion to dismiss, under

16   California law the right to collect copays is not enforceable in light of the Providers oral

17   promise not to collect these sums.  Initially, the assignment does not purport to be an

18   "integrated" contract stating all of the rights and duties of the parties—it only reflects

19   the terms of an assignment—and thus oral promises not to collect copays are

20   enforceable even under the parol evidence rule.  *See Brawthen v. H.& R. Block, Inc.,* 28

21   Cal. App. 3d 131, 137 (1972) (oral statements can form a part of a contract where the

22   written contract is not complete, integrated expression of parties' intent).  Just as

23   critically, under California law, an oral promise inducing participants into entering into

24   a contract cannot be modified by boilerplate language buried in a form provided to

25   consumers.  *Riverisland Cold Storage,* 55 Cal. 4th at 1174.

26          Further, although the Omidis claim that these documents demonstrate that the

27   patients "were balanced billed," they do nothing of the sort.  Nothing in the documents

28   indicates that the Omidis actually attempted (in violation of their promises) to collect

1    patient co-pays.  In any case, current collection efforts do not change the analysis.  Just

2    because the Providers reneged on a promise to waive co-pays—by belatedly balance

3    billing patients—does not make their initial misrepresentation to United any less

4    fraudulent (or any less damaging, since United contends that the initial waiver of co-pay

5    induced patients to undertake surgery they would otherwise have foregone).  This is a

6    cover-up of past fraud.  If the Omidis seriously intend to *prove* otherwise, they can

7    attempt to do so—at trial.  On a motion to dismiss, United's allegations of co-pay

8    waiver must be credited, and it clearly states a viable fraud claim.  Even if, in violation

9    of their promises, the Providers did charge participants years after the event, it only

10   underscores that their initial oral promises to waive those co-pays were fraudulent.  And

11   by fraudulently inducing participants into receiving out-of-network services, United, the

12   patients, and the Plans were harmed.

13          Of course, co-pay waiver is just one of the Omidis' fraudulent schemes.  The

14   FAC's other fraud theories are just as viable.  The Omidi Network used inflated CPT

15   codes; charged for procedures that were never performed; and performed unnecessary

16   surgeries, such as a second, unnecessary EGD procedure, to manufacture a reason to

17   perform an unnecessary hiatal hernia surgery.  (FAC ¶ 219-20.)  Regardless of how the

18   Omidis try to rationalize medically unnecessary surgeries, it is insurance fraud to

19   perform (i) a second unnecessary EGD, (ii) a manufactured hiatal hernia surgery, and

20   (iii) an undocumented lap band surgery that was the only reason the patient sought

21   treatment.  (*Id.* ¶¶ 215-21.)  *See United States v. Patel*, 485 Fed. App'x 702, 709 (5th

22   Cir. 2012) (affirming insurance-fraud conviction for doctor who performed medically

23   unnecessary procedures on patients with private insurance).[7]

---

24

25   [7]    A very similar scheme was recently the subject of a criminal indictment in this
26          Court.  *United States v. Nguyen*, Case no. 14-cr-00110, Indictment at ¶¶ 4-6 (C.D.
             Cal. July 16, 2014) (*See* Ex. 2 to the Declaration of Kirsten Schubert) (indicting
27          physician for, *inter alia*, performing medically unnecessary procedures and
             submitting fraudulent claim forms).

28

Once again, the Omidis mischaracterize United's allegations, claiming, for example, that there is nothing wrong with failing to include the lap band surgery on claim forms since they were not charging for it.  But that is not United's position.  The FAC alleges that the Omidi Network did indeed charge for the lap band surgery (the charges claimed are far too high for hernia surgery).  They misrepresented what they were doing by omitting mention of the procedure they actually sought to charge for.

The Omidis also suggest that these practices cannot have occurred very often, since the FAC contains only a limited number of examples.  But this is an implied admission by the Omidis, since occasional fraud is still fraud, and discovery may well reveal substantial numbers of additional examples.  For now, it is clear that the FAC's 15 detailed examples of all of the various types of fraud are sufficient to state a fraud claim and survive a motion to dismiss.  *Nutrishare, Inc. v. Conn. Gen'l Life Ins. Co.*, 2014 WL 1028351, at *4 (E.D. Cal. Mar. 14, 2014) (The pleading need not "specify each and every transaction, such particularity is neither practical nor required.")

In addition, Providers fraudulently altered patient Body Mass Index ("BMI") measurements, to make it appear (falsely) that patients qualified for lap band surgery.  The Omidis' attempt to explain this away as a "clerical error" is wildly implausible, given the particularity of United's allegations.[8]  The additional examples in the FAC, (*see* FAC ¶¶ 254-72), further confirm the implausibility of the "clerical error" defense.

Defensive excuses (feeble or not) have no place in a motion to dismiss.  If the Omidis want to claim clerical error, they can plead that defense and try to prove it.  They cannot, however, ask this Court to *find* clerical error at this stage of the case.

---

[8]  For example, Dr. Lee recorded United Member 7's height as 5'3" on the form used to determine the patient's candidacy for a lap band.  (FAC ¶ 256.)  But on the day of surgery, Member 7 was measured as two inches taller.  (*Id.* ¶ 257.)  The second measurement was used to determine the amount of anesthesia the patient required for surgery.  Given the importance of administering the correct dosage of anesthesia, the second measurement was certainly more accurate than the first; leaving the more-than-probable inference that Dr. Lee falsified the initial measurement to qualify Member 7 for lap band surgery.

Finally, United pleads a viable fraud claim based on Providers' exorbitant and excessive insurance claims. The exorbitant claims are further evidence that the Omidi Network misrepresented the *actual amounts* charged. In other words, it was fraud to bill United $140,000 for a procedure that typically costs one-tenth of that amount (*id.* ¶ 68). *See Nutrishare*, 2014 WL 1028351, at *1 (denying motion to dismiss exorbitant-fee claim where CIGNA alleged that Nutrishare "bill[ed] CIGNA at exorbitant rates while misrepresenting the amounts it usually accepts for the services provided and what the 'actual, total charges' for those services were"). By any measure, United's fraud theories state plausible and particularized causes of action.

### B.    United justifiably relied upon the misrepresentations.

United also properly alleges reliance. The Omidis assert that United was on inquiry notice of the falsity of their statements and could not have justifiably relied upon the fraudulent claim forms.[9] Omidi MTD at 15-16. The Omidis' argument, in other words, is that its fraud was so blatant that United should have noticed it sooner.

Even if the Omidis' argument ("you should have seen my fraud more clearly") is not an admission of liability, justifiable reliance is a fact issue unsuitable for a motion to dismiss. *Thrifty Payless, Inc. v. Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1239 (2013) ("Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."). Here, the Omidis have offered nothing to suggest that this is such a "rare case." It is not.

In asking the Court to make an extraordinary finding of no justifiable reliance, the Omidis continue to ignore the gist of United's fraud theory. The Omidi Network deceived United by affirmatively misrepresenting the amount of money the Providers charged patients. The amount stated as the total charge on the claim was *not* the total

---

[9]    The Omidis argue only that United was unjustified in relying upon claim forms that included excessive and exorbitant fees. Omidi MTD at 16. The Omidis do not dispute United's justifiable reliance regarding United's three other fraud theories.

1   charge, because the co-pay waiver reduced the amount of the total charge.  The face of

2   the claim forms gave no indication of co-pay waiver.  United had no reason to suspect

3   it, particularly given the undisclosed nature of co-pay waivers.  United was justified in

4   relying on the fraudulent claim forms, certainly for purposes of this motion.

5   *Nutrishare*, 2014 WL 1028351, at *8; *Feiler v. N.J. Dental Ass'n*, 467 A.2d 276, 281

6   (N.J. Super. Ct. Ch. Div. 1983).

7            *Nutrishare* rejected a similar argument, because CIGNA adequately alleged that

8   it "relied on the misrepresentations in the claim forms submitted by Nutrishare, leading

9   it to reimburse Nutrishare amounts in excess of what was due under the terms of the

10  plans." *Nutrishare*, 2014 WL 1028351, at *5.  United's allegations are nearly identical

11  to CIGNA's allegations in *Nutrishare*.  United "reasonably relied on the false

12  statements contained in the claims . . . as to the amount charged to the members" and

13  paid Counterclaim Defendants amounts not actually owed.  (FAC ¶¶ 289; 293.)

14           The Omidis' repeated reference (here and in their timeliness arguments) to

15  United's decision not to pay certain claims in 2010 and 2011 does not undercut

16  justifiable reliance or constitute inquiry notice of fraud.  United denies claims for a wide

17  number of reasons.  The fact that Claim A was denied in 2010 (for a reason not shown

18  in either the FAC or the Omidis' motion) says absolutely nothing about whether United

19  should have known that Claim B in 2011 was fraudulent.

20           California courts routinely permit fraud claims to proceed when the defendant

21  had "superior knowledge and information." *Thrifty Payless, Inc.*, 218 Cal. App. 4th at

22  1242.  The Omidi Network had superior knowledge about whether it (i) waived co-pays

23  and failed to inform United; and (ii) billed United exorbitant charges for routine

24  procedures.  The Omidis cannot claim that United should have known about its fraud,

25  when it repeatedly concealed the very nature and scope of the fraud from United.

26

27

28

C.    **United's fraud and conspiracy claims are not time-barred**.[10]

The Omidis raise statute of limitations arguments for each of the state law claims.  Because the reasons why those arguments fail are very similar for each state-law claim, United addresses all limitations issues at pp. 21-25, *infra*.

D.    **United's conspiracy allegations are sufficient**.

The Omidis also attack Count III (conspiracy), but United's allegations clearly support civil conspiracy's three elements: "(1) formation of the conspiracy (an agreement to commit wrongful acts); (2) operation of the conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of the conspiracy."  *People v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 137 (2003).

The Omidis challenge only the conspiracy's formation.[11]  California does not require an "express agreement" for civil conspiracy, only "a tacit understanding."  *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1517 (9th Cir. 1991).  United alleges that the Omidis and others entered into *either* an explicit *or* tacit agreement.  For example, the Omidis agreed "to create Top Surgeons, Inc., Top Surgeons, LLC and 1-800-Get-Thin, LLC to fraudulently market and sell Lap Band surgeries."  (FAC ¶¶ 304; 307(a).)  The Omidis agreed to organize surgical centers to which Providers could refer patients.  (*Id.* ¶¶ 307(b)-(e).)  Indeed, it is difficult to imagine anyone creating the enormous web of corporate entities, maintaining them at the same few addresses, renaming the same business when it was necessary to escape detection, and commingling funds, for any

---

[10]    The financial consequences of the fraud and other wrongful acts alleged in the FAC remain as issues in the case separate and apart from the Counts of the FAC.  United has alleged as an affirmative defense that it entitled to "set off and recoupment . . . for wrongful claims previously submitted by Plaintiffs and paid by United or the health plans [for which United acts as claims administrator]."  Answer; Eighteenth Affirmative Defense.  Set-off and recoupment are not subject to a limitations defense.  *See, generally, Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co.,* 29 Cal.4th 189, 195-98, (2002).

[11]    The Omidis also argue that if the fraud claim falls, the conspiracy claim must fall.  But United's fraud and alter-ego allegations remain viable, and so too does the conspiracy claim.  *See Saunders v. Superior Court*, 27 Cal. App. 4th 832, 846 (1994).

1    reason *other* than to further a conspiracy.  For the same reason, the Omidis agreed to

2    direct and control all aspects of patient scheduling, billing, record-keeping, and most

3    troublingly, medical decision-making.  (*Id.* ¶¶ 107(b)-(c); 107(f)(i)-(iii).)  These

4    allegations state a claim that the Omidis conspired to defraud United.

5            The pleading standard is not strict.  "[T]he existence of a conspiracy 'may

6    sometimes be inferred from the nature of the acts done, the relations of the parties, the

7    interests of the alleged conspirators, and other circumstances.'"  *In re Sunset Bay*

8    *Assocs.*, 944 F.2d at 1517 (quoting *Greenwood v. Mooradian*, 137 Cal. App. 2d 532,

9    538 (1955)).[12]  The specific allegations here amply justify such an inference.  For

10   example, the Omidis' corporate structure is designed to evade fraud detection.

11   Moreover, the individual parties are brothers, who jointly own and control the

12   Providers.  Ultimately, the relationship and joint interest of the parties is more than

13   enough for a reasonable fact finder to infer a conspiracy.

14   **IV.    United Properly Alleges UCL Claims**.

15           The Omidis attack United's UCL cause of action, arguing that (1) United does

16   not allege fraudulent, unfair, or unlawful practices; (2) relief under the UCL is

17   unavailable against the Omidis as a matter of law; and (3) United's UCL claim is time-

18   barred.  Omidi MTD at 19-22.[13]  These arguments are unpersuasive.

19           **A.    United Properly Alleged Wrongful Conduct Under the UCL**

20           The Omidis' first argument (no "fraudulent" practices as a predicate for UCL

21   liability) merely relies on their earlier attacks on the fraud claim.[14]  This fails not only

22

23   [12]  Even the Omidis concede that a conspiracy is relatively easy to allege.  Omidi
     MTD at 22 (citing *Choate v. Cnty. of Orange*, 86 Cal. App. 4th 312, 333 (2001)).

24   [13]  The Omidis briefly reference the issue of UCL standing (*id.* at 19).  United
     incorporates its discussion of UCL standing in its response to the Provider MTD.

25

26   [14]  Except for mentioning them in an argument heading, the Omidis do not address the
     UCL's "unlawful" or "unfair" prongs, so United has still stated a UCL claim.  *See*
     Cal. Bus. & Prof. Code § 17200 (proscribing "any unlawful, unfair *or* fraudulent

27   business act or practice" (emphasis added)); *Cel-Tech Commc'ns, Inc. v. Los*
     *Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (each of the UCL's three

28                                                            (Footnote continues on next page.)

1  for all the reasons stated earlier in this brief, but also because a plaintiff "need not plead

2  all [of] the elements of a common law fraudulent deception." *Fife v. Facebook, Inc.*,

3  905 F. Supp. 2d 989, 1012 (N.D. Cal. 2012); *see also Casault v. Fed. Nat'l Mortg.*

4  *Ass'n*, 915 F. Supp. 2d 1113, 1129 (C.D. Cal. 2012).  Conduct is "fraudulent" under the

5  UCL if it would likely deceive a reasonable person.  *See In re Tobacco II Cases*, 46 Cal.

6  4th 298, 312 (2009); *see also Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir.

7  2010) (fraud prong of UCL "is governed by the reasonable consumer test").  United

8  satisfied that standard by alleging not only affirmative misrepresentations in claim

9  forms but also, for example, that patients "would never have agreed to undergo Lap

10  Band surgery if" they had known that they "would be responsible for a co-payment"

11  (FAC ¶ 160) and that the Providers omitted services provided from claim forms (*id.* ¶

12  247).  United adequately alleged that the Omidis and their Network engaged in conduct

13  that would deceive a reasonable person.

14       The Omidis also argue that United's claims based on the Omidis' corporate

15  practice of medicine (which is "unlawful" in violation of the UCL) does not state a

16  claim because the surgical centers were physician-owned and United cannot identify a

17  specific medical decision made by a non-physician.  But United has alleged in detail

18  how the Omidi Network, including Julian, whose license was revoked, effectively

19  owned and controlled the Providers and made medical decisions.  (FAC ¶ 107-08.)

20       The incentive payments made to doctors for performing high numbers of

21  procedures also violate the law.  Cal. Bus. & Prof. Code § 650(a) prohibits payments

22  "as compensation or inducement for referring patients."  Through the 1-800-GET-THIN

23  recruitment procedures, the doctors brought patients to Omidi Network surgery centers

24  for procedures and got a bonus if they performed enough procedures.  The FAC alleges

25

26  (Footnote continued from previous page.)

27  prongs has a different meaning and "a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa").

28

1   that that the bonuses were "an inducement to perform procedures at Omidi-owned

2   surgery centers." (FAC ¶ 299.) Any defenses the Omidis claim to have must be

3   resolved based on a factual record.

4              **B.    United Has Viable UCL Remedies Against The Omidis**

5              The Omidis assert next that the Court is unable, as a matter of law, to grant any

6   injunctive relief or restitution against the Omidis. Omidi MTD at 20-21. This conflicts

7   with the plain text of the UCL, which expressly authorizes injunctions and restitution.

8   *See* Cal. Bus. & Prof. Code § 17203 (providing that "[a]ny person who engages, has

9   engaged, or proposes to engage in unfair competition may be enjoined" and that the

10  court may "restore to any person in interest any money or property . . . which may have

11  been acquired by means of such unfair competition").

12             To the extent that the Omidis argue that injunctive relief is unavailable to

13  remedy past conduct, *see* Omidi MTD at 20, they are simply incorrect. Nothing in the

14  UCL constrains injunctive relief in that way. UCL remedies are "extraordinarily broad"

15  and can, in fact, be used to "correct the consequences of past conduct and prevent future

16  violations." *See Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 656 (1996).

17  In any case, United seeks injunctive relief here not simply to remedy past conduct but

18  also to prevent future violations. (*See* FAC ¶ 11; Prayer ¶¶ 3-4.) The fact that the

19  Omidi Network continues to submit fraudulent claims even in 2014 is proof that

20  injunctive relief is neither outdated nor unneeded.

21             To the extent that the Omidis suggest that UCL restitution is legally unavailable

22  against them, this argument is based on two faulty premises. First, the Omidis argue

23  that United cannot obtain restitution from them of money paid to Providers. Omidi

24  MTD at 21. But this mischaracterizes the factual allegations. The very first paragraph

25  of the FAC alleges that: "United seeks to recover millions of dollars *paid to brothers*

26  *Julian and Michael Omidi* through their 1-800-GET-THIN referral network and

27  network of ambulatory surgical centers . . . as a result of their unlawful scheme and

28  artifice to defraud United . . . and to illegally enrich themselves through false and

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE OMIDIS' MOTION TO DISMISS

1  fraudulent pretenses, representations, and promises." (FAC ¶ 1 (emphasis added).)

2  Because of the nature of the Omidi Network, some of the payments may have been

3  indirect (some were direct), but they were all payments, ultimately, to the Omidis.

4      The Omidis' underlying legal premise is also faulty, and the only case they cite

5  to support it is readily distinguishable. In *Madrid v. Perot Sys. Corp.*, a plaintiff suing

6  electricity companies was not seeking a refund for money spent for his electricity, but

7  rather the recovery of *other funds*, including alleged profits from the sale of insider

8  information. 130 Cal. App. 4th 440, 454, 456 (2005). Such profits were not "money

9  taken from plaintiff or money in which plaintiff had a vested ownership interest." *Id*. at

10 456. Indeed, *Madrid* distinguishes itself from several other cases imposing alter-ego

11 liability or liability on conspirators. *See id*. at 456-58 (citing *People v. Bestline Prods.,*

12 *Inc.*, 61 Cal. App. 3d 879 (1976); *People v. Toomey*, 157 Cal. App. 3d 1 (1984); and

13 *People v. Orange Cnty. Charitable Servs.*, 73 Cal. App. 4th 1054 (1999)). The *Madrid*

14 court also explained that it was not addressing fraud. *Id*. at 457. United's FAC, by

15 contrast, contains alter-ego allegations, (*see* FAC ¶¶ 71-104); conspiracy allegations,

16 (*see id*. ¶¶ 303-08); and fraud allegations, (*see id*. ¶¶ 282-94).

17      Unlike the plaintiff in *Madrid*, United seeks the return of funds it paid to

18 Providers as a result of unlawful, unfair, and fraudulent conduct. (*Id.* ¶ 1; Prayer ¶ 2

19 (seeking that the Court order "Counterclaim Defendants to return or repay to United all

20 sums that were fraudulently or inappropriately paid to the Counterclaim Defendants").)

21 The Court is empowered to grant such relief.

22 **V.    United Has Properly Alleged Intentional Interference**.

23      The Omidis argue that the Court should dismiss the intentional-interference

24 claim (Count IV) because (1) Providers, as contracted parties, cannot intentionally

25 interfere with the relevant contracts; (2) United alleged "no facts" showing the Omidis

26 were aware of the terms of those contracts; and (3) United's "interference cause of

27 action is time-barred." Omidi MTD at 23-25. These arguments are unavailing.

28

The Omidis' first argument is the same argument raised by the Providers, and United rests in part on its response. (*See* United Resp. to Providers' MTD at Arg. § III.D.) Most importantly, United alleges intentional interference independent of any assignment, because the payments were made to Providers as authorized representatives, not as assignees.

The Omidis cite no case holding that an *assignee* can defeat an intentional-interference claim by claiming to be a *party*. United's claim is also viable to the extent that the Providers lacked a valid assignment or, even if the assignment was valid, the act of interference occurred before the assignment. (FAC ¶¶ 271, 311-14.) Yet again, the Omidis are misusing a 12(b)(6) motion to seek dismissal of only some claims within a broader count. *Netopia, Inc., Sec. Litig.*, 2005 WL 3445631, at *3.

The Omidis' second argument—that the Omidis lacked knowledge of the provisions in the plans that prohibited waiver of co-payments—is flawed because it ignores the factual allegations expressly alleging that the Omidis had such knowledge. (*See, e.g.*, FAC ¶ 310.) Indeed, it is difficult to understand how United could have pleaded the Omidis' knowledge of the terms of the plans more directly.

## VI.    All Of United's State Law Counts Are Timely.

The Omidis argue that fraud and conspiracy, the UCL claim, and the intentional interference claims are all time-barred. For multiple reasons, there is no basis to grant a motion to dismiss on timeliness grounds. The Omidis attempt to raise the *affirmative defense* of statute of limitations in their motion to dismiss. Even if that were procedurally proper, the FAC's allegations, taken as true, defeat the limitations defenses. The statutes of limitations are three years for fraud, four years for the UCL, and two years for intentional interference. Cal. Civ. Code § 338(d) (fraud); Cal. Bus. & Prof. Code § 17208 (UCL); Cal. Civ. Code § 339(1) (intentional interference).

As with other Omidi arguments, the limitations defense applies only to some *claims* within the FAC's Counts. Many of the payments induced by the Omidis' fraud occurred within the limitations periods. Because the motion to dismiss is not the proper

1    vehicle to attack *portions* of a cause of action, dismissal on limitations grounds must be

2    denied.  *Netopia, Inc., Sec. Litig.*, 2005 WL 3445631, at *3.

3         The limitations argument also fails for other reasons.  On this affirmative

4    defense, the Omidis bear the burden of proof.  *Grisham v. Philip Morris, Inc.*, 670 F.

5    Supp. 2d 1014, 1020 (C.D. Cal. 2009).  The accrual and running of a limitations period

6    in California raises a host of fact-specific legal inquiries that cannot normally (and

7    certainly not here) be resolved from the face of a pleading.

8         The first factually complex issue is accrual of the cause of action.  A fraud

9    claim accrues on "the date the complaining party learns, or at least is put on notice, that

10   a representation was false."  *Brandon G. v. Gray*, 111 Cal. App. 4th 29, 35 (2003).  As

11   the California Supreme Court recently recognized, the UCL is "governed by common

12   law accrual rules to the same extent as any other statute."  *Aryeh v. Canon Bus.*

13   *Solutions, Inc.*, 55 Cal. 4th 1185, 1196 (2013).  United's discovery of the Omidis' fraud

14   is a question of fact, and courts are reluctant to decide it even on summary judgment, let

15   alone on a motion to dismiss.  *Grisham*, 670 F. Supp. 2d at 1021 ("[S]ummary

16   judgment is a disfavored vehicle for determining whether a party exercised reasonable

17   diligence in attempting to determine the cause of her injury. This is largely a factual

18   issue . . . .").

19        Rather than attempt to show how, on the face of the FAC, United must have

20   discovered the fraudulent scheme at some early date, the Omidis' motion simply notes

21   United's sophistication and posits hypotheticals about what United might, could or

22   should have done to discover the fraud sooner.  Omidi MTD at 18.  Even after full

23   discovery, with an actual evidentiary record, courts are very reluctant to decide this

24   issue as a matter of law on summary judgment.  It certainly is not amenable to

25   resolution on this motion, given the Omidis' burden of proof and their reliance on

26   assumptions about what could have happened.

27        With regard to Count III (conspiracy), accrual occurs even later.  United's

28   conspiracy claim does not accrue until the "last overt act" is completed.  *Wyatt v. Union*

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE OMIDIS' MOTION TO DISMISS

1  *Mortg. Co.*, 24 Cal. 3d 773, 786 (Cal. 1979); *Raceway Props., LLC v. LSOF Carlsbad*

2  *Land L.P.*, 157 Fed. App'x. 959, 962 (9th Cir. 2005).  Here, the FAC alleges that the

3  conspiracy is still ongoing, as the Omidi Network is still performing medical procedures

4  at exorbitant prices while misrepresenting to United actual patient charges.  (FAC ¶

5  304.)  Because the conspiracy continues, the statute of limitations on the underlying

6  offenses has not yet accrued.  *See Raceway Props., LLC*, 157 Fed. App'x at 962

7  (reversing dismissal of conspiracy claim because the complaint alleged that the "last

8  overt act occurred within the statutory period"); *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d

9  1092, 1127 (1988) (superseded by statute on other grounds) ("[I]f a continuing

10  conspiracy is proved, the action is obviously timely. . . . The determinative issue is

11  factual and cannot be resolved by demurrer.").[15]

12         Even if a presumptive accrual date could be determined (it cannot be on this

13  motion), the Omidis ignore a host of equitable doctrines that delay when a cause of

14  action accrues, including the (1) discovery rule; (2) equitable tolling; (3) fraudulent

15  concealment; (4) continuing-violation doctrine; and (5) continuous-accrual doctrine.

16  *See Aryeh*, 55 Cal. 4th at 1192.  Courts are properly reluctant, unless it is absolutely

17  clear from the face of the pleadings, to resolve these fact-dependent equitable doctrines

18  at the motion-to-dismiss stage.  *See, e.g.*, *Supermail Cargo, Inc. v. United States*, 68

19  F.3d 1204, 1206 (9th Cir. 1995) (equitable tolling is not usually amenable to resolution

20  on a Rule 12 motion); *Grisham*, 670 F. Supp. 2d at 1021 (summary judgment "rarely

21  proper" when statute of limitations turns on "when plaintiff discovered or should have

22  discovered the elements of the cause of action"); *Snow v. A.H. Robins Co.*, 165 Cal.

23  App. 3d 120, 128 (1985) (issue of belated discovery is typically "for the trier of fact to

24  decide").  *See also Cervantes v. City of San Diego*, 5 F.3d 1273, 1275 (9th Cir. 1993)

25  (motion to dismiss based on statute of limitations, "can be granted only if the assertions

---

26  [15]  Courts are reluctant to rule on the date of the last overt act of a conspiracy as a

27  matter of law. *See Livett v. F.C. Fin. Assocs., Ltd.*, 124 Cal. App. 3d 413, 418 (1981).

28

1   of the complaint, read with the required liberality, *would not permit the plaintiff to*

2   *prove*" the potential applicability of a tolling doctrine (emphasis added)).

3          Here, the FAC's allegations support equitable tolling.  Fraudulent concealment

4   tolls the statute "where a defendant, through deceptive conduct, has caused a claim to

5   grow stale." *Aryeh*, 55 Cal. 4th at 1192.  The statute does not run "for that period

6   during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the

7   exercise of reasonable diligence, should have discovered it." *See Agustina Sanchez v. S.*

8   *Hoover Hosp.*, 18 Cal. 3d 93, 99 (1976); *see also Grisham v. Philip Morris U.S.A., Inc*.,

9   40 Cal. 4th 623, 637 (2007).

10         Fraudulent concealment also applies here.  United alleged in detail how it

11  behaved reasonably and diligently, but still did not detect the sophisticated and complex

12  wrongful conduct that the Omidi Network labored so hard to conceal.  (*See, e.g.*, FAC

13  ¶¶ 17, 59, 281.)  Further, the Omidis committed fraud while abusing corporate

14  formalities and changing the names of Providers—efforts specifically designed to defeat

15  United's fraud-detection efforts.  (*Id*. ¶¶ 70, 78, 94.)  The fraudulent-concealment

16  exception applies to United's UCL claims.

17         The Omidis also ignore the fact that the FAC is a compulsory counterclaim.  It

18  involves (wholly or in large part) the same providers, plans, and patients, all in

19  connection with the same fraudulent scheme by the Omidi Network.  A compulsory

20  counterclaim relates back to the date of the original complaint.  *See, e.g., N. Cnty.*

21  *Commc'ns. Corp. v. Verizon Global Networks, Inc.*, 685 F. Supp. 2d 1112, 1119 (S.D.

22  Cal. 2010) (compulsory counterclaim tolls statute of limitations).

23         Finally, United's claims are timely under the "continuing violation doctrine,"

24  which "aggregates a series of wrongs or injuries for purposes of the statute of

25  limitations, treating the limitations period as accruing for all of them upon commission

26  or sufferance of the last of them." *Aryeh*, 55 Cal. 4th at 1192.  United has alleged that

27  the Omidis and their clinics, beginning in 2008 and continuing to the present, have

28  engaged in a "pattern and practice" of conduct of submitting thousands of claims that

1  are false or otherwise fraudulent for substantially similar reasons.  (*See, e.g.*, FAC ¶¶
2  90, 272, 275.)  These facts are a classic example of a "continuing violation."  *See Aryeh*,
3  55 Cal. 4th at 1192 ("Allegations of a pattern of reasonably frequent and similar acts
4  may, in a given case, justify treating the acts as an indivisible course of conduct
5  actionable in its entirety, notwithstanding that the conduct occurred partially outside,
6  and partially inside the limitations period.").  The Omidis cannot meet their burden to
7  show that the statute of limitations bars United's claims.[16]  At a minimum, United has
8  alleged enough facts to create a fact issue, and the Court should therefore decline to
9  decide the statute-of-limitations question at this time.

10  **CONCLUSION**
11  United respectfully requests that the Court deny the Omidis' Motion to Dismiss.

13  Dated:  October 31, 2014  **WALRAVEN & WESTERFELD LLP**

14  ___/s/ Bryan S. Westerfeld_____
15  By:  BRYAN s. WESTERFELD
16  Attorneys for Defendant UnitedHealth Group, Inc., and Counterclaim Plaintiffs/Defendants United Healthcare Services, Inc., United
17  Healthcare Insurance Company, and OptumInsight, Inc.

18  Dated:  October 31, 2014  **DORSEY & WHITNEY LLP**

20  ___/s/ R.J. ZAYED_____
21  By:  R.J. ZAYED
22  Attorneys for Defendant UnitedHealth Group, Inc., and Counterclaim Plaintiffs/Defendants United Healthcare Services, Inc., United
23  Healthcare Insurance Company, and OptumInsight, Inc.

---

[16] The result is the same for intentional interference.  Cal. Civ.  Code § 339(1) expressly recognizes the discovery rule for intentional interference.  There is no logical reason why fraudulent concealment should not also apply.  *See, e.g., Bernson v. Browning-Ferris Indus.*, 7 Cal.4th 926, 931 n.3 (1994) ("The rule of fraudulent concealment is applicable whenever the defendant intentionally prevents the plaintiff from instituting suit.").

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
                                              ) ss
COUNTY OF ORANGE )

     I am employed in the County of Orange, State of California. I am over

the age of 18 years and not a party to the within action. My business address is 101

Enterprise, Suite 350, Aliso Viejo, CA 92656.

     On October 31, 2014, I served the foregoing document(s) described as

**COUNTERCLAIM PLAINTIFFS' MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO OMIDIS' MOTION TO DISMISS THE
FIRST AMENDED COUNTERCLAIM**

on all interested parties in this action as follows (or as on the attached service list):

DARON L. TOOCH                          E-Mail:
BRYCE WOOLLEY                          dtooch@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**    bwoolley@health-law.com
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517

☒    BY CM/ECF NOTICE OF ELECTRONIC FILING: I electronically filed the
document(s) with the Clerk of the Court by using the *CM/ECF* system. Participants in
the case who are registered *CM/ECF* users will be served by the *CM/ECF* system.
Participants in the case who are not registered *CM/ECF* users will be served by mail or
by other means permitted by the court rules.

     I declare under penalty of perjury under the laws of the State of California

that the above is true and correct.

     Executed on October 31, 2014, at Aliso Viejo, California.

_____
Jessica M. Ridley

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE OMIDIS' MOTION TO DISMISS