1  **BRYAN WESTERFELD (S.B. # 218253)**
   **bwesterfeld@calemployerlaw.com**
2  **NICOLE E. WURSHER (S.B # 245879)**
   **nwurscher@calemployerlaw.com**
3  **WALRAVEN & WESTERFELD LLP**
   101 Enterprise, Suite 350
4  Aliso Viejo, CA 92656
   Telephone: (949) 215-1997
5  Facsimile: (949) 215-1999

6  **R.J. ZAYED**
   **zayed.rj@dorsey.com**
7  **STEPHEN P. LUCKE**
   **lucke.steve@dorsey.com**
8  *Admitted pro hac vice*
   **DORSEY & WHITNEY LLP**
9  Suite 1500, 50 South Sixth Street
   Minneapolis, MN 55402-1498
10 Telephone: (612) 340-2600
   Facsimile: (612) 340-2868

11

12 Attorneys for Defendant UnitedHealth Group, Inc.;
   and Defendants/Counterclaim Plaintiffs
   United Healthcare Services, Inc., UnitedHealthcare
13 Insurance Company; OptumInsight, Inc.

14        **UNITED STATES DISTRICT COURT**

15        **CENTRAL DISTRICT OF CALIFORNIA**

16 | ALMONT AMBULATORY SURGERY      CASE NO. 2:14-CV-03053-DMG-VBK
   CENTER, LLC, a California limited
17 liability company; BAKERSFIELD     MAGISTRATE:
   SURGERY INSTITUTE, LLC, a          Hon. Victor B. Kenton
18 California limited liability company;
   INDEPENDENT MEDICAL              **DISCOVERY MATTER**
19 SERVICES, INC., a California
   corporation; MODERN INSTITUTE OF  **DECLARATION OF BRYAN**
20 PLASTIC SURGERY & ANTIAGING,      **WESTERFELD IN SUPPORT OF**
   INC., a California corporation; NEW **UNITED'S MOTION FOR A**
21 LIFE SURGERY CENTER, LLC, a       **PROTECTIVE ORDER**
   California limited liability company, dba
22 BEVERLY HILLS SURGERY
   CENTER, LLC; ORANGE GROVE
23 SURGERY CENTER, LLC, a California  Date:    December 2, 2014
   limited liability company; SAN DIEGO Time:    10:00 a.m.
24 AMBULATORY SURGERY CENTER,        Dept.:   Ctrm 590
   LLC, a California limited liability
25 company; SKIN CANCER &
   RECONSTRUCTIVE SURGERY
26 SPECIALISTS OF BEVERLY HILLS,     Discovery cutoff: None set
   INC., a California corporation;     Pretrial conference: None set
27 VALENCIA AMBULATORY              Trial date: None set
   SURGERY CENTER, LLC, a California  Complaint filed: March 21, 2014
28 limited liability company; WEST HILLS

| | |
|---|---|
| 1 | VALENCIA AMBULATORY |
| | SURGERY CENTER, LLC, a California |
| 2 | limited liability company; WEST HILLS |
| | SURGERY CENTER, LLC, a California |
| 3 | limited liability company, |
| 4 | Plaintiffs, |
| 5 | v. |
| 6 | UNITEDHEALTH GROUP, INC.; |
| | UNITED HEALTHCARE SERVICES, |
| 7 | INC., UNITEDHEALTHCARE |
| | INSURANCE COMPANY; |
| 8 | OPTUMINSIGHT, INC., and DOES 1 |
| | through 20, |
| 9 | |
| | Defendants. |
| 10 | |
| 11 | |
| | UNITED HEALTHCARE SERVICES, |
| 12 | INC.; UNITEDHEALTHCARE |
| | INSURANCE COMPANY; |
| 13 | OPTUMINSIGHT, INC., |
| 14 | Counterclaim Plaintiffs |
| 15 | v. |
| 16 | ALMONT AMBULATORY SURGERY |
| | CENTER, LLC, a California limited |
| 17 | liability company; BAKERSFIELD |
| | SURGERY INSTITUTE, LLC, a |
| 18 | California limited liability company; |
| | INDEPENDENT MEDICAL |
| 19 | SERVICES, INC., a California |
| | corporation; MODERN INSTITUTE OF |
| 20 | PLASTIC SURGERY & ANTIAGING, |
| | INC., a California corporation; NEW |
| 21 | LIFE SURGERY CENTER, LLC, a |
| | California limited liability company, dba |
| 22 | BEVERLY HILLS SURGERY |
| | CENTER, LLC; ORANGE GROVE |
| 23 | SURGERY CENTER, LLC, a California |
| | limited liability company; SAN DIEGO |
| 24 | AMBULATORY SURGERY CENTER, |
| | LLC, a California limited liability |
| 25 | company; SKIN CANCER & |
| | RECONSTRUCTIVE SURGERY |
| 26 | SPECIALISTS OF BEVERLY HILLS, |
| | INC., a California corporation; |
| 27 | VALENCIA AMBULATORY |
| | SURGERY CENTER, LLC, a California |
| 28 | limited liability company; WEST HILLS |

1  SURGERY CENTER, LLC, a California
   limited liability company, KAMBIZ
2  BENJAMIN OMIDI (A/K/A JULIAN
   OMIDI, COMBIZ OMIDI, KAMBIZ
3  OMIDI, COMBIZ JULIAN OMIDI,
   KAMBIZ BENIAMIA OMIDI, JULIAN
4  C. OMIDI); MICHAEL OMIDI, M.D.;
   ALMONT AMBULATORY SURGERY
5  CENTER, A MEDICAL
   CORPORATION; BAKERSFIELD
6  SURGERY INSTITUTE, INC.; CIRO
   SURGERY CENTER, LLC; EAST BAY
7  AMBULATORY SURGERY CENTER,
   LLC; SKIN CANCER &
8  RECONSTRUTIVE SURGERY
   SPECIALISTS OF WEST HILLS, INC.;
9  VALLEY SURGICAL CENTER, LLC;
   TOP SURGEONS, INC.; TOP
10 SURGEONS, LLC; PALMDALE
   AMBULATORY SURGERY CENTER,
11 A MEDICAL CORPORATION; 1 800
   GET THIN, LLC; does 1-200,
12
                    Counterclaim Defendants.
13
        I, Bryan Westerfeld, declare as follows:
14
        1.      I am a partner at the law firm of Walraven & Westerfeld LLP,
15
   attorneys for the United entities in the above-captioned action. I make this
16
   Declaration in support of United's Motion for a Protective Order.
17
        2.      Over the span of a few months, the parties to this action negotiated the
18
   potential terms of a protective order. On September 18, 2014, United provided
19
   counsel for the Counterclaim Defendants with a draft protective order.
20
        3.      Counterclaim Defendants reviewed the draft protective order and
21
   provided proposed revisions to United on September 30. The redline mark-up of
22
   the protective order demonstrated that the parties agreed on virtually all aspects of
23
   the protective order.
24
        4.      On October 16, 2014 counsel for the parties met and conferred on the
25
   protective order, among other issues in the case. United explained the rationale
26
   behind paragraph 7.4 of the protective order. Counterclaim Defendants stated that
27
   the provision was unnecessary and that permitting United to provide information
28

1 | without notice was a deal breaker.  The parties agreed that there were at an impasse
2 | and would have to bring the dispute before the Court.

3 |         5.      Attached hereto as **Exhibit 1** is a proposed Protective Order.

4 |         6.      A few years ago, United became aware of a number of lawsuits against
5 | Michael and Julian Omidi and various persons and entities associated with them
6 | ("the Omidi Network").  United obtained copies of the complaints and other
7 | documents related to those lawsuits.  As part of that process, United obtained an
8 | affidavit filed by a special agent for the United States Food and Drug
9 | Administration ("FDA"), which revealed that the Omidi's 1-800-GET-THIN
10 | campaign was the subject of a criminal investigation focused on "potential
11 | violations of federal law, including conspiracy, healthcare fraud, wire fraud, mail
12 | fraud, tax violations, identity theft [and] money laundering."  A true and correct
13 | copy of the affidavit of Special Agent Samanta Kelley dated June 8, 2012 is
14 | attached as **Exhibit 2**.  Exhibit 2 was originally filed with the Central District of
15 | California as part of *United States v. Burrows*, No. 12-1371, Docket No. 1 (C.D.
16 | Cal. June 8, 2012).

17 |         7.      Attached hereto as **Exhibit 3** is a true and accurate copy of Stuart
18 | Pfeifer's article, *State Launches Lap-Band Investigation*, published in the Los
19 | Angeles Times on Jan. 26, 2012.

20 |         8.      Attached hereto as **Exhibit 4** is a true and accurate copy of Stuart
21 | Pfeifer's article, *Get-Thin Brothers in Fraud Inquiry*, published in the Los Angeles
22 | Times on October 23, 2012.

23 |         9.      Attached hereto as **Exhibit 5** is a true and accurate copy of Stuart
24 | Pfeifer's article, *Inside Get-Thin*, published in the Los Angeles Times on May 6,
25 | 2012.

26 |         10.     Attached hereto as **Exhibit 6** is a true and accurate copy of Stuart
27 | Pfeifer's article, *Cindy Omidi Convicted of Violating Laws to Prevent Money*
28 | *Laundering*, published in the Los Angeles Times on October 10, 2014

1      11.    One of the lawsuits that United discovered was a wrongful death suit

2 against 1-800-GET-THIN and several related providers titled *Faitro v. Shamaan, et*

3 *al.*, LASC Case No. SC111332. In that case, Dr. Ihsan Shamaan, M.D., a former

4 surgeon for several GET-THIN facilities, testified under oath that he and others at

5 the surgery centers routinely engaged in health care fraud. A true and correct copy

6 of Dr. Shamaan's deposition transcript in that action is attached as **Exhibit 7**.

7      12.    Attached hereto as **Exhibit 8** is a true and accurate copy of the

8 protective order entered in *DHR Int'l, Inc. v. Pollick*, No. 13-CV-01477 (D. Colo.

9 Oct. 21, 2013).

10

11      I declare under penalty of perjury under the laws of the United States of

12 America and the State of California that the foregoing is true and correct.

13

14

15 Dated: Oct 31 , 2014

16                           By: _____

17                              BRYAN WESTERFLED

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

Almont Joint Stipulation for Entry of a Protective Order

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company, et al. , | Case No. 2:14-CV-03053-MWF (VBKx) |
| Plaintiffs, | **[PROPOSED] STIPULATED PROTECTIVE ORDER** |
| vs. | Judge: Hon. Michael W. Fitzgerald |
| UNITEDHEALTH GROUP, INC.; UNITED HEALTHCARE SERVICES, INC.; UNITED HEALTHCARE INSURANCE COMPANY, INC.; OPTUMINSIGHT, INC.; and DOES 1-20, | Magistrate Judge: Hon. Victor B. Kenton |
| | Trial Date: None Set |
| Defendants. | |

## 1.  PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted.  Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order.  The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.  The parties further acknowledge, as set forth in Section 12.3, below, that this Proposed Protective Order does not entitle them to file confidential information under seal; Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

Based upon the Stipulation of the parties and pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, IT IS HEREBY ORDERED that:

1

## 2.   DEFINITIONS

2.1   Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2   "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c), including but not limited to patient records and data, claim files, non-public financial records and data, employee or personnel files, customer or client lists, confidential contracts, other healthcare-related information protected by The Health Insurance Portability and Accountability Act of 1996, and all other information that the party in good faith believes will, if disclosed, cause harm to the Producing Party's competitive position.

2.3   "CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: subset of information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c) subject to limited disclosure as set forth in Paragraph 7.3, that will, if disclosed, cause substantial competitive and economic harm to the Producing Party. This includes, but is not limited to, trade secrets, United's proprietary claims-review and audit processes, and all other non-public, proprietary financial, regulatory, or strategic information and data, to the extent that any of these categories of information or tangible things will, if disclosed, cause substantial competitive and economic harm to the Producing Party.

2.4   Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.5   Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY."

PROPOSED PROTECTIVE ORDER

Exhibit Page 7

2.5　　Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are provided, produced or generated in relation to the claims and disputes in this matter or in disclosures or responses to discovery in this matter.

2.6　　Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

2.7　　House Counsel: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.8　　Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.9　　Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.10　　Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.11　　Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.12　　Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.13　　Protected Material: any Disclosure or Discovery Material that is

designated as "CONFIDENTIAL" or CONFIDENTIAL – ATTORNEYS' EYES ONLY."

2.14    Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

2.15    United: Collectively, UnitedHealth Group, Inc., United Healthcare Services, Inc.; United Healthcare Insurance Company, Inc.; and OptumInsight, Inc.

## 3.    SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also any and all copies, excerpts, or compilations of Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

## 4.    DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

**5.    DESIGNATING PROTECTED MATERIAL**

5.1    Exercise of Restraint and Care in Designating Material for Protection.

Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2    Manner and Timing of Designations.

Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced. Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b) for testimony given in a deposition, confidentiality designations shall be made either on the record or by written notice to the other party within 14 days of receipt of the transcript. Unless otherwise agreed, depositions shall be treated as "Confidential" during the 14-day period following receipt of the transcript. The deposition of any witness (or any portion of such deposition) that encompasses

Confidential information shall be taken only in the presence of persons who are qualified to have access to such information.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or CONFIDENTIAL – ATTORNEYS' EYES ONLY." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3    Inadvertent Failures to Designate.

If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.    **CHALLENGING CONFIDENTIALITY DESIGNATIONS**

All challenges to confidentiality designations shall proceed under Local Rule 37-1 through Local Rule 37-4.

7.    **ACCESS TO AND USE OF PROTECTED MATERIAL**

7.1    Basic Principles.

A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation or related litigation involving some or all of the parties hereto. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of Section 13 below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2    Disclosure of "CONFIDENTIAL" Information or Items.

Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation;

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, mock jurors, licensed private investigators retained by Counsel, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

2:14-CV-03053-MWF (VBKx)

PROPOSED PROTECTIVE ORDER

Exhibit Page 12

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

### 7.3    Disclosure of "CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items.

Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of Record in this action;

(b) United's House Counsel in this action, which for purposes of this provision only is limited to the following individuals, or individuals assuming their positions in the future: Steven Burstein, Linda Daugherty and Carolyn Ham;

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, mock jurors, licensed private investigators retained by Counsel, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.4 <u>Disclosure to Government Authorities</u>

Nothing herein shall preclude disclosure of any Protected Information, as required by law, to agencies or departments of the state, county, city or federal government, including law enforcement personnel, or require notice of the same to the producing party.

**8.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED**

If a Party is served with a valid subpoena or court order that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY," that Party must promptly notify in writing the party who caused the subpoena or order to issue that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order.

**9.    A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED**

9.1    The terms of this Order are applicable to information and/or tangible things produced by a Non-Party in this action, if that Non-Party signs Exhibit A (Acknowledgement and Agreement to be Bound) and that Non-Party designates said information and/or tangible things as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to the terms of this Protective Order. Under such circumstances, such information produced by Non-Parties is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

9.2    In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(a) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(b) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(c) make the information requested available for inspection by the Non-Party.

If the Non-Party fails to object or seek a protective order from this Court within fourteen (14) days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

## 10.  UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

## 11.  INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

1
2
3
4
5
6
7
8
9

In accordance with Federal Rule of Civil Procedure 26(b)(5)(B) and Federal Rule of Evidence 502, any Party who inadvertently produces Discovery Material that is privileged or otherwise immune from discovery shall, promptly upon discovery of such inadvertent production, so advise the Producing Party and request that the Discovery Materials be returned.  The Receiving Party shall return, sequester, or destroy such inadvertently produced Discovery Materials, including all copies, within five (5) business days of receiving such a written request.  The Party returning such inadvertently produced Discovery Materials may thereafter seek re-production of any such Discovery Materials pursuant to applicable law.

10   **12.    MISCELLANEOUS**

11       12.1   Right to Further Relief.

12
13

Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

14       12.2   Right to Assert Other Objections.

15
16
17
18
19

By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order.  Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

20       12.3   Filing Protected Material.

21
22
23
24
25
26
27
28

Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material.  A Party that seeks to file under seal any Protected Material must comply with Local Rule 79-5.  Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue.  Pursuant to Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged,

protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Local Rule 79-5 is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.

## 13.    FINAL DISPOSITION

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO ORDERED.

1

2

3    Dated: _____    _____

4                                    Victor B. Kenton
                                     United States Magistrate Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**
**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

I, _____ [print or type full name], of _____

[print or type full address], declare under penalty of perjury that I have read in its

entirety and understand the Stipulated Protective Order that was issued by the United

States District Court for the Central District of California on [_____] in the case of

*Almont Ambulatory Surgery Center, LLC, et al. v. UnitedHealth Group, Inc., et al.,*

Case No: CV14-3053-MWF-VBK.

I agree to comply with and to be bound by all the terms of this Stipulated

Protective Order and I understand and acknowledge that failure to so comply could

expose me to sanctions and punishment in the nature of contempt. I solemnly promise

that I will not disclose in any manner any information or item that is subject to this

Stipulated Protective Order to any person or entity except in strict compliance with the

provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for

the Central District of California for the purpose of enforcing the terms of this

Stipulated Protective Order, even if such enforcement proceedings occur after

termination of this action.


Date: _____

City and State where sworn and signed: _____

Printed name: _____

[printed name]

Signature: _____

[signature]

PROPOSED PROTECTIVE ORDER

Exhibit Page 19

EXHIBIT 2

Almont Joint Stipulation for Entry of a Protective Order

AO 91
Rev. 11/97

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>TIFFINY BURROWS | DOCKET NO. |
| | MAGISTRATE'S CASE NO.<br><br>12-   12-1371M |

| Complaint for violation of 42 U.S.C. §§ 1320d-6(3), (b)(3) | FILED<br>CLERK, U.S. DISTRICT COURT<br>JUN - 8 2011<br>CENTRAL DISTRICT OF CALIFORNIA<br>Los Angeles/CA |
|---|---|

| NAME OF MAGISTRATE JUDGE<br>VICTOR B. KENTON<br><br>THE HONORABLE STEPHEN J. HILLMAN | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION |
|---|---|---|

| DATE OF OFFENSE<br><br>June 7, 2012 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

42 U.S.C. §§ 1320d-6(3), (b)(3) (Wrongful disclosure of individually identifiable health information).

On or about June 7, 2012, in Los Angeles County, in the Central District of California, and elsewhere, defendant TIFFINY BURROWS knowingly and for a reason other than permitted by Title 42, United States Code, Chapter 7, Subchapter XI, Part C, disclosed individually identifiable health information relating to an individual with the initials P.R. with the intent to sell the information for personal gain.

### BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Samanta Kelley |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT — FDA |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>VICTOR B. KENTON | DATE<br><br>June 8, 2012 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
[Initials (DK:sy)DK]     REC: Bond.

## A F F I D A V I T

I, Samanta Kelley, being duly sworn, hereby depose and state:

### INTRODUCTION

1.    I am employed as a Special Agent ("SA") of the Office of Criminal Investigations for the United States Food and Drug Administration ("FDA") and have been employed by the FDA as a Special Agent since April 2010.  I am responsible for conducting investigations involving alleged criminal violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Section 321 et seq.; and other federal statutes. Prior to becoming a Special Agent with the FDA, I completed the three week FDA Special Agent Training Program.  As a special agent with the FDA, I completed the one week FDA Law Course.  I graduated from California State University Long Beach where I completed a Bachelor of Science and a Master of Science Degree in Criminal Justice.  Prior to my work in the FDA, I was a Special Agent with the Department of Defense, Office of Inspector General, Defense Criminal Investigative Service ("DCIS").  I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in September 2000.  During the ten years I worked for the DCIS, I investigated numerous crimes included but not limited to product

1

substitution fraud, workers compensation fraud, and labor mischarging fraud.

2.   This affidavit is made in support of a criminal complaint charging TIFFINY BURROWS ("BURROWS") with disclosing individually identifiable health information to another person with intent to sell that information for personal gain in violation of 42 U.S.C. §§ 1320d-6(a)(3), 1320d-6(b)(3), the Health Insurance Portability and Accountability Act ("HIPAA").

3.   The information contained in this affidavit is based on my training and experience, personal observations, witness interviews, conversations with Agents from the Federal Bureau of Investigations ("FBI") and other agencies involved in this investigation, and review of the documents, email and telephonic consensual conversation obtained during this investigation. This affidavit is intended to show that that there is sufficient probable cause for the requested complaint, and does not purport to set forth all of my knowledge of the investigation into this matter.

BACKGROUND

4.   I am one of the agents assigned to investigate 1-800-GET-THIN, Top Surgeons, Inc., Michael Omidi, Julian Omidi, Beverly Hills Surgery Center, and numerous related individuals and entities (collectively, "1-800-GET-THIN") that conduct an enterprise that promotes and conducts Lap-Band surgery, a

2

procedure designed to address morbid obesity.

5.    Along with agents from multiple other federal and state agencies, I am conducting an investigation of 1-800-GET-THIN for potential violations of federal law including conspiracy, health care fraud, wire fraud, mail fraud, tax violations, identity theft, money laundering, and the Food and Drug Cosmetic Act.

6.    The Los Angeles County District Attorney's Office ("LADA") and the Los Angeles Police Department ("LAPD") are conducting a separate investigation into the death of a 1-800-GET-THIN patient, Paula Rojeski, who died following Lap-Band surgery at a 1-800-GET-THIN surgery center.

7.    Alexander Robertson is a private attorney who represents plaintiffs in civil actions against 1-800-GET-THIN, including a whistleblower lawsuit by former 1-800-GET-THIN employees Dyanne Deuel and Karla Osario, wrongful death cases by the families of Paula Rojeski and another patient who died following lap band surgery at a 1-800-GET-THIN surgery center. Robertson's involvement in this matter was at the direction of federal law enforcement agents including myself and SA Hadley.

8.    BURROWS is a licensed vocational nurse who was formerly employed by 1-800-GET-THIN.

3

**RELEVANT STATUTES**

9.   HIPAA provides federal protections for personal health information held by covered entities.  Title 42, United States Code, Section 1320d-6(a)(3) prohibits a person from knowingly disclosing individually identifiable health information to another person.  A person (including an employee or other individual) shall be considered to have disclosed individually identifiable health information if the information is maintained by a covered entity (including a health care provider who transmits health information in electronic form) and the individual disclosed information without authorization.  Title 42, United States Code, Section 1320d-6(b)(3) provides heightened penalties if such disclosure is committed with intent to sell, transfer, or use the individually identifiable health information for commercial advantage, personal gain, or malicious harm.

10.   On the other hand, Title 45, Code of Federal Regulations, Section 164.512 permits the disclosure of personal health information in certain circumstances including disclosures provided to law enforcement agents conducting a health oversight investigation; in the course of a judicial or administrative proceedings; pursuant to a court order, subpoena or summons, or grand jury subpoena.

4

## FACTUAL BASIS PROBABLE CAUSE

11. On April 11, 2012, Robertson forwarded me and other agents the following email he received from "R.S. CRITERDEN" which used the email address officeaccess66@gmail.com:

> "From: "R.S. Criterden" <officeaccess66@gmail.com>
> Date: April 11, 2012 12:19:14 PM PDT
> To: Alexander Robertson <arobertson@arobertsonlaw.com>
> Subject: INFORMATION YOU WOULD LIKE TO HAVE re 1800 get thin
>
> Mr. Robertson,
>
> While Dyanne Dueull and Karla Osario have provided you with verbal information (much of it being purely conjecture I assure you), I have substantial written proof that will assure you will win every aspect of ALL of your cases. From original medical records on your death clients that are all-telling (and untouched), to administratrive[1] records that are also in original form which are different than what you have or ever will receive regarding the company. The amount of documents is voluminous, and all of your subpoenas and discovery requests will never produce what I have should you be willing to invest in obtaining my cache.
>
> I would be willing to consider no less than between $50,000 to $75,000, a small comparison to what you will pay your experts to try and prove up what where these documents prover themselves.
>
> You can email me only through this email which has been set up specifically to communicate with you only. You won't be given another opportunity to access these documents as I am the only person who ever had access prior to the documents being changed and/or destroyed.

---

[1] Email and text messages are included in this affidavit in their original form. Spelling or grammatical errors have not been corrected.

5

I will remain anonymous throughout, and require absolute discretion or I will witrhdraw from communications witrh you.

gt

12.   After receiving the email, FDA SA Keith Hadley and I, asked Robertson not to respond to this email.  SA Hadley later informed me he arranged for Robertson to meet a Special Agent from the Federal Bureau of Investigation ("FBI") and sign a consent agreement to allow the FBI to set up an email account using Robertson's identity in order for the FBI to communicate with "R.S. CRITERDEN."

13.   On June 5, 2012, FBI SA Nancy Kevany told me that on April 14, 2012, FBI SA Timothy Alon set up an undercover email account in order for the FBI to communicate with R.S. CRITERDEN.

14.   On June 4, 2012, SA Kevany provided me the following email which was sent by the FBI on April 15, 2012 using the undercover account:

Sun, Apr 15, 2012 at 1:58 PM
R.S. Alexander <arobertson0414@gmail.com>
To: officeaccess66@gmail.com
I received the email you sent to my office account and think it is better if we communicate through this address instead. Indeed, I plan to send you an email from my office address stating that I am not interested in your proposal. In fact, I am interested but, like you, want to assure absolute discretion. Your email confirms my fears that my clients and I are not receiving appropriate responses to our discovery requests and that documents we have subpoenaed have been changed and/or destroyed. However, as I am sure you will appreciate, I have no way of knowing if you have original records in their original form, as you claim, or if you are merely trying to obtain money or are

6

actually working for the Omidis. Please let me know how you expect to proceed and specifically how I can be assured of your bona fides before we discuss an investment in obtaining your cache.

15.  On April 19, 2012, I along with FBI SA Kevany and Assistant United States Attorneys Consuelo Woodhead and David Kirman interviewed BURROWS at the office of her attorney, DARRELL Erwin, at 750 B. Street, Suite XXXX, San Diego, CA. BURROWS met with the government pursuant to a standard proffer agreement and with an assurance that the production of medical records to federal authorities conducting a health oversight investigation would not violate HIPAA. Erwin provided me with his business card, which depicted his email address as erwinlaw2@hotmail.com. The following are some of the facts I learned from BURROWS during the interview:

a.   BURROWS is a licensed vocational nurse and was a former employee of the OMIDIS. BURROWS sent her notice to terminate her employment on April 9, 2012. She has not received her paychecks that were due to her on April 1st and April 15th, 2012.

b.   BURROWS started working for "1-800-GET-THIN" in November 2008. Her employment involved both providing nursing services and performing quality assurance functions, including reviews of "sentinel events" like emergencies that required the transfer of a patient to a hospital.

7

c.    In January 2012, BURROWS began feeling uncomfortable in her job; she did not want to be at work anymore. BURROWS had heard about insurance fraud through allegations in a lawsuit. Because of the stress that BURROWS was experiencing as a result of the lawsuit, she took a leave of absence and later quit.

d.    BURROWS mostly reported to the OMIDIS. The OMIDIS controlled everything at TOP SURGEONS. A company organizational chart created in 2010 showed DR. JULIAN OMIDI at the top of the chart listed as the Chief Executive Officer for the BEVERLY HILLS SURGERY CENTER.

e.    BURROWS provided copies of medical records and other documents obtained during her employment. Those documents included numerous documents and medical records relating to the deaths of a few patients at TOP SURGEONS including Paula Rojeski and Laura Faitro. BURROWS stated that the records may establish that certain documents the Omidis were providing had been manipulated. BURROWS also provided numerous other documents and emails not relating to the deaths but relating more generally to 1-800-GET-THIN and the OMIDIS.[2]

_____

[2] At BURROW's interview, Erwin expressed concern regarding disclosure of medical records to the government. The AUSAs present at the meeting told Erwin and BURROWS that production of medical records to law enforcement as part of a health-oversight investigation was protected under HIPAA, 42 U.S.C. § 1320-6 et

8

16.   Based on my conversations with Robertson and detectives from the Los Angeles Police Department, I believe that the documents provided by BURROWS during the interview are relevant to pending civil cases as well as a criminal homicide investigation by the LAPD.

17.   During the April 19. 2012 interview, Erwin stated that he created email account officeaccess66@gmail so that BURROWS and Erwin could communicate with one another.

18.   On June 4, 2012, SA Kevany provided me the following email which was received on the FBI's undercover account on April 26, 2012:

> Thu, Apr 26, 2012 at 2:22 PM
> R.S. Criterden <officeaccess66@gmail.com>
> To: "R.S. Alexander" <arobertsoh0414@gmail.com>
> Thank you for your reply. I was not able to respond until now for various reasons which I cannot discuss. But I can state that now is a more appropriate time to discuss these matters as opposed to previously.
>
> To briefly address your main concern, I do NOT work for the Omidis in any capacity whatsoever. I do NOT communicate with the Omidis nor witrh any person or entity associated with them, nor would I at any time offer them assistance, whether directly or indirectly. To the contrary, I would like to see them answer for some of their poor decisions whether criminally, through the civil system or both. I do not have these documents in violation of an attorney-client relationship nor have they been gotten through such a relationship and violation thereof. I believe you that you will realize this once I confirm through sharing of certain information that will validate that I have information that you too have received. I also have indisputable information that would tend to impeach or give rise to a viable.

seq. because it was related to a health oversight investigation and later sent Erwin a letter memorializing this statement.

9.

defense(s) as to your client's factual allegations and/or
asserted causes of actions.N OTE: This information is
specific to a certaina individual client of yours and NOT
to all of your clients collectively.

Therefore, I would propose that to make matters simple, we
speak on the phone and compare what you have received
versus what I know to be an unaltered original. I can
assure you that if either is altered, it would be your
documents as the documents that I have would not have
reached any altering hands. I can read excerpts from the
same records that you have so that you know I am not simply
on a fishing expedition to ascertain what you have
received. Stated differently, I likely have everything that
you have in your possession, and likely much more than than
you on other very relevant issues.

Additionally, since my last email, I have located
additional documents which I am certrain you would not, nor
could not, ordinarilly obtain through traditional discovery
channels. For example, incident reports (All), transfer
reports (AII),hand-written memoranda of Omidi-attended
meetings following your client(s) deaths. The hand-written
memoranda could be identifying, thus I am not certain it
could be transferred to you unless there was an association
of Counsel for a prearranged and legally authorized fee
sharing agreement with an appropriate attorney of my
choosing. This is not to imply that this is a contingent
demand, but an alternate avenue of discussion. I have
extensive emails and policy information which you would not
likely receive. I have "story scriprts" (directly related
to your case(s) which you could never obrtain even through
the most clever legal manuvering.

If you would like to speak on the phone, please let me know
some appropriate dates and times that you are available, or
alternatively, supply me with your cellular number and I
will call you after I receive it in your email.

Additionally, you might consider that my information may be
beneficial in obtaining a pre-judgement writ of attachment
so that you secure assets now with the information that you
may receive if we can come to an agreement. Quite
obviously, it could also be beneficial in forcing the
Omidis to the table in exchange for confidentiality and
funding based on the information. To this end, I would
insist that our communhications remain OUT OF THE PRESS and

10

strictly confiderntial at this juncture, or I will not
transfer any information to you. Therefore, please make
certain that information that I convey to you by any means,
including my emails, do NOT show up in a Los Angeles Times
news article.

In closing, I am not a good samaritan with an overwhelming
desire to help you and your clients. They are not the only
ones who have been harmed or suffered.

Best regards!

16.   On June 4, 2012, SA Kevany provided me the following

email which was received on the FBI's undercover account on

April 26, 2012:

Thu, Apr 26, 2012 at 5:21 PM
R.S. Criterden <officeaccess66@gmail.com>
To: "R.S. Alexander" <arobertson0414@gmail.com>
Mr. Robertson,
A couple last thoughts of importance:

1. I have what I will phrase as "The Nuclear Bomb" in my
possession. It WILL bring the Omidis to their knees in
settlement discussions. It exists nowhere but with them, if
it even exists in writing at his juncture;

2. This "bomb", coupled with the other original documents
in my possesion, will assure that all of your cases
settle, including the class actrion;

3. The class-action should be approved for settlement if
there is a proper extraction frrom the Omidis. Any opt-outs
can be dealt with considering you and me both know who has
really suffered death or injury, and who has not;

4. The obvious advantage to those lunartics in settling
would be that any not future "press" would only be based on
conjecture, or at least, stemming from you or some other
Plaintiff or attrorney suing them. They can feel that their
reputation is potentially salvageable thereafter, and can
go on to make their press release statements thatdo not
violate the terms and conditions of the settlement;

11

5. The Omidis should foresee the value of paying whatever is within reason considering the much larger benefit they will derive through focusing only on defending any potential criminal action against them. Because they CAN afford to pay a large settlement at this juncture (no seizure orders presently), they will be free from you or any other attorney or potential Plaintiff from coming back later and distracting their attention from a potential criminal action;

5. A confidenrtial settlement assures the Omidis, through a Liquidated Damages Clause, can put the civil actions to rest;

6. The Omidis can be assured that the other shoe will never drop as all documents can be transferred and/or destroyed after payment has cleared. Should they refuse settlement in the face of it, they would be sealing theirfate, and they know it. (They will be shocked that anyone knows such information even exists seperate and apart from them. (I assure you will be amazed I have such a document in my possession should we come to a "meeting of the minds" in these matters.

Finally, time is of the essence in this situation, and there is plenty of information to bring the Omidis to the table NOW. I believe that should you choose to take a "wait and see approach", I promise you will be fighting a fight that you may never see a dime for in the long-run. I also believe that you are in the best position presently to use my information to OUR advantage, since your cases would be an impediment to me in realizing the potential value of the information that I have. While they would pay for sure NOT to have my information fall into your hands, they would still be forced to focus on the bad press that stems from your ongoing legal cases against them.

Bst Regards

19. On June 4, 2012, SA Kevany forwarded me the following email which was received at the undercover FBI account on May 3, 2012:

12

Date: May 3, 2012 5:31:32 PM PDT
From: "R.S. Criterden" <officeaccess66@gmail.com>
To: "R.S. Alexander" <arobertson0414@gmail.com>,
<arobertson@arobertsonlaw.com>
Subject: Omidis
Mr. Robertson,
In follow-up to my previous 4 emails to you, could you
kindly contact me so that we may discuss the matter?
Moreover, I want to confirm you received the document
that I provided to you recently.
Thank you.
Best regards,
GT

20.   On May 3, 2012, Robertson forwarded another email to
SA Hadley and me.   That email was from R.S. Criterden using the
email officeaccess66@gmail.com to Robertson at his work email
address, not to the undercover email address.   That email was
titled "R.S. Criterden wants to chat" and contained a link for
chatting.

21.   On June 4, 2012, SA Kevany forwarded me the following
email which was sent from the undercover FBI account:

Sat, May 5, 2012 at 8:40 PM
R.S. Alexander <arobertson0414@gmail.com>
To: "R.S. Criterden" <officeaccess66@gmail.com>
I would like to set up a time that we can chat. Are you
available in the afternoon next week?

I will only contact you through this e-mail account. Please
stop sending anymore e-mails to the other account.

22.   On June 6, 2012, SA Kevany forwarded me the following
email which was received on the undercover FBI account on May 7,
2012:

                    13

Mon, May 7, 2012 at 7:14 PM
R.S. Criterden <officeaccess66@gmail.conn>
To: "R.S. Alexander" <arobertson0414@gmail.com>
Mr. Alexander,
I only sent to your office since I believed you were not
able to access your gmail for whatever reason. I am
available most afternoons after 4:00. I will log on Tuesday
thru Friday of this week at 4:00 and will be available to
chat. If that doesn't wok, I will be available Friday at
6:00 p.m.to chat. Iikewise I will be available to email vs.
Chat on the same days and times.
Best regards< GT

23. On June 6, 2012, SA Kevany provided me with the

following email which was received on the undercover FBI

account:

Tue, May 8, 2012 at 5:32 PM
R.S. Criterden <officeaccess66@gmail.com>
To: arobertson0414@gmail.com
These messages were sent while you were offline.
5:32 PM R.S.: Mr. Alexander,
I am uncertain whether you received the document that i
attached last week. if not, i will be happy to resend it.
5:33 PM Thank you,

24. On May 10, 2012, Robertson informed SA Hadley and me

about a phone call he received on this same date. Robertson

told us the following:

.a.   On May 10, 2012 he received a telephone call from

R.S. CRITERDEN at Robertson's office phone number (805-418-XXX)

at approximately 12:00 p.m.  The caller ID displayed "private

caller".

b.   The male caller identified himself as "R.S.

CRITERDEN" and said he was the person who had been sending

Robertson the emails about evidence against the OMIDIS.  The

14

caller said he was calling from a cell phone and that R.S. CRITERDEN was not his real name. He said he "didn't want to mess around" with emails anymore and that is why he called Robertson directly.

      c. The caller said he "represents a client" who had access to "original" patient records that were not produced to Robertson by the OMIDIS in Robertson's civil cases and that these records had been altered and Robertson would never get the original, unaltered patient records for his clients unless he received them from the caller's client.

      d. Robertson asked R.S. CRITERDEN if he was an attorney and he stated to Robertson that he was an attorney who represented a client who used to work for the OMIDIS.

      e. The caller again claimed that the OMIDIS has "sanitized" patient records in Robertson's "death cases". The caller also said that his client had a document describing the OMIDIS' fraud scheme depicting how "money came in and went out." The caller claimed that the OMIDIS paid someone $2.7 million to set up this fraudulent scheme of different companies. He also said that "nobody was closer to the OMIDIS than his client" and that "if the Feds were to get this document in their hands they would arrest the OMIDIS immediately."

      f. The caller also said that if Robertson had this document the OMIDIS would have "no choice" but to settle all of

15

his civil cases and pay Robertson a lot of money so they didn't go to jail.

    g. Robertson asked the caller if his client was a doctor or an attorney and he said "yes." Robertson asked the caller if his client would be willing to testify in court and he said "yes."

    h. The caller said that the OMIDIS had "ruined my client's career" and that his client wanted between $50,000 and $75,000 in exchange for giving Robertson these documents described above.

    i. The caller confirmed that his client was not willing to turn over these documents unless his client was paid for this information.

    j. The caller said he lived "far away" from L.A. and could possibly meet in Orange County at a court reporting firm so that Robertson could review his client's documents to determine their value to his civil cases.

    k. Robertson asked the caller for a phone number that he could use to call him back and the caller said he uses "many different cell phones" in his business and that he would call Robertson back with a cell phone number to use.

    l. During Robertson's conversation with the caller, Robertson advised me that the caller sounded very nervous and did not want to tell Robertson his identity. The caller said he

16

wanted to stay anonymous. Robertson said he never received another phone call back from the caller.

25. On May 31, 2012, Robertson informed SA Hadley and me about a telephone call (unrecorded) he received at approximately 3:00 PM on his cell phone (805) 558-XXXX from phone number (310) 728-XXXX. Robertson reported the following to me:

a. A female caller identified herself as BURROWS and said she obtained Robertson's cell phone number from Dr. Steven Mandel, a client of Robertson's in an identity theft lawsuit Robertson has filed against the OMIDIS.

b. BURROWS said that she was "no longer represented by an attorney" but had original patient files for clients Robertson was representing in civil lawsuits against the OMIDIS, as well as a document that outlined the OMIDIS' fraud scheme using fake companies.

c. Robertson asked BURROWS if she knew "R.S. CRITERDEN" and she told Robertson that this person was actually Erwin, an attorney in San Diego who had been previously representing her. She told Robertson that Erwin was the person who had sent him the emails using the pseudonym "R.S. CRITERDEN." Robertson asked BURROWS if Erwin was still representing her and she said "no;"

d. BURROWS said she was desperate, that the OMIDIS had ruined her life and that she had lost her home, her car, and

17

couldn't find another job because she was tainted in the medical profession because she previously worked for the OMIDIS. Robertson asked her what she wanted from him and she said that she wanted money as fast as possible for the documents she had copied from the OMIDIS.

      e.  Robertson asked BURROWS if she was looking for legal representation to sue the OMIDIS and BURROWS said, "Definitely not." BURROWS wanted $250,000 for her documents or she would go to the OMIDIS and force them to pay her off.

      f.  BURROWS indicated that she was going to sell her documents to the highest bidder. BURROWS asked Robertson if he received an email from Erwin and Robertson said, "no." Burrows said she would forward Erwin's email to him from her cell phone, which she did after they hung up.

      g.  Robertson forwarded the below email to SA Hadley and me on this same date. The subject content of the email is copied below in its entirety:

```
"---------- Forwarded message ----------
From: Darrell Erwin <erwinlaw3@gmail.com>
Date: Tue, 29 May 2012 06:01:47 -0700
Subject: Fwd: R.S. CRITENDEN / OMIDI INFORMATIOON
To: Diamond Rains <clientaccess77@gmail.com>

---------- Forwarded message ----------
From: Darrell Erwin <erwinlaw3@gmail.com>
Date: Tue, May 29, 2012 at 5:50 AM
Subject: R.S. CRITENDEN / OMIDI INFORMATIOON
To: arobertson0414@gmail.com
```

Mr. Robertson,

I can now tell you freely that I represent Ms. Tiffiny Burrows. Ms. Burrows worked for the Omidis for approximately 4 years, and as we recently discussed, she does have many relevant documents regarding important issues of wrongdoing that you allege in your complaints. In fact, one of your clients recently contacted Ms. Burrows and strongly encouraged her to provide you with any documents that she might have obtained during her employment with the Omidis. He seemed genuinely excited stating he understands since there was "much money hopefully coming his way...", and "it was the right thing to do for the sake of medicine..." While I was present when Ms. Burrows took the call, I added nothing to steer the conversation one way or another, and remained silent during the short conversation. In fact it was that conversation between our clients that helped me convince Ms. Burrows that remaining autonomous would only lead to more information requests which she will not share information in her position freely nor voluntarily.

If you are  are NOT interested in purchasing the information at a fair price that is negotiable, our next step would be to place the information back into the hands of the Omidis for  a similar price as would be offered to you. In consideration for the purchase anticipated by the Omidis, they gain not only the very important documents into their possession, but also the confidence that comes with knowing they are in the best position to control all information relevant to them in the civil cases against them. I believe this reasoning would also hold true in motivating them to resolve your cases at a fair price once they know you have the important documentation they no doubt would never provide you even if it does still exist in some shape or form. The Omidis would certainly be in a better position to fight the anticipated criminal charges against them with all other legal issues dismissed.

I will be in Beverly Hills this coming wednesday and thursday and in San Diego this Friday where I begin a 3-week trial on this coming Monday, June 2, 2012. If my schedule lends itself to a for a face-to-face

19

meeting with you in San Diego or L.A., please let me
know as soon as possible. Although I was hoping for an
earlier meeting with you, unfortunately my schedule
coupled with other factors prevented it. I apologize
if this caused you any inconvenience.

My cellular number is 619-993-XXXX, or you can reach
me at my office at 619-222-XXXX.

Thank you in advance.

Darrell N. Erwin, Esq.

Erwin & ASSOCIATES, A.P.L.C
750 "B" STREET, 33rd Floor
San Diego, CA 92101"[3]

26.   On May 31, 2012, SA Hadley and I contacted Robertson
and asked him to call BURROWS back on a consensually recorded
phone call. I monitored the call and reviewed the recording and
learned the following:

a.   BURROWS stated she was not represented by an
attorney and was not willing to retain Robertson as an attorney.

b.   BURROWS advised Robertson she was representing
herself.

c.   BURROWS advised Robertson she has no home, no
car, and that she has nowhere to go. BURROWS said she does not
have anything anymore.

d.   BURROWS stated, "All I have is documents that are
probably worth a lot of money to your case and that can help

---

[3]   This email was also received on the undercover FBI account.
SA Kevany forwarded it to me on June 4, 2012.

20

you, and if you can help me I can help you, but I don't want to get screwed in the long run."

      e. BURROWS stated, "I officially did not work there in April , huh April 9, that's my official like letter that said excuse me, but while you continue to have these legal issues, I cannot work under these conditions."

      f. BURROWS stated, "I've got the original charts for Rojeski, I've got the original all code paperwork untouched. The reason why I have all the originals because you're probably wondering that is because I did quality assurance and so therefore before anything was messed with, I immediately obtained the charts. It is copies of original documentation. I have notes of mine as a nurse that were taken and removed from charts um um against without me knowing until I later was working on quality assurance and went to pull the chart and have the peer reviews done and the doctors are telling me where are the rest of the notes and I said well it's in there because I wrote them myself and they have been removed."

      g. BURROWS stated, "Are you going to subpoena my information and not pay me off?" "I am the only one with these documents, I can guarantee you that."

      h. BURROWS stated that she came across a document that has the OMIDIS corporate structure which shows the transfer

21

of money from place to place, which transfers are hidden, and which transfers are not hidden.

      i.    BURROWS stated that she knows the OMIDIS paid a "pretty corrupt law firm to create that for them or they paid them to obtain it or something, they paid 2.7 million dollars to get this because that's how they made 100's of millions of dollars."

      j.    BURROWS said, "The FBI was interested in all of my stuff, but they don't have all of it because I didn't have all of it when I met with them." BURROWS stated, "I didn't have anything to hide from them, I just wanted to make sure that I wasn't prosecuted for having knowledge of these wrong doings and not saying anything."

      k.    BURROWS said that she has a list of the indictments that the "feds" want to press on the OMIDIS; she said she wrote them all down. Burrows said she knows everything that's going to happen. BURROWS stated, "Can you get me a home, can you get me a quarter a million for all my shit and I'll turn it over to you and I'll go to court and I will say yes that is the paperwork." "I would like you to succeed, I would like me to succeed and I would like the feds to succeed." BURROWS stated, "I want to get paid off."

      l.    BURROWS requested a quarter of a million dollars from Robertson. BURROWS offered Robertson part of her documents

22

since Robertson said he doesn't have a quarter of a million dollars.

m.    BURROWS stated, "I'm not giving you all of it for any less than that because it's worth way more than that and if you want to make a deal like then maybe I can get part of the settlement in the end, I don't know." BURROWS advised Robertson that she has documents that she did not give to the "feds": money transfers, some of the charts BURROWS found after her interview on April 19, 2012, and quality assurance meeting minutes. Burrows also advised that the "feds" don't have all of the Laura Faitro "stuff" because BURROWS' mother found more of it in BURROWS' house while BURROWS' mother was staying with BURROWS. BURROWS said, "They [meaning the feds] don't really care what happens to the OMIDIS anymore. Finagle however much money you want out of them. They gave my attorney permission at the time to go ahead and do whatever it is we want to do, they weren't going to intervene."

n.    Robertson asked BURROWS about a fraud document she had previously talked about and BURROWS stated, "its one piece of paper worth a lot of money." Burrows advised Robertson that she does know what country the OMIDIS money is in. Burrows advised she has people feeding her information and that the OMIDIS don't know.

23

o.   Robertson asked BURROWS if R.S. CRITENDEN was "still in the picture." Burrows told Robertson that she read every email that Robertson received before he received it except for the last email at approximately 5:30 a.m. (May 29, 2012 at 5:50 a.m.). BURROWS said that email was sent to Robertson before she had a chance to read it and ended up screaming and yelling at R.S. CRITENDEN because she felt he wasn't doing her any justice. BURROWS stated, "yeah, it's not a hoax" [meaning the email dated Tue, May 29, 2012 at 5:50 a.m.].

p.   BURROWS stated, "I was ready this morning before I called you to go face to face with the OMIDIS and freaking extort the shit out of them, I don't know what else to say." BURROWS advised Robertson that she is desperate and that she does not want to lose and all she wants is to move on with her life with her kids. BURROWS quoted "$100,000, $300,000" something to where she can live, get a place, have her kids back with her, and find work comfortably.

q.   BURROWS stated, "I'm trying to help you and I hope that you will try and help me." BURROWS stated, "I was ready to break the law in many different ways this morning by committing extortion against the OMIDIS, so I really don't care about that."

r.   BURROWS advised Robertson that Erwin, also known as R.S. CRITENDEN, is no longer in the picture. BURROWS asked

24

Robertson to not contact Erwin and that she discontinued her legal relationship with him.

s.   BURROWS told Robertson she wants to meet away from Beverly Hills where the OMIDIS live. Robertson suggested meeting in a public place in Westwood next Wednesday or Thursday (June 6th or 7th, 2012).

t.   BURROWS advised she has to get her documents from where they are or from her former attorney's office in downtown San Diego. Robertson advised BURROWS that she should be able to get them back from Erwin. BURROWS related that Erwin had sent her an email telling her she can pick up the documents anytime.

u.   BURROWS stated, "Give me a ball park on what you can afford in cash or if you can give me something in cash and then tie me to the winnings in the end." BURROWS stated, "I'm desperate, do you think I really want to do this, no, I just want to move on with my life. I would like to give them to you, have you succeed, and me to take the money and move on with my life." BURROWS advised Robertson she can authenticate the paperwork in court. Robertson commented to BURROWS, "But you got stuff that the feds don't have." BURROWS responded, "Yeah." BURROWS advised Robertson that's she has this other "big file" that she came up with after she saw the "feds" that the "feds" don't have. BURROWS stated, "I'm ready to ya know fry these guys because they fried me." BURROWS told Robertson she has

25

files in her personal computer that the "feds" don't know about and she didn't want the "feds" to take her personal computer; she said she was being a "little selfish."

      v.   BURROWS advised she gave "5 to 6 inches" worth of paperwork that went to the "feds" and "5 to 6 inches" of paper work that didn't go to the "feds." BURROWS said, "It's a lot."

    27.  On May 31, 2012, Robertson also forwarded me a text message provided by "Tiffiny" which stated: "Please do not tell anyone associated with the omidis that I have spoken to u. I am living in fear from them and I have children to support."

    28.  On June 4, 2012, I reviewed a recorded consensual call was between Robertson and BURROWS which occurred that same day. On that call, I heard the following:

      a.   Robertson asked BURROWS if she had a chance to get her documents. BURROWS responded, "I'm getting them as we speak actually." BURROWS advised Robertson she was not in the LA area and had a job interview on Tuesday (June 5th, 2012). BURROWS advised Robertson that Wednesday or Thursday (June 7th, 2012) would be good and Robertson advised that Wednesday was not good with him because he has a court hearing.

      b.   Robertson told BURROWS he is available Thursday or Friday (June 8th, 2012) and asked her if one worked better than the other.

26

c.   BURROWS responded that Thursday was better.

BURROWS advised Robertson she was without a car and Robertson

offered to arrange a taxi cab to pick her up where they can meet

at a coffee shop.   BURROWS advised Robertson she would need a

taxi ride from her friend's house in LA.   Robertson asked

BURROWS for the address.   BURROWS advised Robertson she did not

have the address and would have to ask her friend.

d.   Robertson asked BURROWS, "And then the documents

just want to confirm you're going to bring everything you got,

right?   Cause I'd like to see what you got."   BURROWS told

Robertson "I'm going to bring everything I got."

e.   Robertson asked BURROWS if she was able to get

back everything from Erwin.   BURROWS responded, "yeah."   BURROWS

advised Robertson that it was a little bit of a struggle and

that she's trying to cut ties gently and be nice about it and

said, "You know you lawyers are not very, you're pretty strong

headed."

f.   BURROWS advised Robertson she was picking the

documents up tomorrow at noon (June 5th, 2012) and that she will

text Robertson in the afternoon to let him know "everything's

good to go."   BURROWS advised Robertson she would like to meet

in Westwood or by UCLA.

30.   On June 6, 2012, SA Hadley informed me that on June 5,

2012 at approximately 3:00 P.M., Robertson notified SA Hadley,

27

via telephone, that BURROWS had contacted Robertson on his mobile phone earlier in the day. BURROWS stated to Robertson that she had attempted to retrieve all of the business documents and medical charts from Erwin's law practice which is located in San Diego, CA. BURROWS initially spoke with Erwin's paralegal that had provided BURROWS with some of the documents; BURROWS knew immediately the documents the paralegal provided to her were incomplete and did not include medical patient charts. BURROWS told Robertson that several days prior to this incident, BURROWS was at Erwin's residence and together they were reviewing all of the records, to include the medical charts. BURROWS knew from reviewing the records and medical files several days prior, that the records Erwin's paralegal provided to BURROWS were incomplete; BURROWS became angry and demanded to speak with Erwin. Later in the day, BURROWS texts Robertson to confirm that she has all of the files to include the Medical records.

    31. On June 5 and 6, 2012, Robertson forwarded me a series of text messages between BURROWS and Robertson:

> [Robertson]
> Tiffany
> Did u get your documents?
> Alex

> [Robertson]
> Tiffany
> After thinking about our call, do u have any patient
> records? If so I am still interested in buying those from

28

u and meeting Thursday. What docs did u get from ypur lawyer?

My week next week is jammed and we can always do a second meeting later to buy the rest of your docs when u get them back

[BURROWS]
I didn't get any patient records back! I am extremely upset. I am trying now. Will let u know asap
He kept everything he knew was important from me

[Robertson]
Asshole

[BURROWS]
Yeah! No kidding. I have been taken advantage of once again and I am not giving up. I don't have anything left and have to make this happen

[Robertson]
Yeah I hope u can. I'll hold Thursday to meet for now hoping you get everything. I've pulled a ton of cash out of the bank and don't like carrying it around not knowing if this is going to happen!

[BURROWS]
I just got a call that they were found and I can pick them up. I am going now. I hope that its true

[Robertson]
Me too

[BURROWS]
Sorry for late txt. I just got all my docs to my knowledge. I am going to go though them tonight. Everything actually went ok once I spoke to him. However I Really prefer to keep our meeting under discretion. Will touch basis with u 2mrw. Thank u

[Robertson]
Ok great. Please text me the address where u want the taxi to pick u up in BH on Thursday and I'll find a coffee shop near UCLA to meet.

[BURROWS]
Hi Alex, this is the address I will be staying at 2mrw.
xxxxxxxx, inglewood ca 90302. What time were u thinking
on meeting?
Tiffany

[Robertson]
How about I have a taxi pick you up at 1:30? Is there an
apt or suite number i need to give the taxi company?
I found a public park on the border of BH which is open
and a public place.but where we won't be overhead like in
a coffee shop. Please confirm u will be bringing all of
the patient records and the smoking gun doc you
described. Looking forward to meeting you.
Alex

[BURROWS]
130 sounds good. The park does sound better. I will go to
front of apt when the driver arrives. U can give them my
number for pick up thank u.

[Robertson]
Ok great. Just making sure you are bringing all of your
docs?

[BURROWS]
I will be bringing all my docs with me. Please be real
and honest with me. Look forward to meeting u as well.

[Robertson]
Will do. See you tomorrow. Btw do you know what I look
like? How will I recognize you? Can u send me a photo?

[BURROWS]
Lol. I saw u on TV...20/20 not to long ago. I will send u
a photo.

[Robertson]
Tx sorry just thought of that

[BURROWS]
Really prefer to keep our meeting under discretion. Will
touch basis with u.2mrw. Thank u

30

32.  On June 7, 2012, Robertson forwarded me a series of text messages between BURROWS and Robertson:

> **[BURROWS]**
> What park r we going to meet at and can we meet a little earlier?  I have borrow my friends car Tiff

> **[Robertson]**
> I picked Cheviot Hills Recreation Center at XXXX Motor Ave, L.A.  There are a bunch of picnic benches.  What kind of car will you be driving so I can look for u?  I will be tied up with client meetings all morning so I can't meet before 2:00 p.m.  If I can I will try and be there a few minutes early.

> **[BURROWS]**
> Ok.  I'm in a black nissan altima

33.  On June 7, 2012, Special Agent Laura Wilbur and other law enforcement agents conducted surveillance of BURROWS at the apartment she was staying at in Inglewood.  SA Wilbur reported that BURROWS left the apartment and drove to a CVS Drugstore and took a stack of documents inside.  BURROWS was inside for approximately 10 minutes.  When BURROWS returned, it appeared as if the stack of documents got thicker.  BURROWS returned to the residence for approximately 15 minutes and then returned to her car and drove to the designated meeting location at the Cheviot Hills Recreation Center.

34.  Prior to the meeting, SA Hadley told me he gave $75,000 of the FDA's money to Robertson to complete the transaction.

31

35.   On June 7, 2012, I observed BURROWS arrive at the Cheviot Hills Recreation Center Picnic Area. BURROWS exited her car and approached Robertson carrying a box. BURROWS met with Robertson.

36.   SA Hadley told me he observed the following:

    a.   Robertson and BURROWS appeared to discuss documents.

    b.   BURROWS delivered the box of documents to Robertson

    c.   Robertson gave BURROWS the satchel with the $75,000.

    d.   BURROWS and Robertson shook hands.

    e.   ROBERTSON walked away while BURROWS gathered her stuff at the picnic table.

37.   At the meeting, at my direction, Robertson provided BURROWS $75,000 once she delivered patient records to him. Once I confirmed that the documents contained medical records, BURROWS was arrested and taken into custody.

38.   During the meeting, SA Hadley told me he called Robertson to confirm that BURROWS was selling medical records. Robertson confirmed that BURROWS was selling medical records.

39.   After the meeting ended and I learned BURROWS had sold patient records, I observed SA Hadley and another agent approach

32

and arrest BURROWS's. I then approached and read BURROWS her Miranda rights which she waived orally and in writing.

40. I observed agents from the FDA retrieve the $75,000 from BURROWS.

41. CAL DOJ SA Laura Wilbur then interviewed BURROWS. In summary, BURROWS stated the following:

a. BURROWS and Erwin came up with a plan to sell the medical records and other documents because BURROWS needs money.

b. Erwin's wife set up the gmail account which Erwin subsequently used to set up the email to Robertson.

c. The verbal agreement was that Erwin would keep 1/3 of the proceeds of the documents and BURROWS would keep 2/3 of the proceeds of the sale of the documents.

d. BURROWS told Erwin that she was going to sell the documents on her own.

e. Erwin responded on June 5, 2012 by giving BURROWS a bill for his legal services .

f. BURROWS figured it was ok to sell the medical records and other documents because Erwin, being an attorney, told her it was ok even though he told BURROWS it was borderline extortion.

42. Following the arrest, I reviewed a recording of the meeting between BURROWS and Robertson. Among other things, I heard from BURROWS:

33

       a.    State that she only brought half of the documents and that she and Robertson could negotiate for the other half.

       b.    State she had various medical records and other documents relating to patients Paula Rojeski, Laura Faitro, Ana Renteria, and Tamra Walters, and at least one other patient.

       c.    Discuss her employment with the Omidis.

       d.    State she would testify if the price is right.

       e.    State documents did not go to the government because she did not have the documents at that time.

    43.    Based on the foregoing, I believe there is probable cause to believe that TIFFINY BURROWS disclosed individually identifiable health information to another person for personal gain in violation of 42 U.S.C. §§ 1320d-6(a)(3), 1320d-6(b)(3)(1) (Health Insurance Portability and Accountability Act).

                                /s/

                         SAMANTA KELLEY
                         Special Agent - FDA

Subscribed and sworn to before me
this ~8th~ day of June, 2012

THE HONORABLE ~STEPHEN J. HILLMAN~
UNITED STATED MAGISTRATE JUDGE

        VICTOR B. KENTON

EXHIBIT 3

Almont Joint Stipulation for Entry of a Protective Order

# State launches Lap-Band investigation

**By STUART PFEIFER, LOS ANGELES TIMES**

JANUARY 26, 2012, 6:22 PM

 he California Department of Insurance is investigating the business practices of Lap-Band surgery centers affiliated with the 1-800-GET-THIN advertising campaign, according to insurer Aetna Inc.

The insurance giant said in a statement that it was cooperating with the department's law enforcement branch, which has the power to make arrests and pursue criminal charges, to "investigate alleged fraud against our members by the 1-800-GET-THIN ... surgery centers."

The state probe joins local and federal agencies investigating the businesses behind the ads that have become a fixture of Southern California airwaves and roadside billboards. The U.S. Food and Drug Administration, Los Angeles County Board of Supervisors and Congress are examining alleged misleading advertising and risks of the weight-loss surgery.

Officials with 1-800-GET-THIN and affiliated surgery centers said they were unaware of the new investigation and had broken no laws.

"1-800-GET-THIN has never engaged in any type of insurance fraud and has not been contacted by the Department of Insurance," the marketing firm's president, Robert Silverman, said in an email.

Konrad Trope, an attorney who represents the surgery centers affiliated with the ad campaign, said in an email: "My clients' medical facilities have been repeatedly inspected and reviewed and no wrongdoing has ever been found."

At least five Southern California patients have died after Lap-Band procedures at clinics in Beverly Hills and West Hills that are affiliated with the 1-800-GET-THIN campaign, according to lawsuits, autopsy reports and other public records. Manufactured by Irvine-based Allergan Inc., the Lap-Band is a silicone ring that is surgically implanted around the stomach to discourage overeating.

Lap-Band surgeries typically cost $12,000 to $20,000, according to Allergan. However, a recent lawsuit said the surgery centers have inflated costs and billed insurers many times that amount. In one instance, the lawsuit said, a patient was charged $179,000.

The Los Angeles County coroner is investigating the Sept. 8 death of Orange County resident

Paula Rojeski, who died after Lap-Band surgery at a clinic affiliated with 1-800-GET-THIN. Ed
Winter, the county's assistant chief coroner, said he was aware of law enforcement interest in the
surgery centers.

"There's a couple entities looking at different aspects," Winter said. He would not identify the
agencies or what they were investigating.

David Althausen, a spokesman for the Department of Insurance, would not confirm or deny that
the agency was investigating the surgery centers.

Aetna declined to discuss the investigation beyond confirming that it was cooperating with
authorities.

"Since this is an ongoing investigation, there is no additional information that I can share,"
spokeswoman Anjie Coplin said in an email.

The Department of Insurance has a team of investigators that looks into alleged insurance fraud.
If the investigation finds criminal activity, the agency asks prosecutors to consider filing criminal
charges, Althausen said.

Wayne Gross, a former federal prosecutor who now defends white-collar cases for Greenberg
Traurig in Irvine, said the Department of Insurance has a team of investigators who work with
federal and state prosecutors to bring criminal charges.

Prosecutors, either with the county district attorney's office or U.S. attorney's office, ultimately
decide whether to file charges, said Gross, who as a federal prosecutor handled a fraud case that
was investigated by the Department of Insurance.

The latest investigation follows a stream of civil litigation against 1-800-GET-THIN.

The lawsuits say that brothers Michael and Julian Omidi operate the lucrative weight-loss business
out of offices in Beverly Hills.

Neither of the Omidis responded to a request for comment about the Department of Insurance
investigation.

Two former employees alleged in a Jan. 17 whistle-blower lawsuit that workers at the surgery
centers encouraged patients to have "medically unnecessary" surgeries and billed insurers for
procedures that were not performed.

Westlake Village attorney Alexander Robertson, who represents former surgery center workers
Dyanne Deuel and Karla Osorio in that lawsuit, declined to say whether his clients had met with

law enforcement officials.

"Our lawsuit does allege fraudulent billing practices," Robertson said. "We alleged that their actions violated the state insurance code."

The lawsuit also accused the surgery centers of operating in unsanitary conditions, using equipment that was not properly sterilized and covering up the circumstances behind Rojeski's death.

According to the lawsuit, medical staff forgot to turn on the oxygen before Rojeski's surgery and a tube that was supposed to fill her bloodstream with medication became dislodged during surgery, causing the solution to pool on the floor.

Also pending are a series of wrongful-death lawsuits that seek damages from 1-800-GET-THIN, the surgery centers and doctors involved in the surgeries.

One lawsuit faulted the work of an anesthesiologist named Daniel Shin, who was on probation with the state medical board at the time of the surgery because of a criminal conviction for assault with a deadly weapon.

In December, the FDA stepped into the matter, issuing a warning letter to 1-800-GET-THIN that accused the firm of failing to adequately disclose risks of the surgery. Meanwhile, three members of Congress are calling for hearings on the advertising campaign and the safety and effectiveness of the Lap-Band device.

Silverman, the 1-800-GET-THIN president, told the Los Angeles County Board of Supervisors that the company had modified its website to address the FDA's concerns. The website now includes a prominent disclosure that the surgery can result in death.

At that meeting, Silverman also said the company planned to address the FDA's concerns about the billboards. Many of the billboards remain unchanged.

Attorneys for 1-800-GET-THIN said in a court filing last year that the marketing firm had scheduled more than 10,000 Lap-Band surgeries in its first 15 months.

*stuart.pfeifer@latimes.com*

*Times staff writer W.J. Hennigan contributed to this report.*

Copyright © 2014, Los Angeles Times

---

Exhibit Page 57

EXHIBIT 4

Almont Joint Stipulation for Entry of a Protective Order

## Los Angeles Times | ARTICLE COLLECTIONS

←– Back to Original Article

# GET-THIN brothers in fraud inquiry

*Court filing reveals broad criminal inquiry involving state and federal agencies.*

October 23, 2012 | By Stuart Pfeifer, Los Angeles Times

The brothers behind the 1-800-GET-THIN ad campaign are the subjects of a criminal investigation involving several federal and state law enforcement agencies, according to a court filing.

The investigation is focused on numerous "potential violations of federal law, including conspiracy, healthcare fraud, wire fraud, mail fraud, tax violations, identity theft [and] money laundering," Samanta Kelley, a special agent for the Food and Drug Administration's criminal division, said in an affidavit filed at the federal courthouse in Los Angeles. She said the FBI was also involved.

Kelley's statement was the first public acknowledgment of a broad criminal probe of companies behind the 1-800-GET-THIN advertisements that once blanketed Southern California roadside billboards, television, radio and the Internet. Michael and Julian Omidi, brothers who are listed in numerous lawsuits as the owners of the weight-loss business, are also subjects of the investigation, Kelley said in the filing.

One worker at a clinic affiliated with 1-800-GET-THIN has already been arrested.

Federal agents arrested Tiffny Burrows, a licensed vocational nurse, after she tried to sell medical records about two patients who died after Lap-Band surgeries to an attorney who has filed several lawsuits against 1-800-GET-THIN, Kelley said in an affidavit filed in Burrows' case.

The attorney, Alexander Robertson, reported the nurse's offer to federal law enforcement officials. They gave him cash and ran an undercover operation that led to the woman's arrest, according to the affidavit.

With undercover agents watching, Robertson carried $75,000 in cash to a park in West Los Angeles on June 7 and met with the nurse, who arrived carrying a box of documents. The nurse gave the documents to Robertson, who handed her a satchel stuffed with cash, according to the affidavit.

Agents then moved in and arrested the nurse. Burrows has pleaded not guilty. She is scheduled to stand trial Nov. 27 at the federal courthouse in Los Angeles.

Burrows' attorney, Richard Goldman of the federal public defender's office in Los Angeles, did not respond to a request for comment. FBI spokeswoman Laura Eimiller and FDA spokeswoman Morgan Liscinsky declined to comment, citing the ongoing investigation.

John Hueston, an attorney who represents the Omidis, said he was confident that no criminal charges would be brought against his clients. He noted that Kelley's affidavit said that Burrows had considered using the documents to extort money from the Omidis, but instead decided to try to sell them to Robertson.

"The Omidi family has been the victim of an extortionist," Hueston said Monday in an email. "We are confident that an investigation once very broad due to profiteering so-called whistleblowers such as Ms. Burrows will end without any action against the Omidis."

Dan Chambers, an attorney for the surgery centers affiliated with 1-800-GET-THIN, said in an email that he was "outraged" by Burrows' conduct.

"Her actions clearly violate the code of conduct for protection of patient records and confidentiality that the surgery centers have implemented," Chambers said in the email. "We look forward to her actions and those of her accomplices being fully investigated and prosecuted by the appropriate authorities."

He did not comment about the investigation of his clients.

Five patients died after Lap-Band procedures at clinics tied to the ad campaign between 2009 and 2011, according to autopsy reports, lawsuits and other public records.

Relatives of the dead patients alleged in wrongful-death lawsuits that 1-800-GET-THIN and its affiliated clinics failed to adequately warn patients about risks of the surgery and that doctors made numerous mistakes that led to the deaths.

1-800-GET-THIN removed the ads this year after receiving a warning from the FDA that the ads were misleading because they failed to include adequate warnings about the surgery.

Allergan Inc., the Irvine manufacturer of the Lap-Band, has said it would no longer sell the device to any companies affiliated with 1-800-GET-THIN. The toll-free number still connects callers to a recording that begins "Congratulations on taking the first step to reaching your weight-loss goals."

In April, the Los Angeles Police Department said detectives from its Robbery-Homicide unit were investigating the Sept. 8, 2011, death of Paula Rojeski after Lap-Band surgery at Valley Surgical Center in West Hills. The investigation is ongoing.

Rojeski's sister sued 1-800-GET-THIN, West Hills Surgery Center, three doctors and the Omidi brothers. The lawsuit alleges that defective medical equipment was used during Rojeski's surgery and that medical records were falsified to hide mistakes that contributed to the woman's death. The lawsuit is pending.

Attorneys for the Omidis and the clinics denied wrongdoing.

Two former workers had previously alleged in a lawsuit that 1-800-GET-THIN and the Omidi brothers had committed fraud by billing insurers for procedures that were never performed or were not medically necessary. That lawsuit is also pending.

Burrows, the nurse, told Robertson that the company had altered records related to Rojeski's death and that she had the originals, which "are probably worth a lot of money to your case," according to the affidavit.

She said she had worked for the company from 2008 until April of this year and had access to records that would be valuable in lawsuits filed against 1-800-GET-THIN, its affiliated clinics and the Omidi brothers.

With Robertson's permission, federal agents set up an email account in his name and communicated by email with an attorney who said he represented the nurse, the affidavit said. The nurse's attorney used a pseudonym, R.S. Criterden, but later used his real name, Darrell Erwin, the affidavit said.

"I have what I will phrase as the nuclear bomb in my possession. It will bring the Omidis to their knees in settlement discussions," the attorney wrote in an email to Robertson. "This bomb, coupled with the other original documents in my possession, will assure that all of your cases settle."

Erwin did not respond to requests for comment. He has not been charged in the case.

Burrows contacted Robertson directly on May 31, and the two communicated numerous times by telephone, email and text message, according to the affidavit. Robertson forwarded the nurse's statements to law enforcement agents, the affidavit said.

In one phone call, monitored by federal agents, Burrows told Robertson that she had already given half of her documents to "the feds." She said was willing to give all of her records to Robertson for a price.

"Give me a ballpark on what you can afford in cash or if you can give me something in cash and then tie me to the winnings in the end," the nurse said, according to the affidavit. "I would like to give them to you, have you succeed, and me take the money and move on with my life."

She initially requested $250,000 but later settled for the $75,000 that she accepted before her arrest, according to the affidavit.

The U.S. attorney's office charged Burrows with two counts of selling protected health records. It is a violation of federal law to disclose a patient's medical records to third parties without the patient's authorization.

*stuart.pfeifer@latimes.com*

---

**Los Angeles Times** Copyright 2014 Los Angeles Times                    Index by Keyword | Index by Date | Privacy Policy | Terms of Service

EXHIBIT 5

Almont Joint Stipulation for Entry of a Protective Order

## Los Angeles Times | ARTICLE COLLECTIONS

← Back to Original Article

# Inside GET-THIN

*The obesity empire built by Julian and Michael Omidi comes under scrutiny by authorities after five deaths following Lap-Band surgery*

May 06, 2012 | By Stuart Pfeifer, Los Angeles Times

It's a Friday afternoon and the movie "Moneyball" is playing in a medical clinic waiting room at 9001 Wilshire Blvd. in Beverly Hills.

No one is there to watch it, just rows of vacant chairs. Perhaps it's just an off day, but on two other recent visits, no more than a handful of people could be found in the waiting room.

It was a much different scene two years ago, when a visitor to the Beverly Hills clinic found the waiting room packed, every seat filled and patients spilling out into an overflow area.

Most were after one thing: Lap-Band weight-loss surgery advertised in the 1-800-GET-THIN marketing campaign that blanketed Southern California freeway billboards and broadcast airwaves. Today, that campaign is nearly dead — most of the billboards have been removed, the catchy jingles lifted from local radio and TV broadcasts.

In December, the Food and Drug Administration warned the clinic and several affiliates that their 1-800-GET-THIN ad campaign was misleading because it did not include adequate warnings about the risks of the surgery. Two months later, Lap-Band maker Allergan Inc. said it would no longer sell the device to any of the clinics tied to 1-800-GET-THIN.

Last month, The Times reported that the Los Angeles Police Department's Robbery-Homicide unit was investigating the September death of patient Paula Rojeski, 55, of Orange County.

She was one of five patients to die following Lap-Band procedures at clinics affiliated with 1-800-GET-THIN, according to lawsuits, autopsy reports and other public records. Other patients who died after surgeries, according to those same sources, were Willie Brooks, 35; Ana Renteria, 33; Laura Faitro, 50; and Tamara Walter, 52.

Lawsuits have alleged that the Lap-Band clinics are owned by brothers Michael and Julian Omidi, Iranian immigrants whose fast-lane lifestyles were chronicled on the E! Entertainment reality show "Dr. 90210" in 2004 and 2005. Both men have repeatedly declined interview requests from The Times.

VIDEO: Omidi brothers on 'Dr. 90210'

"They clearly have had the bright light of government scrutiny on them and that has slowed their business," said Alexander Robertson, a Westlake Village attorney who has filed several lawsuits against the Omidis on behalf of dead patients' relatives, patients and former workers.

For a time, business was very good, former employees said in interviews and sworn testimony. In 2010, Julian Omidi said the clinics associated with the ad campaign — listed at 13 on the company's website — were bringing in $21 million a month, Dr. Ihman Shamaan, who performed Lap-Band surgeries at the clinics, testified at a deposition.

The clinics offered a surgical solution to people suffering from chronic obesity: the implantation of a silicone ring — Allergan's patented Lap-Band — around the stomach to discourage overeating. Allergan said the surgery typically costs $12,000 to $20,000, although lawsuits have alleged that some clients of the 1-800-GET-THIN clinics were charged more than $100,000.

GRAPHIC: How the Lap-Band works

Julian Omidi came up with the idea for the 1-800-GET-THIN advertising, according to Dr. H. Joseph Naim, who said he was the first surgeon to perform Lap-Band surgeries at the clinics.

Naim said he was riding as a passenger in Julian Omidi's car on the 5 Freeway in 2008 when Omidi told him he had just purchased the rights for the toll-free number 1-800-GET-THIN.

"Julian is smart, a marketing genius," Naim said. "He said he paid $50,000 for the number. But he had a vision he could make 1,000 times that. He did gamble and it paid off."

The Omidis used aggressive advertising to grow their business, and lawsuits to threaten anyone they perceived as a threat to it, said Robertson, the attorney who has sued them several times.

The brothers — Julian is 43, Michael, 41 — and their affiliated companies have filed four lawsuits against The Times and its journalists, claiming the news organization's articles and columns about patient deaths unfairly damaged their reputation and infringed their trademark.

Each suit was dismissed, and the Omidis and their companies were ordered to pay the newspaper's legal costs.

They've also sued anonymous commenters who posted remarks on The Times' website, seeking damages from people with such names as "RUJoking,"

"RamonaInCorona," and "OCChick." The Times has been fighting efforts by the Omidis' companies to learn the identities of the anonymous commenters.

Although the brothers have declined interviews, some of their story can be pieced together from public records and interviews with people who knew them.

They were born in Iran and moved to the United States as children, Julian Omidi said in a court filing. The family eventually settled in Irvine.

Julian Omidi graduated from University High School and enrolled at UC Irvine in 1986. He was a hardworking student, arriving on campus early in the morning, staying late and making few friends, according to court records.

He was expelled in 1990 after the university accused him of participating in the theft of exams from a campus office, the court records show.

He pleaded guilty to criminal burglary charges, which were dismissed after he completed probation and community service. Julian Omidi would later sue The Times, claiming it was inaccurate to report that he pleaded guilty because the charges were eventually dismissed. The lawsuit was dismissed.

After resolving the criminal case, Julian Omidi started his academic career anew, attending community college before earning his bachelor's degree from Cal State Los Angeles.

Julian Omidi went on to medical school at St. Louis University, graduating with a distinction in research in 1996. His brother, Michael, graduated from the same medical school in 1997.

Julian Omidi "wasn't the smartest guy in the class, but he was hardworking," said Dr. Brian Borsook, a medical school classmate at St. Louis University. "He really pushed himself. He was one of the people who would usually be sitting in the front row and always try to answer questions to show what he knew."

After medical school, the brothers returned to Southern California. Julian Omidi worked as a dermatologist, his younger brother as a plastic surgeon. They were shown on the E! reality show "Dr. 90210" consulting with patients, offering them younger-looking skin, larger breasts, fuller lips and streamlined stomachs.

"We're going to make you look a little bit like Angelina Jolie," Julian told one woman. "If you do a lot of these treatments when you're young, you'll never really get old."

After work, they were shown dating young, attractive women, salsa dancing and hosting extravagant dinner parties.

"I think we have a very exciting life, much more exciting than I think most people," Julian said in one of the episodes.

Neither of the two episodes in which they appeared dealt with tragedies their family had endured.

Their father, Firooz Omidi, committed suicide in 1996 by shooting himself in the head with a nail gun, according to Orange County sheriff's and coroner's reports. The 55-year-old patriarch had been despondent about financial problems with his construction business, according to the sheriff's report.

In the months that followed, their mother, Cindy Omidi, declared bankruptcy and lost the family's home in foreclosure, court records show.

The bankruptcy filing listed more than $1.07 million in liabilities — including $16,000 in medical bills — and $590,000 in assets.

Cindy Omidi went to work in the front office of her sons' medical practice, Julian noted during the E! television show. She posed with her sons in an Iranian Yellow Pages ad for their medical business.

"My mom doesn't look like my mom. She's very, very attractive," Julian said on one of the "Dr. 90210" episodes. "Everywhere we go people think she's my wife or my girlfriend or my sister. It's really nice to have her in the office 'cause if a patient is really concerned about having some procedure done, I just say, 'This is my mother.' And then that's it. There's no headache."

About the same time that those shows were airing, Julian approached former classmate Borsook about opening a chain of dermatology clinics, Borsook recalled.

The idea was for Julian to open a dermatology business at Borsook's family practice in Torrance. The plan never materialized.

"He talked about the fact that his father was a builder and had some financial ups and downs," Borsook said. "It was quite obvious that he was strongly motivated to succeed."

However, in 2007 the Medical Board of California stripped Julian Omidi of his license. It accused him of dishonesty for failing to state on his application that he attended UC Irvine, which expelled him.

Julian Omidi sued the medical board in an attempt to regain his license, but a Superior Court judge upheld the revocation.

In 2008, the medical board placed Michael Omidi on three years' probation for violating state law by performing surgeries on three patients — including one who appeared on "Dr. 90210" — at an unaccredited surgical facility.

The board's accusation also faulted Michael Omidi for allowing a nurse — instead of a trained specialist — to administer anesthesia to a liposuction patient. The accusation also said he failed to properly document medication provided to patients.

In a settlement of the case, the board found only that he had performed surgeries at unaccredited facilities. Michael Omidi completed probation in fall 2011.

Unable to practice medicine, Julian Omidi focused on the business side of things. He dealt with insurers, supervising employees and increasing business through advertising, former employees said.

By 2010, the 1-800-GET-THIN campaign was in full swing. Ads featuring the catchy slogan "Let your new life begin, call 1-800-GET-THIN" became a fixture of Southern California advertising. Callers were referred to clinics including ones at 9001 Wilshire Blvd. in Beverly Hills and at 7320 Woodlake Ave. in West Hills, according to a wrongful termination lawsuit that two former workers filed against the Omidis.

"You'd have people spilling out onto the street on Wilshire, waiting to be seen," Dr. Scott Bickman, an anesthesiologist, said of the Beverly Hills clinic. He said he worked on hundreds of Lap-Band surgeries for the Omidis.

Julian Omidi supervised employees who answered calls to 1-800-GET-THIN, while Michael Omidi oversaw medical decisions, including hiring and the purchase of medical supplies, former employees said in lawsuits and interviews.

Because the company is privately held, its finances are confidential. According to the California Department of Motor Vehicles, Michael Omidi owns a 2004 Lamborghini Murcielago. Records also show that Top Surgeons, a company affiliated with 1-800-GET-THIN, owns a 2006 Ferrari F430 Spider.

Public records do not tie the brothers to any real estate holdings.

Their mother, Cindy Omidi, now lists an $8.5-million estate in the Hollywood Hills as an address, according to public records. The 14,000-square-foot mansion on Sierra Alta Way was previously occupied by Rockstar Energy Drink founder Russell Weiner and Interscope Records co-founder Ted Field, property and campaign records show.

When she made a recent contribution to President Obama's reelection campaign, Cindy Omidi listed the Hollywood Hills estate as her home address. Public records show the home was purchased in 2010 by a limited-liability corporation called FJKJ.

Shamaan, who performed Lap-Band surgeries at the clinics, testified that Michael Omidi put making money ahead of patient care.

"His god is money," Shamaan said in the deposition for a wrongful-death lawsuit involving one of the patient deaths. "If the patient brings in money, he will give him service. His prerogative is not patient care, not patient safety, just 'Can he pay?'"

That's not the way the Omidis are portrayed on a number of websites in their names that have popped up on the Internet.

The sites, MichaelOmidi.net, MichaelOmidi.org, JulianOmidi.net and JulianOmidi.org, document philanthropic efforts by the brothers. One of the sites has a photograph of Michael Omidi posing with Rep. Brad Sherman (D-Sherman Oaks).

Sherman spokesman Ben Fishel said that his boss has taken thousands of photographs at public events with people he does not know, and that he does not know Michael Omidi.

Naim, the surgeon, said he stopped working for the Omidis because of his concerns that they were putting patients at risk by cutting costs. He said the surgery centers were understaffed and some employees were not properly trained.

Still, he said he holds no grudges.

"I could even have a drink with Julian. We have no problems personally," Naim said. "But if you say, 'Can I do surgery for him?' I'd say, 'No. Are you crazy?'"

*stuart.pfeifer@latimes.com*

---

**Los Angeles Times** Copyright 2014 Los Angeles Times                    Index by Keyword | Index by Date | Privacy Policy | Terms of Service

EXHIBIT 6

Almont Joint Stipulation for Entry of a Protective Order

# Cindy Omidi convicted of violating laws to prevent money laundering



Cindy Omidi and Brian Oxman, a former 1-800-GET-THIN attorney, leave the federal courthouse in Los Angeles. Omidi's sons, Michael and Julian Omidi, were behind the 1-800-GET-THIN ad campaign for weight-loss surgery. (Glenn Koenig / Los Angeles Times)

**By** STUART PFEIFER

OCTOBER 10, 2014, 4:58 PM

The mother of two brothers behind the now-defunct 1-800-GET-THIN ad campaign was convicted Friday of violating laws designed to prevent money laundering.

Jurors reached their verdict after listening to three days of testimony this week before U.S. District Judge Stephen V. Wilson in Los Angeles.

Cindy Omidi, 65, had been accused of illegally buying dozens of postal money orders in an amount just below the $3,000 threshold that would have required postal officials to keep reports about them. She was charged with violating a federal law that prohibits sizing money order purchases to avoid scrutiny by the government.

The charges carry a maximum possible sentence of 10 years in federal prison, but as a first-time offender she is likely to receive substantially less time. The sentencing hearing is scheduled for Jan. 12.

Omidi and her attorneys declined to comment on the verdict.

Federal prosecutors built their case around the circumstances of the purchases. Many of the money orders were paid for in cash immediately after Cindy Omidi's credit card was used to buy postage and other supplies — from the same postal teller, prosecutors said.

And, they said, more than $20,000 of the money orders was deposited into Cindy Omidi's personal bank account. Other money orders were deposited into the bank account of a dermatology business that she managed with her son, Julian Omidi, who ran a dermatology business before he lost his license to practice medicine, they added.

Outside the courthouse, one juror said the repeated transactions, the credit card evidence and the deposits into Cindy Omidi's account were strong evidence that she was the one buying the money orders.

"It was the consistency of the transactions, over and over, the same amount," said the juror, a 28-year-old Highland Park resident who works in set design for a performing arts school. He declined to give his name. The deposits into Cindy Omidi's personal and business accounts "is literally what gave it away," he said.

During the trial, the defense argued that the money orders were purchased by Cindy Omidi's younger brother, Ken Pezeshk, who defense witnesses said frequently conducted business transactions with money orders. Pezeshk fell to his death from the balcony of a West Los Angeles high-rise condominium on Feb. 9, 2010, at age 57.

In his closing argument, defense attorney Nathan Hochman noted that the money order purchases at issue in the case — there were more than 300 of them — ended the day that Pezeshk died.

"That's huge," Hochman said. "Why did they stop on 2-9-10? Because he passed away. Ken Pezeshk was the person who bought the money orders, not Cindy Omidi."

Hochman said Pezeshk was using the money orders to repay a $200,000 loan from the dermatology business. That would explain why the money orders were deposited into the business account, he said.

The defense also noted that there were no videos, no photographs and no fingerprints linking Cindy Omidi to the purchases. There was also no evidence that Cindy Omidi had obtained money illegally, which could have given her motive to launder money, her attorneys said.

Assistant U.S. Atty. Evan Davis told jurors that Pezeshk did not list his name on any of the money orders, or deposit them into his bank accounts. Cindy Omidi's name and signature was on most of them, Davis said.

"If you follow the money, it all points to the defendant," Davis said.

A postal clerk named Roberta Chandler testified Wednesday that she recognized Cindy Omidi as someone who purchased money orders from her at a West Los Angeles post office. But she said she could not recall whether any of them were for $2,900. Prosecutors accused Cindy Omidi of purchasing 93 money orders for exactly that amount.

Cindy Omidi's sons, Julian and Michael Omidi, who were in the courtroom for the verdict, have been named in numerous lawsuits as the owners of the Lap-Band weight-loss-surgery business that was widely advertised on Southern California freeway billboards, radio and television.

The brothers are also the subjects of a federal investigation into several potential crimes, including healthcare fraud, money laundering, tax violations and identity theft related to the heavily advertised surgery business, according to a 2012 court filing. That investigation is "active," prosecutors said in a trial memorandum filed Oct. 3 in Cindy Omidi's case.

The brothers, who both earned medical degrees, have denied wrongdoing through their attorneys. No charges have been filed.

The 1-800-GET-THIN ad campaign promoted Lap-Band weight-loss surgery performed at clinics throughout Southern California and as far north as the San Francisco Bay Area.

Five patients died following surgeries at Southern California clinics affiliated with 1-800-GET-THIN from 2009 to 2011, according to lawsuits, autopsy reports and other public records.

The billboards came down in 2012 after the Food and Drug Administration warned that the ads were misleading because they failed to include adequate warnings about the risks of the surgery.

*stuart.pfeifer@latimes.com*

*Twitter: @spfeifer22*

Copyright © 2014, Los Angeles Times

Exhibit Page 65

EXHIBIT 7

Almont Joint Stipulation for Entry of a Protective Order

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                     COUNTY OF LOS ANGELES

 3   JOHN FAITRO, and CHEYENNE FAITRO,     )
     individually and as heirs of LAURA    )
 4   LEE FAITRO, deceased,                 )
                                           )
 5              Plaintiffs,                )
                                           )
 6        vs.                              ) Case No. SC111332
                                           )
 7   IHSAN NAJIB SHAMAAN, M.D. and KEVORK  )       VOLUME II
     GEORGE TASHJIAN, M.D., individually   )
 8   and d/b/a WEIGHT LOSS CENTERS; TOP    )
     SURGEONS, INC.; Top Surgeons, LLC;    )
 9   1-800-GET-THIN, LLC; 1-800-GET-SLIM;  )
     JULIAN OMIDI, M.D. and MICHAEL OMIDI, )
10   M.D., individually and dba            )
     1-800-GET-THIN and 1-800-GET-SLIM and )
11   WEIGHT LOSS CENTERS; VALLEY AMBULATORY)
     SURGERY CENTER, LLC, individually and )
12   d/b/a VALLEY SURGICAL CENTER; VALLEY  )
     SURGICAL CENTER; WEIGHT LOSS CENTERS; )
13   SIMI VALLEY HOSPITAL; SIMI VALLEY     )
     HOSPITAL & HEALTH CARE SERVICES, INC.,)
14   individually and d/b/a SIMI VALLEY    )
     HOSPITAL; ALLIED EMERGENCY PHYSICIANS,)
15   INC.; MICHAEL DRUCKER, M.D.; ALAN     )
     KUBAN, M.D.; and DOES 1 through 100,  )
16   inclusive,                            )
                                           )
17              Defendants.                )
                                           )

18

19        DEPOSITION OF:    IHSAN NAJIB SHAMAAN, M.D.

20        DATE:             Tuesday, December 20, 2011

21        LOCATION:         880 Hampshire Road, Suite B
                            Westlake Village, CA 91361
22
          REPORTED BY:      DEBRA LYNN KETRING, CSR 8462
23

24

25
```

                                                                    14

Exhibit Page 66

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | |
|---|---|
| 1 | SUPERIOR COURT OF THE STATE OF CALIFORNIA |
| 2 | COUNTY OF LOS ANGELES |
| 3 | JOHN FAITRO, and CHEYENNE FAITRO, ) |
| | individually and as heirs of LAURA ) |
| 4 | LEE FAITRO, deceased, ) |
| | ) |
| 5 | Plaintiffs, ) |
| | ) |
| 6 | vs. ) Case No. SC111332 |
| | ) |
| 7 | IHSAN NAJIB SHAMAAN, M.D. and KEVORK ) VOLUME II |
| | GEORGE TASHJIAN, M.D., individually ) |
| 8 | and d/b/a WEIGHT LOSS CENTERS; TOP ) |
| | SURGEONS, INC.; Top Surgeons, LLC; ) |
| 9 | 1-800-GET-THIN, LLC; 1-800-GET-SLIM; ) |
| | JULIAN OMIDI, M.D. and MICHAEL OMIDI, ) |
| 10 | M.D., individually and dba ) |
| | 1-800-GET-THIN and 1-800-GET-SLIM and ) |
| 11 | WEIGHT LOSS CENTERS; VALLEY AMBULATORY) |
| | SURGERY CENTER, LLC, individually and ) |
| 12 | d/b/a VALLEY SURGICAL CENTER; VALLEY ) |
| | SURGICAL CENTER; WEIGHT LOSS CENTERS; ) |
| 13 | SIMI VALLEY HOSPITAL; SIMI VALLEY ) |
| | HOSPITAL & HEALTH CARE SERVICES, INC.,) |
| 14 | individually and d/b/a SIMI VALLEY ) |
| | HOSPITAL; ALLIED EMERGENCY PHYSICIANS,) |
| 15 | INC.; MICHAEL DRUCKER, M.D.; ALAN ) |
| | KUBAN, M.D.; and DOES 1 through 100, ) |
| 16 | inclusive, ) |
| | ) |
| 17 | Defendants. ) |
| | ) |
| 18 | |
| 19 | Deposition of IHSAN NAJIB SHAMAAN, M.D., |
| 20 | taken on behalf of the Plaintiffs at 880 Hampshire Road, |
| 21 | Suite B, Westlake Village, California 91361, beginning at |
| 22 | 9:31 a.m. and ending at 4:00 p.m. on Tuesday, |
| 23 | December 20, 2011, before Debra Lynn Ketring, Certified |
| 24 | Shorthand Reporter No. 8462 |
| 25 | |

15

Exhibit Page 67

FAITRO v. SHAMAAN       IHSAN NAJIB SHAMAAN, M.D.              12/20/2011

```
 1     APPEARANCES OF COUNSEL:

 2

 3     FOR PLAINTIFFS JOHN FAITRO and CHEYENNE FAITRO:

 4                    ROBERTSON & ASSOCIATES
                      BY:  ALEXANDER ROBERTSON, IV, ESQ.
 5                    880 Hampshire Road, Suite B
                      Westlake Village, California 91361
 6                    (805) 418-9900
                      (805) 418-9901 FAX
 7                    arobertson@rvcdlaw.com

 8                    LAW OFFICES OF JOHN M. WALKER
                      BY:   JOHN M. WALKER, ESQ.
 9                    5850 Canoga Avenue, Fourth Floor
                      Woodland Hills, California 91367
10                    (818) 719-9181

11     FOR DEFENDANT   IHSAN NAJIB SHAMAAN, M.D.:

12                    APPEARING IN PRO PER
                      4946 E. Florence Avenue
13                    Bell, California 90201
                      (323) 773-0591
14
       FOR DEFENDANT   SIMI VALLEY HOSPITAL & HEALTH CARE
15                    SERVICES, INC., dba SIMI VALLEY HOSPITAL:

16                    CARROLL, KELLY, TROTTER, FRANZEN & McKENNA
                      BY:   SANDRA J. CARLSON, ESQ.
17                    111 W. Ocean Boulevard, 14th Floor
                      Long Beach, California 90801
18                    (562) 432-5855
                      (562) 432-8785 FAX
19                    sjcarlson@cktfmlaw.com

20     FOR DEFENDANT   MICHAEL DRUCKER, M.D.:

21                    CARROLL, KELLY, TROTTER, FRANZEN & McKENNA
                      BY:   CHRISTY LEE THOMASSON, ESQ.
22                    111 W. Ocean Boulevard, 14th Floor
                      Long Beach, California 90801
23                    (562) 432-5855
                      (562) 432-8785 FAX
24                    clthomasson@cktfmlaw.com

25
```

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

1    APPEARANCES OF COUNSEL:    (continued)

2

3    FOR DEFENDANTS ALAN KUBAN, M.D. and JJ&R EMERGENCY
                   MEDICAL GROUP:
4
                   BERTLING & CLAUSEN, LLP
5                  BY:  EYDITH J. KAUFMAN, ESQ.
                   15 W. Carrillo Street, Suite 100
6                  Santa Barbara, California 93101
                   (805) 892-2100
7                  (805) 963-6044 FAX
                   ejk@bertling-clausen.com
8
     FOR DEFENDANTS Top Surgeons, LLC d/b/a WEIGHT LOSS
9                   CENTERS AND 1-800-GET-THIN;
                    1-800-GET-THIN, LLC; JULIAN OMIDI,
10                  individually; MICHAEL OMIDI, M.D.,
                    individually; and VALLEY SURGICAL CENTER,
11                  LLC and KEVORK GEORGE TASHJIAN, M.D.:

12                  PRINDLE, AMARO, GOETZ, HILLYARD, BARNES &
                    REINHOLTZ, LLP
13
                    BY:  DOUGLAS S. DE HERAS, ESQ.
14                  310 Golden Shore, Fourth Floor
                    Long Beach, California 90802
15                  (562) 436-3946
                    (562) 495-0564 FAX
16                  ddeheras@prindlelaw.com

17   ALSO PRESENT:  STEPHEN CRAKER, VIDEOGRAPHER

18

19

20

21

22

23

24

25

17

Exhibit Page 69

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

```
 1                      I N D E X
 2    WITNESS                              EXAMINATION
 3    IHSAN NAJIB SHAMAAN, M.D.
 4              BY MR. WALKER                    21
 5    AFTERNOON SESSION
 6              BY MR. WALKER                   108
 7                  E X H I B I T S
 8    No.            Description                  Page
 9    A   Summary of Dr. Shamaan's fees          26
10    B   Declaration Of Ihsan Najib Shamaan     38
11    C   Notice Of Continuance Of Taking Deposition Of   48
          Defendant Ihsan Najib Shamaan, M.D. And Request
12        For Production Of Documents At The Deposition
13    D   Independent Contractor Agreemen For General    61
          Surgery Services, Director Of Surgery Center,
14        Director Of Center Of Excellence
15    E   Copy of a Superbill                   101
16    F   Copy of an e-mail from Roberto Macatangay    113
          dated Saturday, September 25, 2010
17
      G   Copy of a pre-printed operative report   115
18
      H   Letter from Atul Madan, M.D. re Jennifer Baez   116
19
      I   Request For Authorization/Pre-Determination    116
20        from Atul Madan, M.D. regarding Jennifer Baez
21    J   Surgery request dated November 17, 2010   118
22    K   Surgery request dated November 10, 2010   119
23    L   Surgery request dated October 29, 2010   119
24    M   Surgery request dated October 26, 2010   120
25    N   Reconsideration Determination from TriWest   120
```

18

Exhibit Page 70

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.        12/20/2011

1                    I N D E X (continued)

2                       E X H I B I T S

3
     No.              Description                    Page
4
     O   Dr. Shamaan's Operative Note re Lap Band for   151
5        Laura Faitro dated 7/21/10

6    P   Photocopy of a check to Dr. Shamaan for $6,250  172
         dated 9/1/10, check No. 1441
7
     Q   Photocopy of a check to Dr. Shamaan for $7,250  173
8        dated 7/9/10, check No. 5283

9    R   Explanation Of Benefits for Laura Faitro from   175
         United Healthcare dated 7/2/10
10
     S   Explanation Of Benefits for Laura Faitro from   176
11       United Healthcare dated 6/29/10

12   T   Explanation Of Benefits for Laura Faitro from   176
         United Healthcare dated 6/4/10
13

14

15

16             INFORMATION REQUESTED

17              PAGE     LINE

18               80        5

19

20             REFERENCE REQUESTED

21               (None Offered)

22

23       INSTRUCTION NOT TO ANSWER

24               (None Offered)

25

19

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 09:31:53 | 1 | WESTLAKE VILLAGE, CALIFORNIA; TUESDAY, DECEMBER 20, 2011 |
| 09:31:53 | 2 | 9:31 a.m. – 4:00 p.m. |
| 09:31:53 | 3 | * * * |
| 09:57:22 | 4 | THE VIDEOGRAPHER:  We are on the record.  The date |
| 09:57:24 | 5 | is December 20, 2011.  The time is 9:57 a.m. |
| 09:57:32 | 6 | Good morning.  My name is Stephen Craker, the |
| 09:57:34 | 7 | videographer; the court reporter is Debra Ketring, both |
| 09:57:34 | 8 | with DCR Litigation Services of Westlake Village, |
| 09:57:34 | 9 | California. |
| 09:57:46 | 10 | This starts media No. 1 of the volume 2 |
| 09:57:49 | 11 | deposition of Ihsan Najib Shamaan, M.D., in the case named |
| 09:57:58 | 12 | John Faitro and Cheyenne Faitro individually and as heirs |
| 09:58:02 | 13 | of Laura Lee Faitro, deceased, versus Ihsan Najib Shamaan |
| 09:58:10 | 14 | M.D., et al. in the Superior Court of California for the |
| 09:58:13 | 15 | County of Los Angeles.  The case number is SC 111332. |
| 09:58:20 | 16 | This deposition is taking place at the law firm |
| 09:58:22 | 17 | of Robertson & Associates, 880 Hampshire Road, Suite B, |
| 09:58:26 | 18 | Westlake Village, California. |
| 09:58:32 | 19 | Would all present please state your appearance, |
| 09:58:34 | 20 | starting with the witness. |
| 09:58:38 | 21 | THE WITNESS:  Ihsan Shamaan, I-H-S-A-N.  Shamaan, |
| 09:58:38 | 22 | S-H-A-M double A-N. |
| 09:58:47 | 23 | MS. KAUFMAN:  Yes, good morning.  Edith Kaufman on |
| 09:58:48 | 24 | behalf of defendant Alan Kuban, M.D. |
| 09:58:55 | 25 | MR. DE HERAS:  Good morning.  Douglas De Heras. |

20

Exhibit Page 72

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 09:58:55 | 1 | MS. CARLSON:  Good morning.  Sandra Carlson on |
| 09:58:55 | 2 | behalf of defendant Simi Valley Hospital. |
| 09:58:57 | 3 | MS. THOMASSON:  Christie Thomasson for Michael |
| 09:58:57 | 4 | Drucker, M.D. |
| 09:58:57 | 5 | MR. ROBERTSON:  Alex Robertson for plaintiffs. |
| 09:58:57 | 6 | MR. WALKER:  And John Walker for the plaintiffs. |
| 09:59:22 | 7 | Shall we swear the witness? |
| 09:59:22 | 8 | |
| 09:59:22 | 9 | IHSAN NAJIB SHAMAAN, M.D., |
| 09:59:22 | 10 | having been duly sworn, was examined and |
| 09:59:22 | 11 | testified as follows: |
| | 12 | E X A M I N A T I O N |
| 09:59:22 | 13 | BY MR. WALKER: |
| 09:59:22 | 14 | Q    Dr. Shamaan, have you ever had your deposition |
| 09:59:24 | 15 | taken before? |
| 09:59:25 | 16 | A    Yes. |
| 09:59:26 | 17 | Q    I'm going to repeat a couple of things just so |
| 09:59:29 | 18 | we have a clear record here.  Do you understand that you |
| 09:59:32 | 19 | are under oath to tell the truth today? |
| 09:59:35 | 20 | A    Correct. |
| 09:59:36 | 21 | Q    And that's under penalty of perjury; do you |
| 09:59:38 | 22 | understand that? |
| 09:59:38 | 23 | A    I understand. |
| 09:59:39 | 24 | Q    What do you understand the word to mean that |
| 09:59:41 | 25 | you are under penalty of perjury? |

21

Exhibit Page 73

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 09:59:45 | 1 | A    If I lie I could go to jail. |
| 09:59:48 | 2 | Q    Is there any reason why you feel that you |
| 09:59:50 | 3 | cannot give your truthful, best, honest answers today? |
| 09:59:54 | 4 | A    Correct. |
| 09:59:55 | 5 | Q    Is that your intent to do that? |
| 09:59:56 | 6 | A    Yes. |
| 09:59:57 | 7 | Q    Are you under the influence of any kind of |
| 09:59:59 | 8 | medications today that would affect your abilities to |
| 10:00:01 | 9 | understand the questions or to give your best testimony? |
| 10:00:03 | 10 | A    I take medications for high blood pressure and |
| 10:00:06 | 11 | diabetes, but they will not affect my memory or my |
| 10:00:11 | 12 | ability to answer questions or alertness. |
| 10:00:15 | 13 | Q    Do you have any pressing engagements or |
| 10:00:17 | 14 | anything that's occurring outside of this room that would |
| 10:00:20 | 15 | affect your abilities to give your best, accurate |
| 10:00:22 | 16 | testimony today; in other words, things that you are |
| 10:00:24 | 17 | worried about or disturbed about that are distracting you |
| 10:00:24 | 18 | from understanding the questions and giving your best |
| 10:00:29 | 19 | testimony? |
| 10:00:29 | 20 | A    No. |
| 10:00:34 | 21 | Q    Doctor, we've come here to talk about a case |
| 10:00:37 | 22 | that I understand you are involved in with Laura Faitro. |
| 10:00:41 | 23 | And is there anything that strikes you as being important |
| 10:00:47 | 24 | concerning Ms. Faitro and the case? |
| 10:00:57 | 25 | MR. DE HERAS:  Objection, vague and ambiguous. |

22

Exhibit Page 74

FAITRO v. SHAMAAN       IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 10:00:58 | 1 | THE WITNESS:  Do you want me to talk about what I |
| 10:00:59 | 2 | know about the Faitro case? |
| 10:00:59 | 3 | BY MR. WALKER: |
| 10:00:59 | 4 | Q    Yes.  There -- the questions will have to be |
| 10:01:03 | 5 | based upon your personal knowledge about the Faitro case. |
| 10:01:06 | 6 | A    Okay. |
| 10:01:07 | 7 | Q    Is there anything that strikes you as being |
| 10:01:10 | 8 | overridingly important concerning the Laura Faitro case? |
| 10:01:14 | 9 | A    Yes. |
| 10:01:14 | 10 | Q    And what is that? |
| 10:01:15 | 11 | A    A lot of things. |
| 10:01:18 | 12 | Q    Let's start with the beginning.  First of all, |
| 10:01:21 | 13 | has anyone ever instructed you or attempted to get you to |
| 10:01:26 | 14 | say anything other than the truth in this particular |
| 10:01:28 | 15 | matter? |
| 10:01:28 | 16 | A    Yes. |
| 10:01:31 | 17 | Q    Since you have filed your answer in this |
| 10:01:33 | 18 | particular case, have you ever been represented by an |
| 10:01:38 | 19 | attorney? |
| 10:01:38 | 20 | A    No. |
| 10:01:39 | 21 | Q    Have you at any point in time ever retained the |
| 10:01:42 | 22 | services of a Brian Oxman to represent you in this case? |
| 10:01:45 | 23 | A    No. |
| 10:01:48 | 24 | Q    You indicated that someone had told you to be |
| 10:01:51 | 25 | other than truthful in this case.  Can you tell us about |

23

Exhibit Page 75

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:01:53 | 1 | that? |
| 10:01:54 | 2 | A    Please repeat the question. |
| 10:01:56 | 3 | Q    Sure.  By the way, if you don't understand a |
| 10:01:58 | 4 | question that's asked of you, it's perfectly fine to stop |
| 10:02:00 | 5 | us and let us know that you didn't understand the |
| 10:02:03 | 6 | question.  We will ask it again until you do. |
| 10:02:05 | 7 | All right? |
| 10:02:06 | 8 | A    Okay. |
| 10:02:06 | 9 | Q    If you answer one of our questions, we're going |
| 10:02:07 | 10 | to assume that you understood it. |
| 10:02:11 | 11 | Would that be fair? |
| 10:02:11 | 12 | A    That would be fair. |
| 10:02:14 | 13 | Q    You indicated earlier to us that someone had |
| 10:02:17 | 14 | instructed you to be other than truthful in this |
| 10:02:20 | 15 | particular matter. |
| 10:02:20 | 16 | A    Yes. |
| 10:02:22 | 17 | Q    And who was that? |
| 10:02:23 | 18 | A    The Omidis and Mr. Oxman. |
| 10:02:31 | 19 | Q    And when did that occur? |
| 10:02:33 | 20 | A    Two weeks ago. |
| 10:02:35 | 21 | Q    Can you describe the circumstances of that |
| 10:02:37 | 22 | discussion? |
| 10:02:43 | 23 | A    At one point before that Michael Omidi called |
| 10:02:50 | 24 | me and he said that this patient died of MI, we shouldn't |
| 10:02:58 | 25 | use this case.  We need to sit down and talk about it. |

24

FAITRO v. SHAMAAN       IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 10:03:03 | 1 | I told him, "Well, I don't want to talk about |
| 10:03:05 | 2 | it because I -- you owe me about -- in excess of $80,000 |
| 10:03:11 | 3 | in salaries and services.  And it's been one year, you |
| 10:03:15 | 4 | haven't given it to me.  So I don't want to talk about |
| 10:03:18 | 5 | it." |
| 10:03:19 | 6 | And he said, "Well, do you have an attorney?" |
| 10:03:24 | 7 | I said, "No, I don't have an attorney." |
| 10:03:26 | 8 | He said, "Okay.  Let's sit down and we will get |
| 10:03:29 | 9 | you an attorney to represent you, and we will pay you |
| 10:03:32 | 10 | your salaries." |
| 10:03:35 | 11 | So I -- I took it at the face value of -- of |
| 10:03:39 | 12 | what he said.  But I didn't know that there is something |
| 10:03:42 | 13 | behind that. |
| 10:03:44 | 14 | So I went and prepared all the documents that I |
| 10:03:54 | 15 | have that show how much they owe me.  And here is a |
| 10:04:07 | 16 | summary of those fees.  I represent it as in evidence. |
| 10:04:14 | 17 | Q    Was this prepared by you personally? |
| 10:04:16 | 18 | A    Yes. |
| 10:04:16 | 19 | Q    And did you present this to one of the Omidis? |
| 10:04:20 | 20 | A    Michael Omidi. |
| 10:04:21 | 21 | Q    To Michael Omidi? |
| 10:04:21 | 22 | A    Yeah. |
| 10:04:21 | 23 | Q    And when did that occur? |
| 10:04:24 | 24 | A    About two weeks ago. |
| 10:04:27 | 25 | Q    And did you have further discussions with him |

25

Exhibit Page 77

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 10:04:29 | 1 | concerning this case? |
| 10:04:31 | 2 | A    Not yet. |
| 10:04:34 | 3 | Q    We will mark this exhibit as Exhibit A.    Attach |
| 10:04:51 | 4 | a copy to the deposition. |
| 10:04:53 | 5 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 10:04:53 | 6 | PLAINTIFF'S EXHIBIT A FOR IDENTIFICATION BY THE CERTIFIED |
| 10:04:53 | 7 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 10:04:53 | 8 | BY MR. WALKER: |
| 10:04:53 | 9 | Q    Before we move on from the document, there |
| 10:04:56 | 10 | appears to be a number of names that are associated here. |
| 10:05:00 | 11 | Are those individual patients that you worked on? |
| 10:05:03 | 12 | A    Yes. |
| 10:05:08 | 13 | Q    Go ahead.    Continue on with your discussion |
| 10:05:10 | 14 | with -- with the Omidis in your meeting. |
| 10:05:16 | 15 | A    So I told him, "This is fees for work that I |
| 10:05:20 | 16 | have done.    In other words, it's my sweat.    You are not |
| 10:05:23 | 17 | donating it.    You are not doing me a favor.    I have done |
| 10:05:27 | 18 | this work and I deserve that money because I -- I made |
| 10:05:33 | 19 | that work." |
| 10:05:35 | 20 | So he said, "Okay.    We will pay you.    But we |
| 10:05:37 | 21 | will get you a lawyer to represent you, but we need to |
| 10:05:41 | 22 | meet." |
| 10:05:43 | 23 | So I said, "Well, I don't want to meet right |
| 10:05:46 | 24 | now.    I will see after the deposition." |
| 10:05:54 | 25 | So two days before the deposition he called me |

26

Exhibit Page 78

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:05:57 | 1 | again, and he said, "I found you a good lawyer.  His -- |
| 10:06:01 | 2 | his name is Mr. Oxman.  He has represented Michael |
| 10:06:07 | 3 | Jackson and LaToya Jackson, and he is one of the big |
| 10:06:11 | 4 | shots in the -- in the Los Angeles area.  And he is a |
| 10:06:14 | 5 | very capable attorney, and he is going to represent you." |
| 10:06:18 | 6 | So far, I haven't met Mr. Oxman. |
| 10:06:21 | 7 | The next day, which is the day of the |
| 10:06:23 | 8 | deposition, Mr. Oxman called me from his car.  He said, |
| 10:06:29 | 9 | "Where are you?"  So I described what street I am near |
| 10:06:31 | 10 | by.  And he said, "Well, I am behind you one mile." |
| 10:06:35 | 11 | That's the whole conversation there is. |
| 10:06:39 | 12 | Anyway -- |
| 10:06:39 | 13 | Q    Was that the first time you ever spoke to |
| 10:06:43 | 14 | Mr. Oxman? |
| 10:06:44 | 15 | A    That's the first time. |
| 10:06:45 | 16 | Q    Go ahead. |
| 10:06:46 | 17 | A    I arrived before he did, and I sat in the room |
| 10:06:49 | 18 | downstairs waiting for him.  Finally he showed up. |
| 10:06:55 | 19 | And he said, "Do you want an attorney to |
| 10:06:59 | 20 | represent you?"  That's exactly the question that he |
| 10:07:02 | 21 | asked. |
| 10:07:02 | 22 | And I said, "Yes." |
| 10:07:03 | 23 | And he said, "I am going to represent you." |
| 10:07:07 | 24 | I stayed quiet, because I told him "For an |
| 10:07:12 | 25 | attorney to represent me, this is the thing that I |

27

Exhibit Page 79

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:07:16 | 1 | understand, that I have to sit down with him, discuss the |
| 10:07:20 | 2 | whole case with him; and if he agrees to take it, then I |
| 10:07:24 | 3 | have to sign a contract. And in that contract it |
| 10:07:29 | 4 | specifically says that there should be some |
| 10:07:33 | 5 | confidentiality and what is the fees and who is going to |
| 10:07:37 | 6 | pay them." |
| 10:07:39 | 7 | He said, "We will discuss that later." Then he |
| 10:07:42 | 8 | took me upstairs here and he pulled the stunt that you -- |
| 10:07:47 | 9 | everybody have seen. And he took me out. And until that |
| 10:07:51 | 10 | moment, I never understood. I never knew -- I did not |
| 10:07:57 | 11 | have any kind of assertion that he represented me. He |
| 10:08:01 | 12 | just took me out. And I told him on the stairs -- going |
| 10:08:05 | 13 | in the stairs, "Is the thing you did is legal? I haven't |
| 10:08:13 | 14 | seen such a thing before. Is that legal?" |
| 10:08:16 | 15 | He said "Yes, it is legal. And they can -- |
| 10:08:19 | 16 | they are stunned. And you are now the center stage of |
| 10:08:24 | 17 | the case." |
| 10:08:27 | 18 | So we went after this to a cafeteria nearby. |
| 10:08:33 | 19 | And in that cafeteria we did not discuss the case. But |
| 10:08:37 | 20 | he said two things; that "The only way we can win this |
| 10:08:42 | 21 | case is by you saying that the attorneys for the Faitro |
| 10:08:47 | 22 | case lied to you and talked to you even though they knew |
| 10:08:57 | 23 | that you have been represented by an attorney." |
| 10:09:00 | 24 | I said, "But how did they know?" |
| 10:09:02 | 25 | He said, "I called them and I left a message on |

28

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:09:05 | 1 | the phone saying that I am representing my -- I am |
| 10:09:10 | 2 | representing Dr. Shamaan." |
| 10:09:11 | 3 | Q    Let me make this clear.  Have either myself or |
| 10:09:15 | 4 | Mr. Robertson ever spoken to you while you were |
| 10:09:18 | 5 | represented by an attorney? |
| 10:09:20 | 6 | A    Every time you spoke to me and |
| 10:09:22 | 7 | Mr. Robertson spoke to me, the first sentence you say is: |
| 10:09:27 | 8 | "Do you have an attorney?" |
| 10:09:30 | 9 | And my answer to you was "No." |
| 10:09:34 | 10 | Q    You are not represented by an attorney today; |
| 10:09:37 | 11 | is that correct? |
| 10:09:38 | 12 | A    No. |
| 10:09:38 | 13 | Q    You understand that you're -- |
| 10:09:39 | 14 | A    I understand that. |
| 10:09:40 | 15 | Q    You understand you have a right to be |
| 10:09:41 | 16 | represented by an attorney? |
| 10:09:42 | 17 | A    I do. |
| 10:09:43 | 18 | Q    And you are here voluntarily to give your best |
| 10:09:43 | 19 | testimony and truthful testimony? |
| 10:09:47 | 20 | A    Until I get one. |
| 10:09:49 | 21 | Q    Okay.  Continue on with your discussions |
| 10:09:51 | 22 | concerning -- again, the question was:  Has anybody told |
| 10:09:54 | 23 | you that you should say anything other than the truth in |
| 10:09:58 | 24 | this particular matter? |
| 10:09:59 | 25 | A    Could you repeat that? |

29

Exhibit Page 81

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 10:10:00 | 1 | Q    We were talking about -- the question initially |
| 10:10:02 | 2 | to you was:  Has anyone told you to say anything other |
| 10:10:05 | 3 | than the truth in this matter? |
| 10:10:07 | 4 | A    Yeah.  I'm -- I'm in the process of telling you |
| 10:10:09 | 5 | that. |
| 10:10:09 | 6 | Q    Continue on. |
| 10:10:11 | 7 | A    So I told him, "Before we sign a contract, I |
| 10:10:13 | 8 | need to sit down with you and you have to ascertain three |
| 10:10:18 | 9 | things:  No. 1, there should be no conflict of interest. |
| 10:10:22 | 10 | Because if you have anything to do with the Omidis, you |
| 10:10:28 | 11 | cannot represent me. |
| 10:10:29 | 12 | "Whatever I tell you, whatever you tell me, is |
| 10:10:34 | 13 | pure confidential, nobody should know -- know about it. |
| 10:10:38 | 14 | That is the way I understood -- understand how my lawyer |
| 10:10:43 | 15 | will behave. |
| 10:10:46 | 16 | "Number 3, before you represented me, you need |
| 10:10:51 | 17 | to go through all the evidence and procedures that you do |
| 10:10:57 | 18 | not have a conflict of interest. |
| 10:11:01 | 19 | "Number 4, they have to pay all the debt -- the |
| 10:11:06 | 20 | debt before I talk to them." |
| 10:11:08 | 21 | And I sat down and I wrote it on a piece of |
| 10:11:12 | 22 | handkerchief because we didn't have a piece of paper. |
| 10:11:15 | 23 | And I give it to him. |
| 10:11:16 | 24 | Q    And what was on that paper? |
| 10:11:18 | 25 | A    I wrote down the contents of this. |

30

Exhibit Page 82

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 10:11:22 | 1 | Q    So continue on.  What was -- what else was |
| 10:11:24 | 2 | said? |
| 10:11:24 | 3 | A    Well, he -- he left to talk to the Omidis.  And |
| 10:11:30 | 4 | he called -- he told me that he is going to meet with me |
| 10:11:34 | 5 | on a Thursday at 12 noon in Steven's Restaurant, which is |
| 10:11:42 | 6 | in East L.A.  He didn't show up.  He called -- his |
| 10:11:48 | 7 | secretary called me after two hours, "Sorry, Mr. Oxman is |
| 10:11:53 | 8 | tied up with another patient but he will meet with you at |
| 10:11:56 | 9 | 5 o'clock." |
| 10:11:57 | 10 | So I left and I came at 5 o'clock, he didn't |
| 10:12:00 | 11 | show up. |
| 10:12:04 | 12 | Then after maybe two weeks he calls me again |
| 10:12:09 | 13 | and he said, "There is a check for you," but he refuses |
| 10:12:16 | 14 | to say how much is the check.  He became floridly and |
| 10:12:21 | 15 | obviously the liaison for the Omidis. |
| 10:12:25 | 16 | So he said, "There is a check for you."  So |
| 10:12:27 | 17 | from the tone of his voice I could realize that they are |
| 10:12:32 | 18 | trying to remove the guilt from their side by saying, |
| 10:12:36 | 19 | "Oh, we gave him a check but he didn't take it."  Okay? |
| 10:12:41 | 20 | "So we have fulfilled our commit- -- our obligation to |
| 10:12:46 | 21 | him but he doesn't want to take it." |
| 10:12:48 | 22 | I asked him, "Okay.  Tell me the amount of the |
| 10:12:51 | 23 | check so I will know that this is exactly the amount that |
| 10:12:54 | 24 | they owe me."  And he wouldn't say. |
| 10:12:57 | 25 | So I told him, "You know what, if you don't |

31

Exhibit Page 83

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:13:00 | 1 | tell me what is the amount of the check I don't want to |
| 10:13:03 | 2 | see you." He hang up. |
| 10:13:06 | 3 | He called me at another time. The same story |
| 10:13:09 | 4 | again: "I am very good attorney. I have very vast |
| 10:13:14 | 5 | experience in -- in defense. And you know me, I have |
| 10:13:23 | 6 | represented so and so and so. And it will be good for |
| 10:13:27 | 7 | you that I represented you." |
| 10:13:29 | 8 | I said, "Mr. Oxman, we don't want to keep on |
| 10:13:35 | 9 | repeating the things again and again and again. There |
| 10:13:38 | 10 | are certain conditions that should exist before you can |
| 10:13:42 | 11 | represent me. And I told you about those. Unless those |
| 10:13:46 | 12 | are done, I don't want to see you." |
| 10:13:51 | 13 | Anyway, yesterday he called me. And I have his |
| 10:14:00 | 14 | name on my phone. My phone stores everybody who called |
| 10:14:04 | 15 | me for the next 16 days. He called me five times. He |
| 10:14:08 | 16 | called me twice on my clinic phone and he called me three |
| 10:14:12 | 17 | times on my cellular phone. |
| 10:14:16 | 18 | And I could see and I could feel that maybe |
| 10:14:19 | 19 | they are sitting beside him and telling him what to say. |
| 10:14:23 | 20 | So he said, "Dr. Shamaan, there a check for |
| 10:14:26 | 21 | you. And here I feel very despondent, very" -- what did |
| 10:14:36 | 22 | he say? "I feel that I was insulted and you treated me |
| 10:14:46 | 23 | very bad." And he tried to make me feel guilty. And |
| 10:14:52 | 24 | he -- he is a martyr. |
| 10:14:55 | 25 | So I said, "Let's forget about this acting. |

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | | |
|---|---|---|
| 10:15:00 | 1 | You do not represent me.  You actually now wide in the |
| 10:15:05 | 2 | open representing the Omidis.  You are not representing |
| 10:15:09 | 3 | me.  You are delivering messages for the Omidis and |
| 10:15:13 | 4 | that's all you want.  The Omidis -- The Omidis wanted |
| 10:15:20 | 5 | only one thing.  They pay me my salaries for -- on one |
| 10:15:26 | 6 | condition, that I lie to them." |
| 10:15:28 | 7 | Q     And how -- how do you know that? |
| 10:15:29 | 8 | A     We met with them, the three of them, in Michael |
| 10:15:36 | 9 | Omidi's office. |
| 10:15:37 | 10 | Q     Who is the three? |
| 10:15:38 | 11 | A     The three are:  Michael Omidi, Julian Omidi and |
| 10:15:41 | 12 | Mr. Oxman. |
| 10:15:42 | 13 | Q     And yourself? |
| 10:15:43 | 14 | A     And myself. |
| 10:15:44 | 15 | Q     When did that meeting occur? |
| 10:15:45 | 16 | A     Two weeks ago. |
| 10:15:46 | 17 | Q     Do you remember what day it was? |
| 10:15:48 | 18 | A     No. |
| 10:15:48 | 19 | Q     Which office did you meet in? |
| 10:15:50 | 20 | A     In Beverly Hills, in the Top Surgeon Surgery |
| 10:15:55 | 21 | Center. |
| 10:15:56 | 22 | Q     And is that on the 8th Floor?  Or was this |
| 10:15:59 | 23 | on -- on the first floor? |
| 10:16:01 | 24 | A     No.  On the first -- the ground floor. |
| 10:16:03 | 25 | Q     So is that the 9001 -- |

33

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.              12/20/2011

| | | |
|---|---|---|
| 10:16:06 | 1 | A    I think that is the one, yes. |
| 10:16:07 | 2 | Q    Suite 106? |
| 10:16:08 | 3 | A    Yes. |
| 10:16:09 | 4 | Q    And that's a surgical center; that's the |
| 10:16:11 | 5 | ambulatory surgical center? |
| 10:16:14 | 6 | A    Yes. |
| 10:16:15 | 7 | Q    And where did that meeting occur in that; was |
| 10:16:17 | 8 | it one of the offices? |
| 10:16:19 | 9 | A    It occurred at 8 o'clock. |
| 10:16:22 | 10 | Q    And whose office was that meeting? |
| 10:16:23 | 11 | A    Michael Omidi's office. |
| 10:16:25 | 12 | Q    And what was the nature of the conversation; |
| 10:16:27 | 13 | what was said to you and what did you say to them? |
| 10:16:30 | 14 | A    To discuss the way how to defend this case and |
| 10:16:35 | 15 | how they will pay me my salaries. |
| 10:16:38 | 16 | Q    What did they say to you? |
| 10:16:39 | 17 | A    They said -- they start negotiating how much |
| 10:16:42 | 18 | they pay me.  And it was obvious that Julian is the mild |
| 10:16:49 | 19 | one, where he negotiates to pay me like -- he tries to |
| 10:16:53 | 20 | nibble on this amount.  In other words, "Why don't we pay |
| 10:16:56 | 21 | you 70,000 or 60,000 or 40,000 And I -- you know, I |
| 10:17:01 | 22 | understand some Persian because of my -- my country is in |
| 10:17:05 | 23 | proximity to Iran.  I understand a little bit, few words. |
| 10:17:08 | 24 | So I could hear Michael Omidi was telling Julian Omidi, |
| 10:17:15 | 25 | saying, "Don't give him those -- this money, he's not |

34

Exhibit Page 86

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.        12/20/2011

| | | |
|---|---|---|
| 10:17:18 | 1 | going to say what we want."  That's what I understood in |
| 10:17:22 | 2 | Persian.  So -- |
| 10:17:25 | 3 | Q    Do you speak Persian? |
| 10:17:27 | 4 | A    I don't speak fluent Persian, but I understand |
| 10:17:27 | 5 | words.  You see, if you -- if you hear somebody says |
| 10:17:36 | 6 | "Shamaan" and "went" and "show," you know that Shamaan |
| 10:17:43 | 7 | went to that place and he didn't show up.  You can add it |
| 10:17:46 | 8 | up. |
| 10:17:47 | 9 | Q    So they were speaking -- |
| 10:17:48 | 10 | A    Persian. |
| 10:17:48 | 11 | Q    -- in between themselves? |
| 10:17:51 | 12 | A    Right. |
| 10:17:51 | 13 | Q    And that's between the Omidi brothers, Michael |
| 10:17:53 | 14 | was -- |
| 10:17:54 | 15 | A    And Julian was sitting. |
| 10:17:55 | 16 | Q    And so you understood what they were saying to |
| 10:17:57 | 17 | each other? |
| 10:17:59 | 18 | A    Yes.  In essence, he -- he was telling him, |
| 10:18:01 | 19 | Don't give him nothing because he is not going to say |
| 10:18:04 | 20 | what we want. |
| 10:18:08 | 21 | So at any rate, which surprised me, and I was |
| 10:18:12 | 22 | shocked, that Mr. Oxman was sitting there like poodle |
| 10:18:19 | 23 | listening to what the Omidis are telling him to say.  And |
| 10:18:23 | 24 | then they started dictating on Oxman who using his |
| 10:18:29 | 25 | computer, started dictating a letter or an affidavit what |

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 10:18:35 | 1 | to say so we can diffuse that case. |
| 10:18:43 | 2 | Q   Who was actually dictating to Mr. Oxman?  Who |
| 10:18:46 | 3 | was actually telling Mr. Oxman -- |
| 10:18:46 | 4 | A   Both the Omidis. |
| 10:18:47 | 5 | Q   Both of them were? |
| 10:18:48 | 6 | A   Right. |
| 10:18:50 | 7 | Q   That's both Julian and Michael Omidi were |
| 10:18:53 | 8 | dictating to Mr. Oxman what he should place in the |
| 10:18:56 | 9 | declaration? |
| 10:18:57 | 10 | A   Correct. |
| 10:18:59 | 11 |     And they -- they started writing things.  And |
| 10:19:01 | 12 | then, you know, I was stunned.  I'm -- I'm listening to |
| 10:19:06 | 13 | them and I can't believe that three millionaires are |
| 10:19:10 | 14 | sitting on the desk negotiating my salary which is few |
| 10:19:14 | 15 | thousand dollars, and to give me that I have to lie |
| 10:19:19 | 16 | and -- and write this declaration. |
| 10:19:24 | 17 | Q   Did they present you with the declaration that |
| 10:19:26 | 18 | Mr. Oxman had typed up based upon the dictation from the |
| 10:19:29 | 19 | Omidi brothers? |
| 10:19:30 | 20 | A   Correct. |
| 10:19:31 | 21 | Q   And was that information in that declaration |
| 10:19:34 | 22 | true and correct or was it false and -- and a lie? |
| 10:19:36 | 23 | A   It's a lie, all of it.  No exception. |
| 10:19:41 | 24 | Q   Did you ever sign the declaration? |
| 10:19:44 | 25 | A   I signed it, yes.  But just to see what's going |

www.DCRLitigationServices.com
(818) 706-3749     (800) DCR-3003     (415) 777-1190     (805) 497-0046

Exhibit Page 88

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.      12/20/2011

| | | |
|---|---|---|
| 10:19:47 | 1 | on. |
| 10:19:49 | 2 | But the Omidis said, "No, that's not enough." |
| 10:19:52 | 3 | And they started writing another letter -- |
| 10:19:55 | 4 | Q    May I see the declaration?  Is this the |
| 10:19:56 | 5 | declaration you have in front of you? |
| 10:19:58 | 6 | A    Yeah.  Can I read it or -- |
| 10:19:59 | 7 | Q    Let me just mark it first.  And then we will go |
| 10:20:01 | 8 | ahead and read it, make sure we know what it is. |
| 10:20:04 | 9 | So this is the declaration that was presented |
| 10:20:05 | 10 | to you? |
| 10:20:07 | 11 | A    Uh-huh. |
| 10:20:07 | 12 | Q    And did you actually sign this declaration? |
| 10:20:09 | 13 | A    I think I signed something.  I don't -- don't |
| 10:20:10 | 14 | remember. |
| 10:20:10 | 15 | Q    Okay.  But the information that's contained in |
| 10:20:12 | 16 | this declaration, which we'll now mark as Exhibit B, all |
| 10:20:15 | 17 | the information in this declaration -- |
| 10:20:17 | 18 | A    Is not correct.  It's a lie.  And it's intended |
| 10:20:22 | 19 | to do two things:  One, they think that paying my money, |
| 10:20:27 | 20 | which is a bribe, for the sake of writing this |
| 10:20:31 | 21 | declaration; in other words, there is a price for my |
| 10:20:35 | 22 | money. |
| 10:20:36 | 23 | Q    Did they offer to pay you money for you to lie? |
| 10:20:38 | 24 | A    Yes. |
| 10:20:39 | 25 | Q    And -- |

www.DCRLitigationServices.com
(818) 706-3749      (800) DCR-3003      (415) 777-1190      (805) 497-0046

Exhibit Page 89

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | | |
|---|---|---|---|
| 10:20:40 | 1 | A | And that money is my salaries. |
| 10:20:43 | 2 | Q | And did they ever tell you that if you don't |
| 10:20:44 | 3 | | sign this and don't lie -- |
| 10:20:46 | 4 | A | They won't give me the money. |
| 10:20:49 | 5 | Q | That's what they told you? |
| 10:20:50 | 6 | A | Exactly. |
| 10:20:50 | 7 | Q | Who told you that? |
| 10:20:51 | 8 | A | The Omidis. |
| 10:20:52 | 9 | Q | Both Michael and Julian tell you that or one of |
| 10:20:54 | 10 | | the Omidi brothers? |
| 10:20:54 | 11 | A | Both of them. |
| 10:20:54 | 12 | Q | Both of them? |
| 10:20:56 | 13 | | MR. WALKER:  We'll mark this declaration as Exhibit |
| 10:20:58 | 14 | | B. |
| 10:20:59 | 15 | | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 10:20:59 | 16 | | PLAINTIFF'S EXHIBIT B FOR IDENTIFICATION BY THE CERTIFIED |
| 10:20:59 | 17 | | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 10:21:05 | 18 | | BY MR. WALKER: |
| 10:21:05 | 19 | Q | If you would, if you go through that |
| 10:21:06 | 20 | | declaration, and tell me what items are not true that |
| 10:21:09 | 21 | | they wanted you to indicate -- |
| 10:21:09 | 22 | A | I'm going to read it one by one.  And -- and |
| 10:21:13 | 23 | | I -- I will tell you:  This is true or this is not true. |
| 10:21:16 | 24 | | "On November 1, I contacted Attorney Brian Oxman |
| 10:21:19 | 25 | | and requested that he serve as my attorney."  Not true. |

38

Exhibit Page 90

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | | |
|---|---|---|
| 10:21:22 | 1 | Q    That is a lie? |
| 10:21:24 | 2 | A    Pure lie. |
| 10:21:29 | 3 | Los Angeles Superior Court case No. SC 111332. |
| 10:21:34 | 4 | "I requested Mr. Oxman to contact opposing |
| 10:21:36 | 5 | counsel, John Walker and Alexander Robinson, and inform |
| 10:21:36 | 6 | them of his representation."  Not true.  I did not ask |
| 10:21:45 | 7 | him to do that. |
| 10:21:47 | 8 | "I instructed Mr. Oxman to request a |
| 10:21:51 | 9 | continuance as of my deposition scheduled for November 2 |
| 10:21:54 | 10 | because I had just retained counsel verbally."  Not true. |
| 10:21:59 | 11 | So only time I knew that this deposition was |
| 10:22:04 | 12 | continued is when he pulled that stunt in front of all of |
| 10:22:07 | 13 | you. |
| 10:22:08 | 14 | Q    Slow down a little bit as you are reading |
| 10:22:09 | 15 | through this so we get an accurate record, both for the |
| 10:22:09 | 16 | court reporter as well as for the videotape. |
| 10:22:16 | 17 | You may continue. |
| 10:22:27 | 18 | A    Okay.  "Mr. Oxman agreed -- |
| 10:22:28 | 19 | Q    Slow down.  Slow down. |
| 10:22:29 | 20 | A    "Mr. Oxman agreed and contacted opposing |
| 10:22:30 | 21 | counsel on my behalf on November 1, 2011."  Not true. |
| 10:22:35 | 22 | And I don't know. |
| 10:22:38 | 23 | Q    Was he contacting -- as far as you know, he was |
| 10:22:41 | 24 | not contacting anyone on your behalf; is that correct? |
| 10:22:44 | 25 | A    That is correct.  I never talked to him. |

39

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 10:22:46 | 1 | Q    I understand.  Continue on. |
| 10:22:49 | 2 | A    Item No. 3.  "As of November 1, 2011, plaintiff |
| 10:22:54 | 3 | counsel knew I was represented by an attorney."  I don't |
| 10:22:59 | 4 | know. |
| 10:23:00 | 5 | Q    Well, were you represented by an attorney at |
| 10:23:02 | 6 | that time? |
| 10:23:03 | 7 | A    I mean, he is saying that I was represented by |
| 10:23:05 | 8 | an attorney.  It is not true, he never represented me. |
| 10:23:09 | 9 | Did he contact you?  I don't know. |
| 10:23:12 | 10 | "Instead of respecting that fact, plaintiff |
| 10:23:15 | 11 | counsel, John Walker and Alexander Robinson, telephoned |
| 10:23:20 | 12 | me seven different times on the morning of November 2 |
| 10:23:23 | 13 | prior to my deposition."  Not true. |
| 10:23:28 | 14 | I will tell you what is true about this.  You |
| 10:23:30 | 15 | might have called me, but I didn't answer the phone. |
| 10:23:34 | 16 | Is that correct? |
| 10:23:35 | 17 | Q    That's my -- my recollection, but you may |
| 10:23:38 | 18 | continue on. |
| 10:23:38 | 19 | A    "Mr. Walker left messages asking me about me |
| 10:23:41 | 20 | having an attorney."  That is true. |
| 10:23:44 | 21 | You always -- before you talked to me, you |
| 10:23:47 | 22 | always said, "Do you have an attorney?"  And I have |
| 10:23:51 | 23 | always said, "No, I don't have an attorney." |
| 10:23:56 | 24 | Item No. 4.  "When I arrived at the deposition |
| 10:23:58 | 25 | at Mr. Robertson's office located at 880 Hampshire Road, |

www.DCRLitigationServices.com
(818) 706-3749     (800) DCR-3003     (415) 777-1190     (805) 497-0046

Exhibit Page 92

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:24:05 | 1 | Suite B, Westlake Village, Mr. Robinson placed me in a |
| 10:24:10 | 2 | small room downstairs from where the deposition was to be |
| 10:24:14 | 3 | held and started to talk to me. I told him that I was |
| 10:24:19 | 4 | waiting for my attorney who I had asked to represent me." |
| 10:24:24 | 5 | Not true. |
| 10:24:28 | 6 | Q    First of all, I want to make sure -- you were |
| 10:24:29 | 7 | placed in a room, but you were not -- |
| 10:24:33 | 8 | A    But he's saying that you placed me in a room |
| 10:24:40 | 9 | and I'm waiting for an attorney who is representing me. |
| 10:24:44 | 10 | There is no such thing. I never talked to him. |
| 10:24:48 | 11 | Q    Very fine.  Continue on. |
| 10:24:49 | 12 | A    "I was never told that a reporter was going to |
| 10:24:52 | 13 | be present." I was told up front, outside in the |
| 10:24:57 | 14 | corridor that there will be a reporter by the name of Mr. |
| 10:25:02 | 15 | Pfiefer. |
| 10:25:03 | 16 | "Do you have any opposition to allow him to |
| 10:25:07 | 17 | attend the deposition?" And I said "No, I don't have any |
| 10:25:12 | 18 | opposition to allow him to attend." That is the pure |
| 10:25:15 | 19 | truth. I -- I agreed for him to -- to be present during |
| 10:25:21 | 20 | the deposition. |
| 10:25:24 | 21 | Item No. 5.  "Mr. Robinson and Mr. Walker asked |
| 10:25:29 | 22 | me if I had a written, signed contract with an attorney. |
| 10:25:34 | 23 | I told him I did not." True. |
| 10:25:39 | 24 | "They then said that meant that I did not have |
| 10:25:42 | 25 | an attorney." True. |

41

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

10:25:47  1          "I had a verbal agreement with Mr. Oxman.  But

10:25:50  2     from what they said, I thought a verbal contract was not

10:25:53  3     a contract."

10:25:55  4          Q    Is that true or untrue?

10:25:57  5          A    Not true.

10:25:59  6          Q    Fine.  Continue on.

10:25:59  7          A    "I told them that I had talked to my attorney

10:26:03  8     on the telephone three times that morning and I was

10:26:08  9     waiting for him to arrive.  They said they already knew

10:26:12  10    my attorney's name."  Half is true, half is not true.

10:26:17  11         I mean, I talked to him three times, but only

10:26:20  12    to -- to tell me where is he on the road.  Nothing else.

10:26:25  13    And I was -- and they -- you did not tell me that you

10:26:31  14    know that he is representing me.  You did not tell me

10:26:34  15    that.  I don't know if he did or not, but you did not

10:26:37  16    tell me.

10:26:40  17         Item No. 6.  "Both Mr. Walker and Robinson then

10:26:46  18    introduced me to the reporter for the Los Angeles Times,

10:26:49  19    Stuart Pfiefer."  True.

10:26:52  20         "Mr. Pfiefer asked me if he could attend the

10:26:54  21    deposition."  True.

10:26:57  22         "I said I have no objection, but I'm waiting

10:26:59  23    for my attorney, Mr. Oxman."  Not true.

10:27:05  24         I'm waiting for Mr. Oxman, not my attorney

10:27:08  25    Mr. Oxman.  The sentence is wrong.

www.DCRLitigationServices.com
(818) 706-3749      (800) DCR-3003      (415) 777-1190      (805) 497-0046

Exhibit Page 94

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | | |
|---|---|---|
| 10:27:14 | 1 | "Mr. Pfiefer asked me if I could tell him any |
| 10:27:16 | 2 | information about the case.  I said I could not do that |
| 10:27:19 | 3 | because that is not the avenue."  True. |
| 10:27:25 | 4 | Even after I told Mr. Pfiefer I could not give |
| 10:27:27 | 5 | him more, Mr. Pfiefer stayed in the room while the other |
| 10:27:32 | 6 | attorneys asked me questions while I was waiting for |
| 10:27:35 | 7 | Mr. Oxman."  Not true. |
| 10:27:38 | 8 | You never asked me any questions about the case |
| 10:27:41 | 9 | and -- and -- and we didn't discuss anything about the |
| 10:27:45 | 10 | case in front of Mr. Pfiefer. |
| 10:27:49 | 11 | Item No. 7.  "Mr. Robinson and Mr. Walker told |
| 10:27:54 | 12 | me that there would be a lot of people upstairs who will |
| 10:27:59 | 13 | videotape my deposition."  True. |
| 10:28:02 | 14 | "They said that they were going to ask me about |
| 10:28:04 | 15 | the case."  True. |
| 10:28:08 | 16 | "They asked if Mr. Pfiefer could attend the |
| 10:28:10 | 17 | deposition."  True. |
| 10:28:12 | 18 | "I told them I had no objection but I am |
| 10:28:15 | 19 | waiting for my attorney."  Not true. |
| 10:28:20 | 20 | "Mr. Robinson said" -- Item No. 8. |
| 10:28:22 | 21 | "Mr. Robinson said that I should talk with the L.A. Times |
| 10:28:26 | 22 | newspaper reporter.  I said I should wait until after the |
| 10:28:33 | 23 | case."  Not true. |
| 10:28:37 | 24 | Half of it's true, half of it's not true.  Mr. |
| 10:28:37 | 25 | Robertson never told me I should talk to the L.A. Times. |

43

Exhibit Page 95

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:28:37 | 1 | But it is true that I said to Mr. Pfiefer, "We should |
| 10:28:39 | 2 | not -- we should talk about this case some other time." |
| 10:28:42 | 3 | "Even when after I said we should wait, |
| 10:28:45 | 4 | Mr. Pfiefer stayed in the room to listen to the |
| 10:28:49 | 5 | conversation." Not true. |
| 10:28:52 | 6 | He -- he stayed because I allowed him to stay. |
| 10:28:55 | 7 | "We talked for more than ten minutes until Mr. |
| 10:28:58 | 8 | Oxman arrived." We didn't talk for ten minutes. We were |
| 10:29:05 | 9 | like, How are you? How are you doing? The weather is |
| 10:29:08 | 10 | good. Stuff like that. General. Not related to this |
| 10:29:11 | 11 | case. |
| 10:29:12 | 12 | Item No. 9. "Mr. Robinson and Mr. Walker said |
| 10:29:16 | 13 | there was another patient who Dr. Gee operated on and the |
| 10:29:21 | 14 | oxygen tank was empty. And they said the patient died |
| 10:29:26 | 15 | because of this." Not true. I said that. I am the one |
| 10:29:31 | 16 | who said that. |
| 10:29:33 | 17 | "They wanted to know that I knew about it." |
| 10:29:36 | 18 | They didn't ask that question. |
| 10:29:37 | 19 | "I told them that Dr. Gee is an excellent |
| 10:29:41 | 20 | doctor, and I did not think that he has done anything |
| 10:29:44 | 21 | wrong." True. I said that. |
| 10:29:49 | 22 | "They were very interested about my other |
| 10:29:50 | 23 | problems that had happened at the surgery center." Not |
| 10:29:54 | 24 | true. |
| 10:29:56 | 25 | "They said that the patient died because the |

44

Exhibit Page 96

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.           12/20/2011

```
10:29:58   1   oxygen tank was empty."  I said that.  They didn't say
10:30:02   2   that.
10:30:04   3        Item No. 10.  "Mr. Robinson and Mr. Walker
10:30:07   4   said, this is another case and everyone knew that a
10:30:10   5   patient had died.  They said that it was all over the
10:30:16   6   internet."  Not true.  I said that.  Because I found
10:30:21   7   about it in the internet myself.
10:30:24   8        "I told I did not think Dr. Gee would have done
10:30:28   9   anything wrong.  The reporter was in the room and they
10:30:33  10   were trying to ask me questions about Dr. Gee."  Not
10:30:35  11   true.
10:30:37  12        Item No. 11.  "When Mr. Oxman arrived, he saw
10:30:39  13   me talking to Mr. Walker and Mr. Robertson in the small
10:30:44  14   room.  Mr. Oxman became very upset.  He asked me why I
10:30:51  15   was talking to Mr. Robinson.  He said, Walker -- both
10:30:54  16   Mr. Robinson and Mr. Walker told Mr. Oxman that they were
10:30:59  17   not sure that Mr. Oxman was going to show up and they
10:31:03  18   wanted to go over a few things with me before the
10:31:06  19   deposition started."  I don't remember such a thing, but
10:31:08  20   I don't see any harm in that.
10:31:11  21        Item No. 12.  "Mr. Oxman took me by the hand
10:31:16  22   and led me to the deposition chair upstairs.  When we
10:31:21  23   went upstairs, Mr. Pfiefer was in the room when the
10:31:25  24   deposition started."  That is not true.
10:31:29  25        "When I was sworn as a witness, Mr. Oxman said
```

45

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

10:31:32  1    the deposition would have to be rescheduled."  True.

10:31:42  2         "Mr. Oxman took me by the hand and we left the

10:31:45  3    deposition room."  True.

10:31:48  4         "On the way down the stairs -- on the way down

10:31:50  5    the stairway, Mr. Oxman stated to Mr. Robinson and

10:31:54  6    Mr. Walker that with the stunt they had pulled in

10:32:00  7    speaking to me, Dr. Shamaan, before the deposition

10:32:04  8    without representation -- without representation, the

10:32:07  9    court could impose sanctions.  My attorney was visibly

10:32:12  10   upset."

10:32:13  11        Did they say that?  I don't know.

10:32:17  12   Q    I'm just asking what your recollection is.

10:32:20  13   A    I don't know.

10:32:21  14        Number 13.  "Approximately two weeks ago on or

10:32:28  15   about November 21st, Mr. Walker called me on the phone

10:32:31  16   again.  He asked me if I was represented by an attorney.

10:32:38  17   I told him I did not have a signed agreement, but I had

10:32:42  18   asked Mr. Oxman to help me."  Not true.

10:32:46  19        "He then said that I did not have an attorney

10:32:49  20   and that he wanted me to take a deposition.  He told me

10:32:53  21   that they were taking Dr. Tashjian's deposition and he

10:32:59  22   wanted to schedule my deposition.  I asked him to please

10:33:02  23   make it on a Tuesday or a Thursday.  I have now

10:33:08  24   discovered that Mr. Walker was sending court notices to

10:33:12  25   Mr. Oxman, but Mr. Walker did not tell me he was doing

46

Exhibit Page 98

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

10:33:17  1  this on the phone conversation." The part that I wanted

10:33:21  2  my deposition to be scheduled Tuesday or Thursday is

10:33:24  3  true. Because these are the days that I can be

10:33:29  4  available. The rest of the stuff is not true.

10:33:33  5      Item No. 14. "I received a letter from John

10:33:37  6  Walker yesterday. In it he has scheduled my deposition

10:33:40  7  for December 20. A copy of the letter is attached as

10:33:45  8  Exhibit A." I don't know what did he meant by it, but my

10:33:50  9  understanding is he is trying to show that Mr. Walker did

10:33:53  10 not honor the fact that Mr. Oxman represent Dr. Shamaan.

10:34:05  11 So that letter should have been -- should have been sent

10:34:08  12 to Mr. Oxman not to Shamaan. But I don't think

10:34:22  13 Mr. Walker did anything wrong, because I did not have an

10:34:26  14 attorney. And him sending me that letter is in -- is

10:34:30  15 okay.

10:34:31  16     Q    Dr. Shamaan, I want to show you a notice of

10:34:36  17 taking your deposition for today, December 20th, and ask

10:34:44  18 if this document was received by you?

10:34:45  19     A    That is true. And I brought all the documents

10:34:48  20 that you requested.

10:34:50  21     Q    My question to you on this document, which we

10:34:58  22 will mark as Exhibit C, was this the document that was

10:35:20  23 attached to that supposed declaration that you have been

10:35:25  24 reading from?

10:35:26  25     A    I didn't understand the question.

47

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.           12/20/2011

| | | |
|---|---|---|
| 10:35:32 | 1 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 10:35:32 | 2 | PLAINTIFF'S EXHIBIT C FOR IDENTIFICATION BY THE CERTIFIED |
| 10:35:32 | 3 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 10:35:32 | 4 | Q    At the last paragraph it indicates that a copy |
| 10:35:35 | 5 | of the deposition notice was attached as an exhibit to |
| 10:35:41 | 6 | that declaration. |
| 10:35:42 | 7 | A    No.  That is not -- that is not -- I don't know |
| 10:35:43 | 8 | if he meant that or not. |
| 10:35:45 | 9 | Q    Okay.  There was nothing that was attached to |
| 10:35:46 | 10 | that document? |
| 10:35:48 | 11 | A    No, there is nothing. |
| 10:35:52 | 12 | MS. KAUFMAN:  Mr. Walker, could I ask a quick |
| 10:35:53 | 13 | question?  I -- I don't have a copy of that declaration |
| 10:35:55 | 14 | the deponent is reading from.  Could we clarify that the |
| 10:36:05 | 15 | doctor's name is Dr. Gee? |
| 10:36:05 | 16 | MR. WALKER:  Dr. Gee. |
| 10:36:05 | 17 | MS. KAUFMAN:  Could you spell that, please. |
| 10:36:05 | 18 | THE WITNESS:  Gee. |
| 10:36:05 | 19 | MR. WALKER:  G-E-E. |
| 10:36:09 | 20 | MS. KAUFMAN:  Okay.  Thank you, very much. |
| 10:36:09 | 21 | BY MR. WALKER: |
| 10:36:09 | 22 | Q    Doctor, what was your understanding as to what |
| 10:36:11 | 23 | the purpose of that document was that they wanted you to |
| 10:36:18 | 24 | sign? |
| 10:36:19 | 25 | A    Two things.  One, they will pay me my salary if |

48

Exhibit Page 100

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                  12/20/2011

| | |
|---|---|
| 10:36:23 | 1 |
| 10:36:33 | 2 |
| 10:36:36 | 3 |
| 10:36:42 | 4 |
| 10:36:46 | 5 |
| 10:36:48 | 6 |
| 10:36:48 | 7 |
| 10:36:48 | 8 |
| 10:36:49 | 9 |
| 10:36:56 | 10 |
| 10:36:57 | 11 |
| 10:36:59 | 12 |
| 10:37:01 | 13 |
| 10:37:03 | 14 |
| 10:37:06 | 15 |
| 10:37:09 | 16 |
| 10:37:09 | 17 |
| 10:37:09 | 18 |
| 10:37:15 | 19 |
| 10:37:15 | 20 |
| 10:37:27 | 21 |
| 10:37:29 | 22 |
| 10:37:30 | 23 |
| 10:37:30 | 24 |
| 10:37:32 | 25 |

I lie.  Two, to disbar you, Mr. Walker and Mr. Robertson.

    Q    Did they offer -- first, did Julian Omidi offer you money in order for you to sign a declaration that was untrue?

    A    That's true.

    Q    Did Michael Omidi offer you money to sign a declaration that was untrue?

    A    True.

    Q    Did Mr. Oxman offer you anything for you to sign the declaration that was untrue?

    A    He asked me to sign the declaration.  But he didn't -- he didn't talk about the money because he is not the one who is giving me it.

    Q    Did Mr. Oxman give you the impression that he knew that the information in that declaration was untrue?

    A    The -- the Omidis dictated it to him.

    MR. DE HERAS:  Objection.  Calls for speculation.  Lacks foundation.

BY MR. WALKER:

    Q    Did either Julian Omidi or Michael Omidi ever request you to lie about anything additional concerning this case.

    MR. DE HERAS:  Objection.  Lacks foundation.  Calls for speculation.

    THE WITNESS:  I can answer?

49

Exhibit Page 101

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 10:37:32 | 1 | BY MR. WALKER: |
| 10:37:32 | 2 | Q    Yes. |
| 10:37:33 | 3 | A    Yes. |
| 10:37:33 | 4 | Q    And what was that? |
| 10:37:34 | 5 | A    They will be willing to hire me a lawyer, give |
| 10:37:37 | 6 | me my salaries if I sign this declaration. |
| 10:37:43 | 7 | Q    Did they ever ask you to lie about anything |
| 10:37:45 | 8 | else? |
| 10:37:46 | 9 | A    Not at that meeting. |
| 10:37:51 | 10 | Q    Who said to you that they wanted you to sign |
| 10:37:58 | 11 | that declaration with the false information in it, |
| 10:38:03 | 12 | Exhibit B, for the purpose of getting Mr. Robertson |
| 10:38:09 | 13 | and/or myself disbarred? |
| 10:38:12 | 14 | A    Mr. Oxman. |
| 10:38:14 | 15 | Q    Were you ever paid any money by either Julian |
| 10:38:16 | 16 | or Michael Omidi after that conversation? |
| 10:38:20 | 17 | A    No. |
| 10:38:20 | 18 | Q    Let's talk a bit about your background.  You |
| 10:38:39 | 19 | are a medical doctor? |
| 10:38:42 | 20 | A    Yes. |
| 10:38:43 | 21 | Q    First, where were you born? |
| 10:38:44 | 22 | A    I was born in Iraq, 5/9/46, Baghdad. |
| 10:38:55 | 23 | Q    And how long did you live there? |
| 10:38:56 | 24 | A    27 years. |
| 10:38:57 | 25 | Q    Were you a medical doctor in -- in Baghdad? |

50

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:39:00 | 1 | A    I graduated as a doctor when I was 21.  I did |
| 10:39:07 | 2 | residencies from 21 until 27 in Baghdad in general |
| 10:39:12 | 3 | surgery, in trauma surgery and in war surgery. |
| 10:39:16 | 4 | Q    Where were you educated? |
| 10:39:22 | 5 | A    I was educated in Baghdad High School founded |
| 10:39:26 | 6 | by the American Jesuits.  That's where I learned my |
| 10:39:29 | 7 | English. |
| 10:39:30 | 8 | Q    Are you Catholic? |
| 10:39:31 | 9 | A    I am Catholic. |
| 10:39:36 | 10 | Q    And so that's why you were at the Jesuit |
| 10:39:38 | 11 | school? |
| 10:39:39 | 12 | A    Yes. |
| 10:39:40 | 13 | Q    And what was the name of the institution where |
| 10:39:44 | 14 | you received your medical training initially? |
| 10:39:47 | 15 | A    It's called College of Medicine, Baghdad, Iraq. |
| 10:39:53 | 16 | Q    And did you graduate and practice surgery in |
| 10:39:56 | 17 | Baghdad? |
| 10:39:56 | 18 | A    Correct. |
| 10:39:57 | 19 | Q    And for how many years did you practice surgery |
| 10:39:59 | 20 | in Baghdad? |
| 10:40:01 | 21 | A    Seven years. |
| 10:40:03 | 22 | Q    Did you have a specialty while you were there? |
| 10:40:06 | 23 | A    General surgery. |
| 10:40:08 | 24 | Q    What was the reason --- why did you leave |
| 10:40:10 | 25 | Baghdad and go to next? |

51

Exhibit Page 103

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 10:40:11 | 1 | A    Two reasons, I wanted to continue my education |
| 10:40:13 | 2 | and I wanted to run away from Saddam Hussein. |
| 10:40:18 | 3 | Q    Were you being persecuted there at all? |
| 10:40:20 | 4 | A    Yes.  I was a Christian, and I was subjected to |
| 10:40:23 | 5 | a lot of mental and physical torture. |
| 10:40:27 | 6 | Q    And that was by the regime that was there? |
| 10:40:30 | 7 | A    Yes. |
| 10:40:31 | 8 | Q    And where did you go to from Baghdad? |
| 10:40:32 | 9 | A    To England. |
| 10:40:35 | 10 | Q    And where did you settle in England; what city? |
| 10:40:37 | 11 | A    I did a residency in surgery, again three |
| 10:40:40 | 12 | years. |
| 10:40:41 | 13 | Q    Where was that? |
| 10:40:42 | 14 | A    In London. |
| 10:40:43 | 15 | Q    Did you have any specialties? |
| 10:40:44 | 16 | A    General surgery. |
| 10:40:45 | 17 | Q    How long did you stay there and practice |
| 10:40:46 | 18 | medicine? |
| 10:40:47 | 19 | A    Three years. |
| 10:40:48 | 20 | Q    And where did you go to next? |
| 10:40:50 | 21 | A    United States. |
| 10:40:51 | 22 | Q    And where did you settle in the United States? |
| 10:40:52 | 23 | A    In California.  I went into Martin Luther King |
| 10:40:54 | 24 | Hospital.  I got five-year residency in general surgery |
| 10:41:00 | 25 | also. |

52

Exhibit Page 104

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

```
10:41:01   1        MR. ROBERTSON:   That was Martin Luther King
10:41:03   2   Hospital?
10:41:03   3        THE WITNESS:   Yes.
10:41:03   4   BY MR. WALKER:
10:41:06   5        Q     Did you receive any type of board
10:41:07   6   certifications?
10:41:10   7        A     Yes.   I -- I passed my boards in the first
10:41:15   8   year.
10:41:15   9        Q     And which board did you receive, which
10:41:16  10   certification?
10:41:17  11        A     American Board of Surgeons.
10:41:18  12        Q     During the time that you were at Martin Luther
10:41:19  13   King, did you specialize in any particular type of
10:41:24  14   surgery?
10:41:25  15        A     Well, from my background with my training in
10:41:31  16   three continents, I happen to be exposed to a lot of
10:41:34  17   things that I don't -- I doubt that any doctor here in
10:41:38  18   the United States have the capabilities that I have
10:41:41  19   because of my training in three different countries.
10:41:47  20        In England and in Baghdad, I did G.I.
10:41:50  21   surgeries, G.I. endoscopies, gynecological surgeries,
10:41:55  22   general surgeries.   I even was trained on deliveries,
10:42:08  23   C-sections, vascular surgery and urological surgery.
10:42:15  24        This is the school -- the English school
10:42:19  25   requirements for you to become a general surgeon.   You
```

53

Exhibit Page 105

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 10:42:25 | 1 | have to know surgery of everything a little bit. |
| 10:42:32 | 2 | When I came to this country I maintained that. |
| 10:42:35 | 3 | Actually, at this present time, I do family practice.  I |
| 10:42:39 | 4 | do endoscopies, G.I. surgeries.  I do general surgery.  I |
| 10:42:45 | 5 | do gynecological surgery.  And I do them in seven |
| 10:42:49 | 6 | hospitals. |
| 10:42:50 | 7 | I am so much experienced that I doubt there is |
| 10:42:53 | 8 | any expert witness who can give the information about |
| 10:42:56 | 9 | these things more than I do. |
| 10:42:59 | 10 | Q    Do you have residency -- do you have privileges |
| 10:43:01 | 11 | at a number of hospitals in the Los Angeles area? |
| 10:43:07 | 12 | A    Yes. |
| 10:43:08 | 13 | Q    Which hospitals are those? |
| 10:43:13 | 14 | A    Community Hospital of Huntington Park, Beverly |
| 10:43:17 | 15 | Hospital of Montebello, Los Angeles Metropolitan |
| 10:43:19 | 16 | Hospital, Silver Lake Hospital. |
| 10:43:24 | 17 | MS. CARLSON:  Which hospital? |
| 10:43:28 | 18 | THE WITNESS:  Silver Lake Hospital. |
| 10:43:29 | 19 | MS. CARLSON:  Thank you. |
| 10:43:29 | 20 | THE WITNESS:  Coast Community Hospital and Coast |
| 10:43:29 | 21 | Plaza Community Hospital. |
| 10:43:29 | 22 | BY MR. WALKER: |
| 10:43:38 | 23 | Q    At the time the surgery was performed on Laura |
| 10:43:47 | 24 | Faitro, did you have privileges at those hospitals? |
| 10:43:50 | 25 | A    Yes. |

54

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:43:51 | 1 | Q    Did you ever seek political asylum from any |
| 10:43:54 | 2 | country? |
| 10:43:55 | 3 | A    Yes. |
| 10:43:56 | 4 | Q    And where was that? |
| 10:43:57 | 5 | A    1977. |
| 10:43:57 | 6 | Q    And to which country? |
| 10:44:02 | 7 | A    To the United States. |
| 10:44:02 | 8 | Q    Are you a United States citizen? |
| 10:44:04 | 9 | A    Yes. |
| 10:44:04 | 10 | Q    When did you become a United States citizen? |
| 10:44:06 | 11 | A    1987. |
| 10:44:12 | 12 | Q    You have a private practice at this time? |
| 10:44:15 | 13 | A    I could summarize this in maybe three ways.  I |
| 10:44:19 | 14 | had a private practice before joining the Omidis.  I |
| 10:44:23 | 15 | stopped the private practice because of the good offer |
| 10:44:30 | 16 | they -- they gave me, but it was not true. |
| 10:44:33 | 17 | I used to make $180,000 before I joined them. |
| 10:44:38 | 18 | They promised half a million dollars if I joined them. |
| 10:44:44 | 19 | When I got in the first year with them, $59,000. |
| 10:44:47 | 20 | And right now I went back to private practice, |
| 10:44:49 | 21 | I am barely making a living. |
| 10:44:52 | 22 | Q    When did you first become aware of the |
| 10:44:56 | 23 | 1-800-Get-Thin or the Omidi brothers that were doing lap |
| 10:45:01 | 24 | band surgeries? |
| 10:45:03 | 25 | MR. DE HERAS:   Objection.  Lacks foundation.  Calls |

55

Exhibit Page 107

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.           12/20/2011

| | | |
|---|---|---|
| 10:45:07 | 1 | for speculation.  Vague and ambiguous as phrased. |
| 10:45:16 | 2 | BY MR. WALKER: |
| 10:45:16 | 3 | Q    You may answer. |
| 10:45:18 | 4 | A    I was contacted by a person by the name of |
| 10:45:23 | 5 | Goldstein.  He seems to be the one who recruits different |
| 10:45:26 | 6 | specialties, doctors and nurses, to the Omidis. |
| 10:45:28 | 7 | Q    Do you know his first name? |
| 10:45:31 | 8 | A    No. |
| 10:45:32 | 9 | Q    Is he a medical doctor? |
| 10:45:36 | 10 | A    No. |
| 10:45:37 | 11 | Q    Do you know what his position was with the -- |
| 10:45:40 | 12 | A    He is a promoter or a recruiter.  He -- he |
| 10:45:43 | 13 | works in the same building on Beverly -- Beverly Hills. |
| 10:45:45 | 14 | Q    Is that the 9001, Suite 106? |
| 10:45:48 | 15 | A    Correct. |
| 10:45:49 | 16 | Q    And when were you first contacted by |
| 10:45:51 | 17 | Mr. Goldstein? |
| 10:45:57 | 18 | A    He called me. |
| 10:45:58 | 19 | Q    Approximately what point in time, what year, |
| 10:46:02 | 20 | what month? |
| 10:46:03 | 21 | A    Probably, I would say, July '09. |
| 10:46:06 | 22 | Q    And you were in private practice at that time? |
| 10:46:07 | 23 | A    Yes. |
| 10:46:08 | 24 | Q    Had you placed any type of ads or any kind of |
| 10:46:10 | 25 | information with any organization indicating that you |

56

Exhibit Page 108

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.      12/20/2011

| | | |
|---|---|---|
| 10:46:15 | 1 | were available for hire? |
| 10:46:16 | 2 | A    No. |
| 10:46:17 | 3 | Q    Do you know how he found you or decided to |
| 10:46:21 | 4 | contact you? |
| 10:46:23 | 5 | A    I think he got in contact with a nurse who |
| 10:46:28 | 6 | knows me very well.  And she has told them that this guy |
| 10:46:31 | 7 | is a very experienced guy, he does all sorts of |
| 10:46:34 | 8 | surgeries.  And if you are looking for a surgeon who's so |
| 10:46:38 | 9 | experienced as -- it's this guy. |
| 10:46:39 | 10 | Q    Did you ever talk to that nurse? |
| 10:46:41 | 11 | A    Yes.  Her name is Mirna Tovalin. |
| 10:46:44 | 12 | Q    And how did you know Mirna? |
| 10:46:46 | 13 | A    I worked with her. |
| 10:46:47 | 14 | Q    And that was in your private practice? |
| 10:46:49 | 15 | A    No.  In the hospital. |
| 10:46:51 | 16 | Q    At the hospital.  Which hospital? |
| 10:46:56 | 17 | A    Mission Hospital. |
| 10:46:57 | 18 | Q    Did she assist you in any of the surgeries? |
| 10:47:00 | 19 | A    No.  She was -- you remember I told you that I |
| 10:47:03 | 20 | do family practice. |
| 10:47:06 | 21 | Q    Yes. |
| 10:47:06 | 22 | A    So I admit my pediatric patients to the |
| 10:47:07 | 23 | pediatric unit, and she trains to be a pediatric nurse. |
| 10:47:16 | 24 | Q    Did Mr. Goldstein indicate to you that that's |
| 10:47:19 | 25 | how he had found you? |

57

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:47:20 | 1 | A    Yes. |
| 10:47:21 | 2 | Q    Did he make you an offer for you to come to |
| 10:47:24 | 3 | work? |
| 10:47:25 | 4 | A    He said, "They will offer you much more than |
| 10:47:27 | 5 | what you are making if you come and do lap bands with the |
| 10:47:29 | 6 | Omidis." |
| 10:47:29 | 7 | I told them, "I don't have any experience in |
| 10:47:33 | 8 | lap bands.  I have experience in everything else, but not |
| 10:47:37 | 9 | lap bands, because this is a new thing." |
| 10:47:39 | 10 | Q    And what did he say to you in that regard? |
| 10:47:40 | 11 | A    He said, "Just don't worry, they will take care |
| 10:47:43 | 12 | of that." |
| 10:47:44 | 13 | Q    And how did you proceed now to become |
| 10:47:46 | 14 | associated with the Omidi brothers? |
| 10:47:49 | 15 | A    He made an appointment to meet them.  And I |
| 10:47:57 | 16 | came to the surgery center in Beverly Hills, 9001 Beverly |
| 10:48:03 | 17 | Boulevard, and I met -- |
| 10:48:05 | 18 | Q    That's on Wilshire Boulevard? |
| 10:48:06 | 19 | A    Wilshire Boulevard. |
| 10:48:08 | 20 | And I met with the two Omidis. |
| 10:48:13 | 21 | Q    That's Michael and Julian? |
| 10:48:15 | 22 | A    Both, yes. |
| 10:48:17 | 23 | And the one which seems to be in control is |
| 10:48:19 | 24 | Michael.  He was sitting behind the desk and Julian was |
| 10:48:23 | 25 | sitting on the side. |

58

Exhibit Page 110

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:48:25 | 1 | And the conversation went like that.  "We know |
| 10:48:27 | 2 | that you are a very good surgeon, very experienced, and |
| 10:48:31 | 3 | we want to have you with us.  What we offer you is a |
| 10:48:35 | 4 | salary of -- basic salary of $150,000 a year.  You will |
| 10:48:39 | 5 | be doing only lap bands and cholecystectomies."  This is |
| 10:48:56 | 6 | the only two things I need to do with them to get that |
| 10:49:04 | 7 | salary. |
| 10:49:05 | 8 | Q    Had you ever done either of those type of |
| 10:49:09 | 9 | surgeries before? |
| 10:49:10 | 10 | A    No -- one of them, yes.  The other one of them, |
| 10:49:12 | 11 | no. |
| 10:49:12 | 12 | Q    Which one had you done? |
| 10:49:14 | 13 | A    I've done a cholecystectomy but not the lap |
| 10:49:17 | 14 | band. |
| 10:49:18 | 15 | They will offer me $500 per gastric band after |
| 10:49:21 | 16 | I do 16 free ones.  I didn't understand what that means. |
| 10:49:24 | 17 | But that was like a loophole that later on I found out |
| 10:49:29 | 18 | that it is not true.  It's just put there to lure you. |
| 10:49:35 | 19 | And I will explain to you later. |
| 10:49:40 | 20 | Then they offered me $40,000 director of |
| 10:49:43 | 21 | surgery center.  Now, if you look at item B in that |
| 10:49:48 | 22 | contract, it says "Physician will be paid... will be paid |
| 10:49:54 | 23 | an additional $40,000 per year for director of Surgery |
| 10:49:58 | 24 | Center and director of Bariatric Surgery Center of |
| 10:50:02 | 25 | Excellence." |

59

FAITRO v. SHAMAAN        IHSAN NAJIB SHAMAAN, M.D.        12/20/2011

| | | |
|---|---|---|
| 10:50:08 | 1 | There was no attachment to that phrase.  There |
| 10:50:59 | 2 | was no conditions attached to that phrase.  In other |
| 10:50:13 | 3 | words, it doesn't say, You have to do this to get this. |
| 10:50:17 | 4 | They simply said, "You will be paid $40,000."  That was |
| 10:50:21 | 5 | not true. |
| 10:50:22 | 6 | Item C.  They said, "We will give you $20,000 |
| 10:50:25 | 7 | per year or $40,000 per year for my practice coverage." |
| 10:50:30 | 8 | That was not true also. |
| 10:50:33 | 9 | Q    Was that for insurance coverage? |
| 10:50:37 | 10 | A    Yes. |
| 10:50:39 | 11 | Q    Are you presently, to your knowledge, covered |
| 10:50:45 | 12 | by any policy of insurance? |
| 10:50:47 | 13 | A    I am covered by general surgery coverage but |
| 10:50:49 | 14 | not by bariatrics. |
| 10:50:51 | 15 | Q    Continue on with what you understood the |
| 10:50:52 | 16 | agreement to be with you and the Omidi brothers for you |
| 10:50:58 | 17 | to come to work with them. |
| 10:51:00 | 18 | A    So they promised $20,000 and $40,000 for my |
| 10:51:03 | 19 | practice.  They didn't pay that.  They didn't pay the |
| 10:51:05 | 20 | $40,000 for the deduction fee.  They promised health |
| 10:51:08 | 21 | insurance after three months.  They never paid that. |
| 10:51:11 | 22 | Q    The document you are looking at in front of |
| 10:51:14 | 23 | you, is that an appointment contract? |
| 10:51:18 | 24 | A    That's the contract. |
| 10:51:18 | 25 | Q    Let me take a look at that.  We will mark this |

60

Exhibit Page 112

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | |
|---|---|
| 10:51:34 | 1 |
| 10:51:36 | 2 |
| 10:51:36 | 3 |
| 10:51:36 | 4 |
| 10:51:37 | 5 |
| 10:51:37 | 6 |
| 10:51:40 | 7 |
| 10:51:42 | 8 |
| 10:51:46 | 9 |
| 10:51:47 | 10 |
| 10:51:53 | 11 |
| 10:52:05 | 12 |
| 10:52:06 | 13 |
| 10:52:10 | 14 |
| 10:52:10 | 15 |
| 10:52:11 | 16 |
| 10:52:14 | 17 |
| 10:52:14 | 18 |
| 10:52:16 | 19 |
| 10:52:22 | 20 |
| 10:52:22 | 21 |
| 10:52:22 | 22 |
| 10:52:22 | 23 |
| 10:52:46 | 24 |
| 10:52:51 | 25 |

1  as Exhibit D, as in David.

2       (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED

3  PLAINTIFF'S EXHIBIT D FOR IDENTIFICATION BY THE CERTIFIED

4  SHORTHAND REPORTER AND IS ATTACHED HERETO.)

5  BY MR. WALKER:

6       Q    Was this presented to you at the first meeting

7  with the Omidi brothers?

8       A    Yes.  I think it was in August.

9       Q    Appears to be a 14-page document with your

10  initials in the lower left-hand corner and a signature at

11  the end dated August 25th of 2009.

12       A    Correct.

13       Q    Was that your first meeting with them, to your

14  knowledge?

15       A    That's correct.

16       Q    And that is your signature at the bottom of the

17  page?

18       A    Yes.

19       Q    Let's take a quick break so you can get some

20  water and we can make some copies.

21            Before we go off the record, though, I just

22  want to clarify something, Dr. Shamaan.

23            Has either Mr. Walker or myself offered you any

24  type of money, gift or anything of value to try to

25  influence your testimony here today?

Exhibit Page 113

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

10:52:54  1      A    No.   That was Mr. Oxman, which I didn't say

10:53:00  2   that.   His last call, which I didn't mention -- you just

10:53:03  3   reminded me.   The last call was yesterday, and he said --

10:53:06  4   he said, "Here there is $40,000 check," just like Eddie

10:53:12  5   Murphy when he said, "I have an ice cream, you don't,"

10:53:16  6   waiving the $40,000 check.   And he says, "You don't want

10:53:26  7   $40,000?   Then Mr. Walker and Robertson must have offered

10:53:30  8   you money.   Did they offer you more than that?"

10:53:38  9          And I said, "You know, Mr. Oxman, don't say

10:53:42 10   that.   I have principals.   I won't do this for such a

10:53:45 11   thing.

10:53:46 12          And No. 2 -- then he said, "You know what, by

10:53:51 13   going and telling the truth is going to wind you in jail

10:53:56 14   and losing your license.

10:53:59 15          "I said, if I tell the truth and I lose my

10:54:05 16   license, then let it be.   I don't want to practice no

10:54:09 17   more.

10:54:10 18          Then he said, "To defend this case, the truth

10:54:12 19   does not set you free."

10:54:15 20      Q    Did either myself or Mr. Robertson ever offer

10:54:20 21   you any money for your testimony?

10:54:24 22      A    Never.

10:54:25 23      Q    Did Mr. Oxman ever offer you any money if you

10:54:32 24   would not tell the truth?

10:54:33 25      A    Say that again.

                                                                        62

Exhibit Page 114

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 10:54:34 | 1 | Q    Did Mr. Oxman ever offer you any money if you |
| 10:54:39 | 2 | would lie? |
| 10:54:40 | 3 | A    The Omidis. |
| 10:54:41 | 4 | Q    This last conversation you had with Mr. Oxman, |
| 10:54:48 | 5 | was it your impression if you would lie that he would |
| 10:54:53 | 6 | give you the money he had? |
| 10:54:55 | 7 | A    Who are you talking about? |
| 10:54:56 | 8 | Q    About Mr. Oxman. |
| 10:54:57 | 9 | A    Oxman didn't say that.  The Omidis said that. |
| 10:54:59 | 10 | Q    I understand. |
| 10:55:01 | 11 | Who did you understand your employer to be when |
| 10:55:03 | 12 | you signed this contract marked as Exhibit D? |
| 10:55:06 | 13 | A    This contract is a very weird contract.  And if |
| 10:55:09 | 14 | you go through it, you will see.  I have to work four |
| 10:55:13 | 15 | days, 7:00 to 7:00, that's 48 hours per week.  And they |
| 10:55:20 | 16 | will give me $12,500 a month for four weeks.  And then in |
| 10:55:28 | 17 | that contract it never said where you will practice. |
| 10:55:33 | 18 | Okay?  So I thought it was Los Angeles area.  Then later |
| 10:55:39 | 19 | on I was going to San Diego, Victorville and San |
| 10:55:46 | 20 | Bernardino.  Travel time each week is 20 hours.  20 hours |
| 10:55:50 | 21 | with 68 hours of my time for $12,500.  68 hours for four |
| 10:56:01 | 22 | days.  It comes out to $35 an hour. |
| 10:56:08 | 23 | Right now, as you all know, physician assistant |
| 10:56:12 | 24 | gets $60 an hour, physician assistant.  A nurse can get |
| 10:56:19 | 25 | $50 an hour.  I was getting $35 an hour with three boards |

63

Exhibit Page 115

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | |
|---|---|
| 10:56:25 1 | in my pocket, $35 an hour. And I was waking up 4 o'clock |
| 10:56:33 2 | in the morning, returning 10 o'clock in the evening. |
| 10:56:37 3 | Q    Do you think the number of hours that you were |
| 10:56:40 4 | working permitted you to be a good surgeon? |
| 10:56:43 5 | A    Repeat that again. |
| 10:56:44 6 | Q    Do you believe the number of hours that they |
| 10:56:46 7 | made you work permitted you to be a good surgeon. |
| 10:56:50 8 | MR. DE HERAS:  Objection.  (Inaudible). |
| 10:56:52 9 | THE WITNESS:  It made me -- |
| 10:56:52 10 | BY MR. WALKER: |
| 10:56:52 11 | Q    You can answer. |
| 10:56:52 12 | A    It made me feel that I am passed out. |
| 10:56:55 13 | Q    The -- Exhibit D indicates that the agreement |
| 10:56:59 14 | was with Top Surgeons, Inc., a Medical Corporation. |
| 10:57:04 15 | Was that your understanding as to who you were |
| 10:57:07 16 | employed with?  Or did you understand you were employed |
| 10:57:11 17 | by someone else? |
| 10:57:12 18 | A    Yeah.  That's the name they used at the time I |
| 10:57:18 19 | signed the contract. |
| 10:57:19 20 | MR. WALKER:  Let's take a break for a few minutes |
| 10:57:22 21 | and make some copies of this.  Is that all right with |
| 10:57:23 22 | everyone?  Let's go off the record. |
| 10:57:23 23 | THE VIDEOGRAPHER:  The time is 10:57 a.m.  We are |
| 10:57:23 24 | off of the record. |
| 10:57:33 25 | (Whereupon, a brief recess was taken.) |

64

Exhibit Page 116

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.      12/20/2011

| | | |
|---|---|---|
| 10:57:35 | 1 | THE VIDEOGRAPHER:  We are back on the record.  The |
| 11:01:49 | 2 | time is 11:12 a.m.  This starts media No. 2 of the volume |
| 11:12:33 | 3 | 2 deposition of Ihsan Najib Shamaan, M.D., in the case |
| 11:12:39 | 4 | named John Faitro, et al. versus Ihsan Najib Shamaan, |
| 11:12:40 | 5 | M.D., et al. |
| 11:12:45 | 6 | Thank you. |
| 11:12:46 | 7 | BY MR. WALKER: |
| 11:12:46 | 8 | Q    Dr. Shamaan, I know you understand you are |
| 11:12:48 | 9 | still under oath? |
| 11:12:49 | 10 | A    Yes. |
| 11:12:50 | 11 | Q    Let's move for a moment, if you will -- let's |
| 11:12:52 | 12 | go to the Laura Faitro case itself.  I understand you |
| 11:12:57 | 13 | were the surgeon for Laura Faitro; is that correct? |
| 11:13:00 | 14 | A    Correct. |
| 11:13:00 | 15 | Q    What do you know about the Laura Faitro case? |
| 11:13:03 | 16 | A    Okay.  I sat down yesterday and discussed |
| 11:13:05 | 17 | everything in my mind.  And I want to go systematically |
| 11:13:08 | 18 | through the whole procedure of how we do surgery in this |
| 11:13:15 | 19 | surgery center on Wilshire Boulevard, 9001 Wilshire. |
| 11:13:23 | 20 | I just want to make a statement first that |
| 11:13:28 | 21 | during the last month the Omidi brothers and Mr. Oxman |
| 11:13:33 | 22 | placed me under tremendous mental pressure.  And |
| 11:13:37 | 23 | pressured me to testify with lack of ethics, morality and |
| 11:13:43 | 24 | more so dignity.  In their meeting with me, I was able to |
| 11:13:52 | 25 | understand only one thing, and that is they only give me |

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

Exhibit Page 117

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | |
|---|---|
| 11:13:57 | 1 |
| 11:14:04 | 2 |
| 11:14:10 | 3 |
| 11:14:20 | 4 |
| 11:14:25 | 5 |
| 11:14:32 | 6 |
| 11:14:35 | 7 |
| 11:14:42 | 8 |
| 11:14:45 | 9 |
| 11:14:48 | 10 |
| 11:14:52 | 11 |
| 11:14:57 | 12 |
| 11:15:03 | 13 |
| 11:15:06 | 14 |
| 11:15:07 | 15 |
| 11:15:12 | 16 |
| 11:15:24 | 17 |
| 11:15:27 | 18 |
| 11:15:31 | 19 |
| 11:15:33 | 20 |
| 11:15:36 | 21 |
| 11:15:41 | 22 |
| 11:15:45 | 23 |
| 11:15:50 | 24 |
| 11:15:59 | 25 |

my salaries on one condition, and that is to lie.

Lying is against my principal, especially when it is connected to medicine.  They wanted me to lie to exonerate themselves and harm others.  They asked me not only to lie about the lawyers, but they also asked me to say some thing against the doctor in the other hospital -- what is the name of that hospital?

Q    Simi Valley Hospital?

A    Yes.  And say that they are at fault and they should have opened that patient.  And they were not.

So I decided one thing.  I said, "The hell with my money.  I will not tell a lie.  I will tell the truth even if it harms me.  And I will see if the truth will set me free."

When I graduated as a medical doctor from my country, I took the Hippocratic oath.  In my country this is what the oath says:  "Thou shall not harm your patient.  And thou shall teach your profession to others with dignity."

That did not happen in the United States, with this group especially.

So I made a decision last night.  And I said, I am going to go and tell the truth and commit myself so that in the future nobody can persuade me to change my mind.  And there is no -- no turning back.  I cannot

66

Exhibit Page 118

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

11:16:02  1    change what I'm going to say today.

11:16:08  2         Mr. Oxman and the Omidis said that if you tell

11:16:13  3    the truth, you are committing suicide.  And I am going to

11:16:22  4    lose my license.

11:16:24  5         We will see about that.  And if it is, then let

11:16:26  6    it be.

11:16:29  7         I will try the shortest possible to -- to

11:16:30  8    expose this organization and the fraud, the intrigue and

11:16:35  9    the disregard for the life of patients.  This

11:16:39  10   organization is controlled by one person, Michael Omidi.

11:16:47  11   And he uses his brother Julian Omidi and his mother, and

11:17:02  12   at the beginning his uncle, and to a certain extent

11:17:08  13   certain employees, which majority belongs to a country --

11:17:15  14   and I don't want to mention that country name because I

11:17:22  15   don't want to be accused of prejudices.

11:17:29  16        But from my experience with people from that

11:17:31  17   country, especially at one time in my life I had a

11:17:37  18   girlfriend from that country and I will know that they

11:17:41  19   will do anything for you as long as they get money.  They

11:17:46  20   will lie for you.  They will falsify documents for you.

11:17:50  21   They will do -- they are like a dog sitting on his behind

11:17:54  22   with his hands in front of them: Master, tell me.  Tell

11:17:59  23   me and I will do it for you.

11:18:04  24        Michael Omidi and Julian Omidi choose people

11:18:08  25   who are desperate, who have no future, but promise them a

www.DCRLitigationServices.com
(818) 706-3749     (800) DCR-3003     (415) 777-1190     (805) 497-0046

Exhibit Page 119

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

11:18:27  1   salary because they have no choice.  I will give you an

11:18:30  2   example -- two examples, actually.  There is a person,

11:18:35  3   his name is Bobby.  He is the medical director of that

11:18:39  4   institute.  Bobby is a doctor from the Philippines.  He

11:18:43  5   did not pass his flex exam so he could not be a doctor.

11:18:47  6   So what did he do?  He got this job from the Omidis.  And

11:18:54  7   what does he do?  He enforces what the Omidis want.

11:18:58  8           See, Michael Omidi, in his mind, that he wants

11:19:01  9   to control the whole show, but not get involved, because

11:19:04 10   he does not want to get discovered by the medical board

11:19:09 11   and lose his license.  He's already on probation.

11:19:13 12           And he uses his brother who already lost his

11:19:20 13   license to accomplish what he wants.  He is the

11:19:22 14   mastermind.

11:19:25 15           Bobby will do anything Michael Omidi will do

11:19:29 16   because he -- he knows that he cannot be a doctor.

11:19:32 17       Q     Do you know his last name?

11:19:38 18       A     Number 2 is a doctor from Iran.  He went into

11:19:42 19   general surgery program, and while he was on his third

11:19:47 20   year of the program he was fired.  So that means he

11:19:53 21   cannot become a surgeon.  Because for you to become a

11:19:59 22   surgeon, you have to finish five years' residency or six

11:20:04 23   years' residency.  He did not finish, so he's finished.

11:20:07 24           So what does he have?  He has no choice but to

11:20:11 25   go to the Omidis and do what they want him to do, even

68

Exhibit Page 120

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | |
|---|---|
| 11:20:16 1 | falsify documents, even seeing patients in the disguise |
| 11:20:19 2 | of other specialists; in other words, he sit down and |
| 11:20:22 3 | start clearing patients for surgery and he is not even a |
| 11:20:27 4 | third-year resident. |
| 11:20:31 5 | Q    Do you know his name? |
| 11:20:33 6 | A    No.  I forgot. |
| 11:20:36 7 | Q    Do you remember Bobby's last name? |
| 11:20:38 8 | A    No. |
| 11:20:38 9 | Q    What else do you know about the Faitro case? |
| 11:20:43 10 | MR. DE HERAS:  Objection.  Vague and ambiguous. |
| 11:20:52 11 | Calls for a narrative. |
| 11:20:56 12 | BY MR. WALKER: |
| 11:20:56 13 | Q    You may continue, Doctor. |
| 11:20:58 14 | A    Michael Omidi had one policy, this policy is: |
| 11:21:04 15 | Lie, spy, buy, fry and deny.  I will explain each one of |
| 11:21:22 16 | them. |
| 11:21:34 17 | Lie, the whole organization is full of lies. |
| 11:21:41 18 | Spy, he make sure that one spies on the other.  The |
| 11:21:46 19 | employees spy on the doctors.  The doctors spy on the |
| 11:21:50 20 | employees.  The employees spy on each other.  The doctor |
| 11:21:54 21 | spies on each other and inform him. |
| 11:21:57 22 | His god is money.  If the patient brings in |
| 11:21:59 23 | money, he will give him service.  His prerogative is not |
| 11:22:09 24 | patient care, not patient safety, just "Can he pay?" |
| 11:22:16 25 | Now I will come to Mrs. Faitro.  With one |

69

Exhibit Page 121

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | |
|---|---|
| 11:22:20 | 1 |
| 11:22:24 | 2 |
| 11:22:30 | 3 |
| 11:22:35 | 4 |
| 11:22:47 | 5 |
| 11:22:51 | 6 |
| 11:23:01 | 7 |
| 11:23:04 | 8 |
| 11:23:17 | 9 |
| 11:23:24 | 10 |
| 11:23:30 | 11 |
| 11:23:36 | 12 |
| 11:23:42 | 13 |
| 11:23:48 | 14 |
| 11:23:49 | 15 |
| 11:24:05 | 16 |
| 11:24:10 | 17 |
| 11:24:15 | 18 |
| 11:24:20 | 19 |
| 11:24:22 | 20 |
| 11:24:29 | 21 |
| 11:24:33 | 22 |
| 11:24:37 | 23 |
| 11:24:47 | 24 |
| 11:24:54 | 25 |

1     simple sentence, Mrs. Faitro unfortunately die because of
2     faults of this group.  Poor selection of the patient.
3     Poor preparation of the patient.  Poor surgery.  Poor
4     post-op care.  All controlled by the Omidis.
5          I want to go systematically to prove what I
6     just said.  After I met the Omidis, they send me the next
7     day by a -- by a special airplane.  I know when you buy a
8     ticket the next day it's very expensive.  I was placed in
9     a hotel, first class in New York.  I attended the lap
10    band course.  In that course I learned a lot of things.
11    I learned the right things.  I learned the legitimate
12    things.  When I came back whatever I learned was not
13    being done by this group.
14         So I started working with three doctors at that
15    time:  Dr. Powell, Madan -- Dr. Madan and Dr. Tashjian.
16    With me there was another doctor, his name is Dr. Gee.
17    We came together to this group.
18         Q    You and Dr. Gee came together?
19         A    We came together.  We went to New York
20    together.  Dr. Gee was trained by those three doctors,
21    and he accomplished to pass the exam way, way before me.
22         In my association with these three doctors, two
23    of them were very belligerent, insulting, unethical,
24    immoral.  You remember the Hippocratic oath teach your
25    profession like they taught you.  They didn't say in that

Exhibit Page 122

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:24:58 | 1 | oath yell at them, demoralize them, persecute them, |
| 11:25:02 | 2 | scream at them. |
| 11:25:04 | 3 | I scrubbed twice with Dr. Tashjian, twice. |
| 11:25:08 | 4 | First one, I was standing behind him looking at monitor. |
| 11:25:18 | 5 | And then he turned.  It was his fault, he turned.  And |
| 11:25:24 | 6 | when he turned, he touched me.  So he got angry at me and |
| 11:25:30 | 7 | said, "Why did you stand here?  You should tell me where |
| 11:25:34 | 8 | you should stand before you move."  A sentence I have |
| 11:25:39 | 9 | never heard in my life in 17 years of residency, to |
| 11:25:44 | 10 | insult a doctor that way.  I was just sitting -- standing |
| 11:25:50 | 11 | there watching the monitor.  And he screamed as if I am |
| 11:25:54 | 12 | his servant. |
| 11:25:56 | 13 | The second time I scrubbed with him, the |
| 11:25:58 | 14 | laparoscope head was down.  I pushed it up.  He hit me on |
| 11:26:04 | 15 | the hand and pushed it down.  He treated me like a kid. |
| 11:26:11 | 16 | I was a surgeon when he was -- when he was learning how |
| 11:26:13 | 17 | to masturbate.  I was a surgeon, full-fledge surgeon. |
| 11:26:18 | 18 | And he treated me as if I was his kid. |
| 11:26:27 | 19 | His attitude was like a demigod.  He knew |
| 11:26:31 | 20 | everything.  He knew everything.  The only thing he knows |
| 11:26:37 | 21 | is how to do lap bands. |
| 11:26:39 | 22 | Q    This is Dr. Tashjian you are talking about? |
| 11:26:42 | 23 | A    Yes. |
| 11:26:42 | 24 | Q    Continue on, Doctor. |
| 11:26:44 | 25 | A    So I went to Michael Omidi.  I told him, I |

71

Exhibit Page 123

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:26:51 | 1 | don't want to scrub with this guy.  He is very |
| 11:26:55 | 2 | insulting and -- and scream and yell.  That is not |
| 11:26:59 | 3 | allowable in the surgical theater. |
| 11:27:03 | 4 | So they assigned me to Madan.  And that guy is |
| 11:27:12 | 5 | even worse.  He started ridiculing me and calling my God |
| 11:27:16 | 6 | in vain.  He is a Hindu.  He is an atheist.  And I am a |
| 11:27:21 | 7 | Catholic, which I honor my religion.  Jesus Christ to me |
| 11:27:31 | 8 | is my God.  The name of Jesus Christ never falls from his |
| 11:27:36 | 9 | mouth.  Everything he says is "Jesus Christ, Jesus |
| 11:27:38 | 10 | Christ."  I couldn't accept that also.  Besides he |
| 11:27:44 | 11 | screams and yells again.  So I went to Michael Omidi and |
| 11:27:48 | 12 | I said, "I cannot do that." |
| 11:27:51 | 13 | So what happened is I have to wait until Gee |
| 11:27:55 | 14 | finishes his training, and then Gee started training me. |
| 11:27:58 | 15 | Gee is a very honorable man, very ethical man, very |
| 11:28:02 | 16 | respectable man.  And one thing he said I will never |
| 11:28:05 | 17 | forget.  After he finished training me, I told him, "You |
| 11:28:10 | 18 | know what, I can't thank you very much.  I can't thank |
| 11:28:16 | 19 | you enough because of what you have done to me."  His |
| 11:28:20 | 20 | answer is a typical Hippocratic oath answer.  "I taught |
| 11:28:24 | 21 | you.  You go and teach somebody else."  Very respectable. |
| 11:28:32 | 22 | During my training with Gee, several times we |
| 11:28:35 | 23 | chit-chat.  And at one point he told me -- he -- he seems |
| 11:28:39 | 24 | that he is more involved with the Omidis more than I am. |
| 11:28:55 | 25 | So he told me, "You know what, they are trying |

www.DCRLitigationServices.com
(818) 706-3749      (800) DCR-3003      (415) 777-1190      (805) 497-0046

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:28:58 | 1 | to get rid of Powell and Tashjian because they are |
| 11:29:01 | 2 | costing them a lot of money." |
| 11:29:04 | 3 | Q    Who said that? |
| 11:29:05 | 4 | A    Gee. |
| 11:29:06 | 5 | Q    Dr. Gee said to you -- |
| 11:29:07 | 6 | A    Yes. |
| 11:29:08 | 7 | Q    -- that the Omidis were trying to get rid of |
| 11:29:08 | 8 | Powell and Tashjian? |
| 11:29:12 | 9 | A    And Tashjian because they are costing them a |
| 11:29:14 | 10 | lot of money. |
| 11:29:16 | 11 | Powell, because he uses an instrument they call |
| 11:29:18 | 12 | it automatic suture.  It costs $600 a piece.  So that is |
| 11:29:21 | 13 | too much for them.  They want you to do suturing by hand |
| 11:29:25 | 14 | not by -- by the autosuture machine.  So they want to get |
| 11:29:28 | 15 | rid of him because of that. |
| 11:29:30 | 16 | And certainly Powell after two weeks, he |
| 11:29:33 | 17 | stopped doing -- the Omidis never fire anybody.  They |
| 11:29:36 | 18 | never fire anybody.  But they make his life so miserable |
| 11:29:40 | 19 | that you have to leave. |
| 11:29:44 | 20 | I'll tell you an example.  I go to San Diego, |
| 11:29:48 | 21 | take me three hours from my home to San Diego.  It takes |
| 11:29:53 | 22 | me three hours also to come back during traffic time |
| 11:29:57 | 23 | after 7 o'clock.  So I arrive at 10 o'clock to be going |
| 11:30:01 | 24 | again at 4 o'clock in the morning.  So there was nothing |
| 11:30:04 | 25 | except sleep six hours and the rest either travel or |

73

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

11:30:08  1    work.

11:30:09  2          The Omidis, they do not tell you up front what

11:30:12  3    they are going to do.  They -- they surprise you with it.

11:30:14  4    And they will make you like a robot, like a slave to do

11:30:26  5    what they want, by just -- that's what you have.  You do

11:30:32  6    it or you lose your job.

11:30:42  7          How do they terminate your job?  For instance,

11:30:45  8    Powell.  You remember, there is 15 cases free and then

11:30:48  9    after each case you get $500.  So what they did, they

11:30:53  10   started giving him less cases, less cases.  So at the end

11:30:58  11   he doesn't have money to -- to work for.  So what is he

11:31:01  12   there for?  Do seminars?  So he quit.

11:31:05  13         Tashjian started becoming greedy.  He wanted to

11:31:09  14   be paid, not like 15 cases free and after the 15 you get

11:31:15  15   500.  He wanted to get -- be paid by the case.  And for

11:31:20  16   that reason they want to get rid of him.

11:31:26  17      Q    How do you know that?

11:31:28  18      A    That is the conversation between me and

11:31:32  19   Dr. Gee.

11:31:33  20      Q    Fine.  Continue on.

11:31:34  21      A    So I asked Omidi one time, I said, "Why they

11:31:38  22   are behaving like that?  I haven't done anything to them.

11:31:41  23   Why would they do that?"

11:31:50  24         And he said, "I know why they are doing that,

11:31:53  25   because they know that you are going to replace them, so

74

Exhibit Page 126

FAITRO v. SHAMAAN        IHSAN NAJIB SHAMAAN, M.D.            12/20/2011

```
11:31:55   1    they give you hard time so that you quit, and they will
11:31:58   2    stay as they are the most favorite ones."
11:32:01   3            Remember what I told you, their god is money.
11:32:06   4            They -- they made contracts which you don't
11:32:09   5    understand this contract is independent contract or
11:32:12   6    employee contract or you don't know.  But what they do
11:32:18   7    is, it is designed so that every doctor who works with
11:32:26   8    them, they split fee their expenses.  In other words, for
11:32:29   9    instance, an anesthesiologist, he usually -- they usually
11:32:31  10    bill for 6- to $900 per case.  Their contract with
11:32:40  11    anesthesiologist, $200 an hour.  For us, 12,500.  But
11:32:52  12    they bill 100 to $125,000 per case.  100 to $125,000 per
11:32:58  13    case.
11:33:00  14            Who told me that?  Their uncle.
11:33:05  15        Q    Which --
11:33:06  16        A    How much money they do?  $21 million a month.
11:33:10  17    $21 million a month.
11:33:13  18            Who told me that?  Their uncle.
11:33:18  19        Q    What's the uncle's name?
11:33:21  20        A    He died.  I don't know his name.  He was the
11:33:24  21    CFO.
11:33:25  22        Q    He was the CFO.
11:33:27  23        A    So they -- he said that they are treating you
11:33:33  24    like that so that you can quit and not get trained and
11:33:35  25    they will stay charging us the money they want to charge.
```

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:33:42 | 1 | At any length, I was able to do three cases only in my |
| 11:33:46 | 2 | training with Gee, and assist in about maybe 10 or 15 |
| 11:33:50 | 3 | cases. |
| 11:33:51 | 4 | I've been through 300 residency programs, and I |
| 11:33:54 | 5 | know what training is.  To be a surgeon, it is not how |
| 11:33:59 | 6 | you cut or you tie.  It is decision-making first; when to |
| 11:34:05 | 7 | operate, when not to operate.  Then the technique of the |
| 11:34:13 | 8 | operation.  Then most important thing is how to deal with |
| 11:34:19 | 9 | complications, because if you have a complication, you |
| 11:34:22 | 10 | still can help the patient by managing it but not |
| 11:34:27 | 11 | dumping.  Okay? |
| 11:34:30 | 12 | Number 3, most importantly, the post-op care. |
| 11:34:36 | 13 | I found that in this group, this -- I mean, |
| 11:34:40 | 14 | either it doesn't apply or it doesn't exist.  Here is the |
| 11:34:49 | 15 | issue:  A doctor is sitting, let's say, in the Santa Ana |
| 11:34:58 | 16 | clinic.  He sees the patient, he makes the H&P.  This |
| 11:35:02 | 17 | doctor doesn't know what happens to the chart after that. |
| 11:35:05 | 18 | The chart goes to the headquarters. |
| 11:35:09 | 19 | Who's in the headquarters?  Michael Omidi, |
| 11:35:13 | 20 | Julian Omidi and the employees from that country. |
| 11:35:17 | 21 | What happens to the chart?  Nobody knows, |
| 11:35:19 | 22 | except them. |
| 11:35:21 | 23 | What tests are being done?  The doctor who saw |
| 11:35:23 | 24 | the patient doesn't know what tests have been done.  It |
| 11:35:29 | 25 | is the Omidis who knows, not the doctor who does. |

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

Exhibit Page 128

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:35:36 | 1 | What procedures should be done?  The doctor |
| 11:35:38 | 2 | doesn't know, because these are given to other doctors to |
| 11:35:41 | 3 | do certain procedures. |
| 11:35:42 | 4 | The main, main prerogative from this kind of |
| 11:35:47 | 5 | procedure is to get more money.  They go with the |
| 11:35:51 | 6 | endoscopies and also they give him $100 per case or maybe |
| 11:36:01 | 7 | $50 per case, I don't know. |
| 11:36:05 | 8 | In order to make -- split the money.  Remember? |
| 11:36:07 | 9 | Fee splitting in general surgery is unallowed and it's |
| 11:36:12 | 10 | illegal. |
| 11:36:13 | 11 | They did it in a contract way, so they can get |
| 11:36:20 | 12 | most of the fee and just give the part of the fee to the |
| 11:36:24 | 13 | doctors. |
| 11:36:26 | 14 | The patient chart when seen by the doctor, he |
| 11:36:29 | 15 | writes:  I want this blood test, this blood test, this |
| 11:36:30 | 16 | blood test and this blood test.  And I want this test, |
| 11:36:38 | 17 | this test and this test.  I have seen personally some of |
| 11:36:41 | 18 | my patients who came back to me for follow-up that there |
| 11:36:44 | 19 | are certain tests which are added, there are certain |
| 11:36:47 | 20 | procedures which are added.  I'll tell you an example. |
| 11:36:53 | 21 | The patient who's morbidly obese has no |
| 11:36:56 | 22 | whatsoever NHI symptoms:  No heartburn, no pain, no |
| 11:36:57 | 23 | bloating, he is just obese.  Okay?  This patient doesn't |
| 11:37:06 | 24 | need endoscopy, obvious.  At any rate, the endoscopy is |
| 11:37:13 | 25 | done and it's normal.  But what is the fact -- what has |

77

Exhibit Page 129

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 11:37:17 | 1 | happened is that the insurance company have paid for that |
| 11:37:22 | 2 | endoscopy maybe about $11,000 to the Omidis.  Is that |
| 11:37:27 | 3 | fraud?  Of course it's fraud.  Doing a procedure |
| 11:37:31 | 4 | unnecessarily, that is fraud. |
| 11:37:34 | 5 | Q    Are you saying that you saw this being done on |
| 11:37:40 | 6 | patients where procedures were being ordered and |
| 11:37:43 | 7 | requested that were not medically indicated? |
| 11:37:46 | 8 | A    Correct. |
| 11:37:47 | 9 | Q    And you know that -- |
| 11:37:48 | 10 | A    I'll tell you another example. |
| 11:37:49 | 11 | Q    You know that of your personal knowledge? |
| 11:37:50 | 12 | A    Yes. |
| 11:37:50 | 13 | Q    Another example:  Patient tells you, "I have |
| 11:37:52 | 14 | sleep apnea.  I have done tests for sleep apnea and I am |
| 11:37:58 | 15 | using CPAP."  I don't know if you know what CPAP is. |
| 11:38:04 | 16 | CPAP is a machine you put on your face when you sleep so |
| 11:38:08 | 17 | that you don't stop breathing. |
| 11:38:10 | 18 | So this is -- already is proof that this |
| 11:38:12 | 19 | patient has sleep apnea, he is being treated for sleep |
| 11:38:16 | 20 | apnea.  But to them, that is not enough.  They made a |
| 11:38:23 | 21 | room in every clinic that they had to do a sleep apnea |
| 11:38:26 | 22 | test.  And every patient, whether he needs it or not, |
| 11:38:29 | 23 | gets a sleep apnea test. |
| 11:38:32 | 24 | Q    Do you believe that that was fraudulent? |
| 11:38:34 | 25 | A    Of course it's fraudulent.  He has already -- |

78

Exhibit Page 130

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | |
|---|---|
| 11:38:37 | 1 |
| 11:38:40 | 2 |
| 11:38:42 | 3 |
| 11:38:47 | 4 |
| 11:38:50 | 5 |
| 11:38:53 | 6 |
| 11:38:57 | 7 |
| 11:39:06 | 8 |
| 11:39:09 | 9 |
| 11:39:12 | 10 |
| 11:39:13 | 11 |
| 11:39:18 | 12 |
| 11:39:22 | 13 |
| 11:39:27 | 14 |
| 11:39:29 | 15 |
| 11:39:32 | 16 |
| 11:39:37 | 17 |
| 11:39:44 | 18 |
| 11:39:46 | 19 |
| 11:39:47 | 20 |
| 11:39:48 | 21 |
| 11:39:51 | 22 |
| 11:39:55 | 23 |
| 11:39:55 | 24 |
| 11:40:01 | 25 |

he's telling you, "I have sleep apnea," why do you want
to do a test for sleep apnea?  All you need to know is
does he have sleep apnea or not?  And he has done it.
But why do you want to do it again?  That is fraud.

          The chart goes to that headquarters.  In my
practice as a general surgeon I am in control of that
chart.  That chart doesn't go anywhere.  I know what's in
that chart.  I know what's going to happen to that
patient.  And with them, you don't know.

          Anyway, the patient goes through a lot of
procedures.  What are the procedures that's being done?
Endoscopy; sometime necessary, sometime not necessary.
Sleep apnea, just like I explained.  Medical clearance,
that is the worse one.

          One day I was in San Diego and this fourth-year
resident came to San Diego.  I said, "What are you doing
here?  I am the doctor today here."  He said, "No, I am
doing medical clearance."

          Is that fraud?  Of course, it's fraud.

     Q    Why?

     A    Why it's fraud?  Medical clearance is being
done -- should be done either by an internist board
certified or a cardiologist board certified.  This guy's
a resident.

     Q    Do you know his name?

79

Exhibit Page 131

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.      12/20/2011

11:40:02  1          A    I forgot.  I mean, I tried to remember.  I
11:40:05  2     don't know.
11:40:05  3          Q    We will leave a blank in the deposition for you
11:40:07  4     to fill it in.  If you recall, you can write it in.
11:40:15  5          (INFORMATION REQUESTED: _____.)
11:40:15  6          THE WITNESS:  Okay.
11:40:19  7          Number 4.  Every patient needs a psychiatric
11:40:21  8     evaluation.  Why?  This is how we were trained.
11:40:35  9          What does the psychiatric evaluation mean?  We
11:40:40 10     need to find out what are the indicators for poor outcome
11:40:45 11     of surgery.  Number one, lack of knowledge regarding
11:40:51 12     bariatric surgery.  Lack of commitment.  Failure to keep
11:40:58 13     appointments.  Lack of social support.  Resistant of a
11:41:01 14     spouse.  Lack of community support.  Lack of very social
11:41:07 15     isolation.  Untreated psychological disorders.  Majority
11:41:13 16     of obese people have depression, majority of them.  I
11:41:19 17     would say up to 80 percent.
11:41:21 18          Apathetic individuals.  Patient comes in, you
11:41:26 19     talk to him, he is in a trance.  You talk to him in the
11:41:29 20     seminar, he sit down in a chair, and then he sleeps and
11:41:36 21     he doesn't hear the seminar.  He sleeps.  You've seen
11:41:42 22     that, I'm sure.  Patients are sitting in front of you and
11:41:47 23     then they go into deep sleep, narcoleptic -- it's called
11:41:49 24     narcolepsy.
11:41:54 25          Individuals with unrealistic expectation.  50

80

Exhibit Page 132

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:41:58 | 1 | percent of those patients, they think that they are going |
| 11:42:02 | 2 | to lose weight by just putting the band on.  They do not |
| 11:42:08 | 3 | know that losing weight is much more than just putting a |
| 11:42:14 | 4 | band.  That is not being explained to them in detail so |
| 11:42:19 | 5 | that they know that they are going to lose weight. |
| 11:42:23 | 6 | Q    Doctor, is what you are telling us part of what |
| 11:42:26 | 7 | you were trained from Allergan when you went to New York |
| 11:42:32 | 8 | in the training course? |
| 11:42:33 | 9 | A    Correct. |
| 11:42:33 | 10 | Q    Continue on, Doctor. |
| 11:42:34 | 11 | A    They think the lap band is the miracle cure. |
| 11:42:37 | 12 | Once it's put in, he can do everything but he is going to |
| 11:42:40 | 13 | lose weight.  That is not true.  I will tell you an |
| 11:42:45 | 14 | example.  Probably 50 percent of those patients who |
| 11:42:49 | 15 | undergo lap band in this institute don't lose weight. |
| 11:42:51 | 16 | Why?  Because -- it's a simple fact.  If you take an |
| 11:42:56 | 17 | obese patient and imprison him, and you tell him, "Here, |
| 11:43:02 | 18 | when you eat -- when you eat, don't drink water while you |
| 11:43:07 | 19 | eat.  You can eat only the palm of your hands.  Chew your |
| 11:43:11 | 20 | food when you eat very well until it becomes liquid, and |
| 11:43:19 | 21 | then you swallow it.  And you can eat only one time every |
| 11:43:23 | 22 | four hours.  This will accomplish like 600, 700 calories. |
| 11:43:29 | 23 | If you put this patient in a room, don't put band on him |
| 11:43:31 | 24 | but give him this instruction, he's going to lose weight. |
| 11:43:31 | 25 | In other words, the band to me, in my |

81

Exhibit Page 133

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | |
|---|---|
| 11:43:43 | 1 | experience, the short experience that I have, is a |
| 11:43:46 | 2 | gimmick.  Just like the gastric bypass.  The gastric |
| 11:43:50 | 3 | bypass, they have done it, it's major surgery, and now we |
| 11:43:55 | 4 | are seeing all sorts of complications, all sorts of |
| 11:43:59 | 5 | failures that -- that now it is deemed not good, because |
| 11:44:01 | 6 | now there is a new toy in the business, it's called lap |
| 11:44:06 | 7 | band. |
| 11:44:06 | 8 | And this leads us to the conspiracy between |
| 11:44:10 | 9 | Allergan and the Omidis.  Allergan, when we went to |
| 11:44:18 | 10 | New York and we were taught this, we were taught to |
| 11:44:22 | 11 | choose patient, because not everybody is going to benefit |
| 11:44:28 | 12 | from that operation.  There are some persons who will not |
| 11:44:34 | 13 | benefit, so you do not do those.  You need to find out |
| 11:44:39 | 14 | who is not going to benefit. |
| 11:44:43 | 15 | Faitro was one of them. |
| 11:44:44 | 16 | Q    Do you believe in your medical opinion that |
| 11:44:48 | 17 | Laura Faitro was not a candidate to have lap band surgery |
| 11:44:51 | 18 | done? |
| 11:44:52 | 19 | A    She was not a candidate. |
| 11:44:54 | 20 | MR. DE HERAS:  Objection.  Calls for expert opinion. |
| 11:44:58 | 21 | BY MR. WALKER: |
| 11:44:58 | 22 | Q    What was your reasoning for your opinion that |
| 11:45:06 | 23 | Laura Faitro was not a candidate for the lap band |
| 11:45:10 | 24 | surgery? |
| 11:45:11 | 25 | A    First of all, which I'm going to come to it, I |

82

Exhibit Page 134

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:45:16 | 1 | don't -- you are like advancing me too fast. |
| 11:45:17 | 2 | Q    I don't want to do that.  But you started to |
| 11:45:20 | 3 | mention about -- |
| 11:45:22 | 4 | A    Well, Laura Faitro, whoever saw her the first |
| 11:45:26 | 5 | time, he should have ordered an ultrasound, which he did |
| 11:45:28 | 6 | probably, to see if she has stones.  But in that report |
| 11:45:33 | 7 | of the ultrasound, it was very clear that this patient |
| 11:45:37 | 8 | had fatty infiltration of the liver.  In common language, |
| 11:45:39 | 9 | swollen liver.  Okay? |
| 11:45:43 | 10 | For these patients, when you see this kind of |
| 11:45:47 | 11 | picture on ultrasound, then you have to order special |
| 11:45:52 | 12 | diet for two weeks before surgery. |
| 11:45:54 | 13 | The doctor who saw her in the clinic doesn't |
| 11:45:57 | 14 | know about that.  He doesn't know the results of |
| 11:46:00 | 15 | ultrasound. |
| 11:46:03 | 16 | Who knows?  The headquarters.  Okay?  Did they |
| 11:46:05 | 17 | tell this patient that you have a swollen liver?  I doubt |
| 11:46:08 | 18 | it.  Did they tell the patient that you have to have a |
| 11:46:13 | 19 | special regime for two weeks?  I doubt it.  Did they -- |
| 11:46:17 | 20 | did they check this patient's condition prior to surgery; |
| 11:46:19 | 21 | in other words, do another ultrasound to see if the liver |
| 11:46:23 | 22 | shrunk?  They didn't do that. |
| 11:46:30 | 23 | Actually, I had a conversation with Michael |
| 11:46:34 | 24 | Omidi about that.  I said, "You dump this patient for me |
| 11:46:38 | 25 | to do surgery but you did not do an ultrasound to show |

83

Exhibit Page 135

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:46:43 | 1 | that this fatty infiltration or swollen liver has gone." |
| 11:46:47 | 2 | You just said to me, "She's cleared for surgery." |
| 11:46:50 | 3 | I only had the green light to go to surgery. |
| 11:46:53 | 4 | But I didn't know what the results were. |
| 11:46:57 | 5 | Remember, I am saying even if it harms me. |
| 11:47:03 | 6 | Hold on, hold on. Let me talk. |
| 11:47:04 | 7 | Q    Go ahead. |
| 11:47:05 | 8 | A    Laura -- Laura Faitro either wasn't told to get |
| 11:47:09 | 9 | that regime for two weeks or she didn't follow it up. |
| 11:47:14 | 10 | But in either case, whether it is her a fault or their |
| 11:47:23 | 11 | fault, there should have been an ultrasound prior to |
| 11:47:26 | 12 | surgery, and this ultrasound should have been seen by the |
| 11:47:30 | 13 | one who cleared her for surgery to say she is clear. Not |
| 11:47:35 | 14 | to say she is cleared because her insurance can pay. |
| 11:47:39 | 15 | Is this fraud? Of course, this is fraud. Is |
| 11:47:43 | 16 | this malpractice? Of course, this is malpractice. |
| 11:47:47 | 17 | We come back from Faitro. Faitro came to the |
| 11:47:52 | 18 | surgery center in -- what? |
| 11:47:54 | 19 | Q    West Hills. |
| 11:47:55 | 20 | A    West Hills. And I saw her alone. I didn't see |
| 11:48:05 | 21 | anybody with her. Maybe there were somebody, but sitting |
| 11:48:13 | 22 | in the waiting room, I didn't see them. They put the |
| 11:48:17 | 23 | patient in the room, and I saw her. I asked her a lot of |
| 11:48:21 | 24 | questions about an H&P, and -- and she told me whatever I |
| 11:48:24 | 25 | needed to know. And then she said -- I said, "Did you do |

84

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 11:48:26 | 1 | the regime for two weeks prior?  She said "Yes."  I |
| 11:48:33 | 2 | didn't know was it done properly or not.  I didn't know. |
| 11:48:38 | 3 | I just depended on her word. |
| 11:48:41 | 4 | But to me, you know -- after the fact, not at |
| 11:48:46 | 5 | that time, after the fact, I realized that there should |
| 11:48:49 | 6 | have been an ultrasound done and there should be an |
| 11:48:56 | 7 | internist seeing the ultrasound before they sent her to |
| 11:49:01 | 8 | do the surgery. |
| 11:49:04 | 9 | Who ordered this patient to go to that surgery |
| 11:49:07 | 10 | center?  I didn't.  Who did?  The Omidis.  The Omidis |
| 11:49:12 | 11 | made the decision for surgery.  They stayed behind the |
| 11:49:16 | 12 | scene saying, "Oh, you are independent contractor.  It's |
| 11:49:21 | 13 | you who's going to make the decisions."  But in |
| 11:49:25 | 14 | actuality, they make the decisions.  They send the |
| 11:49:29 | 15 | patient, not based on patient's safety and welfare, but |
| 11:49:32 | 16 | based on can they pay. |
| 11:49:35 | 17 | Q    Was that Michael Omidi, Julian Omidi or both of |
| 11:49:42 | 18 | them? |
| 11:49:43 | 19 | A    Both of them. |
| 11:49:46 | 20 | Okay.  I saw her.  And we went through the |
| 11:49:48 | 21 | procedure.  You know, I explain to her the possible |
| 11:49:50 | 22 | complications and said, Does she understand?  She says |
| 11:49:52 | 23 | "Yes, I understand."  And then I took her to surgery. |
| 11:49:57 | 24 | If I go back to the first time, this case -- I |
| 11:50:01 | 25 | remember from my talking to her in that room, I asked |

www.DCRLitigationServices.com
(818) 706-3749      (800) DCR-3003      (415) 777-1190      (805) 497-0046

Exhibit Page 137

FAITRO v. SHAMAAN        IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 11:50:05 | 1 | her, "Who saw you first?"  Okay.  And I -- I know all the |
| 11:50:14 | 2 | other doctors, and I can describe them for her.  She |
| 11:50:16 | 3 | described for me that she was seen by Dr. Tashjian.  But |
| 11:50:21 | 4 | I looked on the chart, Tashjian's signature was not |
| 11:50:26 | 5 | there. |
| 11:50:27 | 6 | What does that tell me?  That it has been |
| 11:50:30 | 7 | altered.  This H&P was written by somebody else.  I don't |
| 11:50:35 | 8 | know who, but it wasn't Tashjian.  Okay?  But she told |
| 11:50:41 | 9 | me -- she told me.  And she even she tried to pronounce |
| 11:50:45 | 10 | the name, she couldn't, but I knew it was Tashjian who |
| 11:50:49 | 11 | saw her first. |
| 11:50:51 | 12 | What it tells me is this is that because the |
| 11:50:54 | 13 | surgeon is not in contact with the chart all the time, |
| 11:50:56 | 14 | hundred percent of the time, like I have in my clinic, |
| 11:51:04 | 15 | this chart can be altered in different ways, changing the |
| 11:51:08 | 16 | H&P, changing the labs done, changing the procedures to |
| 11:51:15 | 17 | be done without the main surgeon knowing that.  It is |
| 11:51:17 | 18 | customary in that organization that every surgeon who |
| 11:51:21 | 19 | sees that patient, he is the one who's supposed to do the |
| 11:51:26 | 20 | surgery.  So if Tashjian saw her, then he should have |
| 11:51:31 | 21 | done the surgery. |
| 11:51:33 | 22 | Now, it is very obvious that Tashjian -- does |
| 11:51:37 | 23 | Tashjian like me?  Answer is no.  Do I like Tashjian? |
| 11:51:40 | 24 | The answer is no.  He tried hard not to make me graduate. |
| 11:51:47 | 25 | Patient was on the table and suddenly Tashjian come into |

86

Exhibit Page 138

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | | |
|---|---|---|
| 11:51:51 | 1 | the room. |
| 11:51:52 | 2 | Q    This is Laura Faitro that was on the table? |
| 11:51:57 | 3 | A    Yes. |
| 11:51:57 | 4 | Q    So you're in the surgery room with Laura Faitro |
| 11:51:59 | 5 | on the table -- |
| 11:51:59 | 6 | A    And Tashjian pops in.  And he said, "Dr. |
| 11:52:06 | 7 | Shamaan, I am here to help you."  I was shocked.  I said, |
| 11:52:09 | 8 | "Does Tashjian love me?  I don't think so.  Why is he |
| 11:52:13 | 9 | there?  Why is he there?" |
| 11:52:15 | 10 | There's only two explanations.  One, he knew |
| 11:52:21 | 11 | something about her or the Omidis sent him.  There is no |
| 11:52:25 | 12 | other explanation. |
| 11:52:27 | 13 | So he knew there is something wrong.  He knew |
| 11:52:28 | 14 | there is something wrong, so he popped in. |
| 11:52:32 | 15 | In doing the lap band procedure, what you do |
| 11:52:34 | 16 | first is you put the trocar with the camera.  When you |
| 11:52:39 | 17 | introduce the camera, then you can see the whole abdomen |
| 11:52:47 | 18 | and the liver. |
| 11:52:50 | 19 | The second step, you do a small hole to put the |
| 11:52:53 | 20 | liver retractor.  Okay.  So I made those two.  And I |
| 11:52:57 | 21 | tried to retract the liver, I couldn't.  It was so |
| 11:53:00 | 22 | swollen, there is no way I can do the surgery if I don't |
| 11:53:05 | 23 | push the liver sideways.  I couldn't do it. |
| 11:53:09 | 24 | And during that procedure, I lacerated the |
| 11:53:12 | 25 | liver like about 2 inches.  It bled a little bit but it |

87

Exhibit Page 139

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:53:17 | 1 | was stationary and it was not active bleeding. |
| 11:53:22 | 2 | So according to my training in New York, if you |
| 11:53:24 | 3 | have a swollen liver, stop and get out.  So I told |
| 11:53:28 | 4 | Tashjian, "I cannot do it.  I'm going to stop." |
| 11:53:34 | 5 | He said, "No, I'm going to come in."  And he |
| 11:53:38 | 6 | came in. |
| 11:53:41 | 7 | In my language as a surgeon, when I put the |
| 11:53:44 | 8 | knife on that patient, I am the captain of the ship. |
| 11:53:47 | 9 | Okay?  When I say "I cannot do it no more," and he comes |
| 11:53:54 | 10 | in, then he is the captain of the ship. |
| 11:53:59 | 11 | Q    Was it your belief that Dr. Tashjian had taken |
| 11:54:02 | 12 | over control of Laura Faitro's surgery? |
| 11:54:07 | 13 | A    I was set aside, and Tashjian was doing the |
| 11:54:10 | 14 | surgery without assisting him. |
| 11:54:12 | 15 | Q    So you were watching Dr. Tashjian do the |
| 11:54:15 | 16 | surgery? |
| 11:54:15 | 17 | A    Right. |
| 11:54:16 | 18 | Q    You were not assisting him? |
| 11:54:18 | 19 | A    No. |
| 11:54:19 | 20 | Q    Did he push you out of the way? |
| 11:54:21 | 21 | A    I was pushed behind.  He was the surgeon.  Au |
| 11:54:24 | 22 | was the assistant on the other side, and I was behind |
| 11:54:27 | 23 | him, because there is no space.  Then the other spot is |
| 11:54:29 | 24 | being taken by the scrub tech. |
| 11:54:32 | 25 | MR. ROBERTSON:  You said Au, is that Lee Au, A-U? |

Exhibit Page 140

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.              12/20/2011

| | |
|---|---|
| 11:54:35 | 1 |
| 11:54:35 | 2 |
| 11:54:35 | 3 |
| 11:54:39 | 4 |
| 11:54:40 | 5 |
| 11:54:46 | 6 |
| 11:54:50 | 7 |
| 11:54:53 | 8 |
| 11:55:05 | 9 |
| 11:55:15 | 10 |
| 11:55:20 | 11 |
| 11:55:25 | 12 |
| 11:55:30 | 13 |
| 11:55:34 | 14 |
| 11:55:36 | 15 |
| 11:55:41 | 16 |
| 11:55:47 | 17 |
| 11:55:52 | 18 |
| 11:55:58 | 19 |
| 11:55:59 | 20 |
| 11:56:02 | 21 |
| 11:56:04 | 22 |
| 11:56:07 | 23 |
| 11:56:08 | 24 |
| 11:56:13 | 25 |

          THE WITNESS:  Yes.

BY MR. WALKER:

     Q    So Lee Au was the assistant surgeon?

     A    Yes.  And as usual, Tashjian was screaming and
yelling at Au.  So he took it, the poor guy.  He took it.

          Anyway, with force Tashjian put that retractor
on.  Now I will on the day of court bring some samples of
a soft liver and a swollen liver or some simulator to
show that if you have swollen liver, the liver is not
malleable.  It won't -- it won't move.  And if you do it
by force, and you have a small laceration, all you are
going to do is make that laceration bigger.  And that's
what I found out in the autopsy report.

          At the time of my surgery, I did lacerate the
liver.  It was maybe one, maybe a couple of inches.  In
the autopsy report, multiple lacerations.  I think about
4 inches or something like that.  Multiple lacerations, 4
inches.  How did they become that?  Because by forced
retraction.

     Q    Is it your opinion, your medical opinion that
the lacerations to the liver --

     A    Was started by me but was increased by
Tashjian.

     Q    You believe the Dr. Tashjian made the
lacerations worse?

Exhibit Page 141

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

11:56:14  1       A     Worse.

11:56:15  2       MR. DE HERAS:  Objection.  Calls for expert opinion.

11:56:17  3   BY MR. WALKER:

11:56:17  4       Q     What else do you recall?

11:56:18  5       A     Tashjian popped in and said, "I am going to

11:56:21  6   help you."  He pops in to take over the surgery.  And

11:56:27  7   then after that, he did surgery on the patient.  He did

11:56:33  8   hernia repair.  He did.  He was the captain of the ship.

11:56:39  9           Then suddenly he took off his clothes and got

11:56:45  10  out saying one word:  Good luck.  Saying only one word.

11:56:48  11  How can a doctor who has became the captain of the ship

11:56:53  12  leave the patient like that abandoning the patient

11:57:01  13  without taking at least permission from me to take over?

11:57:09  14      Q     Did --

11:57:11  15      A     And I had no choice but -- at that time.  He

11:57:14  16  didn't only leave the OR, he leave -- he left the

11:57:16  17  building.

11:57:17  18      Q     Did he tell you to complete the surgery or that

11:57:22  19  you had to --

11:57:23  20      A     He just said, "Good luck" and he left.

11:57:26  21      Q     Did he put in the trocars himself besides the

11:57:28  22  ones put in?

11:57:29  23      A     When he did the surgery, he -- he put the other

11:57:33  24  three trocars.

11:57:34  25      Q     Did he actually do a hernia surgery on Laura

Exhibit Page 142

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.            12/20/2011

| | | |
|---|---|---|
| 11:57:38 | 1 | Faitro? |
| 11:57:38 | 2 | A    I did -- I did the lap band. |
| 11:57:41 | 3 | Q    Did Dr. Tashjian do a hernia surgery on Laura |
| 11:57:44 | 4 | Faitro? |
| 11:57:45 | 5 | A    Correct. |
| 11:57:45 | 6 | Q    Was the hernia surgery indicated or necessary |
| 11:57:49 | 7 | for Laura Faitro? |
| 11:57:52 | 8 | A    You see, it all depends on, Does Tashjian see a |
| 11:57:55 | 9 | hernia or not?  I didn't see a hernia because the liver |
| 11:58:01 | 10 | was in there.  He pushed the liver up, and he did a |
| 11:58:08 | 11 | repair. |
| 11:58:11 | 12 | Was there a hernia there?  I don't know. |
| 11:58:12 | 13 | Q    Did Dr. Tashjian know that the liver had been |
| 11:58:16 | 14 | lacerated by you? |
| 11:58:18 | 15 | A    Yes. |
| 11:58:19 | 16 | MR. DE HERAS:  Objection.  Calls for speculation. |
| 11:58:20 | 17 | Assumes facts not in evidence. |
| 11:58:27 | 18 | BY MR. WALKER: |
| 11:58:27 | 19 | Q    How do you know that Dr. Tashjian knew the |
| 11:58:29 | 20 | liver had been lacerated by you before he took over |
| 11:58:34 | 21 | control of the patient? |
| 11:58:35 | 22 | A    He saw it on the monitor. |
| 11:58:36 | 23 | Q    Did he make any mention of that to you that he |
| 11:58:39 | 24 | had seen the laceration? |
| 11:58:40 | 25 | A    No.  He didn't mention it.  So it was obvious |

91

Exhibit Page 143

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.            12/20/2011

| | | |
|---|---|---|
| 11:58:43 | 1 | for everybody. |
| 11:58:43 | 2 | Q    And you could see it on the monitor as you |
| 11:58:46 | 3 | looked at it? |
| 11:58:47 | 4 | A    Yes. |
| 11:58:48 | 5 | Q    Was it still bleeding when Dr. Tashjian took |
| 11:58:50 | 6 | over the patient? |
| 11:58:51 | 7 | A    No. |
| 11:58:52 | 8 | Q    Before you did the surgery on Laura Faitro, did |
| 11:58:55 | 9 | you have her entire chart available to you? |
| 11:58:57 | 10 | A    Yes. |
| 11:58:57 | 11 | Q    Did you have her entire chart with you before |
| 11:59:02 | 12 | the surgery started? |
| 11:59:04 | 13 | A    I want to correct you on that a little bit. |
| 11:59:07 | 14 | You are saying "the entire chart." I don't know, was |
| 11:59:11 | 15 | that the entire chart? Was everything in there? I don't |
| 11:59:14 | 16 | know. |
| 11:59:14 | 17 | Q    Did you generate a report based upon the |
| 11:59:16 | 18 | surgery on Laura Faitro? |
| 11:59:19 | 19 | A    Operative report? |
| 11:59:21 | 20 | Q    Yes. |
| 11:59:22 | 21 | A    I will come to that. Because there is some |
| 11:59:31 | 22 | issues about that too. |
| 11:59:33 | 23 | Q    Let me back up then. Is there anything |
| 11:59:38 | 24 | additional that you think is important for us to |
| 11:59:41 | 25 | recognize or know about Laura Faitro's surgery? |

www.DCRLitigationServices.com
(818) 706-3749      (800) DCR-3003      (415) 777-1190      (805) 497-0046

Exhibit Page 144

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 11:59:43 | 1 | A    I am going step by step.  I am not leaving |
| 11:59:47 | 2 | anything because -- when you ask me a question, you cut |
| 11:59:49 | 3 | me. |
| 11:59:50 | 4 | Q    I'm sorry.  That's not my intention. |
| 11:59:52 | 5 | A    So but he left without telling me anything, he |
| 11:59:54 | 6 | just left completely when he was the captain of the ship. |
| 11:59:58 | 7 | He didn't even tell me, "Finish the operation."  He |
| 12:00:03 | 8 | didn't -- I don't know why he did half and he left the |
| 12:00:05 | 9 | other half for me.  When I told him, I can't do it, you |
| 12:00:08 | 10 | come in -- he come in and do it. |
| 12:00:10 | 11 | So he left.  So I had only one choice, and that |
| 12:00:12 | 12 | is to finish the operation. |
| 12:00:15 | 13 | But I -- I'm am asking myself one question.  I |
| 12:00:18 | 14 | am not experienced in lap band at that point, he is.  He |
| 12:00:21 | 15 | is supposed to told me what to do about that laceration. |
| 12:00:30 | 16 | Admit her, suture it, open her.  He didn't tell me. |
| 12:00:35 | 17 | What do they do to manage that liver |
| 12:00:37 | 18 | laceration?  I wasn't trained. |
| 12:00:41 | 19 | Hold on, please.  I will answer anything you |
| 12:00:42 | 20 | want, but let me finish. |
| 12:00:48 | 21 | Q    Go ahead, Doctor. |
| 12:00:50 | 22 | A    Like I told you before, that in training is not |
| 12:00:55 | 23 | only way you train on how to do the procedure but how to |
| 12:00:58 | 24 | manage those procedures.  I was never trained on those. |
| 12:01:02 | 25 | He left me, and he has much more experience |

93

Exhibit Page 145

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 12:01:04 | 1 | about lap bands; not about general surgery, about lap |
| 12:01:08 | 2 | band, about how to deal with those.  To me, I don't think |
| 12:01:14 | 3 | it was ethical for him to leave.  Because if I ask him to |
| 12:01:20 | 4 | come in, then that means he is now becoming the captain |
| 12:01:23 | 5 | of the ship. |
| 12:01:25 | 6 | Anyway, he left, I finished the procedure.  And |
| 12:01:29 | 7 | she was in a stable condition.  All her vital signs were |
| 12:01:36 | 8 | normal.  And the anesthesiologist woke her up.  She went |
| 12:01:43 | 9 | to the recovery room.  I saw her there.  I talked to her. |
| 12:01:49 | 10 | She was in a very good condition.  She was awake. |
| 12:01:52 | 11 | I went out to the waiting room to see if there |
| 12:01:55 | 12 | is anybody there to talk to them.  I did not see anybody. |
| 12:01:58 | 13 | I know that somebody said -- or the relative said that |
| 12:02:04 | 14 | they were there, but I didn't see them.  This is the |
| 12:02:08 | 15 | whole truth, I did not see them.  That's why I couldn't |
| 12:02:15 | 16 | tell them about the liver laceration, because I am |
| 12:02:21 | 17 | obliged to tell them that. |
| 12:02:24 | 18 | Anyway, this patient went home with the usual |
| 12:02:26 | 19 | post-op instructions.  And what we do, usually tell them |
| 12:02:31 | 20 | "Do not eat that day.  You can eat only one ounce of |
| 12:02:37 | 21 | fluid every hour -- hour or so.  Do not gulp.  Sip.  And |
| 12:02:43 | 22 | there is any problem, you call us immediately and -- |
| 12:02:47 | 23 | phone us.  And we have a hot line.  And there is always a |
| 12:02:52 | 24 | doctor on call." |
| 12:02:57 | 25 | Unfortunately, the system in Top Surgeons is |

94

Exhibit Page 146

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 12:03:02 | 1 | very bad.  At least at one occasion they usually have a |
| 12:03:10 | 2 | meeting every two weeks on a Wednesday.  In that meeting |
| 12:03:17 | 3 | the doctors all -- all the specialties meet and discuss |
| 12:03:23 | 4 | the cases and the needs for -- for us to correct if there |
| 12:03:28 | 5 | is anything to correct. |
| 12:03:29 | 6 | And at one point I -- myself, I remember I |
| 12:03:32 | 7 | asked one question.  I said, "I am on call today and some |
| 12:03:40 | 8 | other doctor did an operation."  And she told me in |
| 12:03:43 | 9 | trouble, "What do I do?"  In my practice, what do I do is |
| 12:03:50 | 10 | I will tell her -- the patient to go to a hospital and |
| 12:03:54 | 11 | I will meet her there.  That is my practice.  In that |
| 12:03:59 | 12 | case, what do I do?  Call the surgeon who did the |
| 12:04:03 | 13 | surgery?  Or what do you want me to do? |
| 12:04:08 | 14 | And Tashjian specifically -- I remember |
| 12:04:09 | 15 | Tashjian answered, He said, "Tell her to go to the |
| 12:04:13 | 16 | nearest emergency room."  I said, "But the nearest |
| 12:04:16 | 17 | emergency room is neither me nor you.  So what is the |
| 12:04:22 | 18 | nearest emergency room?" |
| 12:04:24 | 19 | He said, "Well, you need to save her life just |
| 12:04:26 | 20 | tell her to go to the emergency room." |
| 12:04:29 | 21 | To me, with honesty, I think their answer is |
| 12:04:32 | 22 | dumping.  Because I think the surgeon who did the surgery |
| 12:04:37 | 23 | is responsible to be the one who manages her, or at least |
| 12:04:43 | 24 | delegate that function to another surgeon to make sure |
| 12:04:47 | 25 | that something is being done. |

95

Exhibit Page 147

FAITRO v. SHAMAAN        IHSAN NAJIB SHAMAAN, M.D.            12/20/2011

| | | |
|---|---|---|
| 12:04:52 | 1 | As a matter of fact, there is a law that |
| 12:04:54 | 2 | governs the surgery centers.  They should have a hospital |
| 12:04:59 | 3 | that has contracted with where they will accept |
| 12:05:04 | 4 | complications and get admitted without any question, in |
| 12:05:09 | 5 | other words, without any procrastination. |
| 12:05:15 | 6 | And Laura Faitro's problem was, she live |
| 12:05:18 | 7 | somewhere, she is seen in West Hills, she is operated on |
| 12:05:24 | 8 | in West Hills.  She left home and she was seen in the -- |
| 12:05:32 | 9 | in the -- what clinic? |
| 12:05:34 | 10 | Q    You are talking about the clinic that's up |
| 12:05:37 | 11 | in -- |
| 12:05:37 | 12 | MS. THOMASSON:  Valencia? |
| 12:05:37 | 13 | MR. WALKER:  No.  That was in Oxnard. |
| 12:05:37 | 14 | THE WITNESS:  Valenica? |
| 12:05:37 | 15 | BY MR. WALKER: |
| 12:05:37 | 16 | Q    Valencia.  She was seen in Valencia. |
| 12:05:37 | 17 | A    She was seen in Valencia. |
| 12:05:45 | 18 | Q    Post-op. |
| 12:05:45 | 19 | A    The doctor who saw her was not the surgeon who |
| 12:05:54 | 20 | did the operation.  And she was sent like Tashjian wanted |
| 12:05:59 | 21 | to an emergency room who they don't know nothing about |
| 12:06:01 | 22 | this patient. |
| 12:06:04 | 23 | I think that hospital -- I mean, they have |
| 12:06:06 | 24 | nothing wrong.  They only did what they can do.  And that |
| 12:06:09 | 25 | is deal with it.  Because it's an emergency.  And this |

96

Exhibit Page 148

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 12:06:14 | 1 | patient is sick. |
| 12:06:17 | 2 | They cannot say, "We don't want you." They |
| 12:06:20 | 3 | cannot say, "We have to ship you." They have to deal |
| 12:06:24 | 4 | with it. And she was in a -- in a condition, she's |
| 12:06:27 | 5 | extremely dire conditions. |
| 12:06:31 | 6 | Anyway -- hold on, please. Let me finish. |
| 12:06:35 | 7 | I remember I talked to Madan who saw the |
| 12:06:37 | 8 | patient. And I swear to God, I begged him, literally |
| 12:06:44 | 9 | begged him to tell this patient to come to Beverly |
| 12:06:53 | 10 | Hospital so I can at least see her and manage her. I |
| 12:06:58 | 11 | don't think Madan did the best that he could. I think |
| 12:07:05 | 12 | what he did is was just dump her. That's what he did. |
| 12:07:12 | 13 | I think if I got her that day, I would have |
| 12:07:15 | 14 | saved her. Like I saved my wife two weeks ago. |
| 12:07:20 | 15 | My wife was suffering from the same conditions |
| 12:07:22 | 16 | like Laura Faitro. I admitted her to Cedar Sinai. I |
| 12:07:30 | 17 | asked another doctor who is my friend to admit her under |
| 12:07:33 | 18 | his name because I don't have privileges at Cedar Sinai. |
| 12:07:38 | 19 | But I was smart enough to ask him to admit her under his |
| 12:07:43 | 20 | name. But then he carries my orders, so this way I |
| 12:07:48 | 21 | manage her. |
| 12:07:50 | 22 | My wife stayed unconscious for 12 days. Okay? |
| 12:07:53 | 23 | She was in septic shock, just like Laura Faitro. I |
| 12:07:57 | 24 | intubated her. She was unconscious. I gave her all the |
| 12:08:03 | 25 | antibiotics that's necessary. I saved her. She woke up, |

97

Exhibit Page 149

FAITRO v. SHAMAAN        IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 12:08:08 | 1 | she is walking right now.  12 days unconscious and |
| 12:08:11 | 2 | intubated. |
| 12:08:12 | 3 | If there was a patient who can save Laura it |
| 12:08:16 | 4 | was me.  But I was never given that opportunity to help |
| 12:08:21 | 5 | her. |
| 12:08:23 | 6 | Why?  Because of the systematic organization of |
| 12:08:26 | 7 | this group.  The doctor who is a surgeon does not follow |
| 12:08:33 | 8 | up with the patient who he has operated upon.  That is -- |
| 12:08:39 | 9 | that is what I said, one of reasons why Laura Faitro |
| 12:08:44 | 10 | died, poor post-op care. |
| 12:08:46 | 11 | We go back to the issue of fraud.  When I am |
| 12:08:51 | 12 | in, let's say, any one of those centers that I see |
| 12:08:56 | 13 | patients, and in -- in that center we have three hours in |
| 12:09:02 | 14 | the morning, three hours in the evening, okay, and one |
| 12:09:08 | 15 | hour in the middle for lunch.  Okay?  Three hours.  About |
| 12:09:18 | 16 | one hour goes away because we give a seminar.  So that |
| 12:09:22 | 17 | leaves only two hours.  Okay?  There is like, let's say, |
| 12:09:26 | 18 | 20 patients.  Out of those 20 patients, we gave seminar |
| 12:09:31 | 19 | to, 10 patients will want to do the surgery.  That's the |
| 12:09:35 | 20 | average, about 50 percent of them.  Sometimes more. |
| 12:09:39 | 21 | For 10 patients to be seen in two hours, how |
| 12:09:42 | 22 | much is that going to be?  15 minutes for each patient. |
| 12:09:45 | 23 | 15 minutes. |
| 12:09:46 | 24 | Now if you look at the billing -- you see this |
| 12:09:50 | 25 | is the super bill. |

98

Exhibit Page 150

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

12:09:54  1    Q    Doctor, I'll slide that to you.

12:09:55  2    A    We go by CPT code book -- codes.  CPT codes.  I

12:09:57  3    don't know if you know what CPT code is.  CPT code is a

12:10:08  4    code that the American Board make codes for each

12:10:18  5    diagnosis.

12:10:19  6         For instance, if you see the patient 10

12:10:20  7    minutes, the code for that 10 minutes is 99212.  If you

12:10:31  8    see her 20 minutes, it's 99213.

12:10:34  9         Now, the code they use for billing is 99244.

12:10:39  10   99244 says that you have to sit down with the patient one

12:10:45  11   hour, asking him and examining him and giving him

12:10:50  12   instructions, one hour to deserve that code, which is

12:11:02  13   usually between 250 to $350.

12:11:11  14        Now, you tell me -- I mean, you do the math:

12:11:14  15   Ten patients in two hours, there is no way you can bill

12:11:17  16   that code, 99244.  That is fraud.  I see the patient 5

12:11:21  17   minutes and they charge for $350.  That is fraud.

12:11:31  18        Then after the surgery I went to dictate.  This

12:11:34  19   is my first operation.  In every hospital in the -- in

12:11:38  20   the United States, in every hospital, in every surgery

12:11:39  21   center in the United States, I work in about -- like I

12:11:50  22   told you, about six, seven hospitals, I work also in

12:11:58  23   about six, seven surgery centers.

12:12:01  24        Every surgery center has a number.  They call

12:12:03  25   it a dictation number.  You dial that number and then you

99

Exhibit Page 151

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 12:12:07 | 1 | start dictating what you have done on that patient. |
| 12:12:12 | 2 | In my experience, in my training in three |
| 12:12:14 | 3 | countries, in three residencies, I was told "There are no |
| 12:12:18 | 4 | two patients who are the same. None. Every patient is |
| 12:12:23 | 5 | different than the other one." So when you dictate the |
| 12:12:27 | 6 | operative report, every dictation is different than the |
| 12:12:33 | 7 | other one. |
| 12:12:34 | 8 | In this company, it's preprinted operative |
| 12:12:36 | 9 | report. The only thing you need to go do is in the |
| 12:12:40 | 10 | computer put the name, put the date of the operation, put |
| 12:12:45 | 11 | the operation name and the operation will come out |
| 12:12:49 | 12 | automatically, and you sign it. |
| 12:12:52 | 13 | I find out that lot of the information in that |
| 12:12:56 | 14 | op report is not true. I didn't dictate it. But you |
| 12:13:00 | 15 | know in this situation, when Tashjian came in, I had to |
| 12:13:06 | 16 | insert what Tashjian did, because I didn't do that part. |
| 12:13:12 | 17 | So I went into the computer and I asked one of |
| 12:13:15 | 18 | those Filipino guys: "How do you do it?" He said, |
| 12:13:18 | 19 | "Okay" -- he showed me how to open the op report and |
| 12:13:22 | 20 | insert whatever I wanted. |
| 12:13:24 | 21 | But the main op report is being -- being -- |
| 12:13:26 | 22 | what you call it? Preprinted. Okay? Is that fraud? Of |
| 12:13:32 | 23 | course, it's fraud. |
| 12:13:33 | 24 | Before the operation, before we do surgery, |
| 12:13:36 | 25 | there are some letters that get out of that group to get |

100

Exhibit Page 152

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.              12/20/2011

| | |
|---|---|
| 12:13:42 | 1 |
| 12:13:49 | 2 |
| 12:13:53 | 3 |
| 12:13:57 | 4 |
| 12:14:04 | 5 |
| 12:14:11 | 6 |
| 12:14:16 | 7 |
| 12:14:18 | 8 |
| 12:14:22 | 9 |
| 12:14:25 | 10 |
| 12:14:29 | 11 |
| 12:14:30 | 12 |
| 12:14:31 | 13 |
| 12:14:33 | 14 |
| 12:14:36 | 15 |
| 12:14:36 | 16 |
| 12:14:36 | 17 |
| 12:14:36 | 18 |
| 12:14:41 | 19 |
| 12:14:44 | 20 |
| 12:15:09 | 21 |
| 12:15:12 | 22 |
| 12:15:13 | 23 |
| 12:15:13 | 24 |
| 12:15:15 | 25 |

authorization from the insurance company.  Neither me or

Gee nor everybody, which I asked, did you ever send a

letter to the insurance company telling them that you

need to operate and they, you know, ask you a few

questions, and then they decided to let you operate?  No.

I have signed about 600 letters authorization for

operation.  What these letters are?

    Q    You signed them blank or were they dealing with

individuals page?

    A    No.  Preprinted it's the same -- what you call

it?

    Q    Form letter?

    A    Form that they insert.

    Q    Let's mark this as Exhibit E.

    (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED

PLAINTIFF'S EXHIBIT E FOR IDENTIFICATION BY THE CERTIFIED

SHORTHAND REPORTER AND IS ATTACHED HERETO.)

    THE WITNESS:  I have a copy of that letter they sent

to insurance, it's preprinted.  But the doctor who

performs the surgery never sees that letter.  It is

written and signed by other physicians or other

employees.

BY MR. WALKER:

    Q    Who directed you to do that?

    A    I didn't -- nobody directed me.  But for the

101

Exhibit Page 153

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 12:15:18 | 1 | letters that I signed, the 600 letters, Julian Omidi did. |
| 12:15:22 | 2 | Q    Julian Omidi told you to sign those in blank? |
| 12:15:26 | 3 | A    Not blank, preprinted. But I signed them. |
| 12:15:30 | 4 | Q    Were they -- were they -- did the letters |
| 12:15:31 | 5 | indicate the name of the patient or was the patient's |
| 12:15:33 | 6 | name left off when you signed them? |
| 12:15:36 | 7 | A    Okay.  The top of the page, it has name of the |
| 12:15:44 | 8 | patient, date of birth, case number, chart number, |
| 12:15:47 | 9 | whatever. |
| 12:15:48 | 10 | The bottom of the page preprinted material.  It |
| 12:15:53 | 11 | is like -- what do you call it -- a song.  This patient |
| 12:15:57 | 12 | is overweight.  She has a BMI, which is always inflated. |
| 12:16:02 | 13 | She is fat.  We have tried medical treatment of diet.  It |
| 12:16:05 | 14 | failed.  And psychiatrically she is stable and -- you |
| 12:16:10 | 15 | know, so on, so on, so on, to all to justify the |
| 12:16:14 | 16 | operation when it is not true. |
| 12:16:20 | 17 | MR. ROBERTSON:  Did you see any of those patients |
| 12:16:22 | 18 | that you signed letters for? |
| 12:16:26 | 19 | THE WITNESS:  600 of them. |
| 12:16:28 | 20 | MR. ROBERTSON:  Did you actually evaluate those |
| 12:16:28 | 21 | patients before you signed the letters? |
| 12:16:31 | 22 | THE WITNESS:  I don't know if Gee did.  I know that |
| 12:16:32 | 23 | I did. |
| 12:16:34 | 24 | BY MR. WALKER: |
| 12:16:34 | 25 | Q    That you did or did not? |

102

Exhibit Page 154

FAITRO v. SHAMAAN        IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 12:16:37 | 1 | A    I did. |
| 12:16:38 | 2 | Q    So every one of the letters that you signed -- |
| 12:16:39 | 3 | A    It's about patients that I haven't seen. |
| 12:16:41 | 4 | Q    Were about patients you had not seen? |
| 12:16:42 | 5 | A    Right.  He asked me to sign.  Why?  Because he |
| 12:16:44 | 6 | told me you are the -- what do you call it?  The medical |
| 12:16:47 | 7 | director. |
| 12:16:48 | 8 | Q    Let me make sure I'm clear on this now.  You |
| 12:16:51 | 9 | would sign letters to go to the insurance companies to |
| 12:16:55 | 10 | say that surgery is authorized for patients that you had |
| 12:16:59 | 11 | not seen; is that correct? |
| 12:17:00 | 12 | A    I have not seen. |
| 12:17:01 | 13 | Q    So I'm correct on that? |
| 12:17:04 | 14 | A    Yes. |
| 12:17:04 | 15 | Q    Do you have a copy of that form letter with |
| 12:17:06 | 16 | you? |
| 12:17:06 | 17 | A    I have it, but I don't know where -- I |
| 12:17:09 | 18 | misplaced them. |
| 12:17:10 | 19 | Q    Take your time. |
| 12:17:11 | 20 | A    I will find it. |
| 12:17:12 | 21 | Q    Take your time. |
| 12:17:13 | 22 | A    Is that fraud?  Of course it's fraud.  I |
| 12:17:16 | 23 | haven't seen the patient.  I say, this is -- she is this, |
| 12:17:18 | 24 | this.  She has done medical treatment and it failed. |
| 12:17:26 | 25 | She's been seen by a psychiatrist, which I don't know did |

103

Exhibit Page 155

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | | |
|---|---|---|
| 12:17:29 | 1 | he see her or not.  Is there any report on that?  This is |
| 12:17:33 | 2 | all not true. |
| 12:17:35 | 3 | MR. ROBERTSON:  If you have it, go ahead and try to |
| 12:17:36 | 4 | locate it. |
| 12:17:37 | 5 | THE WITNESS:  I don't know -- I will -- I will find |
| 12:17:38 | 6 | it. |
| 12:17:39 | 7 | BY MR. WALKER: |
| 12:17:39 | 8 | Q    You can take your time and do it now if you |
| 12:17:41 | 9 | want. |
| 12:17:44 | 10 | A    After the letter goes to the insurance company |
| 12:17:46 | 11 | and the insurance company approves the operation, they |
| 12:17:49 | 12 | are supposed to give that approval to the doctor who is |
| 12:17:58 | 13 | going to operate.  Okay. |
| 12:18:02 | 14 | Now, the doctor who is going to operate prior |
| 12:18:08 | 15 | to the surgery, just like I do now in my private |
| 12:18:10 | 16 | practice, I see the patient, discuss with them options, |
| 12:18:15 | 17 | discuss with them risks.  I have to do that because |
| 12:18:20 | 18 | that's by law. |
| 12:18:21 | 19 | And -- and that doesn't happen by the doctor |
| 12:18:23 | 20 | who is going operate.  It happens by other people who |
| 12:18:26 | 21 | will do that for them. |
| 12:18:30 | 22 | Are these people doctors?  I don't think so. |
| 12:18:33 | 23 | Are these people nurses?  I don't know.  Are these people |
| 12:18:36 | 24 | common people?  I don't know.  But obviously a list comes |
| 12:18:41 | 25 | out, they call it informed consent, and it is signed. |

104

Exhibit Page 156

FAITRO v. SHAMAAN        IHSAN NAJIB SHAMAAN, M.D.        12/20/2011

12:18:47  1        At one time I asked the patient, "Did you sign

12:18:50  2    this list?  He says "Yes.

12:18:53  3        "Did you read it?

12:18:54  4        "No."

12:18:55  5        In other words, we talk to you about all the

12:18:58  6    complications and remember this seminar, and just sign

12:19:01  7    for me name, form question.  They sign without reading.

12:19:05  8    Not explained.

12:19:07  9        One more thing that I want to go back about

12:19:10  10   fraud.  Remember, I told you that they make employees spy

12:19:15  11   on doctors.  So how do they do that?  I found out the

12:19:20  12   hard way.  I go in, do the seminar and explain to the

12:19:31  13   patients.  And then a patient asked me, "Well, my BMI is

12:19:34  14   31."  Can I do the surgery?  I said, "No, you don't

12:19:40  15   qualify."

12:19:41  16       The next day I receive a phone call from Julian

12:19:46  17   Omidi or Michael Omidi, "Why are you telling them 'you

12:19:49  18   don't qualify'"?

12:19:50  19       I said because that's what I was trained on.  I

12:19:52  20   was trained that I cannot do a surgery unless the BMI is

12:19:55  21   about 35.  That's how I was trained.  How can -- how do

12:19:59  22   you want me to tell them, "You qualify" when they don't

12:20:01  23   qualify?  That's the rule.

12:20:03  24       "No, don't tell them you don't qualify."  What

12:20:08  25   we will do is we will say that they have hiatal hernia

Exhibit Page 157

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.     12/20/2011

| | | |
|---|---|---|
| 12:20:10 | 1 | and we ask the insurance company to pay us for the hiatal |
| 12:20:16 | 2 | hernia.  And at the same time, we put the lap band on |
| 12:20:22 | 3 | them.  Because that's what they want.  They want to lose |
| 12:20:24 | 4 | weight.  So we put for them the lap band, and then we |
| 12:20:28 | 5 | charge them the $3,000 for the lap band.  And there are a |
| 12:20:31 | 6 | lot of patients who will be happy to pay that.  And why? |
| 12:20:34 | 7 | So that they can get 100 and $125,000 per case.  That is |
| 12:20:38 | 8 | only for that surgery.  Does not include the endoscopy, |
| 12:20:43 | 9 | the medical clearance.  This is more money.  Endoscopy is |
| 12:20:50 | 10 | $11,000; sleep apnea is $3,000; lab test, $2,000; |
| 12:20:56 | 11 | cardiology clearance, $350; internist clearance, $350; so |
| 12:21:03 | 12 | it all adds up.  And what, the patient or the insurance |
| 12:21:09 | 13 | company is bilked because of that. |
| 12:21:12 | 14 | At one time I said -- I told the patient he has |
| 12:21:16 | 15 | high blood pressure, diabetes, heart failure.  He is 350 |
| 12:21:24 | 16 | pounds.  Okay?  He has one attack of MI.  All right.  I |
| 12:21:29 | 17 | mean, I've been a doctor for 40 years.  I know this |
| 12:21:33 | 18 | patient is like -- it's like a bomb.  He is going to put |
| 12:21:37 | 19 | the knife, he is going to explode and he will die.  Don't |
| 12:21:42 | 20 | tell them you don't -- you don't -- you are poor risk. |
| 12:21:48 | 21 | Don't tell them you cannot operate, because we have a |
| 12:21:52 | 22 | cardiologist and an internist who will tell us it's okay |
| 12:21:57 | 23 | to operate. |
| 12:21:59 | 24 | Q    Who told you that you should not tell -- |
| 12:22:02 | 25 | A    Julian and Michael both of them.  Both of them. |

106

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | |
|---|---|
| 12:22:07 | 1 |
| 12:22:09 | 2 |
| 12:22:11 | 3 |
| 12:22:14 | 4 |
| 12:22:18 | 5 |
| 12:22:20 | 6 |
| 12:22:22 | 7 |
| 12:22:26 | 8 |
| 12:22:30 | 9 |
| 12:22:32 | 10 |
| 12:22:43 | 11 |
| 12:22:44 | 12 |
| 12:22:44 | 13 |
| 12:22:48 | 14 |
| 12:22:48 | 15 |
| 12:22:49 | 16 |
| 12:22:54 | 17 |
| 12:22:56 | 18 |
| 12:23:01 | 19 |
| 12:23:04 | 20 |
| 12:23:07 | 21 |
| 12:23:07 | 22 |
| 12:23:07 | 23 |
| 12:23:07 | 24 |
| 12:23:07 | 25 |

1    That's why I'm trying to tell you, one has lost

2  his license so nothing can happen to him.  The other one

3  is one is sitting there on the scene telling his brother

4  what to do.  But he is the one in control.

5        Q    And that you believe to be Michael Omidi?

6        A    Of course, he's the one who runs the show, I

7  mean hundred percent, using his brother too.

8        MR. DE HERAS:  Can we take a break?  It's pretty

9  much the lunch hour.

10        MR. ROBERTSON:  Let me finish up on this topic.

11        THE WITNESS:  There is one attached to the other,

12  so --

13        MR. WALKER:  Is this a good time to take a break for

14  you?

15        THE WITNESS:  No problem with me.

16        MR. WALKER:  Let's take a break for lunch then.

17        THE VIDEOGRAPHER:  This ends media No. 2 of the

18  deposition of Ihsan Najib Shamaan, M.D.  The time is

19  12:23 p.m.  We are off of the record.

20        Thank you.

21        (Whereupon, a lunch recess was taken.)

22  ///

23  ///

24  ///

25  ///

107

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

```
12:23:07   1   WESTLAKE VILLAGE, CALIFORNIA; TUESDAY, DECEMBER 20, 2011;
12:23:08   2              1:48 p.m. - 4:00 p.m.
12:23:08   3        THE VIDEOGRAPHER:  We are back on the record.  The
13:45:35   4   time is 1:48 p.m.  This starts media No. 3 of the
13:48:22   5   deposition, volume 2, of Ihsan Najib Shamaan, M.D., in
13:48:29   6   the case named John Faitro, et al. versus Ihsan Najib
13:48:29   7   Shamaan, M.D., et al.
13:48:40   8              Thank you.
13:48:41   9   BY MR. WALKER:
13:48:41  10        Q    Dr. Shamaan, you understand that you are still
13:48:44  11   under oath to tell the truth?
13:48:46  12        A    I do.
13:48:47  13        Q    And you are still not represented by counsel;
13:48:49  14   correct?
13:48:49  15        A    I do -- I do.
13:48:51  16        Q    We last left off, you were still talking about
13:48:53  17   some of the things that you felt were important
13:48:55  18   concerning the Faitro case?
13:48:57  19        A    If the reporter can read me the last three
13:49:00  20   words or three lines or three sentences.
13:49:02  21        Q    Sure.
13:49:03  22        MR. WALKER:  Ms. Reporter, if you would.
13:49:06  23            (Whereupon, the record was read.)
13:49:06  24        MR. DE HERAS:    I just want to interpose an
13:49:06  25   objection and have a continuing objection to this line of
```

108

Exhibit Page 160

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

13:49:11  1    questioning and the narrative response to this question.

13:49:56  2           The questions are also vague, ambiguous,

13:50:03  3    overbroad, calls for speculation, and assumes facts not

13:50:06  4    in evidence and calls for expert opinion.

13:50:11  5           But I'm continuing objection to this narrative

13:50:14  6    form of answer.

13:50:15  7        MR. WALKER:  As you have objections, Mr. De Heras,

13:50:15  8    go ahead and state them.  There will be no running

13:50:20  9    objections throughout the deposition.  So if you have an

13:50:20  10   objection to a specific question, go ahead and state

13:50:26  11   them.

13:50:27  12   BY MR. WALKER:

13:50:27  13       Q    Mr. Shamaan, go ahead with what you believe is

13:50:27  14   important concerning the Faitro case.

13:50:31  15       MR. DE HERAS:  Objection.   Narration.  Lacks

13:50:31  16   foundation.  Calls for speculation.  Assumes facts not in

13:50:31  17   evidence.  Incomplete hypothetical.  Calls for expert

13:50:36  18   opinion.

13:50:40  19   BY MR. WALKER:

13:50:40  20       Q    You may respond.

13:50:41  21       A    Michael and Julian both, they informed me on

13:50:44  22   several occasions "Do not tell the patient about all the

13:50:48  23   complications.  Only choose the most obvious ones, which

13:50:55  24   is:  Infection, bleed and perforation.  And make sure you

13:50:59  25   tell them that these complications are rare.  They are 1

                                                                    109

Exhibit Page 161

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 13:51:04 | 1 | in 10,000, compared to the gastric bypass, which is 1 in |
| 13:51:09 | 2 | 100.  This is not a true fact. |
| 13:51:11 | 3 | MR. DE HERAS:  I'm also going to make a motion to |
| 13:51:17 | 4 | attach his notes to the transcript as the next exhibit in |
| 13:51:21 | 5 | order because it's refreshing his recollection and he is |
| 13:51:24 | 6 | also reading those notes. |
| 13:51:26 | 7 | THE WITNESS:  I object to that, because I think I am |
| 13:51:30 | 8 | representing myself, and I cannot give you -- you being |
| 13:51:32 | 9 | the lawyer of myself to give attorney's work to you. |
| 13:51:35 | 10 | MR. DE HERAS:  I don't think that's the law.  But if |
| 13:51:38 | 11 | you have records in front of you that you are reviewing, |
| 13:51:42 | 12 | you're refreshing your recollection, they are |
| 13:51:45 | 13 | discoverable in this deposition. |
| 13:51:48 | 14 | MR. WALKER:  Counsel. |
| 13:51:49 | 15 | THE WITNESS:  I am the lawyer. |
| 13:51:51 | 16 | MR. WALKER:  I'm going to disagree with that.  The |
| 13:51:52 | 17 | rule is whether or not the records themselves actually |
| 13:51:56 | 18 | refresh his recollection that he did not recall himself. |
| 13:51:58 | 19 | If he has notes for him to have something that he wants |
| 13:52:01 | 20 | to make sure that's being included so that he doesn't |
| 13:52:04 | 21 | miss something, that's different than a recollection |
| 13:52:04 | 22 | that's been refreshed by a record. |
| 13:52:09 | 23 | MR. ROBERTSON:  Do you have an objection to us |
| 13:52:10 | 24 | making a copy of that, of your notes? |
| 13:52:12 | 25 | THE WITNESS:  If I give them to you as evidence, |

110

Exhibit Page 162

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

13:52:13  1    then you can have copies.  But if I don't give them to

13:52:17  2    you, I am the lawyer.  This is my work.

13:52:19  3        MR. ROBERTSON:  Right.  No.  The question is:  Do

13:52:21  4    you have an objection to all of us having a copy of those

13:52:25  5    notes and attaching them to your deposition?

13:52:29  6        THE WITNESS:  This work?

13:52:30  7        MR. ROBERTSON:  Yes.

13:52:31  8        THE WITNESS:  Yes.

13:52:33  9        MR. ROBERTSON:  Because they contain other thoughts

13:52:33  10   and impressions?

13:52:36  11       THE WITNESS:  Yes.

13:52:36  12       MR. DE HERAS:  Can I ask a question:  Have you

13:52:42  13   provided those written notes to Mr. Robertson or

13:52:44  14   Mr. Walker?

13:52:45  15       THE WITNESS:  No.

13:52:46  16       MR. DE HERAS:  Have any of the exhibits that you've

13:52:48  17   attached or that have been attached to the record so far

13:52:50  18   today, have they been provided previously to Mr. Walker

13:52:51  19   or Mr. Robertson?

13:52:54  20       THE WITNESS:  No.

13:52:55  21       MR. ROBERTSON:  We're seeing them for the first

13:52:56  22   time, Counsel.

13:52:58  23       MR. WALKER:  You may recall, Counsel, there was a

13:52:58  24   request to produce documents that was attached to the

13:53:03  25   deposition subpoena or notice for today.  And those are

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

Exhibit Page 163

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

13:53:06  1    the responses I understand to that request.

13:53:08  2    BY MR. WALKER:

13:53:08  3         Q    Go ahead, Doctor.  You were -- you were talking

13:53:10  4    about the --

13:53:11  5         A    We were told also that, do not tell the patient

13:53:13  6    you do not qualify for lap band if his BMI is less than

13:53:18  7    35.  We were told also not to tell the patient, "You are

13:53:24  8    a high risk and you don't qualify to have a lap band."

13:53:32  9         Q    Who told you that, Doctor?

13:53:35  10        A    Both Michael and Julian.

13:53:37  11             I want to produce one document that reflects

13:53:40  12   the board has suspended Julian Omidi's license to

13:53:46  13   practice medicine in any shape or manner.  Yet he still

13:53:51  14   continues to practice medicine, and even give orders to

13:54:00  15   practice medicine with others, using the co-workers that

13:54:04  16   he has with them.  And I present this document.

13:54:11  17             In this document, he is ordering all the

13:54:14  18   physicians to do a liver biopsy on every patient and a

13:54:19  19   sleep test on every patient.  He gave it to Bobby

13:54:23  20   Macatanjay.

13:54:26  21        Q    How do you spell that?  If you see it there.

13:54:28  22   Is the name on the document?

13:54:30  23        A    M-A-C-A-T-A-N-J-A-Y.  Roberto Macatanjay.

13:54:37  24   Filipino name.

13:54:46  25             He is giving orders for this doctor to send

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 13:54:50 | 1 | e-mail to all the doctors to make sure to do a liver |
| 13:54:58 | 2 | biopsy and a sleep study routinely on all the patients. |
| 13:55:04 | 3 | That is interference with medicine. |
| 13:55:07 | 4 | MR. DE HERAS:  Can I get a copy of that? |
| 13:55:10 | 5 | MR. WALKER:  We will mark this as Exhibit F next in |
| 13:55:13 | 6 | order. |
| 13:55:14 | 7 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 13:55:14 | 8 | PLAINTIFF'S EXHIBIT F FOR IDENTIFICATION BY THE CERTIFIED |
| 13:55:14 | 9 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 13:55:15 | 10 | BY MR. WALKER: |
| 13:55:15 | 11 | Q    Which appears to be a copy of an e-mail |
| 13:55:17 | 12 | dated -- regards "Subject matter of minutes of |
| 13:55:20 | 13 | September 16th meeting, sent September 25, 2010." |
| 13:55:24 | 14 | MR. DE HERAS:  Can we get a copy before you continue |
| 13:55:29 | 15 | to ask questions in regard to this document? |
| 13:55:32 | 16 | MR. WALKER:  I'm not to going to have any questions |
| 13:55:38 | 17 | about this document. |
| 13:55:39 | 18 | MR. ROBERTSON:  At a break, we will make you a copy. |
| 13:55:42 | 19 | MR. DE HERAS:  I would object to the foundation of |
| 13:55:44 | 20 | the document. |
| 13:55:45 | 21 | BY MR. WALKER: |
| 13:55:45 | 22 | Q    Doctor, did you receive this document?  I see |
| 13:55:47 | 23 | here at one point it's addressed to the two people as to |
| 13:55:51 | 24 | who it's addressed to, one of the names on the document |
| 13:55:54 | 25 | who it's addressed to is -- appears to be you.  And so |

113

Exhibit Page 165

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 13:55:59 | 1 | this was addressed to you and you received this as an |
| 13:56:02 | 2 | e-mail that was addressed to you in the normal course of |
| 13:56:07 | 3 | business from Dr. Julian Omidi. |
| 13:56:09 | 4 | A    And Roberto. |
| 13:56:11 | 5 | Q    And Roberto. |
| 13:56:13 | 6 | Did you ever hear Dr. -- did you ever hear |
| 13:56:13 | 7 | Julian Omidi actually direct Robert to send out this |
| 13:56:21 | 8 | e-mail? |
| 13:56:22 | 9 | A    I didn't see him doing that. |
| 13:56:29 | 10 | Q    Did you ever hear Julian Omidi direct that the |
| 13:56:34 | 11 | doctors should be doing these medical procedures even if |
| 13:56:38 | 12 | they weren't indicated? |
| 13:56:39 | 13 | A    I only know it by this document. |
| 13:56:45 | 14 | Q    Go ahead, Doctor. |
| 13:56:48 | 15 | A    I have mentioned before that after I finished |
| 13:56:51 | 16 | Faitro's operation, I dictated it.  But fortunately I |
| 13:56:59 | 17 | took a copy of an operative report which is preprinted as |
| 13:57:07 | 18 | usual, and they asked us to just put the name of the |
| 13:57:13 | 19 | patient on that preprinted operative report.  And that |
| 13:57:17 | 20 | will be the hunky-dory operative report, which is not |
| 13:57:22 | 21 | true.  And I present that document to you also as well. |
| 13:57:24 | 22 | Q    My first question to you, if I may, there |
| 13:57:27 | 23 | appears to be materials on the back.  I'm assuming that's |
| 13:57:31 | 24 | not blood or something else that's contaminating -- |
| 13:57:34 | 25 | A    No.  That's coffee. |

114

Exhibit Page 166

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | | |
|---|---|---|
| 13:57:36 | 1 | Q    That's coffee.  Okay. |
| 13:57:36 | 2 | And this is a -- is intended to be basically an |
| 13:57:38 | 3 | indication of what the format was supposed to be for the |
| 13:57:39 | 4 | operative reports? |
| 13:57:48 | 5 | A    Right. |
| 13:57:49 | 6 | Q    Let's mark that next in order as Exhibit G. |
| 13:57:51 | 7 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 13:57:51 | 8 | PLAINTIFF'S EXHIBIT G FOR IDENTIFICATION BY THE CERTIFIED |
| 13:57:51 | 9 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 13:57:52 | 10 | BY MR. WALKER: |
| 13:57:52 | 11 | Q    And, Doctor, I do have a copy of your report |
| 13:57:54 | 12 | here, operative report, if you don't have one that we can |
| 13:57:54 | 13 | talk about if you wish to. |
| 13:57:57 | 14 | A    Yes.  I don't need it. |
| 13:57:58 | 15 | Like I told you before, that they send letters |
| 13:58:03 | 16 | which are also preprinted, to the different insurance |
| 13:58:07 | 17 | companies asking them for approval of the surgery where |
| 13:58:13 | 18 | the physician who has seen the patient has never seen |
| 13:58:19 | 19 | those documents.  Those documents are being signed by any |
| 13:58:23 | 20 | doctor who is pro Omidis.  In other words, he will -- |
| 13:58:26 | 21 | he's the yes man that will do for him anything that he |
| 13:58:30 | 22 | wants.  And I myself have done it also.  Remember, I told |
| 13:58:38 | 23 | you I have signed 600 letters like that. |
| 13:58:41 | 24 | And these are copies of those letters that are |
| 13:58:44 | 25 | sent without the knowledge of the physicians. |

115

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 13:58:47 | 1 | Q    Did you ever see any other doctors besides |
| 13:58:50 | 2 | yourself signing these type of letters in blank to be |
| 13:58:53 | 3 | sent to the insurance companies? |
| 13:58:55 | 4 | A    I -- I haven't seen, but I know. |
| 13:58:57 | 5 | Q    How do you know? |
| 13:58:58 | 6 | A    Because I read it through the computers and |
| 13:59:01 | 7 | through documents like that in front of you. |
| 13:59:05 | 8 | Q    I'm going to attach the first document.  This |
| 13:59:07 | 9 | document is Exhibit H.  Which is from a Jennifer Baez, |
| 13:59:12 | 10 | B-A-E-Z, with the name of Atul Madan at the top of it. |
| 13:59:16 | 11 | It's a one-page document. |
| 13:59:20 | 12 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 13:59:20 | 13 | PLAINTIFF'S EXHIBIT H FOR IDENTIFICATION BY THE CERTIFIED |
| 13:59:20 | 14 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 13:59:22 | 15 | BY MR. WALKER: |
| 13:59:22 | 16 | Q    And I'm going to also attach as Exhibit I a |
| 13:59:27 | 17 | request for authorization determination letter.  This is |
| 13:59:29 | 18 | also reference to a Jennifer B-A-E-Z.  And has a |
| 13:59:38 | 19 | signature line for Doctor Atul Madan.  And it's three |
| 13:59:43 | 20 | pages in length. |
| 13:59:44 | 21 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 13:59:44 | 22 | PLAINTIFF'S EXHIBIT I FOR IDENTIFICATION BY THE CERTIFIED |
| 13:59:44 | 23 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 13:59:45 | 24 | BY MR. WALKER: |
| 13:59:45 | 25 | Q    Doctor, is there any additional information |

116

Exhibit Page 168

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 13:59:50 | 1 | that you have concerning any request by Julian or Michael |
| 13:59:54 | 2 | Omidi for you or other doctors to do anything that you |
| 14:00:05 | 3 | felt was inappropriate? |
| 14:00:06 | 4 | MR. DE HERAS: Objection. Calls for speculation. |
| 14:00:09 | 5 | Assumes facts not in evidence. Compound. Argumentative. |
| 14:00:14 | 6 | Incomplete hypothetical. |
| 14:00:16 | 7 | THE WITNESS: I can answer? |
| 14:00:17 | 8 | BY MR. WALKER: |
| 14:00:17 | 9 | Q    Yes. |
| 14:00:18 | 10 | A    I only know what Julian told me about me. |
| 14:00:22 | 11 | About others, I don't know. |
| 14:00:25 | 12 | Q    You can continue with what you think is |
| 14:00:27 | 13 | important concerning the Faitro case, Doctor. |
| 14:00:30 | 14 | A    I also have found out that they use the best |
| 14:00:33 | 15 | doctor who has the best reputation with the insurance |
| 14:00:37 | 16 | company, such as myself, when I have worked with those |
| 14:00:39 | 17 | insurance companies for maybe 30 years, and I have a good |
| 14:00:45 | 18 | rapport with them. And they usually believe all the |
| 14:00:49 | 19 | reports that I tell them. And they will approve my |
| 14:00:52 | 20 | surgeries. |
| 14:00:53 | 21 | So they have sent letters under the presumption |
| 14:00:55 | 22 | that I sent them. But, actually, they do send them for |
| 14:00:59 | 23 | approval for surgeries. |
| 14:01:02 | 24 | And not only that they did it without my |
| 14:01:08 | 25 | knowledge, but they did it even after my resignation from |

117

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 14:01:12 | 1 | work with them. |
| 14:01:14 | 2 | I have maybe like 50 letters that I can give |
| 14:01:16 | 3 | you all, but I will give you some which are very |
| 14:01:25 | 4 | interesting.  And that is I quit working with them |
| 14:01:29 | 5 | October 6, 2010.  And here you find letters dated |
| 14:01:33 | 6 | November 17, 2010; November 10, 2010; October 29, 2010; |
| 14:01:39 | 7 | and all showing that they have asked for surgeries for |
| 14:01:43 | 8 | their group under my name, using my name with the |
| 14:01:50 | 9 | insurance company to get approval. |
| 14:01:53 | 10 | Q    These were not sent with your knowledge? |
| 14:01:58 | 11 | A    No. |
| 14:02:02 | 12 | Q    Let's do them in order.  The next one in order |
| 14:02:04 | 13 | we'll do is J.  One dated November the 17th, concerning a |
| 14:02:14 | 14 | Barbara Gonzalez. |
| 14:02:17 | 15 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 14:02:17 | 16 | PLAINTIFF'S EXHIBIT J FOR IDENTIFICATION BY THE CERTIFIED |
| 14:02:17 | 17 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 14:02:18 | 18 | BY MR. WALKER: |
| 14:02:18 | 19 | Q    Did you ever evaluate Barbara Gonzalez? |
| 14:02:23 | 20 | A    I have no idea. |
| 14:02:24 | 21 | MR. WALKER:  The next one will be K which is a |
| 14:02:29 | 22 | letter on the stationery from TriWest Health Alliance |
| 14:02:31 | 23 | concerning a Kalaya Valdez, V-A-L-D-E-Z, dated |
| 14:02:46 | 24 | November 10, 2010. |
| 14:02:49 | 25 | /// |

118

Exhibit Page 170

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:02:49 | 1 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 14:02:49 | 2 | PLAINTIFF'S EXHIBIT K FOR IDENTIFICATION BY THE CERTIFIED |
| 14:02:49 | 3 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 14:02:49 | 4 | MR. WALKER:  Next is Exhibit L also on TriWest dated |
| 14:02:58 | 5 | October 26, 2011 -- I'm sorry, dated October 29, 2010. |
| 14:03:07 | 6 | Addressed to Dr. Shamaan, in regards to a Christopher |
| 14:03:12 | 7 | Chapman, C-H-A-P-M-A-N. |
| 14:03:19 | 8 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 14:03:19 | 9 | PLAINTIFF'S EXHIBIT L FOR IDENTIFICATION BY THE CERTIFIED |
| 14:03:19 | 10 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 14:03:19 | 11 | MR. WALKER:  Strike that.  It's not in regards to |
| 14:03:21 | 12 | Mr. Chapman, it's addressed to a Christopher Chapman. |
| 14:03:29 | 13 | Next exhibit -- |
| 14:03:30 | 14 | MR. DE HERAS.  Before you go on, I'm going to object |
| 14:03:32 | 15 | to the introduction of these exhibits based on the |
| 14:03:32 | 16 | privacy of the patient.  There are patient names on these |
| 14:03:47 | 17 | documents, the doctor testified he doesn't know if he |
| 14:03:50 | 18 | treated them. |
| 14:03:51 | 19 | These patients have privacy rights under HIPAA. |
| 14:03:53 | 20 | And I think it's highly inappropriate to introduce these |
| 14:03:57 | 21 | documents, based on those objections. |
| 14:04:01 | 22 | THE WITNESS:  All these documents have my name on |
| 14:04:04 | 23 | them.  There is no violation of HIPAA. |
| 14:04:08 | 24 | MR. WALKER:  Next exhibit in order is M, dated |
| 14:04:11 | 25 | October 26, 2010, on stationery of TriWest Health |

119

Exhibit Page 171

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.     12/20/2011

| | | |
|---|---|---|
| 14:04:16 | 1 | Alliance. |
| 14:04:23 | 2 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 14:04:23 | 3 | PLAINTIFF'S EXHIBIT M FOR IDENTIFICATION BY THE CERTIFIED |
| 14:04:23 | 4 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 14:04:28 | 5 | MR. WALKER:  The next will be exhibit N as in Nancy, |
| 14:04:37 | 6 | also on TriWest Health Coverage -- Health Alliance.  I'm |
| 14:04:39 | 7 | sorry.  Dated March 9, 2011. |
| 14:04:39 | 8 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 14:04:39 | 9 | PLAINTIFF'S EXHIBIT N FOR IDENTIFICATION BY THE CERTIFIED |
| 14:04:39 | 10 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 14:04:39 | 11 | MR. DE HERAS:  Same objections. |
| 14:04:45 | 12 | THE WITNESS:  All those documents are sent to my |
| 14:04:47 | 13 | clinic address.  They are my letters.  I didn't take them |
| 14:04:52 | 14 | from anybody else. |
| 14:05:00 | 15 | BY MR. WALKER: |
| 14:05:00 | 16 | Q   Exhibit N lists Dr. Shamaan as being the |
| 14:05:04 | 17 | provider. |
| 14:05:07 | 18 | Doctor, anything further that you feel is |
| 14:05:23 | 19 | important concerning the Laura Faitro case for us to |
| 14:05:26 | 20 | understand the quality and nature of her treatment or |
| 14:05:33 | 21 | lack thereof? |
| 14:05:33 | 22 | MR. DE HERAS:  Objection.  Calls for a narrative. |
| 14:05:36 | 23 | Vague and ambiguous.  Incomplete hypothetical.  Lacks |
| 14:05:39 | 24 | foundation.  Calls for speculation.  Compound. |
| 14:05:46 | 25 | Argumentative. |

120

Exhibit Page 172

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:05:47  1      THE WITNESS:  I can answer?

14:05:49  2      MR. DE HERAS:  Calls for expert opinion.

14:05:51  3  BY MR. WALKER:

14:05:51  4      Q    You may answer.

14:05:51  5      A    Mrs. Faitro died, like I said, because of poor

14:05:55  6  selection, poor pre-op care.

14:06:00  7          And I'm going to talk now about the post-op

14:06:06  8  care.  Mrs. Faitro was not given a specific place to go

14:06:14  9  to in case she has a complication.

14:06:18  10         My patients in my clinic when I operated on

14:06:21  11 them, they come either to my clinic or to my hospital

14:06:27  12 where they have the operation.  Mrs. Faitro was not told

14:06:32  13 where to go if something happened.

14:06:35  14         Mrs. Faitro died from sepsis and severe

14:06:38  15 infection.

14:06:39  16     MS. THOMASSON:  I'm going to object with a late

14:06:39  17 objection as well.  Calls for an expert opinion, lacks

14:06:39  18 foundation.

14:06:39  19     MS. CARLSON:  Join.

14:06:39  20     MR. DE HERAS:  Join.

14:06:39  21     MS. KAUFMAN:  Join.

14:06:39  22     THE WITNESS:  I didn't understand.

14:06:49  23 BY MR. WALKER:

14:06:49  24     Q    You may respond.

14:06:49  25         They are objecting to the question and their

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

Exhibit Page 173

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:06:54 | 1 | belief that you are not an expert to be able to render |
| 14:06:59 | 2 | that type of opinion and it lacks foundation. |
| 14:07:01 | 3 | Doctor, you read through the autopsy report; is |
| 14:07:06 | 4 | that correct? |
| 14:07:06 | 5 | A    Yes.   That's where I got it from. |
| 14:07:08 | 6 | Q    And relied upon the autopsy report, that's your |
| 14:07:08 | 7 | professional opinion as a medical doctor? |
| 14:07:13 | 8 | A    Yes. |
| 14:07:14 | 9 | Q    Go ahead. |
| 14:07:15 | 10 | A    So with my experience of 40 years, I am -- |
| 14:07:18 | 11 | even -- I can say I am better than an expert witness. |
| 14:07:22 | 12 | With three residencies in three countries, with all this |
| 14:07:26 | 13 | experience, I mean, you can object until tomorrow, I am |
| 14:07:29 | 14 | better than an expert witness. |
| 14:07:31 | 15 | To follow, she died from severe infection that |
| 14:07:34 | 16 | lead to system failure that led to myocardial infarction. |
| 14:07:43 | 17 | Dr. Omidi called me.  He says, "Well, this |
| 14:07:44 | 18 | patient died from myocardial infarction.  We shouldn't |
| 14:07:49 | 19 | use that case."  Well, that tells me how much he is |
| 14:07:51 | 20 | expert in ICU care or severe problems post-op.  He |
| 14:07:56 | 21 | doesn't know that infection can cause thrombosis of |
| 14:08:01 | 22 | vessels and can cause MI.  MI is not the thing that |
| 14:08:10 | 23 | happened per se first.  It happened after the infection. |
| 14:08:17 | 24 | The infection precipitated the MI. |
| 14:08:22 | 25 | If you read the autopsy report -- and I would |

122

Exhibit Page 174

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:08:24 | 1 | alert you to two paragraphs.  The first one is the |
| 14:08:27 | 2 | hepatobiliary system. |
| 14:08:31 | 3 | MS. THOMASSON:  I'm sorry.  The what? |
| 14:08:33 | 4 | THE WITNESS:  Hepatobiliary system.  We are trained |
| 14:08:39 | 5 | that a patient who is obese, you do an ultrasound for him |
| 14:08:49 | 6 | to make sure that they don't have stones in the |
| 14:08:55 | 7 | gallbladder.  The reason why is because sometimes when |
| 14:08:59 | 8 | you put the lap band, the stones might move and cause |
| 14:09:03 | 9 | acute cholecystitis.  And then she will probably need an |
| 14:09:07 | 10 | operation after the lap band, which might jeopardize the |
| 14:09:12 | 11 | lap band procedure. |
| 14:09:15 | 12 | In this case, this patient had, as you see in |
| 14:09:16 | 13 | the last two lines -- |
| 14:09:18 | 14 | MR. DE HERAS:  What page? |
| 14:09:21 | 15 | THE WITNESS:  Page 3.  It says "The gallbladder is |
| 14:09:23 | 16 | dilated and contains liquid green bile and several |
| 14:09:29 | 17 | yellow-green stones.  These were missed by -- by the |
| 14:09:37 | 18 | doctor who -- who cleared her." |
| 14:09:38 | 19 | In other words, Mrs. Faitro should have gone |
| 14:09:39 | 20 | cholecystectomy before the lap band.  I would alert you |
| 14:09:48 | 21 | also to paragraph -- page 5. |
| 14:09:51 | 22 | BY MR. WALKER: |
| 14:09:51 | 23 | Q    Before you go on, did that make -- did that |
| 14:09:55 | 24 | decrease her likelihood of being a good candidate for the |
| 14:10:00 | 25 | lap band surgery? |

123

Exhibit Page 175

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:10:03    1          A    No.    It increases her morbidity.

14:10:06    2               On page 5, if you read "Gastrointestinal

14:10:08    3    system," it says there, "Sections from the small bowel

14:10:11    4    way down -- sections from the small bowel and colon show

14:10:17    5    evidence of chotalasis (phonetic) and also areas of

14:10:21    6    mucosal hemorrhage and necrosis, most consistent with

14:10:27    7    ischemic enterocolitis."  Ischemic enterocolitis means

14:10:32    8    that the vessels to those organs are stenosed or almost

14:10:37    9    obstructed, which is the same process that affects the

14:10:41   10    heart and caused myocardial infarction.  So...

14:10:48   11          Q    Doctor, was there a significance to that

14:10:49   12    finding in the autopsy report concerning her morbidity or

14:10:53   13    her death?

14:10:55   14          MR. DE HERAS:  Objection.  Calls for expert opinion.

14:11:00   15    Lacks foundation.  Calls for speculation.

14:11:03   16          MS. THOMASSON:  Join.

14:11:05   17          MS. KAUFMAN:  Join.

14:11:05   18          THE WITNESS:  The infection caused thrombosis,

14:11:06   19    autolysis and death of that organ.  And that's why some

14:11:06   20    people suspected that there was an intestinal

14:11:06   21    perforation, but in actuality is necrosis due to

14:11:06   22    thrombosis.  Just like thrombosis that caused MI due to

14:11:27   23    infection.  So that the main villain is the infection.

14:11:33   24               So -- which leads me to say that whatever

14:11:35   25    happened in the valley hospital, whatever Dr. Drucker

124

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:11:39 | 1 | did, whatever -- how he managed her, didn't do anything |
| 14:11:44 | 2 | wrong. |
| 14:11:49 | 3 | What -- what happened is that here he has a |
| 14:11:52 | 4 | patient who's hypovolemic, septic, low blood pressure. |
| 14:11:59 | 5 | If you open that patient, patient will die on the table. |
| 14:12:04 | 6 | So he first elected to revive her first, to revive her |
| 14:12:12 | 7 | and then operate if possible. |
| 14:12:18 | 8 | Now I talked to Dr. Drucker three times.  And |
| 14:12:22 | 9 | we discussed the case on the phone.  And he even asked |
| 14:12:26 | 10 | me, "Can you help me?  What can we do for this patient?" |
| 14:12:34 | 11 | I said, "Well, if I was you, I will get her out |
| 14:12:36 | 12 | of the shock.  And then if possible operate, if you |
| 14:12:41 | 13 | believe -- if you think that there is bleeding.  Or there |
| 14:12:43 | 14 | is perforation.  Because either one of them needs |
| 14:12:47 | 15 | intervention right away." |
| 14:12:53 | 16 | He told me, "Bleeding, no.  Because patient's |
| 14:12:55 | 17 | hematocrit, hemoglobin never fell before 9 -- below 9." |
| 14:12:59 | 18 | If she's bleeding, he would have given her blood |
| 14:13:00 | 19 | transfusion. |
| 14:13:00 | 20 | "Perforation," he said "no," because I think he |
| 14:13:07 | 21 | did some tests, either a CT or an endoscopy.  And he knew |
| 14:13:12 | 22 | that there was no perforation. |
| 14:13:14 | 23 | So his conduct in that hospital, whatever he |
| 14:13:16 | 24 | did -- and I know Mr. Walker, you don't like that, but |
| 14:13:20 | 25 | I'm going it say it, and I'm going to say the truth no |

125

Exhibit Page 177

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.     12/20/2011

```
14:13:24   1   matter what, Mr. -- Dr. Drucker did not do anything
14:13:27   2   wrong.  He just tried to save that patient, but he
14:13:29   3   couldn't.  I would have been more aggressive if she came
14:13:33   4   to me.  Like I save my wife, I could have saved her.
14:13:37   5       Q    What would you have done differently?
14:13:39   6       A    Go aggressively and resuscitate her.
14:13:40   7       MS. THOMASSON:  Calls for speculation.
14:13:41   8   BY MR. WALKER:
14:13:42   9       Q    What would you have done differently, if
14:13:44  10   anything?
14:13:45  11       A    Try to resuscitate her.  That's the main thing,
14:13:49  12   which he was doing.
14:13:56  13       Q    What other factors do you have that's important
14:13:57  14   for us to know about Laura Faitro and her surgery?
14:14:02  15       MR. DE HERAS:  Objection.  Calls for a narrative.
14:14:02  16   Lacks foundation.  Calls for speculation and
14:14:02  17   argumentative.
14:14:02  18       MR. WALKER:  I'm going to restate the question
14:14:02  19   anyway.
14:14:02  20       Q    Are there any additional factors you think that
14:14:09  21   it's important for us to know about that affects the
14:14:19  22   surgery with Laura Faitro?
14:14:25  23       MR. DE HERAS:  Objection.  Calls for a narrative.
14:14:25  24   Expert opinion.  Lacks foundation.  Calls for
14:14:25  25   speculation.  Assumes facts not in evidence.
```

www.DCRLitigationServices.com
(818) 706-3749     (800) DCR-3003     (415) 777-1190     (805) 497-0046

Exhibit Page 178

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.              12/20/2011

| | |
|---|---|
| 14:14:25 | 1 | Argumentative. Compound. Vague and ambiguous. |
| 14:14:34 | 2 |         THE WITNESS: Okay. My surgery? |
| 14:14:35 | 3 | BY MR. WALKER: |
| 14:14:35 | 4 |     Q    Yes. |
| 14:14:35 | 5 |     A    Common sense tells me this, that patient had an |
| 14:14:38 | 6 | infection. The infection has to come from somewhere. It |
| 14:14:44 | 7 | cannot come out of the blues. There is only three |
| 14:14:54 | 8 | possibilities. Number 1 possibility is that we the |
| 14:14:58 | 9 | surgeons introduced it by the trocars, T-R-O-C-A-R-S. I |
| 14:15:08 | 10 | put two trocars and Tashjian put three trocars. |
| 14:15:17 | 11 |         Attached to this possibility is were these |
| 14:15:19 | 12 | trocars infected or was the skin of the patient infected? |
| 14:15:28 | 13 | That is the only conclusion I can tell that makes the |
| 14:15:33 | 14 | infection go inside the patient. |
| 14:15:38 | 15 |         Were the trocars infected? I, during the |
| 14:15:41 | 16 | operation, when I went into that room, I did not see the |
| 14:15:45 | 17 | scrub tech open a box and get the trocars out. I saw |
| 14:15:52 | 18 | them already on the Mayo. Okay. |
| 14:15:58 | 19 |         Other than that, I cannot tell you, and I will |
| 14:16:03 | 20 | be lying if I tell you something else. But usually we |
| 14:16:09 | 21 | see -- when they put the trocars we usually see the tech |
| 14:16:12 | 22 | open a special sterilized box and get those trocars out. |
| 14:16:17 | 23 |     Q    In the case with Laura Faitro you did not see |
| 14:16:20 | 24 | that occur? |
| 14:16:22 | 25 |     A    No. |

127

Exhibit Page 179

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:16:22  1      Q    I'm correct?

14:16:23  2      A    You are correct.  I did not see that they

14:16:27  3   opened the box.  I saw them only on the Mayo.

14:16:31  4        So you know what, I'm trying to find out

14:16:33  5   possibilities why the infection goes in.  I'm trying to

14:16:36  6   go through all the avenues.  So either the patient's skin

14:16:40  7   or the trocars got infected and we introduced them.

14:16:45  8        The second possibility is she aspirated at home

14:16:48  9   and she got the infection through aspiration.  And that

14:16:52  10  also lead us to a conclusion, and that is, "Why would she

14:16:55  11  aspirate at home if she is awake?"  And that leads us to

14:17:01  12  what Allergan teach us in that course.  And they say when

14:17:05  13  a patient is going in lap band, especially if he has

14:17:09  14  sleep apnea, you should put him in the hospital in the

14:17:13  15  ICU and you watch him.  Because those patients with sleep

14:17:18  16  apnea problems, they might have a sleep apnea attack even

14:17:22  17  when they wake up from anesthesia.  And that's the time

14:17:27  18  when they aspirate.  So aspiration by the patient might

14:17:34  19  have been caused by a sleep apnea.

14:17:36  20        So those are the three -- the only three

14:17:39  21  possibilities that I can think of that introduced

14:17:42  22  infection.

14:17:47  23        Where would she get the infection from?  Either

14:17:49  24  from the upper G.I. or from the -- from the surgery.

14:17:52  25      MR. ROBERTSON:  Laura Faitro's surgery, how many

128

Exhibit Page 180

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:17:58  1    open trocars did you observe on the tray?

14:18:01  2         THE WITNESS:  Five.

14:18:02  3         MR. ROBERTSON:  And they were out of the --

14:18:04  4         THE WITNESS:  There was no box.

14:18:06  5         MR. ROBERTSON:  So they were open to room air --

14:18:07  6         THE WITNESS:  They were on the Mayo.  But she --

14:18:11  7    there is two possibilities:  One, they did open it from a

14:18:16  8    box but I didn't see it; or there was no box.

14:18:19  9         And I don't want to go through that because I

14:18:22  10   don't know.

14:18:23  11   BY MR. WALKER:

14:18:23  12        Q    Could a perforation also bring about an

14:18:25  13   infection?

14:18:26  14        A    No.  Because these trocars are -- they call

14:18:29  15   them blunt.  They can't cause perforation.

14:18:39  16             After I talked to Michael, Mr. Heras

14:18:45  17   called me.  And he told me, "If you attack Tashjian,

14:18:52  18   I will stop you.  If you don't say anything about

14:18:57  19   Tashjian, we will not say anything about you."

14:19:01  20        Q    That was -- was that Mr. De Heras?

14:19:04  21        A    I don't know.  Somebody on the phone called

14:19:05  22   himself Heras.

14:19:05  23        MR. DE HERAS:  That's a total lie.

14:19:12  24   BY MR. WALKER:

14:19:12  25        Q    Did you receive a phone call from someone?

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:19:14 | 1 | A  He said, "I am Mr. Heras." |
| 14:19:18 | 2 | Q  And did he say who he was representing? |
| 14:19:21 | 3 | A  Tashjian. |
| 14:19:21 | 4 | Q  He said he was representing Tashjian in the |
| 14:19:24 | 5 | Faitro case? |
| 14:19:25 | 6 | A  Yes. |
| 14:19:26 | 7 | Q  Had you ever spoken to this person before? |
| 14:19:28 | 8 | A  Never. |
| 14:19:29 | 9 | Q  When did this conversation occur? |
| 14:19:30 | 10 | A  After Michael Omidi called me. |
| 14:19:33 | 11 | Q  About two weeks ago? |
| 14:19:34 | 12 | A  No.  About two months or three months ago. |
| 14:19:39 | 13 | Q  Two or three months ago? |
| 14:19:40 | 14 | A  Yeah. |
| 14:19:41 | 15 | Q  And where were you called at?  Were you called |
| 14:19:43 | 16 | at your home or on your cell phone or at your office? |
| 14:19:47 | 17 | A  He called me on my cell. |
| 14:19:48 | 18 | Q  On your cell phone? |
| 14:19:53 | 19 | A  On my cell.  The people that know my cell is |
| 14:19:56 | 20 | the Omidis.  They have my cell number. |
| 14:19:57 | 21 | Q  Continue, Doctor. |
| 14:19:58 | 22 | A  I might -- I don't know if I'm able to get log |
| 14:20:00 | 23 | of all the phone calls I received from the -- from the |
| 14:20:02 | 24 | T-Mobile company.  Can I -- can I -- is it possible to |
| 14:20:14 | 25 | get it?  I will get it. |

130

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:20:17    1        Q    Fair enough.

14:20:18    2        A    To prove my point.

14:20:20    3        Q    Very good.

14:20:26    4             Continue on, Doctor.

14:20:27    5        A    Okay.  Mrs. Faitro took four days for her to

14:20:30    6    come -- to come forward -- or three days to come forward

14:20:34    7    before we were able to do something to help her.  Three

14:20:49    8    days.

14:20:50    9             And during those three days, there is a rule in

14:20:53    10   every hospital in every surgery center, is to call the

14:20:58    11   patient:  "How are you doing?  Are you okay?"  Was that

14:21:03    12   done?  I don't know.  Because she cannot be so sick in

14:21:06    13   three days without nobody knowing.  It's impossible.  In

14:21:11    14   other words, from normal to septic shock, it's

14:21:15    15   impossible.  And all the hospitals nowadays and surgery

14:21:24    16   centers usually call the patient to ask him about what's

14:21:29    17   going on; and if there is anything wrong, instruct him

14:21:32    18   what to do.

14:21:33    19       Q    Were you instructed to call the patient or was

14:21:37    20   that handled by somebody else?

14:21:39    21       A    By somebody else.

14:21:41    22       Q    And who did you understand was to be calling

14:21:43    23   the patients to see how they were doing postoperatively?

14:21:45    24       A    Only the Omidis.

14:21:47    25       Q    So you didn't even know what the procedures

Exhibit Page 183

FAITRO v. SHAMAAN        IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

```
14:21:48   1    were?
14:21:49   2         A    No.
14:21:49   3         Q    Go ahead, Doctor.
14:21:51   4         A    In similarities, there were about five deaths
14:21:53   5    of patients undergoing lap bands, maybe six that I know
14:21:56   6    of.
14:21:58   7              And in all those six patients, no interference
14:22:05   8    postoperatively by the surgeons from the Top Surgeon.
14:22:14   9    None were managed.  Some deaths happened at home.  Some
14:22:21  10    death happened in the emergency room.
14:22:23  11              What it tells me is that those patients were
14:22:27  12    not instructed to go anywhere.  While the law is very
14:22:32  13    clear about it, that every surgery center should have a
14:22:36  14    hospital that will accept the patients.  And that means
14:22:40  15    that the surgery center should instruct the patient to go
14:22:46  16    to this hospital if something happens.  Because that's
14:22:48  17    the only way we can save that patient.  I don't think
14:22:52  18    that happened in all those deaths.
14:22:54  19         MR. ROBERTSON:  You think five or six deaths?
14:22:56  20         THE WITNESS:  Yes.  Under Madan and Tashjian.
14:22:59  21         MR. ROBERTSON:  Five or six deaths in addition to
14:22:59  22    Laura Faitro?
14:23:03  23         THE WITNESS:  Yes.
14:23:04  24         MR. ROBERTSON:  In addition?
14:23:06  25         THE WITNESS:  In addition.
```

132

Exhibit Page 184

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 14:23:07 | 1 | MR. ROBERTSON:  So there would be a total of six or |
| 14:23:07 | 2 | seven that you are aware of? |
| 14:23:10 | 3 | THE WITNESS:  Yes. |
| 14:23:11 | 4 | BY MR. WALKER: |
| 14:23:11 | 5 | Q    Do you have the name of all those decedents? |
| 14:23:14 | 6 | A    I know because I work there.  But names, no, I |
| 14:23:17 | 7 | don't know. |
| 14:23:17 | 8 | Q    These were deaths before you left your |
| 14:23:18 | 9 | association with them?  These were deaths before you left |
| 14:23:19 | 10 | the company that you're aware of? |
| 14:23:20 | 11 | A    No, no, no, no.  While I was working there. |
| 14:23:24 | 12 | Q    While you were working there. |
| 14:23:26 | 13 | When you left in October the 6th of 2010 -- |
| 14:23:35 | 14 | A    Correct. |
| 14:23:35 | 15 | Q    -- all these six or seven deaths were before |
| 14:23:36 | 16 | that time? |
| 14:23:37 | 17 | A    Correct. |
| 14:23:37 | 18 | Q    When they reported to me that Laura Faitro was |
| 14:23:42 | 19 | sick and she's in the emergency room, the Omidis came to |
| 14:23:49 | 20 | me and said, "The cause of her death was a perforation in |
| 14:23:54 | 21 | her stomach." |
| 14:23:57 | 22 | I felt so bad.  And I said, "You know what, |
| 14:23:59 | 23 | I -- I killed that patient."  I said that.  "I killed |
| 14:24:03 | 24 | that patient and I should stop working.  I want to |
| 14:24:07 | 25 | completely retire.  I don't want to work no more." |

133

Exhibit Page 185

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

| | | |
|---|---|---|
| 14:24:13 | 1 | Later I found out that I did not perforate the |
| 14:24:16 | 2 | stomach. She didn't die from my -- they lied to me, |
| 14:24:20 | 3 | saying that to make me feel bad and to accomplish one |
| 14:24:24 | 4 | issue which is -- I call it autonomy. |
| 14:24:29 | 5 | I don't know if you know about the story of a |
| 14:24:32 | 6 | donkey. A farmer has a donkey and he takes him to the |
| 14:24:43 | 7 | farm every day with a leash. After 30 days he take away |
| 14:24:47 | 8 | the leash and the donkey on his own goes to the farm. |
| 14:24:53 | 9 | They have this policy of keep bombarding the |
| 14:24:56 | 10 | people under their control, whether employees or doctors: |
| 14:24:59 | 11 | Don't do this, don't do this, don't do this, don't do |
| 14:25:05 | 12 | this. And then after a while the doctor automatically |
| 14:25:10 | 13 | don't do this. |
| 14:25:14 | 14 | He doesn't use his common sense or his |
| 14:25:16 | 15 | knowledge or his experience not to do this. |
| 14:25:20 | 16 | What I thought by telling me that "You killed |
| 14:25:23 | 17 | Laura Faitro" was callous. And at that time I said -- I |
| 14:25:26 | 18 | said, "If I killed her, that means there would be a |
| 14:25:31 | 19 | lawsuit." |
| 14:25:32 | 20 | And Julian Omidi's response to me was, "Don't |
| 14:25:40 | 21 | worry, we make $21 million a month, 1 million is okay." |
| 14:25:53 | 22 | That response is so callous and so |
| 14:25:56 | 23 | irresponsible for human life that to them only money |
| 14:26:00 | 24 | counts. |
| 14:26:03 | 25 | Q    That comment was made by Julian or Michael? |

134

Exhibit Page 186

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:26:08 | 1 | A    Julian. |
| 14:26:13 | 2 | I have nothing to say. |
| 14:26:15 | 3 | Q    Doctor, let's -- let's back up a bit. |
| 14:26:19 | 4 | Let's talk about the postsurgical care for |
| 14:26:23 | 5 | Ms. Faitro.  When you finished surgery with Ms. Faitro, |
| 14:26:57 | 6 | where was she taken to? |
| 14:27:11 | 7 | A    Repeat that. |
| 14:27:15 | 8 | Q    When you finished the surgery on Ms. Faitro, |
| 14:27:23 | 9 | where was she taken to?  Was there some type of a |
| 14:27:31 | 10 | recovery room? |
| 14:27:32 | 11 | A    The recovery room. |
| 14:27:33 | 12 | Q    Had you ever performed any surgeries before |
| 14:27:35 | 13 | Ms. Faitro at the West Valley Surgical Center? |
| 14:27:38 | 14 | A    Mrs. Faitro was my first surgery in lap band. |
| 14:27:41 | 15 | Q    Did you ever disclose that to either Ms. Faitro |
| 14:27:43 | 16 | or to any members of her family? |
| 14:27:47 | 17 | A    No. |
| 14:27:47 | 18 | Q    Were you ever instructed not to disclose such |
| 14:27:51 | 19 | facts to any of the family members or potential surgical |
| 14:27:54 | 20 | candidates? |
| 14:27:56 | 21 | A    No. |
| 14:27:57 | 22 | Q    The day of the surgery, did you have any other |
| 14:27:59 | 23 | patients that you assisted with surgery?  Or was this the |
| 14:28:03 | 24 | first surgery that day? |
| 14:28:11 | 25 | A    No.  I did two more surgeries; one, another lap |

135

Exhibit Page 187

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:28:16  1    band and one cholecystectomy.

14:28:19  2        Q    So that was after Mrs. Faitro?

14:28:20  3        A    Yes.

14:28:21  4        Q    Did you do any surgeries either directly or

14:28:24  5    that you participated in before Ms. Faitro?

14:28:29  6        A    Oh, a lot of them.

14:28:30  7        Q    No, I'm saying on the day of her surgery?

14:28:32  8        A    No.

14:28:33  9        Q    So she was the first patient that you saw in

14:28:36 10    the surgical theater on the date of the surgery?

14:28:38 11        A    Correct.  That lead me to remember one

14:28:40 12    conversation with Michael Omidi.  And that is, I told him

14:28:46 13    specifically that I don't think I am ready to do lap

14:28:51 14    bands.  And I'm not in a hurry.  I need to do more.

14:29:05 15            He said, "Well, you are not in a hurry but we

14:29:07 16    are."  And what -- this leads me to another issue about

14:29:09 17    Allergan.  Because Allergan are the ones who bring the

14:29:13 18    proctor from an outside facility to proctor you on two

14:29:21 19    cases before they pass you.  And I thought Allergan

14:29:32 20    behavior was very suspicious.  And the least I can say,

14:29:36 21    they are pro Omidis.  They will do whatever the Omidis

14:29:41 22    tell them.

14:29:44 23            So I did two cases.  But I, judging myself, I

14:29:52 24    don't think -- I don't think I was ready to go on my own

14:29:56 25    to do other surgeries.

136

Exhibit Page 188

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:30:00 | 1 | So then I -- later on I went to Michael Omidi |
| 14:30:09 | 2 | and I told him, "Dr. Omidi, I will do lap bands, no |
| 14:30:13 | 3 | problem; but I want the simple cases first. So I can -- |
| 14:30:15 | 4 | I can at least like train more with those cases." |
| 14:30:21 | 5 | And guess what? The first two cases was, one |
| 14:30:24 | 6 | is Faitro with a swollen liver; and the second one was |
| 14:30:33 | 7 | even worse, he was a heart attack case, hypertension, |
| 14:30:37 | 8 | hyperlipidemia, diabetes, 375 pounds, weight. Luckily he |
| 14:30:44 | 9 | didn't die. |
| 14:30:49 | 10 | Q    Did you -- when did you have this conversation |
| 14:30:51 | 11 | with Michael Omidi that you didn't feel you were ready to |
| 14:30:57 | 12 | do surgeries on your own, the lap band surgeries on your |
| 14:31:03 | 13 | own? |
| 14:31:03 | 14 | A    Like about maybe ten days before I was tested |
| 14:31:06 | 15 | by the proctor. And I think -- I think, I am not sure, |
| 14:31:10 | 16 | if Dr. Gee also said he is not ready. |
| 14:31:16 | 17 | Q    When were you tested by the Allergan proctor? |
| 14:31:21 | 18 | Do you remember the date? |
| 14:31:22 | 19 | A    I have a certificate. Maybe I will bring it |
| 14:31:26 | 20 | one day and give you a copy. |
| 14:31:29 | 21 | Q    Do you recall how long it was before you did |
| 14:31:31 | 22 | the Faitro surgery that you were proctored by Allergan? |
| 14:31:36 | 23 | A    About a month. |
| 14:31:37 | 24 | Q    Did you have any discussions with Michael or |
| 14:31:40 | 25 | Julian Omidi after you received the certificate from |

137

Exhibit Page 189

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.     12/20/2011

14:31:44   1   Allergan that you felt you were not ready to do any

14:31:48   2   surgeries -- any lap band surgeries by yourself?

14:31:50   3        A     To me I have been through three residencies.  I

14:31:54   4   am not a rookie.  I have been in general surgery 40

14:31:59   5   years, but I haven't done that procedure.  To me to do it

14:32:03   6   only three times and you become an expert, that is not

14:32:06   7   true.  You have to do much more than three cases to be --

14:32:10   8   to be able to feel comfortable with no fear doing such a

14:32:13   9   case.

14:32:14  10        Q     Is it your testimony that you had installed

14:32:17  11   three lap bands before you installed -- under supervision

14:32:22  12   before you installed the lap band for Laura Faitro?

14:32:27  13        A     Five.

14:32:27  14        Q     You did five before?

14:32:28  15        A     Three with Gee and two alone under the proctor.

14:32:33  16        Q     When you said you did three with Gee, did you

14:32:35  17   actually place the lap bands in with him supervising you?

14:32:40  18        A     He was assisting me.

14:32:43  19        Q     He was assisting you?

14:32:45  20        A     Yes.  And we did -- me and him, we did about

14:32:47  21   maybe 20 or 30 cases where I was assisting him.

14:32:50  22        Q     And so when he was assisting you, you

14:32:52  23   nevertheless were the person who actually installed the

14:32:56  24   lap band; is that correct?

14:32:57  25        A     I am the one.

138

Exhibit Page 190

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:33:02 | 1 | Q    And when you were assisting him, he was the one |
| 14:33:06 | 2 | who actually installed the lap band? |
| 14:33:09 | 3 | A    Well, let's put it this way, I do part of the |
| 14:33:11 | 4 | procedure but not all of it. |
| 14:33:13 | 5 | Q    So if I understand you correctly then, you had |
| 14:33:15 | 6 | done a total of five installations of the lap band before |
| 14:33:18 | 7 | you did the surgery on Laura Faitro? |
| 14:33:23 | 8 | A    Completely. |
| 14:33:24 | 9 | Q    Completely. |
| 14:33:25 | 10 | And the Omidi brothers, both Michael and |
| 14:33:27 | 11 | Julian, knew that; is that correct? |
| 14:33:29 | 12 | A    Yes. |
| 14:33:29 | 13 | Q    And were they the ones who assigned you to do |
| 14:33:32 | 14 | the lap band surgery on Laura Faitro on the day that she |
| 14:33:37 | 15 | had her surgery? |
| 14:33:38 | 16 | A    I want to prove that to you.  Dr. Gee always |
| 14:33:40 | 17 | have complained that here I see all those patients and |
| 14:33:44 | 18 | those clinics but I don't get them to operate on them. |
| 14:33:50 | 19 | Somebody else is getting them.  He should -- he used to |
| 14:33:54 | 20 | comment sarcastically, "We should charge them for the |
| 14:33:57 | 21 | H&P."  In other words, those patients are seen by him but |
| 14:34:01 | 22 | they are operated by somebody else. |
| 14:34:04 | 23 | He said, "God, I am seeing the patient.  I am |
| 14:34:06 | 24 | evaluating the patient.  I am talking to the patient, but |
| 14:34:09 | 25 | I don't get to do the surgery.  That is not fair." |

139

Exhibit Page 191

FAITRO v. SHAMAAN       IHSAN NAJIB SHAMAAN, M.D.           12/20/2011

```
14:34:15  1        So at one point I asked him, "Who assigns the
14:34:18  2   patient to you or to somebody else?"  He says, "The
14:34:20  3   Omidis."
14:34:24  4        I said, "Are you going to complain to them?"
14:34:26  5   He said, "Yes, I did."  And he did, really.
14:34:31  6        So both of them, they hide.  In other words,
14:34:32  7   Julian Omidi doesn't want to let you know that he assigns
14:34:38  8   the patients.  If you ask him directly, he said, "No, I
14:34:47  9   am not assigning the patient."  Then who?
14:34:50 10        Michael Omidi tells Julian Omidi what to do.
14:34:53 11   So he is also outside the bracket, because he doesn't
14:34:55 12   want to get involved and trouble with the board.  So this
14:34:59 13   is the kind of association they have.
14:35:01 14        Q    How did you know for the first time that you
14:35:03 15   were going to do surgery on Laura Faitro?
14:35:05 16        A    I never know.  I just came in that day.  That's
14:35:10 17   the first time I saw her.
14:35:12 18        Q    So how did you know to go to the West Valley
14:35:15 19   Surgical Center?
14:35:16 20        A    I was instructed.
14:35:18 21        Q    By whom?
14:35:19 22        A    By a girl named Lori.
14:35:21 23        Q    Do you know what her position was?
14:35:23 24        A    A clerk.
14:35:24 25        Q    Do you know who she worked with?
```

140

Exhibit Page 192

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:35:26  1     A    Omidi.

14:35:27  2     Q    Do you know if she worked for the Top Surgeons

14:35:40  3  for 1-800-Get-Thin or some other organization?

14:35:42  4     A    I don't know.

14:35:43  5     Q    But it was your understanding, your impression

14:35:47  6  she was taking orders in some fashion from the Omidi

14:35:54  7  brothers, either Michael or Julian?

14:35:56  8     A    You think a clerk can tell me where to go and

14:35:58  9  what to do unless somebody told her to say so?  I mean,

14:35:58 10  this is naive to -- to believe.

14:36:02 11     Q    Was that the typical way that you would find

14:36:04 12  out where you were to go on a specific day to do your

14:36:09 13  work?

14:36:09 14     A    Yes.  It was always her calling me the night

14:36:11 15  before.  Say, "Tomorrow, go to San Diego.  Tomorrow, go

14:36:13 16  to Bakersfield.  Tomorrow, go to San Bernardino."  I

14:36:18 17  receive an order every single day.

14:36:21 18     Q    Would it come to you by e-mail or by phone call

14:36:24 19  or some other --

14:36:24 20     A    By phone call.

14:36:27 21     Q    By phone call?

14:36:27 22     A    By this lady, which she gets the order from the

14:36:30 23  Omidis.

14:36:31 24     Q    Before -- when she would give you instructions

14:36:34 25  to go to a facility, did you have any preknowledge, any

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

14:36:37   1    knowledge before you got there, of what you were going to
14:36:41   2    be expected to do when you got to the facility?  Or were
14:36:45   3    you just told --
14:36:46   4         A    There was only two -- two places where I go,
14:36:48   5    either to a clinic or see patients.  Or to a surgery
14:36:54   6    center to do operations.
14:36:56   7              In the beginning -- in the beginning I used to
14:36:58   8    come to two surgery centers to assist other people.  One
14:37:02   9    is on the Wilshire Boulevard, and the other one is on the
14:37:09  10    Doheny Boulevard.  It's a surgery center that's been
14:37:14  11    owned by a plastic surgeon.  And they do their surgeries
14:37:17  12    their because some insurance company banned them from
14:37:21  13    doing surgeries in the Wilshire because of the fraud.
14:37:26  14              And so they -- they started using the name of
14:37:29  15    the Doheny Institute because they are -- they call them
14:37:33  16    Surgery Center of Excellence.  And because of this good
14:37:38  17    reputation, they can get authorizations.
14:37:42  18         Q    So you were given instructions the evening
14:37:49  19    before to report to either a clinic or to a surgical
14:37:53  20    center; is that correct?
14:37:54  21         A    Yes.
14:37:55  22         Q    When you were given the information to report
14:37:58  23    to a surgical center, were you told in advance how many
14:38:00  24    patients you were to be having that day?
14:38:03  25         A    No.

142

Exhibit Page 194

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.     12/20/2011

14:38:03   1          Q     Were you told what type of patients they were?

14:38:07   2          A     No.

14:38:07   3          Q     Were you given any kinds of charts of those

14:38:11   4   individuals before you arrived at the surgical center?

14:38:15   5          A     No.

14:38:16   6          Q     So when you would arrive at the surgical center

14:38:18   7   that would be the first time that you would know who you

14:38:21   8   were going to see to do surgery on that day?

14:38:26   9          A     Correct.

14:38:26   10         Q     Would the charts be there waiting for you?

14:38:28   11         A     Yes.

14:38:29   12         Q     Would there be -- did you know if they were

14:38:31   13   complete charts or a portion -- or a portion of the

14:38:35   14   charts?

14:38:35   15         A     Nobody knows.

14:38:36   16         Q     Was it typical for you to see, as part of the

14:38:41   17   charts when you would arrive to do your surgeries,

14:38:48   18   whether there were any of the workups that were done by

14:39:00   19   the psychological evaluations or by the nutritionist

14:39:03   20   evaluations or by anyone else?

14:39:07   21         A     Sometimes there is some reports, like endoscopy

14:39:09   22   report or ultrasound report or -- or labs.  But -- and I

14:39:12   23   don't see the psychiatrist report there.  I don't see the

14:39:21   24   internist report there.  I see only cleared for surgery.

14:39:31   25         Q     So let me ask it to you this way:  What would

143

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.     12/20/2011

14:39:36  1    you normally expect to see as part of the chart when you

14:39:39  2    would arrive to do your surgeries on a specific day?

14:39:45  3         A    In my practice --

14:39:46  4         Q    No --

14:39:46  5         A    -- as a surgeon --

14:39:47  6         Q    -- I'm sorry.

14:39:48  7         A    -- the standard of care is, I should know

14:39:49  8    everything about the patient before I put the knife in

14:39:52  9    him.

14:39:54  10        Q    What records would you normally expect to see

14:39:57  11   when you would arrive to do surgery?

14:40:03  12        A    The chart and all the investigations that has

14:40:07  13   been done.

14:40:07  14        Q    That's what you would normally expect to see.

14:40:09  15   Now what would you generally see when you would arrive

14:40:11  16   after Laura would give you instructions to show up some

14:40:15  17   place to do your surgeries, what would you normally see

14:40:18  18   in those charts?

14:40:20  19        MR. DE HERAS:  Objection.  Vague and ambiguous.

14:40:22  20   Lacks foundation.  Calls for speculation.

14:40:24  21   BY MR. WALKER:

14:40:24  22        Q    You can answer, please.

14:40:25  23        A    The standard of care, I should see an H&P.  I

14:40:29  24   should see all the labs.  I should see all the x-rays and

14:40:34  25   ultrasounds.  I see all the evaluations by other doctors,

144

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

14:40:37  1   such a psychiatry, internist, cardiologist.  I should see

14:40:42  2   several visits after the first visit, which is the H&P

14:40:46  3   and before the surgery where you evaluate the results of

14:40:52  4   all these investigations and discuss them with the

14:40:57  5   patient.

14:40:58  6           For instance, like in Laura Faitro's case, she

14:41:01  7   should have an ultrasound.  They should have known about

14:41:05  8   the gallstones.  They should have known about the swollen

14:41:10  9   liver.  What did they do about the swollen liver?  Who is

14:41:13  10  the doctor who talked to her about the swollen liver and

14:41:17  11  the gallstones?  Why they didn't do anything about them.

14:41:19  12  These were missing from the chart.

14:41:21  13          Q    Did that fall below the standard of care?

14:41:23  14          A    Yes.

14:41:24  15          Q    None of those things were available to you in

14:41:26  16  Laura Faitro's chart; is that correct?

14:41:30  17          A    I didn't see them.

14:41:31  18          Q    When you would come to the facility in West

14:41:38  19  Hills, who would provide you with the chart?

14:41:40  20          A    The clerk.

14:41:41  21          Q    Would they normally be waiting for you?  Did

14:41:45  22  you have a room where you would go to and they'd be

14:41:46  23  stacked up for you to look at?  Or did you just walk up

14:41:46  24  and they handed it to you?  Or you walked into the room

14:41:46  25  and see that.

145

Exhibit Page 197

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:41:54  1      A    I think they called the patients and they come

14:41:57  2   with their accompany, people, and they sit in the waiting

14:42:00  3   room.  And then they call each patient.  And they have

14:42:03  4   their chart ready.  And they put one patient with the

14:42:07  5   chart, put outside the door.

14:42:09  6      Q    So the first time you see the chart is when you

14:42:13  7   walk in to see the patient?

14:42:16  8      A    That's the first time.

14:42:17  9      Q    And was that below the standard of care in your

14:42:20  10  opinion?

14:42:20  11     A    Yes.

14:42:20  12     MR. DE HERAS:  Objection.  Calls for expert opinion.

14:42:23  13  BY MR. WALKER:

14:42:23  14     Q    Do you believe that such activity placed the

14:42:25  15  patients, like Laura Faitro, at a greater risk of injury?

14:42:34  16     MR. DE HERAS:  Same objection.

14:42:35  17     THE WITNESS:  I'm more expert than you think.

14:42:39  18         The standard of care is designed for safety of

14:42:41  19  patients, to avoid any complications at any cost, if

14:42:48  20  possible.  The standard of care makes me know about the

14:42:54  21  patients from head to toe before.  The standard of care

14:43:00  22  makes me supposed to know about every test that has been

14:43:06  23  done, documented in the chart.

14:43:10  24         In my office, the chart is under my control;

14:43:13  25  nobody else play with it or change it or do what they

146

Exhibit Page 200

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:43:19 | 1 | want.  Nobody can send that patient to do something else |
| 14:43:22 | 2 | without my knowledge or consent. |
| 14:43:26 | 3 | The standard of care is to make sure that she |
| 14:43:29 | 4 | has done all the follow-up procedures to correct any |
| 14:43:33 | 5 | problems.  I will tell you simple example.  Patient went |
| 14:43:37 | 6 | and we did electrolyte study, the potassium is 5.5.  We |
| 14:43:46 | 7 | cannot do the surgery.  You have to bring that potassium |
| 14:43:49 | 8 | down.  So we give that patient Lasix to bring the |
| 14:43:52 | 9 | potassium down, and then we can do the surgery.  I think |
| 14:43:56 | 10 | in my opinion it was missing in this patient. |
| 14:44:01 | 11 | Q    What was missing in this patient? |
| 14:44:03 | 12 | A    Ultrasound evaluation.  Evaluation of the |
| 14:44:07 | 13 | internist.  Treatment of the abnormality and clearing for |
| 14:44:14 | 14 | the second time. |
| 14:44:15 | 15 | Q    How did you know that Ms. Faitro was clear for |
| 14:44:18 | 16 | surgery? |
| 14:44:19 | 17 | A    It was written in the chart. |
| 14:44:23 | 18 | Q    But there was only the first clearance not the |
| 14:44:27 | 19 | second clearance? |
| 14:44:28 | 20 | A    Yes. |
| 14:44:29 | 21 | Q    I'm correct? |
| 14:44:29 | 22 | A    Yes. |
| 14:44:30 | 23 | Q    And you believe that she should have been |
| 14:44:32 | 24 | cleared for the second? |
| 14:44:32 | 25 | A    I don't think they -- they even looked at the |

147

Exhibit Page 201

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:44:34 | 1 | ultrasound, if there was one. |
| 14:44:36 | 2 | Q    When you see the patient, is she -- is she -- |
| 14:44:38 | 3 | when you see the patient for the first time, does the |
| 14:44:41 | 4 | patient have an IV? |
| 14:44:49 | 5 | A    No. |
| 14:44:50 | 6 | Q    And are you -- when you saw Laura Faitro, was |
| 14:44:59 | 7 | she in the examining room the first time you saw her? |
| 14:45:02 | 8 | A    Yes. |
| 14:45:03 | 9 | Q    Is that the same examining room the place where |
| 14:45:07 | 10 | they'll place the IV? |
| 14:45:09 | 11 | A    No. |
| 14:45:10 | 12 | Q    Where is the IV placed in her initially? |
| 14:45:12 | 13 | A    Either the recovery room or the surgery room. |
| 14:45:15 | 14 | Q    How many surgical rooms were there in the West |
| 14:45:17 | 15 | Hills facility? |
| 14:45:17 | 16 | A    Two. |
| 14:45:18 | 17 | Q    And how many recovery rooms? |
| 14:45:19 | 18 | A    One. |
| 14:45:20 | 19 | Q    And how many patients would be able to be |
| 14:45:23 | 20 | accommodated in the recovery room? |
| 14:45:25 | 21 | A    I think three. |
| 14:45:28 | 22 | Q    Were they normally separated by some type of |
| 14:45:31 | 23 | blinds or curtains? |
| 14:45:33 | 24 | A    Yes. |
| 14:45:33 | 25 | Q    When you first saw Ms. Faitro, do you have a |

148

Exhibit Page 202

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

14:45:39  1   present recollection of seeing her?  Do you recall that

14:45:43  2   event?

14:45:45  3        A    Yes, very vividly.

14:45:59  4        Q    Describe that to me.  What was -- what was her

14:46:05  5   demeanor?

14:46:05  6        A    She was happy.  She was jolly.  She was chubby.

14:46:10  7   And I asked her about -- questions about if she complied

14:46:13  8   with the diet.  And she said "Yes."

14:46:15  9             And "Do you have any questions to ask me before

14:46:18  10  we go to surgery?"

14:46:20  11            "No."  Precisely that's what I did.

14:46:23  12            "Did you sign your inform consent?"

14:46:25  13  She said, "Yes."

14:46:26  14            That's about it.

14:46:27  15       Q    Did you go over any of the risks of surgery

14:46:30  16  with her?

14:46:32  17       A    See, the inform consent was in the chart.  So

14:46:37  18  when I asked her, "Did you sign this inform consent?"

14:46:40  19  She said "Yes."

14:46:41  20       Q    Do you know when she signed the inform consent?

14:46:45  21       A    No.  I don't know by who.  I don't know who

14:46:46  22  talked to her about it.  I don't know who was the

14:46:48  23  witnessing party for that consent.  I don't know.

14:46:51  24       Q    In the past you've been told by the Omidis not

14:46:54  25  to discuss all of the risks of surgery with the patients;

149

Exhibit Page 203

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 14:46:58 | 1 | is that true? |
| 14:47:05 | 2 | A    Yes. |
| 14:47:06 | 3 | Q    Did that become then a standard practice for |
| 14:47:07 | 4 | you based upon their instructions for you not to talk to |
| 14:47:11 | 5 | the patients about those risks? |
| 14:47:15 | 6 | A    Not all of them.  I mean, don't discuss all of |
| 14:47:17 | 7 | them, only the most obvious. |
| 14:47:18 | 8 | Q    Did you discuss any risks with Ms. Faitro? |
| 14:47:22 | 9 | A    I just told you, she -- I asked her, "Did you |
| 14:47:23 | 10 | sign the inform consent?"  And in the inform consent they |
| 14:47:28 | 11 | tabulate all the risks one by one, and she signs that at |
| 14:47:33 | 12 | the end.  So to me, that is an affirmative answer. |
| 14:47:37 | 13 | Q    When you asked her if she had complied with -- |
| 14:47:38 | 14 | if she was on a diet, did you believe that she was giving |
| 14:47:42 | 15 | you truthful answers to it or that she was just |
| 14:47:44 | 16 | dismissing it because she wanted the surgery? |
| 14:47:48 | 17 | A    Your guess is my guess. |
| 14:47:49 | 18 | Q    When was the next time that you saw Ms. Faitro |
| 14:47:51 | 19 | after leaving the examining room? |
| 14:47:54 | 20 | A    In the operating room. |
| 14:47:58 | 21 | Q    Was she already under anesthetic at that time? |
| 14:48:02 | 22 | A    We -- I usually -- this is my practice.  With |
| 14:48:05 | 23 | obese patients, it's a very difficult to intubate.  So |
| 14:48:10 | 24 | what I do is, when the anesthesiologist starts giving |
| 14:48:18 | 25 | anesthesia, I hold the trachea and push it up so that the |

www.DCRLitigationServices.com
(818) 706-3749      (800) DCR-3003      (415) 777-1190      (805) 497-0046

Exhibit Page 204

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | |
|---|---|
| 14:48:22 | 1 | anesthesiologist can see and he can intubate easier. |
| 14:48:25 | 2 | This is my practice all my life. |
| 14:48:27 | 3 | Q    Do you believe that you did the same thing with |
| 14:48:29 | 4 | Laura Faitro? |
| 14:48:31 | 5 | A    Yes. |
| 14:48:32 | 6 | Q    Do you know if that was a nurse anesthetist or |
| 14:48:34 | 7 | an anesthesiologist that was applying the anesthesia? |
| 14:48:41 | 8 | A    It's written in the op report. |
| 14:48:43 | 9 | Q    I will show you the operative report, which we |
| 14:48:46 | 10 | will now mark it as Exhibit O.  For purposes of |
| 14:48:49 | 11 | identification, let me be sure that that is indeed what |
| 14:48:56 | 12 | you understand to be the operative report in this |
| 14:49:00 | 13 | particular case. |
| 14:49:01 | 14 | A    Yeah.  Yvonne Sias.  She is a nurse |
| 14:49:04 | 15 | anesthetist. |
| 14:49:06 | 16 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 14:49:06 | 17 | PLAINTIFF'S EXHIBIT O FOR IDENTIFICATION BY THE CERTIFIED |
| 14:49:06 | 18 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 14:49:06 | 19 | BY MR. WALKER: |
| 14:49:06 | 20 | Q    Was it common place for them to have nurse |
| 14:49:08 | 21 | anesthetists providing the anesthesia into patients? |
| 14:49:14 | 22 | A    I -- from my very little knowledge about |
| 14:49:16 | 23 | administration of all the rules about anesthesia, the |
| 14:49:20 | 24 | only thing I know from my experience is my experience |
| 14:49:27 | 25 | with Kaiser.  In Kaiser, they usually have ten rooms, |

151

Exhibit Page 205

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | |
|---|---|
| 14:49:35 | 1 | they have one anesthesiologist and ten nurse |
| 14:49:38 | 2 | anesthetists. This one anesthesiologist supervises all |
| 14:49:41 | 3 | of them. In other places, I don't know what's the rules. |
| 14:49:49 | 4 | Q Were you aware if there was an anesthesiologist |
| 14:49:51 | 5 | on the floor at the time of the surgery with Laura |
| 14:49:54 | 6 | Faitro? |
| 14:49:55 | 7 | A No, there was not. |
| 14:49:56 | 8 | Q There was not an anesthesiologist on the |
| 14:49:59 | 9 | floor? |
| 14:49:59 | 10 | A No. |
| 14:50:00 | 11 | Q Do you know if there was any anesthesiologist |
| 14:50:03 | 12 | in the building at all? |
| 14:50:04 | 13 | A No. |
| 14:50:05 | 14 | Q To your knowledge, there were none; is that |
| 14:50:06 | 15 | correct? |
| 14:50:06 | 16 | A I'm sorry? |
| 14:50:10 | 17 | Q To your knowledge there were no |
| 14:50:12 | 18 | anesthesiologists? |
| 14:50:13 | 19 | A To my knowledge, no. |
| 14:50:15 | 20 | Q The operative report -- Doctor, while we are |
| 14:50:18 | 21 | looking at the report itself, let me go through a couple |
| 14:50:21 | 22 | of things about the report. You mentioned before that |
| 14:50:26 | 23 | these are somewhat of -- I'll call them templates. Or |
| 14:50:26 | 24 | you indicated they're -- they come off of the computer. |
| 14:50:26 | 25 | At the top portion of it, if you look right |

152

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.           12/20/2011

```
14:50:26   1   under where it says "Preoperative, postoperative
14:50:26   2   assessment," it says, "Preoperative diagnosis, obesity
14:50:26   3   and hiatal hernia."
14:50:26   4        A    Yes.
14:50:54   5        Q    Is that standard language that's in all of the
14:50:56   6   reports, to your knowledge?
14:50:57   7        A    Yes.
14:50:57   8        Q    You're showing here under the indications that
14:51:01   9   there's a BMI of 40.51.  Was that something that you
14:51:04  10   inputted into the computer?
14:51:10  11        A    No.
14:51:11  12        Q    Do you know if that was accurate or not
14:51:13  13   accurate?
14:51:14  14        A    I told you, they come preprinted.  I sign them
14:51:17  15   only.  The only part that I put myself, because I thought
14:51:20  16   I'm obligated to do that, is when I mentioned Dr.
14:51:24  17   Tashjian.  I don't know if it's there or not.
14:51:27  18        Q    You had Dr. Tashjian -- it's in the paragraph
14:51:30  19   that's just above your signature name, above
14:51:34  20   "Postoperative details."  Where it says "Postoperative
14:51:39  21   details" right here, just above this, the first paragraph
14:51:40  22   that's above that.
14:51:44  23             It says "During the procedure."
14:51:47  24        A    Yeah.  That's the only paragraph that I
14:51:49  25   inserted.
```

153

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:51:50 | 1 | Q    Everything else on the document -- |
| 14:51:52 | 2 | A    Is preprinted. |
| 14:51:53 | 3 | Q    Is preprinted. |
| 14:51:55 | 4 | There's an indication here that says that "I |
| 14:51:57 | 5 | called Dr. Tashjian to help me."  Is that true?  Or did |
| 14:52:00 | 6 | he just pop in? |
| 14:52:03 | 7 | A    No.  I told him "I cannot do it, you come in." |
| 14:52:06 | 8 | Q    Did you -- so he stepped in at that point; is |
| 14:52:08 | 9 | that correct? |
| 14:52:08 | 10 | A    Correct. |
| 14:52:09 | 11 | Q    And that's when he placed the liver retractor? |
| 14:52:12 | 12 | A    Yeah; correct. |
| 14:52:12 | 13 | Q    If you look under "Follow-up care," it |
| 14:52:21 | 14 | indicates that the follow-up -- "The patient was |
| 14:52:22 | 15 | instructed to follow-up in seven days." |
| 14:52:38 | 16 | A    That's below the standard of care in lap band. |
| 14:52:44 | 17 | Q    Did you make that instruction to the patient? |
| 14:52:47 | 18 | A    No. |
| 14:52:48 | 19 | Q    Did you give any instructions to the patient |
| 14:52:51 | 20 | concerning her follow-up care? |
| 14:52:55 | 21 | A    No. |
| 14:52:56 | 22 | Q    Who did you understand was to be giving the |
| 14:52:57 | 23 | patient instructions on the follow-up care? |
| 14:53:01 | 24 | A    The preprinted things for all the patients of |
| 14:53:03 | 25 | lap bands.  We don't get involved in that.  The only |

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:53:07 | 1 | thing we do is sign. |
| 14:53:09 | 2 | Q    There is additional notations on this form that |
| 14:53:12 | 3 | indicates some of the photos, that there is lap band |
| 14:53:15 | 4 | pre-op photos, lap band intra-op photos, and lap band |
| 14:53:20 | 5 | post-op photos? |
| 14:53:21 | 6 | A    I did not take any photos. |
| 14:53:23 | 7 | Q    Was it standard practice for any of the doctors |
| 14:53:26 | 8 | to take any photographs at all? |
| 14:53:28 | 9 | A    I don't know. |
| 14:53:28 | 10 | Q    Was it practice for you to take any photographs |
| 14:53:30 | 11 | at all? |
| 14:53:30 | 12 | A    There was no instruction nor practice. |
| 14:53:32 | 13 | Q    Was there any type of equipment provided to you |
| 14:53:35 | 14 | that would permit you to take photographs? |
| 14:53:37 | 15 | A    I have -- I don't know. |
| 14:53:37 | 16 | Q    On -- on -- with some of the laparoscopic |
| 14:53:39 | 17 | instruments, they are attached to a video-capable |
| 14:53:43 | 18 | appliance to where you can press a button and it will |
| 14:53:52 | 19 | record what is seen by the -- the laparoscopic camera; is |
| 14:53:57 | 20 | that your understanding? |
| 14:53:58 | 21 | A    Can you tell me what the significance? |
| 14:54:01 | 22 | Q    I just don't know if -- I'm looking to see |
| 14:54:04 | 23 | whether or not her surgery or other surgeries have -- |
| 14:54:07 | 24 | A    Was videotaped? |
| 14:54:09 | 25 | Q    Correct. |

155

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 14:54:10 | 1 | A    It wasn't.  Because I didn't do it. |
| 14:54:12 | 2 | Q    I'm sorry? |
| 14:54:13 | 3 | A    Because I didn't do it.  Because if I |
| 14:54:15 | 4 | videotape, I will know. |
| 14:54:16 | 5 | Q    I understand. |
| 14:54:17 | 6 | A    I have to press a button.  I didn't press such |
| 14:54:19 | 7 | a button. |
| 14:54:20 | 8 | Q    Were you ever instructed by the Omidis or |
| 14:54:23 | 9 | anyone else not to record any of the surgeries? |
| 14:54:26 | 10 | A    No. |
| 14:54:27 | 11 | Q    Do you know if the equipment had the |
| 14:54:28 | 12 | capabilities of being able to do that? |
| 14:54:30 | 13 | A    I don't know. |
| 14:54:31 | 14 | Q    Okay.  There were -- the anesthetist that was |
| 14:54:33 | 15 | there, had you ever worked with her before? |
| 14:54:35 | 16 | A    Yes. |
| 14:54:36 | 17 | Q    And do you know anything about her at all?  Is |
| 14:54:44 | 18 | she -- |
| 14:54:47 | 19 | A    Yeah.  She is a very good anesthetist.  Very |
| 14:54:51 | 20 | good.  Better than some of the anesthesiologists. |
| 14:54:53 | 21 | Q    Do you have any knowledge if she stayed with |
| 14:54:55 | 22 | the company while you were still there or if she left at |
| 14:55:00 | 23 | some point in time? |
| 14:55:02 | 24 | A    To my knowledge when I left she was there. |
| 14:55:07 | 25 | Q    There was also a Dr. Au Lee that was an |

Exhibit Page 210

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 14:55:10 | 1 | assistant to you? |
| 14:55:12 | 2 | A    Yes. |
| 14:55:12 | 3 | Q    Did you request him as your assistant or was he |
| 14:55:16 | 4 | provided to you? |
| 14:55:19 | 5 | A    No.  He was -- he was there when I arrived. |
| 14:55:21 | 6 | Q    Had you ever worked with Dr. Au Lee before? |
| 14:55:24 | 7 | A    Yes. |
| 14:55:25 | 8 | Q    And had he assisted you in previous surgeries? |
| 14:55:28 | 9 | A    Yes. |
| 14:55:30 | 10 | Q    On how many occasions? |
| 14:55:32 | 11 | A    Maybe three times. |
| 14:55:34 | 12 | Q    What was his duties and obligations on the day |
| 14:55:36 | 13 | of the surgery for -- with Ms. Faitro? |
| 14:55:38 | 14 | A    Just hold for me retractors and scopes. |
| 14:55:41 | 15 | Q    Was he the person who was operating the |
| 14:55:45 | 16 | laparoscopic camera? |
| 14:55:47 | 17 | A    Yes. |
| 14:55:47 | 18 | Q    The indication also underneath where it's shown |
| 14:55:52 | 19 | where the assistant M.D., Au Lee, indicates |
| 14:55:55 | 20 | "Complications of operation, none."  Is that correct? |
| 14:56:07 | 21 | A    That is not correct. |
| 14:56:09 | 22 | Q    Again, that is -- |
| 14:56:10 | 23 | A    Preprinted. |
| 14:56:12 | 24 | Q    It's a preprinted form? |
| 14:56:13 | 25 | A    Yes. |

157

Exhibit Page 211

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 14:56:13 | 1 | Q    They will all say "none" whether or not there |
| 14:56:14 | 2 | are or are not -- |
| 14:56:14 | 3 | A    But I described there was a liver --- |
| 14:56:20 | 4 | Q    I understand. |
| 14:56:20 | 5 | We go down to "Procedural details," which says |
| 14:56:23 | 6 | "Summary."  The first paragraph that is there, is that |
| 14:56:27 | 7 | standard language or is that customized to each |
| 14:56:32 | 8 | individual patient? |
| 14:56:32 | 9 | A    It's preprinted. |
| 14:56:35 | 10 | Q    It's preprinted? |
| 14:56:37 | 11 | A    Yes. |
| 14:56:37 | 12 | Q    Do you know if each of these things that are |
| 14:56:39 | 13 | indicated here were actually done to Ms. Faitro or not? |
| 14:56:47 | 14 | A    I don't know.  I have to ask CS. |
| 14:56:54 | 15 | Q    So when you come into the surgical room, at |
| 14:56:56 | 16 | this point was the patient already draped? |
| 14:57:00 | 17 | A    Oh, no.  I drape them myself. |
| 14:57:06 | 18 | Q    You draped her yourself. |
| 14:57:09 | 19 | On the second paragraph it indicates that "We |
| 14:57:12 | 20 | began injecting a local anesthetic into the subcutaneous |
| 14:57:15 | 21 | tissue of 15 cc's"; did you actually witness that? |
| 14:57:24 | 22 | A    I did it. |
| 14:57:25 | 23 | Q    You did it yourself? |
| 14:57:27 | 24 | A    Yeah.  But it's preprinted. |
| 14:57:28 | 25 | Q    It's preprinted? |

158

Exhibit Page 212

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

```
14:57:29  1        A    Yeah.
14:57:30  2        Q    Is there anything under the procedural
14:57:32  3    details -- procedure details of the summary that -- that
14:57:37  4    did not occur, to your knowledge?
14:57:39  5        A    From what I read, it did occur.  But this is
14:57:46  6    not the language I use.
14:57:48  7        Q    Do you believe that the procedural details
14:57:50  8    summary accurately describes the events that occurred?
14:57:55  9        A    To a certain extent.
14:57:59 10        Q    Is there anything that you feel should be added
14:58:02 11    to the surgical details?
14:58:04 12        A    No.
14:58:04 13        Q    You indicated in the paragraph just above your
14:58:10 14    name on the second page that there was a laceration to
14:58:21 15    the liver.
14:58:23 16             What is your belief as to what caused the
14:58:25 17    laceration to the liver?
14:58:27 18        A    A swollen liver.
14:58:28 19        Q    Was there an instrument or some other device
14:58:31 20    that caused the actual opening of the skin or opening --
14:58:36 21    not the skin, opening the liver itself?
14:58:39 22        A    See, I told you, when it's a swollen liver,
14:58:42 23    it's not malleable.  So when you retract, then one part
14:58:45 24    is fixed and the other part is mobile, and it is swollen,
14:58:49 25    easily you can crack.  Actually, it's not a laceration,
```

159

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

14:58:53  1    it's a crack.

14:58:54  2        Q    So just so we're clear, Doctor, it's not -- I

14:58:56  3    know that some of this you've testified to before, but

14:58:59  4    I'm now going back to get a response to a specific

14:59:02  5    question that may be repetitive of some things.  So I did

14:59:04  6    listen very carefully to what you said.

14:59:08  7            But in order to have continuity now, my

14:59:10  8    question to you is:  What caused the laceration in

14:59:12  9    Mrs. Faitro's liver?

14:59:13  10       A    A swollen liver.

14:59:14  11       Q    Was there an instrument that precipitated --

14:59:17  12       A    Yeah.  There is a retractor that moves one part

14:59:19  13   of the liver while the other part is fixed.  So that

14:59:22  14   might have caused the laceration -- or I -- I prefer to

14:59:25  15   call it crack.

14:59:27  16       Q    Did anyone make any comments to you at all

14:59:29  17   about you including the paragraph that describes the

14:59:31  18   laceration of the liver?  Did anyone in any way chastise

14:59:46  19   you or encourage you or in any way attempt to influence

14:59:52  20   that particular paragraph?

14:59:56  21       A    I wouldn't say the way you said it.  But

14:59:59  22   Tashjian one time called me and he was in a very angry

15:00:02  23   mood.  And I told you, we don't have a love relation with

15:00:12  24   Tashjian.  He called me and he was so mad.  He said, "I

15:00:16  25   want you to go in the deposition and say I came in to

160

Exhibit Page 214

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

15:00:20  1    help you, and it's only been five minutes, and I didn't

15:00:23  2    do anything wrong." He wanted me to say that. I said I

15:00:28  3    can't -- I told him I cannot say that.

15:00:30  4        Q    Did Dr. Tashjian try to influence you to state

15:00:33  5    something under oath, sworn testimony that was not true?

15:00:35  6        A    It is not the way you say it right now. He

15:00:38  7    called me. His conversation took about maybe five

15:00:44  8    minutes. And he said -- he was mad that there was a

15:00:47  9    lawsuit and he was named in that lawsuit.

15:00:52  10            And he said, "I want you to go and tell them

15:00:54  11   that I didn't do anything. I just came in for five

15:00:58  12   minutes and left."

15:00:59  13       Q    How long ago was that phone conversation?

15:01:01  14       A    How long? Five minutes.

15:01:02  15       Q    I mean, how long ago?

15:01:03  16       A    Ago. After you file the lawsuit.

15:01:07  17       Q    Did the Omidi brothers indicate to you that it

15:01:10  18   was proper or improper to place in the additional

15:01:14  19   paragraph concerning the laceration?

15:01:22  20       A    No.

15:01:25  21       MR. WALKER: Let's take about a five-minute break.

15:01:27  22       THE VIDEOGRAPHER: This ends media No. 3 of the

15:01:27  23   deposition of Ihsan Shamaan, M.D. The time is 3:01 p.m.

15:01:27  24   and we are off the record.

15:01:46  25            (Whereupon, a brief recess was taken.)

www.DCRLitigationServices.com
(818) 706-3749      (800) DCR-3003      (415) 777-1190      (805) 497-0046

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 15:01:46 | 1 | THE VIDEOGRAPHER:  We are back on the record.  The |
| 15:01:50 | 2 | time is 3:25 p.m.  This starts media No. 4 of the |
| 15:25:24 | 3 | deposition, volume 2, of Ihsan Shamaan, M.D., in the case |
| 15:25:48 | 4 | named John Faitro, et al. versus Ihsan Shamaan, M.D., et |
| 15:25:54 | 5 | al. |
| 15:25:55 | 6 | Thank you. |
| 15:25:57 | 7 | BY MR. WALKER: |
| 15:25:57 | 8 | Q    Doctor, you understand you are still under |
| 15:25:59 | 9 | oath? |
| 15:26:00 | 10 | A    Yes. |
| 15:26:01 | 11 | Q    And you are still not represented by counsel; |
| 15:26:03 | 12 | correct? |
| 15:26:03 | 13 | A    Yes. |
| 15:26:04 | 14 | Q    Doctor, do you believe that Laura Faitro had |
| 15:26:06 | 15 | proper follow-up care after her surgery? |
| 15:26:10 | 16 | MR. DE HERAS:  Objection.  Calls for expert opinion. |
| 15:26:10 | 17 | Lacks foundation.  Calls for speculation. |
| 15:26:29 | 18 | MS. KAUFMAN:  Join. |
| 15:26:30 | 19 | MS. THOMASSON:  Join. |
| 15:26:30 | 20 | MS. CARLSON:  Join. |
| 15:26:32 | 21 | THE WITNESS:  The only thing that I could criticize |
| 15:26:35 | 22 | is that she should have been seen the next day after |
| 15:26:42 | 23 | operation. |
| 15:26:43 | 24 | BY MR. WALKER: |
| 15:26:43 | 25 | Q    She was seen in the clinic that is up in the |

162

Exhibit Page 216

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 15:26:48 | 1 | Valencia area, to your knowledge, is that correct, |
| 15:26:49 | 2 | postsurgery? |
| 15:26:50 | 3 | A    I didn't know where she lived. |
| 15:26:56 | 4 | Q    There was a -- did you have a conversation with |
| 15:26:59 | 5 | Dr. Madan when she presented herself for the follow-up |
| 15:27:03 | 6 | visit? |
| 15:27:04 | 7 | A    Yes. |
| 15:27:06 | 8 | Q    And what was the nature of the conversation? |
| 15:27:07 | 9 | What did you say to him; what did he say to you? |
| 15:27:10 | 10 | A    He told me that this patient looks very sick. |
| 15:27:12 | 11 | He thinks that she has a perforation of the stomach.  And |
| 15:27:14 | 12 | I think -- I told him, you know what I want, can you tell |
| 15:27:16 | 13 | him please, please, please transfer this patient to |
| 15:27:19 | 14 | Beverly Hospital so I can manage her. |
| 15:27:22 | 15 | Q    To which hospital? |
| 15:27:23 | 16 | A    Beverly Hospital. |
| 15:27:25 | 17 | Q    Where is that located? |
| 15:27:28 | 18 | A    Montebello. |
| 15:27:30 | 19 | Q    Did you have any privileges at either the Simi |
| 15:27:34 | 20 | Valley Hospital or the West Hills Hospital? |
| 15:27:35 | 21 | A    No. |
| 15:27:37 | 22 | Q    Were you aware if the facility at West Hills |
| 15:27:41 | 23 | had any type of transfer agreement with the West Hills |
| 15:27:44 | 24 | Hospital? |
| 15:27:45 | 25 | A    Let me tell you this:  I have managed before |

163

Exhibit Page 217

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.           12/20/2011

15:27:50  1   surgery centers with other doctors.  And I know they will

15:27:54  2   not give them a license unless they have that agreement.

15:27:59  3   Theoretically, they should have one.

15:28:02  4        Q     So you are not aware one way or the other,

15:28:04  5   however, if they did or did not have one?

15:28:07  6        A     Correct.

15:28:08  7        Q     Were you aware of any transfer agreements that

15:28:12  8   were in place at any of the surgical centers that you

15:28:15  9   worked at when you were with the Omidi brothers?

15:28:20 10        A     The same answer.

15:28:21 11        Q     Did you have any further conversations

15:28:23 12   concerning Laura Faitro after you had the conversation

15:28:26 13   with Dr. Madan when she printed with follow-up care?

15:28:33 14        A     With who?

15:28:35 15        Q     Let's talk about Dr. Madan first.  Was that the

15:28:39 16   only conversation after surgery with Laura Faitro that

15:28:43 17   you had with Dr. Madan?

15:28:45 18        A     That was the only one.

15:28:46 19        Q     Did you have any conversations with any doctors

15:28:49 20   after Laura Faitro was at the emergency room at the Simi

15:28:52 21   Valley Hospital?

15:28:52 22        A     No.

15:28:53 23        Q     Did you have any conversations with any doctors

15:28:56 24   at Simi Valley Hospital after she was -- became an

15:28:58 25   inpatient?

164

Exhibit Page 218

FAITRO v. SHAMAAN       IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | |
|---|---|---|
| 15:28:59 | 1 | A    Yeah.  I called Dr. Drucker. |
| 15:29:01 | 2 | Q    How did you know to speak to Dr. Drucker? |
| 15:29:05 | 3 | A    I call the ICU.  And I -- I asked the nurse, |
| 15:29:10 | 4 | "Who is the doctor managing her?"  And I wanted from her |
| 15:29:15 | 5 | to give me his phone number.  She gave me his office |
| 15:29:18 | 6 | number. |
| 15:29:18 | 7 | I called him in his office.  And she's -- he |
| 15:29:21 | 8 | informed me that she's very sick, she is in the ICU. |
| 15:29:24 | 9 | She's intubated.  And she is septic and she's receiving |
| 15:29:30 | 10 | heavy antibiotics. |
| 15:29:32 | 11 | I asked him, "Does she have a perforation?"  He |
| 15:29:35 | 12 | said, "Well, we're doing some tests to see if she has a |
| 15:29:40 | 13 | perforation."  And then he said, "She's hypovolemic and |
| 15:29:45 | 14 | hypotensive." |
| 15:29:47 | 15 | Q    Do you recall which day this was? |
| 15:29:49 | 16 | A    The day she was admitted to the hospital. |
| 15:29:53 | 17 | Q    She was -- to my knowledge, she was brought |
| 15:29:56 | 18 | in -- she presented herself on a Friday.  Her surgery was |
| 15:30:02 | 19 | done on July the 21st of 2010.  She presented herself to |
| 15:30:06 | 20 | the emergency room on July the 23rd, Friday, 2010, and |
| 15:30:10 | 21 | was admitted to the hospital later that day. |
| 15:30:14 | 22 | Do you believe you spoke to Dr. Drucker on |
| 15:30:16 | 23 | Friday? |
| 15:30:18 | 24 | A    Yes. |
| 15:30:19 | 25 | Q    Did you speak to him at any point in time after |

165

Exhibit Page 219

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

15:30:21  1    that first conversation?

15:30:22  2          A    Yeah.  I spoke to him twice.

15:30:24  3          Q    So two times or three times?

15:30:26  4          A    Three times.

15:30:27  5          Q    Three times total?

15:30:28  6          A    Yeah.  The second time I -- I asked him how

15:30:30  7    she's doing.  He said, "She is doing very bad.  She is

15:30:32  8    going down the hill.  Can you help me and suggest

15:30:35  9    something?"

15:30:36  10          I told him, "Open her."

15:30:37  11          And he said, "Why should I open her?  She is

15:30:40  12    not bleeding, because hematocrit never fell."  And he

15:30:45  13    said, "She doesn't have a perforation.  So the only thing

15:30:49  14    is she is septic; and she is hypovolemic and in shock.

15:30:54  15    If I open her, she will die."  And I tend to agree with

15:30:58  16    him.

15:30:58  17          And the third day I called him, he said she

15:31:01  18    died.

15:31:01  19          Q    The second conversation, do you know if that

15:31:04  20    was on Saturday or on Sunday?  And I will tell you that

15:31:06  21    the records indicate that she died early Monday morning.

15:31:10  22          A    Probably Saturday.

15:31:11  23          Q    Have you looked at any of the records from Simi

15:31:15  24    Valley Hospital concerning her admissions or her

15:31:17  25    emergency room treatments that were provided to you?

www.DCRLitigationServices.com
(818) 706-3749    (800) DCR-3003    (415) 777-1190    (805) 497-0046

Exhibit Page 220

FAITRO v. SHAMAAN      IHSAN NÁJIB SHAMAAN, M.D.          12/20/2011

| | | |
|---|---|---|
| 15:31:24 | 1 | A    The one you -- I think somebody send them to |
| 15:31:27 | 2 | me.  I don't know who. |
| 15:31:27 | 3 | Q    I'll represent to you that there were documents |
| 15:31:29 | 4 | that were attached to motions for summary judgments by |
| 15:31:34 | 5 | Dr. Drucker's office that included a CD -- |
| 15:31:37 | 6 | A    Maybe those, yeah. |
| 15:31:39 | 7 | Q    -- that had all the records from Simi Valley |
| 15:31:43 | 8 | Hospital attached as a CD. |
| 15:31:44 | 9 | Did you review those records at all? |
| 15:31:47 | 10 | A    Yes. |
| 15:31:47 | 11 | Q    Did you note one way or another whether or not |
| 15:31:48 | 12 | there was -- let me strike the question. |
| 15:31:51 | 13 | When you reached Dr. Drucker, did you always |
| 15:31:55 | 14 | reach him at his office or some other place? |
| 15:32:00 | 15 | A    Office. |
| 15:32:00 | 16 | Q    How long was your first conversation with him? |
| 15:32:06 | 17 | A    How long? |
| 15:32:07 | 18 | Q    Yes. |
| 15:32:07 | 19 | A    Five minutes. |
| 15:32:09 | 20 | Q    What about your second conversation? |
| 15:32:11 | 21 | A    Same thing, five minutes. |
| 15:32:13 | 22 | Q    And the third conversation? |
| 15:32:15 | 23 | A    Ten seconds. |
| 15:32:15 | 24 | Q    Did you have any discussions as to the cause of |
| 15:32:20 | 25 | her death with Dr. Drucker? |

167

FAITRO v. SHAMAAN       IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

| | | | |
|---|---|---|---|
| 15:32:22 | 1 | A | No. |
| 15:32:23 | 2 | Q | Did you have any discussions with any other |

15:32:22   1        A    No.

15:32:23   2        Q    Did you have any discussions with any other

15:32:26   3    medical practitioner with Simi Valley Hospital, other

15:32:32   4    than Dr. Drucker, concerning Laura Faitro?

15:32:34   5        A    No.

15:32:35   6        Q    Were all the discussions with Dr. Drucker

15:32:37   7    initiated by you, by you making the phone calls?

15:32:40   8        A    Yes.

15:32:40   9        Q    After you had the discussions with Dr. Madan

15:32:43  10    concerning her follow-up care, did you have any

15:32:45  11    discussions with either of the Omidi brothers concerning

15:32:59  12    Laura Faitro?

15:33:00  13        A    Yeah, Michael.

15:33:02  14        Q    With Michael?

15:33:03  15        A    Yes.

15:33:03  16        Q    What was the nature of that discussion?  What

15:33:06  17    did you say to him; what did he say to you?

15:33:08  18        A    After her death, he called me and he said, "You

15:33:10  19    need to get the results of the autopsy."  So I called the

15:33:12  20    coroner's office and said It's not ready.  And I think it

15:33:17  21    took maybe three months before it was ready.

15:33:21  22        Q    Did you eventually get a copy of the coroner's

15:33:24  23    report?

15:33:26  24        A    Never.

15:33:26  25        Q    Never did?

www.DCRLitigationServices.com
(818) 706-3749     (800) DCR-3003     (415) 777-1190     (805) 497-0046

Exhibit Page 222

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

```
15:33:27   1        A    No.
15:33:28   2        Q    After you spoke with Dr. Drucker, did you have
15:33:32   3   any conversations with either of the Omidi brothers
15:33:35   4   concerning Laura Faitro?
15:33:39   5        A    I told you, only the autopsy report.
15:33:41   6        Q    Did you consider yourself to be an employee or
15:33:44   7   an independent contractor when you began your work
15:33:49   8   process concerning lap bands?
15:34:01   9        MR. DE HERAS:  Objection.  Calls for legal opinion.
15:34:01  10   Lacks foundation.  Calls for speculation.
15:34:06  11   BY MR. WALKER:
15:34:06  12        Q    (Inaudible)  Go ahead.  You can answer.
15:34:07  13        A    To this day, I don't know.
15:34:10  14        Q    Do you feel that you were an employee?
15:34:12  15        MR. DE HERAS:  Same objections.
15:34:15  16        THE WITNESS:  I felt I was a slave.
15:34:18  17   BY MR. WALKER:
15:34:18  18        Q    And why is that?
15:34:19  19        A    Because they --- they order me what to do.  An
15:34:21  20   independent contractor does what he wants.
15:34:23  21        Q    Did they tell you where to go to on a specific
15:34:27  22   day to do your work?
15:34:29  23        A    Every single day.
15:34:30  24        Q    Did they provide you with the instruments for
15:34:32  25   you to do your work?
```

169

Exhibit Page 223

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    ·12/20/2011

| | | |
|---|---|---|
| 15:34:34 | 1 | A    Such as? |
| 15:34:35 | 2 | Q    The surgical rooms, the facilities, to do |
| 15:34:37 | 3 | your -- your surgeries in? |
| 15:34:38 | 4 | A    Yes. |
| 15:34:38 | 5 | Q    Did they tell you what hours you were to keep |
| 15:34:41 | 6 | in doing the work you were going to do? |
| 15:34:45 | 7 | A    7:00 to 7:00. |
| 15:34:46 | 8 | Q    Did they tell you which patients you were going |
| 15:34:50 | 9 | to see and do -- and do your surgeries on? |
| 15:34:51 | 10 | A    They have a number, 1-800-Get-Thin. |
| 15:34:51 | 11 | Q    Yes. |
| 15:34:54 | 12 | A    Whoever calls that number and he is assigned |
| 15:34:56 | 13 | to -- to the facility that I'm going to visit, I'm going |
| 15:35:01 | 14 | to see those patients.  Who are they?  I don't know. |
| 15:35:04 | 15 | Q    Did you ever submit any bills for any of the |
| 15:35:07 | 16 | work that you did to any insurance company? |
| 15:35:09 | 17 | A    To any insurance company? |
| 15:35:11 | 18 | Q    Yes. |
| 15:35:23 | 19 | A    Never. |
| 15:35:24 | 20 | Q    Was that ever submitted to any insurance |
| 15:35:27 | 21 | companies on your behalf? |
| 15:35:28 | 22 | A    I don't know. |
| 15:35:29 | 23 | Q    The work that you would do for surgeries or |
| 15:35:31 | 24 | otherwise, how was that to be paid?  In other words, when |
| 15:35:34 | 25 | you did --- when you did a surgery, who would get paid for |

170

Exhibit Page 224

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

15:35:40  1    that surgery?

15:35:41  2        A    The Omidis.

15:35:44  3        Q    And how would that be accomplished?  Who did

15:35:49  4    the billing or did the -- did the billing for that work?

15:35:52  5        A    They bill -- they have a billing department and

15:35:53  6    they bill for it.

15:35:54  7        Q    Did you ever see any of those bills concerning

15:35:56  8    the work that you had done?

15:36:01  9        A    No.

15:36:01  10        Q    Who paid you for the work that you did?

15:36:06  11        A    I receive a check.  It's usually the name of

15:36:09  12    the organization that they are working under.  Like

15:36:16  13    initially, it was "Top Surgeons."  But later on it -- you

15:36:25  14    know, and the Omidis have changed their name several

15:36:29  15    times.  So each time they change their name I get a check

15:36:36  16    in that name.

15:36:37  17        I have some copies.  Here's one of them.

15:36:40  18        MR. WALKER:  I've been handed a copy of a check

15:36:43  19    which we will mark as Exhibit P.  It's check No. 1441.

15:37:29  20    It's made out to Dr. Shamaan, dated September the 1st,

15:37:34  21    2010; it's in the amount of $6,250.  And it is paid from

15:37:42  22    an account with the name of Surgery Center Management,

15:37:46  23    LLC, in parenthesis, payroll account, with an address of

15:37:53  24    9001 Wilshire Boulevard, Suite 106, Beverly Hills 90211.

15:38:00  25    ///

171

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.      12/20/2011

15:38:00  1        (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED

15:38:00  2   PLAINTIFF'S EXHIBIT P FOR IDENTIFICATION BY THE CERTIFIED

15:38:00  3   SHORTHAND REPORTER AND IS ATTACHED HERETO.)

15:38:00  4   BY MR. WALKER:

15:38:00  5        Q    Doctor, is this -- on the bottom it indicates

15:38:05  6   that this check is a replacement for check No. 4448.

15:38:18  7        A    Yeah.  They -- they gave me a check that

15:38:20  8   bounced.

15:38:21  9        Q    And was it from the same surgical -- Surgery

15:38:23  10  Center Management, Inc. that bounced?

15:38:28  11       A    I don't remember.

15:38:29  12       Q    All right.  So they gave you a check that --

15:38:31  13  that did not go through; correct?

15:38:34  14       A    Correct.

15:38:34  15       Q    And there appears to be some notations at the

15:38:37  16  top.  Do you know what those notations are about?

15:38:43  17       A    Yeah.  These are the services that I provided.

15:38:49  18       Q    Would this amount to basically a payroll check

15:38:53  19  pursuant to your contract with them?

15:38:57  20       A    Half of 12,500.

15:39:02  21       Q    So the answer is yes, that was part of the

15:39:05  22  payment for you -- as your payroll check pursuant to the

15:39:08  23  contract you had with them?

15:39:12  24       A    Correct.

15:39:13  25            This is another one.

172

Exhibit Page 226

FAITRO v. SHAMAAN   IHSAN NAJIB SHAMAAN, M.D.   12/20/2011

| | | |
|---|---|---|
| 15:39:13 | 1 | Q   Doctor, Exhibit P appears to be -- it appears |
| 15:39:15 | 2 | to be a rip across the bottom of it.  And it looks like |
| 15:39:19 | 3 | there's -- when it was made a copy, it looks like there's |
| 15:39:24 | 4 | another page that's behind the check itself that's coming |
| 15:39:24 | 5 | through it.  The reason why I say that to you is the date |
| 15:40:08 | 6 | on the check is September, and yet the e-mail, it looks |
| 15:40:10 | 7 | like at the bottom here, is the month before. |
| 15:40:12 | 8 | Was there some kind of e-mail transmission that |
| 15:40:15 | 9 | went to them from you indicating that the check had |
| 15:40:19 | 10 | bounced or something?  Do you have an explanation for |
| 15:40:22 | 11 | that? |
| 15:40:23 | 12 | A   I have no idea. |
| 15:40:24 | 13 | Q   Did you make this copy or was this copy given |
| 15:40:26 | 14 | to you? |
| 15:40:27 | 15 | A   It was given to me by the accountant Napoleon. |
| 15:40:34 | 16 | Q   Napoleon. |
| 15:40:34 | 17 | Do you know Napoleon's last name? |
| 15:40:35 | 18 | A   No. |
| 15:40:36 | 19 | Q   Let me show you another with the -- let's back |
| 15:40:38 | 20 | up.  Let's go to the check that you just gave me.  We'll |
| 15:40:44 | 21 | mark that as Exhibit Q, check No. 5283, amount of $7,250. |
| 15:41:06 | 22 | (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED |
| 15:41:06 | 23 | PLAINTIFF'S EXHIBIT Q FOR IDENTIFICATION BY THE CERTIFIED |
| 15:41:06 | 24 | SHORTHAND REPORTER AND IS ATTACHED HERETO.) |
| 15:41:06 | 25 | /// |

173

Exhibit Page 227

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 15:41:06 | 1 | BY MR. WALKER: |
| 15:41:06 | 2 | Q    This check is made payable from Top Surgeons, |
| 15:41:09 | 3 | LLC.  It appears to be the same address of 9001 Wilshire |
| 15:41:16 | 4 | Boulevard, 106.  Made payable to Dr. Shamaan. |
| 15:41:21 | 5 | And there's a notation at the bottom of the |
| 15:41:22 | 6 | document.  You may be able to decipher that better than I |
| 15:41:24 | 7 | can.  Do you know what it's for? |
| 15:41:28 | 8 | A    Base salary plus two lap bands. |
| 15:41:34 | 9 | Q    And there's a notation that's written in ink |
| 15:41:36 | 10 | that's here.  Is that your handwriting or somebody |
| 15:41:39 | 11 | else's? |
| 15:41:42 | 12 | A    That's my handwriting. |
| 15:41:45 | 13 | Q    And that's the period of time it would have |
| 15:41:48 | 14 | covered? |
| 15:41:49 | 15 | A    Yes.  Usually it's 6,250, plus the extra work |
| 15:41:52 | 16 | that I do, so it came out to 7,500. |
| 15:41:55 | 17 | Q    $7,250. |
| 15:41:57 | 18 | A    Yeah. |
| 15:41:58 | 19 | Q    Doctor, in regards to your billing, I'm going |
| 15:42:00 | 20 | to show you in regards to Laura Faitro a document to |
| 15:42:04 | 21 | United Healthcare -- excuse me.  A document that's on |
| 15:42:22 | 22 | stationery from United Healthcare, concerning Laura |
| 15:42:27 | 23 | Faitro, that shows a billing for May the 20th, 2010, |
| 15:42:31 | 24 | amount of 12,200.  It looks -- it appears to be billing |
| 15:42:37 | 25 | from Beverly Hills Surgery. |

174

Exhibit Page 228

C

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

15:42:41  1          Do you have any explanation as to why that

15:42:45  2    would be billed from Beverly Hills Surgery?

15:42:47  3          A    I have no idea.

15:42:48  4          Q    Just to be clear on that, do you know if the

15:42:51  5    surgery was done on May the 20th -- or any procedure was

15:42:58  6    done on her May 20th from the Beverly Hills facility?

15:43:16  7          A    I have a suspicion that there -- there is no

15:43:19  8    CPT code here so I can tell what is that procedure.  But

15:43:24  9    I have a suspicion this is the bill for the endoscopy.

15:43:46 10          Q    I'll show you another billing, again from

15:43:49 11    United Healthcare.  This is Exhibit S.

15:43:52 12          The one for Beverly Hills Surgery on 5/20 is

15:44:01 13    marked Exhibit R.

15:44:04 14          Thank you.

15:44:04 15          (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED

15:44:04 16    PLAINTIFF'S EXHIBIT R FOR IDENTIFICATION BY THE CERTIFIED

15:44:04 17    SHORTHAND REPORTER AND IS ATTACHED HERETO.)

15:44:05 18    BY MR. WALKER:

15:44:05 19          Q    The next we will mark Exhibit S for a procedure

15:44:19 20    that was done on, again, the same day, May 20, 2010.  The

15:44:24 21    billing from the skin cancer.  And reading upside down

15:44:30 22    now, "Cancer" --

15:44:31 23          A    Skin Cancer And Consultation Diagnostic

15:44:32 24    Services.

15:44:35 25          Q    Right.

175

Exhibit Page 229

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

15:44:39  1      A    This is for a consultation of one of the

15:44:43  2  doctors.

15:44:44  3      (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED

15:44:44  4  PLAINTIFF'S EXHIBIT S FOR IDENTIFICATION BY THE CERTIFIED

15:44:44  5  SHORTHAND REPORTER AND IS ATTACHED HERETO.

15:44:44  6  BY MR. WALKER:

15:44:44  7      Q    Do you know why that would be billed out from

15:44:46  8  the Skin Cancer Consultation Diagnostic Services?

15:44:48  9      A    I have no idea.

15:44:49  10      Q    Do you know who they are?

15:44:51  11      A    No.

15:44:52  12      Q    Exhibit T, United Healthcare for surgical

15:44:54  13  procedure or some type of procedure performed on May 5th,

15:44:56  14  2010, showing the skin cancer and office visits.

15:45:38  15      Do you have any knowledge as to who that

15:45:42  16  facility is or what was performed?

15:45:46  17      (WHEREUPON, THE AFOREMENTIONED DOCUMENT WAS MARKED

15:45:46  18  PLAINTIFF'S EXHIBIT T FOR IDENTIFICATION BY THE CERTIFIED

15:45:46  19  SHORTHAND REPORTER AND IS ATTACHED HERETO.)

15:45:47  20      THE WITNESS:  I have no idea.

15:45:48  21  BY MR. WALKER:

15:45:48  22      Q    Doctor, there was a death that occurred

15:45:50  23  concerning an operation at the facility where there was

15:45:52  24  not an appropriate oxygen tank.

15:46:30  25      Do you know anything about that?

176

Exhibit Page 230

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.                12/20/2011

| | | |
|---|---|---|
| 15:46:31 | 1 | MR. DE HERAS:  Objection.  Lacks foundation.  Calls |
| 15:46:32 | 2 | for speculation.  Assumes facts not in evidence. |
| 15:46:38 | 3 | Argumentative.  Incomplete hypothetical.  Calls for |
| 15:46:42 | 4 | expert opinion. |
| 15:46:45 | 5 | THE WITNESS:  I only read about it in the internet. |
| 15:46:48 | 6 | BY MR. WALKER: |
| 15:46:48 | 7 | Q    Did you have all the equipment that you needed |
| 15:46:58 | 8 | to have in your surgical theater when you performed the |
| 15:47:03 | 9 | surgery on Laura Faitro? |
| 15:47:04 | 10 | A    I believe so. |
| 15:47:04 | 11 | Q    Was -- what type of monitoring equipment did |
| 15:47:07 | 12 | you have in that surgical theater in West Hills? |
| 15:47:10 | 13 | A    There is a monitor for anesthesia.  And there |
| 15:47:15 | 14 | is a monitor for me, which is a TV screen. |
| 15:47:18 | 15 | Q    Did you have any -- any equipment there in case |
| 15:47:20 | 16 | Ms. Faitro would crash? |
| 15:47:23 | 17 | A    Yes. |
| 15:47:23 | 18 | Q    What kind of equipment did you have available? |
| 15:47:27 | 19 | A    Cardiac life support, crash cart. |
| 15:47:34 | 20 | Q    Crash cart? |
| 15:47:34 | 21 | A    Yes. |
| 15:47:35 | 22 | Q    Do you have an opinion as to the overall |
| 15:47:36 | 23 | general quality of -- let me strike the question. |
| 15:47:43 | 24 | Do you have an opinion as to the overall |
| 15:47:44 | 25 | general sanitary conditions of the surgical facility in |

177

Exhibit Page 231

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 15:47:52 | 1 | West Hills where the surgery was performed for Laura |
| 15:47:58 | 2 | Faitro? |
| 15:48:00 | 3 | MR. DE HERAS:  Objection.  Expert opinion.  Lacks |
| 15:48:00 | 4 | foundation.  Calls for speculation.  Assumes facts not in |
| 15:48:00 | 5 | evidence.  Argumentative.  Incomplete hypothetical. |
| 15:48:05 | 6 | Vague and ambiguous. |
| 15:48:08 | 7 | THE WITNESS:  It's very good. |
| 15:48:08 | 8 | MR. DE HERAS:  Sorry, I didn't hear your answer. |
| 15:48:09 | 9 | BY MR. WALKER: |
| 15:48:09 | 10 | Q    You can answer. |
| 15:48:09 | 11 | A    What was the question again?  Very well. |
| 15:48:11 | 12 | Q    Is that your answer to the question? |
| 15:48:12 | 13 | A    Yes. |
| 15:48:12 | 14 | COURT REPORTER:  I had, "What was the question |
| 15:48:12 | 15 | again?  Very well." |
| 15:48:12 | 16 | MR. WALKER:  I'll ask it again. |
| 15:48:12 | 17 | Do you want to use the same objection -- |
| 15:48:12 | 18 | MR. DE HERAS:  Sure.  But I didn't hear the answer. |
| 15:48:12 | 19 | He just mumbled it. |
| 15:48:12 | 20 | MS. WALKER:  Ms. Reporter -- I heard the answer.  I |
| 15:48:12 | 21 | don't know if you did. |
| 15:48:12 | 22 | COURT REPORTER:  I heard, "What was the question |
| 15:48:14 | 23 | again?  Very well." |
| 15:48:15 | 24 | MR. WALKER:  That was my understanding as to his |
| 15:48:15 | 25 | answer to the question. |

178

Exhibit Page 232

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 15:48:15 | 1 | COURT REPORTER:  That's what I heard.  That's what |
| 15:48:15 | 2 | he didn't catch. |
| 15:48:39 | 3 | BY MR. WALKER: |
| 15:48:39 | 4 | Q    Doctor, there were some documents that had been |
| 15:48:42 | 5 | sent to you concerning a motion for summary judgment by |
| 15:49:00 | 6 | Dr. Tashjian.  And attached to that was a declaration. |
| 15:49:10 | 7 | Do you recall receiving that? |
| 15:49:11 | 8 | A    Yes. |
| 15:49:15 | 9 | Q    Did you read through that declaration? |
| 15:49:16 | 10 | A    Yes. |
| 15:49:16 | 11 | Q    I want to show you a copy of that declaration |
| 15:49:20 | 12 | here.  This was initially set for a hearing date on |
| 15:49:22 | 13 | December the 15th. |
| 15:49:27 | 14 | Do you recall receiving that? |
| 15:49:28 | 15 | A    Yes. |
| 15:49:28 | 16 | Q    If I may, would you go through -- hand it back |
| 15:49:31 | 17 | to me for just a moment, Doctor.  My apologies.  I don't |
| 15:49:58 | 18 | have an extra copy. |
| 15:50:03 | 19 | If I may start with paragraph 4.  Appears on |
| 15:50:05 | 20 | page 1.  And ask you if you have any information as to |
| 15:50:07 | 21 | whether or not that portion of his declaration; is |
| 15:50:22 | 22 | correct or incorrect? |
| 15:50:24 | 23 | A    That is incorrect. |
| 15:50:26 | 24 | Q    What is -- what is the statement?  Would you |
| 15:50:27 | 25 | read paragraph 4 to me. |

179

Exhibit Page 233

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.        12/20/2011

| | | |
|---|---|---|
| 15:50:29 | 1 | A    "As a preliminary matter, I was not involved in |
| 15:50:31 | 2 | either the pre-op or post-op care and treatment of |
| 15:50:36 | 3 | patient or decedent.  I have never spoken with the |
| 15:50:39 | 4 | decedent or her representative." |
| 15:50:41 | 5 | Q    That statement is untrue as far as you are |
| 15:50:44 | 6 | concerned? |
| 15:50:45 | 7 | A    Well, she told me she did. |
| 15:50:47 | 8 | Q    Ms. Faitro told you that she had spoken to |
| 15:50:50 | 9 | Dr. Tashjian? |
| 15:50:50 | 10 | A    Right. |
| 15:50:51 | 11 | Q    And paragraph No. 5.  Would you read that to |
| 15:50:53 | 12 | us? |
| 15:50:54 | 13 | A    "My only involvement with the decedent was a |
| 15:50:55 | 14 | short window of time, approximately 10 minutes where I |
| 15:51:01 | 15 | was called by Dr. Shamaan during the surgery to assist in |
| 15:51:04 | 16 | retracting the liver and stitching of the hiatal hernia." |
| 15:51:09 | 17 | The procedure is correct.  But the terminology |
| 15:51:10 | 18 | is wrong. |
| 15:51:11 | 19 | Q    What's wrong about the terminology? |
| 15:51:14 | 20 | A    Well, he didn't assist me.  He was the surgeon. |
| 15:51:18 | 21 | And approximately 10 minutes, it's not true.  To -- to |
| 15:51:21 | 22 | fix a hiatal hernia, it takes at least 20 minutes.  And |
| 15:51:25 | 23 | to assist him in retracting a liver, he didn't assist me, |
| 15:51:32 | 24 | he did it. |
| 15:51:33 | 25 | MR. DE HERAS:  I didn't hear that. |

180

Exhibit Page 234

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.          12/20/2011

15:51:33  1          MR. WALKER:  Ms. Reporter.

15:51:33  2          (Whereupon, the record was read by the reporter.)

15:51:37  3     BY MR. WALKER:

15:51:37  4          Q     Next paragraph, Doctor, is what?

15:51:38  5          A     "I assisted in exposing the hiatal hernia,

15:51:43  6     which was dissected and stitched.  I was not made aware

15:52:11  7     of the laceration of the liver or did I observe one."

15:52:14  8     That is not true.

15:52:15  9          Q     What is not true about the statement?

15:52:17  10         A     He said actually -- at one point he said for

15:52:20  11    the laceration of the liver there is some like pockets of

15:52:23  12    blood, "Suction them out" he said.  So he knew there was

15:52:26  13    a laceration of the liver.

15:52:28  14         Q     So he told you -- so I'm clear, he told you to

15:52:33  15    suction out some of the --

15:52:35  16         A     The blood.  The -- you know, the -- like small

15:52:37  17    ponds.  What do you call them?

15:52:37  18         Q     It's a ponding of the blood?

15:52:38  19         A     Yeah.  Like 10 cc or 5 cc.

15:52:40  20         Q     So that leads you to believe that he knew that

15:52:47  21    the liver had been lacerated and his statement is not

15:52:52  22    correct?

15:52:52  23         MR. DE HERAS:  Objection.  Calls for speculation.

15:52:53  24    Assumes facts not in evidence.  Incomplete hypothetical.

15:52:56  25         THE WITNESS:  It is not speculation.

www.DCRLitigationServices.com
(818) 706-3749     (800) DCR-3003     (415) 777-1190     (805) 497-0046

Exhibit Page 235

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | |
|---|---|
| 15:52:58 | 1 |
| 15:52:58 | 2 |
| 15:52:59 | 3 |
| 15:52:59 | 4 |
| 15:52:59 | 5 |
| 15:52:59 | 6 |
| 15:53:01 | 7 |
| 15:53:05 | 8 |
| 15:53:14 | 9 |
| 15:53:17 | 10 |
| 15:53:22 | 11 |
| 15:53:27 | 12 |
| 15:53:33 | 13 |
| 15:53:37 | 14 |
| 15:53:41 | 15 |
| 15:53:45 | 16 |
| 15:53:48 | 17 |
| 15:53:52 | 18 |
| 15:53:53 | 19 |
| 15:53:55 | 20 |
| 15:53:59 | 21 |
| 15:54:03 | 22 |
| 15:54:06 | 23 |
| 15:54:11 | 24 |
| 15:54:15 | 25 |

BY MR. WALKER:

    Q    Well, tell me, Doctor.

    MR. DE HERAS:  I didn't hear what he said.

    COURT REPORTER:  He said, "It's not speculation."

BY MR. WALKER:

    Q    Explain to us, if you will, why you believe
that statement is either correct or incorrect.

    A    Because the main reason why I called him to
come in is because I couldn't move the liver or retract
the liver.  And during the process of trying to retract
the liver, I made a laceration about 1 or 2 inches.  And
because I couldn't, I wanted to cancel the case.  When I
couldn't, I told him then I have to ask you to come in
and do the case.  And he saw the laceration.

    Q    How do you know that he saw the laceration?

    A    Because he asked me to suction all the blood
that came out of the laceration.

    Q    Doctor, go to the next paragraph.  Will you
read that for us, too, please.

    A    After I assisted Dr. Shamaan -- by the way,
this reminds me of another thing, Mr. Heras or somebody
called Heras, and he told me "Tashjian is going to say
that he did not do any operation."  And I told him that
is not true.  And he said, "If you say that, I will
oppose you.  And we are going to present a summary

182

Exhibit Page 236

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

15:54:26  1    judgment."

15:54:27  2         I told him, "I am going to oppose it.  I will

15:54:30  3    not let you do that."

15:54:32  4    Q    If you'd read through the next paragraph.

15:54:37  5    A    "Mr. Heras" -- I don't know which Mr. Heras,

15:54:38  6    but he identified himself as Mr. Heras.

15:54:40  7    Q    And how long ago was this conversation?

15:54:43  8    A    Just immediately after Michael Omidi called me.

15:54:47  9    Q    And again, put us in time frame of where that

15:54:49  10   was; what time of -- what part of the year, what month,

15:54:51  11   or after a specific event that might have occurred?

15:54:54  12   A    October.

15:54:55  13   Q    October?

15:54:55  14        Was it after you filed your answer in this

15:54:58  15   lawsuit or before that?

15:54:59  16   A    No, after.

15:55:00  17   Q    After you filed your answer.

15:55:09  18        Doctor, what was that paragraph number you just

15:55:10  19   read?

15:55:11  20   A    I read 6.

15:55:12  21        You want 7?

15:55:12  22   Q    Yes, please.

15:55:13  23   A    "After I assisted Dr. Shamaan, I scrubbed out

15:55:15  24   of the operating room.  Had no further contact or

15:55:20  25   involvement with the decedent care and treatment."  That

Exhibit Page 237

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 15:55:24 | 1 | is true. |
| 15:55:24 | 2 | "I had no contact with the decedent or her |
| 15:55:27 | 3 | representatives, and I was not a part of her post-op care |
| 15:55:30 | 4 | and treatment." That is true. |
| 15:55:31 | 5 | Number 8. "In no way did I conceal or |
| 15:55:34 | 6 | misrepresent any information." I don't know. |
| 15:55:36 | 7 | "It is my professional opinion that at all |
| 15:55:41 | 8 | times I complied with the applicable standard of care |
| 15:55:41 | 9 | with regard to my brief involvement with the decedent |
| 15:55:48 | 10 | care and treatment. The portion of the surgery that I |
| 15:55:52 | 11 | assisted in was performed in compliance with the standard |
| 15:55:55 | 12 | of care." Half yes, half no. |
| 15:55:57 | 13 | Q    What do you -- |
| 15:55:57 | 14 | A    The part which is not correct is that -- saying |
| 15:56:02 | 15 | "I assisted." I think he didn't assist, he performed. |
| 15:56:08 | 16 | Q    Do you believe that he performed within the |
| 15:56:11 | 17 | standard of care? |
| 15:56:16 | 18 | MR. DE HERAS:  Objection.  Calls for expert opinion. |
| 15:56:19 | 19 | THE WITNESS:  Yes. |
| 15:56:20 | 20 | BY MR. WALKER: |
| 15:56:20 | 21 | Q    While you were doing your work with the lap |
| 15:56:23 | 22 | band surgeries, who do you believe was your immediate |
| 15:56:26 | 23 | supervisor? |
| 15:56:27 | 24 | A    Gee. |
| 15:56:27 | 25 | Q    And who do you believe was his immediate |

184

Exhibit Page 238

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 15:56:34 | 1 | supervisor? |
| 15:56:36 | 2 | A    Whose immediate supervisor? |
| 15:56:39 | 3 | Q    Gee's. |
| 15:56:40 | 4 | A    Gee's? |
| 15:56:41 | 5 | Tashjian, Powell and Madan. |
| 15:56:45 | 6 | Q    In that order, or any one of those? |
| 15:56:48 | 7 | A    Any one of them. |
| 15:56:50 | 8 | Q    Who do you believe was Tashjian's supervisor? |
| 15:56:55 | 9 | A    I don't know. |
| 15:56:56 | 10 | Q    Who had the ultimate control over you? |
| 15:56:58 | 11 | A    Michael Omidi and Julian Omidi. |
| 15:57:01 | 12 | Q    Who did you understand that set the policy for |
| 15:57:10 | 13 | the 1-800-Get-Thin clientele? |
| 15:57:14 | 14 | MR. DE HERAS:  Objection.  Calls for speculation. |
| 15:57:15 | 15 | Lacks foundation.  Calls for speculation.  Argumentative. |
| 15:57:21 | 16 | THE WITNESS:  Michael Omidi and Julian Omidi. |
| 15:57:26 | 17 | BY MR. WALKER: |
| 15:57:26 | 18 | Q    Did you at any time have any abilities to set |
| 15:57:28 | 19 | any policies or procedures? |
| 15:57:31 | 20 | A    No. |
| 15:57:32 | 21 | Q    Do you know -- I'll leave it at that. |
| 15:57:35 | 22 | MR. WALKER:  I think at this point in time, given |
| 15:57:37 | 23 | the lateness of the hour and some other events that have |
| 15:57:48 | 24 | occurred, I propose the following:  That we conclude this |
| 15:57:53 | 25 | portion of the deposition and we will reconvene at a |

185

Exhibit Page 239

FAITRO v. SHAMAAN     IHSAN NAJIB SHAMAAN, M.D.                    12/20/2011

15:57:56  1     later -- at a later time.

15:57:57  2         And I would request the following:  That the

15:57:59  3     court reporter transcribe this portion of the deposition;

15:58:03  4     that it be sent to the doctor for his review and for him

15:58:08  5     to sign it under penalty of perjury; that the -- along

15:58:14  6     with an envelope to be returned back to Mr. Robertson's

15:58:17  7     office at this address; and that the doctor may sign it

15:58:21  8     under penalty of perjury, that if -- and make any

15:58:26  9     corrections he finds that are appropriate to make, if he

15:58:29 10     needs to.  And that if there -- the deposition is not

15:58:33 11     signed or not corrected, that it will be treated as being

15:58:35 12     a signed deposition original for all purposes if not so

15:58:40 13     notified within ten days after it is sent to the doctor.

15:58:46 14         And that if for any reason the original is not

15:58:49 15     available, that a certified copy may be used in place

15:58:51 16     thereof.  And if for any reason it is not signed, that it

15:58:55 17     will after ten days be considered to be a signed original

15:58:56 18     without corrections.

15:58:57 19     MR. ROBERTSON:  To be used for any purpose at any

15:59:02 20     proceeding?

15:59:03 21     MR. WALKER:  Correct.

15:59:03 22     MR. DE HERAS:  I just want to reserve the right to

15:59:08 23     reconvene this deposition and ask questions on behalf of

15:59:13 24     my clients.  And cross-examination of the witness, I'm

15:59:15 25     not waiving any right to do that.

FAITRO v. SHAMAAN    IHSAN NAJIB SHAMAAN, M.D.    12/20/2011

| | | |
|---|---|---|
| 15:59:17 | 1 | MR. WALKER:  Oh, no, absolutely.  Absolutely.  Just |
| 15:59:17 | 2 | for the record, at this point we have been notified of |
| 15:59:17 | 3 | some events that have occurred with the family members. |
| 15:59:17 | 4 | And it's been, I think to all of our satisfaction, that |
| 15:59:30 | 5 | cross-examination will not be appropriate at this point |
| 15:59:32 | 6 | in time.  And that's being reserved to conduct |
| 15:59:33 | 7 | appropriate cross-examination as well as additional |
| 15:59:33 | 8 | direct examination of this witness at a later point. |
| 15:59:42 | 9 | Is that fair? |
| 15:59:42 | 10 | MR. DE HERAS:  That's fair. |
| 15:59:44 | 11 | MS. THOMASSON:  Dr. Shamaan, you are stipulating to |
| 15:59:44 | 12 | produce yourself for a second session of this deposition; |
| 15:59:49 | 13 | is that correct? |
| 15:59:50 | 14 | THE WITNESS:  I would say yes to an agreement |
| 15:59:55 | 15 | between all of you. |
| 15:59:56 | 16 | MS. THOMASSON:  You understand that we're going to |
| 15:59:56 | 17 | notice your deposition and you have to come back again. |
| 15:59:56 | 18 | Okay? |
| 16:00:01 | 19 | THE WITNESS:  On a Tuesday or a Thursday. |
| 16:00:05 | 20 | MS. THOMASSON:  On a Tuesday or a Thursday, but you |
| 16:00:07 | 21 | are agreeing to that; correct? |
| 16:00:08 | 22 | THE WITNESS:  Yes. |
| 16:00:09 | 23 | MR. WALKER:  The deposition is concluded at this |
| 16:00:10 | 24 | point. |
| 16:00:11 | 25 | THE VIDEOGRAPHER:  This ends today's deposition, |

187

Exhibit Page 241

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.              12/20/2011

16:00:12  1    volume 2 of the Ihsan Shamaan, M.D.  This ends media No.
16:00:20  2    4.  The time is 4 o'clock p.m.  We are off of the record.
16:00:22  3         COURT REPORTER:  Ms. Thomasson, do you need a copy
16:00:22  4    of today's proceedings?
16:00:22  5         MS. THOMASSON:  A copy, a condensed, a word index
16:00:22  6    and a cd.
16:00:22  7         COURT REPORTER:  Ms. Carlson, would you like a copy?
16:00:22  8         MS. CARLSON:  Yes, please.
16:00:22  9         MS. KAUFMAN:  Copy and a condensed as well, please.
16:00:52 10         (Whereupon, at the hour of 4:00 p.m., the deposition
16:00:52 11    proceedings adjourned.)
         12
         13
         14
         15
         16
         17
         18
         19
         20
         21
         22
         23
         24
         25

                                                                    188

Exhibit Page 242

FAITRO v. SHAMAAN      IHSAN NAJIB SHAMAAN, M.D.            12/20/2011

DECLARATION

    I hereby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof, and I declare the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe it to be true.

    I declare under penalties of perjury of the State of California that the foregoing is true and correct.

Executed on the _____ day of _____

2012 at _____, California.

_____
IHSAN NAJIB SHAMAAN, M.D.

189

Exhibit Page 243

REPORTER'S CERTIFICATE

    I, Debra Lynn Ketring, a Certified Shorthand Reporter within and for the State of California, do hereby certify:

    That prior to being examined, the witness solemnly stated that the testimony given in this deposition would be the truth, the whole truth, and nothing but the truth;

    That the said deposition was taken down by me in Stenotype at the time and place therein stated and was thereafter transcribed under my direction;

    That the said deposition is a true record of the testimony given by the witness.

    I further certify that I am not of counsel or attorney for any of the parties hereto or in any way interested in the event of this cause, and that I am not related to any of the parties hereto.

    Dated this 5th day of January, 2012.

Debra Lynn Ketring
Certified Shorthand Reporter

ERRATA SHEET

| PAGE | LINE | ORIGINAL TEXT | CORRECTION | INITIAL |
|------|------|---------------|------------|---------|
| | | | | |

9th Circuit Case Number(s) | 13-57105

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | February 10, 2014 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Bryan S. Westerfeld

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) |                | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |

EXHIBIT 8

Almont Joint Stipulation for Entry of a Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-CV-01477-CMA-BNB

DHR INTERNATIONAL, INC.

     Plaintiff.

DEBRA POLLICK and
BATTALIA WINSTON INTERNATIONAL, INC.,

     Defendants.

---

### PROTECTIVE ORDER

WHEREAS, the parties to the above litigation may produce in discovery confidential information within the meaning of Federal Rule of Civil Procedure 26(c) ("Confidential Material"); and

WHEREAS, it has been agreed by and among the parties, through their respective counsel, that a protective order preserving the confidentiality of documents and information produced in this litigation should be entered by the Court; and

WHEREAS, the Court has reviewed the terms and conditions of the protective order submitted by the parties (the "Protective Order");

IT IS HEREBY ORDERED ~~THAT~~:

1.     Any of the parties to this action or any witness from whom discovery is sought in this action may designate as Confidential Material any documents or information that the producing party believes contains confidential information as defined by Federal Rule of Civil Procedure 26(c). Confidential Material shall remain confidential and shall not be used except in

the prosecution, defense or settlement of this action, including appeals related to this action. Confidential Material shall not be used or shown, disseminated, copied, or in any way communicated, orally, in writing, or otherwise, to anyone for any other purpose.

2.    Confidential status may be claimed for documents and information contained therein either by stamping or writing "confidential" on them prior to their production or by providing counsel for the inspecting party with a written description of the documents for which confidential treatment is desired. The parties may designate documents as confidential prior to the entry of this Protective Order and, upon entry of the order, such documents shall be considered Confidential Material and be governed by the provisions of this Protective Order.

3.    Nothing in this Protective Order shall be construed as an agreement, concession or admission by any party that documents designated as Confidential Material pursuant to this Protective Order are otherwise confidential or proprietary. ~~The designation of any documents or information as Confidential Material may be challenged by any party by motion to the Court.~~

4.    A party may object to the designation of particular Confidential Material by giving written notice to the party designating the disputed information. The written notice shall identify the information to which the objection is made. If the parties cannot resolve the objection within ten (10) business days after the time the notice is received, it shall be the obligation of the party designating the information as Confidential Material to file an appropriate motion requesting that the court determine whether the disputed information should be subject to the terms of this Protective Order. If such a motion is timely filed, the disputed information shall be treated as Confidential Material under the terms of this Protective Order until the Court rules on the motion. If the designating party fails to file

2

such a motion within the prescribed time, the disputed information shall lose its designation as Confidential Material and shall not thereafter be treated as Confidential Material in accordance with this Protective Order. In connection with a motion filed under this provision, the party designating the information as Confidential Material shall bear the burden of establishing that good cause exists for the disputed information to be treated as Confidential Material.

5.    Confidential Material may be disclosed to the Court and to other persons whose assistance is required by counsel for the parties in conducting this litigation, but only to the parties, those persons regularly employed by counsel for the inspecting party, persons assisting such counsel in this litigation, or any regular employee of such counsel to whom it is necessary that the documents or information be shown for purposes of this litigation. The parties may designate certain Confidential Material as "Attorney Eyes Only," which status can be challenged as set forth above. Such a designation restricts access to this Confidential Material as set forth above, except that it cannot be shared with the parties without the written consent of the disclosing party's counsel.

6.    Counsel for the parties may also disclose or discuss Confidential Material, or any contents thereof, to or with witnesses and prospective witnesses and persons employed by the inspecting party or counsel to assist in the preparation of this case for trial, such as experts, on the condition that (i) all persons to whom the disclosure of confidential information is made under this paragraph are made fully aware of the terms of this Protective Order and understand that use of any information contained in Confidential Material is strictly limited to litigation of this case; and (ii) prior to disclosure by the inspecting party or counsel of the Confidential

3

Material pursuant to this paragraph, a copy of this Protective Order shall be presented to the person to whom such document(s) or information are to be disclosed, who shall sign it or otherwise signify in writing that he or she has been advised that a violation of this Protective Order may subject him or her to sanctions for contempt of Court, and that he or she consents to be bound by the terms of this Protective Order.

7.      If the answer to any interrogatory, request for production of documents, or request for admission requires the disclosure of Confidential Material, that answer shall be stamped "confidential." Such answer shall be handled in the same manner as any other Confidential Material of that designation.

8.      Portions of any depositions where any confidential information is used or referred to shall be taken only in the presence of those authorized under this Order to have access to such confidential information. The transcript or portions of such depositions containing confidential information shall be stamped confidential and handled in the same manner as other Confidential Material of that designation.

9.      At the conclusion of the proceedings of this action, all Confidential Materials produced pursuant to this Protective Order and all copies, excerpts, or extracts (excluding excerpts or extracts incorporated into any privileged memoranda of the parties), except for such material which has become part of the record in this action, shall be returned or destroyed as agreed at the time by counsel for the parties.

10.     ~~In the event that a party intends to use Confidential Material in a brief or~~ ~~document filed with the Court, the party shall notify the other party and identify the Confidential~~ ~~Material at least 5 business days in advance of filing the Confidential Material with the Court, so~~

4

that the other party has an opportunity to petition the Court to seal the Confidential Material

according to the Federal Rules of Civil Procedure. Regardless of whether or not the filing party

complies with the notice provisions of this paragraph, the other party shall have the opportunity

to request that the Court seal Confidential Material filed with the Court through an appropriate

motion. Any request to restrict access must comply with the requirements of

**D.C.COLO.LCivR 7.2.**

11.    No paper shall be filed under seal without Court Order specifically authorizing

the same under D.C. COLO. LCivR 7.2. The Clerk of the Court shall maintain under seal all

such sealed documents and make them available only to the Court and to counsel for the parties

to this proceeding until further order of this Court.

12.    At the trial of this action or at any hearing relating to this action before any

judicial officer, a party may, subject to the rules of evidence and the order of the Court, use any

Confidential Material for any purpose, provided that counsel for the party producing such

material is given an opportunity to be heard prior to the disclosure of the Confidential Material.

13.    Nothing contained herein shall be construed to prejudice any party's right to use

any document or information for purposes of further discovery. Counsel may make and use a

photocopy of a document or information designated as Confidential Material if such copy (a) is

retained in counsel's possession and is made for counsel's internal use only; (b) is to be used for

purposes of disclosure pursuant to paragraph 6 hereof; (c) is to be identified in a deposition or

used as a deposition exhibit; or (d) is to be used at any hearing or trial in this case. In any such

situation, the parties shall take reasonable steps to maintain the confidential nature of the

document or information.

5

14.    This Protective Order shall be binding upon the parties to this action and any witness who has access to confidential documents or information. The parties shall request that any witness with access to confidential information or documents evidence his or her agreement to be bound by the terms of this Protective Order by signing a copy of the Protective Order and returning it to counsel of record in this matter. This Protective Order may also be used to protect Confidential Materials asserted as such by any non-party witness who produces such materials pursuant to a subpoena or otherwise in discovery in this matter. In the event that such witness asserts that documents or information sought of him or her in discovery are confidential, the party seeking such discovery shall provide a copy of this Protective Order to the witness. Such witness shall evidence his or her agreement to be bound by the terms of this Protective Order in order to produce documents or information in discovery as Confidential Material, by signing a copy of this Protective Order and returning it to counsel for the party seeking such discovery, who shall file it with the Clerk and serve it upon opposing counsel. The parties may also mark any documents received from any witness as confidential, subject to the terms and procedures outlined in this Agreement.

15.    This Protective Order may be construed or modified by the Court, on application of either party or any witness or on the Court's own initiative, to ensure the adjudication of all issues in this action in light of all relevant and material facts without publishing or otherwise destroying the value of Confidential Materials.

16.    Any confidential information should be placed, to the extent possible, in exhibits which can be removed from papers being filed and retained by the submitting party.

6

17.    Nothing herein shall prohibit the disclosure of any documents or information to public officials for law enforcement purposes.

18.    Inadvertent production of privileged or arguably privileged materials under this order shall not be deemed to be either a general waiver of the attorney-client privilege, the work product doctrine, or any other privileges, or a specific waiver of any such privilege.

~~SO ORDERED,~~

Dated October 21, 2013.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge

7

SO STIPULATED:


s/Brian G. Dershaw
Brian G. Dershaw
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

Richard A. Westfall
Aaron Solomon
Hale Westfall, LLP
1445 Market Street, Suite 300
Denver, CO 80202
Attorneys for Plaintiff DHR International, Inc.

s/David J. Schaller
David J. Schaller
Stephanie A. Reedy
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
Attorneys for Defendant Debra Pollick

s/William R. Dabney
William R. Dabney
John M. Husband
Holland & Hart, LLP
P.O. Box 8749
555 17th Street #3200
Denver, CO 80201-8749
Attorneys for Defendant
Battalia Winston International, Inc.

8