**BRYAN WESTERFELD (S.B. # 218253)**
bwesterfeld@calemployerlaw.com
**NICOLE E. WURSHER (S.B # 245879)**
nwurscher@calemployerlaw.com
**WALRAVEN & WESTERFELD LLP**
101 Enterprise, Suite 350
Aliso Viejo, CA 92656
Telephone:  (949) 215-1997
Facsimile:   (949) 215-1999

**R.J. ZAYED (MN ID #0309849)**
zayed.rj@dorsey.com
**TIMOTHY BRANSON (MN ID #174713)**
branson.tim@dorsey.com
**STEPHEN P. LUCKE (MN ID #151210)**
lucke.steve@dorsey.com
*Admitted pro hac vice admission pending*
**DORSEY & WHITNEY LLP**
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:   (612) 340-2868

Attorneys for Defendant UnitedHealth Group Incorporated;
and Defendants/Counterclaim Plaintiffs
United Healthcare Services, Inc., UnitedHealthcare
Insurance Company; OptumInsight, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company; BAKERSFIELD SURGERY INSTITUTE, LLC, a California limited liability company; INDEPENDENT MEDICAL SERVICES, INC., a California corporation; MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC., a California corporation; NEW LIFE SURGERY CENTER, LLC, a California limited liability company, dba BEVERLY HILLS SURGERY CENTER, LLC; ORANGE GROVE SURGERY CENTER, LLC, a California limited liability company; SAN DIEGO AMBULATORY SURGERY CENTER, LLC, a California limited liability company; SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, INC., a California corporation; VALENCIA AMBULATORY SURGERY CENTER, LLC, a California limited liability company; | Case No 2:14-cv-03053-MWF(VBKx)<br><br>**SECOND AMENDED COUNTERCLAIM**<br><br>(Superior Court of the State of California, County of Los Angeles, Central District Case Number: BC540056)<br><br>Complaint filed:  March 21, 2014 |

WEST HILLS SURGERY CENTER, LLC, a California limited liability company,

Plaintiff,

v.

UNITEDHEALTH GROUP, INC.; UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY; OPTUMINSIGHT, INC., AND DOES 1 THROUGH 20,

Defendants.

_____

UNITED HEALTHCARE SERVICES, INC.; UNITEDHEALTHCARE INSURANCE COMPANY; OPTUMINSIGHT, INC.,

Counterclaim Plaintiffs,

v.

ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company; BAKERSFIELD SURGERY INSTITUTE, LLC, a California limited liability company; BEVERLY HILLS SURGERY CENTER, LLC; INDEPENDENT MEDICAL SERVICES, INC., a California corporation; MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC., a California corporation; NEW LIFE SURGERY CENTER, LLC, a California limited liability company, dba BEVERLY HILLS SURGERY CENTER, LLC; ORANGE GROVE SURGERY CENTER, LLC, a California limited liability company; SAN DIEGO AMBULATORY SURGERY CENTER, LLC, a California limited liability company; SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, INC., a California corporation; VALENCIA AMBULATORY SURGERY CENTER, LLC, a California limited liability company; WEST HILLS SURGERY CENTER, LLC, a California limited liability company, KAMBIZ BENJAMIN OMIDI (A/K/A JULIAN OMIDI, COMBIZ OMIDI, KAMBIZ OMIDI, COMBIZ JULIAN OMIDI, KAMBIZ BENIAMIA OMIDI, JULIAN C. OMIDI); MICHAEL OMIDI,

1   M.D.; CINDY OMIDI (A/K/A NAHID
OMIDI, NAHID PEZESHK, CINDY
2   PEZESHK); ALMONT AMBULATORY
SURGERY CENTER, A MEDICAL
3   CORPORATION; BAKERSFIELD
SURGERY INSTITUTE, INC.; CIRO
4   SURGERY CENTER, LLC; EAST BAY
AMBULATORY SURGERY CENTER,
5   LLC; SKIN CANCER &
RECONSTRUTIVE SURGERY
6   SPECIALISTS OF WEST HILLS, INC.;
VALLEY SURGICAL CENTER, LLC;
7   TOP SURGEONS, INC.; TOP SURGEONS,
LLC; TOP SURGEONS LLC (NEVADA);
8   WOODLAKE AMBULATORY;
PALMDALE AMBULATORY SURGERY
9   CENTER, A MEDICAL CORPORATION;
1 800 GET THIN, LLC; SURGERY
10  CENTER MANAGEMENT; DEVIDA,
USA, LLC; PROPERTY CARE
11  INSURANCE, INC.; DOES 1-200,

12                    Counterclaim Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

SECOND AMENDED COUNTERCLAIM ................................................................ 1

SUMMARY OF ACTION AND COUNTERCLAIM DEFENDANTS'
      CONSPIRACY AND SCHEME AND ARTIFICE TO DEFRAUD
      UNITED ........................................................................................................ 1

JURISDICTION AND VENUE ............................................................................. 6

PARTIES ............................................................................................................... 7

    I.       UNITED .............................................................................................. 7

    II.     COUNTERCLAIM DEFENDANTS AND CO-
            CONSPIRATORS ............................................................................. 7

          A.     The Omidis: Julian, Michael, and Cindy .................................... 7

          B.     The Omidis' "Referral Network": 1-800-GET THIN ................ 9

          C.     The Omidis' "Management Company": Top Surgeons ............. 9

          D.     The Omidis' Surgery Centers .................................................. 10

          E.     The Omidis' Billing Entities .................................................... 15

          F.     The Omidis' Captive Insurance Company ............................... 16

FACTUAL ALLEGATIONS ................................................................................ 18

    I.       UNITED INSURES AND PROVIDES ADMINISTRATIVE
            SERVICES FOR GROUP-HEALTH PLANS .................................. 18

    II.     COUNTERCLAIM DEFENDANTS CONSPIRED TO AND
            DID DEFRAUD UNITED BY SUBMITTING KNOWINGLY
            FALSE BENEFIT CLAIMS ........................................................... 22

          A.     Counterclaim Defendant 1-800-GET-THIN Funnels
              Patients Into The Vast Network of Omidi Surgery Centers
              and Associated Providers .......................................................... 22

          B.     Counterclaim Defendant Billing Entities Misrepresented
              Charges by Failing to Disclose the Providers' Systematic
              Waiver of Member Responsibility Amounts,
              Misrepresentations Concerning Insurance Coverage, and
              Other Billing Manipulations ..................................................... 27

          C.     Exemplar Patients .................................................................... 32

               i.     Counterclaim Defendants Performed Unnecessary
                      Procedures and Waived Patient Responsibility
                      Amounts After Intentionally Misleading Patients
                      into Believing that United Covered Bariatric
                      Coverage .......................................................................... 32

1.  United Member 8[1] ................................................ 34

2.  United Member 16 ................................................ 41

3.  United Member 17 ................................................ 44

4.  United Member 18 ................................................ 47

5.  United Member 19 ................................................ 50

6.  United Member 20 ................................................ 52

7.  United Member 21 ................................................ 55

8.  United Member 22 ................................................ 58

9.  United Member 23 ................................................ 60

10. United Member 24 ................................................ 63

11. United Member 25 ................................................ 67

12. United Member 26 ................................................ 69

ii.  Counterclaim Defendants Concealed Lap Band
Surgery on Claims Forms and Instead Billed United
Inflated Charges for Hiatal Hernia Repair .................... 73

1.  United Member 27 ................................................ 76

    a.  Counterclaim Defendants Perform an
        EGD and Lap Chole in 2009 .................... 78

    b.  Counterclaim Defendants Perform a
        Second EGD in 2010 and a Lap Band
        Surgery with Hernia Repair .................... 80

2.  United Members 4, 5, and 6 ............................... 85

    a.  United Denies Authorization for Lap
        Band Surgery for United Members 4
        and 5 ........................................................ 87

    b.  Counterclaim Defendants Perform A
        Second EGD in 2010 on United
        Members 4 and 5 .................................... 87

    c.  Counterclaim Defendants Perform an
        EGD on United Member 6 ...................... 88

    d.  Counterclaim Defendants Perform Lap
        Band Surgery With Hernia R████n
        United Members 4 and 5 in██████
        2010, and on Member 6 in ████0 ...... 89

3.  Eleven Similar Hernia Patients ....................... 93

iii. Counterclaim Defendants Inflated Patients' BMI In An Attempt To Obtain Coverage for Lap Band Services ........................................................ 95

    1. United Member 7 ................................................. 96

    2. United Member 14 ............................................... 98

iv. The Omidis created and registered professional medical corporations on behalf of their affiliated physicians as a means to deceive United and to conceal the true ownership of the providers. ................ 99

    1. United Member 29 ............................................. 100

v. Counterclaim Defendants Waived Patient Responsibility Amounts and Engaged in Other Improper Practices........................................................ 102

    1. United Member 1 ............................................... 103

    2. United Member 2 ............................................... 107

    3. United Member 3 ............................................... 109

    4. United Member 9 ............................................... 110

    5. United Member 10 ............................................. 112

    6. United Member 11 ............................................. 114

    7. United Member 12 ............................................. 115

    8. United Member 13 ............................................. 118

    9. United Member 15 ............................................. 120

    10. United Member 28 ........................................... 121

vi. Counterclaim Defendants Submitted Claims and Wrongfully Induced United to Pay Amounts That Were Greater Than What the Group Health Plans Would Pay for These Services ..................................... 123

vii. Counterclaim Defendants Fraudulently Billed for Assistant Surgeons ....................................................... 125

D. United Paid Numerous Claims In Good Faith Based On Counterclaim Defendants' Misrepresentations ..................... 127

III. In Furtherance of the Conspiracy and Scheme and Artifice to Defraud United, the Omidis Exercised Control Over the Counterclaim Defendants and the Omidi Network ......................... 128

A. The Omidis Operate Counterclaim Defendants Through a Wide Array of Corporate Entities and a Close Circle of

Individuals ............................................................. 128

B. The Hub of the Omidi Network: 9001 Wilshire Boulevard, Suite 106 .............................................. 133

C. The Counterclaim Defendants' Business Addresses at "The Beverly Hills Postal Place" ............................................ 137

D. The Counterclaim Defendants Used This Web of Corporate Entities to Control and Conceal Payments from United ..................................................................... 139

     1. Members of the Omidi Network Regularly Endorse Checks Written to Other Entities or Individuals in the Omidi Network ..................... 147

     2. Payments to the Counterclaim Defendants Were Routinely Commingled With Other Omidi Network Entities and Individuals ........... 153

E. The Omidis and Their Company, Top Surgeons, Control the Day-to-Day Operations of the Counterclaim Defendants and Persons and Entities in the Omidi Network ..................................................................... 157

FIRST CAUSE OF ACTION (Fraud) ................................................... 165

SECOND CAUSE OF ACTION (Unfair Business Practices, Business & Professions Code § 17200) ....................................... 169

THIRD CAUSE OF ACTION (Conspiracy to Commit Fraud) ........................... 172

FOURTH CAUSE OF ACTION (Intentional Interference with Contractual Relationships) ............................................... 181

FIFTH CAUSE OF ACTION (Conversion) ............................................. 184

SIXTH CAUSE OF ACTION (Restitution under ERISA § 502(a)(3) ................. 186

SEVENTH CAUSE OF ACTION (For Declaratory and Injunctive Relief under ERISA § 502(a)(3)) .................................. 192

PRAYER FOR RELIEF ........................................................... 194

## SECOND AMENDED COUNTERCLAIM

Counterclaim Plaintiffs UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY, AND OPTUMINSIGHT, INC., (collectively "United") allege, upon personal knowledge and upon information and belief, as follows:

## SUMMARY OF ACTION AND COUNTERCLAIM DEFENDANTS' CONSPIRACY AND SCHEME AND ARTIFICE TO DEFRAUD UNITED

1.      United seeks to recover millions of dollars paid to brothers Julian and Michael Omidi, and their mother, Cindy Omidi (collectively, the "Omidis") and their network of ambulatory surgical centers and related entities, including the Counterclaim Defendants.  They collectively participated in an unlawful conspiracy and scheme and artifice to defraud United and the health plans it insured or administered (the "United Plans"), and to illegally enrich themselves through false and fraudulent pretenses, representations, and promises.

2.      In its capacities as an insurer and a claims administrator, United is responsible for administering the hundreds of millions of health care claims it receives every year.  United is responsible for making efforts to safeguard and protect itself, its members, and the various employer group health benefit plans from fraud, waste, and abuse—like the fraud at issue here.

3.      For years, the Omidis created, organized, directed, and profited from a sophisticated network of corporations and individuals, designed to submit fraudulent and misleading claims to hundreds of group health plans, including (but not limited to) the United Plans.  Using their network of hundreds of corporate entities and named and unnamed co-conspirators, Michael and Julian Omidi directed a massive advertising campaign throughout California.  Using their network of physicians, medical personnel and staff, and Surgery Centers, they enticed patients to receive weight-reduction surgery (Lap Bands) and related services by promising to waive co-pays, deductibles, co-insurance, and other patient

financial responsibility amounts (collectively, "Member Responsibility Amounts") as well as by misrepresenting to many patients the provisions of their coverage.

4.      At the direction and control of Michael and Julian Omidi, the Counterclaim Defendants and care coordinators, staff members, and medical personnel working on their behalf systematically promised patients that they would waive Member Responsibility Amounts and accept, as full payment, whatever amount would be paid under their health plan.  These promises removed the patient's financial incentive to ensure the care was medically appropriate, necessary, and delivered in a cost-effective manner as set forth in greater detail below.  Each of the Counterclaim Defendants then failed to disclose these routine waivers to United and, instead, submitted falsified claim forms that overstated the total charges for the procedure by, among other things, including the Member Responsibility Amounts as charges, even though the providers relieved the patients of any obligation to pay.  Counterclaim Defendants systematically waived Member Responsibility Amounts, including with respect to United Members 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, and 29 as discussed herein.  These waivers were not unrelated discrete acts, but were part of a pattern and practice of submitting fraudulent claim forms.

5.      Consistent with industry practice, the United Plans are commonly designed with higher Member Responsibility Amounts for out-of-network services. These higher amounts incentivize patients to obtain services on a (less costly) in-network basis, and serve as a check on the medical necessity of services and the higher charges of out-of-network providers, who have not otherwise contracted with United for their rate of reimbursement.  To ensure that the United Plans function as intended, the Member Responsibility Amounts are typically a predicate to any responsibility of a United Plan to provide coverage for services.  Under such provisions, if a provider undermines the operation of the health plan by waiving

Member Responsibility Amounts, the provider has likewise negated coverage under the member's United Plan.

6.       In addition, patients who responded to the 1-800-GET-THIN advertising campaign were referred to physicians, medical personnel and staff, and Surgery Centers controlled by Julian and Michael Omidi.  As set forth herein, patients were often misled about the terms of their coverage by patient coordinators, physicians, call center staff, and other personnel controlled and directed by Michael and Julian Omidi, and as a result, would receive obesity-related tests and services preliminary to and associated with Lap Band surgery, only to be told after the tests and services were provided that they did not have coverage.  Michael and Julian Omidi, and those working on their behalf, would then submit bills to United that misleadingly omitted that the services were for obesity-related or other services for which there was no coverage

7.       For example, United Member 8 was told by Omidi employees that her health benefit plan covered all costs associated with her Lap Band surgery, *even though* this was not true.  United Member 8 was then told that she needed to undergo a variety of costly medical services "in preparation for" Lap Band surgery, and subsequently, she suffered a severe injury during the required endoscopy. Meanwhile, the Omidis' centralized billing office not only misleadingly billed United by omitting that the services were obesity-related, but Counterclaim Defendants Skin Cancer & Reconstructive Surgery Specialists of Beverly Hills, Inc. and Skin Cancer & Reconstructive Surgery Specialists of West Hills, Inc. submitted multiple claims for services that were never rendered, including a psychological examination, psychological testing, and an ultrasound, and inflated the Current Procedural Terminology ("CPT") codes billed for other services.  Only after undergoing a series of costly services and suffering severe injury in "preparation for" a Lap Band did United Member 8 discover that she was not, in fact, eligible for weight-reduction surgery under the terms of her plan.  *See also infra* ¶ 115.  She

never received a Lap Band.  United Members 8, 16, 17, 19, 20, 21, 23, 24, 25, 26
experienced similar misrepresentations about the scope of their insurance coverage.

8.     In addition to inducing patients into receiving services through
promises to waive Member Responsibility Amounts and misrepresenting their
eligibility for weight-reduction surgery or related services, the Counterclaim
Defendants conspired to—and did—regularly submit fraudulent claims to induce
United to pay for services that were not covered, never performed, or substantiated
by false medical records.

9.     For example, through their Beverly Hills Surgery Center clinic, the
Counterclaim Defendants devised a reason to perform hernia surgeries on United
Members 4, 5, 6, and 27 only after United advised them that Lap Band surgeries
were not covered under the plans at issue, and then received payment for the
subsequent unauthorized Lap Band surgeries by disguising the surgery as a hernia
repair on claims submitted to United.  In other instances, as with United Members
6, 7, and 14, Counterclaim Defendants manipulated the reported height, weight, or
Body Mass Index ("BMI") calculation of United members to substantiate the
patient's eligibility for Lap Band surgery, when Counterclaim Defendants knew, as
set forth herein, the United members' BMI did not meet the coverage provisions of
the plans at issue.

10.    As reflected in Appendix I, incorporated herein by reference, the
Counterclaim Defendants submitted more than $46 million in fraudulent claims
through a combination of (i) systematic waiver of Member Responsibility
Amounts, (ii) systematic misrepresentations regarding insurance coverage, and (iii)
misrepresentations and manipulations within the billing and medical records.

11.    As a direct result of—and in justifiable reliance upon—this false
billing, United was induced to approve claims for payment under the United Plans
totaling many millions of dollars when, in reality, such claims were not covered,
never performed, or substantiated by false medical records.  The scheme also

resulted in higher utilization of costly out-of-network health services, as patients were induced to obtain treatments for services that they otherwise would not have sought or paid for, or obtain services at a higher out-of-network cost than they otherwise would have incurred.

12. The Omidis concealed their scheme through various means, including creating hundreds of business organizations to avoid fraud detection, using sham and shifting business names, and commingling funds paid by United among various entities and bank accounts controlled by the Omidis. These organizations operate out of a small number of shared spaces, including the Omidis' central office at 9001 Wilshire Boulevard, Suite 106, in Beverly Hills, California, as well as a series of mailboxes rented from public mail and copy stores.

13. Unbeknownst to United, Counterclaim Defendants, using the deceptive corporate and billing practices alleged herein, continued to submit and receive payment for fraudulent claims, with some claims submitted as late as 2014.

14. As discussed in greater detail below, the Omidis have maintained a close circle of confederates who conspired with and aided and abetted the Omidis' scheme and artifice to defraud United, the United Plans, and other health plans and insurers. As alleged herein, *see e.g.,* ¶ 475, United is informed and believes that the Omidis and their agents, including Thomas Cloud, Maureen Jaroscak, Charles Klasky, Robert Macatangay, Araminta Salazar, Dr. Elliot Alpert, Dr. Ryan Stanton, Shawn Pezeshk, Robert Silverman, Brian Oxman, Maria Abaca, Alexander Weisse, and Armando Petrikowski have acted in concert and conspired to create a complicated network of hundreds of corporate entities designed to, among other things, conceal the true nature of their activities (including the fraudulent billing scheme alleged herein), conceal payments, conceal assets, and conceal the Omidis' ownership and control of the Omidi Network.

15. For these and other acts and omissions as alleged herein, United seeks damages, restitution, and other relief on behalf of itself and the health plans it

administers for all sums paid to the Counterclaim Defendants as a direct result of their fraudulent scheme and billings to United.  United also seeks (1) injunctive relief to stop Counterclaim Defendants from continuing their wrongful conduct, (2) a declaration that any unpaid claims submitted by Counterclaim Defendants are not payable, and (3) injunctive relief precluding the Counterclaim Defendants from profiting from their promise to induce participants into receiving care by promising to waive Member Responsibility Amounts in return for the United members' decision to obtain services.

## JURISDICTION AND VENUE

16.     Because several of the counterclaims raised in this matter arise under federal law, this Court has jurisdiction to hear them under 28 U.S.C. § 1331, 29 U.S.C. § 1132(e)(1), and 28 U.S.C. §§ 2201, 2202.  Further, because the counterclaims arise out of the same transaction or occurrence that are the subject matter of the Plaintiffs' Complaint, this Court has jurisdiction over the claims set forth in the counterclaim pursuant Fed. R. Civ. P. 13 and the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

17.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because any or all of the Counterclaim Defendants reside in this judicial district, all Counterclaim Defendants are residents of the State of California, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

18.     Counterclaim Plaintiffs have submitted to personal jurisdiction of this Court by filing their Counterclaim in this Court.

# PARTIES

## I.     UNITED

19.     Counterclaim Plaintiff UNITED HEALTHCARE SERVICES, INC. is a Minnesota Corporation with its principal place of business in Minnetonka, Minnesota.

20.     Counterclaim Plaintiff UNITEDHEALTHCARE INSURANCE COMPANY is a Connecticut Corporation with its principal place of business in Hartford, Connecticut.

21.     Counterclaim Plaintiff OPTUMINSIGHT, INC. is a Delaware Corporation with its principal place of business in Eden Prairie, Minnesota.

## II.     COUNTERCLAIM DEFENDANTS AND CO-CONSPIRATORS

### A.     The Omidis: Julian, Michael, and Cindy

22.     As alleged below in more detail, Julian, Michael, and Cindy Omidi conspired with each other and other confederates to own, control, direct, and manage a sophisticated network of ambulatory surgical centers, billing companies, management companies, and other corporate entities as part of a scheme and artifice to defraud the public, United, and health plans out of millions of dollars. This network of corporate entities, health care providers, employees, administrators, agents, and co-conspirators will be referred to as the "Omidi Network."  Each of the Corporate Counterclaim Defendants is owned, operated, or controlled by the Omidis and acts in concert with and is part of this Network.

23.     KAMBIZ BENJAMIN OMIDI A/K/A JULIAN OMIDI, COMBIZ OMIDI, KAMBIZ OMIDI, COMBIZ JULIAN OMIDI, KAMBIZ BENIAMIA OMIDI, JULIAN C. OMIDI ("Julian Omidi") is an individual who is a citizen of California.  Julian Omidi was at one time licensed to practice, and did practice, medicine in the State of California, but the Medical Board of the State of California revoked Julian Omidi's physician and surgical license in June 2009.  Among other

things, the Medical Board of the State of California found that Julian Omidi (1) "perpetrated a fraud" on the Board by failing to disclose information; (2) committed "misrepresentation and dishonesty . . . go[ing] to the core of his ability to practice his profession"; and (3) has a "penchant for dishonesty, to bend his position and shade his statements to suit his needs, without consistent regard for the truth."

24.     MICHAEL OMIDI, M.D. is an individual who is a citizen of California.  United is informed and believes that Michael Omidi holds a current physician and surgical license in the State of California.  In June 2008, the State of California revoked Michael Omidi's physician and surgical license, but the revocation was stayed pending successful completion of a three-year probationary period which Michael Omidi, upon information and belief, successfully completed. In April 2013, the Medical Board of the State of California formally accused Michael Omidi of "repeated acts of negligence in the care and treatment of patient G.B."  These allegations are still pending.  As a practicing physician, Michael Omidi submitted dozens of claims for services performed on United members.

25.     CINDY OMIDI A/K/A NAHID OMIDI, NAHID PEZESHK, CINDY PEZESHK ("Cindy Omidi) is an individual who is a citizen of California.  As the family's and the Omidi Network's banker, Cindy Omidi conspired with her sons Julian and Michael and the other Corporate Counterclaim Defendants to collect and control ill-gotten proceeds obtained from United.  As just one example, Omidi Network employees were required to notify Cindy Omidi of any patient that sought to pay cash for a procedure.  Recently, Cindy Omidi was convicted of money laundering in violation of 31 U.S.C. § 5324(a)(3), by engaging in prohibited structuring transactions, in part, with Pacific West Dermatology, LLC, a medical provider affiliated with the Omidi Network, which received United funds.

### B.   The Omidis' "Referral Network": 1-800-GET THIN

26.   1-800-GET-THIN, LLC ("1-800-GET-THIN") is a California limited liability company with its principal place of business in California.  The Omidis use this corporation as a means to find, market to, and communicate with prospective patients through an advertising campaign on billboards, TV, radio, and other media outlets throughout California.  Prospective patients who call 1-800-GET-THIN are then referred to physicians and surgery centers controlled and operated by the Omidis.

### C.   The Omidis' "Management Company": Top Surgeons

27.   TOP SURGEONS, INC. is a California corporation with its principal place of business in California.  According to Secretary of State records signed by Michael Omidi, TOP SURGEONS, INC. was organized and incorporated in 2006 by Michael Omidi, who is also the CEO.  His brother Julian Omidi is the registered agent.

28.   In 2008, Michael Omidi converted TOP SURGEONS, INC. to TOP SURGEONS, LLC, a California limited liability company with its principal place of business located at 269 S. Beverly Drive, No. 353, Beverly Hills, CA 90211, a rented mailbox located at Beverly Hills Postal Place.

29.   TOP SURGEONS, LLC ("Top Surgeons Nevada") is a Nevada limited liability company with its principal place of business in California.  According to Nevada Secretary of State records signed by Julian Omidi, Top Surgeons Nevada was organized in December of 2008 by its Manager, Julian Omidi, who continued in this role until at least the end of 2011.

30.   Collectively, these entities will be referred to herein as "Top Surgeons."  Among other things, Top Surgeons operates a network of ambulatory surgical centers and contracts with dozens of affiliated physicians both of which are used to defraud United and the related United Plans.

### D.   **The Omidis' Surgery Centers**

31.   Julian and Michael Omidi own, manage, and control numerous surgery centers located throughout California.  1-800-GET-THIN refers patients to these centers, and Michael and Julian Omidi separately direct physicians—under contract with Top Surgeons—to perform procedures at these centers.  Collectively, these entities will be referred to as the "Surgery Centers."

32.   ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION is a California corporation with its principal place of business at 9001 Wilshire Blvd, Suite 106 in Beverly Hills, CA 90210.  According to Secretary of State records signed by Michael Omidi, he is the CEO of ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION.  Similarly, the NPI Registry[1] reflects that Michael Omidi is the President of Almont Ambulatory Surgery Center, Inc. d/b/a Top Surgeons, which is, upon information and belief, the same corporate entity as ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION.

33.   On December 16, 2009, ALMONT AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION was converted to ALMONT AMBULATORY SURGERY CENTER, LLC, a California limited liability company with its principal place of business in Beverly Hills, California.  ALMONT AMBULATORY SURGERY CENTER, LLC operates at the same business address as its predecessor.  Collectively these entities will be referred to herein as "Almont ASC."  United Members 9, 10, 11, 13, 19, and 27 received

---

[1] The National Provider Identifier ("NPI") is a unique, 10-digit identification number that the Center for Medicaid and Medicare Services assigns to every covered health care provider in the country.  The NPI Registry allows the public to search for a provider's name, address, authorized official, and other information associated with a specific NPI number.

services at Almont ASC. In addition, United paid claims from Almont ASC (taxpayer identification ("TIN"): ███████) totaling at least $8,595,815.

34.    BAKERSFIELD SURGERY INSTITUTE, INC. is a California corporation with its principal place of business in California. According to Secretary of State records, Michael Omidi is the Organizer/Incorporator and CEO of BAKERSFIELD SURGERY INSTITUTE, INC.

35.    On June 20, 2008, Michael Omidi, as Organizer/Incorporator, converted BAKERSFIELD SURGERY INSTITUTE, INC. to BAKERSFIELD SURGERY INSTITUTE, LLC, a California limited liability company with its principal place of business in California. At the time, Julian Omidi was identified as the registered agent. Collectively these entities will be referred to herein as "Bakersfield Surgery Institute." United Members 24 and 26 received services at Bakersfield Surgery Institute. In addition, United paid claims from Bakersfield Surgery Institute (TIN: ███████) totaling at least $43,973.

36.    BEVERLY HILLS SURGERY CENTER, LLC ("Beverly Hills Surgery Center") is a California limited liability company with its principal place of business located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place. United Members 1, 4, 5, 6, 9, 15, 18, 20, 23, 24, 25, and 26 received services at Beverly Hills Surgery Center. In addition, United paid claims from Beverly Hills Surgery Center (TIN: ███████) totaling at least $15,631,936.

37.    CIRO SURGERY CENTER, LLC ("Ciro Surgery Center"), is a California limited liability company with its principal place of business in California. United Members 22 and 28 received services at Ciro Surgery Center. In addition, United paid claims from Ciro Surgery Center (TIN: ███████) totaling at least $126,390.

38.    EAST BAY AMBULATORY SURGERY CENTER, LLC ("East Bay ASC"), is a California limited liability company with its principal place of business

located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  United paid claims from East Bay ASC (TIN: ██████████) totaling at least $125,026.

39.   MODERN INSTITUTE OF PLASTIC SURGERY & ANTIAGING, INC. ("Modern Institute"), is a California corporation with its principal place of business in Beverly Hills, California.  United Members 12 and 23 received services at Modern Institute.  In addition, United paid claims from Modern Institute (TIN: ██████████) totaling at least $3,366,116.

40.   NEW LIFE SURGERY CENTER, LLC d/b/a BEVERLY HILLS SURGERY CENTER, LLC ("New Life Surgery Center"), is a California limited liability company with its principal place located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  United is informed and believes that New Life Surgery Center is a predecessor or successor to Beverly Hills Surgery Center.  United paid claims from New Life Surgery Center (TIN: ██████████) totaling at least $325,639.

41.   ORANGE GROVE SURGERY CENTER, LLC ("Orange Grove Surgery Center") is a California limited liability company with its principal place of business located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  United Member 21 received services at Orange Grove Surgery Center.  In addition, United paid claims from Orange Grove Surgery Center (TIN: ██████████) totaling at least $92,739.

42.   PALMDALE AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION is a California corporation with its principal place of business in California.  Records maintained by the California Secretary of State reflect that Michael Omidi organized/incorporated PALMDALE AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION and serves as its CEO.  The NPI Registry also reflects that Michael Omidi is the Owner of Palmdale Ambulatory Surgery Center, which is, upon information and belief, the same corporate entity.

43.     On June 20, 2008, Michael Omidi, as Organizer/Incorporator, converted PALMDALE AMBULATORY SURGERY CENTER, A MEDICAL CORPORATION to PALMDALE AMBULATORY SURGERY CENTER, LLC, a California limited liability corporation with its principal place of business located at 9001 Wilshire Blvd., Suite 106, Beverly Hills, CA 90211, the same business address as its predecessor.  Collectively, these entities will be referred to herein as "Palmdale ASC."  United paid claims from Palmdale ASC (TIN: ▮▮▮▮▮▮▮) totaling at least $38,242.

44.     SAN DIEGO AMBULATORY SURGERY CENTER, LLC ("San Diego ASC"), is a California limited liability company with its principal place of business located at  269 S. Beverly Drive., No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  Records maintained by the California Secretary of State reflect that San Diego ASC was organized by Julian Omidi.  United Members 2 and 17 received services at San Diego ASC.  In addition, United paid claims from San Diego ASC (TIN: ▮▮▮▮▮▮▮) totaling at least $70,281.

45.     SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF BEVERLY HILLS, LLC ("Skin Cancer Surgery Specialists of Beverly Hills"), is a California limited liability company with its principal place of business located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  Records maintained by the California Secretary of State and the NPI Registry reflect that Skin Cancer Surgery Specialists of Beverly Hills was organized/incorporated by its "owner" Michael Omidi.  United Members  4, 5, 6, 8, 9, 10, 12, 16, 17, 18, 19, 20, 24, 26, and 27 received services at Skin Cancer Surgery Specialists of Beverly Hills.  In addition, United paid claims from Skin Cancer Surgery Specialists of Beverly Hills (TIN ▮▮▮▮▮▮) totaling at least $4,104,651.

46.     SKIN CANCER & RECONSTRUCTIVE SURGERY SPECIALISTS OF WEST HILLS, INC. ("Skin Cancer Surgery Specialists of West Hills"), is a California corporation with its principal place of business located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  Records maintained by the California Secretary of State and the NPI Registry reflect that Skin Cancer Surgery Specialists of West Hills was organized/incorporated by its "Medical Director" Michael Omidi.  United Members 1, 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, 25, 26, and 27 received services at Skin Cancer Surgery Specialists of West Hills.  In addition, United paid claims from Skin Cancer Surgery Specialists of Beverly Hills (TIN: ██████████) totaling at least $1,948,543.

47.     VALENCIA AMBULATORY SURGERY CENTER, LLC ("Valencia ASC"), is a California limited liability company with its principal place of business located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  Records maintained by the California Secretary of State and the NPI Registry reflect that Valencia ASC was organized/incorporated by Julian Omidi.  United Members 3, 8, and 16 received services at Valencia ASC.  In addition, United paid claims from Valencia ASC (TIN: ██████████) totaling at least $493,105.

48.     VALLEY SURGICAL CENTER, LLC ("Valley Surgical Center"), is a California limited liability company, with its principal place of business located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  Records maintained by the California Secretary of State reflect that Julian Omidi organized/incorporated Valley Surgical Center.  United Members 2, 7, 12, 14, 16, 23, and 29 received services at Valley Surgical Center.  In addition, United paid claims from Valley Surgical Center (TIN: ██████████) totaling at least $4,426,224.

49.     WEST HILLS SURGERY CENTER, LLC ("West Hills Surgery Center"), is a California limited liability company with its principal place of business located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  United Members 2, 7, and 14 received services at West Hills Surgery Center.  In addition, United paid claims from West Hills Surgery Center (TIN: ██████) totaling at least $555,871.

50.     WOODLAKE AMBULATORY SURGERY CENTER, A MEDICAL CORP. is a California corporation with its principal place of business in California. Records maintained by the California Secretary of State and the NPI Registry reflect that WOODLAKE AMBULATORY SURGERY CENTER, A MEDICAL CORP. was organized/incorporated by Michael Omidi, its CEO and Owner/Operator.

51.     On June 11, 2008, Michael Omidi, as Organizer/Incorporator, converted WOODLAKE AMBULATORY SURGERY CENTER, A MEDICAL CORP to WOODLAKE AMBULATORY SURGERY CENTER, LLC, a California limited liability corporation with its principal place located at 269 S. Beverly Drive, No. 353, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.  Collectively, these entities will be referred to herein as "Woodlake ASC."

52.     United is informed and believes that Woodlake ASC is the predecessor company to Valley Surgical Center.  United paid claims from Woodlake ASC (TIN: ██████) totaling at least $936,952.

E.     **The Omidis' Billing Entities**

53.     As part of the conspiracy and in furtherance of the scheme and artifice to defraud, the Omidis used a centralized billing and collections office to submit fraudulent medical claims to United.  United is informed and believes that Michael and Julian Omidi staffed this billing office with employees and contractors working for, among others, INDEPENDENT MEDICAL SERVICES, INC., SURGERY

CENTER MANAGEMENT, LLC, and DEVIDA USA, LLC (collectively, the "Billing Entities") who used technology registered to these Billing Entities to process, prepare, and submit fraudulent claims to United on behalf of the Surgery Centers, laboratories, and other Omidi Network physicians and medical professionals. The Billing Entities submitted these claims interchangeably under the names of the Surgery Centers, medical professionals, Independent Medical Services, Inc., or other sham entities within the Omidi Network.

54. INDEPENDENT MEDICAL SERVICES, INC. ("IMS") is a California corporation with its principal place of business located at 269 S. Beverly Drive, No. 1409, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.

55. SURGERY CENTER MANAGEMENT, LLC ("Surgery Center Management") is a California limited liability company with its principal place of business located at 269 Beverly Drive, Suite 353, Beverly Hills, CA 90212, a rented mailbox located at Beverly Hills Postal Place.

56. DEVIDA USA, LLC ("DeVida") is a California limited liability company with its principal place of business located at 9107 Wilshire Blvd, #450, Beverly Hills, CA 90210.

**F.   The Omidis' Captive Insurance Company**

57. PROPERTY CARE INSURANCE, INC. ("PCI") is an offshore captive insurance company registered in Nevis and operating at P.O. Box 24947, Los Angeles, CA 90024. United is informed and believes that PCI transacted business in California through its sole owner, Cindy Omidi.

58. For many years, Julian, Michael, and Cindy Omidi caused millions of dollars to be transferred from the Wells Fargo accounts identified below (*see infra* ¶ 419) into an account established in PCI's name (specifically, a Bank of America account ████). This Bank of America account along with several other

accounts established in PCI's name were lawfully seized by the federal government after it established "probable cause to believe that [the assets] represent or are traceable to a long-term fraud scheme run" by the Omidis, including a fraud perpetrated against healthcare benefits plans. ███████████████████ ████████████████████████████████████████ ████████████████████████████ As described below, prior to this transfer, those Wells Fargo accounts held millions that had originally been deposited from payments made by United, including sums that were received by the Counterclaim Defendants as a result of their wrongful behavior.

59.    The true names and capacities, whether individual, corporate, associate or otherwise, of Does 1-200, inclusive, are unknown to United, who therefore sues these parties by such fictitious names.  United is informed and believes that each of the entities designated as a Doe is a resident of, or business entity doing business in, the State of California, is part of the Omidi Network, is responsible in some manner for the events and happenings referred to herein, and proximately caused injury and damages to United.  In addition, United is informed and believes that certain Does 1-200 are unnamed LLCs and Corporations used by the Omidis to further their conspiracy to defraud patients, claims administrators, health plans, and insurers by using new business organizations in an attempt to evade detection by insurers and claims administrators such as United and to induce United to pay claims that would otherwise not have been paid.

60.    All of the parties listed in Paragraphs 22-59 above shall be collectively referred to as the "Counterclaim Defendants."  All of the Counterclaim Defendants acting as a corporation, limited liability company, or other association, including those referred to in Paragraphs 26-59 shall be referred to collectively as the "Corporate Counterclaim Defendants."

# FACTUAL ALLEGATIONS

## I.   UNITED INSURES AND PROVIDES ADMINISTRATIVE SERVICES FOR GROUP-HEALTH PLANS

61.   United is an insurer and third-party claims administrator for employer group-health plans that are sponsored by employers and provide health benefits to their covered employees and dependents.  The health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 1001 *et. seq* (the "ERISA Plans"), while those sponsored by governmental employers and certain religious organizations are exempted from ERISA's jurisdiction.  United provides insurance and/or administrative services to these employer-sponsored health plans, including (subject to the terms of the individual's plan and associated agreements) the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans ("United members").

62.   For the United Plans that are insured directly by United ("insured plans"), United will resolve claims and will make benefit payments from its own assets.

63.   As noted, United also provides administrative services to self-funded group health plans (both under ERISA and otherwise).  United delivers these services pursuant to Administrative Services Agreements ("ASA") between United and the health plan's sponsor (usually an employer), which identify the rights and obligations of each party.  These ASAs require United to evaluate claims for health insurance benefits to ensure that they are proper and payable under the terms of the relevant group health plan.

64.   For self-funded plans, once United has determined that a claim is payable under the relevant group-health plan, United is authorized to cause payments to be made from the self-funded customer's assets.

65.   Under the ASAs for self-funded customers, United is obligated to approve claims for health benefits that satisfy the terms of the relevant group health

plan.  It can, in some circumstances, be held accountable to the self-funded customers if it causes payments to be made for claims that do not satisfy the terms of the relevant plan.

66.    Further, virtually every ASA at issue in this counterclaim gives United the exclusive authority to recover overpayments that it causes to be made on behalf of its self-funded clients.  The ASAs state that the client delegates to United the authority to recover overpayments (including those related to fraud and abuse), as well as the authority to initiate litigation to recover overpayments.  The ASAs typically require United to return to the customers/group health plans overpayments that it recovered from the group health plans subject to United's right to retain a portion of the overpayment, as compensation for its services as further set forth in the ASAs.  The customers agree that it will not engage any other entity to provide these recovery services, unless United consents to such a delegation.

67.    The terms of the specific health benefit plan provides whether medical services are covered by the plan and thus are reimbursable ("Covered Services").  The plan also determines the extent to which the United member bears responsibility for a portion of the charge through a copayment, coinsurance, deductible amount, or other Member Responsibility Amounts.

68.    The amount paid by United for Covered Services also depends on whether the services were provided by an in-network or out-of-network provider.  In-network providers have generally agreed to accept a contracted rate from United in exchange for participation in United's network.  Members who choose an in-network provider are generally assured that, for covered services, their responsibility for payment is limited to any applicable copayment, coinsurance, and deductible amount provided in their plan.  Out-of-network benefits do not include this assurance.  Accordingly, in the ordinary course, patients are subject to being "balance billed" by their out-of-network providers for the difference between their charges and any reimbursement paid by United, in addition to payment by the

member for copayments, coinsurance and deductibles.  Moreover, Member Responsibility Amounts are typically lower for in-network services than for out-of-network services.

69.     Although there are some differences under the various health benefit plans, out-of-network providers are often reimbursed by United for a certain percentage of "eligible expenses" (taking into account the patient's Member Responsibility Amounts).  There are a number of formulae that the group health plans use to determine the "eligible expenses," such as the "usual, customary, and reasonable" charges in the relevant area for the services at issue; a percentage of the Medicare-approved rate for the service at issue; a percentage of the billed charges; or at a rate determined pursuant to negotiations with the provider.

70.     In seeking reimbursement on behalf of United Members, the Billing Entities, on behalf of Counterclaim Defendant Surgery Centers and other affiliated medical providers submitted numerous bills to United using either a standard (1) CMS-1500 claim form (formerly HFCA-1500) or (2) UB-04 claim form (formerly UB-92), both of which require providers to describe the services provided and procedures performed using certain mandated coding regimes.  These are forms approved and generated in connection with the federal Medicare program, and it is common in the health care industry for these same forms to be used in connection with other governmental and non-governmental insurance.

71.     When a provider submits a claim, it certifies that the contents of the form are true, correct, and complete.  The provider also certifies that the services billed were medically indicated and were in fact provided as billed.

72.     The CMS-1500 and UB-04 forms also call for the provider to submit its "Charges" or "Total Charge(s)" for each service or procedure and list the "balance due" or "est. amount due."  The Counterclaim Defendant Billing Entities routinely submitted CMS-1500 and UB-04 claim forms to United with amounts for "Charges" or "Total Charge(s)" that included the Member Responsibility Amounts,

even though the Counterclaim Defendant Surgery Centers and other affiliated providers had previously told the patients that Member Responsibility Amounts would be waived.  These claim forms and the misrepresentations therein by the Counterclaim Defendant regarding their "Charges" or "Total Charge(s)" were, thus, false and misleading.  The Counterclaim Defendant Billing Entities submitted these forms to United, intending for United to rely on the truth and accuracy of the information submitted.

73.     The Office of Inspector General for the Department of Health and Human Services has issued a Special Fraud Alert, specifying that a Medicare provider who routinely waives patient responsibility amounts and then submits its charges on CMS-1500 and UB-04 claim forms, which include the waived amounts, is misstating its charge and committing fraud.  These same practices by the Counterclaim Defendant Billing Entities and the same misstatement of their charges on the same CMS-1500 and UB-04 claim forms submitted to United were likewise fraudulent, just as they are for patients who are covered by Medicare.

74.     United reasonably relied on the false and misleading claim information submitted by the Billing Entities regarding their charges and the procedures performed, which resulted in the approval of payments to the Counterclaim Defendants that would not otherwise have been approved.  United did so without knowledge of the routine promises by the Counterclaim Defendants and other affiliated medical providers to their patients to waive Member Responsibility Amounts.  Such promises generally negate the purpose of Member Responsibility Amounts under the United Plans, meaning that the Counterclaim Defendants received millions of dollars for services that are not, in fact, covered by health benefit plans under which such payments were made.

75.     United receives nearly two million health care claims per day and must comply with various laws and regulations mandating that such claims be paid within a short period of time.  United reasonably and in good faith relies on the

veracity of the descriptions of the services rendered as stated on the claims form and the amount of the bill submitted by the provider for each service.  The Counterclaim Defendants took advantage of United's efforts to process claims expeditiously and in compliance with such laws and regulations by repeatedly submitting false and misleading claim forms to United that intentionally overstated the amount charged.  United relied upon the veracity and truthfulness of the Counterclaim Defendants' communications about their billed charges in making these payments.

76.      United has previously provided to counsel for the Counterclaim Defendants a confidential electronic spreadsheet of claims totaling over $43,000,000 that were paid as a direct result of the waiver of Member Responsibility Amounts, as well as the other fraudulent billings as alleged below, by the Counterclaim Defendants.  This spreadsheet has now been updated to reflect additional claims uncovered by United.  For each claim, this spreadsheet includes the patient name, plan, provider, provider taxpayer identification number, date of service, procedure code, provider charges, deductible amount, co-pay amount, amount paid, bill received date, and date paid.  A non-confidential version of this updated spreadsheet, with confidential information, redacted, is attached as Appendix I hereto.  Due to the Omidis' fraudulent scheme, United is continuing to uncover additional claims and payments that may supplement those disclosed to Counterclaim Defendants and contained on Appendix I.

II.   **COUNTERCLAIM DEFENDANTS CONSPIRED TO AND DID DEFRAUD UNITED BY SUBMITTING KNOWINGLY FALSE BENEFIT CLAIMS**

   A.   **Counterclaim Defendant 1-800-GET-THIN Funnels Patients Into The Vast Network of Omidi Surgery Centers and Associated Providers**

77.      Since at least 2006, the Omidis have created, directed, controlled, and profited from a vast network of corporate entities, including Counterclaim

Defendants, for the purpose of defrauding the public, United, and the United Plans out of millions of dollars though a web of fraudulent practices, in violation of various state and federal laws.

78.    More specifically, the medical providers in the Omidi Network are ambulatory surgery centers and affiliated physicians and other medical professionals that specialize in outpatient laparoscopic gastric banding surgeries—a short, outpatient surgery by which a silicon "Lap Band" is inserted laparoscopically around the patient's stomach to control hunger.  According to the National Institutes of Health ("NIH"), laparoscopic gastric banding surgery "is done using a tiny camera that is placed in [the patient's] belly," which allows the surgeon to see inside the belly. http://www.nlm.nih.gov/medlineplus/ency/article/007388.htm. Generally, the surgeon makes one to five small surgical cuts in the patient's abdomen and places a camera and the surgical instruments inside these cuts.  The surgeon then places a Lap Band around the upper corner of the patient's stomach to separate it from the lower part.  This creates a small pouch that has a narrow opening that goes into the larger, lower part of the patient's stomach.  The surgery does not involve any cutting or stapling inside the belly.  The purpose of this surgery is to restrict food intake—when the patient eats after the surgery, the small pouch will fill up quickly, and the patient will feel full after eating just a small amount of food. After the surgery, a physician can adjust the band to make food pass more quickly or slowly through the patient's stomach.

79.    These Surgery Centers, as well as other affiliated clinics, labs, and other healthcare service providers situated throughout California, also provided ancillary services, as recommended by patient coordinators, that were promoted and recommended to patients as related to, or in preparation for, the Lap Band surgery, including lab testing, sleep studies, ultrasounds, EGDs, and cosmetic surgery.

80.    Michael and Julian Omidi and co-conspirator Robert Macatangay, on behalf of Counterclaim Defendant Top Surgeons, recruited and hired physicians to

perform services at the Surgery Centers.  United is informed and believes that each of these physicians executed a contract with Top Surgeons, and that Michael and Julian Omidi ultimately directed and controlled the physicians' schedules, patient load, and even the procedures performed.  Throughout the relevant time period, the following physicians contracted with Top Surgeons: Atul Madan, George Tashjian, Julius Gee, Nathan Thusha, Marvin Perer, Aram Bonni, Alex Perea, Ariel Malamud, George Mednik, Elliot Alpert, Arman Karapetyan, Lee Au, Martin Flynn, Cynthia Chin, Daniel Shin, Ishan Shamaan, Brian West, Scot Bickman, Robert McKeen, Pejman Samouha, and Stephanie Roberts.

81.     To funnel patients into the Omidi Network, Counterclaim Defendant 1-800-GET-THIN has long advertised to consumers on billboards, TV, radio, print ads, the internet, and social media across California.  In a series of articles about the Omidi Network, the *Los Angeles Times* referred to the ads as "blanket[ing] Southern California freeway billboards and broadcast airwaves," and stated that the ad campaign was "as inescapable . . . as smog in summer."  This advertising campaign touts, among other things, that prospective patients will receive high-quality Lap Band procedures.



83.     At these "free" informational meetings, Top Surgeons physicians and other medical staff induce potential patients to obtain medical treatments, including

Lap Band surgery, through, among other things, unlawful promises to provide the medical services free of charge to patients, thereby waiving all Member Responsibility Amounts, and to accept as full payment for the patients' services whatever amounts the Counterclaim Defendants obtain from the patients' United Plans. In some cases, care coordinators deliberately misrepresent the patient's eligibility to receive a Lap Band in an effort to convince the patient to proceed with a costly battery of services that are supposedly required in preparation for the Lap Band that will never be covered.

84. Once the Counterclaim Defendants convince a prospective patient to receive health services, Omidi Network patient coordinators schedule prospective patients for a series of pre-determined medical services, including nutritional consultations, psychological examinations, sleep studies, EGDs, abdominal ultrasounds, and myriad lab tests. These procedures, in many instances, are unnecessary, not indicated by medical tests or the patient's individual circumstances, or are performed only in preparation for Lap Band surgeries that unbeknownst to the patient but known to Counterclaim Defendants, are not covered under the patient's plan. In the case of nutritional consultations and psychological examinations, Counterclaim Defendants, with the assistance of the Billing Entities, typically bill for costlier face-to-face consultations even though many members have reported that they spoke only over the phone with these providers.



2:14-CV-03053-MWF (VBKx)
SECOND AMENDED COUNTERCLAIM

87.     In many instances where a patient's medical plan did not cover bariatric surgery, patient coordinators, at the instruction of Michael and Julian Omidi, nonetheless promised patients that their insurance covered Lap Band Surgery as long as those patients submitted to various pre-surgery procedures. Once those procedures were performed and reimbursed by the patient's insurer, care coordinators and other Omidi Network representatives stopped communicating with these patients or misrepresented that the insurer had only *recently* denied Lap Band coverage.

88.     Further, as set forth below, following a surgical procedure, the Billing Entities often submitted (on behalf of Surgery Centers and other affiliated providers) fraudulent insurance claims to United for unnecessary procedures or procedures that were not fully documented. The Billing Entities also submitted insurance claims and/or medical records that fraudulently misrepresented the nature and complexity of the services provided, sought payment for services which were

never rendered, and misrepresented a member's BMI or other pertinent information that impacted United's obligation to pay benefits under the member's health plan.

89. The Counterclaim Defendants also used their systematic waiver of Member Responsibility Amounts to inflate their bills. Having been lured to the Omidi Network by the promise of having no responsibility to pay for a portion of the medical services, the patients no longer acted as a check on the charges of the Counterclaim Defendants or the use of their services, as they would have if the patients had an obligation to contribute up to 20%-50% of the payment to the Counterclaim Defendants.



91. Thus, as discussed in further detail below, after a patient has called to inquire about treatment from Counterclaim Defendants, the Counterclaim Defendants conspired to engage in various fraudulent practices designed to manipulate United to pay for services that were unnecessary, never provided, or not covered by the terms of the United Plans. This is evidenced by exemplar United Members 1-29 below.

**B.** **Counterclaim Defendant Billing Entities Misrepresented Charges by Failing to Disclose the Providers' Systematic Waiver of Member Responsibility Amounts, Misrepresentations Concerning Insurance Coverage, and Other Billing Manipulations**

92. The typical design of the health benefit plans insured or administered by United provides significant financial incentives for members to use lower cost

in-network providers, instead of higher cost out-of-network providers.  These health plans typically have lower Member Responsibility Amounts for services received from in-network providers.  For example, a common design of the health plan insured or administered by United specifies 30% or 40% coinsurance for out-of-network services, and either 10% or 20% coinsurance for in-network services.  Annual deductibles may also be higher for out-of-network services.

93.    Members of health plans insured or administered by United are also protected from "balance billing" in the ordinary course when they utilize in-network providers, who have agreed to accept as full payment the combination of the contracted rates paid under the health plans, together with the patient's in-network Member Responsibility Amounts.  In contrast, patients receiving services from out-of-network providers are in the ordinary course subject to balance billing by providers for any difference between their actual charges and the amounts paid under the plan.

94.    To induce United members to forgo the significant cost-saving benefits of using in-network providers, the Counterclaim Defendants, who were not part of United's provider network, systematically promised to waive all Member Responsibility Amounts, including copayments, co-insurance, and deductibles, in return for an agreement from the Member to accept services from Counterclaim Defendants.  Counterclaim Defendants systematically promised United members that they would not be responsible for any out-of-pocket costs and that the Counterclaim Defendants would accept as full payment whatever amounts insurance would pay.  In this way, the Counterclaim Defendants eliminated the financial incentives for United members to use in-network providers by assuring United members that the actual cost to them for Counterclaim Defendants' out-of-network services would be zero.  They also induced participants to receive services from Counterclaim Defendants when the participant otherwise would have simply forgone the treatment (even at less expensive in-network providers), found another

form of weight-loss treatment, or, alternatively, sought treatment from an in-network provider that would (but for the waiver of the Member Responsibility Amounts) have been less expensive for both the group health plan and the participant.

95.     Consistent with their promises to United members to waive Member Responsibility Amounts, the Counterclaim Defendants systematically failed to collect such amounts from several thousand United members.  As of August 2011, United is informed and believes, based on documents Counterclaim Defendants provided to United, that the Counterclaim Defendant Surgery Centers waived complete Member Responsibility Amounts for at least 96% of claims submitted on behalf of United members.

96.     In addition, patient coordinators routinely promised United members that they would bear no out-of-pocket expenses related to any of the provided procedures, including those members on whose behalf United paid claims.  In the limited claim information that the Corporate Counterclaim Defendants have produced to date in the lawsuit, the total amount that they acknowledge as having been paid and received by them for services provided to more than 200 United Members includes $0 for Member Responsibility Amounts.  Because of several limitations in the data produced by the Corporate Counterclaim Defendants, which, for example, does not address the claims of several hundred or more individuals listed on Appendix I, the effective admission of non-receipt of Member Responsibility Amounts for more than 200 United Members substantially understates the actual number of United Members from whom the Counterclaim Defendants did not, in whole or material part, collect Member Responsibility Amounts.

97.     The systematic waiver by the Counterclaim Defendants of Member Responsibility Amounts resulted in an intentional misrepresentation of the amounts billed on the claim forms submitted to United.  As described above, the claim forms

represent the amount Counterclaim Defendants purport to have charged the United members for services.  When Counterclaim Defendants waived Member Responsibility Amounts, they effectively reduced the amount that they were charging the members for their services by the amount of the waived member responsibility.  Nonetheless, when they and other Omidi Network Providers submitted claim forms to United, the amounts set forth therein for "Charges" and "Total Charges," fraudulently included the waived Member Responsibility Amounts.

98.     United is informed and believes that the Counterclaim Defendants were willing to waive Member Responsibility Amounts as a tool to obtain new patients and because they intended to submit inflated billed charge amounts to United that greatly exceeded what the Counterclaim Defendants would charge to cash-paying patients, what Medicare charged, and what the majority of providers in the relevant geographical region would charge for the same services.  In many instances, after Counterclaim Defendants failed to obtain reimbursement from United, they retracted their earlier agreements with and representations to United members and billed them for their services, in many cases, years after the procedures were allegedly performed.  Many of these United members have been shocked to discover the amounts charged.

99.     In addition, most health plans insured or administered by United contain provisions do not cover any services that are accompanied by a provider's promise to waive Member Responsibility Amounts.  For example, the Plan Document for the AARP Employees' Welfare Plan provides, "In the event that a non-Network provider waives Copayments and/or the Annual Deductible for a particular health service, no Benefits are provided for the health service for which the Copayments and/or Annual Deductible are waived."  Similarly, the benefits plans for Belmont Village LP, Boston Market Corp., and Informa USA, Inc., among many others, contain an identical or nearly identical provision.  Meanwhile,

other plans such as ADP Totalsource, Inc., American Building Supply, and Apple, Inc. do not cover "[h]ealth services for which you have no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the policy," such as when the provider agrees to accept whatever payment the insurance company will pay as full payment for all services.  Most other plans contain substantially identical language.

100.   Counterclaim Defendants intentionally failed to disclose their routine waiver of these amounts so that they could circumvent these restrictions on benefits and obtain payment for claims based on purported assignments from the members. They then inflated their charges to recover sums they would not receive from members.

101.   United is further informed and believes that, as is customary in the healthcare industry, Counterclaim Defendants had knowledge of a prospective patient's insurance coverage and benefits prior to providing medical services. Moreover, United is informed and believes that Michael and Julian Omidi trained their call center representatives to determine the scope of each prospective patient's insurance coverage, and in particular, to determine whether surgical or non-surgical services related to obesity were covered.  *See* Exhibit G.

102.   Further, United has discovered multiple instances where Counterclaim Defendants performed unnecessary services, submitted false bills, misrepresented CPT codes to charge higher amounts, sought payment of services without disclosing that the services related to conditions that were not covered under the terms of the plans, and submitted records with incorrect BMI calculations to secure reimbursement from United or to evade the coverage limitations imposed by a number of the United Plans (of which Counterclaim Defendants had notice, through communications with United, prior to the delivery of services).  In addition, Counterclaim Defendants have purported to submit assignment of benefit forms which were invalid because they were unsigned, undated, or which lacked vital

information, including the names of the assignees.  These assignment-of-benefits forms are invalid on their face.

103.   For years, Counterclaim Defendants have carried out this fraud by disguising the true identities of its billing providers by using generic "surgery center" or "provider" on stationery, medical records, correspondence, assignments of benefits forms, and correspondence with patients; billing under at least 100 various and shifting Tax Identification Numbers and National Provider Identification numbers; and establishing dozens of sham entities—all of which concealed the conduct underlying this fraudulent scheme and induced United to pay fraudulent claims as late as 2014.

104.   The following patients, and the specific factual allegations related thereto reflect instances where Counterclaim Defendants performed unnecessary services, submitted false bills and inflated charges, and submitted records with incorrect BMI calculations in order to secure reimbursement from United.  These examples are representative of the routine, systematic, widespread, and ongoing scheme and artifice to defraud United and the health plans it administered.

C.   **Exemplar Patients**

   i.   **Counterclaim Defendants Performed Unnecessary Procedures and Waived Patient Responsibility Amounts After Intentionally Misleading Patients into Believing that United Covered Bariatric Coverage**

105.   Many health-benefit plans administered or insured by United either do not cover bariatric surgery or surgical and non-surgical treatment of obesity, or limit coverage for such surgery, including to either in-network providers or designated Centers of Excellence.  Other health-benefit plans insured or administered by United may provide coverage for Lap Band surgery, including on an out-of-network basis, but only if certain conditions are met.

106.   At the direction and control of Michael and Julian Omidi and co-conspirator Robert Macatangay, Omidi Network representatives, including call-

center operators, administrators, physicians, and patient coordinators routinely misled patients who did not have insurance coverage for Lap Band surgery performed at or by the Counterclaim Defendants into believing that they had such coverage. These Omidi Network representatives deceived or lied to these patients, knowing that these patients were not covered for Lap Band surgery, either at all, or on an out-of-network basis, or with reckless disregard for whether patients had such coverage. The Omidis and their representatives did so for the purposes of inducing patients to proceed with what they told the patients were pre-Lap Band services, and securing reimbursement from United for such services based on incomplete or misleading information, as set forth in the examples below.

107.   Once the pre-Lap Band services were complete, and after performing whatever additional services were purportedly revealed as necessary by the pre-Lap Band services, the Omidi Network physicians, patient coordinators, and other representatives would make excuses as to why they could not proceed with Lap Band surgery, or they failed to schedule such surgery, or they told patients that their insurance had denied the request for Lap Band coverage, or that they were waiting for insurance to approve the Lap Band surgery.

108.   Had the United members known that they were not covered for Lap Band surgery performed by Omidi Network Surgery Centers, these members would not have consented to these services, which, having been misrepresented as pre-Lap Band services, were unnecessary and inappropriate. Moreover, in that event, United would not have made any payments for such services on behalf of its insured or self-funded group-health plans.

109.   United is entitled to reimbursement for all payments made to the Counterclaim Defendants for services provided to patients who were deceived by Omidi Network physicians and patient coordinators into consenting to pre-Lap Band services based on the false pretense that these members had coverage for Lap Band surgery performed at or by the Counterclaim Defendants. United is also

entitled to a declaration that United and the health benefit plans that it insures or
administers have no obligation to make any future payment to the Counterclaim
Defendants for any services provided to patients under the false pretense of
insurance coverage for Lap Band surgery.

110.   United has discovered a number of examples of United Members who
were misled or lied to, including those discussed below.  United expects to identify
additional members who were similarly deceived, and will identify such additional
persons, either during discovery, by the deadline to be set by the Court for
amendments to pleadings, or as otherwise directed by the Court.

### 1.   United Member 8[1]

111.   United Member 8 was covered by an employer-sponsored health
benefit plan for which United served as a claims administrator.  The health benefit
plan does not cover "[s]urgical treatment of obesity."  The plan also does not cover
services "[i]n the event that a Non-Network provider waives Copayments (and/or
the Annual Deductible) for a particular health service."  In addition, the plan
provides that "[w]henever payments have been made in excess of the amount
necessary to satisfy the provisions of this plan, the plan has the right to recover
these excess payments from any individual (including yourself), insurance company
or other organization to whom the excess payments were made or to withhold
payment, if necessary, on future benefits until the overpayment is recovered."

112.   In or around ████ 2010,[2] United Member 8 called the 1-800-GET-
THIN telephone line after seeing the billboards and other advertisements in

---

[1] Due to privacy concerns, United has removed all private health information for
patients referenced herein and will refer to patients as United Member 1, United
Member 2, *etc.*

[2] All dates of service and other confidential information has been redacted pursuant
to HIPAA and the Protective Order and will be provided to counsel for
Counterclaim Defendants.

Southern California.  The 1-800-GET-THIN operator took her insurance information over the phone, and purported to verify her insurance coverage.

113.   Counterclaim Defendants' records reflect that Nique, a representative from "Ambulatory Surgical Center" at the hub of the Omidi Network, 9001 Wilshire Blvd., Suite 106, Beverly Hills, CA, contacted United on ████████, 2010 to verify United Member 8's benefits.  Nique was told that United Member 8 did not have coverage for bariatric surgery, regardless of "medical necessity." Consistent with the computer generated questionnaire that Nique was, upon information and belief, required to follow when calling United to inquire about United Member 8's insurance benefits and which is attached hereto as **Exhibit G**, Nique then asked, "Are there out of network benefits for other procedures such as Endoscopy (CPT Code: 43239?)" and "Do you pay the usual & customary fees of the provider?"  Per the questionnaire, Nique wrote down that United Member 8 had no daily maximum on her policy, that no preauthorization was required for EGD procedures or polysomnography (sleep study), that the deductible for out of network benefits was $████, and that the plan paid 60% of out-of-network benefits.

114.   Within the next two days, an Omidi call-center representative who was, upon information and belief, a patient coordinator, contacted United Member 8 and told her that she was covered for the Lap Band and that costs for the entire procedure, including pre-operative testing, would be covered by insurance and would not cost her anything out of pocket.  The Omidi Network representative then invited United Member 8 to attend a "seminar" for Lap Band candidates at one of the Omidi Network Surgery Centers, in order to learn more about the procedure and fill out paperwork.

115.   At no time did any Counterclaim Defendant, or any of their representatives, ever tell United Member 8 that she did not have coverage for Lap Band surgery.  Instead, the Omidi Network representative deceived United Member

8 into believing that the procedures she was undergoing were necessary in order to clear her for the Lap Band surgery that would be covered by her insurance with United.  Had United Member 8 known from the outset that her health plan did not cover Lap Band surgery, she would not have proceeded to receive services from Omidi Network providers and Counterclaim Defendants.

116.   United Member 8 attended the seminar and completed a series of forms.  With respect to a "Sleep Study" form, United Member 8 did not indicate that she had any symptoms that would necessitate a sleep study, including snoring, sleep apnea, difficulty sleeping, or difficulty breathing, because she was not having any issues with sleep.

117.   Nevertheless, Omidi physician Dr. Gee scheduled United Member 8 for a sleep study and an EGD.  United Member 8 arrived for her sleep study on Monday, ███████, 2010, as scheduled, but the building was locked and no one appeared to be at the location.  United Member 8 called the phone number on the door but, after several attempts, no one answered.  United Member 8 returned home.

118.   On ███████, 2010, in reliance on the false assurance regarding her coverage for the Lap Band, United Member 8 reported to Counterclaim Defendant Valencia ASC for her EGD, lab tests, and an ultrasound, all of which had been represented to her by Omidi Network physicians and the patient coordinator as necessary to secure a Lap Band.  Specifically, the EGD (also known as an Upper GI Endoscopy or Esophagogastroduodenoscopy) is a short outpatient procedure that Counterclaim Defendant Surgery Centers commonly bill United for.  The NIH describes an EGD as a test "to examine the lining of the esophagus (the tube that connects your throat to your stomach), stomach, and first part of the small intestine. It is done with a small camera (flexible endoscope) that is inserted down the throat."  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003888.htm.  NIH states that the patient can usually expect to receive a sedative and a painkiller, a

local anesthetic sprayed into the mouth to prevent coughing or gagging when the endoscope is inserted, and an IV to administer medicine during the procedure. After the sedatives have taken effect, the endoscope is inserted through the esophagus to the stomach and duodenum.  The doctor examines the lining of the esophagus, stomach, and upper duodenum, and may take a biopsy through the endoscope.  Additional treatments, such as stretching or widening a narrow area of the esophagus, may also be done when indicated.

119.   The EGD was performed by Dr. Perer, who received a $110 bonus for each EGD procedure, above 60, performed each week, as well as a $110 bonus for any EGD he covered for another physician.  Consistent with Dr. Perer's contract, he was scheduled to perform 19 gastrointestinal surgeries in the six hours between 7 a.m. and 1 p.m. on the date of United Member 8's EGD procedure.  United Member 8's surgery was scheduled to last approximately 15 minutes, and medical records reflect that she was taken into the operating room at 7:50 a.m. and removed from the operating room at 8:00 a.m.

120.   After United Member 8 awoke from anesthesia, she was directed to sit in a chair in the hallway, and a nurse came to check on her.  United Member 8 complained that her throat hurt badly, but the nurse told her it was normal and that she should drink hot tea.  United Member 8 was then sent home.  That weekend, United Member 8 reported to the emergency room where she was diagnosed with a perforated esophagus and a significant secondary infection as a result of her EGD, which required surgical debridement twice.  Ultimately, United Member 8 required a feeding tube for approximately six weeks.

121.   In the interim, United Member 8 received various calls from a patient coordinator to reschedule her sleep study, claiming she was a "no show."  United Member 8 contested the allegation that she failed to appear as scheduled, and declined to reschedule.  Additionally, agents from the Omidi Network attempted to schedule United Member 8 for a vaginal ultrasound with Dr. Aram Bonni, but she

declined that service as well.  On or around ███████, 2010, United Member 8 communicated that she was no longer interested in proceeding with bariatric surgery with the Omidi Network.

122.   Pursuant to a bill that was likely prepared by the Billing Entities and received by United on ████████, 2011, Valencia ASC requested that "Total Charges" of $█████ be paid for the facility where the EGD was performed, which included the Member Responsibility Amounts, even though a patient coordinator had told United Member 8 that she would not have to pay anything out of pocket. This claim form, and the amount set forth therein for "Charges" or "Total Charges," was false and misleading.  But, in reliance on the truthfulness of this claim, United paid $███████ on ████████, 2011, while also informing Valencia ASC that United Member 8 was obligated to pay $██████ in Member Responsibility Amounts for the EGD facility charge under the terms of her health benefit plan.  Having waived her out-of-pocket costs, Valencia ASC did not timely seek payment of this $█████, and has not received this amount from United Member 8.  As a result, she has no coverage for the services performed on ███████, 2010, and United is entitled to be reimbursed for all amounts paid for services provided to United Member 8.

123.   Omidi Network physician Dr. George Mednik, likely with the assistance of the Billing Entities, also submitted claims for an abdominal ultrasound that was also allegedly conducted on ███████, 2010.  But, United Member 8 does not have any knowledge that this procedure was ever performed. The Ultrasound record is a computer print-out with an electronic signature by Dr. Mednik.  In response to a claim form submitted to United on or around ████████, 2010, United, who was unaware that United Member 8 would contest the claim, paid the Billing Entities, on behalf of Dr. Mednik $█████ for this service.  In total, United paid $███████ for the EGD, ultrasound, and other related procedures performed on ███████, 2010.

124.   Counterclaim Defendant Skin Cancer Surgery Specialists of Beverly
Hills, likely with the assistance of the Billing Entities, also submitted claims
beginning on or about ██████, 2011 for a $██ psychological diagnostic
interview examination (CPT code 90801) and a $██ psychological testing by
psychiatrist or physician (CPT code 96101) purportedly conducted on ████████,
2010.  But, United Member 8 never met with a psychologist or psychiatrist.

a)   When the claims for these two psychological services were
initially submitted to United in ████ 2011, they both listed 1518032218 as the
"Billing Provider's NPI."  This NPI, however, is registered to Dr. Ariel Malamud,
M.D., an internist/gastroenterologist practicing in Los Angeles.  The claim form
names Skin Cancer & Reconstructive Surgery Specialists of Beverly Hills as the
"Servicing Provider," but the "Servicing Provider's Address" is that of Valencia
Surgery Center—not the Skin Cancer clinic. United responded by requesting
additional information to support these claims.  When the claims were re-submitted
almost a full year later under the same provider identification, United denied the
claims for lack of proper documentation and support.

b)   Eleven months later, in or around ██████ 2012, these claims
were submitted again—this time, however, the Billing Entities listed Dr. Martin
Alex Perea, 9001 Wilshire Blvd., Suite 106, as the provider, and listed
Counterclaim Defendant Skin Cancer Surgery Specialists of Beverly Hills's NPI
number as both the Billing Provider's NPI and the Servicing Provider's NPI.
United did not pay these claims for the services never rendered, but they serve as an
illustration of the types of deceptive tactics Counterclaim Defendants have utilized
in billing United for fraudulent services.

125.   United should have paid nothing for the services provided to United
Member 8 because they were performed under the false pretense of insurance
coverage for the Lap Band, in some cases not performed at all, and performed and
fraudulently billed with all Member Responsibility Amounts having been waived,

thereby negating coverage.  United Member 8 would never have undergone the EGD procedure that ultimately caused her severe injury, or any other services if the Omidi Network call center had not told her that she was covered for the Lap Band procedure, that she needed to undergo services to "clear" her for the Lap Band, and that their services would not cost her anything out of pocket.  Thus, Valencia ASC, both Skin Cancer Surgery Specialists, and the Counterclaim Defendant Billing Entities are liable to reimburse United, on behalf of the relevant plan, $██████, plus interest and attorneys' fees.  United is also entitled to a declaration that it and United Member 8's health benefit plan have no obligation to make any payment to Valencia ASC, either Skin Cancer Surgery Specialists, or any Counterclaim Defendant for any services provided to United Member 8.

126.  United Member 8 filed two lawsuits on ████████████ and ████████████ against 1-800-GET-THIN, et al. for, among other things, medical malpractice and intentional misrepresentation.  United became aware of these lawsuits on or about ████████ and thereafter learned that Counterclaim Defendants had deceived United Member 8 into believing that she had insurance coverage for Lap Band surgery for the purpose of securing her consent to receive pre-Lap Band services.  In particular, the second lawsuit brought by United Member 8 in ██████ contains the allegations that 1-800-GET-THIN lied to her about her insurance coverage, and that this was part of a pattern of telling prospective patients that they were covered for Lap Band surgery whether or not the patient had coverage for bariatric surgery.  United had not previously known of this deception by Counterclaim Defendants, and could not have discovered it through the exercise of reasonable diligence given that the claim forms omitted the material misrepresentations that induced United Member 8 into receiving these services.

127.  As indicated below, at least 11 other members were similarly deceived by the Counterclaim Defendants into believing that they had insurance coverage for a Lap Band or other related services.  United was not aware at the time it processed

and paid the claims that these members were misled into believing they had coverage for Lap Band surgery and related services when they did not, nor could United have discovered these claims were false through the exercise of reasonable diligence in evaluating the claim forms, which omitted the material misrepresentations that induced the members into receiving these services. United only discovered these fraudulent claims after it learned of the lawsuits brought by United Member 8 after the Plaintiffs' Complaint in this matter was filed, and as part of its investigation in this litigation, beginning in 2014, regarding patients who were misled in broadly similar fashion to United Member 8.

128.   United is informed and believes that additional individuals were similarly deceived as part of a pattern and practice by the Counterclaim Defendants and Omidi Network Providers to induce patients without coverage for Lap Band surgery to consent to receive services from them. For example, as reflected on Appendix I, the Counterclaim Defendants provided services to 21 other individuals who were covered by a plan sponsored by the same employer as the sponsor of United Member 8's plan. According to the claim forms submitted to United, none of these other 21 individuals received a Lap Band from the Counterclaim Defendants. United is informed and believes that many or all of these individuals had coverage similar to United Member 8, and that many, most, or all of these patients were similarly deceived by the Counterclaim Defendants into believing that they had coverage for a Lap Band surgery and related services.

## 2.    United Member 16

129.   During the times relevant hereto, United Member 16 was covered by an employer-sponsored health benefit plan for which United serves as a claims administrator. United Member 16's benefit plan did not cover "[n]on-surgical treatment of obesity, including morbid obesity," or "[s]urgical treatment of obesity including severe morbid obesity (with a BMI greater than 35)." The plan also does

not cover "[h]ealth services for which [the patient has] no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Plan."  Furthermore, "[i]n the event that a non-Network provider waives Copayments and/or the Annual Deductible for a particular health service, no Benefits are provided for the health service for which the Copayments and/or Annual Deductible are waived."  And, if United pays "Benefits for expenses incurred on account of a Covered Person, that Covered Person, or any other person or organization that was paid, must make a refund to us if . . . [a]ll or some of the expenses were not paid by the Covered Person or did not legally have to be paid by the Covered Person."

130.   On or about ██████ 2010, following the birth of her children, United Member 16 called 1-800-GET-THIN and told them she wanted to get a Lap Band to lose weight.  She was referred to Omidi Network physician Dr. Bonni, and told at her initial visit to his office, and on subsequent visits to Omidi Network providers, that her insurance would cover everything, including the Lap Band, and that she would not have to pay any out-of-pocket expenses for care that she received.  Given that her health plan did not cover surgical and non-surgical treatment of obesity, the coverage statements made to her by or on behalf of her Omidi Network providers as listed in Appendix I, including Dr. Bonni, and Counterclaim Defendants Valley Surgical Center, Valencia ASC, and Skin Cancer Surgery Specialists of West Hills, were false, and given the practice of Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), these statements were made with knowledge of their falsity or made with reckless disregard for their truth or falsity.

131.   Had United Member 16 known from the outset that her health plan did not cover Lap Band surgery, she would not have proceeded to receive services from Omidi Network providers, including Dr. Bonni, and Counterclaim Defendants Valley Surgical Center, Valencia ASC, and Skin Cancer Surgery Specialists of

West Hills.  However, in reliance on the false statement made to her regarding her coverage for the Lap Band the promise that she would not have to pay anything out of pocket, and the representation that the services were necessary to secure a Lap Band, United Member 16 consented to undergo an upper GI (EGD) on ███████, 2010, cystoscopies on ███████ and ███████, 2010, a sleep study on ███████, 2010, a partial hysterectomy to remove fibroids on ███████, 2010, and a bladder-repair procedure on ███████, 2010.  After these procedures were performed, Dr. Bonni and other agents of the Counterclaim Defendants including patient coordinators then made repeated excuses to United Member 16 as to why she could not move forward with the Lap Band that she earlier had been told was covered, and ultimately told her that they were waiting on her insurance for approval.

132.   Given that her plan does not cover treatment of obesity, approval for the Lap Band was never secured.  But, in the meantime, Dr. Bonni, and other Omidi Network providers, including Counterclaim Defendants Valley Surgical Center, Valencia ASC, and Skin Cancer Surgery Specialists of West Hills had performed procedures and provided services under false pretenses, for which they were attempting to secure payment from United, on behalf of the plan.

133.   Specifically, Omidi Network providers, including Dr. Bonni, Valencia ASC, Valley Surgical Center, Modern Institute, and Skin Cancer Surgery Specialists of West Hills, likely with the assistance of the Billing Entities, submitted claim forms to United with amounts for "Charges" or "Total Charge(s)" for the services rendered that included the Member Responsibility Amounts, even though they or their agents had told United Member 16 that she would not have to pay anything out of pocket.  These claim forms, and the amounts set forth therein for "Charges" or "Total Charges," were false and misleading.

134.   United relied on the truthfulness of the claim forms received on the dates indicated on Appendix I, and paid more than $███████ to the Counterclaim

Defendants for services provided to United Member 16. By Provider Explanation of Benefits sent with the payments to Counterclaim Defendants, including Valley Surgical Center, United also informed them that United Member 16 owed more than $███ in Member Responsibility Amounts. Having waived her out-of-pocket costs, Valley Surgical Center and the Counterclaim Defendants did not timely seek payment of this more than $███ and have not received this amount from United Member 16.

135.   United should have paid nothing for the services provided to United Member 16 because they were performed under the false pretense of insurance coverage for the Lap Band, and performed and fraudulently billed with Member Responsibility Amounts having been waived, thereby negating coverage. Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the plan, the more than $███, plus interest and attorneys' fees, paid to the Counterclaim Defendants for services provided to United Member 16. In addition, United is entitled to a declaration that neither United, nor United Member 16's plan, has any obligation to pay for any of the services provided to United Member 16.

136.   Finally, United discovered the Counterclaim Defendants' fraudulent assurance to United Member 16 of coverage for the Lap Band only as a result of information provided by this member on October 15, 2014. Until interviews with patients during the course of this lawsuit, United was unaware that the Counterclaim Defendants were systematically deceiving patients into believing they were covered for a Lap Band to be placed by the Counterclaim Defendants and undergoing other procedures as a purported pre-requisite to receiving an insurance-covered Lap Band.

### 3.   United Member 17

137.   During the times relevant hereto, United Member 17 was covered by an employer-sponsored health benefit plan for which United administers claims.

This plan does not cover, among other things, "the following treatments for obesity: - non-surgical treatment, even if for morbid obesity; and - surgical treatment of obesity even if there is a diagnosis of morbid obesity."  This plan does not cover "expenses for health services and supplies . . . for which you have no legal responsibility to pay . . . , [or] for which a non-Network provider waives the Annual Deductible or Coinsurance amounts."  In addition, the plan provides that "[i]f the Plan overpays a healthcare provider, UnitedHealthcare reserves the right to recover the excess amount, by legal action if necessary."

138.   On or about ███ 2010, United Member 17 called 1-800-GET-THIN after seeing numerous advertisements.  In particular, United Member 17 was interested in weight-loss surgery because of numerous health issues related to his morbid obesity.  Thereafter, United Member 17 attended a "free" informational seminar at San Diego ASC.  During the seminar, United Member 17 told the patient coordinator that his top priority was making sure that his health insurance covered the procedure, to which the coordinator assured United Member 17 that it was, and that it would be a "slam dunk" to get the Lap Band surgery paid.  Given that this health plan does not cover surgical treatment of obesity, the coverage statement made to him by the patient coordinator was false, and was made with knowledge of its falsity, given the practice of Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), or made with reckless disregard for their truth or falsity.

139.   Had United Member 17 known from the outset that his health plan does not cover Lap Band surgery, he would not have proceeded to receive services from Omidi Network physician Dr. Daniel Shin, Dr. Mednik, or Counterclaim Defendants San Diego ASC and Skin Cancer Surgery Specialists of Beverly Hills.  However, in reliance on the false statement regarding his coverage for the Lap Band and the representation that the services were necessary to secure a Lap Band, United Member 17 consented to undergo psychological examinations on ███

1  ███, 2010, an upper GI (EGD) on ████████ 2010, an abdominal examination on

2  ████████, 2010, and a nutritional consultation on ███████, 2010.

3          140.    In addition, United Member 17 was forced to undergo an unnecessary

4   sleep study.  United Member 17 told one of the Omidi Network physicians that he

5   had sleep apnea, that he was already using the equipment, and that he had a sleep

6   study done a few months earlier, but that physician insisted that he have another

7   sleep study done.  United Member 17 consented to what turned out to be a poorly

8   done study, using old equipment in a noisy area.

9          141.    Given that his plan does not cover treatment of obesity, approval for

10  the Lap Band was never secured.  But, in the meantime, Dr. Shin and other Omidi

11  Network providers, including Counterclaim Defendants San Diego ASC and Skin

12  Cancer Surgery Specialists of Beverly Hills, had performed procedures and

13  provided services under false pretenses, for which they were attempting to secure

14  payment from United, on behalf of the plan.

15         142.    Specifically, Omidi Network providers, including Dr. Chin, Dr.

16  Mednik, San Diego ASC, and Skin Cancer Surgery Specialists of Beverly Hills,

17  likely with the assistance of the Billing Entities, submitted claim forms to United

18  with amounts for "Charges" or "Total Charge(s)" for the services rendered that

19  included the Member Responsibility Amounts, even though they never intended to

20  collect United Member 17's Member Responsibility Amounts.  These claim forms,

21  which were received on the dates indicated on Appendix I, and the amounts set

22  forth therein for "Charges" or "Total Charges," were false and misleading.

23         143.    United relied on the truthfulness of the claim forms and paid more than

24  $███ to Omidi Network providers, including Dr. Mednik, for services provided to

25  United Member 17, also informing the providers that United Member 17 owed

26  more than $███ in Member Responsibility Amounts.  They did not timely seek to

27  collect and have not received the more than $███ in Member Responsibility

28  Amounts that United Member 17 was obligated to pay under the terms of his plan.

144.   United should have paid nothing for the services provided to United Member 17 because they were performed under the false pretense of insurance coverage for the Lap Band, and because the Omidi Network providers, Billing Entities and Counterclaim Defendants never intended to collect United Member 17's Member Responsibility Amounts.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the plan, the more than $████, plus interest and attorneys' fees, paid for services provided to United Member 17.  In addition, United is entitled to a declaration that neither United, nor the plan, has any obligation to pay for any of the services provided to United Member 17.

145.   Finally, United discovered the Counterclaim Defendants' fraudulent assurance to United Member 17 of coverage for the Lap Band only as a result of information provided by this member on February 23, 2015.

### 4.   United Member 18

146.   During the times relevant hereto, United Member 18 was covered by an employer-sponsored health benefit plan for which United administers claims. This plan does not cover, among other things, "the following treatments for obesity: - non-surgical treatment, even if for morbid obesity; and - surgical treatment of obesity even if there is a diagnosis of morbid obesity."  This plan also does not cover "charges incurred for any surgical procedure aimed at alleviating obesity, including morbid obesity. These specific procedures include: a) gastric bypass; b) roux-en-Y; c) duodenal switch; [and] d) laparoscopic lap band . . . ."  This plan does not cover "expenses for health services and supplies . . . for which you have no legal responsibility to pay . . . , [or] for which a non-Network provider waives the Annual Deductible or Coinsurance amounts."

147.   On or about ████ 2009, United Member 18 called 1-800-GET-THIN to inquire about getting a Lap Band.  In response, he was directed to a seminar where, after checking his insurance, he was told that he had good

insurance, and that he would be set-up to get tested for the Lap Band.   Given that his health plan does not cover surgical treatment of obesity and the Lap Band, the coverage statement made to him was false, and was made with knowledge of its falsity, given the practice of Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), or made with reckless disregard for their truth or falsity.  The Omidi Network representative that reviewed his insurance also learned, among other things, that for covered services, United Member 18 was covered 60% out of network, that he had more than $████ remaining on his 2010 out-of-network deductible and more than $████ remaining on his 2010 out-of-network, out-of-pocket maximum.

148.   In reliance on the false statement regarding his coverage for the Lap Band and the representation that the services were necessary to secure a Lap Band, United Member 18 consented to undergo an upper GI (EGD) on █████████, 2009 at Beverly Hills Surgery Center, as well as an ultrasound and office exam that day.  Had United Member 18 known from the outset that his health plan did not cover Lap Band surgery, he would not have proceeded to receive services from Omidi Network providers and Counterclaim Defendants.  After the procedures were performed, he was told his insurance denied Lap Band coverage.

149.   Given that his health plan does not cover treatment of obesity and Lap Band surgery, approval for the Lap Band was never secured.  But, in the meantime, Dr. Mednik, Dr. Karapetyan, and other Omidi Network providers, including Beverly Hills Surgery Center and Skin Cancer Surgery Specialists of West Hills had, under false pretenses, performed procedures and provided services to United Member 18 on █████████, 2009, for which they were attempting to secure payment from United, on behalf of his plan.  Dr. Mednik, Dr. Karapetyan, and Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists of West Hills could have, but did not, seek and require payment of his more than $████ outstanding deductible, before providing services to United

Member 18, or seek payment of such deductible from United Member 18 before later billing United for these services.

150.   Specifically, by claims received in █████ 2009, and █████, █████, █, and █████ 2010, as set forth on Appendix I, Dr. Karapetyan, Dr. Mednik, and other Omidi Network providers, including Beverly Hills Surgery Center and Skin Cancer Surgery Specialists of West Hills, likely with the assistance of the Billing Entities, submitted claim forms to United with amounts for "Charges" or "Total Charge(s)" for the services rendered that included the Member Responsibility Amounts, even though they had no intention of collecting such amounts, and they told United Member 18 that they would accept whatever insurance paid as full payment.  These claim forms, and the amounts set forth therein for "Charges" or "Total Charges," were false and misleading.

151.   United relied on the truthfulness of the claim forms and paid more than $███ to Beverly Hills Surgery Center and Skin Cancer Surgery Specialists of West Hills for services provided to United Member 18, also informing them that United Member 18 owed a $█████ deductible and an additional $████ in Member Responsibility Amounts.  They did not timely seek to collect and have not received the $████ deductible and additional $████ in Member Responsibility Amounts.

152.   United should have paid nothing for the services provided to United Member 18 because they were performed under the false pretense of insurance coverage for the Lap Band, and because the Omidi Network Providers, Billing Entities, and Counterclaim Defendants never intended to collect United Member 18's Member Responsibility Amounts.  Thus, Beverly Hills Surgery Center, Skin Cancer Surgery Specialists of West Hills and the Counterclaim Defendants are liable to reimburse United, on behalf of the plan, the more than $████, plus interest and attorneys' fees, paid for services provided to United Member 18.  In addition,

2:14-CV-03053-MWF (VBKx)
SECOND AMENDED COUNTERCLAIM

United is entitled to a declaration that neither United, nor the plan, has any obligation to pay for any of the services provided to United Member 18.

153.   Finally, United discovered the Counterclaim Defendants' fraudulent assurance to United Member 18 of coverage for the Lap Band only as a result of information provided by this member on September 8, 2014.

154.   United is informed and believes that additional individuals were similarly deceived.  For example, as reflected on Appendix I, the Counterclaim Defendants provided services to 22 other individuals who were covered by a plan sponsored by the same employer as the sponsor of United Member 18' plan (including United Member 23).  According to the claim forms submitted to United, none of these other 21 individuals received a Lap Band from the Counterclaim Defendants.  United is informed and believes that many or all of these individuals had coverage similar to United Member 18, and that many, most, or all of these patients were similarly deceived by the Counterclaim Defendants into believing that they had coverage for a Lap Band surgery and related services.

### 5.    United Member 19

155.   During the times relevant hereto, United Member 19 was covered by a health benefit plan for which United administers claims.  This plan "covers surgical treatment of morbid obesity only under certain circumstances, including that the surgery must take place at a Bariatric Center of Excellence.  The plan also does not cover "expenses for health services and supplies for which you have no legal responsibility to pay or for which a charge would not ordinarily be made in the absence of coverage under this Program."  In addition, the plan provider that "[i]f a claims administrator incorrectly pays any benefits for expenses incurred on account of a Covered Person, that Covered Person (or any other entity that was paid) must pay the Program a refund if either of the following apply:  All or some of the expenses were not paid by the Covered Person, or did not legally have to be paid by

the Covered Person or all or some of the payments the claims administrator made exceeded the benefits due under the Program."

156.   United Member 19 first learned of the 1-800-GET-THIN providers after seeing a billboard advertising weight-loss surgery.  In ███ or ███ 2009, United Member19X attended a group seminar presented by 1-800-GET-THIN-affiliated providers, where they checked her insurance and told her that she was covered for Lap Band surgery, and indicated that there would be no cost to her for all of the services they would provide.  Given the limitation in her health plan for coverage of surgical treatment of obesity only at Bariatric Centers of Excellence, the coverage statement made to her was false, and given the practice of the Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), these statements were made with knowledge of their falsity or made with reckless disregard for its truth or falsity.

157.   Following the informational seminar, United Member 19 was scheduled for an EGD and additional services on ███, 2009, but, prior to proceeding, United Member 19 called United to determine whether she was covered for Lap Band surgery performed by Omidi Network providers at Counterclaim Defendant Surgery Centers.  United explained that United Member 19's plan did not cover out-of-network bariatric surgery, and that United Member 19 likely would not have even qualified for in-network benefits because she did not satisfy the other coverage conditions.  Because she had been lied to about her eligibility for Lap Band surgery, United Member 19 refused to have the scheduled EGD and other services.

158.   After United Member 19 did not appear for her scheduled EGD and other services, she received a call from the Counterclaim Defendants inquiring why she did not appear as scheduled, to which she replied that "they had lied" to her about having insurance coverage for the Lap Band and she was not happy with them for being lied to.

159.   Despite not providing any services to United Member 19 on ████, 2009 or any other date, Almont ASC and Skin Cancer Surgery Specialists of West Hills, likely with the assistance of the Billing Entities, submitted claims to United for services purportedly provided to United Member 19.  These claims were submitted with the knowledge that they were false, or with reckless disregard regard for their truth or falsity.

160.   Specifically, as reflected on Appendix I, United received claim forms in ████, ████, and ████ 2009 from Almont ASC and Skin Cancer Surgery Specialists of West Hills for services allegedly provided to United Member 19 on ████, 2009.  Relying on the truthfulness of the claim forms that services had actually been provided to United Member 19 as indicated on the claim forms, United paid more than $████ to Almont ASC and Skin Cancer Surgery Specialists of West Hills for services never provided to United Member 19.

161.   Almont ASC, Skin Cancer Surgery Specialists of West Hills, and the Counterclaim Defendants are liable to reimburse United, on behalf of the plan, the more than $████, plus interest and attorneys' fees, paid for services that were never provided to United Member 19.  In addition, United is entitled to a declaration that neither United, nor her plan, has any obligation to pay any amount related to United Member 19.

162.   Finally, United discovered the Counterclaim Defendants' fraudulent assurance to United Member 19 of coverage for the Lap Band only as a result of information provided by this member on February 28, 2015.

### 6.   United Member 20

163.   During the times relevant hereto, United Member 20 was covered by a health benefit plan insured by United.  United Member 20's benefit plan does not provide coverage for "surgical and non-surgical treatment of obesity."  The plan also does not cover "[h]ealth services for which you have no legal responsibility to

pay, or for which a charge would not ordinarily be made in the absence of coverage under the Policy." And, if United pays "Benefits for expenses incurred on account of a Covered Person, that Covered Person, or any other person or organization that was paid, must make a refund to us if . . . [a]ll or some of the expenses were not paid by the Covered Person or did not legally have to be paid by the Covered Person."

164.   On or about ██████ or ██████ 2009, United Member 20 called 1-800-GET-THIN to find out about getting Lap Band surgery. She was directed to a free consultation at Beverly Hills Surgery Center. Once there, a patient coordinator made a copy of United Member 20's insurance card, and later explained that her insurance covered all future procedures, including Lap Band surgery, and that she would not bear any out-of-pocket expenses. After the meeting, she received a call from an Omidi Network representative to schedule "necessary" tests before she could get Lap Band surgery. She was told that insurance would cover everything, and that she would not have to pay anything out of pocket. Given that her health plan did not cover surgical and non-surgical treatment of obesity, the coverage statements made to her by or on behalf of Dr. Karapetyan and Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists of West Hills, were false, and given the practice of the Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), these statements were made with knowledge of their falsity or made with reckless disregard for their truth or falsity.

165.   In reliance on the false statement to her regarding her coverage for the Lap Band, the promise that she would not have to pay anything out of pocket, and the representation that he services were necessary to secure a Lap Band, United Member 20 consented to undergo an upper GI (EGD) and lab work on ██████, 2009. Had United Member 20 known from the outset that her health plan did not provide coverage for Lap Band surgery, she would not have proceeded to

-53-

receive services from Dr. Karapetyan and Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists of West Hills.

166.   After the EGD was performed, United Member 20's patient coordinator called to tell her that her insurance carrier had denied their request for Lap Band coverage, although the patient coordinator also told United Member 20 not to worry about this because they had their ways of obtaining coverage.  The patient coordinator also advised on this phone call that United Member 20 should schedule a sleep study and tests for other medical conditions to try to get the Lap Band covered.  United Member 20 did not have sleep issues or physical complaints; she simply wanted a Lap Band to lose weight.

167.   Given that her plan did not cover surgical treatment of obesity, approval for the Lap Band was never secured.  But, in the meantime, Dr. Karapetyan and Counterclaim Defendants Beverly Hills Surgery Center and Skin Cancer Surgery Specialists of West Hills had performed procedures and provided services under false pretenses, for which they were attempting to secure payment from United, on behalf of the plan.

168.   Specifically, Dr. Karapetyan, and other Omidi Network providers, including Beverly Hills Surgery Center and Skin Cancer Surgery Specialists of West Hills, likely with the assistance of the Billing Entities, submitted claim forms to United with amounts for "Charges" or "Total Charge(s)" for the services rendered that included the Member Responsibility Amounts, even though they or their agents had told United Member 20 that she would not have to pay anything out of pocket.  These claim forms, and the amounts set forth therein for "Charges" or "Total Charges," were false and misleading.

169.   United owes nothing for the services provided to United Member 20, because they were performed under the false pretense of insurance coverage for the Lap Band, and performed and fraudulently billed with Member Responsibility Amounts having been waived, thereby negating coverage.  Because United has paid

nothing for the services provided on ███████, 2009 to United Member 20, but the Counterclaim Defendants are seeking payment for these services, United is entitled to a declaration that neither United, nor United Member 20's plan, has any obligation to pay for any of the services provided to United Member 20.

170.   Finally, United discovered the Counterclaim Defendants' fraudulent assurance to United Member 20 of coverage for the Lap Band only as a result of information provided by this member on April 7, 2015.

### 7.   United Member 21

171.   During the times relevant hereto, United Member 21 was covered by an employer-sponsored health benefit plan for which United administers claims. United Member 21's benefit plan did not cover "surgical treatment of obesity including severe morbid obesity," as well as "[h]ealth services for which [the patient has] no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Plan."  Furthermore, "[i]n the event that a non-Network provider waives Copayments and/or the Annual Deductible for a particular health service, no Benefits are provided for the health service for which the Copayments and/or Annual Deductible are waived."  And, if United pays "Benefits for expenses incurred on account of a Covered Person, that Covered Person, or any other person or organization that was paid, must make a refund to use if . . . [a]ll or some of the expenses were not paid by the Covered Person or did not legally have to be paid by the Covered Person."

172.   United Member 21 called 1-800-GET-THIN to inquire about Lap Band surgery.  He subsequently scheduled an initial consultation on or around ████ or ████ 2012 on Long Beach Blvd. in Long Beach.  At the consultation, a patient coordinator took his insurance information, told him that he should be able to move forward with the Lap Band and Lap Band pre-tests, and that he would have no copay.  Given that his health plan does not cover surgical treatment of obesity, the

coverage statement made to him by or on behalf of Counterclaim Defendants IMS and Orange Grove Surgery Center were false, and given the practice of Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), these statements were made with knowledge of their falsity or made with reckless disregard for their truth or falsity.  Consistent with the practice of the Counterclaim Defendants (*see* Exhibit G), the individual who checked his insurance also learned, among other things, that he had more than $███ remaining on his 2012 out-of-network deductible.

173.   In reliance on the false statement regarding his coverage for the Lap Band, the promise that he would not have to pay anything out of pocket, and the representation that the services were necessary to secure a Lap Band, United Member 21 consented to undergo a psychological examination on ███, 2012, an EGD on ███, 2012, a sleep study on ███, 2012, an outpatient visit on ███, 2012, a second sleep study on ███, 2012, and nutritional consultations on both ███ and ███, 2012.  Had United Member 21 known from the outset that his health plan does not provide coverage for Lap Band surgery, he would not have proceeded to receive these services.  Counterclaim Defendants IMS and Orange Grove Surgery Center did not seek and require payment of his more than $███ outstanding deductible, before providing services to United Member 21 on ███, 2012 or thereafter, or seek payment of such deductible from United Member 21 before later billing United for these services.

174.   After these procedures were performed, United Member 21's patient coordinator next attempted to convince him to have his gall bladder removed.  United Member 21 declined because it had not been bothering him.  Shortly thereafter, a patient coordinator called United Member 21 to tell him that his insurance did not cover Lap Band surgery—this was the sole reason United Member 21 sought treatment in the first place.  The coordinator then suggested that

United Member 21 misrepresent the severity of his various health issues to United. United Member 21 told the coordinator that he would not lie to United.

175.   Given that his plan does not cover treatment of obesity, approval for the Lap Band was never secured.  But, in the meantime, Counterclaim Defendants IMS and Orange Grove Surgery Center had performed procedures and provided services under false pretenses, for which they were attempting to secure payment from United, on behalf of the plan.

176.   Specifically, Omidi Network providers, including IMS and Orange Grove Surgery Center, likely with the assistance of the Billing Entities, submitted claim forms for services provided to United Member 21 in ███ and ███ 2012, with amounts for "Charges" or "Total Charge(s)" for the services rendered that included the Member Responsibility Amounts, even though their representatives had told United Member 21 that he would not have to pay anything out of pocket. These claim forms, received as reflected on Appendix I, were false and misleading. United relied on the truthfulness of these claim forms and allowed, as reflected on Appendix I and in communications to these providers, $███ toward the 2012 annual out-of-network deductible.  IMS and Orange Grove Surgery Center did not timely seek to collect and have not received the $███ deductible.

177.   United owes nothing for the services provided to United Member 21, because they were performed under the false pretense of insurance coverage for the Lap Band, and performed and fraudulently billed with Member Responsibility Amounts having been waived, thereby negating coverage.  Because United has paid nothing for the services provided to United Member 21, but the Counterclaim Defendants are seeking payment for these services, United is entitled to a declaration that neither United, nor United Member 21's plan, has any obligation to pay for any of the services provided to United Member 21.

178.   Finally, United discovered the Counterclaim Defendants' fraudulent assurance to United Member 21 of coverage for the Lap Band only as a result of information provided by this member on March 25, 2015.

### 8.     United Member 22

179.   During the times relevant hereto, United Member 22 was covered by an employer-sponsored health benefit plan for which United administers claims. This plan covers "[s]urgical treatment of obesity" only under certain conditions, including that the "bariatric surgical procedure must be performed at a Bariatric Center of Excellence."  United Member 22's benefit plan does not cover "[h]ealth services for which [the patient has] no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Plan." The benefit plan also does not cover "[a]ny charge for services, supplies or equipment advertised by the provider as free."  And, if United "overpays a health care provider, [the Plan] reserves the right to recover the excess amount, by legal action if necessary."

180.   Shortly before ████████, 2012, United Member 22 contacted 1-800-GET-THIN to inquire about Lap Band surgery.  She was directed to attend an initial meeting where she was told that she, and her insurance, would not have to pay anything for pre-Lap Band testing.  In fact, United Member 22's patient coordinator told her that she would not be billed for anything, even if she decided not to have Lap Band surgery.  Given the limitation in her health plan for coverage for bariatric surgery only at a designated a Bariatric Center of Excellence, the statements made to her, by or on behalf of Omidi Network physician Dr. Stephanie Roberts and Omidi Network entities, including IMS, Ciro Surgery Center, ALJO Medical, and HOLI Medical, were false, and given the practice of Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), these

statements were made with knowledge of their falsity or made in reckless disregard for their truth or falsity.

181.   Had United Member 22 known from the outset that her health plan did not cover out-of-network Lap Band surgery, she would not have proceeded to receive services from Dr. Stephanie Roberts, IMS, Ciro Surgery Center, ALJO Medical, or HOLI Medical.  But, in reliance on the false statement to her about doing tests to secure coverage for an out-of-network Lap Band and the promise that she would not have to pay anything out of pocket, she consented to undergo a sleep study on ████████, 2012, a upper GI (EGD) on ████████, 2012, a second sleep study on ████████, 2012, and an outpatient visit on ████████, 2012.

182.   Given that her plan does not cover treatment of obesity, approval for the Lap Band was never secured.  But, in the meantime, Dr. Stephanie Roberts, IMS, Ciro Surgery Center, ALJO Medical, and HOLI Medical had performed procedures and provided services under false pretenses, for which they were attempting to secure payment from United, on behalf of the plan.

183.   Specifically, Omidi Network providers, including Dr. Stephanie Roberts, IMS, Ciro Surgery Center, ALJO Medical, and HOLI Medical, likely with the assistance of the Billing Entities, submitted claim forms for services provided to United Member 22 in ████████ and ████████ 2012, with amounts for "Charges" or "Total Charge(s)" for the services rendered that included the Member Responsibility Amounts, even though they or their agents had told United Member 22 that she would not have to pay anything out of pocket.  These claim forms, received as reflected on Appendix I, were false and misleading.   United processed these claims, seeking additional information, relying on the truthfulness of these claim forms.

184.   United owes nothing for the services provided to United Member 22, because they were performed under the false pretense of doing tests to secure out-of-network coverage for Lap Band surgery, and performed and fraudulently billed

with Member Responsibility Amounts having been waived, thereby negating coverage.  Because United has paid nothing for the services provided to United Member 22, but the Counterclaim Defendants are seeking payment for these services, United is entitled to a declaration that neither United, nor United Member 22's plan, has any obligation to pay for any of the services provided to United Member 22.

185.   Finally, United discovered the Counterclaim Defendants' fraudulent statements to United Member 22 with respect to insurance coverage only as a result of information provided by this member on March 11, 2015.

186.   United is informed and believes that additional individuals were similarly deceived.  For example, as reflected on Appendix I, the Counterclaim Defendants provided services to 8 other individuals who were covered by a plan sponsored by the same employer as the sponsor of United Member 22's plan.  According to the claim forms submitted to United, none of these other 8 individuals received a Lap Band from the Counterclaim Defendants.  United is informed and believes that many or all of these individuals had coverage similar to United Member 22, and that many, most, or all of these patients were similarly deceived by the Counterclaim Defendants into believing that they had coverage for a Lap Band surgery and related services.

### 9.   United Member 23

187.   During the times relevant hereto, United Member 23 was covered by an employer-sponsored health benefit plan for which United administers claims.  This plan does not cover, among other things, "the following treatments for obesity: - non-surgical treatment, even if for morbid obesity; and - surgical treatment of obesity even if there is a diagnosis of morbid obesity."  This plan also does not cover "charges incurred for any surgical procedure aimed at alleviating obesity, including morbid obesity. These specific procedures include: a) gastric bypass; b)

roux-en-Y; c) duodenal switch; [and] d) laparoscopic lap band . . . ."  This plan also does not cover "expenses for health services and supplies . . . for which you have no legal responsibility to pay . . . [or] for which a non-Network provider waives the Annual Deductible or Coinsurance amounts."

188.  Shortly before ████████, 2010, United Member 23 called 1-800-GET-THIN to schedule an initial consultation because she wanted Lap Band surgery.  At her initial appointment, an Omidi Network representative, believed to be a patient coordinator, told United Member 23 that she had good insurance that would cover everything, including the Lap Band, and that she would not have to pay any out-of-pocket expenses for care that she received.  Given that her health plan does not cover surgical and non-surgical treatment of obesity, the coverage statements made to her by or on behalf of Omidi Network providers, including Dr. Alpert, Dr. Madan, Dr. Shin, Dr. Pejman Samouha, Valley Surgical Center, Modern Institute, West Hills Anesthesia, LLC, West Hills Laboratory, LLC, West Hills Ultrasound, LLC, and West Hills Gastroenterology, were false, and given the practice of Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), these statements were made with knowledge of their falsity or made with reckless disregard for their truth or falsity.  Consistent with the practice of the Counterclaim Defendants, the Omidi Network representative who checked her insurance also learned, among other things, that she had more than $████ remaining on her 2010 out-of-network deductible.

189.  Had United Member 23 known from the outset that her health plan did not cover Lap Band surgery, she would not have proceeded to receive services.  But, in reliance on the false statement to her regarding her coverage for the Lap Band, the promise that she would not have to pay anything out of pocket, and the representation that the services were necessary to secure a Lap Band, United Member 23 consented to undergo an upper GI (EGD) and abdominal examination on ████████, 2010, a colonoscopy on ████████, 2010, a sleep study on ████████,

-61-

2010, and a laparoscopic cholecystectomy on ████████, 2010. Following the laparoscopic cholecystectomy, United Member 23 sought a second opinion regarding the treatment regimen prescribed by Dr. Alpert, Dr. Madan, Dr. Shin, and Dr. Pejman Samouha, as well as Counterclaim Defendants Valley Surgical Center, Modern Institute, and Beverly Hills Surgery Center, at which point she was told to stop the process.

190. Given that her health plan did not cover treatment of obesity, approval for the Lap Band was never secured. But, in the meantime, Omidi Network providers, including Dr. Alpert, Dr. Madan, Dr. Shin, Dr. Pejman Samouha, Valley Surgical Center, Modern Institute, and Beverly Hills Surgery Center had performed procedures and provided services under false pretenses, for which they were attempting to secure payment from United, on behalf of the plan. These providers could have, but did not, seek and require payment of her more than $████ outstanding deductible, before providing services to United Member 23 in ████ 2010, or seek payment of such deductible from United Member 23 before later billing United for these services.

191. Specifically, Dr. Alpert, Dr. Madan, Dr. Shin, and Dr. Pejman Samouha, as well as Counterclaim Defendants Valley Surgical Center, Modern Institute, and Beverly Hills Surgery Center, and other related Omidi Network providers, likely with the assistance of the Billing Entities, submitted claim forms to United with amounts for "Charges" or "Total Charge(s)" for the services rendered that included the Member Responsibility Amounts, even though they or their agents had told United Member 23 that she would not have to pay anything out of pocket. These claim forms, received as reflected on Appendix I beginning in ████ and ████ 2010, and the amounts set forth therein for "Charges" or "Total Charges," were false and misleading.

192. United relied on the truthfulness of the claim forms and paid, on the dates indicated on Appendix I, more than $████ to the Counterclaim Defendants

for services provided to United Member 23, also informing them that she owed a $▮▮ deductible and an additional nearly $▮▮ in Member Responsibility Amounts.  Having waived Member Responsibility Amounts, the Billing Entities and the Counterclaim Defendants did not timely seek to collect, and have not received, the more than $▮▮ deductible and an additional nearly $▮▮ in Member Responsibility Amounts.

193.   United should have paid nothing for the services provided to United Member 23, because they were performed under the false pretense of insurance coverage for the Lap Band, and performed and fraudulently billed with Member Responsibility Amounts having been waived, thereby negating coverage.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the plan, the more than $▮▮, plus interest and attorneys' fees, paid to the Counterclaim Defendants for services provided to United Member 23.  In addition, United is entitled to a declaration that neither United, nor United Member 23's plan, has any obligation to pay for any of the services provided to United Member 23.

194.   Finally, United discovered the Counterclaim Defendants' fraudulent assurance to United Member 23 of coverage for the Lap Band only as a result of information provided by this member on March 21, 2015.

### 10.   United Member 24

195.   During the times relevant hereto, United Member 24 was covered by an employer-sponsored health benefit plan for which United administers claims. United Member 24's benefit plan does not cover "surgical treatment of obesity including severe morbid obesity," as well as "[h]ealth services for which [the patient has] no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Plan."  Furthermore, "[i]n the event that a non-Network provider waives Copayments and/or the Annual

Deductible for a particular health service, no Benefits are provided for the health service for which the Copayments and/or Annual Deductible are waived."

196.   After seeing a TV advertisement, United Member 24 called 1-800-GET-THIN to schedule an initial consultation at Bakersfield Surgery Institute because she was interested in having Lap Band surgery.  At this first appointment, in ▬▬▬ 2009, an Omidi Network representative believed to be a patient coordinator took her insurance information, and told her that United would pay for her treatment, including a Lap Band.  But, given that her health plan did not cover for surgical and non-surgical treatment of obesity, the coverage statements made to her by or on behalf of Omidi Network providers, including Dr. Karapetyan, Dr. Mednik, Beverly Hills Surgery Center, and Skin Cancer Surgery Specialists of Beverly Hills, were false, and given the practice of the Counterclaim Defendants to determine insurance coverage prior to providing services (*see* Exhibit G), these statements were made with either knowledge of their falsity, or made in reckless disregard for their truth or falsity.   Consistent with the practice of the Counterclaim Defendants, the Omidi Network representative who checked her insurance also learned, among other things, that she had more than $▬▬ remaining on her 2009 out-of-network deductible.

197.   United Member 24 was called on ▬▬▬▬, 2009 by a doctor at Beverly Hills Surgery Center and told that they had an opening that day and she needed to come down for a series of pre-Lap Band tests.  In reliance on the false statement to her regarding her coverage for the Lap Band and the representation that the services were necessary to secure a Lap Band, United Member 24 consented to undergo an EGD, ultrasound, and various lab tests on ▬▬▬▬, 2009.  Had she known from the outset that her health plan did not cover Lap Band surgery, she would not have proceeded to receive services from Omidi Network providers and Counterclaim Defendants.

198.   United Member 24 was scheduled for her Lap Band in ████ 2010, but before that procedure, a patient coordinator called United Member 24 to tell her that the Lap Band surgery was not covered, and that she would have to pay for the tests already done.  She would not agree to pay, and attempted to arrange for a cash Lap Band of $████, but decided not to proceed after the provider declined to put this arrangement in writing, and after doing research on the providers.

199.   Given that her plan did not cover treatment of obesity, approval for the Lap Band was never secured.  But, in the meantime, Omidi Network providers, including Dr. Karapetyan, Dr. Mednik, Beverly Hills Surgery Center, and Skin Cancer Surgery Specialists of Beverly Hills had performed procedures and provided services on ████████, 2009 under false pretenses, for which they were attempting to secure payment from United, on behalf of the plan.  These providers could have, but did not, seek and require payment of her $████ outstanding deductible, before providing services to United Member 24.

200.   United received in ████, ████, and ████ 2010, as indicated on Appendix I, claim forms from Dr. Karapetyan, Dr. Mednik Beverly Hills Surgery Center, and Skin Cancer Surgery Specialists of Beverly Hills, for the pre-Lap Band services provided to United Member 24 on the false pretense that she had insurance coverage for the Lap Band.  United paid, from ████ to ████, 2010, as reflected on Appendix I, more than $████ to these providers for the services provided to United Member 24 on ████████, 2009, while also informing them that United Member 24 had a $████ deductible and more than $████ remaining in Member Responsibility Amounts.

201.   United's payments in ████ 2010 included $████ to Beverly Hills Surgery Center for the EGD facility fee.  As reflected on Appendix I, Beverly Hills Surgery Center later billed United a second $████ for an EGD purportedly, but not actually, performed on United Member 24 on ████████, 2009; less than two months before the actual EGD.  Beverly Hills Surgery Center submitted this claim

knowing it was false.  Relying on the truthfulness of this claim form, United paid Beverly Hills Surgery Center an additional $███ for the ███████, 2009, EGD that was not performed.

202.   United should have paid nothing for the services provided to United Member 24, because they were performed under the false pretense of insurance coverage for the Lap Band, and because no services were provided to United Member 24 on ██████, 2009.  Thus, the Counterclaim Defendants are liable to reimburse United, on behalf of the plan, the more than $████, plus interest and attorneys' fees, paid to the Counterclaim Defendants for services provided to United Member 24 on ██████, 2009 and not provided on ████████, 2009.  In addition, United is entitled to a declaration that neither United, nor United Member 24's plan, has any obligation to pay for any of the services provided to United Member 24.

203.   Finally, United discovered the Counterclaim Defendants' fraudulent assurance to United Member 24 of coverage for the Lap Band, and billing for services not performed on ███████, 2009, only as a result of information provided by this member on March 21, 2015.

204.   United is informed and believes that additional individuals were similarly deceived.  For example, as reflected on Appendix I, the Counterclaim Defendants provided services to 5 other individuals who were covered by a plan sponsored by the same employer as the sponsor of United Member 24's plan.  According to the claim forms submitted to United, none of these other 5 individuals received a Lap Band from the Counterclaim Defendants.  United is informed and believes that many or all of these individuals had coverage similar to United Member 24, and that many, most, or all of these patients were similarly deceived by the Counterclaim Defendants into believing that they had coverage for a Lap Band surgery and related services.