**BRYAN WESTERFELD (S.B. # 218253)**
bwesterfeld@calemployerlaw.com
**NICOLE E. WURSHER (S.B # 245879)**
nwurscher@calemployerlaw.com
**WALRAVEN & WESTERFELD LLP**
101 Enterprise, Suite 350
Aliso Viejo, CA 92656
Telephone:   (949) 215-1997
Facsimile:    (949) 215-1999

**R.J. ZAYED (MN ID #0309849)**
zayed.rj@dorsey.com
**TIMOTHY BRANSON (MN ID #174713)**
branson.tim@dorsey.com
**ANDREW HOLLY (MN ID #308353)**
holly.andrew@dorsey.com
*Admitted pro hac vice*
**DORSEY & WHITNEY LLP**
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:   (612) 340-2600
Facsimile:    (612) 340-2868

Attorneys for Defendant UnitedHealth Group Incorporated;
and Defendants/Counterclaim Plaintiffs
United Healthcare Services, Inc., UnitedHealthcare
Insurance Company; OptumInsight, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALMONT AMBULATORY SURGERY CENTER, LLC; *et al.* | Case No 2:14-cv-03053-MWF(VBKx) |
| Plaintiffs**,** | **COUNTERCLAIM PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROVIDERS' MOTION TO DISMISS THE SECOND AMENDED COUNTERCLAIM** |
| v. | |
| UNITEDHEALTH GROUP, INCORPORATED; *et al.*, | |
| Defendants**.** | |
| _____ | |
| UNITED HEALTHCARE SERVICES, INC.; *et al.*, | **DATE: Sept. 9, 2015** |
| Counterclaim Plaintiffs, | **TIME: 3:00 pm** |
| v. | **DEPT.: Courtroom 16** |
| ALMONT AMBULATORY SURGERY CENTER, LLC; *et al.* | (Superior Court of the State of California, County of Los Angeles, Central District Case Number: BC540056) |
| Counterclaim Defendants. | Complaint filed:  March 21, 2014 |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 1

I.    United Sufficiently Alleges Fraud Under Rule 9(b) ..................................... 1

    A.    The Providers Concede that United Properly Alleges Multiple Acts of Fraud (Counts I-V) ............................................................... 1

    B.    The SACC Properly Pleads that the Providers Engaged in a Fraudulent Scheme to Waive Member Responsibility Amounts ......... 4

        1.    Waiving Member Responsibility Amounts Constitutes Fraud ......................................................................................... 4

        2.    Appendix I Provides Sufficient Detail Under Rule 9(b) ........... 7

    C.    United Adequately Alleges Fraud Based Upon Misrepresentations Made to United Members ................................... 10

    D.    United Properly Alleges Fraud Against All of the Counterclaim Defendants .......................................................................................... 11

II.    The Providers Do Not Dispute That United Has Raised A Conspiracy Claim ........................................................................................................... 12

III.    United Has Standing To Raise Claims To Recover Fraudulent Payments Made To The Providers ............................................................. 12

    A.    Plaintiffs Do Not Dispute that United Has Standing to Raise ERISA Claims on Behalf of the ERISA Plans ................................. 12

    B.    United Has Standing to Raise State Law Claims to Recover Overpayments it Caused to be Made to the Providers ...................... 12

    C.    United Has Standing to Raise Claims Under California's UCL ........ 15

    D.    United Has Standing To Raise A Tortious Interference with Contract Claim (Count IV) ............................................................... 16

IV.    United's State Law Claims Are Not Preempted ........................................ 166

V.    United Raises Claims For Relief Under ERISA § 502(a)(3) ....................... 19

    A.    United Properly States an ERISA § 502(a)(3) Claim ....................... 19

        1.    United States a Claim for an Equitable Lien by Agreement ................................................................................ 20

        2.    United States a Claim for Restitution ..................................... 21

    B.    United Sufficiently Alleges Recoupment and "Coverage Negating" Terms are Found in Plan Documents, Not SPDs ............. 23

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE PROVIDERS' MOTION TO DISMISS

C.    Count VII Properly Seeks Declaratory and Injunctive Relief ............ 25

CONCLUSION ......................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aetna Health v. Davila*,
   542 U.S. 200 (2004) ........................................................................................ 18

*Glanton ex. rel ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
   465 F.3d 1123 (9th Cir. 2006) ...................................................................... 13

*Almont Ambulatory, et al. v. UnitedHealth Group, Inc., et al.*,
   No. 14-cv-2139 ......................................................................................... 8, 24

*Appollinari v. Johnson*,
   305 N.W.2d 565 (Mich. Ct. App. 1981) ...................................................... 11

*Arapahoe Surg. Ctr., LLC v. Cigna Healthcare, Inc.*,
   2015 WL 1041515 (D. Colo. Mar. 6, 2015) ................................................ 18

*Ariz. State Carpenters Pension Tr. Fund v. Citibank (Ariz.)*,
   125 F.3d 715 (9th Cir. 1997) ....................................................................... 17

*Armstrong v. Kubo & Co.*,
   88 Cal. App. 331 (1928) .............................................................................. 14

*Ass'n of N.J. Chiropractors v. Aetna, Inc.*,
   2012 WL 1638166 (D.N.J. May 8, 2012) .................................................... 17

*Assocs. Disc. Corp v. Gillneau*,
   322 Mass. 490 (1948) .................................................................................. 14

*Bd. of Trs. of the Nat'l Elevator Indus. Health Plan v. Montanile*,
   593 F. App'x 903 (11th Cir. 2014) .............................................................. 24

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014) ..................................................................... 11

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ..................................................................... 3, 4

*Bilyeu v. Morgan Stanley Long Term Disability Plan*,
   683 F. 3d 1083 (9th Cir. 2012) .......................................................... 20, 21, 22

*Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Group*,
   187 F.3d 1045 (9th Cir. 1999) ............................................................................. 19

*Butero v. Royal Maccabees Life Ins. Co.*,
   174 F.3d 1207 (11th Cir.1999) ........................................................................... 17

*Conn. Gen'l Life Ins. Co. v. Advanced Surgery Ctr. of Bethesda, LLC*,
   2015 WL 4394408 (D. Md. July 15, 2015) .......................................................... 5

*Conn. Gen'l Life Ins. Co. v. Roseland Ambulatory Ctr., LLC*,
   2013 WL 5354216 (D.N.J. Sept. 24, 2013) .................................................. 4, 24

*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1997) ..................................................................... 3, 4, 8

*Dep't of Indus. Relations v. UI Video Stores*,
   55 Cal. App. 4th 1084 (1997) ............................................................................ 14

*Dist. Council 16 N. Cal. Health & Welfare Tr. Fund v. Sutter Health*,
   2015 WL 2398543 (N.D. Cal. May 19, 2015) .................................................... 18

*Feiler v. N.J. Dental Ass'n*,
   467 A.2d 276 (N.J. Super. Ct. Ch. Div. 1983) .................................................... 4

*Fla. Specialty Inc. v. H 2 Ology, Inc.*,
   742 So. 2d 523 (Fla. Dist. Ct. App. 1999) ........................................................ 14

*Fremont Indem. Co. v. Fremont Gen. Corp.*,
   148 Cal. App. 4th 97 (2007) .............................................................................. 14

*Fustok v. UnitedHealth Grp., Inc.*,
   2013 WL 2189874 (S.D. Tex. May 20, 2013) ..................................................... 3

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ............................................................................. 21, 22, 23

*United States ex rel. Guardiola v. Renown Health*,
   2014 WL 4162201 (D. Nev. Aug. 20, 2014) ....................................................... 7

*I.L.W.U. Welfare Plan v. South Gate*,
   2012 WL 4364567 (N.D. Cal. Sept. 24, 2012) .................................................. 23

*Jenkins v. Grant Thornton LLP*,
   2015 WL 349275 (S.D. Fla. Jan. 23, 2015) ...................................................... 24

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE PROVIDERS' MOTION TO DISMISS

*Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. College of Wis., Inc.*,
  657 F.3d 496 (7th Cir. 2011) ................................................................. 17

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011)........................................................................... 15

*Lake City Auto Fin. Co v. Waldron*,
  83 So. 2d 877 (Fla. 1955) ..................................................................... 14

*Langlois v. Metro. Life. Ins. Co.*,
  833 F. Supp. 2d 1182 (N.D. Cal. 2011) ............................................... 24

*Aetna Life Ins. Co. ex rel. Lehman Bros. Holdings, Inc. v. Kohler*,
  2011 WL 5321005 (N.D. Cal. Nov. 2, 2011)....................................... 23

*Lopardo v. Lehman Bros., Inc.*,
  548 F. Supp. 2d 450 (N.D. Ohio 2008) ............................................... 11

*Mairena v. Enter. Rent-A-Car Hosp. Ins. Plan*,
  2010 WL 3931098 (N.D. Cal. Oct. 6, 2010)....................................... 23

*Mid Atl. Med. Servs. v. Do*,
  294 F. Supp. 2d 695 (D. Md. 2003) ..................................................... 19

*N. Cal. Gen. Teamsters Sec. Fund v. Fresno French Bread Bakery, Inc.*,
  2012 WL 3062174 (E.D. Cal. July 25, 2012) ..................................... 17

*Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.*,
  2014 WL 1028351 (E.D. Cal. Mar. 14, 2014) ....................... 3, 4, 13, 15

*Nuveen v. Bd. of Public Instruction of Gadsden Cnty, Fla.*,
  88 F.2d 175 (5th Cir. 1937) ................................................................. 23

*Parks v. Zions First Nat'l Bank*,
  673 P.2d 590 (Utah 1983) .................................................................... 23

*Priority Finishing Corp. v. LAL Constr. Co.*,
  667 N.E. 2d 290 (1996) ........................................................................ 14

*Rashiel Salem Enters. LLC v. Bunton*,
  2013 WL 3581723 (D. Ariz. July 12, 2013) ........................................ 21

*Rhea v. Alan Ritchey, Inc.*,
  2015 WL 1456210 (E.D. Tex. Mar. 30, 2015) ..................................................... 24

*Scharff v. Raytheon Co. Short Term Disability Plan*,
  581 F. 3d 899 (9th Cir. 2009) .............................................................................. 24

*Sereboff v. Mid Atl. Med. Servs., Inc.*,
  547 U.S. 356 (2006) ................................................................................ 20, 21, 23

*Silvaco Data Sys. v. Intel Corp.*,
  184 Cal. App. 4th 210 (2010) ............................................................................. 15

*Spates v. Dameron Hosp. Ass'n*,
  114 Cal. App. 4th 208 (2003) ............................................................................. 14

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*
  554 U.S. 269 (2008) ............................................................................... 12, 13, 14

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ............................................................................ 11

*Swain v. CACH, LLC*,
  699 F. Supp. 2d 1117 (N.D. Cal. 2009) .............................................................. 15

*Transitional Hosp. Corp. v. Blue Cross & Blue Shield of Tex. Inc.*,
  164 F.3d 952 (5th Cir. 1999) .............................................................................. 17

*Trs. of the AFTRA Health Fund v. Biondi*,
  303 F.3d 765 (7th Cir. 2002) .............................................................................. 17

*United HealthCare Services, Inc. v. Sanctuary Surgical Ctr., Inc.*,
  5 F. Supp. 3d 1350, 1363 (S.D. Fla. 2014) .................................................. 17, 18

*United States v. Summit Healthcare Ass'n, Inc.*,
  2011 WL 814898 (D. Ariz. Mar. 3, 2011) ............................................................ 3

*Wool v. Tandem Comps., Inc.*,
  818 F.2d 1433 (9th Cir. 1987) (*overruled on other grounds*) .......................... 3, 4

*Zaslow v. Kroenert*,
  29 Cal. 2d 541 (1946) ......................................................................................... 11

**Statutes**

Cal. Civ. Code § 3336 .............................................................................................. 19

ERISA § 502(a) ............................................................................................. 18

ERISA § 502(a)(1)(B) ............................................................................ 14, 15

ERISA § 502(a)(3).................................................................................*passim*

**Other Authorities**

AMA Med. Ethics, *Opinion 6.12 – Forgiveness or Waiver of
    Insurance Copayments* (June 1993) ........................................................ 4

C.D. Cal. Local Rule 5.2-1 ......................................................................... 8

ERISA Prac. & Litig. §12:38 (2014)........................................................ 24

Fed. R. Civ. P. 9(b) ..............................................................................*passim*

Fed. R. Civ. P. 12 ..........................................................................21, 23, 24

Fed. R. Civ. P. 17(a)(1)(B) ....................................................................... 13

Fed. R. Civ. P. 17(a)(1)(E) ....................................................................... 13

Fed. R. Civ. P. 56........................................................................................ 2

https://www.medicare.gov/your-medicare-costs/costs-at-a-
    glance/costs-at-glance.html#collapse-4809........................................ 6

Restatement (3d) of Restitution §§ 58 ..................................................... 22

Restatement (3d) of Restitution § 59............................................... 22, 23

Restatement of Trusts § 107 (3d) ............................................................ 11

*Special Fraud Alert*, 59 Fed. Reg. 65,372, 65,374 (Dec. 19, 1994)................. 4, 6

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE PROVIDERS' MOTION TO DISMISS

## INTRODUCTION

The Second Amended Counterclaim ("SACC") alleges that the Counterclaim Defendants (the "Providers") engaged in a pervasive and systemic conspiracy to defraud both United and hundreds of the group health plans it administers.  The SACC alleges that the Providers induced 2,000 patients into receiving services from them by promising to waive co-pays, co-insurance, deductibles, and other amounts due under the terms of participants' plans ("Member Responsibility Amounts"). This resulted in patients obtaining services that they otherwise would not have sought, with United paying the bill.  In many cases, the Providers told patients— falsely—that their health plans covered Lap Bands, knowing that their plans provided no such coverage.  Then, after the patients endured preparatory tests, for which the Providers billed United millions, the Providers finally informed their patients that they did not have coverage for Lap Band surgery.  United has cited 40 specific instances in which these, and other misrepresentations, manipulations, and deceptions have occurred, and has made clear that this is just the tip of the iceberg.

United should be allowed to raise claims to rectify this fraud.  The Providers' motion to dismiss acknowledges that United pleads fraudulent conduct under Rule 9(b) for 40 individuals—allegations which under Ninth Circuit law are sufficient to allow United to prosecute its entire claim.  Even further, Appendix I alleges fraudulent conduct with respect to 2,000 other patients.  The Providers' remaining arguments merely rehash arguments that the Court has already (properly) rejected. Their motion to dismiss should be denied.

## ARGUMENT

### I.    United Sufficiently Alleges Fraud Under Rule 9(b)

#### A.    The Providers Concede that United Properly Alleges Multiple Acts of Fraud (Counts I-V)

The Providers' brief begins with an explicit concession that United has complied with Fed. R. Civ. P. 9(b) with respect to the 40 individual patient

examples found in SACC ¶¶ 105-384.  *See* Providers' Mot. at 2 (acknowledging that they are left to disprove United's allegations "during discovery and trial").[1]

Through these examples, United alleges numerous, specific instances in which the Providers used a variety of fraudulent schemes to obtain payments from United.  Foremost, the SACC alleges that the Providers routinely induced members into receiving services by promising that their patients would have no out-of-pocket costs and that they would accept as full payment whatever insurance was willing to pay.  The Providers then fraudulently billed United for these services.  SACC ¶¶ 316-17.  For example, with United Member 2, the Providers submitted claims to United for more than $121,408 that did not reflect the waiver of more than $9,500 in Member Responsibility Amounts.  *Id.* ¶¶ 330-33.  Other patients, such as United Member 8, were lied to about their eligibility for benefits, only to later learn (after going through expensive and harmful treatments) that they were *never* eligible for weight-reduction procedures.[2]  *Id.* ¶¶ 111-28.  Similarly, United Member 17 was told that insurance coverage was a "slam dunk," even though the plan excluded coverage for weight-loss treatments.  *Id.* ¶ 138.  In other cases, when a patient's plan did not cover Lap Band surgery, the Providers performed Lap Band surgery but billed it as a hiatal hernia repair, concealing the Lap Band surgery on the claim forms and inflating the charges for a hiatal hernia surgery.  *Id.* ¶ 223.  And, in yet

---

[1] Although the title of the Providers' motion indicates it is "alternatively" for summary judgment, their supporting memorandum includes no reference to Rule 56.  Nor have the Providers included any evidence to support such a motion (apart from attorney declarations that do not purport to be authentic).  In any event, as discussed *infra*, this evidence does not provide a basis for summary judgment.

[2] United alleges that United Member 8 did not pay the more than $5,700 in Member Responsibility Amounts that were incurred under the terms of the plan.  Any dispute about this, including those that may arise from her pleadings, is a fact issue to be resolved at trial.  Moreover, as United Member 8 further alleges in her November 2012 lawsuit, she would never have consented to receive services from the Providers had they not told her that she was covered for Lap Band surgery, when they had actual knowledge that she had no such coverage.  SACC ¶ 126.

another scheme, the Providers inflated the Body Mass Index of prospective patients in order to justify performing Lap Band surgery. *Id.* ¶¶ 294-306.

Given the Providers' concession that those 40 examples comply with Rule 9(b), the SACC clearly states a claim with respect to Counts I-V. The Providers do not argue otherwise. Rather, they seek a preemptive ruling that Counts I-V should be limited to those 40 examples, but Rule 9(b) does not require that United include every example of a fraudulent claim. Rather, courts, including the Ninth Circuit, recognize that a party pleading an extensive scheme to defraud need not "allege all facts supporting every instance when the defendant engaged in fraud." *Fustok v. UnitedHealth Grp., Inc.*, 2013 WL 2189874, at *5 (S.D. Tex. May 20, 2013) (internal citation omitted); *Wool v. Tandem Comps., Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (*overruled on other grounds*). Thus, in cases involving an ongoing conspiracy to commit fraud occurring over multiple transactions over a period of years, Rule 9(b) does not require a complete recitation of *every* alleged fraudulent transaction. *See Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).[3] Rule 9(b) is not designed to "carry more weight than it was meant to bear." *Id.*

Here (even apart from Appendix I), United indisputably alleges under 9(b) that it was defrauded with respect to the 40 example patients. The SACC also includes well-pled allegations that these fraudulent practices applied to hundreds or thousands of other patients, who were promised Member Responsibility waivers (SACC ¶¶ 92-101; App'x I); or who were lied to about their coverage (*id.* ¶¶ 128; 154; 186; 204; 221). These allegations are sufficient to allow the SACC to survive the Providers' motion to dismiss as to the *entire* alleged fraudulent scheme.

---

[3] *See also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008); *Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.*, 2014 WL 1028351, at *4 (E.D. Cal. Mar. 14, 2014); *United States v. Summit Healthcare Ass'n, Inc.*, 2011 WL 814898, at *5 (D. Ariz. Mar. 3, 2011).

Finally, United did not cite the Ninth Circuit's decisions in *Cooper*, *Berson* and *Wool* in the earlier briefing on the sufficiency of United's original Counterclaim, because the Providers made only scant mention of Rule 9(b). *See* Omidi MTD FACC, [Dkt. No. 46] at 16-17; Provider MTD FACC, [Dkt. No. 48] at 15 n.7. With the benefit of these and similar cases, United believes the Court should allow United's fraud claim to proceed in its entirety.

## B. The SACC Properly Pleads that the Providers Engaged in a Fraudulent Scheme to Waive Member Responsibility Amounts

Even apart from these 40 examples, United has alleged under Counts I-V that the Providers engaged in a scheme to induce nearly 2,000 patients to receive medical services from them by waiving Member Responsibility Amounts. *See id.* App'x I. These allegations satisfy all the elements of common law fraud (as the Court has already concluded), and also comply with Rule 9(b).

### 1. Waiving Member Responsibility Amounts Constitutes Fraud

This Court previously and correctly found that United had properly alleged that the Providers' repeated waiver of Member Responsibly Amounts stated a claim for fraud. Provider FACC Order, [Dkt. No. 145] at 26-29. Through this practice, the Providers both undermined the plan's cost-control mechanisms, and also submitted a fraudulent claim that inflated the amount charged when it failed to reflect the amount waived. *Id.* Nearly every court to consider this issue, the Federal Government, and the American Medical Association agree,[4] as do decisions

---

[4] *Nutrishare, Inc.*, 2014 WL 1028351, at *1; *Conn. Gen'l Life Ins. Co. v. Roseland Ambulatory Ctr., LLC*, 2013 WL 5354216, at *5 (D.N.J. Sept. 24, 2013); *Feiler v. N.J. Dental Ass'n*, 467 A.2d 276, 281-83 (N.J. Super. Ct. Ch. Div. 1983); Dep't of Health and Human Servs. *Special Fraud Alert*, 59 Fed. Reg. 65,372, 65,374 (Dec. 19, 1994); AMA Code of Med. Ethics, *Opinion 6.12 – Forgiveness or Waiver of Insurance Copayments* (June 1993). Furthermore, and as this has Court recognized, the 35 year-old California Attorney General Opinion cited by the Providers does not have any relevance to United's allegations. Provider FACC Order at 27 (distinguishing "usual fee" as analyzed in the Attorney General's opinion from "total charges" as alleged by United); *accord Nutrishare*, 2014 WL 1028351, at *8.

1    issued since the prior Order.  *Conn. Gen'l Life Ins. Co. v. Advanced Surgery Ctr. of*
2    *Bethesda, LLC*, 2015 WL 4394408, at *21 (D. Md. July 15, 2015).

3         The Providers' various attempts to avoid this result fail.  *First*, there can be
4    no dispute that United has alleged it relied upon these misrepresentations.  As this
5    Court already found, the misleading charges included on claim forms are alleged to
6    have "resulted in payments that would not otherwise have been made," Provider
7    FACC Order at 29, and that California law provides that "whether reliance was
8    reasonable is a question of fact," *id.* at 30.  This is sufficient to allege reliance.

9         *Second*, as this Court also previously found, United has sufficiently alleged
10   that the submissions were *knowingly* fraudulent.  Allegations of an individual's
11   knowledge need not comply with Rule 9(b), and here, United has alleged that the
12   Providers knowingly and deliberately submitted a false claim when they failed to
13   account for Member Responsibility waivers.  *See* SACC ¶¶ 4, 97, 452.  The
14   Providers knew that the submitted claim form overstated each member's "total
15   charges" even if they did not know by how much the claim was overstated.  *Id.  See*
16   *also* Provider FACC Order at 29.  Moreover, United alleges that the Providers *did*
17   have complete knowledge of their patients' out-of-network deductibles and out-of-
18   pocket maximums, as well as whether those amounts had been satisfied, *prior* to
19   providing treatment.  SACC Ex. G; *see also id.* ¶¶ 73 (It was common knowledge
20   within the industry that co-pay waivers constitute fraud); 101 (the Omidis trained
21   staff members to verify the scope of each patients' insurance coverage.); 113, 130,
22   138, 147, 156, 164, 172, 180, 188, 196, 206, 214, 233, and 379.

23        The Providers cannot overcome these allegations by arguing that they could
24   not know the amount of the deductible or co-pay at the time of billing because even
25   after they learned the amount of the patient's outstanding deductible and co-
26   payment, the patient could possibly have exhausted those amounts in connection
27   with services from an unrelated out-of-network podiatrist that would be billed and
28   paid before the Providers submitted their bills.  As an initial matter, as to

deductibles, the Providers' argument is both wrong and contrary to allegations in the SACC that must be accepted as true.  United repeatedly alleges that because the Providers routinely verified with United the amount that the patients had yet to satisfy on their out-of-network deductibles, the Providers could have, but did not, seek and require payment by the patients the deductible amounts either before providing services or, after service, but before billing United for those services. *See, e.g., id.* ¶¶ 147, 149, 188, 190, 196, 199, 233 and 236.  Indeed, pre-service collection of deductibles is far from uncommon with respect to commercial insurance beneficiaries.  Moreover, consistent with the allegations in the SACC, the evidence will show that the Providers had the ability to confirm and did confirm outstanding deductible amounts both before providing services and after providing services, but before billing.  In sum, as set forth in Appendix I, the claims submitted by Providers included waived deductible amounts of more than $1.5 million.

More fundamentally, it does not matter if a provider cannot calculate the co-payment or deductible at the time of billing.  What they cannot do is submit a false claim form with charge amounts that include waived Member Responsibility Amounts.  The inability to calculate a co-payment or deductible at the time of billing is common under Medicare,[5] but nonetheless it is conceded that under Medicare, the claims submissions that include waived deductible and co-pay amounts are fraud.  *See* 59 Fed. Reg. 65,372, 65,374 (Dec. 19, 1994).  Fraud claims based on the same facts and claim forms for commercial insurance beneficiaries have likewise been repeatedly recognized to state a claim. *See supra* n.4.

---

[5] Medicare Part B has an annual deductible and a 20% co-pay (based on Medicare approved amounts, not the amount of charges billed).  *See* https://www.medicare.gov/your-medicare-costs/costs-at-a-glance/costs-at-a-glance.html#collapse-4809.  When two unrelated Medicare providers, say a physician and podiatrist, submit claims for office visits by the same patient, they both submit their charges, without either of them knowing if their claim will be subject to the annual deductible, and without either of them being able to calculate the co-pay, which applies only after the deductible is exhausted.

### 2.    Appendix I Provides Sufficient Detail Under Rule 9(b)

Even apart from the 40 examples, Appendix I to the SACC properly alleges under Rule 9(b) that the Providers waived Member Responsibility Amounts to 2,000 individuals listed therein.  Information the Court previously indicated was lacking from United's prior complaint, namely, the (i) "category . . . of misrepresentations alleged with respect to each claim line"; (ii) "the relevant Counterclaim Defendants implicated in each purported claim line"; and (iii) the date of claim submission for each claim line" is included in the SACC.  Omidi FACC Order, [Dkt. No. 144] at 19.

The SACC alleges far more than that.  It alleges that the "Counterclaim Defendant Surgery Centers waived complete Member Responsibility Amounts for at least 96% of claims submitted," SACC ¶ 95, and that the Providers effectively admitted this was so for at least 200 members.  *Id.* ¶ 96.  The SACC also attaches Appendix I—a spreadsheet that identifies 2,024 members and 29,617 claim lines. Each claim within Appendix I identifies:  member name; provider name and taxpayer identification number; date of service; billed procedure's CPT code; billed amount; amount paid; member's deductible and co-payment obligations; bill received date; paid date; and the status of the health benefit plan as self-funded or fully insured.  In aggregate, Appendix I also identifies the total claimed damages relating to fraudulently submitted bills for 2,000 patients for whom the identified Providers waived Member Responsibility Amounts totaling nearly $6,000,000.  For example, Appendix I indicates that the Providers waived $2,594 in deductibles and $6,245 in co-pays/co-insurance owed by United Member 16.  *See also id.* ¶¶ 131-36.  The allegations in the SACC and Appendix I comply with Rule 9(b).  *See United States ex rel. Guardiola v. Renown Health*, 2014 WL 4162201, at *6, 8 (D. Nev. Aug. 20, 2014) (denying motion to dismiss under Rule 9(b) in part because plaintiff set forth two lists of 647 false claims).

The Providers' challenges to Appendix I are unavailing.  *First*, Appendix I

includes what the Court previously indicated was missing.[6]  Of the three items that the Court indicated United should plead, the Providers contend only that United has failed to identify the type of fraud at issue.  But, the very title of Appendix I indicates that the chart identifies individuals who received a "Waiver of Member Responsibility Amounts," *see* SACC App'x I, and the SACC confirms this, *id.* ¶ 76. Even the Providers' brief recognizes that Appendix I lists "Claims & Recovery Sought for Waiver of Member Responsibly Amounts."  Provider Mot. at 3.

*Second*, the Providers' challenges to the individual line items in Appendix I fail to undermine its accuracy.  These disputes are, individually, without merit (as discussed below), but just as critically the Providers challenge a small number of claims on Appendix I—and thus conflate Rule 9(b)'s pleading requirements with evidentiary issues to be explored during discovery, *Cooper*, 137 F.3d at 627.  It is not surprising that a nearly 30,000-line spreadsheet of claim data will contain a few items that will need to be reconciled to address multiple submissions or otherwise better understood during discovery.[7]

---

[6] Inexplicably, the Providers also complain that United erred by filing a redacted version of Appendix I that omitted HIPAA-protected data.  They cite no authority for their position, perhaps because Local Rule 5.2-1 specifically sanctions United's conduct (providing that "[i]f a redacted version of the document is filed, counsel shall maintain possession of the unredacted document pending further order of the Court . . . .").  In compliance with this rule, on May 1, 2015, United provided the confidential version of Appendix I to the Providers, just one day after it filed the SACC and before the Providers requested it.  *See* Decl. of Eric Chan, [Dkt. No. 168-18] ¶ 9.  It then filed the unredacted version of Appendix I after the Court's order allowed it to.  This is the exact procedure called for under the Local Rules.

[7] Notably, the Providers' parallel Second Amended Complaint avoided all challenges of pleading financial information, simply asserting, for example, for Patient 16 in their Second Amended Complaint, that "United has paid for some of the services provided by Plaintiffs to Patient 16 but has refused to pay for the other services provided to Patient 16."  *Almont Ambulatory, et al. v. UnitedHealth Group, Inc., et al.*, No. 14-cv-2139, [Dkt. No. 1493] Second Am. Compl., App'x A at 21. In contrast, compare the detail Appendix I provides for United Member 16, who is also Patient 16.

*Third,* each of the Providers' individual disputes with Appendix I lack merit. Although the Providers, for example, claim that certain lines in Appendix I have no deductible or co-pay amount, that is not a valid attack on Appendix I. Rather, although some patients' specific services might, for various reasons, not have deductibles, United has alleged that some portion of each of the 2,000 patients' services required Member Responsibly payments. Thus, for United Member 16, for example, 7 of 14 lines have a co-pay or deductible amount, and 7 do not.[8] Even the Providers do not dispute that United has alleged that they waived Member Responsibility Amounts for the 7 lines that include a co-pay. Further, without the Providers' alleged and verified wrongdoing, United Member 16 would not have received any services from the Providers, and none of the amounts paid by United relating to United Member 16 would have been paid. Accordingly, all listed amounts are relevant to United's recovery.

Further, the Providers' assertion that a small number of Appendix I's lines include a negative number is also unavailing. In nearly every instance, the "negative" amount fully offsets a positive amount, with no net impact on the amounts listed.[9] For example, for United Member 16, United lists that it paid $89.24 for a specific claim and then offset ($89.24) for that claim, and likewise paid $69.81 and offset ($69.81) for another claim. Without these offsets, Appendix I would have inflated United's alleged damages, which the Providers would have inevitably disputed.

---

[8] Of the 2,000 patients listed on Appendix I, there are only 172 patients for whom no co-pay or deductible is listed, and for whom United paid about $1,000,000 in aggregate (a small portion of the amount sought). Depending on the results of discovery, claims relating to some of these 172 patients may be withdrawn, whereas others will likely remain at issue.

[9] As a further example, there are 120 negative co-pays for patients on Appendix I whose last name begins with A, and in all 120 instances, those negative co-pays offset a positive co-pay listed for the same claim. Thus, the presence of negative amounts on Appendix I is a non-issue.

1   The Providers also complain about co-payment amounts being as small as

2   $.01, and there sometimes being more than one claim line for a single payment, or

3   duplicate lines for the same service with different paid dates.  The Providers do not

4   explain how any of these things, however rare, bear upon the sufficiency of

5   United's allegations, which is the issue presented on a motion to dismiss.[10]

6   **C.    United Adequately Alleges Fraud Based Upon Misrepresentations Made to United Members**

7   The SACC alleges that the Providers deceived hundreds of patients into

8   believing that they had coverage for Lap Bands, only later to tell them that United

9   had changed its mind once they had undergone costly preparatory medical

10  procedures.  SACC ¶¶ 105-222.  For example, the Providers learned that Member

11  8's plan did not cover Lap Bands.  Nevertheless, the Providers told her (falsely) that

12  she *did* have coverage, and that she would have to go through a series of procedures

13  in preparation for the Lap Band, *id.* ¶ 115—in one such procedure, she developed a

14  perforated esophagus, and was forced to eat through a feeding tube for six weeks,

15  *id.* ¶¶ 118-20.  As alleged in the SACC, after lying in this manner to United

16  Member 8 and other patients, and after performing and billing for services such as

17  EGDs and sleep studies that were supposedly required for the Lap Band surgery, *id.*

18  ¶¶ 118, the Providers obtained payments from United for services that were not

19  covered under patients' health plans and would not have been procured absent these

20  lies; United Member 8 would not have obtained services, *see id.* ¶ 126 (United

21  Member 8 would not have obtained services absent Provider lies); *cf* United Resp.

22  to Omidi Mot. at n.7 (Most of Providers' claims for services to non-Lap Band

23  patients whose plans exclude bariatric coverage); *see also* SACC ¶¶ 6, 87, 474(d).

24  United properly alleges that this practice constituted common law fraud.  It

25  alleges that when the Providers lied to their patients about their insurance coverage,

26

27  ───────────────

28  [10] United notes that there are only 21 claim lines in Appendix I that have a co-pay less than $1.

the Providers then submitted claims that falsely represented that the services were medically necessary to treat conditions unrelated to Lap Band surgery, when in fact, that was the express purpose of such service. *Id.* 106. Further, even as to the misstatements to the patients, section 107 of the Restatement of Trusts (3d) provides that "a trustee may maintain a proceeding against a third party on behalf of the trust and its beneficiaries." Thus, courts hold that a trustee can sue on behalf of their beneficiaries where the wrong committed on the beneficiary resulted in the dissipation of trust assets. *See Lopardo v. Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 458 (N.D. Ohio 2008); *Appollinari v. Johnson,* 305 N.W.2d 565, 567 (Mich. Ct. App. 1981). Here, United has sufficiently alleged that the Providers lied to their patients, and, as a result, United paid for unnecessary services. To the extent that United serves as a fiduciary claims administrator to a plan**,** it has the authority and right to recover for the injury caused by the Providers' lies.

Further, the remaining counts (the UCL: Count II; tortious interference: Count IV; conversion: Count V; and conspiracy: Count III) do not even require reliance. For example, to state a conversion claim, United need only allege that the Providers' wrongful actions allowed them to obtain possession of plan assets they had no right to. *See Zaslow v. Kroenert,* 29 Cal. 2d 541, 549-50 (1946). Reliance is not required, and the Providers do not dispute that their misrepresentations state a conversion claim.[11]

### D.    United Properly Alleges Fraud Against All of the Counterclaim Defendants

United has alleged claims against East Bay Ambulatory Surgery Center, Palmdale Ambulatory Surgery Center, and Woodlake Ambulatory. It alleges that

---

[11] Similarly, the Ninth Circuit recognizes that a party need not allege reliance on a false statement to state a claim under California's UCL. *Berger v. Home Depot USA, Inc.,* 741 F.3d 1061, 1068 (9th Cir. 2014); *Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1020-21 (9th Cir. 2011). Here, United has sufficiently alleged that the plans (and United, *see infra* Section III(c)) lost "money or property."

1   Woodlake is the predecessor to Valley Surgical Center, (SACC ¶ 52), and that

2   United paid significant claims to each of these three Surgery centers, including

3   $936,952 to Woodlake (*id*.); $38,242 to Palmdale (*id*. ¶ 43); and $125,026 to East

4   Bay (*id*. ¶ 38). *See also id.* App'x I (identifying various members treated at East

5   Bay (12), Palmdale (9), and Woodlake (22).

## II. The Providers Do Not Dispute That United Has Raised A Conspiracy Claim

The Providers no longer dispute that the SACC properly alleges that the

Counterclaim Defendants engaged in an ongoing conspiracy to commit fraud on

United. They argue only that United has failed to state an underlying fraud claim,

Provider Mot. at 13, which for the reasons expressed above, must be rejected.

## III. United Has Standing To Raise Claims To Recover Fraudulent Payments Made To The Providers

### A. Plaintiffs Do Not Dispute that United Has Standing to Raise ERISA Claims on Behalf of the ERISA Plans

The Providers no longer dispute that United has standing to raise claims

under ERISA. *See* Provider FACC Order at 6.

### B. United Has Standing to Raise State Law Claims to Recover Overpayments it Caused to be Made to the Providers

This Court previously (and correctly) concluded that United has Article III

standing to raise state law claims to recover assets that it authorized to be paid on

behalf of self-funded plans. *Id.* at 8 (insured plans are not at issue). As the Court

noted, "federal courts routinely entertain suits which will result in relief for parties

that are not themselves directly bringing suit," including when a trustee initiates

suit on behalf of a trust. *Id.* at 8 (quoting in part *Sprint Commc'ns Co., L.P. v.

APCC Servs., Inc.* 554 U.S. 269, 287 (2008)).[12]  Just as in such cases, United's state

law claims are brought for plans that it serves as a claims administrator, pursuant to

---

[12] As the Court recognized, "ERISA abounds with the language and terminology of
trust law'" and thus courts "rel[y] heavily on trust law doctrine in interpreting
ERISA." Provider FACC Order at 8 (internal quotations and citation omitted).

which it has the right to recover overpayments made on behalf of the plans.  Thus, just like a trustee, United has "a stake in the litigation because [it] is acting on behalf of the [plan], which owns the claims being litigated."  Provider FACC Order at 8 (*citing Glanton ex. rel ALCOA Prescription Drug Plan v. AdvancePCS Inc.,* 465 F.3d 1123, 1126 (9th Cir. 2006)); *see also Nutrishare*, 2014 WL 1028351, at *3.  This rule is also consistent with the Federal Rules of Civil Procedure, which allow an "administrator[s]" to sue on behalf of entities it represents, without naming such entities as parties.  *See* Fed. R. Civ. P. 17(a)(1)(B) & (E).

Even apart from its ability to represent the *plans'* interests, the amended allegations in the SACC demonstrate United's *own* Article III standing to recover overpayments.  As alleged, United's duties as a claims administrator require it to evaluate whether claims should be paid under the terms of a group health plan.  SACC ¶ 63.  Once United has determined that a claim is proper, it is authorized to cause payments to be made from the self-funded customer's assets.  *Id.* ¶ 64.  The Administrative Services Agreements ("ASA") generally give United the exclusive authority to recover overpayments that are made on behalf of its self-funded plan clients, including the right to initiate litigation.  *Id.* ¶ 66.  Should United recover such assets, it must return those assets to the plan sponsors—subject to its right to retain a portion of the overpayment as compensation for its services.  *Id.*  And, in certain circumstances, United could be accountable to its customers for claims paid that are inconsistent with the terms of the relevant plan.  *Id.* ¶ 65.

Under these circumstances, holding that United has Article III standing to recover amounts that the Providers procured by fraud is entirely consistent with United's role as a claims administrator for the plans it sues for.  The SACC alleges that the Providers' conduct has interfered with United's performance of its contractual duties, which is sufficient to give United an Article III injury.  *Sprint Commc'ns Co. L.P.,* 554 U.S. at 288 (recognizing that a contractual right to litigate supports Article III standing ).  Further, United has the contractual authority to

recover assets fraudulently paid to participants and providers, along with the contractual duty to remit such payments to its customers. *Id.* It has a monetary interest to pursue claims. *Id.* at 289 (noting that representative would have Article III standing to sue for another party if the representative kept a portion of the proceeds). Thus, as in *Sprint*, United's duties under the ASA give it standing to recover payments made on behalf of its employer customers, and avoid the risk of those customers being required to bring some or all of those claims in another forum.

This rule is consistent with the long-standing common law rule (in California and nationally) that a party who possesses another's property can sue to recover it, should he or she be defrauded of it.[13] Thus, in California, courts have held that a party who controls or has a limited possessory interest in property of another can sue for conversion to recover those assets if stolen. *E.g., Dep't of Indus. Relations v. UI Video Stores,* 55 Cal. App. 4th 1084, 1096 (1997); *Spates v. Dameron Hosp. Ass'n,* 114 Cal. App. 4th 208, 221 (2003); *Fremont Indem. Co. v. Fremont Gen. Corp.,* 148 Cal. App. 4th 97, 119-26 (2007). This rule applies beyond the conversion claim, to other state law causes of action as well. *Armstrong v. Kubo & Co.,* 88 Cal. App. 331, 334-35 (1928). United thus has an interest in recovering assets it paid on behalf of customers to the Providers as a result of their fraud.

The Providers' only response is to argue that United claimed in a petition for *certiorari* filed in the *Spinedex* litigation that it was not a proper defendant to an ERISA § 502(a)(1)(B) claim because it was just a "third party claims administrator

---

[13] *E.g., Lake City Auto Fin. Co v. Waldron*, 83 So. 2d 877, 878 (Fla. 1955) (a party who controls the personal property of another may maintain an action against a third party who injures the property); *Fla. Specialty Inc. v. H 2 Ology, Inc.,* 742 So. 2d 523, 526 (Fla. Dist. Ct. App. 1999); *Assocs. Disc. Corp v. Gillneau,* 322 Mass. 490, 492 (1948); *Priority Finishing Corp. v. LAL Constr. Co.,* 667 N.E. 2d 290, 292 (1996); *see also Sprint*, 554 U.S. at 274 (recognizing that "history and tradition provide a "meaningful guide" to interpreting Article III).

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE PROVIDERS' MOTION TO DISMISS

hired to process claims for benefits."  Provider Mot. at 14.  *Spinedex* involves an entirely different issue than here—whether United is a proper defendant to an ERISA § 502(a)(1)(B) claim when it is not the obligor.  Here, this case asks whether United has Article III standing to raise state law claims, where it was defrauded of the assets in question, and has the contractual obligation to recover them.

### C.    United Has Standing to Raise Claims Under California's UCL

For these reasons, the amended allegations in the SACC allege that, even with respect to the self-funded plans, the Providers' unlawful acts caused United to lose "money or property" under California's UCL (Count II).

Just as California courts have recognized that a party can sue to recover assets it had control over but did not own, *see supra* Section IV(b), California courts have similarly held that the UCL's "money or property" requirement includes "part[ing], deliberately or otherwise, with some identifiable sum formerly belonging to him *or subject to his control.*"  *Silvaco Data Sys. v. Intel Corp.,* 184 Cal. App. 4th 210, 244 (2010) (emphasis added) disapproved on other grounds by *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 335 (2011).[14]  Thus, consistent with long-standing California law, California courts recognize that a party has UCL standing to recover assets over which it has an interest, even if it did not own them. This rule is also consistent with the purpose of the UCL's "money or property" requirement: to "preserve[] standing for those who *had* had business dealings with a defendant and had lost money or property as a result" consistent with the federal Article III "injury in fact" standard.  *Kwikset*, 51 Cal. 4th at 321-22.

_____

[14] *See also Swain v. CACH, LLC*, 699 F. Supp. 2d 1117, 1122 (N.D. Cal. 2009) ("Plaintiff will have standing if she alleges a loss of money or property in which she had prior possession or a vested legal interest . . . ."); *Nutrishare,* 2014 WL at 1028351 at *3 ("CIGNA alleges Nutrishare's scheme has caused it to pay Nutrishare over six million dollars for procedures that should have cost twenty to thirty percent less.").

Just as the facts referenced above demonstrate that United has Article III standing to raise common law claims, they also support the fact that United has satisfied the UCL's related "money or property" requirement.  United's customer contracts require it to make payments only pursuant to the terms of customers' plans.  SACC ¶ 63.  The Providers' fraud, however, caused United to pay claims not called for under the plans' terms, and as such, United has the contractual right and obligation to seek to recover those sums.  *Id.* ¶ 66.  These allegations are sufficient to allege a violation of the UCL's "money or property" rule.

### D.  United Has Standing To Raise A Tortious Interference with Contract Claim (Count IV)

To dismiss United's tortious interference claim, the Providers argue that United is "not a party to the contracts with the patients who were covered under self-funded plans," but this misses the point.  Provider Mot. at 15.  United alleges that it is a party to the ASA with its customers, and that the Providers' fraud disrupted that contractual relationship.  These allegations are sufficient to state a tortious interference claim and cure the shortcomings identified in the FACC.

Specifically, as alleged in the SACC, pursuant to the ASAs United has paid or authorized claims from self-funded customers' assets that are due and owing under the relevant plans.  SACC ¶ 488.  The Providers' wrongful and fraudulent conduct was intended to cause United to pay claims not appropriate under the plans.  Pursuant to the ASA, United is (as noted above) responsible for attempting to recover such assets for its customers, and could be (in certain circumstances) held accountable for such payments.  Thus, the SACC sufficiently alleges that the Providers' actions caused a "disruption" of United's administration of the ASAs, which states a claim for relief.  Provider FACC Order at 44 (recognizing that a "disruption" of a contractual relationship states a claim for tortious interference).

## IV.  United's State Law Claims Are Not Preempted

Just as the Court previously concluded, Plaintiffs provide no basis to believe that United's state law claims (Count I-V) are preempted as to ERISA plans.

*First,* Plaintiffs do not dispute that claims in Count I-V on behalf of non-ERISA plans are not preempted.  *See* Provider FACC Order at 11.

*Second*, claims are not preempted to the extent that United is suing to recover assets it paid out on behalf of insured plans.  *See* SACC ¶ 62.  Such claims survive preemption because "ERISA does not completely preempt claims brought by an insurer who sues a provider for fraudulent or negligent misbilling." *Ass'n of N.J. Chiropractors v. Aetna, Inc.,* 2012 WL 1638166, at *6 (D.N.J. May 8, 2012).[15] Rather, because United is suing to protect its own interests (and recover its own damages), such a claim does not interfere with ERISA's civil enforcement mechanism, nor does it provide an alternative means for regulating the relationship between primary ERISA entities—plans, their fiduciaries, and participants.  *Id.*

*Third*, United's claims seeking recovery of sums it paid on behalf of self-funded plans are not "expressly" or "completely" preempted.  The "express preemption" doctrine does not apply because common law claims are an area of "traditional state regulation, which places a considerable burden on the party asserting express preemption."  Provider FACC Order at 16.  Courts have thus long recognized that ERISA plans can raise state law fraud (and fraud-like) common law claims against third-party medical providers who overbill for their services.  *Id.* at 17.[16]  Thus, as the Court's prior order recognized, United's various common law

---

[15] *See also United HealthCare Services, Inc. v. Sanctuary Surgical Ctr., Inc.,* 5 F. Supp. 3d 1350, 1363 (S.D. Fla. 2014); *Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1212 (11th Cir.1999) (complete preemption applies "only when" defendant is ERISA entity); *Transitional Hosp. Corp. v. Blue Cross & Blue Shield of Tex. Inc.*, 164 F.3d 952, 955 (5th Cir. 1999).

[16] *See also Trs. on behalf of N. Cal. Gen. Teamsters Sec. Fund v. Fresno French Bread Bakery, Inc.*, 2012 WL 3062174, at *8 (E.D. Cal. July 25, 2012); *Ariz. State Carpenters Pension Tr. Fund v. Citibank (Ariz.)*, 125 F.3d 715, 723 (9th Cir. 1997) (fraud claim not preempted because it is "not an alternative enforcement mechanism for employees to obtain benefits"); *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. College of Wis., Inc.,* 657 F.3d 496, 504-05 (7th Cir. 2011); *Trs. of the AFTRA Health Fund v. Biondi,* 303 F.3d 765, 775 (7th Cir. 2002).

claims for fraud, tortious interference, conversion, and under California's UCL do not "directly implicate an ERISA-regulated relationship," do not "compromise the purpose of Congress" and do not "impede federal control over the regulation of employee benefit plans." *Id.* at 23 (internal quotations omitted).

This Court also correctly concluded that United's state law claims do not fall within the "complete preemption" doctrine."[17] *Aetna Health v. Davila,* 542 U.S. 200, 210 (2004). United's state law claims do not fall within *Davila*'s first requirement, requiring that the claim "could have" been "brought under ERISA" § 502(a). Its state law claims could not have been raised under ERISA § 502(a)(3)—which only allows a fiduciary to obtain "equitable" relief to enforce ERISA or the "terms of the plan" (essentially, contractual claims). *See infra* Section V(a). In contrast, United's state law claims are all claims "at law" that seek an award of damages based upon fraudulent or wrongful behavior that violated state law duties and obligations. *See Sanctuary Surgical,* 5 F. Supp. 3d at 1359-61.

Further, this Court previously concluded that United's state law causes of action do not fall within *Davila*'s second requirement, because they allege a violation of a legal duty independent of ERISA. Provider FACC Order at 20. United's fraud claim, in other words, is based upon "affirmative misrepresentations [the Providers] made to United in submitting claims for reimbursement"—and rests on state law obligations not to lie, or wrongfully covert the property of another. *Id.* Its UCL claim is based on those same misrepresentations, as well as California's "prohibitions on the corporate practice of medicine and incentivization of patient referrals," which are "quite outside the duties imposed by ERISA." *Id.* at 23. United's tortious interference claim arises under state law, and is based in part on

---

[17] Since the Court's prior decision, multiple courts have recognized that state law fraud claims are not preempted by ERISA. *Dist. Council 16 N. Cal. Health & Welfare Tr. Fund v. Sutter Health*, 2015 WL 2398543, at *6 (N.D. Cal. May 19, 2015); *Arapahoe Surg. Ctr., LLC v. Cigna Healthcare, Inc*., 2015 WL 1041515, at *7 (D. Colo. Mar. 6, 2015).

interference with the ASA, not the plan document. *Id.* at 25. In other words, United's claims rest on state law duties and obligations, not the plan itself, and thus do not fit within *Davila*'s second requirement.[18]

In response, the Providers continue to press their argument (previously rejected) that United's counterclaim requires some tangential reference to the plan documents. The Court correctly rejected that argument. In many instances, United's state law claims have no reference to plan terms at all—such as United's claim that the Providers falsified billing or medical records. *See supra* Section I. Although other aspects of United's SACC might require some reference to an ERISA plan, "the bare fact that [a] Plan may be consulted in the course of litigating a state-law claim does not require that the claim be extinguished by ERISA's enforcement provisions." Provider FACC Order at 21 (citing *Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Group*, 187 F.3d 1045, 1051 (9th Cir. 1999)). Here, although some aspect of United's state law counterclaim may include a tangential reference to plan terms, these claims do not "for[m] an essential part of the asserted state law claim," and thus do not "exist . . . only because of" the ERISA plan terms. *Id.* at 22 (citation omitted).

## V.    United Raises Claims For Relief Under ERISA § 502(a)(3)

### A.    United Properly States an ERISA § 502(a)(3) Claim

In addition to seeking to recover amounts that the Providers procured by fraud and other state law misconduct theories, United raised claims under ERISA § 502(a)(3) to enforce plan terms. Through this claim, United sought to enforce

---

[18] Contrary to the Providers' assertion, United's new conversion claim is not preempted, either expressly or completely. Under California law, this is a claim at law that seeks an award of damages as compensation for the unjust taking of property. *See* Cal. Civ. Code § 3336. United is not limited to equitable remedies, and the claim does not seek to enforce plan terms and is not preempted. *See Mid Atl. Med. Servs. v. Do*, 294 F. Supp. 2d 695, 703 (D. Md. 2003) (holding conversion claim not preempted).

plan terms nullifying coverage where Member Responsibility Amounts are waived regardless of any fraudulent intent, and allowing the plan to recover overpayments made to the Providers.

United advances this claim under two theories:  it seeks an equitable lien by agreement, and it seeks to recover in restitution.  *See Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 364-65 (2006).  In its prior Order, the Court held that United properly alleged an equitable lien by agreement, but found that it did not extend to situations when United was seeking to recover only a "portion" of a benefit distribution.  Provider FACC Order at 53.  In the SACC, United again alleges an equitable lien by agreement, and it further articulated its restitution claim under which United sought to recover overpayments pursuant to a constructive trust.  Even if this Court maintains its ruling limiting relief under the equitable lien by agreement theory, this constructive trust theory is not so limited.

### 1.    United States a Claim for an Equitable Lien by Agreement

Just as before, United has properly alleged a claim seeking to impose an "equitable lien by agreement" under ERISA § 502(a)(3) on the overpayments made to the Providers.  As this Court has already found, United has properly alleged such a claim under *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F. 3d 1083 (9th Cir. 2012).  This Court has already held that United's allegations satisfy *Bilyeu*'s requirement that it identify a promise by the beneficiary to reimburse the plan for overpayments.

The Providers cannot escape liability by arguing that such terms apply only to participants, not them.  At a minimum, even the Providers acknowledge that this requirement is satisfied to the extent that they received payments pursuant to a "valid assignment of benefits," Provider Mot. at 24, and they acknowledge, at least in some instances , they submitted claims pursuant to a valid assignment.  This should end the inquiry, at least on a Rule 12 motion.  In any event, the same logic should apply to claims submitted pursuant to an "authorized representative" form

pursuant to which a provider agrees to represent the patient and take assets in their name.  Finally, so long as the plan includes a proper agreement with the participant to return assets, the fact that those assets are in the hands of a third party is irrelevant—the equitable interest still exists.[19]

Further, as the Court previously held, United has alleged facts satisfying the second and third requirements of *Bilyeu*.  First, United has properly alleged that it is seeking reimbursement of a specifically identified fund—the overpayments made to the Providers.[20]  Provider FACC Order at 51-52.  And finally, for the reasons discussed below, United has alleged facts sufficient to demonstrate that the Plaintiffs are still in possession or control of these assets, or are in control of assets that can be 'traced' from these assets.  *Id.* 52-53.

## 2.    United States a Claim for Restitution

As the Providers recognized, the SACC alleges a restitution claim under ERISA § 502(a)(3), seeking to recover overpayments made to the Providers in violation of plan terms.  *See* SACC ¶ 513.  The Providers do not dispute that such a claim exists under ERISA; nor do they dispute that the SACC pleads facts that establish a right to equitable restitution under ERISA § 502(a)(3).  *See Sereboff,* 547 U.S. at 356-57; *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 214-15 (2002) (recognizing right to recover in restitution under ERISA § 502(a)(3)).  Although the Providers argue that United has failed to properly allege an entitlement to the equitable remedy of a constructive trust, that argument fails.

---

[19] *Rashiel Salem Enters. v. Bunton*, 2013 WL 3581723 (D. Ariz. July 12, 2013).

[20] Although the Court's prior order concluded that United could recover only in situations in which the entire overpayment made to the Providers was inappropriate, it respectfully requests that the Court reconsider that ruling.  *Bilyeu* did not demand (even in *dicta*) such a result, *see Bilyeu*, 683 F.3d at 1093, and such a conclusion is inconsistent with the Supreme Court's decision in *Sereboff,* where the court concluded that the plaintiff could recover $74,869 out of a $750,000 settlement fund.  *Sereboff,* 547 U.S. at 369. Further, *Bilyeu* addressed the unique situation where a party was attempting to end run around rules precluding assignments of social security disability benefits.  *Bilyeu* 683 F.3d at 1093-94.

*First*, the Providers reassert their prior, rejected argument that United has failed to sufficiently allege that the assets it seeks to recover in restitution are still in their possession or control.[21]  The Court previously held, however, that the "tracing" allegations in the FACC were sufficient to state a claim under ERISA § 502(a)(3), *see* Provider FACC Order at 54, and the SACC goes further.  It alleges that the money that United seeks to recover was originally owned by the plans.  Due to the Providers' fraud, that money was deposited in bank accounts controlled by the Providers, and those sums either remain in those bank accounts, were transferred into other accounts controlled by the Providers, or were used to purchase property.  SACC ¶¶ 510-11.  The SACC goes further and specifically alleges that approximately 70% of the fraudulently obtained overpayments were deposited into Wells Fargo bank accounts controlled by the Providers, and either remain in those accounts, or (as alleged in sealed portions of the SACC) were transferred to other accounts or were used to purchase property.  *Id.* ¶¶ 420(a); *see also id.* ¶¶ 431, 510-11. The fact that such assets have been comingled with other assets does not, of course, preclude United from recovering them.  *See Bilyeu,* 683 F.3d at n. 6; Restatement (3d) of Restitution §§ 58-59.[22]

*Second*, United properly seeks a constructive trust over the assets incorrectly received by the Providers.  A constructive trust is an equitable remedy under which the court orders that identified funds be held in equitable trust, to be returned to the plaintiff.  *E.g., Great-West Life & Annuity Ins. Co.,* 534 U.S. at 213-14.

Providers seek to dismiss this claim by arguing that a constructive trust can be imposed only on "ill-gotten gains," but that is exactly what United alleges here.

---

[21]The Providers cannot argue that, in this case, the "tracing" requirements are more stringent for an ERISA restitution claim than for an "equitable lien by agreement." As the Court recognized, the tracing requirements for a recoupment claims requires only that the assets United seeks to recover can be traced back to the plans it administers.  Provider FACC Order at 51.

[22] Although the SACC alleges that some of these assets were dissipated, it also clearly alleges that this is not true of all of the assets.  SACC ¶¶ 420, 431, 510-11.

1   *See supra* Sections I-II.  Just as critically, since *Sereboff*, courts have recognized

2   that the imposition of a "constructive trust" no longer requires a showing of fraud

3   or wrongdoing.  *See, e.g., Aetna Life Ins. Co. ex rel. Lehman Bros. Holdings, Inc. v.*

4   *Kohler*, 2011 WL 5321005, at *6 (N.D. Cal. Nov. 2, 2011).[23]  The Providers have

5   thus provided no basis to dismiss United's demand for a constructive trust on a

6   Rule 12 motion.  Further, the remedy of constructive trust is not limited to

7   situations in which the entire payment made to the Providers was wrongful.  Rather,

8   Courts have regularly imposed constructive trusts over a share of a larger piece of

9   property—even when the property appears indivisible—so long as the correct

10   "share" of the fund can be identified.  *Great-West Life & Annuity Ins. Co.*, 534 U.S.

11   at 213-14 (recognizing that a party can seek a constructive trust where property

12   "can be traced to particular funds or property in the defendants' possession").[24]

13   Thus, because the SACC has properly identified the "sums" that were wrongfully

14   paid to the Providers, it can seek a constructive trust, notwithstanding that those

15   payments may have been included along with some proper payments.

16   ### B.    United Sufficiently Alleges Recoupment and "Coverage Negating" Terms are Found in Plan Documents, Not SPDs

17          Finally, the Providers' attempt to upend United's ERISA claims through

18   challenges to United's allegations that many of the relevant plans contained

19   "coverage negating" language, and that nearly all of them contained "recoupment"

20   language allowing United to recover overpayments made to the Providers in

21

22   [23] *Mairena v. Enter. Rent-A-Car Hosp. Ins. Plan,* 2010 WL 3931098, at *8 (N.D.
     Cal. Oct. 6, 2010) (finding *Sereboff* "did not indicate that a plan fiduciary may only

23   be entitled to this remedy if it is able to show fraud or wrong-doing by the
     beneficiary").

24   [24] *I.L.W.U. Welfare Plan v. South Gate,* 2012 WL 4364567 at *2 (N.D. Cal. Sept.

25   24, 2012) (allowing plan to recover partial overpayments); *see also Nuveen v. Bd.*
     *of Public Instruction of Gadsden Cnty, Fla.*, 88 F.2d 175, 179 (5th Cir. 1937)

26   (declaring that donor of funds to a school building would equitably own a one-half
     interest in the building because the "indivisible thing that was produced ought

27   equitably to be shared in proportion to [the] several contributions toward it"); *Parks*
     *v. Zions First Nat'l Bank*, 673 P.2d 590, 600 (Utah 1983) (upholding imposition of

28   constructive trust upon estate of wife, "at least as to that portion representing
     plaintiff's proven interest therein"); Restatement (3d) of Restitution § 59.

1  violation of the plan.  SACC ¶¶ 99, 504.  Such evidentiary challenges have no place

2  in a Rule 12 motion to dismiss, especially where United has specifically pled that

3  such terms are included in the exemplar plans referenced in the SACC, as well as

4  the other plans it administers.  *Id.* ¶¶ 111, 129, 137.[25]

5       Relying on plan documents that were produced in connection with this

6  Court's April 22, 2015, Order in the related action, *Almont Ambulatory, et al. v.*

7  *UnitedHealth Group, Incorporated, et al*, No. 14-cv-2139, [Dkt. No. 1418], the

8  Providers argue that in 16 of 29 instances, the "coverage negating" language is

9  found in a document described as a Summary Plan Description ("SPD"), and is

10  therefore insufficient.  This argument, however, ignores authorities recognizing that

11  in many instances, the SPD is the only plan document and that in any event, its

12  terms can be "plan terms" even when there are other documents that comprise the

13  plan.[26]  This is true even where (as the Providers allege occurred here) the SPD

14  refers to other plan documents whose terms may take precedence.  *Rhea v. Alan*

15  *Ritchey, Inc.*, 2015 WL 1456210, *3 (E.D. Tex. Mar. 30, 2015).[27]  Although

16  United was required to produce for the Providers the entire plan document for its

17  motion to dismiss the Providers' claims based on plan terms, nothing in the Court's

18

19

_____

20  [25] The Providers' one paragraph reference to the "reasonable expectations" doctrine
    does not provide a basis for dismissal. The doctrine should not apply to self-funded
21  ERISA plans, *Scharff v. Raytheon Co. Short Term Disability Plan*, 581 F. 3d 899,
    903-904 (9th Cir. 2009).  In any event, the SACC repeatedly cites to numerous plan
22  terms that unambiguously preclude coverage when (for example) a "non-Network
    provider waives the Annual Deductible or Coinsurance amounts."  SACC ¶ 146.
23

24  [26] *Roseland Amb. Ctr.*, 2013 WL 5354216, at *3; *Bd. of Trs. of the Nat'l Elevator
    Indus. Health Plan v. Montanile*, 593 F. App'x 903, 909 (11th Cir. 2014); *Langlois
25  v. Metro. Life. Ins. Co.*, 833 F. Supp. 2d 1182, 1185-86 (N.D. Cal. 2011); ERISA
    Prac. & Litig. §12:38 (2014) (noting that for group health plans, the SPD is
26  generally the plan document).

27  [27] *Langlois,* 833 F.Supp.2d at 1185-86 (holding that a SPD that indicated that the
    "official plan documents . . . will govern in every respect and instance" was still a
28  part of the plan, except insofar as there were any discrepancy with the plan);
    *Jenkins v. Grant Thornton LLP*, 2015 WL 349275, at *1 (S.D. Fla. Jan. 23, 2015)
    (citing cases); *Roseland Amb. Ctr. LLC*, 2013 WL 5354216, at *2.

April 22 2015, Order suggested that United was conversely obligated to allege anything more than the relevant terms of the applicable plans, which it has done.[28]

Nor can the Providers obtain dismissal of United's ERISA claims by arguing that the plans lack terms allowing the plans to recoup overpayments. Although the Providers' submission (*see* Gordon Decl., App'x A) insinuates that only 7 of the 29 plans therein include this recoupment language, this list only includes the recoupment language quoted in the SACC. United was not purporting to allege terms from each plan, but rather, it identified the specific language of these 7 plans as representative, and then alleges that such plans "typically" include materially indistinguishable language. SACC ¶ 504. The Providers ignored this allegation even though the Court previously found it was sufficient to state an ERISA claim. Looking at the documents for the 29 plans the Providers attach excerpts of, *every* one includes relevant recoupment language. The Providers merely neglected to attach or cite to the relevant pages. Holly Decl. ¶¶ 6-27.

## C.    Count VII Properly Seeks Declaratory and Injunctive Relief

Finally, the Providers offer only the most superficial opposition to United's request for injunctive and declaratory relief. They fail to cite a single case where a court has held that injunctive or declaratory relief that United seeks—including an injunction precluding a party from submitting fraudulent claims—would be inappropriate under ERISA § 502(a)(3).    Further, their fact dispute as to the scope of United's recovery is not amenable to resolution on a Rule 12 motion.

## CONCLUSION

United respectfully requests that the Court deny the Providers' Motion to Dismiss.

---

[28] Indeed, in many instances, the very plan documents that the Providers rely upon indicate that the SPD is a part of the Plan document. *See* Declaration of Andrew Holly ("Holly Decl."), ¶¶ 6, 8, 9, 10, 11, 13, 16, 21, 22, 23, and 26.

1

2  Dated:  <u>July 29, 2015</u>                    **WALRAVEN & WESTERFELD LLP**

3
                                                      <u>/s/ BRYAN S. WESTERFELD</u>
4                                          By:  BRYAN S. WESTERFELD

5                                          Attorneys for Defendant UnitedHealth
                                           Group Incorporated;
6                                          and Defendants/Counterclaim Plaintiffs
                                           United Healthcare Services, Inc.,
7                                          UnitedHealthcare
                                           Insurance Company; OptumInsight, Inc.
8
   Dated:  <u>July 29, 2015</u>                    **DORSEY & WHITNEY LLP**
9

10
                                                      <u>/s/ ANDREW HOLLY</u>
11                                         By:  ANDREW HOLLY

12                                         *Admitted Pro Hac Vice*
                                           Attorneys for Defendant UnitedHealth
13                                         Group Incorporated;
                                           and Defendants/Counterclaim Plaintiffs
14                                         United Healthcare Services, Inc.,
                                           UnitedHealthcare
15                                         Insurance Company; OptumInsight, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE PROVIDERS' MOTION TO DISMISS

# PROOF OF SERVICE

STATE OF CALIFORNIA       )
                         )   ss
COUNTY OF ORANGE       )

       I am employed in the County of Orange, State of California. I am over the age of 18 years and not a party to the within action. My business address is 101 Enterprise, Suite 350, Aliso Viejo, CA 92656.

       On July 29, 2015, I served the foregoing document(s) described as:

**COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE PROVIDERS' MOTION TO DISMISS THE SECOND AMENDED COUNTERCLAIM**

on all interested parties in this action as follows (or as on the attached service list):

| | |
|---|---|
| DARON L. TOOCH<br>BRYCE WOOLLEY<br>**HOOPER, LUNDY & BOOKMAN, P.C.**<br>1875 Century Park East, Suite 1600<br>Los Angeles, California 90067-2517 | E-Mail:<br>dtooch@health-law.com<br>bwoolley@health-law.com |
| BRYAN D. DALY<br>CHARLES L. KREINDLER<br>BARBARA E. TAYLOR<br>**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**<br>333 South Hope Street, 43rd Floor<br>Los Angeles, California 90071-1422 | bdaly@sheppardmullin.com<br>ckriendler@sheppardmullin.com<br>btaylor@sheppardmullin.com |

☒     BY CM/ECF NOTICE OF ELECTRONIC FILING: I electronically filed the document(s) with the Clerk of the Court by using the *CM/ECF* system. Participants in the case who are registered *CM/ECF* users will be served by the *CM/ECF* system. Participants in the case who are not registered *CM/ECF* users will be served by mail or by other means permitted by the court rules.

1 | AND

2 | ☒      (VIA U.S. MAIL) I served the foregoing document(s) by U.S. Mail, as follows:  I
3 | placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above.  I placed each such envelope with postage thereon fully prepaid, for collection and mailing at Walraven & Westerfeld LLP, Aliso Viejo, California.  I am
4 | readily familiar with Walraven & Westerfeld LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service.  Under that practice,
5 | the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

6 |

7 |          I declare under penalty of perjury under the laws of the State of

8 | California that the above is true and correct.

9 |          Executed on, _____ 2015, at Aliso Viejo, California.

10 |

11 |                                                  Kim Sullivan

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |