UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES—GENERAL</u>

**Case No.** CV 14-03053 MWF(VBKx)          **Date:  October 23, 2015**
Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
           Inc., et al.

Present:   <u>The Honorable MICHAEL W. FITZGERALD, U.S. District Judge</u>

          Relief Deputy Clerk:                Court Reporter:
          Cheryl Wynn                         Not Reported

          Attorneys Present for Plaintiff:    Attorneys Present for Defendant:
          None Present                        None Present

**Proceedings (In Chambers):**   ORDER GRANTING IN PART AND DENYING IN
                                 PART PROVIDER COUNTER-DEFENDANTS'
                                 MOTION TO DISMISS THE SECOND AMENDED
                                 COUNTERCLAIM OR, IN THE ALTERNATIVE,
                                 FOR PARTIAL SUMMARY JUDGMENT [168]

       Before the Court is the Provider Counter-Defendants' Motion to Dismiss the
Second Amended Counterclaim, or, in the Alternative, for Partial Summary Judgment
(the "Motion").  (Docket No. 168).  The Court read and considered the papers on the
Motion, and held a hearing on **September 17, 2015**.

       For the reasons stated below, the Court **GRANTS in part** and **DENIES in part**
the Motion.  United adequately alleged that Providers made intentional and material
misrepresentations in its submitted claims to United.  While the Court acknowledges
the incongruities in the individual claim lines contained in Appendix I of the Second
Amended Counter Claim ("SACC"), such deficiencies are insufficient to defeat the
allegations at this stage of the proceedings.  The Court further concludes that ERISA
does not preempt United's state law claims, as they do not interfere with the objects of
the federal regulation.  United, moreover, has sufficiently pleaded claims for equitable
relief under ERISA.  Finally, although United does have Article III standing, it may not
bring a UCL claim on behalf of the self-funded plans under California law.

I.     **<u>BACKGROUND</u>**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group,
          Inc., et al.

On March 21, 2014, Plaintiffs initiated the Removed Action by filing a Complaint in the Los Angeles Superior Court.  (Removed Action Docket No. 1, Notice of Removal, Ex. A).  On April 21, 2014, Defendants removed the action to this Court. (*Id.*).

On May 15, 2014, the Court issued an Order to Show Cause Re: Jurisdiction (the "OSC") Docket No. 27), to which the parties responded on June 5, 2014 (Docket Nos. 34, 35).  The Court then issued an Order Discharging the OSC on June 16, 2014 (Removed Action Docket No. 38), in which the Court exercised its own judgment and agreed with the parties' reasoning that the Complaint's claim for declaratory relief was completely preempted by ERISA, thereby conferring federal jurisdiction over the action.

A.    **Complaint and First Amended Counterclaim**

Plaintiffs in this action consist of: (1) nine ambulatory surgery centers that provide Lap-Band surgeries and services; and (2) Independent Medical Services, Inc., which is a physicians' medical group.  (Compl. ¶¶ 16, 44-45).

Defendants include: (1) UnitedHealth Group, Inc., a health insurance company that allegedly does business in California through its subsidiaries; (2) UnitedHealthcare Insurance Company; and (3) United HealthCare Services, Inc.  (*Id.* ¶¶ 46-48). Defendant OptumInsight, Inc. (also called "Optum" or "Ingenix") is also a wholly-owned subsidiary of UnitedHealth, and served as a "Special Investigations Unit" for the claims at issue.  (*Id.* ¶¶ 49, 81).  The Complaint refers to these four Defendants collectively as "United" or the "United Defendants."  (*Id.* ¶ 51).  The Complaint alleges that "United is one of the nation's largest health insurers," "[i]t underwrites and issues thousands of health insurance plans," and "also contracts with other entities that provide health benefits in order to provide administrative services for those entities' health plans, such as claim pricing."  (*Id.* ¶ 52).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES—GENERAL</u>

**Case No.** CV 14-03053 MWF(VBKx)          **Date:** October 23, 2015
**Title:**   Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
        Inc., et al.

The Complaint asserts claims for violation of the California Business and
Professions Code section 17200 *et seq*. (the "UCL"), breach of implied-in-fact
contracts, services rendered, estoppel, and declaratory relief. (*Id.*). The general
conduct alleged in the Complaint involved United's purported failure to properly pay
claims submitted by the Plaintiffs, out-of-network providers, through the use of
pretextual responses to claim submissions.

On September 3, 2014, United filed a First Amended Counterclaim ("FACC").
(Removed Action Docket No. 45), adding several Counterclaim Defendants to the
litigation, including Dr. Michael Omidi ("Michael Omidi") and Kambiz Benjamin
Omidi (a.k.a. Julian Omidi, Combiz Omidi, Kambiz Omidi, Combiz Julian Omidi,
Kambiz Meniamia Omidi, Julian C. Omidi) ("Julian Omidi") (when referencing the
FACC, Michal and Julian Omidi are collectively referred to as the "Omidis"), as well
as ambulatory surgical centers (including those named as Plaintiffs, as well as
additional surgery centers), an additional billing entity, several "Top Surgeons"
entities, and "1-800-Get-Thin." (FACC ¶¶ 15-44).

In the FACC, United alleged that it:

> [I]s an insurer and third party claims administrator for employer
> group health plans, which are sponsored by employers and
> provide health benefits to their covered employees and
> dependents. The health plans sponsored by private employers
> are governed by ERISA, 29 U.S.C. § 1001 *et. seq* (the "ERISA
> Plans"), while those sponsored by governmental employers and
> certain religious organizations are exempted from ERISA's
> jurisdiction. United provides insurance and/or administrative
> services to these employer-sponsored health plans, including
> (subject to the terms of the individual's plan and associated
> agreements) the processing of claims for reimbursement of
> medical services provided to the individuals covered by these

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
          Inc., et al.

> benefit plans ("United members").  For the United Plans that
> are insured directly by United ("insured plans"), benefit
> payments are made from United's own funds.  For those self-
> funded benefit plans for which United acts only as claims
> administrator, and not insurer, benefit payments are made from
> plan funds provided by the employer-sponsor of the self-funded
> plans.  United's contractual agreements with the employer-
> sponsors of such self-funded plans typically specifically grant
> United the authority to recover overpayments, including
> through litigation, on behalf of the self-funded plans.

(FACC ¶ 51).

Pursuant to United's role with respect to the various plans at issue, the FACC
asserted claims for fraud, violation of the UCL, conspiracy to commit fraud, intentional
interference with contractual relationships, restitution under ERISA § 502(a)(3), and
declaratory and injunctive relief under ERISA § 502(a)(3).  (Removed Action Docket
No. 45).  The FACC alleged that Counterclaim Defendants are conspiring to defraud
the public and United out of millions of dollars.  (FACC ¶ 62).  This conspiracy is
purportedly hidden through the use of sham/shifting business names.  (*Id*. ¶ 126).  The
activities underlying the conspiracy are generally alleged to be "various fraudulent
practices designed to manipulate United to pay for services that were not medically
necessary, never provided, or not covered by the terms of the United Plans."  (*Id*. ¶ 68).
The specific malfeasance alleged included: inducing patients to receive Lap-Band-
related treatment through, among other things, improperly waiving copay, coinsurance,
deductibles amounts (collectively, "co-pay") (*id*. ¶ 66); mischaracterizing Lap-Band
procedures provided by billing under incorrect CPT codes, hiding services that would
not have otherwise been covered, or misrepresenting patients' BMI calculations (*id*. ¶
68); and submitting inflated bills to United in an attempt to induce United to allow
payment in excess of UCR (*id*. ¶ 275).

---

**CIVIL MINUTES—GENERAL**                                              **4**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES—GENERAL</u>

**Case No.** CV 14-03053 MWF(VBKx)  **Date:** October 23, 2015
Title:  Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group,
Inc., et al.

Julian and Michael Omidi are alleged to exercise control over the provider
network, and have purportedly established hundreds of corporate entities to "conduct
and conceal the fraudulent activities" alleged in the FACC.  (*See, e.g., id.* ¶¶ 71-72).

### B.  <u>Motions to Dismiss FACC</u>

On October 3, 2014, the Counterclaim Defendants filed Motions to Dismiss the
First Amended Counterclaim (collectively, the "Motions to Dismiss the FACC").
(Docket Nos. 46, 48).  On October 31, 2014, United filed Oppositions to the Motions
to Dismiss the FACC.  (Docket Nos. 63, 65).  On November 14, 2014, the
Counterclaim Defendants filed their Replies (Docket Nos. 77, 78).

On February 12, 2015, the Court entered Orders granting in part and denying in
part the Motions to Dismiss the FACC.  (Docket Nos. 144, 145).  In relevant part,
while the Court concluded that United had alleged viable fraud theories, it ruled that
United had failed to allege fraud with the requisite specificity.  The Court also
concluded that United's state law claims were not preempted by ERISA, and that
United had failed to sufficiently demonstrate that the discovery rule or tolling
mechanisms saved claims which manifestly (from the face of the FACC) fell outside of
the relevant statutes of limitations.  Further, the Court ruled that United had failed to
demonstrate that it had standing to assert UCL or intentional interference claims on
behalf of self-funded plans.  The Court also concluded that the FACC contained
sufficient alter ego allegations as to the Omidis.

### C.  <u>Second Amended Counterclaim</u>

On April 30, 2015, United filed the SACC.  (*See* Removed Action Docket No.
152).

Among the named SACC Defendants are Julian and Michael Omidi, as well as
their mother, Cindy Omidi (a.k.a. Nahid Omidi, Nahid Pezeshk, Cindy Pezeshk)
("Mrs. Omidi").  (SACC ¶¶ 22-25).  Also named among the SACC Defendants are

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
           Inc., et al.

several ambulatory surgical centers (including those named as Plaintiffs, as well as
additional surgery centers), billing entities (including one named as a Plaintiff), several
"Top Surgeons" entities, "1-800-Get-Thin," and an offshore captive insurance
company.  (*Id.* ¶¶ 26-58).  The SACC refers to the Counter-Defendants other than Mrs.
Omidi, Michael Omidi, and Julian Omidi as the "Corporate Counterclaim Defendants."
(*Id.* ¶ 60).  The SACC also refers to the "network of corporate entities, health care
providers, employees, administrators, agents, and co-conspirators" described
throughout the SACC as the "Omidi Network."  (*Id.* ¶ 22).  For clarity, this Order will
refer to the Counter-Defendants bringing the Motion as "Providers."

        Pursuant to much the same underlying conduct alleged in the FACC, the SACC
asserts claims for fraud, violation of the UCL, conspiracy to commit fraud, intentional
interference with contractual relationships, conversion, restitution under ERISA §
502(a)(3), and declaratory and injunctive relief under ERISA § 503(a)(3).  (*Id.* ¶¶ 446-
524).

        As will be relevant to the analysis below, the SACC notes that for insured (or
"fully-insured") plans, "United will resolve claims and will make benefit payments
from its own Assets," and for self-funded plans, "once United has determined that a
claim is payable under the relevant group-health plan, United is authorized to cause
payments to be made from the self-funded customer's assets."  (*Id.* ¶¶ 62, 64).
Moreover, United "provides administrative services to self-funded group health plans
(both under ERISA and otherwise)," which it does "pursuant to Administrative
Services Agreements ('ASA') between United and the health plan's sponsor (usually
an employer), which identify the rights and obligations of each party."  (*Id.* ¶ 63).

        On June 25, 2015, Provider Counter-Defendants filed this Motion.  On July 14,
2015, three remaining Counter-Defendants filed a Joinder in the Motion.  (Docket No.
175).  On July 29, 2015, United filed an Opposition to Providers' Motion to Dismiss
the Second Amended Counterclaim (the "Opposition").  (Docket No. 184).  On August

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)            Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
            Inc., et al.

13, 2015, Providers filed a Reply Brief in Support of Motion to Dismiss, or, in the
Alternative, for Partial Summary Judgment (the "Reply").  (Docket No. 199).

## II.   **MOTION TO DISMISS**

Providers bring the Motion pursuant to Federal Rules of Civil Procedure 9(b),
12(b)(1) and 12(b)(6).

In ruling on a motion under Federal Rule of Civil Procedure 12(b)(6), the Court
follows *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*,
556 U.S. 662 (2009).  "To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on
its face.'"  *Iqbal*, 556 U.S. at 678 (citations omitted).  "'All allegations of material fact
in the complaint are taken as true and construed in the light most favorable to the
plaintiff.'"  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir. 2008) (quoting
*Stoner v. Santa Clara Cnty. Office of Educ.*, 502 F.3d 1116, 1120 (9th Cir. 2007))
(holding that a plaintiff had plausibly stated that a label referring to a product
containing no fruit juice as "fruit juice snacks" may be misleading to a reasonable
consumer).

Federal Rule of Civil Procedure 9(b) requires that "a party [alleging fraud] must
state with particularity the circumstances constituting fraud."  To satisfy Rule 9(b), a
plaintiff must include "the who, what, when, where, and how" of the fraud.  *Vess v.
Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks
and citations omitted).  "A motion to dismiss a complaint or claim 'grounded in fraud'
under Rule 9(b) for failure to plead with particularity is the functional equivalent of a
motion to dismiss under Rule 12(b)(6) for failure to state a claim."  *Id.* at 1107.  As
such, dismissals under Rule 9(b) and 12(b)(6) "are treated in the same manner."  *Id.* at
1107-08.

In ruling on a motion under Federal Rule of Civil Procedure 12(b)(1), the Court
must determine whether it lacks subject matter jurisdiction over the Complaint or any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
           Inc., et al.

claims therein.  "A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence."  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)) (evaluating whether a composer had standing to pursue copyright claims against a producer and distributors).

## A.    Fraud

The Ninth Circuit has stated that "[t]o comply with Rule 9(b), allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'"  *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir.1993)).  "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'"  *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (quoting *Haskin v. R.J. Reynolds Tobacco Co.*, 995 F. Supp. 1437, 1439 (M.D. Fla. 1998)).

For a fraud claim against several defendants, "a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'"  *Swartz*, 476 F.3d at 765 (quoting *Moore v. Kayport Package Express, Inc*., 885 F.2d 531, 541 (9th Cir.1989)).  Allegations that "everyone did everything" are insufficient.  *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) (finding that the district court properly dismissed a second amended complaint with prejudice when a plaintiff had been given three opportunities to comply with Rule 9(b), and yet continually failed to "set out which of the defendants made which of the fraudulent statements/conduct").

In *Swartz*, the Ninth Circuit evaluated allegations of fraud in the context of a conspiracy.  The *Swartz* complaint contained "several allegations detailing the time,

---

CIVIL MINUTES—GENERAL                                                8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)            Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
            Inc., et al.

place, and content of representations made by" certain of the defendants, but contained nothing other than generalized allegations as to the roles of other defendants in the purported conspiracy.  *Swartz*, 476 F.3d at 764-65.  The court held that the complaint's allegations that "'defendants' engaged in fraudulent conduct," without specification of the misconduct attributed to particular defendants, failed satisfy Rule 9(b) as to those defendants.  *Id*. at 765.  The Ninth Circuit did, however, provide leave to amend, because it could not "say on de novo review that the pleading 'could not possibly be cured by the allegation of other facts.'"  *Id*. (quoting *Bly-Magee*, 236 F.3d at 1019).

## 1.  Roles of Counter-Defendants

Providers argue that "the SACC does not contain any substantive allegations relating to at least Counter-Defendants East Bay Ambulatory Surgery Center, Palmdale Ambulatory Surgery Center, and Woodlake Ambulatory," and therefore request that these Counter-Defendants, along with any others for whom United has not adequately pleaded fraud, be dismissed.  (Mot. at 2-3).

United, however, contends that it "has alleged claims against East Bay Ambulatory Surgery Center, Palmdale Ambulatory Surgery Center, and Woodlake Ambulatory."  (Opp. at 11).  Specifically, United alleges that "Woodlake is the predecessor to Valley Surgical Center, (SACC ¶ 52), and that United paid significant claims to each of these three Surgery centers, including $936,952 to Woodlake (*id*.); $38,242 to Palmdale (*id*. ¶ 43); and $125,026 to East Bay (*id*. ¶ 38)."  (Opp. at 12).  United also points out that Appendix I "identif[ies] various members treated at East Bay (12), Palmdale (9), and Woodlake (22)."  (*Id*.).

Such allegations are sufficient to provide East Bay, Palmdale, and Woodlake notice of their role in the claimed fraud.  Indeed, United identifies the plan members whose co-pay was waived at those facilities, which, as discussed further below, purportedly led to inflated amounts United paid on the submitted claims.  The Court

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                    Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

therefore declines to dismiss the SACC as to East Bay, Palmdale, and Woodlake on this basis alone.

### 2.  Rule 9(b) Heightened Pleading

#### a.  *Exemplar Claims Listed in SACC*

Providers note that "[t]he SACC alleges discrete instances of fraud upon United, such as services that were supposedly billed even though they were not provided, supposed alterations to the patient body mass index (BMI) measurements that were submitted to United, and supposed failures to disclose that a lap band surgery was performed at the same time as other surgeries." (Mot. at 2).  Plaintiffs state that they "vigorously dispute the veracity of these accusations, and will disprove them during discovery and at trial." (*Id*.).

United argues that, based on this language, "[t]he Providers' brief begins with an explicit concession that United has complied with Fed. R. Civ. P. 9(b) with respect to the 40 individual patient examples found in SACC ¶¶ 105-384." (Opp. at 1-2 (citing Mot. at 2)).  United contends that "[t]hrough these examples, United alleges numerous, specific instances in which Providers used a variety of fraudulent schemes to obtain payments from United." (*Id*. at 2).  Consequently, United posits that:

> Given the Providers' concession that those 40 examples comply with Rule 9(b), the SACC clearly states a claim with respect to Counts I-V.  The Providers do not argue otherwise.  Rather, they seek a preemptive ruling that Counts I-V should be limited to those 40 examples, but Rule 9(b) does not require that United include every example of a fraudulent claim.  Rather, courts, including the Ninth Circuit, recognize that a party pleading an extensive scheme to defraud need not "allege all facts supporting every instance when the defendant engaged in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                    Date:  October 23, 2015

Title:    Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

          fraud." *Fustok v. UnitedHealth Grp., Inc*., 2013 WL 2189874, at *5 (S.D. Tex. May 20, 2013) (internal citation omitted); *Wool v. Tandem Comps., Inc*., 818 F.2d 1433, 1439 (9th Cir. 1987) (overruled on other grounds).  Thus, in cases involving an ongoing conspiracy to commit fraud occurring over multiple transactions over a period of years, Rule 9(b) does not require a complete recitation of every alleged fraudulent transaction.  *See Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).  Rule 9(b) is not designed to "carry more weight than it was meant to bear."  *Id*.

(*Id*. at 3 (footnote omitted)).  United notes that it did not cite to *Cooper*, *Wool*, or a case cited in a footnote in the Opposition, *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 989-90 (9th Cir. 2008) (*see* Opp. at 3 n. 3), "in the earlier briefing on the sufficiency of United's original Counterclaim, because Providers made only scant mention of Rule 9(b)" (*id*. at 4).

      In *Cooper*, individuals who had purchased stock in a wholesale computer distributor, Merisel, Inc. ("Merisel") brought a class action against the corporation, corporate officers and directors of the corporation, and the corporation's accountants and underwriters, alleging violation of securities laws.  *Cooper*, 137 F.3d at 620-21.  The thrust of the scheme alleged was that:

          Merisel officers, who communicated regularly with securities analysts, told the analysts that Merisel's business was strong and that [an acquisition] in early 1994 would increase Merisel's earnings per share.  The analysts then repeated those representations in their favorable reports.  Merisel then endorsed the reports by distributing them to potential investors, who relied on the favorable reports.  Merisel also faxed an

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
           Inc., et al.

internal forecast of increasing 1994 earnings to a securities
analyst.

In their regular conference calls with securities analysts,
Merisel's officers predicted that the . . . acquisition would boost
Merisel's 1994 earnings, that demand was strong, and that
Merisel's international operations were stabilizing and could be
expected to be profitable in 1994.  The analysts echoed these
positive assessments in their reports.

*Id*. at 620.  The complaint alleged that "all these statements were false": "[d]emand
was softening, the profitability of the company's core business was under severe
pressure from price-cutters, the European operations were still weak, international
operations continued to lose money, and the . . . acquisition would hurt Merisel's 1994
earnings."  *Id*.  The complaint also alleged that "SEC regulations create a duty to
disclose the adverse information defendants concealed."  *Id*.

The Ninth Circuit concluded, faced with arguments that claims of improper
revenue recognition failed to satisfy Rule 9(b), that "the complaint identified who
(eight of Merisel's customers), what (four types of improper revenue recognition),
when (last two quarters of 1993 and first quarter of 1994), and where (reported in
financial statements).  *Id*. at 627.  Moreover, "[t]he complaint alleged that Merisel
misled by inflating its revenues by specific amounts, and by falsely claiming that its
revenue recognition policy was stricter than it really was ('how')."  *Id*.  The Ninth
Circuit found that "[i]t [was] not fatal to the complaint that it [did] not describe in
detail a single specific transaction (i.e. shipment) in which Merisel transgressed as
above, by customer, amount, and precise method" and "decline[d] to require that a
complaint must allege specific shipments to specific customers at specific times with a
specific dollar amount of improperly recognized revenue."  *Id*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)               Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

In *Wool*, a stock purchaser brought a class action on behalf of himself and a class of others similarly situated against a corporation, Tandem Computers Incorporated ("Tandem"), and corporate officers, "to recover damages for alleged fraud and breach of fiduciary duties in violation of federal securities law and California common law." *Wool*, 808 F.2d at 1435.  The complaint alleged that "Tandem and the individual defendants had utilized improper accounting practices and issued public reports which overstated the profits of Tandem and which, in turn, artificially inflated the market price of Tandem securities." *Id*.  The class members were alleged to have "purchased Tandem stock during the alleged inflation." *Id*.

The individual defendants had argued that the complaint failed to satisfy Rule 9(b) because it failed "to attribute particular fraudulent statements or acts to each individual defendant." *Id*. at 1440.  The Court held that "[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Id*.  "Under such circumstances," the court noted, "a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations." *Id*.  The court found these requirements satisfied, as "[t]he individual defendants [were] a narrowly defined group of officers who had direct involvement not only in the day-to-day affairs of Tandem in general but also in Tandem's financial statements in particular." *Id*.

Finally, in *Berson*, investors filed a class action suit against a telecommunication company, Applied Signal Technology, Inc. ("Applied"), and its officers, alleging violations of Securities Exchange Act § 10(b) and Rule 10b–5. *Berson*, 527 F.3d at 984.  Applied's "customers [were] almost all agencies of the federal government," and Applied only [got] paid for work performed; therefore, when the government issue[d] a "stop-work order," Applied no longer could earn money. *Id*.  The suit sought losses investors allegedly incurred due to Applied's misleading practice of counting stopped work as part of "backlog" ("a term the company defines as the dollar value of the work

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

it has contracted to do but hasn't yet performed"), without disclosing that backlog included tens of millions of halted contract work that was the subject of stop-work orders.  *Id.*

In discussing "particular causes of loss," the Ninth Circuit assumed, without deciding, that Rule 9(b) applied, and held that "the complaint describes the [stop-work] orders in sufficient detail to give defendants ample notice of plaintiffs' loss causation theory, and to give . . . some assurance that the theory has a basis in fact."  *Id.* at 989-90.  The court noted that "Rule 9(b) requires no more."  *Id.*

At the hearing, counsel for Providers argued that this authority is limited to the realm of securities regulations.  Although the Court is unpersuaded that a more lenient Rule 9(b) analysis applies to claims under Rule 10b-5 than state fraud statutes, the cited case law is indeed distinguishable.  For example, unlike in *Wool*, the alleged false or misleading information here was not "conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information.'"  *Wool*, 808 F.2d at 1440.  Instead, the claimed fraudulent practices constitute distinct events that require inquiry into the individual circumstances of each Plan Member.  More specific allegations are thus required to provide notice of all alleged instances of misconduct.

The Court, nonetheless, is mindful of the general principal expressed in the cited case law.  When the allegations involve a large conspiracy to commit fraud over thousands of transactions and a period of many years, it is neither practical nor required to plead in detail every instance of misrepresentation.  *Cooper*, 137 F.3d at 627; *see Nutrishare, Inc. v. Connecticut Gen. Life Ins. Co.,* No. 2:13-CV-02378-JAM-AC, 2014 WL 1028351, at *4 (E.D. Cal. Mar. 14, 2014) ("When dealing with thousands of instances, it is often the case that a complaint or counterclaim laying out each and every misrepresentation in detail would provide less effective notice and be less useful in framing the issues than would a shorter, more generalized version.") (internal quotation marks and citations omitted).  United describes with great

---

**CIVIL MINUTES—GENERAL**                                               **14**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 14-03053 MWF(VBKx)          **Date:** October 23, 2015
**Title:**   Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group, Inc., et al.

specificity the schemes Counter-Defendants used to allegedly defraud United with respect to 40 individual Plan Members.  (SACC ¶¶ 105-384).  United then alleges that the same fraudulent practices applied to the "hundreds or thousands of other patients. (Opp. at 3; SACC ¶¶ 92-101, 128, 154, 186, 204, 221).  Such allegations are sufficiently particular to provide notice of the types of fraud at issue in this action. Indeed, it is quite likely that neither Counter-Defendants nor this Court would benefit from United describing the thousands of alleged misrepresentations with the same specificity used in the 40 examples.  *Nutrishare*, 2014 WL 1028351 at *4 ("Although the Counterclaim does not specify each and every [purportedly fraudulent] transaction, such particularity is [not required even under the heightened pleading requirements of Rule 9(b)].").  The SACC thus satisfies the requirements of Rule 9(b).

The Court recognizes, however, that the issue is a close one.  As such, the Court continues to analyze the adequacy of the claims presented in Appendix I of the SACC and United's co-pay waiver theory of fraud.

### b. *Claims in Appendix I*

Providers argue that the recoupment claims listed only in Appendix I and not the SACC itself should be dismissed for failure to comport with Rule 9(b).  (Mot. at 2-5). Providers observe that for all of the claim lines not set forth in the body of the SACC or in Appendix II, "the sole theory of fraud alleged for all remaining recoupment claims, including the nearly 30,000 claim lines set forth in Appendix I to the SACC, is the alleged waiver of patients' co-pay and deductible obligations."  (*Id*. at 3). Providers assert that United has alleged these co-pay waiver claims in only a conclusory way.  (*Id*.).

United, however, argues that "Appendix I to the SACC properly alleges under Rule 9(b) that Providers waived Member Responsibility Amounts to 2,000 individuals listed therein."  (*Id*. at 7).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

The Court previously concluded that the FACC contained "generalized allegations that all of the Counterclaim Defendants participated in fraudulent conduct," which was insufficient to state a claim for fraud.  (*See* Docket No. 144 at 17-19).  The Court observed that United could not "generally assert that everyone did everything on the basis of the examples it presented without specifying the roles that each Counterclaim Defendant played in carrying out the purported fraud."  (*Id.*).

The Court noted that it would not advise United as to how it may fulfill the requirements imposed by Rule 9(b), but it provided "the following examples of the types of allegations that appeared to be lacking from the FACC and Appendix I: the category or categories of misrepresentations alleged with respect to each claim line; the relevant Counterclaim Defendants implicated in each purported claim line; and the date of claim submission for each claim line."  (*Id.* at 19).

### i.   *Categories of Fraud*

With respect to the SACC, Providers argue that "Appendix I . . .  fails to specify 'the category or categories of misrepresentations alleged with respect to each claim line.'"  (Mot. at 3).  United, however, points out that "the very title of Appendix I indicates that the chart identifies individuals who received a 'Waiver of Member Responsibility Amounts,'" thereby identifying the category of fraud at issue for these claims.  (Opp. at 7-8).

The Court agrees that United has identified the category of fraud at issue for the claim lines in Appendix I, as argued in the Opposition.

### ii.   *Consideration of Unredacted Appendix I*

Providers assert that:

_____

CIVIL MINUTES—GENERAL                                          16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

> United appears to have added two new columns to Appendix I:
> (i) the date on which United received a reimbursement form
> from Providers; and (ii) the date on which United paid each
> claim. United has also added two new columns in addition
> to the amount charged and the amount paid on each claim:
> "deductible" and "copay."  ***However, in the publicly filed
> version, both these columns, as well as the "charges" and
> "paid" columns for each claim, are blank***.  As a result, United
> has provided ***even less information*** in the SACC than it did in
> the FACC.  Appendix I to the FACC identified amounts
> charged and paid.  In contrast, the SACC's Appendix I redacts
> such information.

(*Id*. (emphasis in original)).  Providers note that United moved *ex parte* to file an
unredacted copy of the SACC under seal on June 22, 2015 (which was two months
after the deadline for filing of the SACC)—the Court granted the request on June 24,
2015, which was two days prior to the deadline for the Motion.  (*Id*. at 4).  Providers
argue that "[g]iven the extensive nature of the redactions in both the body of the SACC
and the Appendix, and the nearly two months that have elapsed, the additional
information contained in the confidential version cannot be considered for purposes of
this motion to dismiss."  (*Id*. (footnote omitted)).

      The parties do not dispute that the Plaintiffs were provided with "a complete
version of the Appendix . . . shortly after the SACC was filed."  (*See* Mot. at 4 n. 1
(citing Declaration of Eric D. Chan ("Chan Decl.") (Docket No. 168-18) ¶ 10; Opp. at
8 n. 6).  Indeed, it appears from the Chan Declaration that "[o]n May 1, 2015, [the day
after the SACC was filed (*see* Docket No. 152),] counsel for United provided
'unredacted' versions of the SACC and its Appendices via e-mail."  (Chan Decl. ¶ 9).
The Chan Declaration notes that the version sent on May 1, 2015 did not include
patient names and was labelled as "CONFIDENTIAL – NOT FILED IN COURT."
(Chan Decl. ¶ 10).  Mr. Chan further describes his communication with counsel for

CIVIL MINUTES—GENERAL                                              17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015

Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

---

United on June 4, 2015 to procure a copy of Appendix I with patient names included, which was provided on June 10, 2015 (Chan Decl. ¶ 11), and a discussion on June 17, 2015 during which it was mentioned that one of the grounds for Providers' pending motion to dismiss would be that the filed version of Appendix I contained blank columns (Chan Decl. ¶ 12).  Mr. Chan observes that an unredacted version was filed shortly thereafter, but contends that at the time of the filing, "United had not yet provided to the Providers any courtesy copy of the filing that it made under seal," which prevented them from determining whether the filed versions comported with the versions sent on May 1, 2015.  (Chan Decl. ¶¶ 13-14).

Although the Court notes the delay in filing the unreacted version under seal, it observes that Providers were provided with an unredacted version the day after the SACC was filed.  To the extent there are inconsistencies between the version provided on May 1, 2015 and the version filed under seal, which the Court has been given no reason to suspect is the case, the Court will address any such identified inconsistencies at a later date.  For the moment, however, the Court does not discount the information provided in the unredacted columns of Appendix I.

### iii.   *Rule 9(b) and the Contents of the SACC and Appendix I*

United contends that the SACC contains far more information than the Court had previously identified as lacking.  (Opp. at 7).  Specifically, the SACC itself alleges that "'Counterclaim Defendant Surgery Centers waived complete Member Responsibility Amounts for at least 96% of claims submitted,'" (*id*. (quoting SACC ¶ 95)), "and that the Providers effectively admitted this was so for at least 200 members" (*id*. (citing SACC ¶ 96)).  Moreover, Appendix I is "a spreadsheet that identifies 2,024 members and 29,617 claim lines," and "[e]ach claim within Appendix I identifies: member name; provider name and taxpayer identification number; date of service; billed procedure's CPT code; billed amount; amount paid; member's deductible and co-payment obligations; bill received date; paid date; and the status of the health benefit plan as self-funded or fully insured."  (*Id*.).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 14-03053 MWF(VBKx)          **Date:** October 23, 2015
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
              Inc., et al.

The Court was previously concerned that the FACC inadequately alleged fraud
by providing a limited number of detailed examples as to the types of fraud alleged,
and then extrapolating these examples to all Counter-Defendants through an
impermissible "everyone did everything" theory.  (*See* Docket No. 144 at 19).  As
discussed above and below, United has now at least provided line item allegations for
all of the Counter-Defendants, and has tied those allegations to the particular category
of fraud alleged with respect to the claim line, such that the Counter-Defendants have
notice of the allegations against them.  Due to these and other amendments delineating
the roles of particular Counter-Defendants in the alleged misconduct, the Court's prior
concerns have been satisfactorily addressed in the SACC.

### iv.    *Line Item Objections*

Providers contend that the unredacted information reveals that: "United charged
no co-pay whatsoever on roughly half of the claims"; "[m]any claim lines contain
negative co-pays and negative charges"; "[w]here the co-payment amount is a positive
number, it is sometimes as small as one cent on submitted bills for thousands of
dollars"; "[t]he majority of supposed co-payment and deductible amounts are irregular
amounts that the Providers would not have been able to calculate prior to submitting
their reimbursement claims to United, given their lack of access to the plan
documents"; and "[t]here is sometimes more than one claim line for a single payment,
or duplicate lines for the same service with different 'paid dates.'"  (Mot. at 4
(emphasis removed)).  Providers state that such deficiencies indicate a failure of even
the unredacted Appendix I to meet Rule 9(b)'s requirements.  (*Id.*).

United, however, contests Providers' specific challenges to Appendix I as
follows:  "the Providers' challenges to the individual line items in Appendix I fail to
undermine its accuracy" because "the Providers challenge a small number of claims on
Appendix I—and thus conflate Rule 9(b)'s pleading requirements with evidentiary
issues to be explored during discovery" (*id.* at 8 (citing *Cooper*, 137 F.3d at 627));

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                    Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

Providers challenges to lines that have no deductible or co-pay amount are without merit because, even if certain claim lines do not have deductibles, "United has alleged that some portion of each of the 2,000 patients' services required Member Responsibly payments" and, further, "without the Providers' alleged and verified wrongdoing," particular patients "would not have received any services from the Providers, and none of the amounts paid by United relating to" the patients would have been paid (*id*. at 9); "Providers' assertion that a small number of Appendix I's lines include a negative number is also unavailing" because "[i]n nearly every instance, the [negative] amount fully offsets a positive amount, with no net impact on the amounts listed" (*id*. (footnote omitted)); and, finally, as to co-pay amounts as small as $.01 or more than one claim line for a single payment, United contends that "Providers do not explain how any of these things, however rare, bear upon the sufficiency of United's allegations, which is the issue presented on a motion to dismiss" (*id*. at 10 (footnote omitted)).

The Court agrees with United that the identified incongruities in the specific claim lines are insufficient to defeat United's allegations of fraud.  As a whole, Appendix I provides sufficient detail to cure the deficiencies identified in this Court's Order dismissing the FACC.  It puts Providers on notice of (1) ***what*** type of misrepresentation is alleged with respect to each submitted claim; (2) ***who*** made each misrepresentation; (3) ***when*** the misrepresented claims were submitted to United; and (3) ***how*** those submissions impacted United.  It may be that individual claim lines are problematic, as Providers exhort.  But such issues are not properly determined at this stage of litigation.  Existing allegations as to Providers' knowing submission of false claims are sufficient to move this action to discovery, and after sufficient evidence is gathered with respect to the claims and patients involved in this action, the parties may properly brief the objections Providers now raise (if any still remain).

Even United concedes, however, that there are 172 patients for whom no copay or deductible is listed.  (Opp. at 9, n. 8).  The Court agrees with providers that United cannot plausibly recover for overpayments as to those patients since no overpayments

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
          Inc., et al.

have been made in the first place.  United is therefore **ORDERED** to withdraw claims relating to those patients from the SACC and Appendix I.

### 3. Co-Pay Waiver Theory and Elements of Fraud

#### a. *Statements Made to Patients as Opposed to United*

Providers argue that United cannot recover for misrepresentations made to patients, rather than to United.  (Mot. at 5-6).  Providers contend that "[r]ather than bolster the allegations relating to the fraud upon United, the SACC simply adds allegations about how patients were supposedly deceived by various individuals acting on behalf of the Providers."  (*Id*. at 5).  Further, Providers argue that United's allegations demonstrate that the relevant patients are capable of recovering for misrepresentations made to them, as evidenced by the fact that "United Member 8 has independently brought two lawsuits against some of the Counter-Defendants in this case, and that her allegations in one of the lawsuits alleges the same theory of fraud as in the SACC, e.g., misrepresentations about coverage."  (*Id*. at 6 (citing SACC ¶ 126)).

United, in contrast, argues that "[t]he SACC alleges that the Providers deceived hundreds of patients into believing that they had coverage for Lap Bands, only later to tell them that United had changed its mind once they had undergone costly preparatory medical procedures."  (Opp. at 10 (citing SACC ¶ 105-222)).  "As alleged in the SACC, after lying in this manner to [for example] United Member 8 and other patients, and after performing and billing for services such as EGDs and sleep studies that were supposedly required for the Lap Band surgery, [SACC] ¶¶ 118, the Providers obtained payments from United for services that were not covered under patients' health plans and would not have been procured absent these lies."  (Opp. at 10).  United argues that it "properly alleges that this practice constituted common law fraud," because "[i]t alleges that when the Providers lied to their patients about their insurance coverage, the Providers then submitted claims that falsely represented that the services were

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:       Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
             Inc., et al.

medically necessary to treat conditions unrelated to Lap Band surgery, when in fact, that was the express purpose of such service." (*Id.* at 10-11 (citing SACC ¶ 106)).

Moreover, United argues that "even as to the misstatements to the patients, section 107 of the Restatement of Trusts (3d) provides that 'a trustee may maintain a proceeding against a third party on behalf of the trust and its beneficiaries,'" and, therefore, "courts hold that a trustee can sue on behalf of their beneficiaries where the wrong committed on the beneficiary resulted in the dissipation of trust assets." (*Id.* at 11). United analogizes this to the situation in this case, contending that "[t]o the extent that United serves as a fiduciary claims administrator to a plan, it has the authority and right to recover for the injury caused by the Providers' lies." (*Id.*).

The SACC alleges, for example:

> At the direction and control of Michael and Julian Omidi and coconspirator Robert Macatangay, Omidi Network representatives, including call- center operators, administrators, physicians, and patient coordinators routinely misled patients who did not have insurance coverage for Lap Band surgery performed at or by the Counterclaim Defendants into believing that they had such coverage. These Omidi Network representatives deceived or lied to these patients, knowing that these patients were not covered for Lap Band surgery, either at all, or on an out-of-network basis, or with reckless disregard for whether patients had such coverage. The Omidis and their representatives did so for the purposes of inducing patients to proceed with what they told the patients were pre-Lap Band services, ***and securing reimbursement from United for such services based on incomplete or misleading information***, as set forth in the examples below.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
          Inc., et al.

Once the pre-Lap Band services were complete, and after performing whatever additional services were purportedly revealed as necessary by the pre-Lap Band services, the Omidi Network physicians, patient coordinators, and other representatives would make excuses as to why they could not proceed with Lap Band surgery, or they failed to schedule such surgery, or they told patients that their insurance had denied the request for Lap Band coverage, or that they were waiting for insurance to approve the Lap Band surgery.

Had the United members known that they were not covered for Lap Band surgery performed by Omidi Network Surgery Centers, these members would not have consented to these services, which, having been misrepresented as pre-Lap Band services, were unnecessary and inappropriate.  Moreover, in that event, United would not have made any payments for such services on behalf of its insured or self-funded group-health plans.

United is entitled to reimbursement for all payments made to the Counterclaim Defendants for services provided to patients who were deceived by Omidi Network physicians and patient coordinators into consenting to pre-Lap Band services based on the false pretense that these members had coverage for Lap Band surgery performed at or by the Counterclaim Defendants. United is also entitled to a declaration that United and the health benefit plans that it insures or administers have no obligation to make any future payment to the Counterclaim Defendants for any services provided to patients under the false pretense of insurance coverage for Lap Band surgery.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

(SACC ¶¶ 106-09 (emphasis added)).

Ultimately, the Court views United's allegations regarding the misrepresentations made to patients as culminating in allegedly false claims sent to United itself.  (*See, e.g., id*. ¶¶ 6, 106).  As a result of Providers' alleged deception of Plan Members, United was tricked into paying for unnecessary services.  And to the extent United acted as a claims administrator for self-funded plans, United has the authority to recover for injury caused to the individual employers of Providers' patients.  Put simply, the SACC alleges that Providers' fraud caused a direct economic harm to United or sponsors of plans administered by United.  At least at this early stage of litigation, it is impertinent that the original misrepresentations in the alleged chain of fraud were made only to the patients who are not parties to this action.

### b. *Misrepresentations of Total Charges Submitted to United*

Providers challenge the very foundation of United's co-pay waiver theory of fraud.  Specifically, Providers argue that they could not have fraudulently submitted inflated claims that failed to account for waived co-pays because they "did not know whether any co-pays were owed, much less the amount of such co-pays, at the time they submitted their reimbursement claims."  (Mot. at 6-7 (citing SACC ¶ 4)).  Providers conclude that the SACC does not support United's claims since no allegations establish that any false representations were made to United.  (*Id.*).  As counsel for Providers put it at the hearing, a mere "stink" of fraud is insufficient to state a claim for relief.

In contrast, United argues that its allegations regarding co-pay waiver "satisfy all the elements of common law fraud," as the Court has previously concluded.

Before turning to the parties' substantive arguments, the Court addresses one observation made by Providers in support of this portion of the Motion.  Providers state that "the Court [previously] acknowledged that 'there is no affirmative duty for out-of-

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)               Date:  October 23, 2015

Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

network healthcare providers like Plaintiffs to collect or disclose collection of co-pay[s].'" (*Id.* at 6 (citing Docket No. 145 at 26) (internal quotation marks omitted)). However, the cited portion of the Court's prior Order is merely the Court's summary of Provider's argument on this point.  The Court went on to note that "Providers misconstrue the FACC's allegations—this is not a case of non-disclosure absent an affirmative duty, but rather an instance in which affirmative misrepresentations were alleged to have been made during the course of claims submissions."  (Docket No. 145 at 26).

       The Court also notes its previous conclusion that United's stated theories are based on affirmative misrepresentations, including in the co-pay waiver context. Specifically, the Court reasoned that this case "asks whether reporting ***charges*** to an insurer that allegedly fail to account for co-pay waivers but are meant to reflect the fees actually charged to the patient constitutes a misrepresentation," and concluded that "[t]he allegations in the FACC support[ed] a finding that Providers' purported practice constitutes misrepresentation."  (Docket No. 145 at 28).  Further, the Court observed:

              Providers contend that they made no misrepresentations by failing to disclose waiver of co-pay because the industry-standard billing forms contain no spaces for disclosure of discounts.  (Mot. at 15).  Rather, Providers state that they "did here what every other healthcare provider does," and simply noted their "Total Charges" on these forms, making no representations as to whether they would collect co-pay obligations.  (*Id.* at 16).  Providers also note that they did not know the amounts of the relevant copays until after they had submitted these forms, since providers do not learn these amounts until the insurer or plan sends an Explanation of Benefits ("EOB") in response to claim submissions.  (*Id.*). Providers cite to the Declaration of Araminta Salazar ("Salazar Declaration") as evidence of the EOB format.  (*Id.*).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)               Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
          Inc., et al.

As a preliminary matter, Providers' assertion that the FACC
alleges no misrepresentations ignores the FACC's allegations
outside of the deduction context.  Providers focus on United's
fraud allegations regarding waiver of co-pay, and neglect
to address United's other fraud allegations; namely that
Providers submitted "[f]raudulent claims that misrepresented
the nature of the procedure performed, or in
some cases, completely failed to disclose that the member
received a gastric Lap Band," "[f]raudulent claims that sought
payment for services which were charged using inflated CPT
codes," "[f]raudulent claims that sought payment for services
which were never performed," "[f]raudulent claims that inflated
the member's BMI in order to receive secure coverage for the
Lap Band surgery," and "[f]raudulent claims that demanded
exorbitant fees far in excess of the usual and customary rate."
(FACC ¶ 285).

Moreover, even as to the deductions, as discussed above,
United has alleged conduct that could amount to affirmative
misrepresentations.  Providers argue that they were not aware of
co-pay amounts when they submitted the claims for
reimbursement (Mot. at 16), but the allegations of
misrepresentations in the FACC are not negated by invocation
of these factual issues at this stage in the proceedings.

(Docket No. 145 at 28-29).

    With these prior conclusions and present arguments in mind, the Court addresses
the co-pay waiver theory addressed in the SACC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)            **Date:  October 23, 2015**

**Title:**    Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group, Inc., et al.

### i.   *SACC's Fraud Allegations and Providers' Alleged Knowledge of Co-Pay Amounts*

Providers argue that they were not aware of precise co-pay amounts for each claim prior to submitting bills to United and therefore could not have misrepresented the charged amounts.  Specifically, Providers note that "[t]he SACC establishes that (1) United, not the Providers, calculates the supposed co-payment and deductible amounts (if any) on specific reimbursement claims; (2) United does not do so until **after** the Providers submit their claim forms; (3) after United receives the claim forms, United issues a 'Provider Explanation of Benefits' form (EOB) that sets forth the applicable co-pay amounts; and (4) the EOBs are issued at the same time that United issues payment to the Providers."  (Mot. at 7 (emphasis in original)).  Providers conclude that they had no knowledge of allegedly false charges and could not be expected to deduct an amount that has not even been calculated.  (*Id.* at 7, 12-13).

In contrast, United notes that the SACC makes sufficient allegations of knowing misrepresentations on which United relied.  According to United, the very fact that "Providers routinely verified with United the amount that the patients had yet to satisfy on their out-of-network deductibles" shows that "Providers could have, but did not, seek and require payment by the patients the deductible amounts either before providing services or, after service, but before billing United for those services."  (Opp. at 6 (citing SACC ¶¶ 147, 149, 188, 190, 196, 199, 233, 236)).  "More fundamentally," United contends, "it does not matter if a provider cannot calculate the co-payment or deductible at the time of billing" because "[w]hat they cannot do is submit a false claim form with charge amounts that include waived Member Responsibility Amounts."  (*Id.*).

United points out that "[t]he inability to calculate a co-payment or deductible at the time of billing is common under Medicare, but nonetheless it is conceded that under Medicare, the claims submissions that include waived deductible and co-pay amounts are fraud."  (*Id.* (footnote omitted) (citing 59 Fed. Reg. 65,372, 65,374 (Dec.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)                **Date:**  October 23, 2015
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

19, 1994)).  There is no reason, according to United, to treat this case differently as "[f]raud claims based on the same facts and claim forms for commercial insurance beneficiaries have likewise been repeatedly recognized to state a claim."  (*Id.* (citations omitted)).

    The Court agrees that the temporal issues raised by Providers are insufficient to mandate dismissal at this time.  The Court recognizes that Providers may well not have known the precise amounts of co-pay for all claims submitted to United and that there is some evidence to this effect in the SACC.  Taking the allegations in the SACC as a whole, however, United states a viable claim for relief.  Indeed, the SACC includes claims that Providers were well-aware of the co-pay obligations prior to submitting their bills to United.  For instance, as to United Member 23, United alleges that Providers "could have, but did not, see and require payment of her more than $2,600 outstanding deductible . . . before later billing United for these services."  (SACC ¶ 190).  And even if Providers did not know the exact amount of co-pay for every claim, United persuasively argues that Providers knew the bills as to each patient—as opposed to claim (some claims required no copay, as discussed above)—were inflated by at least some amount.  (Opp. at 5).  Indeed, the SACC clearly alleges that "at the time Counterclaim Defendants submitted these materially misleading and fraudulent claims to United, Counterclaim Defendants knew the falsity of such representations."  (SACC ¶ 452; *see also id.* ¶¶ 4, 97).

    No more is required at this stage of the litigation.  As United correctly notes, state-of-mind allegations need not comply with the tightened pleading requirements of Rule 9(b).  *See Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973) ("Nor does Rule 9(b) require any particularity in connection with an averment of intent, knowledge or condition of the mind.").  Allegations described above are sufficient to move this case to discovery, and if it turns out that no evidence supports Providers' knowledge of co-pay amounts, Providers may raise their concerns on a motion for summary judgment.  The Court is therefore satisfied that United has sufficiently pleaded knowing misrepresentation of the submitted bills.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)          Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
           Inc., et al.

Of course, whether United reasonably relied on such misrepresentations is a
different matter.  United argues that it the following allegations are sufficient to
establish reliance:

> Counterclaim Defendants submitted the claims to United with
> the intent to induce United to rely on the false statements as to
> the amount charged to the members and, therefore, pay to
> Counterclaim Defendants an amount that was (in the aggregate)
> millions in excess of the actual amount charged to the members
> or the rate regularly charged by the Counterclaim Defendants to
> cash-paying patients, or the amount that should have been paid
> under the plan.  United reasonably relied on the false statements
> contained in the claims submitted by Counterclaim Defendants.
> Based upon such reliance, United paid to Counterclaim
> Defendants amounts based on the billed charges in the claims,
> when, in fact, the Counterclaim Defendants had not actually
> charged such amounts to the members.

(SACC ¶ 453).  The Court holds, in accordance with its prior Order, that United
adequately alleged reasonable reliance.  Providers' contention that United was not
relying on the "total charges" to determine whether co-pay had been waived is
unpersuasive.  The SACC's central point is that United relied on the submitted "total
charges" in remitting payment when those charges were, in fact, misrepresented.  The
elements of fraud are thus properly alleged, and the SACC survives this stage of the
proceedings.

Providers' cited authority does not compel a different result.  In *Connecticut
General Life Insurance Co. v. Grand Avenue Surgical Center, Ltd.*, No. 13 C 4331,
2015 WL 1868587, at *1 (N.D. Ill. Apr. 21, 2015), Connecticut General Life Insurance
Company ("CGLIC") filed suit against a surgery center ("GSAC") "seeking a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

judgment declaring that GASC [was] not entitled to any reimbursement because the underlying health insurance plans exclude coverage where, as allegedly occurred here, a provider waives patient cost-sharing fees such as co-insurance, co-payments, and plan deductibles."  GASC, in turn, asserted a promissory estoppel claim against CGLIC, "seeking reimbursement of its charges at the percentage CGLIC allegedly promised to pay during telephone calls that GASC made before scheduling any surgical procedures."  *Id*.  CGLIC applied a "fee forgiveness flag" to claims coming from GSAC, and warned GSAC that it would not pay claims from GSAC until it had been presented with "clear evidence" that "(1) 'the charges shown on the [GASC] claims are [GASC's] actual charges for the services rendered' and (2) 'the [plan member] is required to pay the applicable full out-of-network coinsurance and/or deductible.'"  *Id*. at *3 (alteration in original).  The flag was subsequently lifted, though the parties disputed the reason behind this change, and claims were subsequently submitted by GASC after the fee forgiveness issue was resolved.  *Id*. at *4.  The issue that remained in dispute, however, was "whether GASC [was] entitled to additional payment on these [post-fee forgiveness resolution] claims based on a promise CGLIC made when GASC called before each patient's surgery to verify insurance coverage."  *Id*.

        In reviewing the cross motions for summary judgment presented by the parties, the court evaluated CGLIC's asserted unclean hands and contract-based defenses against GASC's promissory estoppel claim.  *Id*. at *7.  The court noted that "[a]ccording to CGLIC, GASC ha[d] unclean hands because it misrepresented its billing and collection practices . . . to get the fee forgiveness flag lifted."  *Id*.  The court concluded that "[t]he problem with this argument [was] that GASC's only source of information about whether a patient owed cost-sharing fees was the EOB received after submitting a claim," and the court had already categorized these EOBs as ambiguous at best.  *Id*.  The court stated that "[i]t cannot be said that GASC has unclean hands simply because it failed to interpret such ambiguous EOBs as requiring the patient to be billed for cost-sharing fees."  *Id*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

Crucially, however, the district court reasoned in the context of a summary judgment motion, where ambiguous EOBs were the only source of information about co-pays.  Here, however, United alleges that that Providers **did** have knowledge of the deductibles prior to submitting its claims and receiving the EOBs.  This difference illustrates precisely why dismissal is improper on a Rule 12(b)(6) motion as opposed to a motion for summary judgment.  The SACC's allegations are sufficient to push this case forward to discovery.

Providers' remaining case law is similarly unavailing.  In *Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc.*, No. 13-CV-3422-WJM-CBS, 2015 WL 1041515, at *1 (D. Colo. Mar. 6, 2015), several ambulatory surgical centers ("ASCs") brought an antitrust suit against various Cigna entities.  Cigna, in turn, asserted counterclaims under ERISA, the Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. § 1962(c), the Colorado Organized Crime Control Act ('COCCA'), Colo. Rev. Stat. § 18–17–104, abuse of health insurance, Colo. Rev. Stat. § 18–13–119, civil theft, Colo. Rev. Stat. § 18–4–405, and state law claims for fraud, aiding and abetting fraud, negligent misrepresentation, aiding and abetting negligent misrepresentation, unjust enrichment, and tortious interference with contract.  *Id*.  The counterclaims were predicated, in part, on alleged activity involving the "ASCs operat[ing] a 'fee-forgiving' or 'dual-pricing' scheme in which the ASCs promised patients that they would receive medical services at in-network rates in order to induce them to use the ASCs' facilities."  *Id*.  "The ASCs estimated in-network rates based on Medicare rates, which were much lower than the 'inflated' rates the ASCs later submitted to Cigna for reimbursement, and waived the patients' co-insurance payments, billing them small amounts or nothing at all."  *Id*. at *2.  "While the ASCs disclosed to Cigna on their claim forms that '[t]he insured's portion of this bill has been reduced in amount so the patient's responsibility for the deductible and copay amount is billed at in network rates,' they did not disclose how the charges were computed or that the ASCs did not charge the patients the amounts later submitted to Cigna."  *Id*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

The counterclaim defendants moved to dismiss the counterclaims arguing, as relevant here, that "Cigna ha[d] failed to plead any misrepresentation because Cigna admits that the material aspects of the challenged billing practices were disclosed, specifically, the ASCs' reduction of a patient's bill and deductible or co-pay amount in order to approximate in-network rates, and the fact that the in-network rate the ASCs proposed was an estimate."  *Id*. at *5.  The court concluded that "[i]n admitting that the ASCs disclosed that they reduced the patient's portion of the bill and made the patient responsible for only an in-network deductible and co-pay amount, Cigna concedes that it was provided information from which it should have known that the ASCs were reducing the amount billed to patients and that they were attempting to approximate in-network rates."  *Id*. at *6.  "Given this disclosure, which appeared in the ASCs' claim forms," the court found "it implausible that Cigna was misled into believing that the patient was charged the same amount that the ASCs billed to Cigna, because Cigna was aware that the ASCs' claims were higher than in-network rates."  *Id*.  The court further noted that Cigna had failed to "allege[] any other theory under which the Court could find that the ASCs made misrepresentations constituting fraud," or "explain how the ASCs' failure to disclose how the in-network estimate was computed was at all material in inducing Cigna to overpay the claims."  *Id*.

No similar disclosure has been alleged here.  Therefore, the Court fails to see the relevance of *Arapahoe*.

### ii.    *Reconsideration of the Court's Prior Ruling as to Misrepresentations*

Providers note that this Court previously concluded that, with respect to the FACC, "'United ha[d] alleged conduct that *could* amount to affirmative misrepresentations.' (Dkt. #145 at p. 29 (emphasis added))."  (Mot. at 11).  However, Providers contend that "the Court's holding was based on the assumption that the Providers could calculate the co-pay amounts at the time that they submitted their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES—GENERAL</u>

**Case No.** CV 14-03053 MWF(VBKx)         **Date:** October 23, 2015
**Title:**    Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

claims," and "[t]he SACC's more complete allegations foreclose that possibility." (*Id.*).

In its prior Order, the Court evaluated a 1981 California Attorney General Opinion Providers cited in support of their position regarding co-pay reporting. (Docket No. 145 at 26-27). The Court noted:

> In that Opinion, the Attorney General interpreted whether a dentist's failure to report deductions of co-pay in reporting his "usual fee" pursuant to a provision in a dental insurance plan violated California laws against misrepresentation and fraud. 64 Cal. Op. Att'y Gen. 782, 1981 WL 126814, at *1-2 (1981). Because the term "usual fee" in the plan was ambiguous, and the term was to be construed against the insurer who drafted the plan, the Attorney General found that the plan could be interpreted to allow co-pay to be included in "usual fee" even when the patient did not have to pay it. *Id.* at *3.
>
> . . .
>
> [The] Attorney General Opinion . . . [is] inapposite. The term "usual fee" as discussed in the Attorney General Opinion necessarily is not tied to a specific patient and service. In contrast, as alleged in the FACC, "Charges" or "Total Charges" were meant to reflect the fees actually charged to the patient for the claims reflected on the forms. (FACC ¶¶ 56, 288). Moreover, the Attorney General was interpreting an ambiguity in an insurance plan against the drafter, in accordance with well-established rules of insurance contract interpretation. Here, however, the "Total Charges" prompt

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 14-03053 MWF(VBKx)          Date:  October 23, 2015

Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

> —which United alleges created a duty to disclose what the actual charge for the services rendered were (*id*. ¶¶ 55-57)—did not come from a document that United drafted.  Rather, United alleges that "[t]hese are forms approved and generated in connection with the federal Medicare program, and it is common in the health care industry for these same forms to be used in connection with other governmental and non-governmental insurance."  (*Id*. ¶ 55).  Therefore, the interpretation afforded by the Attorney General is inapplicable here.

(*Id*.).  Providers ask the Court to reconsider its prior ruling.  (Mot. at 11-12).  The Court declines to do so.

### B.    <u>Conspiracy to Commit Fraud</u>

Providers note the Court's prior decision that United had failed to plead a conspiracy to commit fraud because it failed to plead an underlying fraud claim (*see* Docket No. 144 at 31) and argue that the conspiracy claim once again fails because "[t]he same failure is present here with respect to the vast majority of the 30,000 reimbursement claim lines at issue."  (Mot. at 13).  United, however, argues that this argument must be rejected for the same reasons expressed in connection with the fraud claims, above.  (Opp. at 12).

As the Court has previously recognized, under California law, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 510-11, 28 Cal. Rptr. 2d 475 (1994) (citing *Wyatt v. Union Mortgage Co*., 24 Cal.3d 773, 784, 157 Cal. Rptr. 392 (1979)).

---

CIVIL MINUTES—GENERAL                                                    34

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 14-03053 MWF(VBKx)                **Date:** October 23, 2015

**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

"The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. The cause of action is the damage suffered." *Mox, Inc., v. Woods*, 202 Cal. 675, 677 (1927). "Although an express agreement need not be shown for a plaintiff to prevail on a civil conspiracy claim, there must be at least a tacit understanding." *In re Sunset Bay Associates*, 944 F.2d 1503, 1517 (9th Cir. 1991). "Under California law, the existence of a conspiracy 'may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances.'" *Id.* (quoting *Greenwood v. Mooradian*, 137 Cal. App. 2d 532, 538 (1955)).

The Court previously observed that the allegations in the FACC supported an inference that the Counterclaim Defendants, controlled by the same parties, were engaged in a collective effort—and had at least a tacit agreement—to jointly "'defraud United by submitting and collecting on fraudulent health insurance claims and medical records, and to obtain by means of false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of United, in connection with the delivery of or payment for health care benefits, items, or services.'" (Docket No. 144 at 30 (quoting FACC ¶ 304)).

However, even so, the Court concluded that United's failure to adequately plead its fraud claim also rendered its conspiracy allegations deficient. (*Id*. at 31). The Court noted that "'[i]n some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).'" (*Id*. (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003))). The Court stated that "false statements" made by each Counterclaim Defendant are not necessarily required, but the role of each Counterclaim Defendant in the alleged scheme must be made clear. (*Id*. (citing *Swartz*, 476 F.3d at 764)).

CIVIL MINUTES—GENERAL                                                      35

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)            Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

Here, Providers concede that they do not challenge the conspiracy claim, except to the extent that they challenge the underlying co-pay waiver fraud allegations. (Reply at 10).  As the Court has already concluded that United has adequately alleged fraud generally and the co-pay waiver theory specifically, this theory of liability will be allowed to proceed.

To the extent the SACC states alleges conspiracy to commit fraud as a distinct and freestanding claim, the Court **DISMISSES** that claim *with prejudice*.

## C.    <u>State Law Claims and Self-Funded Plans</u>

### 1.  **Article III Standing**

Providers argue that a claims administrator lacks Article III standing to bring state law claims as to self-funded plans because it has suffered no "injury-in-fact" in connection with these claims.  (Mot. at 13-14).  United, in contrast, contends that "[t]his Court previously (and correctly) concluded that United has Article III standing to raise state law claims to recover assets that it authorized to be paid on behalf of self-funded plans."  (Opp. at 12 (citing Docket No. 145 at 8)).

A plaintiff must have Article III standing in order for the suit to constitute a "case or controversy" over which a federal court has subject matter jurisdiction. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101(1998)).  In order to demonstrate Article III standing, a plaintiff must show: "(1) injury in fact; (2) causation; and (3) likelihood that a favorable decision will redress the injury."  *Schneider v. Chertoff*, 450 F.3d 944, 959 (9th Cir. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  An "injury in fact" consists of "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan,* 504 U.S. at 560 (internal quotation marks and citations omitted).  General allegations regarding injury are sufficient at the pleading stage.  *Braunstein v.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.   CV 14-03053 MWF(VBKx)              Date:  October 23, 2015

Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

*Arizona Dep't of Transp.,* 683 F.3d 1177, 1184 (9th Cir. 2012) (citing *Lujan*, 504 U.S. at 561).

    Previously, the Court recognized that United had made sufficient allegations as to its fiduciary status with respect to the plans at issue to confer it standing for its ERISA claim.  (Docket No. 145 at 4-7).  Further, the Court recognized that ERISA utilizes the terminology of trust law, and courts interpreting ERISA have relied on trust law to do so.  (*Id.* at 8 (citing *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 954 (9th Cir. 2014))).  Moreover, the Court observed, the Supreme Court has noted that ERISA typically treats a plan fiduciary as a trustee.  (*Id.* (citing *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1879 (2011) (stating that ERISA typically treats the terms of a plan as a trust and a plan fiduciary as a trustee))).  Finally, the Court discussed Supreme Court and Ninth Circuit cases recognizing that trustees have Article III standing because they are acting on behalf of parties who own the claims.  (*Id.* (citing *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (discussing Article III standing in the context of assignments, and pointing out that "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit," using trustees initiating suit on behalf of a trust as just such an example); *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1126 (9th Cir. 2006) (noting that trustees and executors have Article III standing because they "have a stake in the litigation because they are acting on behalf of the estate, which owns the claims being litigated"))).  In light of this Supreme Court precedent and the Ninth Circuit's guidance regarding trust law, the Court concluded that United had made an adequate showing of Article III standing as to self-funded plans.  (*Id.* at 8-9).

    In the Motion, Providers argue that, although trust terminology is instrumental in interpreting ERISA, there are limits to this analogy.  (Mot. at 13-14).  Specifically, Providers contend that it would be improper to import this analogy to the issue of an ERISA claims administrator's standing to bring state law claims.  (*Id.*).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015

Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
          Inc., et al.

United, however, argues that the trust analogy is appropriate even as to state law
claims (Opp. at 12) and, moreover, "[e]ven apart from its ability to represent the plans'
interests, the amended allegations in the SACC demonstrate United's own Article III
standing to recover overpayments" (*id*. at 13 (citing SACC ¶ 63)).  United summarizes
its Article III standing as follows:

> As alleged, United's duties as a claims administrator require it
> to evaluate whether claims should be paid under the terms of a
> group health plan.  SACC ¶ 63.  Once United has determined
> that a claim is proper, it is authorized to cause payments to be
> made from the self-funded customer's assets.  *Id.* ¶ 64.  The
> Administrative Services Agreements ("ASA") generally give
> United the exclusive authority to recover overpayments that are
> made on behalf of its self-funded plan clients, including the
> right to initiate litigation.  *Id*. ¶ 66.  Should United recover such
> assets, it must return those assets to the plan sponsors—subject
> to its right to retain a portion of the overpayment as
> compensation for its services.  *Id.*  And, in certain
> circumstances, United could be accountable to its customers for
> claims paid that are inconsistent with the terms of the relevant
> plan.  *Id*. ¶ 65.

> Under these circumstances, holding that United has Article III
> standing to recover amounts that the Providers procured by
> fraud is entirely consistent with United's role as a claims
> administrator for the plans it sues for.  The SACC alleges that
> the Providers' conduct has interfered with United's
> performance of its contractual duties, which is sufficient to give
> United an Article III injury.  *Sprint Commc'ns Co. L.P.,* 554
> U.S. at 288 (recognizing that a contractual right to litigate
> supports Article III standing).  Further, United has the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
             Inc., et al.

---

> contractual authority to recover assets fraudulently paid to
> participants and providers, along with the contractual duty to
> remit such payments to its customers.  *Id*.  It has a monetary
> interest to pursue claims.  *Id*. at 289 (noting that representative
> would have Article III standing to sue for another party if the
> representative kept a portion of the proceeds).  Thus, as in
> *Sprint*, United's duties under the ASA give it standing to
> recover payments made on behalf of its employer customers,
> and avoid the risk of those customers being required to bring
> some or all of those claims in another forum.

(Opp. at 13-14).  This rule is consistent, United argues, "with the long-standing
common law rule (in California and nationally) that a party who possesses another's
property can sue to recover it, should he or she be defrauded of it."  (*Id*. at 14 (footnote
omitted)).

Finally, United points out that "[t]he Providers' only response is to argue that
United claimed in a petition for certiorari filed in the *Spinedex* litigation that it was not
a proper defendant to an ERISA § 502(a)(1)(B) claim because it was just a 'third party
claims administrator'" (*id*. at 14-15 (citing Mot. at 14)); however, United indicates that
"*Spinedex* involves an entirely different issue than here—whether United is a proper
defendant to an ERISA § 502(a)(1)(B) claim when it is not the obligor" (*id*. at 15).

The Court concludes, as it did in its last Order, that United has Article III
standing.  Not only have Providers failed to cite to any authority which would
undermine the Court's prior ruling, but they fail to adequately address United's
allegations in the SACC regarding its duties under the ASAs to pay claims pursuant to
the terms of the plans and, in the event of an improper disbursement, to recover
overpayments.  (*See* SACC ¶¶ 64-66).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

At the hearing, counsel for Providers argued the SACC does not allege a "lock, stock, and barrel" assignment of rights that would enable suit in this Court.  Counsel urged the Court to follow an out-of-circuit opinion in *Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.A.R.L*, where the Second Circuit found that a purported assignee of a promissory had no standing to collect delinquent payments. 790 F.3d 411, 417-18 (2nd Cir. 2015).  In dismissing the complaint, the panel held that the assignee failed to allege that it was transferred the "title [to] or ownership" of the claims.  *Id.* at 418.  At most, the assignee demonstrated that it gained the right to collect owed money under the promissory note, but not the right to the money itself. *Id.*

But this action does not involve a promissory note.  It involves an ERISA plan fiduciary who, for the purposes of standing, occupies the role of a trustee.  And trustees may indisputably litigate claims and collect overpayments on behalf of the trust—or in this case, plan sponsors—even though they do not "own" the money they seek to collect.  The Second Circuit opinion is therefore inapposite; United has adequately alleged Article III standing.

## 2.  UCL Standing

Notwithstanding Article III standing, the Court must determine whether United may properly bring a UCL claim under California law.  Providers argue that United has no standing to sue under the UCL on behalf of self-funded plans because United has suffered no injury with respect to these plans.  (Mot. at 14-15).  United, however, contends that, for the same reasons articulated in connection with its Article III standing, "the amended allegations in the SACC allege that . . . the Providers' unlawful acts caused United to lose 'money or property' under California's UCL (Count II)." (Opp. at 15).

Previously, the UCL afforded standing for "any person acting for the interests of itself, its members or the general public."  *Kwikset Corp. v. Superior Court*

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
            Inc., et al.

---

*("Kwikset")*, 51 Cal. 4th 310, 320, 120 Cal. Rptr. 3d 741 (2011) (internal quotation marks and citations omitted).  However, in 2004, with the enactment of Proposition 64, UCL standing requirements became more stringent.  *Id.* at 320-21.  The California Supreme Court has noted that the purpose of this change was "to eliminate standing for those who have not engaged in any business dealings with would-be defendants and thereby strip such unaffected parties of the ability to file 'shakedown lawsuits,' while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices."  *Id.* at 317 (citations omitted).  "To have standing under California's UCL, as amended by California's Proposition 64, plaintiffs must establish that they (1) suffered an injury in fact and (2) lost money or property as a result of the unfair competition."  *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009) (citing Cal. Bus. & Prof. Code § 17204; *Walker v. Geico Gen. Ins. Co.*, 558 F.3d 1025, 1027 (9th Cir. 2009)) (discussing, in case involving consumer suit alleging that Apple's iPod was defective because it posed an unreasonable risk of noise-induced hearing loss, that consumers lacked standing under the UCL because they failed to show the requisite injury to themselves).

    The "injury in fact" element of UCL standing is meant to incorporate the "established federal meaning," which was already discussed above in the context of Article III standing.  *Kwikset*, 51 Cal. 4th at 322.  In many cases, satisfaction of the "lost money or property" element will satisfy this "injury in fact" requirement.  *Id.* at 323.  In its own right, the "lost money or property" element can be satisfied in "innumerable" ways, such as when a plaintiff is made to: "(1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Id.*  The California Supreme Court has recognized that the economic component of UCL standing renders it more restrictive than federal injury in fact (because it includes fewer types of injury), but also notes that the actual quantum of economic injury needed is only as much as would satisfy injury in fact—all that need be alleged is an

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 14-03053 MWF(VBKx)                **Date:** October 23, 2015
**Title:**   Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

"identifiable trifle" of injury.  *Id*. at 324-25 (internal quotation marks and citations omitted).

As the Court observed in connection with the Motions to Dismiss the FACC, "it does stand to reason that United, as the entity purportedly subject to fraudulent misrepresentations made by Providers, should be permitted to redress the harms stemming from these alleged practices." (Docket No. 145 at 10).  "Moreover, United does not run afoul of *Kwikset's* pronouncement that Proposition 64 was meant to 'eliminate standing for those who have not engaged in any business dealings with would-be defendants.'" (*Id*.).

However, the Court previously concluded that it was "unclear what economic injury United suffered in connection with self-funded plans as a result of Providers' purported conduct." (*Id*.).  The Court observed that, absent a showing of such injury, the UCL standing requirements did not permit United to bring suit.  (*Id*.).  The Court, therefore, ruled that United did not have standing to bring a UCL claim on behalf of the self-funded plans.  (*Id*.).

Providers point out that "United amended the SACC allege that, under 'ASAs between it and the relevant group health plan sponsor,' it 'has the contractual authority to recover overpayments made on behalf of the group health plan . . . .'" (Mot. at 14 (quoting SACC ¶ 488)).  "United claims it has lost injury or property because it is 'the party with the right to recover overpayments made as a result of fraudulent or improper claims.'" (*Id*. (quoting SACC ¶ 490)).  Providers argue, moreover, that this Court's ruling in a related suit, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc*., 2015 WL 1608991, at *70 (C.D. Cal. Apr. 10, 2015), forecloses United's standing here.  (*Id*.).

United, however, urges that it may bring a UCL claim because, "consistent with long-standing California law, California courts recognize that a party has UCL standing to recover assets over which it has an interest, even if it did not own them."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)            Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

(Opp. at 15).  In support of this argument, United cites *Silvaco Data Sys. v. Intel Corp.* *("Silvaco")*, 184 Cal. App. 4th 210, 244 (2010), *disapproved of on other grounds by Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 246 P.3d 877 (2011), *Swain v. CACH, LLC*, 699 F. Supp. 2d 1117, 1122 (N.D. Cal. 2009), and *Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.* *("Nutrishare")*, 2014 WL 1028351, at *3 (E.D. Cal. Mar. 14, 2014).  (*Id.* at 15, 15 n. 14).

       The Court agrees with Providers that *Silvaco* does not stand for the proposition that a plaintiff has standing to assert a UCL claim simply because at some point in time it controlled funds belonging to others.  There, the appellate court stated, in discussing the UCL's "lost money or property" requirement, that:

               Ordinarily when we say someone has "lost" money we mean
               that he has parted, deliberately or otherwise, with some
               identifiable sum formerly belonging to him or subject to his
               control; it has passed out of his hands by some means, such as
               being spent or mislaid, or ceded in a gamble, bad loan, or
               investment.  Similarly, when we say someone has "lost"
               property we mean that he has parted with some particular item
               of property he formerly owned or possessed; it has ceased to
               belong to him, or at least has passed beyond his control or
               ability to retrieve it.

*Silvaco*, 184 Cal. App. 4th at 244.  The *Swain* court, similarly, stated that it would conclude that a plaintiff had standing to bring a UCL claim if the plaintiff "allege[d] a loss of money or property in which she had prior possession or a vested legal interest, even if that loss is not eligible for restitution."  *Swain*, 699 F. Supp. 2d at 1122. However, the Court does not view these statements as compelling it to adopt the view United espouses.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
           Inc., et al.

The Court acknowledges that, in *Nutrishare*, the district court evaluated a similar situation to the one here, and concluded that because CIGNA had alleged that a medical provider's ("Nutrishare's") "scheme has caused it to pay Nutrishare over six million dollars for procedures that should have cost twenty to thirty percent less than that amount," along with "detailed, specific examples of how Nutrishare's schemes caused such injuries," a motion to dismiss CIGNA's UCL claims for lack of standing should be denied.  *Nutrishare*, 2014 WL 1028351, at * 3.

However, while the Court recognizes that the SACC contains similar allegations that Providers' scheme caused United to pay out claims improperly, and despite the allegations that United is contractually obligated to seek recovery of funds improperly paid out (*see* SACC ¶ 66), which are then generally returned to the plans (though United might be permitted to keep a portion of the overpayment) (*see id.*), the Court remains unconvinced that United has adequately demonstrated that it has "lost money or property" for purposes of UCL standing.  The fact remains that the funds sought do not belong and never belonged to United.

Therefore, the Court maintains its prior conclusion that United does not have standing to assert its UCL claim.  Because United does not point to any possible facts that would change this determination, any further amendments of the pleading would be futile.  Accordingly, the SACC's UCL claim is **DISMISSED *with prejudice*** insofar it seeks recovery on behalf of self-funded plans.

### 3.  United as Party to Contracts for Interference Claim

Providers argue that United's interference claim fails as to self-funded plans because United has failed to demonstrate that it is a party to the relevant contracts. (Mot. at 15).  United, however, argues that it has adequately alleged that "it is a party to the ASA with its customers, and that the Providers' fraud disrupted that contractual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

relationship."  Such allegations, according to United, "are sufficient to state a tortious interference claim and cure the shortcomings identified in the FACC."  (Opp. at 16).

In order to properly plead a claim for tortious interference with contractual relations, a party must satisfy three elements: "(1) it has a valid and existing contract with a third party; (2) defendants had knowledge of the contract; (3) defendants committed an intentional act designed to induce a breach or disrupt the contractual relationship; (4) actual breach or disruption of the contract relationship occurred; and (5) damages were suffered as a result."  *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1203 (C.D. Cal. 2001) (citing *Quelimane Co. Inc. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55, 77 Cal. Rptr. 2d 709 (1998); *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 270 Cal. Rptr. 1 (1990)).  The Ninth Circuit, moreover, recently held that liability for the tort of intentional interference with contractual relations is not limited to parties without any legitimate interest in the underlying contract; rather, parties with an economic interest in the contractual relationship may be held liable for intentional interference.  *See United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1007 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 980 (2015) (noting that, "under California law, the pertinent economic relationship is the one that exists between the two contracting parties," and the tort exists so as "to protect the parties to that relationship from 'interference by a stranger to the agreement'" (citations omitted)).

The Court previously ruled that, as to self-funded plans, United failed to allege that it was a party to the contracts with which it asserted interference.  (Docket No. 145 at 43).

Providers point out that "[t]he SACC supplements United's Fourth Cause of Action for Intentional Interference with Contractual Relations by adding, verbatim, the same allegations regarding United's ASAs that are discussed in connection with the UCL claim."  (Mot. at 15).  But such allegations are deficient, Providers argue, because

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
            Inc., et al.

"the ASAs do not designate United a party to the contracts with the patients who were covered under self-funded plans."  (*Id.*).

United asserts, however, that "as alleged in the SACC, pursuant to the ASAs United has paid or authorized claims from self-funded customers' assets that are due and owing under the relevant plans."  (Opp. at 16 (citing SACC ¶ 488)).  United posits that "[t]he Providers' wrongful and fraudulent conduct was intended to cause United to pay claims not appropriate under the plans," and, "[p]ursuant to the ASA, United is (as noted above) responsible for attempting to recover such assets for its customers, and could be (in certain circumstances) held accountable for such payments."  (*Id.*).  Therefore, United contends that "the SACC sufficiently alleges that the Providers' actions caused a 'disruption' of United's administration of the ASAs, which states a claim for relief."  (*Id.* (citing Docket No. 145 at 44)).

The Court agrees that, ***as to the ASAs***, United has properly alleged that it is a party to the contracts and can, therefore, assert interference with them.  The Court nonetheless notes that these allegations do not demonstrate that United is a party to the contracts with the patients covered under the self-funded plans.  It appears, however, that United is not asserting interference with such contracts, and the Court does not dismiss United's claim on that ground.

###    D.    Preemption

Providers argue that United's state law claims related to alleged co-pay waivers are preempted.  (Mot. at 15-20).

"There are two strands of ERISA preemption: (1) 'express' preemption under ERISA § 514(a), 29 U.S.C. § 1144(a); and (2) preemption due to a 'conflict' with ERISA's exclusive remedial scheme set forth in 29 U.S.C. § 1132(a), notwithstanding the lack of express preemption."  *Paulsen v. CNF Inc*., 559 F.3d 1061, 1081 (9th Cir. 2009) (citing *Cleghorn v. Blue Shield of Cal*., 408 F.3d 1222, 1225 (9th Cir. 2005)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015**
**Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.**

The Court discusses each in turn.

### 1.  "Express" Preemption Under § 514(a)

"Express" preemption, unlike "complete" preemption, does not confer federal question removal jurisdiction.  *See Marin Gen. Hosp. v. Modesto & Empire Traction Co. ("Marin General"),* 581 F.3d 941, 945-46 (9th Cir. 2009).  Express preemption is governed by ERISA § 514(a), which "provides that, subject to various exceptions . . . , ERISA 'supersede[s] any and all State laws insofar as they may . . . relate to any employee benefit plan.'"  *Sarkisyan v. CIGNA Healthcare of California, Inc.,* 613 F. Supp. 2d 1199, 1203 (C.D. Cal. 2009) (quoting 29 U.S.C. § 1144(a)).  "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."  *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-97 (1983).  The Supreme Court has noted that this "preemption clause is conspicuous for its breadth," as "[i]t establishes as an area of exclusive federal concern the subject of every state law that 'relate[s] to' an employee benefit plan governed by ERISA."  *FMC Corp. v. Holliday,* 498 U.S. 52, 58 (1990).  Even state laws that are consistent with ERISA are preempted.  *See Metro. Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739 (1985).

A state law demonstrates the forbidden "reference to" an ERISA plan when it "acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation."  *California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.,* 519 U.S. 316, 325 (1997) (finding that a California law requiring a contractor on a public works project to pay its workers the prevailing wage in the project's locale had no "reference to" ERISA plans).

A state law that does not "refer to" an ERISA plan could, nevertheless, be preempted if it has a "connection with" such a plan.  *Id.* at 325.  Previously, the Supreme Court interpreted "relates to," and consequently "connection with," broadly.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

*See, e.g., Shaw*, 463 U.S. at 97.  However, more recently, the Supreme Court has limited the scope of this analysis.  *See Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 677 (9th Cir. 1998) ("Of late, the [Supreme] Court has come to recognize that ERISA pre-emption must have limits when it enters areas traditionally left to state regulation. . . ."). In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance. Co. ("Travelers")*, 514 U.S. 645, 656 (1995), the Supreme Court recognized that "[f]or the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections."  As such, under the more modern approach, a § 514(a) "connection with" analysis requires "look[ing] both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans."  *California Div. of Labor Standards Enforcement*, 519 U.S. at 325 (quoting *Travelers*, 514 U.S. at 656, 658-59).

Regarding the objectives of ERISA, the Supreme Court has stated that Congress's intent in passing § 514(a) was:

> [T]o ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government. Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries.

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990) (citing *FMC Corp. v. Holliday*, 498 U.S. 52, 60 (1990)).

In contrast, the Supreme Court "has established a presumption that Congress did not intend ERISA to preempt areas of 'traditional state regulation' that are 'quite remote from the areas with which ERISA is expressly concerned—reporting, disclosure, fiduciary responsibility, and the like.'"  *Paulsen v. CNF Inc.*, 559 F.3d

---

CIVIL MINUTES—GENERAL                                        48

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)              **Date:  October 23, 2015**
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group,
               Inc., et al.

1061, 1082 (9th Cir. 2009) (quoting *Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*, 201 F.3d 1212, 1216 (9th Cir.), *opinion amended on denial of reh'g,* 208 F.3d 1170 (9th Cir. 2000), *overruled on other grounds by Aetna Health Inc. v. Davila*, 542 U.S. 200(2004)) (internal quotation marks omitted).  Should a state law have "only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability," preemption does not occur.  *Travelers*, 514 U.S. at 661 (quoting *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130 n. 1 (1992)) (internal quotation marks omitted).

     The Ninth Circuit has utilized a "relationship test" in evaluating "connection with" preemption, which entails a finding that "a state law claim is preempted when the claim bears on an ERISA-regulated relationship, *e.g.*, the relationship between plan and plan member, between plan and employer, between employer and employee." *Paulsen*, 559 F.3d at 1082 (citing *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. 2004)).

     Here, the Court previously decided that United's state law claims for fraud, violation of the UCL, and intentional interference were not expressly preempted.  (*See* Docket No. 145 at 11-25).

     As to fraud, the Court pointed out that California fraud law does not make reference to ERISA plans, as it is a law of general applicability that neither "acts immediately and exclusively upon ERISA plans," nor relies upon the existence of ERISA plans to operate.  (*Id.* at 15-16 (quoting *Paulsen*, 559 F.3d at 1082 (finding that state law negligence claims were not preempted under the "reference to" analysis because they were based on common law negligence principles and select California statutes, laws which did not act "immediately and exclusively" on ERISA plans and the operation of which did not rely on the existence of ERISA plans))).

     The Court further concluded, in evaluating whether there was a "connection with" ERISA plans, that the relevant activity transpired when an out-of-network

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

provider submitted allegedly false bills to United, a claims administrator (and, for some plans, an insurer)—in short, the alleged improprieties took place in the context of a relationship that, in and of itself, is not regulated by ERISA.  (*Id*. at 16-18).  While the Court acknowledged that the claims at issue are not entirely unrelated to ERISA-regulated relationships, and although the Court is cognizant that the issue of preemption presented here is difficult, the Court concluded that "the alleged misconduct does not implicate a state law claim that would subject plans and plan sponsors to 'conflicting directives,' such that it would demonstrably be subsumed within the class of state law Congress would have expected ERISA to preempt."  (*Id*. at 17).

     The Court applied the same logic to the remaining state law claims.  (*Id*. at 22-25).  The Court's conclusion that an intentional interference claim predicated upon the contracts at issue is not preempted as "related to" an ERISA plan may seem counterintuitive at first glance.  However, in reaching this conclusion, the Court was guided by precedent that elucidates the purpose behind § 514, the nature of the conduct at issue, and the fact that allowing for redress in these types of scenarios will further the objective of protecting the integrity of employee benefit plans.  Indeed, one of the cases cited by Providers similarly declined to find preemption of counterclaims made against various ambulatory surgical centers for fraud, aiding and abetting fraud, negligent misrepresentation, aiding and abetting negligent misrepresentation, unjust enrichment, and tortious interference with contract.  *See Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc. ("Arapahoe")*, No. 13-CV-3422-WJM-CBS, 2015 WL 1041515, at *7 (D. Colo. Mar. 6, 2015).  The *Arapahoe* court reasoned as follows:

               The Court finds that Cigna's state law claims are not preempted
               by ERISA because the claims at issue are based on whether the
               ASCs made material misrepresentations, and whether those
               alleged misrepresentations caused the ASCs to be unjustly
               enriched or caused interference with the plans.  Because the
               ASCs are not "principal ERISA entities", no relations between

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                    Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
            Inc., et al.

> such entities are affected by the claims.  The mere fact that the
> plan is associated with the claims, or that the plan is factually
> tied to the alleged tortious conduct, does not make them
> "relate[d] to" ERISA so as to trigger conflict preemption under
> this circuit's precedent.  *Id.* at 1136 (finding claim of negligent
> supervision by insurance company over plan advisor not
> preempted because it related to agency relationship not covered
> by ERISA); *Woodworker's Supply*, 170 F.3d at 990–92 (finding
> claim of fraudulent inducement to join plan not preempted
> because relations among principal ERISA entities are not
> affected and claim is not within scope of ERISA, citing cases).

*Id.*  Admittedly, the court was not applying Ninth Circuit precedent, but the reasoning
is nevertheless persuasive.  *See also Connecticut Gen. Life Ins. Co. v. Advanced
Surgery Ctr. of Bethesda, LLC*, No. CIV.A. DKC 14-2376, 2015 WL 4394408, at *18
(D. Md. July 15, 2015) (holding that tortious interference claim was not preempted
because, "as with the Cigna entities' fraud-based claims, the misconduct complained of
does not involve ERISA entities and the misadministration of ERISA benefits, but the
intermeddling of third party providers in a contract between the Cigna entities, the plan
administrators, and the plan beneficiaries").  As a brief note of clarification, the Court
recognizes that self-funded benefit plans are not "insurance policies," as such.  *See
Scharff v. Raytheon Co. Short Term Disability Plan*, 581 F.3d 899, 906 (9th Cir. 2009).
The term "insurance contract(s)" in its prior Orders was meant not as a term of art, but
rather as a general way to refer to contracts bearing on the benefits issues in this case.

Ultimately, the Court maintains its prior conclusions as to express preemption.

Providers' cited Ninth Circuit authority on the "refer to" and "relate to" issue is
distinguishable from this case.  For example, *Aetna Life Ins. Co. v. Bayona*, 223 F.3d
1030, 1032 (9th Cir. 2000), involved a nurse (Evangeline Castro) employed by Good
Samaritan Hospital and enrolled for life insurance coverage under the group insurance

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
           Inc., et al.

policy issued to Good Samaritan through Aetna Life Insurance Company.   Castro
since passed away, and her sister, Emelita Castro, was designated to receive 85% of the
insurance proceeds to hold in trust for Evangeline's children.  *Id.*  However,
Evangeline's husband, Rey Bayona, who had been designated a 15% interest,
"informed Aetna that he wished to claim a community property interest in 50% of the
policy proceeds."  *Id.*  "Aetna filed a complaint in interpleader in federal district court,
naming Castro and Bayona as defendants"; "Castro answered this complaint, and also
filed counterclaims against Aetna, Good Samaritan Hospital, and the Bene–Flex Plan."
*Id.*  The Ninth Circuit held that "Castro asserted counterclaims for breach of contract,
tortious breach of the covenant of good faith and fair dealing, and fraud—all were
based on common law and state causes of action, and all were preempted."  *Id.* at 1034.

        However, *Bayona* involved counterclaims brought by a beneficiary to a life
insurance policy against the life insurance company that administered the policy, and
questions about what she should have been distributed under the terms the policy.
Here, in contrast, the Court is evaluating claims made by an insurer/claims
administrator against out-of-network providers, asserting various fraudulent and
otherwise wrongful activities pertaining to billing and interactions with plan
participants.  The factual scenarios, in short, are distinguishable in significant respects.

        Providers cite additional, non-binding authority on this issue.  The Court
acknowledges that there are cases which reach conclusions different from those the
Court has adopted in this case.  *See Connecticut Gen. Life Ins. Co. v. Humble Surgical
Hosp., LLC*, No. 4:13-CV-3291, 2015 WL 1311224, at *1 (S.D. Tex. Mar. 24, 2015)
(preempting overpayment claims against hospital ).  However, the Court has conducted
its analysis, pursuant to the facts of this particular situation and Ninth Circuit law, and
in a manner that it believes respects the purpose and scope of § 514.  The Court does
not find Providers' out-of-circuit authority persuasive here.

        Providers acknowledge that "'the bare fact that the Plan may be consulted in the
course of litigating a state-law claim' may be insufficient [for preemption]."  (Mot. at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

18-19 (quoting *Blue Cross of California v. Anesthesia Care Associates Med. Grp., Inc*., 187 F.3d 1045, 1051 (9th Cir. 1999)).  However, Providers look to non-binding authority to support their contention that preemption applies when, as here, "United cannot prevail on its state law theories unless the plan provisions are not only **consulted**, but **construed** in a manner favorable to United."  (*Id*. at 20 (emphasis in original)).  Specifically, Providers cite to *Metropolitan Life Insurance Company v. DePalo*, No. CIV.A. 13-3092 KM, 2014 WL 4681094, at *10 (D.N.J. Sept. 22, 2014) and *Merling v. Horizon Blue Cross Blue Shield of New Jersey*, No. CIV. 04-4026 (WHW), 2009 WL 2382319, at *12 (D.N.J. July 31, 2009), as demonstrating that "the bar for what constitutes plan interpretation is not a high one."  (Mot. at 19).  Even if true, however, the Court is not bound by the reasoning of those decisions.

The Court, however, is bound by *Oregon Teamster Employers Trust v. Hillsboro Garbage Disposal, Inc*. ("*OTET*"), No. 13-35555, --- F.3d ---, 2015 WL 5202383 (9th Cir. Sept. 8, 2015), in which the Ninth Circuit held that a breach of contract claim asserted by an ERISA plan fiduciary based upon a contractual reimbursement provision was preempted.  In *OTET*, the court was evaluating, in relevant part, "[w]hether OTET, an Employer Health and Benefit Plan, governed by ERISA, can recover damages, on a breach of contract claim, against a business which received health care benefits for two ineligible employees."  *Id*. at *1.  At issue were contributions made by OTET to Hillsboro Garbage, Inc. ("Hillsboro Garbage")—which was made a subscriber to OTET by virtue of a collective bargaining agreement ("CBA") entered into by the Hillsboro Garbage and Teamsters Local Union No. 305 (the "Union")—on behalf of two employees who were not employed by Hillsboro Garbage.  *Id*.  These individuals were instead employed by a separate company, RonJons Unlimited, Inc. ("RonJons").  *Id*.  "Hillsboro Garbage and the Union agreed to be bound by the provisions of the Trust Agreement governing OTET. . . ."  *Id*.  "The Trust Agreement also authorize[d] OTET's Trustees to enter into special agreements with Hillsboro Garbage under which OTET would provide health and welfare benefits for the company's non-bargaining unit employees (the 'NBU Agreements')."  *Id*.  "The NBU Agreements specif[ied] that only individuals with a *bona fide* employment

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

relationship with Hillsboro Garbage are eligible to participate in OTET benefit plans." *Id.*

The *OTET* court distinguished a prior Ninth Circuit decision, *McDowell*, "which did not turn on whether the beneficiaries were eligible plan participants." *Id.* at *3.  In *McDowell*, the court held that an insurer's breach of contract action against insured to recover payments pursuant to a reimbursement clause—which did not require interpreting the plan, or dictating or disputing the correctness of a benefits distribution— did not have the necessary "connection with" or "reference to" an ERISA plan.  *McDowell*, 385 F.3d at 1172.  In *OTET*, conversely, the court noted that "although analysis of the employment status of the two individuals and whether RonJons had entered the CBA is admittedly straightforward, analysis of the terms of the ERISA plan is nonetheless required."  *OTET*, 2015 WL 5202383, at *3.  "Moreover, OTET alleged in its second amended complaint that Hillsboro Garbage breached the terms of the ERISA plan—not separate agreements."  *Id.*

Certainly, *OTET* would be determinative here if United were asserting a breach of contract action against participants in order to receive damages instead of any equitable relief that might be recoverable under a comparable § 502(a)(3) claim.  Further, the Court construes the Counter-Defendants' Notice Regarding New Ninth Circuit Authority (Docket No. 213) as arguing that *OTET* stands for the proposition that any consultation of an ERISA plan is sufficient for a finding of express preemption.  However, the circumstances in *OTET* are distinguishable from those before the Court.  The Court is not evaluating the plan terms to establish whether any particular patients on whose behalf payments were made were eligible plan participants. Nor is the Court evaluating plan terms in order to gauge whether the misconduct alleged was a violation thereof.  Indeed, this action is more analogous to *McDowell,* as United is attempting to obtain only a reimbursement of overcharged payments, and recovery neither depends on the interpretation of contested plan terms nor stems directly from an "ERISA-regulated relationship," as it did in *OTET*.  The case is therefore not dispositive of the issues facing the Court.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
           Inc., et al.

.

Providers offer several arguments to the contrary.  They first assert that "when
read as a whole, the SACC clearly attempts to impose an affirmative duty upon
Providers to disclose the alleged waivers of co-pays, because those activities were
supposedly so crucial to the benefits provided under the plans." (Mot. at 19).  And
because any "obligation that the defendants may have had to provide such information
stems from the plan and not from an independent legal duty, the plaintiffs' state-law
cause of action for failing to disclose [the waivers] has 'no basis whatsoever but for the
ERISA plan[s].'"  (Mot. at 19 (quoting *Briscoe v. Fine*, 444 F.3d 478, 500 (6th Cir.
2006)) (internal quotation marks omitted)).  But the Court is not persuaded.  The duties
United invokes are those imposed by state/common law, not the plans themselves.
Indeed, United alleges not that the failure to disclose waiver of co-pay gives rise to
breach of contract claim but that such conduct constitutes fraud and violates state law.
Although Providers' failure to adhere to these duties might influence benefit payments
or the amount of benefits owed (as in the co-pay waiver theory), the duty itself does
not arise from the plans.

Moreover, the Court notes that *Briscoe* involved suit by former employees
against several of their employer's former officers and the third party administrator of
the employer's health plan, alleging that the defendants violated their fiduciary duties
under ERISA and committed additional torts under Kentucky law.  *Briscoe*, 444 F.3d
at 482.  The court held that fraud, misrepresentation and concealment claims alleging
failure to disclose the financial condition of the plan were preempted, as it was clear
that "any obligation that the defendants may have had to provide such information
stems from the plan and not from an independent legal duty." *Id*. at 499.

Providers further argue that "[p]ermitting United's state law claims to proceed in
addition to its ERISA claims would . . . frustrate ERISA's 'exclusive remedial
scheme.'"  (Mot. at 19).  Providers cite *Lea v. Republic Airlines, Inc.*, 903 F.2d 624,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

631 (9th Cir. 1990) as an example of a case holding that "'state law claims in addition to the claims actionable under ERISA' are impermissible."  (Mot. at 19-20 (quoting *Lea*, 903 F.2d at 631)).

In *Lea*, former airplane pilots brought suit against Republic Airlines, Inc. (Republic) and the Air Line Pilots Association (ALPA), alleging "that Republic, their former employer, violated the Employee Retirement Income Security Act of 1974 (ERISA), and that ALPA, their collective bargaining representative, violated ERISA and breached its duty of fair representation implied under the Railway Labor Act (RLA)."  *Lea*, 903 F.2d at 626.  The plaintiffs also brought claims for negligence, breach of contract, fraud, and equitable relief.  *Id*.  All of these claims were related to Republic and ALPA's termination of the Pilots Retirement Plan, which was done pursuant to a Termination Agreement.  *Id*.  The suit alleged that "the Termination Agreement improperly denied [the plaintiffs] the additional retirement benefits that it accorded to active pilots."  *Id*.  The Ninth Circuit affirmed the district court's ruling that the asserted state and common law claims were preempted.  *Id*. at 633.  In doing so, the court referenced ERISA's exclusive remedial scheme, 29 U.S.C. § 1132(a) and discussed *Pilot Life Insurance Co. v. Dedeaux ("Pilot Life")*, 481 U.S. 41, 56 (1987).  *Id*. at 632.

*Pilot Life* itself was a suit by an employee against the insurance company that issued his employer's group insurance policy, alleging improper processing of benefits under the relevant ERISA-regulated plan.  *Pilot Life*, 481 U.S. at 43.  The complaint asserted claims for tortious breach of contract, breach of fiduciary duties, and fraud in the inducement.  *Id*.  The Supreme Court held that "[t]he common law causes of action raised in [the] complaint, each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre-emption under § 514(a)."  *Id*. at 48.

Moreover, the *Pilot Life* Court noted that, "[b]ecause in this case, the state cause of action seeks remedies for the improper processing of a claim for benefits under an

CIVIL MINUTES—GENERAL                                          56

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)                **Date:  October 23, 2015**
**Title:**    Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group,
             Inc., et al.

ERISA-regulated plan, our understanding of the saving clause must be informed by the legislative intent concerning the civil enforcement provisions provided by ERISA § 502(a)." *Id*. at 51-52.  In this vein, the Court noted that "[t]he Solicitor General . . . argue[d] that Congress clearly expressed an intent that the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits, and that varying state causes of action for claims within the scope of § 502(a) would pose an obstacle to the purposes and objectives of Congress." *Id*. at 52.  The *Pilot Life* Court agreed with this assessment, looking to both the "language and structure of the civil enforcement provisions" and the "legislative history in which Congress declared that the pre-emptive force of § 502(a) was modeled on the exclusive remedy provided by § 301 of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 156, 29 U.S.C. § 185." *Id*.  As to the first of these, "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive." *Id*. at 54.  Further, regarding the second, "the entire comparison of ERISA's § 502(a) to § 301 of the LMRA, would make little sense if the remedies available to ERISA participants and beneficiaries under § 502(a) could be supplemented or supplanted by varying state laws." *Id.* at 56.

The Ninth Circuit noted in *Lea* that it did "not read *Pilot Life* to permit state law claims in addition to the claims actionable under ERISA," and held that, consequently, "[c]laims relating to ERISA plans must . . . invoke the specific remedies of ERISA § 502." *Lea*, 903 F.2d at 631, 632.

However, in both *Lea* and *Pilot Life*, the claims at issue were brought by plan participants against entities with benefit determination and distribution responsibilities, thus involving a central ERISA-regulated relationship.  The claims, moreover, implicated the defendants' improper distribution of benefits (also discussed below in connection with "complete" preemption)—an activity central to the ERISA remedial scheme.  The same is simply not true here, where the claims only tangentially involve

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)                    **Date:**  October 23, 2015
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group, Inc., et al.

the ERISA plans and therefore pose less danger, if any, to the overall functioning of ERISA regulation.

Similarly, Providers cite to *Tingey v. Pixley-Richards W., Inc*., 953 F.2d 1124, 1130-31 (9th Cir. 1992), as a case "preempting state causes of action 'used to remedy exactly the type of illegal activity proscribed by ERISA.'"  (Mot. at 20 (quoting *Tingey*, 953 F.2d at 1130-31)).  In *Tingey*, a former employee brought suit against his former employer and group health insurer, alleging various state law claims in connection with his termination and the insurer's refusal to allow him to convert his health policy.  *Tingey*, 953 F.2d at 1127-29.  The court noted that "a garden variety state law cause of action, not particularly troublesome in circumstances not involving employee benefits, may be preempted where it is used to remedy exactly the type of illegal activity proscribed by ERISA."  *Id*. at 1130-31 (citing *Felton v. Unisource Corp*., 940 F.2d 503, 510 (9th Cir. 1991)).  The crux of the issues in both *Tingley* and *Felton* were that an employee had been fired so as to deprive him of benefits under the employer's group health insurance contract.  *See Tingey*, 953 F.2d at 1127-29, 1130-33; *Felton*, 940 F.2d at 507-10.  The *Felton* court observed that "[b]ecause the Feltons' state suit sought to redress precisely the type of harm prohibited by § 510 of ERISA, the district court properly found their claims to be preempted."  *Felton*, 940 F.2d at 510.  The *Tingey* court adopted this reasoning to find the claims before it preempted.  *Tingey*, 953 F.2d at 1131.

Once again, however, *Tingey* and *Felton* involved a much more fundamental ERISA issue: suit by an employee against an employer seeking redress for the fact that the employee had been terminated so as to impact his benefits—activity explicitly contemplated and regulated by ERISA § 510.  *See also Dependahl v. Falstaff Brewing Corp*., 653 F.2d 1208, 1215-16 (8th Cir. 1981) (holding, in suit involving claims brought by former executive officers against their former employer and new controlling shareholder, that ERISA preempted common law fraud and intentional interference with contractual relationship claims with regard to ERISA pension and welfare benefit plans).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
            Inc., et al.

Nor does the Court consider any assignments that Providers may have received dispositive under the facts before it.  Although there may be assignments here, the conduct that was allegedly wrongful and caused purportedly improper payouts was not undertaken by a provider standing in the shoes of a patient; rather it was undertaken by a provider in submitting false bills (whether it ultimately received the purportedly wrongful payment because it was an assignee or because of a remitted payment by a patient originally obtained from United pursuant to the allegedly fraudulent bills).

The Ninth Circuit has noted that "[i]t is with great trepidation that we tread into the field of ERISA preemption."  *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 980 (9th Cir. 2001).  The Court recognizes the complexities and nuances of the necessary analysis here, but in reaching its conclusion, the Court continues to rely on the purpose behind § 514 and the nature of the conduct at issue in this case.

## 2.  "Complete" Preemption under § 502(a)

Complete preemption demonstrates that the remedial scheme of 502(a) is to be "'the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits.'"  *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 494 (9th Cir. 1988) (quoting *Pilot Life Ins. Co.*, 481 U.S. at 52).

"Complete preemption under § 502(a) is 'really a jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim.'"  *Marin General*, 581 F.3d at 945 (quoting *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 596 (7th Cir. 2008)).  "If a complaint alleges only state-law claims, and if these claims are entirely encompassed by § 502(a), that complaint is converted from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

'an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'"  *Marin General*, 581 F.3d 941at 945 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65-66 (1987)).

State law claims are completely preempted by § 502(a) if (1) an individual, at some point in time, could have brought the claim under § 502(a); and (2) there is no other legal duty independent of ERISA or plan terms implicated by the defendant's actions.  *Davila*, 542 U.S. at 210.  "A state-law cause of action is preempted . . . only if both prongs of the test are satisfied."  *Marin General*, 581 F.3d at 947.

Here, the Court previously decided that United's state law claims for fraud, violation of the UCL, and intentional interference were not completely preempted. (Docket No. 145 at 18-25).

As to the fraud claim, the Court acknowledged the divergence of views among courts as to whether certain actions are taken "'to enforce the terms of the plan'" under § 502(a)(3), such that the entity bringing the claim is a fiduciary and could have brought the claim pursuant to ERISA (*Davila's* first prong).  (*Id*. at 19 (citing *United Healthcare Servs., Inc. v. Sanctuary Surgical Ctr., Inc. ("Sanctuary Surgical")*, 5 F. Supp. 3d 1350, 1358-59 (S.D. Fla. 2014) (noting the divergence in approaches taken by district courts on the issue of whether a claim could have been brought by a fiduciary under § 502(a)(3))).  The Court noted that many cases United had cited did not include §502(a)(3) claims, unlike this action.  (*Id*. at 19-20).  Moreover, "those courts found that § 502(a)(3) did not completely preempt the relevant state law claims for one of several reasons, including that the claims were not asserted by a party acting as a fiduciary (such that they could be asserted under § 502(a)(3)), or the damages recoverable under the asserted claim were unavailable under a § 502(a)(3) claim."  (*Id*. (citing *Sanctuary Surgical*, 5 F. Supp. 3d at 1359-60 (holding that "United's conduct . . . fail[ed] to satisfy the first prong of the *Davila* test because it is not made to appear that United seeks 'equitable relief' to enforce the terms of the plans within the meaning of § 502(a)(3)"))).  Ultimately, however, the Court concluded that it need not reach a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

conclusion on the first *Davila* prong because both *Davila* prongs must be satisfied in order to find complete preemption, and the Court did not find the second prong met. (*Id.* at 20).

In its analysis of the second *Davila* prong, the Court noted that United's claim rested "on allegations that Providers made affirmative misrepresentations to United in submitting claims for reimbursement."  (*Id.* at 20).  United did not "contend that the duty to provide truthful claims submissions hinges on the terms of the individuals plans."  (*Id.*).  "Rather, '[t]hese claims [did] not rely on, and [were] independent of, any duty under an ERISA plan.'"  (*Id.* (quoting *Marin General*, 581 F.3d at 949)). "While the question of what payments would have been justified may require consultation of the plans themselves," the Court could not say that "the fraud claim was based on no duties independent of ERISA or plan terms."  (*Id.* at 21 (citing *Ass'n of New Jersey Chiropractors v. Aetna, Inc.*, No. CIV.A. 09-3761 JAP, 2012 WL 1638166, at *5-7 (D.N.J. May 8, 2012) (holding, in suit involving counterclaims brought by health insurer against providers alleging that providers misrepresented and over-billed for services, that counterclaims were not preempted because the claims were "based upon an independent duty . . . under New Jersey's insurance fraud statute and common law" that "prohibit[s] providers from committing fraud, including submitting fraudulent bills to an insurer for payment"))).

The Court acknowledged that "the plans dictate what services are covered and what reimbursement is proper for such services."  (*Id.* at 21).  "The plans exclude services for certain procedures, meaning that alleged omission of excluded services in bills for otherwise permissible procedures could have caused improper benefit disbursements."  (*Id.*).  "It is not unprecedented to find that claims arising out of activities such as miscoding are preempted." (*Id.* (citing *Blue Cross & Blue Shield of Rhode Island v. Korsen*, 746 F. Supp. 2d 375, 381-84 (D.R.I. 2010) (holding, in suit brought by health insurer against providers alleging that providers intentionally miscoded services, that the insurer's claims to recover overpayments were preempted and converted into § 502(a)(3) claims because "the crux of the dispute" involved a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 14-03053 MWF(VBKx)              **Date:** October 23, 2015
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group,
              Inc., et al.

benefits determination, and even though the providers' agreements imposed duties on
the defendants, they did not impose duties independent of ERISA))).

Still, the Court pointed out that, in the context of § 502 complete preemption,
Ninth Circuit has said that "'[w]here the meaning of a term in the Plan is not subject to
dispute, the bare fact that the Plan may be consulted in the course of litigating a state-
law claim does not require that the claim be extinguished by ERISA's enforcement
provision.'" (*Id.* (quoting *Blue Cross of California v. Anesthesia Care Associates Med.
Grp., Inc.,* 187 F.3d 1045, 1051 (9th Cir. 1999))).  The Court recognized that "[i]n
*Davila*, the [Supreme] Court analyzed whether ERISA preempted claims brought
pursuant to a Texas state law requiring that managed care entities exercise ordinary
care when making benefit decisions." (Id. at 21-22 (citing *Davila*, 542 U.S. at 204,
212-13)).  "This state law contained a provision stating that it did not require that
managed care entities provide treatment for services not otherwise covered by the
relevant health care plan." (*Id.* at 22 (citing *Davila,* 542 U.S. at 213)).  "As such, the
[Supreme] Court found that 'interpretation of the terms of [the relevant] benefit plans
form[ed] an essential part of' the asserted state law claim, and liability under the state
law 'would exist . . . only because of petitioners' administration of ERISA-regulated
benefit plans.'" (*Id.* (quoting *Davila,* 542 U.S. at 213)).

In contrast, the Court concluded that the alleged misrepresentations in this case,
"while linked to the plans in terms of damage calculation, [were] wrongful irrespective
of the plan terms." (*Id.*).  The Court observed that "[t]his case does not present the
same scenario analyzed in *Davila*, in which adherence to plan terms obviated any
potential violation of the implicated state law." (*Id.*).  As such, the Court ruled that
"the second *Davila* prong weigh[ed] against preemption." (*Id.*).  "Because both *Davila*
prongs must be satisfied before a claim is completely preempted," the Court held that
Providers' motion to dismiss United's fraud claim on the basis of preemption failed.
(*Id.*).

The Court maintains these prior conclusions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES—GENERAL</u>

**Case No.**  CV 14-03053 MWF(VBKx)              **Date:  October 23, 2015**
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group, Inc., et al.

Providers' authority to the contrary is distinguishable.  For instance, in *Cleghorn v. Blue Shield of California,* 408 F.3d 1222, 1223 (9th Cir. 2005), a plan participant sued an insurer (Blue Shield), alleging violations of the UCL and the California Consumers Legal Remedies Act.  The basis for this suit was that the participant had sought and received emergency medical services, and the insurer denied reimbursement; the participant's UCL claim was premised on a violation of California Health and Safety Code § 1371.4(c), which discusses health care plans' reimbursement for emergency services.  *Id.* at 1223-24.  The participant "asserted that this statute required Blue Shield to cover emergency treatment whenever the insured 'reasonably believes that an emergency exists' and that a requirement of pre-authorization in such cases is forbidden."  *Id.* (footnote omitted).

The Ninth Circuit concluded that the state law claims asserted were completely preempted because "[t]he only factual basis for relief pleaded in [the] complaint is the refusal of Blue Shield to reimburse him for the emergency medical care he received," and "[a]ny duty or liability that Blue Shield had to reimburse him 'would exist here only because of [Blue Shield's] administration of ERISA-regulated benefit plans.'" *Id.* at 1226 (quoting *Davila*, 124 S.Ct. at 2498).

Here, in contrast, the duty to avoid deception in submitting fraudulent bills, etc., stems from sources outside of ERISA; stated another way, the providers did not have an obligation to act in a particular way towards United due to the operation of an ERISA-regulated relationship.   Rather, these obligations, and the alleged breach of these obligations, is premised upon state law that operates independently of any plans at issue.

Similarly, in *Melamed v. Blue Cross of California*, 557 F. App'x 659, 660 (9th Cir. February 12, 2014), a provider sued Blue Cross of California and Anthem Blue Cross Life and Health Insurance Company, alleging that these defendants "systematically underpaid him as an out-of-network provider."  The Ninth Circuit

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
            Inc., et al.

concluded that the provider's "breach of implied contract claim [was] completely preempted because through that claim, [the provider sought] reimbursement for benefits that exist 'only because of [the defendant's] administration of ERISA-regulated benefit plans.'"  *Id*. at 661.  The court noted that, "[i]n the operative complaint, [the provider] allege[d] that as 'a direct and proximate result of Defendants' breach of its obligations under the written contracts between Defendants and Defendants' members, to which Plaintiffs are third-party beneficiaries, Plaintiffs have suffered damages.'"  *Id*.  The court concluded that "[b]ecause some of these 'written contracts' are ERISA plans, [the provider] is claiming that he is owed money under the terms of an ERISA plan," which means that the claim is completely preempted under *Cleghorn*.  *Id*.

       *Melamed*, in short, is distinguishable because a claim against an ERISA administrator to recover benefits on behalf of a plan participant pursuant to the terms of an ERISA plan is a quintessential example of a claim premised on ERISA duties.  No such claims are present here.

       Finally, in *Filler v. Blue Cross of California,* 593 F. App'x 685, 685-86 (9th Cir. 2015), providers sued Blue Cross of California, Anthem Blue Cross, and Anthem Blue Cross Life and Health Insurance Company for negligent entrustment, conversion, and interference with contractual relations.  The provider had standing as an assignee of his patients' benefits.  *Id*. at 685-86.  However, the Ninth Circuit concluded that his state law "claims were premised on recovering money owed to [the providers'] patients under an ERISA benefits plan, and thus fell 'within the scope of ERISA § 502(a).'"  *Id*. at 686 (citing *Fossen v. Blue Cross & Blue Shield of Mont., Inc*., 660 F.3d 1102, 1110 (9th Cir. 2011)).  The court further observed that "[t]he independent legal duties [the providers] alleged were merely attempts to 'obtain relief by dressing up an ERISA benefits claim in the garb of a state law tort.'"  *Id*. (quoting *Fossen*, 660 F.3d at 1110-11 (internal quotation marks omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)               **Date:  October 23, 2015**
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

Once again, however, suit brought by a provider as an assignee of plan benefits against a plan administrator is distinguishable from the situation before the Court.

### E.     SPD Provisions

Providers contend that United cannot enforce provisions contained only in SPDs.  (Mot. at 20).

"ERISA requires welfare benefit plans to be established and maintained pursuant to a written instrument.  29 U.S.C. §§ 1102(a)(1), 1102(b).  In addition, an employer must provide employees with a written Summary Plan Description ('SPD') which describes the employees' plan. 29 U.S.C. § 1022(a)(1)."  *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1329 (9th Cir. 1996).

An SPD is the "statutorily established means of informing participants of the terms of the plan and its benefits."  *Alday v. Container Corp. of Am.,* 906 F.2d 660, 665 (11th Cir. 1990) (citing 29 U.S.C. §§ 1022(a) and 1102; 29 C.F.R. § 2520.102–2).  The rule in the Ninth Circuit used to be that an SPD is a plan document that ought to be considered when interpreting an ERISA plan.  *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc*., 293 F.3d 1139, 1143 (9th Cir. 2002) (noting that 29 U.S.C. § 1104(a)(1)(D) requires plan fiduciaries to act "solely 'in accordance with the documents and instruments governing the plan,'" "[e]mployers are required to furnish a copy of the SPD (not the master plan document)" pursuant to 29 U.S.C. § 1022(a)-(b), and the SPD is the "'statutorily established means of informing participants of the terms of the plan and its benefits,'" and that, therefore, the Ninth Circuit would follow other courts that have held that the SPD is part of the ERISA plan) (citations omitted); *see also Pisciotta,* 91 F.3d at 1330 (granting motion for summary judgment as to an alleged obligation when the document purportedly containing that obligation was not an SPD, and therefore no plan documents in the record supported the allegations).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)                **Date:**  October 23, 2015

**Title:**     Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

However, the Supreme Court's decision in *Cigna Corporation v. Amara*, --- U.S. ---, 131 S.Ct. 1866 (2011) has shifted the landscape.  In *Amara*, the Court clarified that SPDs make statements "*about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)."  *Id*. at 1878 (emphasis in original).  A recent decision by a court in this District discussed the impropriety of relying on *Bergt* in light of *Amara*.  *See Mull v. Motion Picture Indus. Health Plan*, --- F. Supp. 3d ---, 2014 WL 4854548 (C.D. Cal. Sept. 30, 2014) ("The Court cannot follow [the statement that the SPD is a plan document and should be considered when interpreting an ERISA plan] in *Bergt*, because it was effectively overruled by *Amara's* holding [that SPDs, by themselves, do not constitute the terms of the plan].").

In *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, a case involving denial of residential treatment costs under a benefits plan, the Tenth Circuit applied *Amara* in deciding whether a plan administrator was entitled to deferential review under the terms of the relevant plan.  *Eugene S.*, 663 F.3d at 1131 (10th Cir. 2011).  The *Eugene S.* court viewed *Amara* as providing one of two propositions under the facts of that case: "(1) the terms of the SPD are not enforceable when they conflict with governing plan documents, or (2) the SPD cannot create terms that are not also authorized by, or reflected in, governing plan documents."  *Id*.  However, the court did not need to follow either proposition, since it decided that the language of the relevant SPD *was* the language of the plan.  *Id*.  The court did note, however, that a district court can only rely on the language of an SPD once it has concluded that the SPD is part of the underlying plan.  *Id*.

In contrast, in *Zalduondo v. Aetna Life insurance Company*, 941 F. Supp. 2d 125, 133-34, 136 (D.D.C. 2013), the court evaluated a less clear-cut situation than *Eugene S*.  Namely, an SPD that was in evidence provided Aetna with discretion, but the plan documents themselves were not in evidence, and the SPD contained a disclaimer that it is not the verbatim language of the plan (though it did not "expressly un-incorporate the SPD from the Plan").  *Zalduondo*, 941 F. Supp. 2d at 133-36.  As such, the court noted that it "may *eventually* rely on the terms in the SPD . . . but only

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)          **Date:  October 23, 2015**
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

after the SPD *and* the official Plan document are before the Court so that the parties may argue, and so that the Court may decide, whether the *Firestone* discretionary standard of review applies and whether Zalduondo was inappropriately denied benefits under the terms of the Plan." *Id*. at 136 (emphasis in original).  The court, accordingly, denied Aetna's motion for summary judgment without prejudice and ordered the plan documents to be produced.  *Id.  See also McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 182 n.5 (4th Cir. 2012) ("We note that, per *Amara*, 'summary documents, important as they are, provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan. . . .'  The record before us reflects, and the parties at oral argument confirmed, that only the summary plan document, and not the plan itself, was before the district court and before us.  Because McCravy's claims and MetLife's defenses depend upon the contents of the plan, their resolution on remand will require the actual plan documents.") (citations omitted).

The Court bears these issues in mind while evaluating the parties' SPD-related arguments.

### 1.  Plans Without Recoupment Provisions

Providers note that "the SACC only alleges that 7 of the 29 United Members' benefit plans contain 'reimbursement' provisions," and add that "it appears that all of the cited SACC allegations appear to be directly quotes from SPDs, not plan documents."  (Mot. at 23 (citing SACC ¶¶ 111, 129, 137, 179, 260, 318, 340 (United Members 8, 16, 17, 22, 5, 1, and 9, respectively))).  Accordingly, Providers contend that these terms are unenforceable and "seek dismissal, or in the alternative, summary adjudication, on all ERISA plan terms that are not contained in the governing plans." (*Id.*).

United, however, argues that "[a]lthough the Providers' submission (*see* Gordon Decl., App'x A) insinuates that only 7 of the 29 plans therein include this recoupment language, this list only includes the recoupment language quoted in the SACC."  (Opp.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)              **Date:  October 23, 2015**
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

at 25).  United contends that it "was not purporting to allege terms from each plan, but rather, it identified the specific language of these 7 plans as representative, and then alleges that such plans 'typically' include materially indistinguishable language."  (*Id.* (citing SACC ¶ 504)).  United posits that "[t]he Providers ignored this allegation even though the Court previously found it was sufficient to state an ERISA claim," and further, asserts that, "[l]ooking at the documents for the 29 plans the Providers attach excerpts of, every one includes relevant recoupment language" (*id.*)—"[t]he Providers merely neglected to attach or cite to the relevant pages" (*id.* (citing Holly Decl. ¶¶ 6-27)).

As to recoupment language, the SACC alleges:

> The ERISA Plans in question typically include language requiring that any overpayments that are made to patients, or (on their behalf) to providers must be returned.  For example, one typical ERISA Plan states that "[t]he Plan reserves the right to recover any payments made by the Plan that were . . . [m]ade in error; or . . . [m]ade to any Covered Person or any party on a Covered Person's behalf where . . . the payment to the Covered Person or any party is greater than the amount payable under this Plan.  The Plan has the right to recover against Covered Persons if the Plan has paid them or any other party on their behalf."

(SACC ¶ 504).

Despite the fact that any particular example may refer to an SPD or that Providers may have received SPDs containing these provisions, the fact remains that United has alleged that these terms are typically contained in "[t]he ERISA Plans in question."  (SACC ¶ 504).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                  Date:  October 23, 2015

Title:       Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

The Court's prior analysis regarding fiduciary status is instructive.  In that instance, the Court detailed the FACC's allegations of the types of discretionary authority granted to United in various example documents, and then noted that "[t]he FACC, moreover, alleges that '[t]hese, or materially indistinguishable, terms are included in the Plan documents and ASAs for all (or virtually all) of the ERISA Plans included in Appendix I.'"  (Docket No. 145 at 6).  The Court concluded that "[t]hese allegations are sufficient at the present stage of the litigation to establish standing as a fiduciary under ERISA § 502(a)(3)."  (*Id*.).

The Court applies similar reasoning here to the issue of these particular terms.  The Court further recognizes that, even if particular documents referenced are SPDs, the thrust of the allegations in the SACC, when taken in a light most favorable to United, are that these terms are contained within the relevant *plans*.  To the extent that any particular plan ultimately is found not to contain the relevant language, United's recovery on corresponding theories of relief will presumably be affected.  However, based on the allegations as they currently stand, the Court does not make such a ruling at present.

In a related *Almont* case (No. CV 14-2139-MWF(VBKx)), the Court declined to allow the defendants (United, as well as several employers and the plans they sponsor) to rely solely on SPDs to dismiss claims against them.  (*See* Case No. 14-2139-MWF(VBKx) Docket No. 1396 at 71-72).  This decision was driven by the Supreme Court's language in *Amara* regarding the role of SPDs, as well as consideration of the fact that dismissal of claims alleged in the FAC on the basis of documents which may or may not reflect the terms of a given plan would be premature.   The situation here is vastly different.  Taking all allegations in the SACC as true, the Court must presume that the plans at issue contain the reimbursement language, thereby plausibly entitling United to relief.  In the related case, United was not entitled to the same presumption as *it* was the one moving to dismiss on the basis of documents which were not in the record.  The results in both cases are therefore entirely consistent.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

Providers note that "[i]n connection with the Jointly Represented Defendants' production of plan documents in the parallel *Almont* case, the Providers' counsel asked Dorsey & Whitney to also produce all the plan documents for the benefit plans for all of the SACC's 29 United Member exemplar patients," which United agreed to do, but "only to the extent such documents were in its possession and control."  (Declaration of Bridget A. Gordon ("Gordon Declaration" (Docket No. 168-2) ¶ 4 (citing Case No. 14-2139-MWF(VBKx) Docket No.1464)).  Providers further acknowledge that "United's counsel has not certified that their production of plan documents for the exemplar patients is complete," though they go on to note that "on May 29, 2015, they represented to the Providers' counsel that they had already produced plan documents for 39 of out of 40 exemplar patients alleged in the SACC, and that they would make 'best efforts' to produce any remaining plan documents for such plans 'in United's possession or control' by June 8, 2015.  (In addition to the 29 United Members identified in the SACC, Appendix II identifies a number of toher unique exemplar patients, which brings the total to 40)."  (Gordon Decl. (Docket No. 168-2) ¶ 5). Providers similarly argue in the Reply that incorporation by reference is applicable here, given that "United cannot credibly dispute the authenticity of the plan documents filed in the supporting declarations in this case given that they have already verified the authenticity of those same in the main *Almont* action."  (Reply at 23 (emphasis removed)).

United observes that "the Providers' attempt to upend United's ERISA claims through challenges to United's allegations that many of the relevant plans contained 'coverage negating' language, and that nearly all of them contained 'recoupment' language allowing United to recover overpayments made to the Providers in violation of the plan."  (Opp. at 23-24 (citing SACC ¶¶ 99, 504)).  United contends that "[s]uch evidentiary challenges have no place in a Rule 12 motion to dismiss, especially where United has specifically pled that such terms are included in the exemplar plans referenced in the SACC, as well as the other plans it administers."  (*Id*. at 24 (citing SACC ¶¶ 111, 129, 137)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)              **Date:**  October 23, 2015

**Title:**      Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group, Inc., et al.

The Court agrees, particularly in light of the seemingly undeveloped record in this case as to what constitutes a particular plan.  The Court recognizes that there may be some overlap in plan documents between this and the *Almont* case Providers reference.  Moreover, the Court has considered the Declaration of Bridget A. Gordon in Support of the Provider Counter-Defendants' Reply Brief (Docket No. 199-1), which purports to match up the Holly Declaration in this case and the declarations filed in *Almont* Case No. CV14-2139 MWF(VBKx).  However, there has not been a full production or authentication of documents in this case.  At this stage, the Court declines to ignore the allegations in the SACC in favor of the documents cited, though these documents may ultimately prove relevant to the action at a later date.  United has alleged that the plans involved in this action properly include recoupment language—no more is required to survive a motion to dismiss.

### 2.  Coverage-Negating Provisions

Providers argue that "United cannot enforce alleged provisions that United claims supposedly 'negate' coverage when co-pays are not collected, but are only contained in an SPD, not the plan."  (Mot. at 21).  Further, Providers argue that "even in the two plan documents identified, the provision is not enforceable because it falls afoul of ERISA's doctrine of reasonable expectations."  (*Id*. at 22 (citing *Scharff*, 581 F.3d at 904).

### a.  *SPDs*

As to the SPD argument, United asserts that "[r]elying on plan documents that were produced in connection with this Court's April 22, 2015, Order in the related action, *Almont Ambulatory, et al. v. UnitedHealth Group, Incorporated, et al*, No. 14-cv-2139, [Dkt. No. 1418], the Providers argue that in 16 of 29 instances, the 'coverage negating' language is found in a document described as a Summary Plan Description ('SPD'), and is therefore insufficient."  (Opp. at 24)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)          Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

      United posits that "[t]his argument, however, ignores authorities recognizing that in many instances, the SPD is the only plan document and that in any event, its terms can be 'plan terms' even when there are other documents that comprise the plan." (*Id.* (footnote omitted)).  United asserts that "[t]his is true even where (as the Providers allege occurred here) the SPD refers to other plan documents whose terms may take precedence." (*Id.* (citing *Rhea v. Alan Ritchey, Inc*., 2015 WL 1456210, *3 (E.D. Tex. Mar. 30, 2015)).  Finally, United contends that "[a]lthough United was required to produce for the Providers the entire plan document for its motion to dismiss the Providers' claims based on plan terms, nothing in the Court's April 22 2015, Order suggested that United was conversely obligated to allege anything more than the relevant terms of the applicable plans, which it has done." (*Id.* at 24-25 (footnote omitted)).

      As to coverage negating language, the SACC alleges:

> In addition, most health plans insured or administered by United contain provisions do not cover any services that are accompanied by a provider's promise to waive Member Responsibility Amounts.  For example, the Plan Document for the AARP Employees' Welfare Plan provides, "In the event that a non-Network provider waives Copayments and/or the Annual Deductible for a particular health service, no Benefits are provided for the health service for which the Copayments and/or Annual Deductible are waived." Similarly, the benefits plans for Belmont Village LP, Boston Market Corp., and Informa USA, Inc., among many others, contain an identical or nearly identical provision.  Meanwhile, other plans such as ADP Totalsource, Inc., American Building Supply, and Apple, Inc. do not cover "[h]ealth services for which you have no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 14-03053 MWF(VBKx)                 Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

> under the policy," such as when the provider agrees to accept
> whatever payment the insurance company will pay as full
> payment for all services.  Most other plans contain substantially
> identical language.

(SACC ¶ 99).

As above, the Court is concludes that these allegations are sufficient at present to survive a motion to dismiss.  Providers' arguments may be addressed at a later juncture, after the parties have sufficient opportunity to develop the record through discovery.

### b. *Reasonable Expectations*

Providers further argue that coverage negating provisions cannot be enforced due to the doctrine of reasonable expectations.  (Mot. at 22).  United retorts that this "doctrine should not apply to self-funded ERISA plans" (Opp. at 24 n. 25 (citing *Scharff*, 581 F. 3d at 903-904)), and, "[i]n any event, the SACC repeatedly cites to numerous plan terms that unambiguously preclude coverage when (for example) a 'non-Network provider waives the Annual Deductible or Coinsurance amounts'" (*id*. (citing SACC ¶ 146)).

In *Sharff*, the Ninth Circuit noted that it had "incorporated the reasonable expectations doctrine into ERISA federal common law when . . . interpret[ing] *insured* plans."  *Scharff*, 581 F. 3d at 905 (emphasis added).  The doctrine may be summarized as follows:

> Under the so-called "doctrine of reasonable expectations,"
> which is often applied in interpreting or construing policies of
> insurance, the meaning of an insurance policy is determined in
> accordance with the reasonable expectations of the insured. In

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

> other words, the meaning of the terms in an insurance policy is to be determined by considering it in light of whether a reasonable person in the position of the insured would expect coverage. The term "insured's reasonable expectations" refers to what a hypothetical reasonable insured would glean from the wording of the particular policy and kind of insurance at issue, rather than how a particular insured who happened to buy the policy might understand it.

*Id*.  The court then recognized that Ninth Circuit authority was in tension as to whether the doctrine applied to self-funded plans.  *Id*. at 906 (citing *Winters v. Costco Wholesale Corp*., 49 F.3d 550 (9th Cir. 1995) and *Estate of Shockley v. Alyeska Pipeline Service Co*., 130 F.3d 403, 407 (9th Cir. 1997)).  Nevertheless, the court went on to assume, without deciding, that doctrine applies, and concluded that the SPD in question "met plan participants' reasonable expectations, in addition to fulfilling the statutory and regulatory requirements."  *Id*.

Here, Providers argue that the Time Warner plan "contains a cryptic and legalistic provision stating that there is no coverage for 'charges that would not have been made if [the member] didn't have this coverage' or 'charges [the member] is not legally required to pay.'"  (Mot. at 22 (citing SACC ¶ 367)).  Providers point out that the AT&T plan contains similar language.  (*Id*. (citing SACC ¶¶ 296, 302)).  This action involves both self-funded and fully-insured plans (*see* Opp. at 7; Appendix I), and because it appears that both Time Warner and AT&T have self-funded plans, it unclear whether the reasonable expectations doctrine applies.

Nevertheless, Providers argue that "[a]n ordinary beneficiary would not expect that [a provision such as that cited above] would nullify all benefit coverage if a co-pay was waived," and cite *North Cypress Medical Center Operating Co., Ltd. v. CIGNA Healthcare ("North Cyprus")*, 781 F.3d 182 (5th Cir. 2015) in support of this position. (Mot. at 22).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)          **Date:  October 23, 2015**
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
            Inc., et al.

*North Cyprus* involved "an insurer's obligation to pay a hospital for medical
services provided to insured patients."  *North Cyrus*, 781 F.3d at 186.  The hospital
sued the insurer, alleging that it had been underpaid for covered services.  *Id*.  The
insurer counter-claimed, arguing that it had paid the out-of-network hospital more than
it was owed, and that the hospital did not charge patients for coinsurance, but billed the
insurer as if it had.  *Id*.  The case involved thousands of plans, some of which were
self-funded, others of which were fully-insured.  *Id*. at 187.  The district court
dismissed the hospital's ERISA claims for lack of standing, dismissed the insurer's
ERISA claims as time-barred, and granted summary judgment against the hospital's
breach of contract claims.  *Id*. at 190-91.

The Fifth Circuit evaluated the insurer's argument a plan provision stating
"payment for the following is specifically excluded from this plan: . . . charges for
which you are not obligated to pay or for which you are not billed," means that the
plan member would have no coverage if she were not charged for coinsurance was
"'legally correct' or otherwise within its discretion."  *Id*. at 195-96.  The court
observed that the proper inquiry in this regard would proceed in two steps: (1) the court
would inquire whether the interpretation is "legally correct" (which includes an
analysis of "whether [the insurer's] 'interpretation is consistent with a fair reading of
the plan[s]"); and (2) whether the insurer, "nevertheless had discretion to absolve itself
of responsibility for payment of the greater part of thousands of claims."  *Id*. (citations
omitted).  Finally, if the insurer's "interpretation was found to be either legally correct
or within its discretion, a determination would also be required as to whether its
sweeping response to [the hospital's] charges was based on 'substantial evidence.'"  *Id*.
(footnote omitted).

The court stated that "[t]here [were] strong arguments that [the insurer's] plan
interpretation is not 'legally correct,'" but ultimately did not make a final
determination because the district court had not had an opportunity to "address the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
           Inc., et al.

merits on this record of the many varied claims," due to its dismissal of the hospital's
ERISA claims on standing grounds. *Id*. at 197.

Here, United's interpretation of the plan provisions is at least plausible, and no
more is required at this juncture. Especially in light of the uncertainty of whether the
doctrine of reasonable expectation applies to the particular plans, the coverage
negating language discussed above (*see* SACC ¶ 99), and the lack of insight into what
the plans at issue provide as a whole, the Court is not prepared to rule that United's
interpretation of various terms  requires dismissal.

### c.  *Two Types of "Coverage-Negating" Provisions*

Providers argue that "United alleges two distinct 'coverage negating'
provisions." (Mot. at 22). One is "the 'not legally required to pay'" variety, while the
other "states that a plan does not provide benefits in the event a provider waives
copays." (*Id*.). Providers assert that "[m]any of the United Members' SPDs alleged in
the SACC contain both varieties, while others only contain one kind of provision or not
the other," and argue that "[t]hey cannot mean the same thing, especially under the
doctrine of reasonable expectations." (*Id*.). Therefore, Providers argue that "these
provisions, even if valid, cannot be enforced." (*Id*.).

In light of its conclusions above, the Court does not find it necessary to address
this argument at present.

### F.     ERISA Claims

Pursuant to § 502(a)(3), "a plaintiff who is a 'participant, beneficiary, or
fiduciary' must prove both (1) that there is a remediable wrong, *i.e*., that the plaintiff
seeks relief to redress a violation of ERISA or the terms of a plan; and (2) that the
relief sought is 'appropriate equitable relief' . . . ." *Gabriel*, 773 F.3d at 954 (citations
omitted). It is true, therefore, that in a claim brought under § 502(a)(3), "[t]he

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)            Date:  October 23, 2015

Title:    Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

complaining party must seek 'equitable, rather than legal relief.'"  *Paulsen*, 559 F.3d at 1075 (quoting *Reynolds Metals Co. v. Ellis*, 202 F.3d 1246, 1247 (9th Cir. 2000)).  "In assessing whether a claim for 'equitable' relief has been properly brought under ERISA, we look to the 'substance of the remedy sought . . . rather than the label placed on that remedy.'"  *Id*. (quoting *Mathews v. Chevron Corp*., 362 F.3d 1172, 1185 (9th Cir. 2004)).

In *Sereboff v. Mid Atlantic Medical Services, Inc. ("Sereboff")*, 547 U.S. 356, 363-65 (2006), the Supreme Court discussed that equitable relief pursuant to ERISA § 502(a)(3) can include the imposition of an equitable lien or constructive trust over assets alleged to have been wrongfully transferred.  The Court noted that § 502(a)(3)(B) had been interpreted to allow only "'those categories of relief that were typically available in equity.'"  *Id*. at 361 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)).  The Court also discussed its prior opinion *Great–West Life & Annuity Ins. Co. v. Knudson ("Knudson")*, 534 U.S. 204 (2002), in which it noted that "'not all relief falling under the rubric of restitution [was] available in equity.'"  *Id*. (quoting *Knudson*, 534 U.S. at 212).  Rather, in *Knudson*, the Court evaluated what would have been done in the days of a divided bench, stating that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  *Knudson*, 534 U.S. at 212-14.  The *Sereboff* Court also distinguished between the tracing rules required for equitable lien by agreement as opposed to equitable restitution, with the latter traditionally requiring a claimant to trace the property back to its own possession.  *Sereboff*, 547 U.S. at 364-65; *see also Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1092 (9th Cir. 2012), *cert. denied sub nom. First Unum Life Ins. Co. v. Bilyeu*, 133 S. Ct. 1242, 185 L. Ed. 2d 178 (2013).  Ultimately, *Sereboff* found that the relief Mid Atlantic Medical Services, Inc. sought—certain funds recovered in a tort settlement and set aside in an investment fund—were properly classified as equitable.  *Sereboff*, 547 U.S. at 369.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)            Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

Bearing in mind this distinction between legal and equitable relief, and cognizant of the fact that § 502(a)(3) claims do not provide for legal damages, the Court evaluates the parties' arguments.

### 1.  Equitable Restitution

Providers observe that equitable restitution available under ERISA takes the form of either a constructive trust or an equitable lien, and note that recovery under either theory requires a plaintiff to "show that the sums sought are still in the defendant's possession or control."  (Mot. at 23 (citing *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002)).  However, Providers argue that United fails to state a claim for equitable restitution because "[t]he SACC fails to allege that the specific payments that United seeks are still in the Providers' possession or control." (*Id.*).

United argues that "[t]he Court previously held, however, that the 'tracing' allegations in the FACC were sufficient to state a claim under ERISA § 502(a)(3), *see* [Docket No. 145] at 54, and the SACC goes further."  (Opp. at 22).  Specifically, United asserts that:

> [The SACC] alleges that the money that United seeks to recover was originally owned by the plans.  Due to the Providers' fraud, that money was deposited in bank accounts controlled by the Providers, and those sums either remain in those bank accounts, were transferred into other accounts controlled by the Providers, or were used to purchase property. SACC ¶¶ 510-11.  The SACC goes further and specifically alleges that approximately 70% of the fraudulently obtained overpayments were deposited into Wells Fargo bank accounts controlled by the Providers, and either remain in those accounts, or (as alleged in sealed portions of the SACC) were

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group,
          Inc., et al.

> transferred to other accounts or were used to purchase property.
> *Id*. ¶¶ 420(a); *see also id*. ¶¶ 431, 510-11. The fact that such
> assets have been comingled with other assets does not, of
> course, preclude United from recovering them.  *See Bilyeu*, 683
> F.3d at n. 6; Restatement (3d) of Restitution §§ 58-59.

(Opp. at 22 (footnote omitted)).

For an equitable lien by agreement, the Ninth Circuit has made clear that the
type of tracing necessary "simply allows a plaintiff to trace the specific property or a
particular fund when the defendant has either commingled it with the defendant's other
assets or exchanged it for other property."  *Bilyeu*, 683 F.3d at 1096 n. 6.

Providers' argue that some of the funds in identified accounts were allegedly
spent on services, rather than property, and that United has failed to "plausibly allege
that each individual payment set forth on Appendix I is still in the Providers'
possession, and has not been dissipated."  (*See* Mot. at 23-24).  Providers cite to SACC
¶¶ 431-33 as examples of allegations that the Counter-Defendants have dissipated
millions of dollars on personal and business expenses.  (Mot. at 23).  As a matter of
course, funds are no longer traceable if they were spent on services and non-tangible
expenses.  *See, e.g.*, *Wong v. Aetna Life Ins. Co.*, 51 F. Supp. 3d 951, 953 (S.D. Cal.
2014) (on summary judgment, finding that *Bilyeu* prongs were not satisfied when
"'[the claimant] asserts, and [the claims administrator] has not refuted, that [the
claimant] has spent the overpaid benefits'" (citations omitted)); *Rashiel Salem
Enterprises LLC v. Bunton*, No. CV-11-08202-PHX-NVW, 2013 WL 3581723, at *1
(D. Ariz. July 12, 2013) (concluding that summary judgment would be appropriate
when a plan could not show that overpaid funds were in the beneficiary's possession,
and summarizing *Bilyeu* as holding that "equitable relief was not available to the
fiduciary even when the specific funds are not within the beneficiary's possession
simply because the beneficiary spent them all" (citing *Bilyeu*, 683 F.3d at 1094)).  The
Court is mindful that United will not be able to recover against Counter-Defendants'

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                    Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

general assets under a § 502(a)(3) claim, as this would be "quintessentially legal, rather than equitable, relief."  *Bilyeu*, 683 F.3d at 1094.

The fact remains, however, that United properly alleged that the "some or all" overpayments are still in possession or control of Providers.  The SACC states the payments were deposited into Providers' Wells Fargo accounts, and they either remain there to this day or have been transferred to other accounts controlled by Providers.  (SACC ¶¶ 510-11).  And to the extent any money was spent, United alleges that it exchanged for ***property*** that is also is possession or control of Providers.  (*Id.* ¶ 511).  It could be that some portion of the overpayments has been dissipated, and some allegations in the SACC support that conclusion.  (*Id.* ¶¶ 431-33).  But simply because some funds have been dissipated, United is not precluded from recovering the funds that have not.  In any event, the allegations contained in paragraphs 510-512 make it at least plausible that United may properly obtain equitable restitution of the overpayments.

## 2.  Equitable Lien by Agreement

In *Bilyeu*, the Ninth Circuit applied *Sereboff* and *Knudson* in the context of an ERISA 502(a)(3) claim, and distinguished between the equitable recovery of specific funds in a defendant's possession and the legal remedy of damages recovered from general assets.  *Bilyeu*, 683 F.3d at 1093-94.  Because ERISA § 502(a)(3) allows only for equitable relief, the Ninth Circuit held that tracing of specific assets is necessary in order to validate the propriety of relief sought.  *Id.* at 1094-97.  However, the *Bilyeu* court also noted that the recovery of equitable relief is not foreclosed merely because the funds sought have been "commingled . . . with the defendant's other assets or exchanged . . . for other property."  *Id.* at 1096 n. 6.  Rather, in order to secure an "equitable lien by agreement in an ERISA action," a plaintiff must demonstrate: (1) "a promise by the [defendant] to reimburse the fiduciary for benefits paid under the plan in the event of a recovery from a third party"; (2) that the reimbursement agreement

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 14-03053 MWF(VBKx)          **Date:** October 23, 2015
**Title:**     Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group, Inc., et al.

specifically identifies a particular fund that is distinct from the defendant's general assets; and (3) that the funds identified are still in the defendant's possession and control. *Id*. at 1093-94 (citing *Sereboff*, 547 U.S. at 363-64).

Providers argue that United has failed to plead an equitable lien by agreement because the SACC: (1) does not allege an "agreement" with Providers; (2) and fails to satisfy equitable tracing requirements. (Mot. at 24-25).

United, however, notes that, "[a]s this Court has already found, United has properly alleged such a claim under *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F. 3d 1083 (9th Cir. 2012)" and observes that "[t]his Court has already held that United's allegations satisfy *Bilyeu's* requirement that it identify a promise by the beneficiary to reimburse the plan for overpayments." (Opp. at 20). United contends that "[a]t a minimum, even the Providers acknowledge that this requirement is satisfied to the extent that they received payments pursuant to a 'valid assignment of benefits,' Provider Mot. at 24, and they acknowledge, at least in some instances , they submitted claims pursuant to a valid assignment." (*Id*.). Moreover, United posits that "the same logic should apply to claims submitted pursuant to an 'authorized representative' form pursuant to which a provider agrees to represent the patient and take assets in their name," and, further, "so long as the plan includes a proper agreement with the participant to return assets, the fact that those assets are in the hands of a third party is irrelevant—the equitable interest still exists." (*Id*. at 20-21 (footnote omitted)).

Finally, United argues that "as the Court previously held, United has alleged facts satisfying the second and third requirements of *Bilyeu*": (1) "United has properly alleged that it is seeking reimbursement of a specifically identified fund—the overpayments made to the Providers" (*id*. at 21(footnote omitted) (citing Docket No. 145 at 51-52)); and (2) "United has alleged facts sufficient to demonstrate that the Plaintiffs are still in possession or control of these assets, or are in control of assets that can be 'traced' from these assets" (*id*. (citing Docket No. 145 at 52-53)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

### a.  *Agreement*

As to an agreement between Providers and United, the Court previously analyzed the issue as follows:

> United alleges that "[t]he ERISA Plans in question typically include language requiring that any overpayments that are made . . . must be returned," which, when coupled with the prior allegations, would suggest satisfaction of the first *Bilyeu* prong.  (FACC ¶ 323).  This would appear to be particularly true in instances involving valid assignments.  In situations lacking assignments, the issue becomes more difficult.  However, as the parties have disputed primarily the second and third prongs of the *Bilyeu* test, the Court need not analyze at present to what extent claims not involving valid assignments might nevertheless fall within the equitable lien by agreement analysis.

(Docket No. 145 at 52).  Here, United appears to be arguing that valid assignments, authorized representative forms, and the mere possession of wrongful payments all satisfy *Bilyeu's* first requirement.  (Opp. at 20-21).

The Court is reluctant to accept United's argument that the categories other than valid assignments can create the requisite "promise" between United and Providers here.  Specifically, United argues that "so long as the plan includes a proper agreement with the participant to return assets, the fact that those assets are in the hands of a third party is irrelevant—the equitable interest still exists."  (Opp. at 21 (footnote omitted)).  The only case United cites in support of this assertion is *Rashiel Salem Enters. v. Bunton*, 2013 WL 3581723 (D. Ariz. July 12, 2013).  In that case, however, the relevant "promise to reimburse" was a provision in an SPD stating that a beneficiary would be required to repay any overpayment, and the party being held to the promise

---

**CIVIL MINUTES—GENERAL**                                              **82**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)              Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

was an ERISA defined benefit plan participant (though she was not the party who had received the overpayments); the benefits in question had been theoretically disbursed to her, though this disbursement was actually the result of actions by a person who had secured a disputed power-of-attorney from the participant.  *Id*. at *1-3.  The Court fails to see how this case supports United's position, as the facts and relationships of the relevant parties in *Bunton* are completely distinguishable from the present situation.

Other cases at least intimate that an equitable lien by agreement under these circumstances would spring only from a valid assignment.  *See, e.g., See Int'l Longshore & Warehouse Union-Pac. Mar. Ass'n Welfare Plan Bd. of Trustees v. S. Gate Ambulatory Surgery Ctr*., LLC, 2012 WL 4364567 (N.D. Cal. Sept. 24, 2012) (evaluating whether anti-assignment clause precluded equitable lien by agreement, though "not reach[ing] other theories of equitable relief, such as constructive trust, nor address[ing] other elements required for a lien by agreement").

Consequently, in situations where no valid assignment exists, the Court concludes that United cannot assert an equitable lien by agreement.  Moreover, although the Court does not presently address specifics, the Court notes that it is inconsistent for United to assert particular assignments in this action while asserting any corresponding anti-assignment clauses for the same plan during the same time period in the related Almont action, Case No. CV 14-2139-MWF (VBKx).

**b.  Bilyeu *and Recovery of a Particular Fund***

In *Bilyeu*, the Ninth Circuit expressed doubt as to whether the case before it, involving recovery of overpayments pursuant to a contractual reimbursement clause, satisfied the second prong of the test laid out above.  *Bilyeu*, 683 F.3d at 1093-94.  There, the relevant agreement provided that the participant would reimburse the claims administrator "any overpayment resulting from [her] receipt of benefits from other sources."  *Id*. at 1090.  The claims administrator argued that once the plan participant received a third-party recovery (Social Security disability benefits), a specifically

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                    Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

identifiable fund (overpaid disability benefits under the plan) came into existence and an equitable lien over the fund was appropriate.  *Id*. at 1093.  The Ninth Circuit found this characterization "plausible, but problematic," and distinguished the tort recovery in *Sereboff*, noting that the overpaid benefits, unlike the tort recovery, were "not a particular fund, but a specific amount of money encompassed within a particular fund." *Id*. (emphasis in original).  The court went on to note that the reimbursement agreement would have skirted these same issues if it had identified the third party recovery, rather than the overpayments, as the fund from which reimbursement would be sought; though, this was not feasible in *Bilyeu* because the third-party recovery consisted of Social Security benefits, which are unalienable.  *Id*. at 1093-94.  Ultimately, the *Bilyeu* court stated that "[e]ven assuming" the second criterion of the test could be satisfied in that case, the third could not.  *Id*. at 1094.

Here, in connection with the second *Bilyeu* prong, United notes the Court's prior conclusion that "United could recover only in situations in which the entire overpayment made to the Providers was inappropriate," and requests that the Court reconsider this ruling, noting that "*Bilyeu* did not demand (even in dicta) such a result, and such a conclusion is inconsistent with the Supreme Court's decision in *Sereboff*." (*Id*. at 21 n. 20 (citations omitted)).  Providers, likewise, argue that "[t]he distinction between an 'entire payment' and a partial overpayment (SACC ¶ 515) is irrelevant under Ninth Circuit law."  (Mot. at 25).

The Court recognizes that *Bilyeu* has been disagreed with based on its "fund" discussion.  The Second Circuit, in particular, has observed:

> . . . Aetna seeks a specific portion (all) of a particular fund (the subset of disability benefits that became overpayments when Thurber received no-fault insurance benefits).  Not surprisingly, these overpayments were not segregated from the total disability payments.  The Ninth Circuit recently held that an action for the return of "overpaid long-term disability benefits"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)          Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. *-v-* UnitedHealth Group, Inc., et al.

> does not seek "a particular fund, but a specific amount of money encompassed within a particular fund—the long-term disability benefits [the insurer] paid to [the beneficiary]." *Bilyeu*, 683 F.3d at 1093 (emphases in original).  But the beneficiary's literal segregation of funds is irrelevant when the terms of the ERISA plan "put [the beneficiary] on notice that she would be required to reimburse [the insurer] for an amount equal to what she might get from" third-party sources.  *Cusson*, 592 F.3d at 231.
>
> We do not see a basis for distinguishing between certain "funds" identified by ERISA plans—i.e., between "third-party recoveries" and benefits that become "overpayments" as a result of third-party recoveries.  Both constitute particular, identifiable sums over which an insurer may assert an equitable lien authorized by its plan.  For this reason, we take issue with the Ninth Circuit's view that the "particular fund" (overpayments) sought lacks sufficient specificity by virtue of being an "undifferentiated component of a larger fund" (total benefits).  *Bilyeu*, 683 F.3d at 1093.

*Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 663-64 (2d Cir. 2013).

Notwithstanding such disagreement, the Court is bound by the reasoning of *Bilyeu*.  The Court has reevaluated *Bilyeu* in light of the parties' arguments and the recent Ninth Circuit decision in *OTET*, which discussed *Bilyeu's* holdings, and once again concludes that United's allegations fail to meet the second prong of *Bilyeu*.  To the extent that the relevant agreements here contain recoupment provisions regarding overpayments (distinct from any third-party recoveries which would not be applicable to the type of provision asserted here), *Bilyeu* forecloses classification of such overpayments as a specifically identifiable fund for purposes of an equitable lien by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:     Almont Ambulatory Surgery Center, LLC, et al. -v- UnitedHealth Group, Inc., et al.

agreement.  Just like in in *Bilyeu*, the overpayments are "undifferentiated component of a larger fund," and are thus not recoverable under the equitable lien by agreement theory.  The Court notes that it does not have the precise plan language of each relevant plan before it at present (in line with its prior discussion); however, it reaches this conclusion on the basis of allegations such as those in SACC ¶ 504 ("The ERISA Plans in question typically include language requiring that any overpayments that are made to patients, or (on their behalf) to providers must be returned"), which the Court has considered in its earlier analysis regarding recoupment provisions.

United's reliance on *Sereboff* is unavailing.  While it is true, as United points out, that the *Sereboff* claimant sought to recover $74,869 from a settlement fund of $750,000, the Supreme Court noted that the sought portion was separated from the aggregate amount.  *Sereboff*, 547 U.S. at 360.  Indeed, the Court specifically noted that at issue was a specifically identifiable "portion of the tort settlement due Mid Atlantic under the terms of the ERISA plan, set aside and preserved in the Sereboffs' investment accounts."  *Id.* at 363 (internal quotations omitted).  As such, the Court is compelled to follow *Bilyeu's* reasoning and conclude that United may not impose an equitable lien on the alleged overpayments.

### 3.  Constructive Trust

Despite the deficiencies in its equitable lien theory, United seeks to establish a constructive trust in order to remedy Providers' alleged wrongdoing.  Providers argue, however, that a constructive trust remedy is appropriate only when "there has been a breach of fiduciary duty and an 'ill-gotten' gain."  (Mot. at 25 (quoting *Reynolds Metals Co. v. Ellis*, 202 F.3d 1246, 1248 (9th Cir. 2000) (internal quotation marks omitted)).  And, according to Providers, "[e]ven if a constructive trust can be asserted against [them], the SACC fails to plead how their behavior was 'wrongful under the terms of [each] relevant group plan.'"  (*Id.* (citing SACC ¶ 515)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015
Title:    Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
          Inc., et al.

___

United, in contrast, contends that "[a] constructive trust is an equitable remedy under which the court orders that identified funds be held in equitable trust, to be returned to the plaintiff."  (Opp. at 22 (citing *Great-West Life & Annuity Ins. Co.*, 534 U.S. at 213-14)).  United asserts that "Providers seek to dismiss this claim by arguing that a constructive trust can be imposed only on 'ill-gotten gains,' but that is exactly what United alleges here."  (*Id*.).  Further, United argues that "since *Sereboff*, courts have recognized that the imposition of a 'constructive trust' no longer requires a showing of fraud or wrongdoing."  (*Id*. at 23 (citing *Aetna Life Ins. Co. ex rel. Lehman Bros. Holdings, Inc. v. Kohler*, 2011 WL 5321005, at *6 (N.D. Cal. Nov. 2, 2011)).

Finally, United contends that "the remedy of constructive trust is not limited to situations in which the entire payment made to the Providers was wrongful" and asserts that, "[r]ather, Courts have regularly imposed constructive trusts over a share of a larger piece of property—even when the property appears indivisible—so long as the correct 'share' of the fund can be identified."  (*Id*. (citing *Great-West Life & Annuity Ins. Co.*, 534 U.S. at 213-14)).  Therefore, United argues that "because the SACC has properly identified the 'sums' that were wrongfully paid to the Providers, it can seek a constructive trust, notwithstanding that those payments may have been included along with some proper payments."  (*Id*.).

In *Bilyeu*, equitable lien by agreement was the only form of equitable relief asserted by the claims administrator.  *Bilyeu*, 683 F.3d at 1086.  In the past, the Ninth Circuit discussed that "restitution as used in § 1132(a)(3), means 'ill-gotten gains,'" and has construed "ill-gotten gains to mean money obtained through 'fraud or wrongdoing.'"  *Cement Masons Health and Welfare Trust Fund for Northern Cali. v. Stone*, 197 F.3d 1003, 1006-07 (9th Cir. 1999) (citations omitted) (discussing that a participant's obligation under the terms of a plan to reimburse trust fund in event of third-party recovery did not render money previously paid by trust fund "ill-gotten gains" subject to § 1132(a)(3) restitution); *Nw. Adm'rs, Inc. v. Cutter*, 328 F. App'x 577, 578 (9th Cir. 2009) ( "Relief under ERISA is available where the defendant 'actively and deliberately' misleads the plaintiff to the plaintiff's detriment.").  In

___

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 14-03053 MWF(VBKx)          **Date:** October 23, 2015
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

*Shereboff*, however, the Supreme Court permitted equitable relief even when nothing in the record indicated that the sought reimbursement was obtained through "fraud or wrongdoing." *Sereboff*, 547 U.S. at 360-61.   Since then, multiple courts have dispensed with the "ill-gotten gains" requirement when determining whether equitable relief is proper under ERISA.  *See Mairena v. Enter. Rent-A-Car Hosp. Ins. Plan*, No. C09-4420, 2010 WL 3931098, at *9 (N.D. Cal. Oct. 6, 2010) ("Plaintiff has not cited any authority after Sereboff indicating that the plan fiduciary must also establish fraud or wrongdoing in order to create a constructive trust or equitable lien by agreement. Thus, Defendants' allegations are sufficient to state an actionable claim under *Sereboff*."); *Aetna Life Ins. Co. ex rel. Lehman Bros. Holdings v. Kohler*, No. C 11-0439 CW, 2011 WL 5321005, at *6 (N.D. Cal. Nov. 2, 2011) ("[E]ach of these cases [requiring a showing of fraud or wrongdoing] predates the Supreme Court's holding in *Sereboff*, wherein the Court imposed an equitable lien in circumstances almost identical to those here and did not require a showing of fraud or wrongdoing.").

In light of these principles, the Court concludes that United has made adequate allegations to support the imposition of a constructive trust to recover purported overpayments.  First, the SACC largely does allege fraud and wrongdoing necessary for equitable relief under the pre-*Sereboff* cases.  Although in Providers' view, "the SACC fails to plead how their behavior was 'wrongful under the terms of [each] relevant group plan" (Mot. at 25 (citing SACC ¶ 515)), the Court reads the SACC's myriad allegations of fraud as sufficient to warrant a constructive trust for any wrongful overpayments.  And to the extent United seeks to recover excess charges even when Providers did not "knowingly and intentionally submit false or inflated bills to United" (SACC ¶ 509), a constructive trust may be plausibly imposed under *Sereboff* and its progeny that has dispensed with the "ill-gotten gains" requirement.

Providers offer virtually no other reasons, and certainly no compelling reasons, to dismiss United's constructive trust allegations.  As the Court already determined, the SACC contains adequate tracing allegations, the merits of which are not properly decided at this stage of the litigation.  The Court, moreover, is presented with no basis

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 14-03053 MWF(VBKx)                Date:  October 23, 2015

Title:      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group,
            Inc., et al.

for extending *Bilyeu's* discussion of equitable liens by agreement and "particular funds" to the separate context of constructive trusts.  Imposing a constructive trust on overpayments contained in specific accounts —or property purchased with the overpayments—would not transform a quintessentially equitable relief into a legal one because Providers' general assets would be left untouched.  That is so even if the sought money is a part of a larger fund maintained in Providers' account.  Consequently, the SACC adequately satisfies the equitable relief requirement of § 502(a)(3).

## 4.  Separate Declaratory or Injunctive Relief

Finally, Providers argue that "United has not alleged any independent form of relief under its Seventh Cause of Action under ERISA."  (Mot. at 25).  Providers also assert that "United also asks for a 'set off' of amounts 'improperly received,' but fails to explain how, in equity, amounts allegedly due to one ERISA plan can be set off against sums due to the Providers under different ERISA plans."  (*Id.* citing SACC ¶ 521)).  Finally, Providers contend that "United's request for an injunction to enjoin Plaintiffs to seek the benefits to which they are entitled under ERISA clearly falls into the category of legal, not equitable relief.  In essence, it seeks a determination of benefits under Section 502(a)(1)(B) – a cause of action that cannot be asserted by a fiduciary."  (Reply at 25).

United, however, contends that Providers "fail to cite a single case where a court has held that injunctive or declaratory relief that United seeks—including an injunction precluding a party from submitting fraudulent claims—would be inappropriate under ERISA § 502(a)(3)."  (Opp. at 25).  United further argues that "their fact dispute as to the scope of United's recovery is not amenable to resolution on a Rule 12 motion."  (*Id.*).

Neither party has cited any caselaw in support of their relative positions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)              **Date:  October 23, 2015**
**Title:**      Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

First, the Court views United's allegations as requesting set-off only as between the amounts allegedly owed and improperly paid out by each particular plan.

Second, United's sought relief is not legal, as Providers would have it.  United essentially seeks an order enjoining Providers from "billing United for amounts for which the Counterclaim Defendants had indicated they would waive Member Responsibility Amounts or otherwise accept payments from United or the Plans as full compensation for their services," or "billing United/the ERISA Plans for amounts which do not reflect the failure to collect Member Responsibility Amounts that are in violation of any plan terms or provisions, or that in any other way artificially inflate amounts," and "injunctive relief precluding the Counterclaim Defendants from profiting from their promise to waive Member Responsibility Amounts, or from seeking to recover sums that would be inconsistent with those promises."  (SACC ¶¶ 523-24).  The Court does not consider these "request[s] for an injunction to enjoin Plaintiffs to seek the benefits to which they are entitled under ERISA."  Whether the relief might otherwise be improper pursuant to § 502(a)(3), Providers have not argued and the Court does not address.

Further, the Court disagrees that United has failed to seek any form of independent relief under its Seventh Cause of Action.  An injunction described above, for instance, is obviously distinct from a constructive trust or equitable lien imposed on specific overpayments.  The Court therefore declines to dismiss United's seventh claim for relief.

## III.    CONCLUSION

For the foregoing reasons, the Court **DISMISSES *with prejudice*** United's second claim for relief insofar it seeks to recover on behalf of self-funded plans.  In all other respects, the Motion is **DENIED**.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES—GENERAL

**Case No.**  CV 14-03053 MWF(VBKx)              **Date:  October 23, 2015**

**Title:**  Almont Ambulatory Surgery Center, LLC, et al. -*v*- UnitedHealth Group, Inc., et al.

Providers are **ORDERED** to file an answer to the SACC on or before **November 20, 2015**.  An answer may be submitted jointly with any of the Counterclaim Defendants.  It will not be necessary to admit or deny each claim line listed in Appendix I.  The Court will deem any explicit or implicit allegation in Appendix I to be denied.

IT IS SO ORDERED.