**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALMONT AMBULATORY SURGERY CENTER, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP INCORPORATED, et al., <br><br> Defendants. <br><br> And Related Counterclaim. | Case No. CV 14-03053 MWF (AFMx) <br><br> **MEMORANDUM OPINION AND ORDER RE IMPERIUM AND PRODUCTION OF DOCUMENTS FROM THE NEXTECH DATABASE** |

This matter came before the undersigned Magistrate Judge on November 14, December 12, and December 19, 2017 for an evidentiary hearing. Counterclaim Plaintiffs (also known as "United") were represented by Bryan S. Westerfeld, Timothy E. Branson, Michelle S. Grant, and Michael E. Rowe. Counterclaim Defendants (also known as "Providers") were represented by Kamille Dean. Imperium Medical Services, Inc. was represented by Okorie Okorocha. Based on the pre-hearing briefs, the evidence presented at the hearing, and the proposed

findings of fact and conclusions of law submitted by the parties, the Court rules as follows:

## I. FINDINGS OF FACT

### A. Background of the Litigation

1. On March 21, 2014, Plaintiffs initiated this action – as well as a related state court action. The state court action was removed as Case No. 14-cv-2139 ("Main Action").

2. On May 12, 2014, United brought a Counterclaim in this action, alleging that Counterclaim Defendants conspired to defraud United and group health plans it administers into paying fraudulent medical claims. Dkt. 15.

3. In September 2015, the Sheppard Mullin law firm moved to withdraw from representing Plaintiffs/Counterclaim Defendants Julian and Michael Omidi. Dkt. 223. A few months later, the Hooper Lundy law firm moved to withdraw from representing most of Counterclaim Defendants. Dkt. 270. After Plaintiffs failed to secure new counsel by a deadline set by the District Judge, their affirmative case against United was dismissed with prejudice. Dkt. 335.

### B. Background of Current Discovery Dispute

4. On October 10, 2014, United served its first set of discovery, and the Providers responded on December 10, 2014. Among the categories of documents that United requested were patient medical and billing files for an identified set of approximately 88 patients identified on Exhibit A to the requests. Dkt. 441-4. Providers agreed to produce responsive information for the 15 United member exemplars and for what they termed as the "overlap" patients; those patients that were part of both Plaintiffs' claims at the time as well as United's Counterclaim. Dkt. 441-5, Ex.15. On April 17, 2015, Providers produced several thousand pages of documents relating to the 15 United member exemplars referenced in the operative counterclaim at the time.

5.     After failing to reach a resolution on the outstanding discovery requests, United filed a motion to compel responses to its first set of discovery requests on February 21, 2017.  Dkt. 441.  In response, Mark Jubelt, then counsel for Counterclaim Defendants, filed a declaration stating that he was unable to locate additional documents, but that he would "continue to attempt to find the relevant documents to properly respond to the request for additional responses to the discovery."  Dkt. 448.

6.     On March 22, 2017, the Court granted United's motion to compel.  Dkt. 462.  The Court ordered Providers and their counsel "to promptly review and produce all responsive documents and to prepare and serve substantive interrogatory answers as sought by the motion."  *Id.*  The Court also ordered the parties to file a May 8, 2017, "joint status report regarding the progress that Providers and their counsel have made in reviewing and producing documents and providing answers to interrogatories."  *Id.* at 2.

7.     Over the next several months, the parties filed two statements regarding Providers' progress with the Court order, and the parties held five telephonic status conferences with the Court.  Following the fourth status conference, the Court ordered Providers to "either (1) serve and file a report describing in detail how and when they will complete their production of 'provider' documents and when they will serve complete responses to the pending interrogatories; or (2) serve and file a sworn declaration signed by their trial lead counsel and a knowledgeable business representative of the parties that sets forth in detail the facts as to why counterclaim defendants are unable to locate and produce responsive documents . . . and why they are unable to provide complete responses to the pending interrogatories."  Dkt. 501.  Providers' statement was due by August 4, 2017.

8.     The Providers failed to provide the required statement by August 14, 2017, and the Court issued a second order requiring that Providers file a similar

statement by August 21, 2017. Dkt. 503.

9. On August 21, 2017, Providers filed the required statement. Dkt. 504. In it, they represented to the Court that they were going to print documents for production from four places, including "documents contained in the Nextec (sic) System." Dkt. 504 at 2.

10. On September 1, 2017, United filed a response and requested sanctions. Dkt. 516.

11. In opposition to United's motion for sanctions, on October 7, 2017, Providers stated for the first time that they were unable to comply with the Court's March 22, 2017 order compelling production of patient records because an "unrelated nonparty entity," Imperium Medical Services, Inc. ("Imperium") held the software license to an electronic medical records database called NexTech in which the records were stored and that Imperium "refuses to generate documents or ESI without compensation for labor and expenses." Dkt. 544.

12. On October 17, 2017, the Court held a hearing at which it orally granted in part United's motion for sanctions. Dkt. 573. In a subsequent written order, the Court found that in failing to comply with the previous order granting United's motion to compel, Providers had "set forth an unending set of excuses, questionable representations, and broken promises to the Court." *Id.* at 6.

13. Counsel for Providers and a litigation coordinator filed sworn declarations asserting that Providers cannot – and do not have the ability to – produce any additional documents because Counterclaim Defendant Surgery Center Management, LLC ("SCM") assigned the NexTech software license to Imperium. Dkt. 557.

14. To address Providers' assertions regarding ownership of the NexTech software license and their access to documents in the NexTech system, the Court scheduled an evidentiary hearing. Dkt. 573 at 8. The Court further ordered that in advance of the hearing, the parties could conduct discovery regarding NexTech

4

issue.  *Id.*  The hearing took place on November 14 and December 12 and 19, 2017.

**C.    Witnesses**

15.    As summarized below, seven witnesses testified at the evidentiary hearing.

- Brian Oxman

16.    Mr. Oxman is currently the litigation coordinator for Golden State Practice Management ("Golden State").  He has been in this position since the end of 2015.  Prior to and overlapping with that position, he was the litigation coordinator for Counterclaim Defendant SCM from 2010 through 2016.  Nov. 14, 2017 Tr. at 14:13-15:5.

17.    Mr. Oxman was designated to testify as the corporate representative of both Imperium and SCM in their 30(b)(6) depositions.  Dkt. 614 at Exs. 7 and 13.

18.    Mr. Oxman has coordinated litigation on behalf of Golden State and SCM for each Counterclaim Defendant.  Nov. 14, 2017 Tr. at 16:5-9.

19.    As a litigation coordinator, Mr. Oxman also "dealt with Imperium from the time of its incorporation in 2013, including its meetings of board of directors, officers, shareholders; the creation of its documents; and the execution of contracts which it signed with doctors and medical facilities."  Nov. 14, 2017 Tr. at 15:6-17; CCP Ex. 42.

20.    Mr. Oxman was paid for his work by Golden State or SCM, or sometimes by the attorneys, including current counsel for Counterclaim Defendants.  Nov. 14, 2017 Tr. at 16:19-17:14.

21.    The Court finds that the testimony of Mr. Oxman was generally not credible.  In reaching this credibility determination, the Court relies on the following:

(i)    On direct examination, Mr. Oxman appeared helpful and responsive to questions.  On cross-examination, he became defensive and argumentative.

(ii)    Mr. Oxman's testimony was contradicted on numerous occasions by other witnesses, by documents and by his own deposition.

(iii)    During the first day of the hearing, Mr. Oxman answered a wide variety of questions regarding Imperium and the Counterclaim Defendants without hesitation and in lengthy answers. During the second day of the hearing, Mr. Oxman attempted to deflect questions on cross examination by stating that he had to review documents before he could provide answers.

(iv)    Significant aspects of Mr. Oxman's testimony were based on what he had been told by others or what he read in documents.

(v)    The Court has reviewed Mr. Oxman's pre-hearing deposition testimony and found that he was evasive, unprofessional and disruptive as a witness – at times raising his own objections (as a witness) to questions.

22.    The Court provides the following examples from the record in support of its findings concerning Mr. Oxman's credibility:

(i)    Mr. Oxman testified that Janzen Hidalgo "often" said "no" to discretionary access to NexTech system under ¶ 6 of the Assignment and Assumption Agreement. Nov. 14, 2017 Tr. at 48. However, Janzen Hidalgo testified that he had not said no to requests for discretionary access by doctors or staff. Dec. 19, 2017 Tr. at 51.

(ii)    Mr. Oxman testified that Dr. Au said no to discretionary access to NexTech system under ¶ 6 of the Assignment and Assumption Agreement. Nov. 14, 2017 Tr. at 48. However, Dr. Au testified that as CEO of Imperium, he did not have any responsibilities with regard to NexTech license. He testified

that as CEO of Imperium, he was not involved in approving or not approving others' use of NexTech. Nov. 14, 2017 Tr. at 83. Dr. Au also testified that when he was CEO of Imperium no one asked for prior medical records from when they were working at Independent Medical Services ("IMS"). Nov. 14, 2017 Tr. at 97. Dr. Au further testified that he was not aware that the NexTech license had been transferred from SCM to Imperium. Nov. 14, 2017 Tr. at 98.

(iii)   Mr. Oxman testified that Medical Investment Trust chose Janzen Hidalgo to be President, CEO and sole Board Member of Imperium. Nov. 14, 2017 Tr. at 50. However, Janzen Hidalgo testified that lawyers who represented Counterclaim Defendants asked him to become CEO of Imperium. The only representative from the Medical Investment Trust who was present at the board meeting was Janzen Hidalgo himself. Dec. 19, 2017 Tr. at 16-17; Nov. 14, 2017 Tr. at 51.

(iv)   Mr. Oxman testified that Dr. Au stepped down as CEO of Imperium because he did not want to do that job anymore. Nov. 14, 2017 Tr. at 52, 131. However, Dr. Au testified that Counterclaim Defendants' lawyers asked him to resign. Nov. 14, 2017 Tr. at 87.

(v)   Mr. Oxman testified that Maureen Jaroscak did not review CCD Ex. 6 before it was sent out. Nov. 14, 2017 Tr. at 140. However, Ms. Jaroscak testified that her practice would have been to review the letter before it was sent, and she assumes that she followed that practice regarding CCD Ex. 6. Dec. 12, 2017 Tr. at 207-08.

(vi)    Mr. Oxman testified that Ms. Jaroscak was not counsel for Counterclaim Defendant SCM at the time she signed CCD Ex. 5 (the NexTech assignment) on behalf of Imperium.  Nov. 14, 2017 Tr. at 175.  However, Ms. Jaroscak testified she was an attorney for SCM at the time she signed CCD Ex. 5 on behalf of Imperium. Dec. 12, 2017 Tr. at 182.  An appearance made by Ms. Jaroscak for Surgery Center Management also contradicted Mr. Oxman's testimony. Nov. 14, 2017 Tr. at 176.

Mr. Oxman's hearing testimony was also impeached by his deposition testimony, where he stated that Ms. Jaroscak assisted Surgery Center Management in connection with the NexTech assignment.  Nov. 14, 2017 Tr. at 177-78.

(vii)    Mr. Oxman's testimony was contrary to CCD Ex. 6, when he stated that counsel for Counterclaim Defendants were not the authors of the document, even though their names are on the signature line of the letter.  Nov. 14, 2017 Tr. at 137-38.

(viii)    Mr. Oxman testified that Julian Omidi was not part of the administration of Surgery Center Management.  Nov. 14, 2017 Tr. at 180.  However, CCP Ex. 9 was signed by Julian Omidi in the position of Surgery Center management administration. Nov. 14, 2017 Tr. at 180.

(ix)    Mr. Oxman testified extensively about the NexTech system and claimed that it would take 3 to 4 hours to identify all information about a single patient.  Nov. 14, 2017 Tr. at 151.  However, Mr. Oxman has never used the system, has not run a search on the system and has never seen a copy of patient notes. He based his testimony about use of the NexTech system on what others told him.  Dec. 12, 2017 Tr. at 61.

(x)    Mr. Oxman's testimony contradicts the sworn declaration of former Imperium CEO Tim Kollars, regarding Mr. Kollars' position. Nov. 14, 2017 Tr. at 192-95.

(xi)   During cross-examination, Mr. Oxman repeatedly stated that he needed to check documents before he could answer questions. Dec. 12, 2017 Tr. at 16, 17, 23, 26, 33, 34, 38, 41, 46.

(xii)  Mr. Oxman's testimony contradicts information in a settlement agreement and license regarding the address of SCM. Dec. 12, 2017 Tr. at 42.

(xiii) Mr. Oxman's testimony regarding the burden of responding to Counterclaim Plaintiffs' discovery was based on what others told him. Dec. 12, 2017 Tr. at 63.

(xiv)  Mr. Oxman testified that he met with Janzen Hidalgo at a DoubleTree Hotel in Commerce, California, in October 2017, at which time, Mr. Hidalgo told him that Counterclaim Defendants could not use NexTech to respond to discovery. Dec. 12, 2017 Tr. at 63-64. However, Janzen Hidalgo testified that he had never discussed with Mr. Oxman the conclusion that it would be an unreasonable burden for Imperium to gather documents in response to discovery in this case. Dec. 19, 2017 Tr. at 62-63.

(xv)   Mr. Oxman testified about the materials put together by Brittany Whitman – based on what others told him. Dec. 12, 2017 Tr. at 82-84.

(xvi)  Examples of Mr. Oxman's misconduct at his deposition are found at pages 11, 12, 13, 15, 16, 21, 27, 28-29, 30, 34, 37, 47, 53, 64-65, 69 and 81 of his deposition testimony on behalf of SCM. *See* Dkt. No. 614-3 at 38-62.

- Maureen Jaroscak

23.     Ms. Jaroscak is an attorney who represented Counterclaim Defendant SCM and Golden State beginning in approximately February 2012.  Dec. 12, 2017 Tr. at 149:17-25; 152:2-7.  She continues to represent Golden State today.  *Id.* at 165:5-15, 205:12-16.

24.     Ms. Jaroscak has also represented Imperium, and has an ongoing attorney-client relationship with Imperium.  Dec. 12, 2017 Tr. at 205:9-11.  Ms. Jaroscak was Imperium's Manager or Chief Financial Officer, for a period of time.  CCP Ex. 5.

25.     Ms. Jaroscak has represented Julian, Michael and Cindy Omidi.  Dec. 12, 2017 Tr. at 205:17-22.

- Tim Kollars

26.     Mr. Kollars served as CEO of Golden State from February 2014 to at least January 2015.  CCP Ex. 72, Kollars Decl. at ¶ 1.  Prior to that, he was the Chief Operating Officer of Golden State.  CCP Ex. 68, Kollars Decl. at ¶ 1.

27.     Mr. Kollars served as CEO of Imperium from 2014 to 2015.  CCD Ex. 15.  Due to a recent medical condition, Mr. Kollars has severe memory issues and is not able to recall much, if anything, regarding his role with either Counterclaim Defendants or Imperium.  Dec. 12, 2017 Tr. at 104:19-115:17.  The Court received into evidence a sworn declaration signed by Mr. Kollars in other litigation.  Dec. 12, 2017 Tr. at 113, 115-16.

- Dr. Lee Au

28.     Dr. Au is a surgeon.  On May 25, 2010, he signed an independent contractor agreement with Counterclaim Defendant IMS to provide physician services.  CCP Ex. 2.  Dr. Au also executed a contract with SCM to provide services as a medical director to those surgery centers managed by SCM, including many Counterclaim Defendants.  CCP Ex. 3.

29.     From 2015 to January 2017, Dr. Au served as the CEO of Imperium.

Nov. 14, 2017 Tr. 78:2-18.  He replaced Timothy Kollars as CEO.

30.     Dr. Au testified that attorneys asked him to become CEO, Secretary, CFO, and Director of IMS.  Nov. 14, 2017 Tr. at 61:22-24.  The lawyers also asked him to be CEO of Imperium.  Nov. 14, 2017 Tr. at 80.  He testified that the lawyers would give him "instruction" when he was CEO of Imperium.  Nov. 14, 2017 Tr. at 64:2-13.

31.     He identified "the attorneys" as Maureen Jaroscak, Robert Rice, Dmitriy Aristov, Mark Jubelt, and Ian Shakramy (all of whom have represented Counterclaim Defendants).  Nov. 14, 2017 Tr. at 62-63.

32.     On or about September 8, 2017, Dr. Au was named CEO, Secretary, CFO, and Director of IMS.  CCP Ex. 1.

- Jamie Hidalgo

33.     Jamie Hidalgo is the registered agent for service of process for Imperium.  CCP Ex. 4.  Mr. Jamie Hidalgo also serves as the manager or corporate representative for Counterclaim Defendants.  Nov. 14, 2017 Tr. at 117:2-118:4; CCP Exs. 28, 29, 34, 36, 37, 38 and 40.

- Janzen Hidalgo

34.     Janzen Hidalgo (Jamie's brother) is 24 years old.  Dec. 19, 2017 Tr. at 9:7-8.  He obtained a bachelor's degree in nursing in 2015 and is a registered nurse in the Philippines.  Dec. 19, 2017 Tr. at 12:1-23.  As his first job out of college, Janzen Hidalgo worked for six months in the second half of 2016 at Royalty as an assistant to an accountant.  Dec. 19, 2017 Tr. at 13:3-20.  Janzen Hidalgo has no formal education in accounting or business.  Dec. 19, 2017 Tr. at 18:20-19:1.

35.     Janzen Hidalgo is the current CEO, Secretary, CFO, and sole Director of Imperium.  CCP Ex. 4.  Janzen Hidalgo has served in this role since approximately January 2017.  Dec. 19, 2017 Tr. 16:13-15.

36.     Janzen Hidalgo testified that Dr. Au and "a bunch of lawyers" asked him to become Imperium's CEO.  Dec. 19, 2017 Tr. 17:3-18:7.

37.     He identified "the lawyers" as Maureen Jaroscak, Robert Rice, Dmitriy Aristov, Mark Jubelt, and Ian Shakramy.

38.     Janzen Hidalgo is also the sole trustee of the Medical Investment Trust, the 100% owner of Imperium.  Dec. 19, 2017 Tr. at 28:21-29:5; CCD Ex. 26.

39.     Janzen Hidalgo is an active-duty seaman with the United States Navy, and is stationed in San Diego.  Dec. 19, 2017 Tr. at 9:9-21.

- Ashkan Rajabi

40.     Mr. Rajabi is the owner of Ashkan Tech, Inc.  This business specializes in IT consulting and computer repair.  Dec. 19, 2017 Tr. 106:3-10.  Ashkan Tech has performed IT work for various Counterclaim Defendants, including SCM and Top Surgeons.  *Id.* Tr. 112:22-24; CCP Ex. 66.

**D.     Imperium Medical Services, Inc.**

41.     Imperium held its first Board of Directors meeting on February 15, 2014.  Present at the meeting were Tim Kollars, Maureen Jaroscak, Brittney Whitman, and Brian Oxman.  CCD Ex. 15 at 1.

42.     Brittney Whitman is an attorney who also represented Counterclaim Defendants and assisted in the preparation of Plaintiffs' Complaint in this action.  Nov. 14, 2017 Tr. at 156:6-7; Dec. 12, 2017 Tr. at 83:15-19.

43.     At the February 15, 2014 meeting, Mr. Kollars was elected as the sole member of the Board of Directors of Imperium, as well as its President, Secretary and Treasurer.  Maureen Jaroscak was elected as Assistant Secretary.  CCD Ex. 15 at 2-3.

44.     At the time he was elected as sole Director, President, Secretary and Treasurer of Imperium, Mr. Kollars was also CEO of Golden State.  CCP Ex. 72, Kollars Decl. at ¶ 1.

45.     The principal executive office of Imperium was "fixed" as 9107 Wilshire Boulevard, Suite 450, Beverly Hills, CA.  CCD Ex. 15 at 5.

46.     Mr. Kollars was the sole Director, President, Secretary and Treasurer of Imperium until approximately August 2015.  CCP Ex. 42.

47.     Dr. Au succeeded Mr. Kollars.  Dr. Au became the CEO, Secretary, CFO, and sole Director of Imperium on August 1, 2015.  Nov. 14, 2017 Tr. at 77:15-78:6; CCP Ex. 42.  He served in each of these roles until sometime in 2017. *Id.* at 79:2-5.

48.     Dr. Au testified that one of the lawyers asked him to become CEO of Imperium.  Nov. 14, 2017 Tr. at 80:15-24.  He could not recall which lawyer, but identified the following individuals as "the lawyers" that he referred to:  Richard [Robert] Rice, Dmitriy Aristov, Mark Jubelt, Maureen Jaroscak, and Ian Shakramy. *Id.*; 61:22-63:11.

49.     According to Dr. Au, Imperium's business is to manage Royalty Surgery Center and Salus Medical.  Nov. 14, 2017 Tr. at 85:6-9.  Yet, Dr. Au, who served as CEO of Imperium for approximately two years, could not identify what Imperium does to manage Salus and Royalty.  Nov. 14, 2017 Tr. at 85.  He did not know (i) if Imperium had a contract with Royalty or Salus, (ii) if he interacted with anyone at Royalty or Salus as CEO of Imperium, and (iii) if Royalty or Salus paid anything to Imperium for its management services. *Id.*

50.     As CEO of Imperium, Dr. Au "answered to the lawyers."  Nov. 14, 2017 Tr. at 82:10-15; 60:9-63:11.

51.     Imperium does not have any employees.  Nov. 14, 2017 Tr. at 40:6-9.

52.     Although he was CEO, Secretary, Treasurer, and Director of Imperium for approximately two years, Dr. Au never saw a financial statement for Imperium showing its revenues and expenses.  He also never saw a tax return and was not aware if it ever filed tax returns.  Nov. 14, 2017 Tr. at 86:1-9.  Dr. Au testified that he supervised a bookkeeper. *Id.* at 113:2-4.

53.     As CEO of Imperium, Dr. Au on rare occasions signed checks for office supplies, such as paper clips and pencils.  Nov. 14, 2017 Tr. at 115:10-116:1.

54. Dr. Au did not receive compensation for serving as CEO, Secretary, Treasurer, or Director of Imperium. Nov. 14, 2017 Tr. at 86:22-87-1.

55. Mr. Oxman testified that Dr. Au decided to resign (Nov. 14, 2017 Tr. at 87:9-24), but Dr. Au testified that several months ago, one of "the lawyers" asked him to resign as CEO of Imperium. (*Id.* at 131:2-9).

56. Dr. Au is currently the CEO of Salus and the manager of Royalty. Nov. 14, 2017 Tr. at 89:11-15; CCP Exs. 43, 44. Despite the fact that both of these entities are currently managed by Imperium, Dr. Au could not recall any interaction with Janzen Hidalgo in his role as CEO of Imperium other than brief greetings. Nov. 14, 2017 Tr. at 89:11-23.

57. Dr. Au was replaced by Janzen Hidalgo in early 2017. CCP Ex. 4.

58. Janzen Hidalgo became the CEO of Imperium, as well as Secretary, Treasurer, and sole Director in January 2017, although his official start date was in March. Dec. 19, 2017 Tr. at 15:18-17:2.

59. Janzen Hidalgo is 24 years old and lacked qualifications to be a CEO, secretary or treasurer of a business at the time he was named CEO, Secretary and Treasurer of Imperium. Dec. 19, 2017 Tr. at 9:7-8; 12:1-23; 13:3-20; 18:20-19:1.

60. Janzen Hidalgo testified that during a meeting, Dr. Au and "a bunch of lawyers" asked him to become CEO, Secretary, Treasurer, and Director of Imperium. He was able to identify Maureen Jaroscak as one of "the lawyers" at this meeting, but could not identify any others. Dec. 19, 2017 Tr. at 17:5-18:3. Brian Oxman was also at the meeting. *Id.* at 19:21-23.

61. Dr. Au testified that he only knew Janzen Hidalgo by name and that he did not know who chose Janzen Hidalgo to replace him as CEO of Imperium. Nov. 14, 2017 Tr. at 88:4-15. Dr. Au did not recall meeting with Janzen Hidalgo to assist him in the transfer of duties as CEO of Imperium. Nov. 14, 2017 Tr. at 88:24-89:1. He only recalled just greeting him briefly several times while in the office or over the phone. *Id.* at 89:2-10.

62.     Janzen Hidalgo testified that he was told his duties as CEO were "to go through . . . the financial for the company and just see if we have a gain or a loss each month, and that was basically it."  Dec. 19, 2017 Tr. at 18:13-19.

63.     In June 2017, Janzen Hidalgo enlisted in the Navy.  He lives on the base in San Diego in the barracks.  Dec. 19, 2017 Tr. at 9:9-21.  On a typical weekday, Janzen Hidalgo is on duty from 7 a.m. until after sunset.  He also may have duty on weekends in which he cannot get off the ship.  Dec. 19, 2017 Tr. at 9:23-10:13.

64.     To fulfill his duties as CEO, Secretary, Treasurer, and Director of Imperium, Janzen Hidalgo goes to Imperium's offices about once a month on a Saturday.  A manager provides him with a two-page financial report for Royalty and Salus (not Imperium), which he reviews to determine if there was a gain or a loss.  If there was a loss, he discusses it with doctors and the other managers.  He has seen a loss only once and claims to have had a discussion about a loss with Dr. Au.  Dec. 19, 2017 Tr. at 73:5-20.  Dr. Au, however, did not testify to such a conversation.  In performing his CEO duties, Janzen Hidalgo spends about 30-90 minutes in the office, once or twice per month.  Dec. 19, 2017 Tr. at 20:13-23:6; 72:5-22.

65.     Janzen Hidalgo has never signed any checks for Imperium.  Dec. 19, 2017 Tr. at 51:17-19.

66.     Janzen Hidalgo was not aware of any revenues or expenditures for Imperium.  Dec. 19, 2017 Tr. at 71:18-24.

67.     Janzen Hidalgo does not know the value of Imperium's asserts or liabilities, if any.  Dec. 19, 2017 Tr. at 75:3-8.

68.     Although he is the sole director on the board of directors for Imperium, Janzen Hidalgo has not reviewed Imperium's bylaws or the minutes of any meeting of the board of directors.  Dec. 19, 2017 Tr. at 75:12-17.  He also has not seen any tax returns.  Dec. 19, 2017 Tr. at 36:17-20.

69.     Janzen Hidalgo is paid $2,500 per month for his positions at Imperium. His paychecks come from Royalty, not Imperium.  Dec. 19, 2017 Tr. at 23:17-25:23.

70.     Based on the above evidence, the Court finds that Dr. Au and Janzen Hidalgo were mere figureheads at Imperium, without actual, substantial responsibilities.  The Court further finds that Imperium had no other employees, officers, or directors during that time period.   Instead, to the extent that Imperium has taken any actions while Dr. Au and Janzen Hidalgo held the positions of CEO, secretary, treasurer and director, those actions were directed as instructed by "the attorneys" who represent Counterclaim Defendants.

71.     Jamie Hidalgo is currently the registered agent for Imperium.  He is a manager or representative of certain Counterclaim Defendants, although he could not recall exactly which ones besides Beverly Hills SC, Bakersfield SC, SCM, and Orange Grove SC.  Nov. 14, 2017 Tr. at 117:2-118:14, 120:7-9.  Sean Pezeshk, the owner of SCM, asked Jamie Hidalgo to serve as the registered agent for Imperium as well as certain Counterclaim Defendants.  Nov. 14, 2017 Tr. at 26:11-16, 121:1-11.

72.     If he receives a document as registered agent for Imperium, Jamie Hidalgo either contacts his brother Janzen Hidalgo or Kamille Dean and Maureen Jaroscak.  Nov. 14, 2017 Tr. at 122:12-23.  In his position as manager for the Counterclaim Defendants, he has contacted Kamille Dean and Maureen Jaroscak as counsel for those companies.  Nov. 14, 2017 Tr. at 123:2-7.

**E.      NexTech Software License Agreement, Use of NexTech and Assignment of the Software License Agreement**

73.     On November 28, 2006 Counterclaim Defendant Julian Omidi and NexTech Systems, Inc. executed a software license agreement in which NexTech granted Julian Omidi a non-exclusive license to use the software ("NexTech Software License Agreement:").  CCD Ex. 1.

74. The Counterclaim Defendants appeared to begin using NexTech immediately following the execution of the NexTech Software License Agreement by Julian Omidi in 2006. CCD Ex. 6.

75. Computers were used at each of the Surgery Centers to access NexTech. Nov. 14, 2017 Tr. at 33:5-11.

76. NexTech could also be accessed via computer at the main office for SCM, which was 9001 Wilshire Blvd. *Id.*

77. Each of the individual doctors could also remotely access NexTech. *Id.* at 33:12-14.

78. On February 12, 2010, Counterclaim Defendant SCM was formed. Ex. 12. On March 1, 2010, Julian Omidi purported to assign the NexTech license to SCM. CCD Ex. 2. Charles Klasky signed the Assignment on behalf of SCM, and Julian Omidi, who was "Administration" for SCM (CCP Ex. 9), signed for himself. *Id.*

79. There is no evidence that SCM gave Julian Omidi any consideration for the March 1, 2010 assignment, other than SCM stepping in his shoes with regard to NexTech. CCD Ex. 2.

80. Section 8.5 of the NexTech Software License Agreement prohibits transfers without NexTech's affirmative consent. CCD Ex. 1. No evidence was presented that NexTech consented to or approved the attempted March 1, 2010 assignment.

81. On March 14, 2012, SCM and non-party Golden State entered into a "General Assignment and Novation," by which SCM granted, assigned, transferred, conveyed and delivered to Golden State "all of [SCM's] duties, obligations, rights, title and interest in and to all contracts and agreements between [SCM] and Independent Medical Services, Inc." CCD Ex. 3 at ¶ 1.

82. Paragraph 4 of the General Assignment and Novation states that it "shall constitute a novation where Assignee shall assume all rights, liabilities,

debts, and other obligations of Assignor, and Assignor shall be released and forever discharged from any debts, obligations, claim, causes of action, duties, or other demands upon it to perform any of the 'property' which is transferred under this General Assignment and Novation." Mr. Oxman initially testified that through the General Assignment and Novation, SCM assigned to Golden State "all contracts of which it was a party to Golden State…, including the Nextech contract, whatever rights it had to the Nextech contract." Nov. 14, 2017 Tr. at 25:2-9.

83.    There is no evidence that this assignment was presented to NexTech, or that NexTech consented to this assignment.

84.    When asked if the contracts assigned to Golden State in CCD Ex. 3 included all of SCM's contracts with surgery centers, Mr. Oxman stated that he would have to look at documents to see what was included in the assignment. Dec. 12, 2017 Tr. at 33:8-22. Mr. Oxman also testified that Golden State did not take over management of the surgery centers after execution of CCD Ex. 3. *Id.*

85.    According to Mr. Oxman, there were two reasons why Imperium, Royalty Surgical Center, LLC ("Royalty"), Salus Medical Services, Inc. ("Salus") and additional surgery centers were created in 2013. First, Imperium, Royalty, Salus, and eight other surgery centers were created in late 2013 as part a desire of a small group of physicians, including Drs. Au and Michael Omidi, "to split off and form their own group." Nov. 14, 2017 Tr. at 37: 6-7. Second, Mr. Oxman testified that Imperium was created because SCM and NexTech were having a dispute over the NexTech Software License Agreement, with NexTech complaining there were too many users. Nov. 14, 2017 Tr. at 31:16-19. Mr. Oxman testified that the solution to this dispute between SCM and NexTech was to create the new entity Imperium. *Id.*

86.    On the other hand, a July 19, 2013 declaration Mr. Kollars submitted in connection with the divorce of Dr. Au, notes that the companies with which Dr. Au was affiliated were in serious decline. Mr. Kollars declared, "I am Chief

18

Executive Officer of Golden State Practice Management. . . . Golden State Practice Management provides management services for the New Life Surgery Centers and oversight for the Independent Medical Services (IMS) companies which 'employ' Dr. Lee Au as an independent contractor. Dr. Lee Au is currently contracted with the IMS organization and he provides medical services to patients affiliated with the New Life Surgery Centers (NLSC)." CCP Ex. 110 at ¶¶ 1-2.

87. Mr. Kollars also stated in his declaration, "Our companies have lost substantial revenue in recent years. In fact, we are not earning the majority of our prior surgical income." *Id.* at ¶ 3. Mr. Kollars also said, "Our loss of revenue seems to be because of the following reasons: (1) The economic condition of California has created an environment wherein people do not spend money on things that are not necessary such as various plastic surgery procedures and other operations of this type, (2) A majority of our revenue reductions are the result of a public image campaign that tarnished the NLSC community image." *Id.* at ¶ 4. Mr. Kollars further stated, "As a result, the NLSC has lost substantial gross revenue. These losses started in 2011, increased losses occurred in 2012, and the losses have been the greatest in 2013. Consequently, our capital budget has been put on hold, our operating budget has been substantially reduced, and we have reduced staffing by 50% or more." *Id.* at ¶ 5.

88. The new entities were intending to go into business at existing locations of the surgery centers. *See* CCP Ex. 6. Mr. Oxman confirmed that the listed addresses of the newly-created entities were the same addresses as the existing Counterclaim Defendants surgery centers. Nov. 14, 2017 Tr. at 182:19-183:3.

89. Similarly, the newly created management company, Imperium (which was purportedly going to manage Royalty, the other surgery centers, and Salus) listed 9100 Wilshire Blvd., Suite 800 East, Beverly Hills, CA as its primary practice address in a federal National Provider Identifier ("NPI") registry (CCP Ex.

5). This is the same address utilized by the management companies (SCM and Golden State) for the Counterclaim Defendant surgery centers.

90. When asked if Salus and Royalty took over the practice of IMS, Dr. Au answered: "I'm not sure if you could say that. Certainly – certainly I guess it could look that way." Nov. 14, 2017 Tr. at 89:24-90:2. He noted that there were "certainly some similar things…[l]ike the office location and the staff." Nov. 14, 2017 Tr. at 90:3-10.

91. With regard to the purported dispute between NexTech and SCM regarding the NexTech Software License Agreement, Mr. Oxman did not specify when the discussions occurred, only that they continued into May 2014. Nov. 14, 2017 Tr. at 22:6-14. Ms. Jaroscak testified that she was not aware of any discussions between SCM and NexTech regarding assignment issues prior to 2014. Dec. 12, 2017 Tr. at 187:12-188:8. Ms. Jaroscak also testified that Mr. Rajabi had discussions with NexTech about problems with the license, in 2014. *Id.* at 187:8-20.

92. On May 1, 2014, SCM purportedly transferred the NexTech Software License Agreement to Imperium, CCD Ex. 5, although NexTech had not consented to the March 1, 2010 assignment between Julian Omidi and SCM.

93. The May 2014 assignment was signed by Charles Klasky as Manager for SCM and Maureen Jaroscak as Manager for Imperium. CCD Ex. 5.

94. Ms. Jaroscak drafted the May 2014 Assignment and advised parties on both sides of the Assignment transaction. At that time, she was acting as a manager for Imperium, as lawyer for SCM and as a lawyer for Imperium. Dec. 12, 2017 Tr. at 182:3-185:20. Even though she was a manager of Imperium, Ms. Jaroscak explained the Assignment to SCM in her role as its lawyer. *Id.* at 185:9-15. Similarly, the other outside counsel involved with the transaction – Sheppard Mullin – reviewed the agreement on behalf of SCM's interest, but also had an attorney-client relationship with Imperium. Dec. 12, 2017 Tr. at 209:9-11.

95.     On May 22, 2014, NexTech signed a Notice and Consent to Assignment, which states:

> NexTech System, Inc., the undersigned, hereby acknowledges receipt of the Assignment dated May 1, 2014, by and between Surgery Center Management, LLC. and Imperium Medical Services, LLC.  NexTech Systems, Inc., acknowledges that by this Assignment, Julian Omidi has assigned the NexTech Software License Agreement dated November 29, 2006, to Surgery Center Management, LLC., which has in turn assigned the License to Imperium Medical Services, LLC.  NexTech Systems, Inc., hereby consents to and approves the Assignment, and NexTech Systems, Inc., agrees to faithfully execute, perform, and carry out all of the terms, conditions, and provisions of the NexTech Software License Agreement with the new Assignee Imperium Medical Services, LLC., in return for Imperium Medical Services, LLC., agreeing to be bound by and faithfully execute, perform, and carry out all the terms, provisions, and conditions of that Agreement pursuant to the Assignment.  NexTech Systems, Inc., hereby releases Julian Omidi from further obligations to perform under the terms of the NexTech Software License Agreement dated November 29, 2006.

CCD Ex. 4.

96.     Under Section 8.5 of the NexTech license, the assignment of the license agreement to Imperium did not become effective until NexTech signed the consent on May 22, 2014.  CCD Ex. 1 at 5; CCD Ex. 4.

97.     May 22, 2014 was two months after Plaintiffs filed their Complaints in this action and the Main Action and ten days after United filed its Counterclaim in this action.

98.     On June 4, 2014, federal agents executed search and seizure warrants against certain Counterclaim Defendants, and other related entities and individuals. Dkt. 122 at 4.

99.     There is also an Assignment and Assumption Agreement dated as of July 1, 2014, with SCM and Golden State the listed Assignors, and Imperium the purported Assignee.  This Assignment and Assumption Agreement is signed by (1) Shawn Pezeshk – the owner of Golden State – on behalf of Golden State,

(2)  Tim Kollars – who was the CEO of both Assignor Golden State and Assignee Imperium at the time – on behalf of Imperium, and (3) Charles Klasky, on behalf of SCM.  The signatures are neither dated nor notarized, but the Assignment and Assumption Agreement states that "IN WITNESS WHEREOF, Assignors and Assignee have executed this Assignment as of the date first set forth above."

100.   The July 1, 2014 Assignment and Assumption Agreement asserts that SCM and Golden State are the "owners and operators of [] records, books, papers, files and documents" that they are purportedly assigning to Imperium.

101.   Under the July 1, 2014 Assignment and Assumption Agreement, SCM and Golden State (the "Assignors") purportedly assigned to Imperium (the "Assignee"):  (i) all rights titles, interest, licenses, or right of use of the NexTech Software System; (ii) all records, papers, materials, computer files, electronically stored information, patient information, patient records, management materials, books, papers, accounting systems and information, license agreements; and (iii) all materials seized by the state, local, and federal government on June 4, 2014 from SCM, Golden State, or any of its clients, managed entities, managed surgery centers, managed physicians groups contract, or other party with whom they had contracted.  CCD Ex. 8 at Section 1.

102.   Sections 5-7 of the July 1, 2014 Assignment and Assumption Agreement purportedly govern SCM's access to NexTech:

> 5.   Continuity of Patient Care. Assignors hereby covenants and agrees that it shall provide patient continuity of medical services, record keeping, medical record history, and management of treatment services which Assignors previously provided for individual patients under its management arrangements with doctors, physicians, nurses, surgical facilities, and other medical practitioners.  Assignors shall be obligated to assist any patient who is in need of finding a medical doctor, nurse practitioner, or surgical facility whose records Assignors shall obtained under this Assignment.  Assignors shall provide any patient upon reasonable request with a copy of their medical records

whenever such patient shall request copies of such records in the manner provided by law.

6.  Discretionary Access. Assignee may within its sole discretion permit Assignors, or any of its agents or representatives, to have access to the NexTech system for the purpose of conducting any patient reviews, services, billings, or to assist Assignors in such uses of the system as Assignee may deem advisable. Such access shall be limited to those persons who are approved by Assignee within its sole discretion. Such access may not include copying, printing, transferring, duplicating, removing, altering, destroying, changing, or concealing any information contained in the system, and such access may not include providing any information contained in the system to any third party for any purpose. Assignee may revoke such permission at any time for any reason within its unlimited and sole discretion, including any costs or burdens resulting from such access.

7.  Third Party Requests. Should Assignors receive any request, legal process, or subpoena by any third party for records, documents, or materials assigned under this Agreement, Assignors shall instruct such third parties that it will be necessary to subpoena Assignee for such documents. Assignee will not comply with requests from third parties for documents, records, or materials transferred under this Agreement unless made pursuant to subpoena to Assignee.

103.  Together, Sections 5-7 of the July 1, 2014 Assignment and Assumption Agreement provide that (i) SCM and Golden State maintained access to respond to patient requests and (ii) Imperium may provide access to SCM and Golden State for patient reviews, services, billings, or other tasks Imperium deems advisable.  However, the Assignment and Assumption Agreement did not allow for access to respond to third-party requests or in litigation other than by subpoena to Imperium.  *Id.*

104.  No monetary consideration was given for the July 1, 2014 Assignment and Assumption Agreement.  CCD Ex. 8 at Section 8.  Rather, Imperium assumed certain of SCM's physician contracts and the supposed maintenance of NexTech.  *Id.*

105.   Mr. Oxman testified that the July 1, 2014 assignment was entered into because it was unclear at the time who had the right to get the materials back from the government after the seizure.  Nov. 14, 2017 Tr. at 43:22-44:18.  The Assignment and Assumption Agreement was executed, according to Mr. Oxman, to make clear that Imperium would own all the materials, and that the individual surgery centers and SCM could request return of materials in their name, in the name of Golden State, or in the name of Imperium.  *Id.* at 44:19-24.

106.   On April 24, 2015 Maureen Jaroscak sent a letter to NexTech regarding the "Status of Account with Golden State Practice Management, et al." CCD Ex. 6.  The letterhead lists both Maureen Jaroscak and Dmitriy Aristov.  *Id.* The letter is not signed, but ends "Regards, Maureen Jaroscak."  *Id.*  The letter states, "I represent Imperium, formerly Surgery Center Management (SCM)…." *Id.*  It further refers to "Imperium/SCM" as utilizing Nextech since 2006.  *Id.* Mr. Oxman testified that this letter was a mistake by Mr. Aristov, noting that the statements were "grandiose" and inaccurate and to his knowledge Ms. Jaroscak did not review the letter before it was sent.  Nov. 14, 2017 Tr. at 138:8-140:15. However, Ms. Jaroscak testified that her normal practice was to review letters that were sent out over her signature before they went out and she assumed she did so with this letter as well.  Dec. 12, 2017 Tr. at 207:20-208:9.

107.   There was no evidence that Dr. Au (CEO of Imperium from August 2015 to January 2017) was aware of the Assignment and Assumption Agreement. Dr. Au testified that he was not involved in granting any approvals as to who could use NexTech, and does not know who would have. Nov. 14, 2017 Tr. at 97:6-10.

108.   SCM, which received discovery requests seeking patient records in October 2014, did not raise the existence of the May 22, 2014 Assignment or the July 1, 2014 Assignment and Assumption Agreement as an impediment to the production of documents until the late fall of 2017.

### F.    The Medical Investment Trust

109.   Imperium is solely owned by the Medical Investment Trust.  CCD Exs. 15 and 18.

110.   Medical Investment Trust bought 50,000 shares of stock in Imperium for $0.2 cash per share, giving Imperium a total capitalization of $1,000.  CCD Ex. 15 at 10-11; CCD Ex. 18.

111.   The Medical Investment Trust was set up by the doctors, who Mr. Oxman believed, but was not certain, included Counterclaim Defendants Julian and Michael Omidi.  Nov. 14, 2017 Tr. at 129:22-130:5.

112.   Ms. Jaroscak testified that one of the individual Omidis – Michael, Julian or Cindy – is a beneficiary of the Medical Investment Trust, although she could not identify which one.  Dec. 12, 2017 Tr. at 201:22-202:14.

113.   As reported to the California Secretary of State in 2017, the address of the Medical Investment Trust is 269 S Beverly Drive, # 1409 Beverly Hills.  CCP Ex. 121.  This is the same postal box that (1) SCM reported in 2017 as its business address (CCP Ex. 12 at 5); (2) Beverly Hills SC reported in 2013 as the street address of its principal executive office/California office (CCP Ex. 27 at 4); (3) New Life SC reported in 2016 as the street address of its principal executive office/California office (CCP Ex. 28 at 3); (4) Orange Grove SC reported in 2016 as the street address of its principal executive office/California office (CCP Ex. 29 at 3); and (5) Valley SC reported in 2014 and 2016 as the street address of its principal executive office/California office (CCP Ex. 37 at 3-4).  This is also the listed address in 2014 and 2016 for Shawn Pezeshk, the owner of Golden State and SCM. CCP Exs. 31 at 5 & 32 at 5-6.

114.   Dr. Au testified that while he believed a trust owned Imperium, he did not know the trust's name and had never heard of the Medical Investment Trust.  Nov. 14, 2017 Tr. at 82:5-9.  When he was CEO of Imperium, he could not recall

interacting with anyone on behalf of the trust other than "the lawyers." *Id.* at 84:5-11.

115.  Janzen Hidalgo became the trustee for Medical Investment Trust on or about January 2017.  CCD Ex. 26; Dec. 19, 2017 Tr. 28:21-29:3.

116.  Janzen Hidalgo testified that Dr. Au and Maureen Jaroscak asked him to become trustee of the Medical Investment Trust at the same time they asked him to become President of Imperium.  Dec. 19, 2017 Tr. at 28:21-29:3.  Janzen Hidalgo also believed that Dmitriy Aristov, former counsel of record in this action for certain Counterclaim Defendants, was also present at the meeting.  *Id.*

117.  Janzen Hidalgo views his job as trustee of the Medical Investment Trust and CEO of Imperium as "mostly the same."  Dec. 19, 2017 Tr. at 30:7-13.  He testified that his role as trustee was to "make sure the business is going fine."  Dec. 19, 2017 Tr. at 26:24-27:4.

118.  Janzen Hidalgo does not get paid to be the trustee of the Medical Investment Trust.  Dec. 19, 2017 Tr. at 30:14-16.  He testified that he took the position to get experience.  *Id.*

119.  Janzen Hidalgo has not seen any documentation explaining the purpose of the Medical Investment Trust.  Dec. 19, 2017 Tr. at 27:10-12.

120.  Janzen Hidalgo could not identify the beneficiaries of the Medical Investment Trust.  Dec. 19, 2017 Tr. at 27:18-20.

**G.    Request for Patient Records for Doctors Affiliated with Counterclaim Defendants**

121.  According to Mr. Oxman, doctors who were previously with IMS have called Imperium to request records for their patients.  In response to these requests, Imperium said "sure," and gave the requested records to the doctors.  Nov. 14, 2017 Tr. at 38:24-39:6.

122.  Mr. Oxman testified that, in most cases, Imperium did not charge the doctors for the retrieval or copying of such records and did not identify an instance

when Imperium charged a third party to retrieve or copy patient files. Nov. 14, 2017 Tr. at 39:7-39:13.

123. Doctors who previously provided services for Counterclaim Defendants have also requested patient records from Imperium for litigation purposes, and Imperium has provided the requested records to those doctors. Nov. 14, 2017 Tr. at 39:21-25.

**H.    Counterclaim Defendants' Use of NexTech in Litigation**

124. To prepare the Complaints in the Main Action and in this action, counsel Brittney Whitman spent six to eight months investigating Plaintiffs' claims. This included retrieving information from NexTech and printing out voluminous records from NexTech. Dec. 12, 2017 Tr. at 74:21-75:1, 76:16-20, 82:8-11, 83:15-19. The Complaint in the Main Action contained allegations regarding 411 specific patients.

125. SCM, Julian Omidi, the Plaintiffs in this case, and other related entities became Counterclaim Defendants pursuant to a United's Counterclaim filed in this action on May 12, 2014. Dkt. 15. This Counterclaim identified seven exemplar United members, only one of which had been identified in either of Plaintiffs' two Complaints.

126. Prior to filing its Counterclaim, United served an Answer on April 18, 2014, seeking to setoff or recoup amounts it had paid to the Plaintiffs. Dkt. 1.

127. SCM and Julian Omidi, with the assistance of their counsel (Ms. Whitman), assigned the software license to Imperium effective May 22, 2014. Nov. 14, 2017 Tr. at 177:14-178:20. In connection with the May 22, 2014 assignment, SCM/Julian Omidi made no provision for a right of access to the information contained on NexTech for purposes of discovery in the two pending lawsuits.

128. As discussed below, Counterclaim Defendants used information contained in the NexTech database to seek dismissal of the Counterclaim, propound

discovery, respond to discovery, and amend their complaint in the Main Action.

129.   In response to the First Amended Counterclaim, the Counterclaim Defendants filed a motion to dismiss.  In support of the motion, they relied on information from NexTech. Dkt. 55.  The motion referenced documents pertaining to seven different patients, which were identified as coming from NexTech.  The dates on the documents for certain of the newly-identified patients indicate that they were printed or created in October 2014 – after the assignment of the NexTech license to Imperium.  Dkt. 66 at 19, 20.

130.   In an April 10, 2015 order in the Main Action, the District Judge granted United's motion to dismiss Plaintiffs' Complaint but allowed leave to amend.  Case No. 14-cv-2139, Dkt. 1396 at 120.  In response, Plaintiffs filed a Second Amended Complaint setting forth numerous, additional specific medical procedures they provided, the dates of those procedures, and the specific surgery centers or other providers that provided those services for many of the over 300 exemplar patients identified by Plaintiffs.

131.   Given the additional information contained in the Second Amended Complaint, it is more likely than not that the NexTech database was accessed between April 10, 2015 and June 1, 2015 to secure some of this additional information.  It is not credible or reasonable that Ms. Whitman would have anticipated all of the materials needed to plead a Second Amended Complaint or to respond to discovery requests served by Counterclaim Plaintiffs.  And the government had seized the documentation printed by Ms. Whitman in the spring of 2014.  Dec. 12, 2017 Tr. at 119.

132.   It is also more likely than not that Counterclaim Defendants utilized NexTech in 2015-16 to send hundreds of letters to patients asking them to sign a supplemental assignment of benefits.  CCP Ex. 64.  Plaintiffs in their Third Amended Complaint in the Main Action filed on February 29, 2016, alleged that they had "recently contacted many of their patients, asking them to sign a follow-up

assignment of benefits" and that over 300 patients had returned such assignments. Case No. 14-cv-2139, Dkt. 1749 at ¶ 707.

133. Counterclaim Defendants have not presented credible evidence that they had to obtain permission from Imperium to utilize NexTech to print or download information from NexTech for use in this litigation, and no evidence that they had to compensate Imperium for such use. Dr. Au (Imperium's CEO from August 2015 through the end of 2016) testified that during that period he was not involved in granting any approvals use of NexTech. Nov. 14, 2017 Tr. at 97:6-8. Nor was any evidence presented regarding any such approvals by Mr. Kollars, the first CEO of Imperium. Similarly, Imperium's current CEO (Janzen Hidalgo) testified that he had not said "no" to requests for discretionary access to documents on the NexTech system by doctors or staff. Dec. 19. 2017 Tr. at 51:5-10.

134. Counterclaim Defendant Top Surgeons utilized NexTech for its benefit in a separate lawsuit entitled *Faitro, et al.* v. *Top Surgeons, Inc., et al.,* Los Angeles Superior Court Case No. BC454464. Top Surgeons asked Ashkan Rajabi, an IT consultant, to determine the identity of all persons who fit the description of class members in *Faitro.* This work required him to use NexTech for six to seven days. Dec. 19, 2017 Tr. at 125:8-127:10. He eventually used the NexTech system to identify over 18,000 patients who were purported class members. *Id.* at 130.

135. Mr. Rajabi initially testified that Top Surgeons asked him to perform the analysis and that he did not recall being contacted by anyone at Imperium. Dec. 19, 2017 Tr. 126:24-127-2, 130:23-25. He later changed his testimony, stating he did speak to Dr. Au – then CEO of Imperium – about this as well. *Id.* at 159:18-161:6. The Court finds Mr. Rajabi's initial testimony more credible, particularly because Dr. Au testified that he (as CEO) was never approached to retrieve old medical records. Nov. 14, 2017 Tr. 97:18-21.

136. In or about December 2016, Imperium requested Mark Jubelt, then counsel for the Counterclaim Defendants, to send out collection letters to patients of

Counterclaim Defendants, which reflected patient contact information and historical billing information obtained from NexTech for services rendered by Counterclaim Defendants. An example of such letter is CCP Ex. 98, which states, in part, that "[o]ur records show that your balance on the services provided under Orange Grove Surgery Center LLC on the date of services is now $[ ]." Counterclaim Defendants also acknowledge that "Imperium requested Mr. Jubelt to provide the services." Dkt. 562-1 at 6.

137. With respect to the uses of NexTech by or for the benefit of Counterclaim Defendants, there is no evidence that Counterclaim Defendants, or anyone on their behalf, had to compensate Imperium for such NexTech use.

**I.**     **October 5, 2017 Letter**

138. On October 7, 2017, Counterclaim Defendants provided this Court with a copy of a letter dated October 5, 2017 from Janzen Hidalgo to Mark Jubelt and Kamille Dean. Dkt. 544, Ex. 3 to K. Dean Declaration.

139. The letter states:

> You have requested that we provide you with documents relating to the NexTech system and materials which we own and operate concerning medical services rendered by various doctors and surgical facilities since 2009. We have had great difficulty accessing this material, and it involves thousands upon thousands of documents. The burden on our company in attempting to access these documents has been unreasonable and extraordinarily burdensome.

> Despite our best efforts we cannot provide any further documents without compensation. Our staff charges between $250 to $300 per hour for document retrieval services. Our attorneys charge $500 per hour for retrieval, review, and privilege examination services. We can simply no longer seek to obtain these documents without compensation.

> There are hundreds of hours involved in meeting your request. Because we do not know the costs involved, we will need to make an assessment of services to be provided. Should you wish a full assessment we will provide it, and can provide you with a specific

breakdown of likely charges for paper and/or electronic production options. However, we anticipate that hundreds of hours of labor will be necessary to satisfy the scope of your request.

Please let us know what you wish to do.

140.   The October 5, 2017 letter does not have a physical signature. Rather, in the signature block it has "Jenzen Hidalgo" typed in italics, which is a misspelling of Janzen Hidalgo. CCD Ex. 9.

141.   Janzen Hidalgo testified that he typed this letter while on the naval base in San Diego. Mr. Hidalgo testified that he asked his friend on base to review it for him and have him add his name under the letter, which he misspelled. Dec. 19, 2017 Tr. at 52:5-53:24.

142.   Janzen Hidalgo testified that he wrote this letter in response to a request by Mark Jubelt, former counsel of record for Counterclaim Defendants, for medical records. Dec. 19, 2017 Tr. at 54:5-17. According to Mr. Hidalgo, Mr. Jubelt orally requested to extract from NexTech "thousands and thousands of patient files." Dec. 19, 2017 Tr. at 54:23-25. Mr. Jubelt did not explain why he needed the files or which specific patients, just that he wanted "all of the information" for thousands of patients. Dec. 19, 2017 Tr. at 55:15-56:12.

143.   Janzen Hidalgo did not recall ever speaking with Mr. Jubelt prior to this phone call in late September 2017. Dec. 19, 2017 Tr. at 56:16-18.

144.   Janzen Hidalgo printed out the letter. He traveled to Los Angeles and gave it to his brother Jamie Hidalgo, a day or two later. He asked his brother to deliver it to Mr. Jubelt and Ms. Dean. Dec. 19, 2017 Tr. at 59:23-60:16.

145.   Janzen Hidalgo's October 5, 2017 letter was based on the assumption that Imperium was being requested to provide records for "thousands and thousands of patients." Dec. 19, 2017 Tr. at 59:4-7. He testified that Mr. Jubelt asked him for records of over 3,000 patients. Dec. 19, 2017 Tr. at 90:7-9. It is not clear where this number has come from or which patients are on this list because Counterclaim

Plaintiffs' pending discovery did not ask for records of 3,000 patients.

146. Mr. Oxman also testified that Imperium had been willing to provide documents and record until it allegedly "became obvious that it was millions of documents." Nov. 14, 2017 Tr. at 48:17-23. Neither Mr. Oxman nor Janzen Hidalgo provided a reasonable or credible basis for the estimate that "millions of documents" were requested by Counterclaim Plaintiffs in discovery.

147. Despite writing in the letter that "[w]e have had great difficulty accessing this material" and "[t]he burden on our company in attempting to access these documents has been unreasonable and extraordinarily burdensome," Janzen Hidalgo has not attempted to access the patient records requested by Mr. Jubelt, nor has anyone else at Imperium. Dec. 19, 2017 Tr. at 62:12-64:7.

148. Janzen Hidalgo did not look at any legal documents within Imperium regarding Imperium's obligation to provide the requested patient records. Dec. 19, 2017 Tr. at 57:5-8.

149. While the October 5, 2017 letter states "[o]ur staff charges between $250 to $300 per hour for document retrieval services," Janzen Hidalgo testified that he did not recall Imperium charging anyone $250 to $300 per hour for document retrieval services. Dec. 19, 2017 Tr. at 64:22-65:4.

150. Janzen Hidalgo testified that the estimate for the number of hours involved and the hourly charge of staff referenced in the October 5, 2017 letter was determined at a meeting between himself, Dr. Au and another manager at Royalty named Janice. According to Mr. Hidalgo, either Dr. Au or Janice came up with the estimate for both the number of hours and hourly rate. Mr. Hidalgo could not identify a basis for the hourly rates other than that it is a "hassle . . . to get all of those information." Dec. 19, 2017 Tr. at 66:3-67:3; 69:4-13. Dr. Au did not testify to such a meeting; to the contrary, Dr. Au testified that he did not do more than exchange greetings with Janzen Hidalgo. Nov. 14, 2017 Tr. at 89:2-6.

151. The October 5, 2017 letter also states that Imperium's "attorneys

charge $500 per hour for retrieval, review, and privilege examination services."
CCD Ex. 9. Janzen Hidalgo testified that he was referring to Maureen Jaroscak and
other "attorneys in the office" that he could not identify by name. Mr. Hidalgo,
however, testified at the hearing that Imperium does not pay these attorneys or any
other entity for the time of these attorneys. Dec. 19, 2017 Tr. at 67:9-69:3.

152. Neither Mr. Jubelt nor Ms. Dean has requested a "full assessment of
services to be provided" as referenced in the October 5, 2017 letter. CCD Ex. 9;
Dec. 19, 2017 Tr. at 69:14-70:6. Any further "assessment" has not been done. *Id.*

153. Janzen Hidalgo's testimony about his conversations with Dr. Au
regarding the statements in the October 5, 2017 letter is not credible and
inconsistent with Dr. Au's testimony that he has not spoken to Mr. Hidalgo since he
took over as CEO of Imperium other than an occasional greeting in the office or
over the phone.

154. Janzen Hidalgo testified that he did not recall having any
conversations with Brian Oxman about the request for patient records from
Mr. Jubelt. Dec. 19, 2017 Tr. at 63:19-25. This contradicts Mr. Oxman's
testimony that they met at a hotel to discuss the request. Dec. 12, 2017 Tr. at 63-
15-64:11.

155. Based on the inconsistencies in testimony discussed above, the
misspelling of the author's name and the Court's observation of Janzen Hidalgo's
demeanor, as well as a comparison of his testimony with the language used in the
letter, the Court finds it not credible that Janzen Hidalgo drafted the letter on his
own. Rather, it is more likely than not that a lawyer or someone else working on
behalf of Counterclaim Defendants drafted the letter.

156. Both Janzen Hidalgo and Brian Oxman testified about the supposed
length of time that it takes to retrieve and print patient records. Janzen Hidalgo
testified that it only takes a couple of minutes to pull up a patient's records, which
is searchable by patient name, but it would take a "long time" to print, estimating

that it would take 30 minutes to print 20 pages of patient notes. Dec. 19, 2017 Tr. at 44:2-46:7. He attributed the lengthy print time to the fact that Imperium has slow or non-functioning printers. *Id.* at 46:15-22. Mr. Oxman testified that it takes "anywhere from an hour or more depending on who the patient is, and sometimes it's take as long as three or four hours just to identify all of the information regarding one patient, because you've got to look at all the different sectors. Nov. 14, 2017 Tr. at 151:17-24. Mr. Oxman, however, has never actually used the NexTech system. In addition, his testimony is inconsistent with the testimony of Ashkan Rajabi, Counterclaim Defendants' IT consultant who testified that pulling up a patient's records "is quick." Dec. 19, 2017 Tr. at 137:14-19.

157. The burden alleged by Imperium was also based on the unsupported assumption that United was requesting all patient records for 3,000 patients and that the requests were for "millions of documents, " as asserted by Mr. Oxman (Nov. 14, 2017 Tr. at 48:17-23). In addition, the testimony by Janzen Hidalgo, Brian Oxman and Dr. Au regarding the cost estimate contains unreasonable and/or unsupported assumptions. United's first set of document requests seek documents relating to only 88 patients. Dkt. 441-4. Subsequent requests relate to discrete subsets of patients, and discrete categories of documents, for example, patient notes. Much of the claimed burden also arises from unsupported calculations of time allegedly required to pull up and print the entirety of a patient record, including use of slow or non-working printers. According to Counterclaim Defendants, even a short set of patient notes from NexTech is a burden to print.

158. The Court finds the assertions of burden put forth by Counterclaim Defendants and Imperium to be unreasonable, unsupported and incredible.

///
///
///
///

## II. CONCLUSIONS OF LAW[1]

### A. Counterclaim Defendants had a duty to preserve and not hinder access to evidence on NexTech

1.     "A litigant has a duty to preserve evidence it knows or should know is relevant to imminent litigation." *Cyntegra, Inc. v. Idexx Labs., Inc.*, 2007 U.S. Dist. LEXIS 97417, at *7 (C.D. Cal. Sept. 21, 2007).  Here, Counterclaim Defendants had a duty to preserve medical records and other information available on the NexTech system. Counterclaim Defendants knew that the NexTech database contained evidence relevant to the two lawsuits filed in March of 2014, before the purported assignment of the NexTech license to Imperium in May of 2014, and before the purported sale and transfer of patient records by way of Assignment and Assumption Agreement in July 2014.

2.     Litigants also have a duty not to hinder their opponents' access to relevant information by making it more difficult or costly to obtain.  *See, e.g., Treppel v. Biovail Corp.,* 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006) ("conduct that hinders access to relevant information is sanctionable, even if it does not result in the loss or destruction of evidence. *See Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 110 (2d Cir. 2002)").

### B. Counterclaim Defendants have possession, custody, or control over the data on NexTech

3.     Rule 34 requires parties to produce responsive documents within their "possession, custody, or control."  Fed. R. Civ. P. 34(a)(1).  A party need not have "actual possession of the requested document" to be obligated to produce it.  *Soto v. City of Concord*, 162 F.R.D. 603, 619 (N.D. Cal. 1995).  Rather, "control" is sufficient.  *See In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999); *Thales*

---

[1]   Any of the following conclusions of law which may be determined to be finding of facts are hereby deemed findings of fact.

*Avionics Inc. v. Matsushita Avionics Sys. Corp.*, 2006 U.S. Dist. LEXIS 97119, at
*10 (C.D. Cal. Mar. 8, 2006). Control may extend to documents that are nominally
held in another corporation's care, including, for example, when stored with a sister
corporation or other unrelated entity, because of that entity's "complicity in storing
or withholding documents." *Uniden Am. Corp. v. Ericsson Inc.*, 181 F.R.D. 302,
306 (M.D.N.C. 1998). Accordingly, under Rule 34, courts are to "closely examine
the actual relationship between two corporations" when one is a party and the other
a non-party with claimed control of responsive documents, in order to "guard
against not just fraud and deceit, but also sharp practices, inequitable conduct, or
other false and misleading actions whereby corporations try to hide documents or
make discovery of them difficult." *Uniden*, 181 F.R.D. at 306 (citing *Societe
Internationale v. Rogers*, 357 U.S. 197, 204 (1958)).

   4.     "[C]ourts have also found that one corporation controls another in the
situation where one is the alter ego of the other corporation." *Uniden*, 181 F.R.D.
at 305 (citing *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 130 (D. Del.
1986) (collecting cases)); *see also Thales Avionics*, 2006 U.S. Dist. LEXIS 97119,
at *10. In these situations, "the court credits substance over form and ignores the
separate corporate entities in order to protect against fraud and deceit." *Uniden*,
181 F.R.D. at 305. Moreover, alter ego for purposes of "Rule 34 includes situations
well beyond those which would permit a finding of *in personam* jurisdiction or
liability based on an alter ego situation." *Id.* at 306.

   5.     Alter ego determinations can depend on a variety of non-exhaustive
factors, including the transfer of assets by non-arm's length transactions, which is
an example of the "inequitable conduct" discussed in *Uniden*. *See, e.g., Kayne v.
Ho*, 2012 U.S. Dist. LEXIS 192916, at *27 (C.D. Cal. Sept. 6, 2012) (listing
numerous factors, including "the failure to maintain arm's length relationships," as
relevant to alter-ego determinations). Similarly, whether a transaction was
conducted at arm's length may depend on "the totality of the circumstances.*" Cf.,*

*e.g.*, *Kachatryan v. Martirosian (In re Martirosian)*, 2017 Bankr. LEXIS 680, at *9, *12-21 (Bankr. C.D. Cal. Mar. 14, 2017) (noting "myriad" facts and circumstances, including a corporation's registered address, as supporting a finding that a property sale "was not an arm's length transaction, but instead part of a scheme to hinder, delay and/or defraud creditors").

6.      Here, the principal transactions at issue – SCM's assignment of the NexTech license to Imperium and SCM's and Golden State's transfer and sale of patient records and other records and materials to Imperium – did not take place at arm's length.  For example, while representing SCM in connection with the May 2014 assignment, Ms. Jaroscak drafted the Assignment on behalf of SCM and executed the assignment on behalf of Imperium as a Manager.  *See* Nov. 14, 2017 Tr. 177:8-178:20; Dec. 12, 2017 Tr. at 183:2-185:15; CCD Ex. 5.  Similarly, the outside counsel involved with the transaction – Sheppard Mullin – reviewed the agreement on behalf of SCM interests, but also had an attorney-client relationship with Imperium.  Dec. 12, 2017 Tr. at 209:4-210:9.  Mr. Kollars also signed the July 1, 2014 Assignment and Assumption Agreement on behalf of Imperium as Assignee, while simultaneously serving as CEO of Assignor Golden State., where he was responsible for the management of Counterclaim Defendant surgery centers. Nor was there credible evidence of any arm's-length negotiation or bargaining before the assignment to Imperium.

7.      Other factors that courts consider to "determine when documents in the possession of one corporation may be deemed under control of another corporation," include, but are not limited to, the following:  (i) commonality of ownership; (ii) exchange or intermingling of directors, officers or employees of the two corporations; (iii) exchange of documents between the corporations in the ordinary course of business; and (iv) involvement of the non-party corporation in the litigation.  *Uniden*, 181 F.R.D. at 306; *Thales Avionics*, 2006 U.S. Dist. LEXIS 97119, at *13-16.  Additional factors include:  employing the same attorneys, *see*

*Tri-State Equip. v. United States*, 1997 U.S. Dist. LEXIS 6281, at *24 n.6 (E.D. Cal. Apr. 17, 1997); or entities that are "controlled, dominated, managed, and operated by [a single family]," *see Riddle v. Leuschner,* 51 Cal.2d 574, 581 (1959). Each of these factors weighs in favor of a finding for purposes of this discovery dispute that Imperium is an alter ego – or should be deemed to be under the control – of one or more Counterclaim Defendants.

8. Counterclaim Defendants argue that there is no evidence of unity of ownership between Imperium (which is owned by the Medical Investment Trust) and any Counterclaim Defendants. That is not true. As an initial matter, the April 24, 2015 letter from Ms. Jaroscak, counsel for SCM and Imperium, to NexTech, evidences a unity of interest: "I represent Imperium, formerly Surgery Center Management." CCD Ex. 6. Mr. Oxman claimed this letter was a mistake by Ms. Jaroscak's colleague, but Ms. Jaroscak testified that she assumed she followed her routine practice in reviewing this letter before it was sent out over her name. Dec. 12, 2017 Tr. at 208: 6-9. With regard to unity of ownership/interest, Ms. Jaroscak also testified that at least one of the beneficiaries of the Medical Investment Trust, which are the equitable owners thereof, is Julian, Michael, or Cindy Omidi. *See* Dec. 12, 2017 Tr. at 201:22-202:5. Michael and Julian Omidi also owned Beverly Hills SC (Dkt. 51-1 at 37), and likely owned other surgery centers that they organized and incorporated (CCP Exs. 25, 30, 33, 37, 38), and also SCM, which is currently owned by Mr. Pezeshk, their uncle and Cindy Omidi's brother. Nov. 14, 2017 Tr. at 26:11-16.

9. Moreover, there has been substantial overlap and intermingling among the personnel of Imperium (and its managed entities), and the personnel of Counterclaim Defendants. For example, Timothy Kollars, CEO of Imperium from early 2014 through approximately August 2015, was the CEO "of the various surgery centers and doctors' group identified in the complaint in *Faitro v. Top Surgeons, LLC*," including Counterclaim Defendants Almont ASC, Beverly Hills

SC, New Life SC, Woodlake ASC, and Top Surgeons. CCP Ex. 16, Ex. E (Kollars Decl.). In addition, Mr. Kollars was CEO of Golden State, which managed Counterclaim Defendants, including Beverly Hills SC, New Life SC, IMS and Valley SC. As a result, he was simultaneously managing the Counterclaim Defendants and Imperium. Similarly, Dr. Au was first a physician at IMS and Medical Director for SCM, then a physician at Salus (managed by Imperium) and then CEO of Imperium.

10.     There has also been substantial overlap of the locations of Imperium (and its managed entities) and those of Counterclaim Defendants. Imperium and its staffing company Augustus Health told the federal government that each of their addresses is 9100 Wilshire Blvd., Suite 800E, Beverly Hills (CCP Ex. 5), which was also the address of Counterclaim Defendants SCM. CCP Exs. 3 at 7 & 83 at 2. Ms. Jaroscak, counsel for SCM and Imperium, also had offices at this same address. CCD Ex. 6 & Dec. 12, 2017 Tr. at 195: 2-4. Medical Investment Trust (sole shareholder of Imperium) has an address (CCP Ex. 121) that is the same postal box used by Counterclaim Defendants SCM (CCP Ex. 12 at 5), Beverly Hills SC (CCP Ex. 27 at 4), New Life SC (CCP Ex. 28 at 3), Orange Grove SC (CCP Ex. 29 at 3), and Valley SC (CCP Ex. 37 at 3-4). Finally, Royalty and Salus (Imperium's managed entities) operate, rent free, at the surgery center that was formerly Orange Grove SC, and which Orange Grove SC continues to own. Nov. 14, 2017 Tr. 120:7-22.

11.     The evidence also shows, as detailed in the findings of fact above, that in the course of Imperium's business, Counterclaim Defendants have had access after the May 2014 Assignment to use NexTech as it benefitted them in this and other litigation. Imperium also allows access to billing and patient records located in the NexTech database to or for the benefits Counterclaim Defendants – without charge – for the purpose of billing patients (CCP Ex. 98) or for "patient continuity." CCD Ex. 8 at Section 5. And Counterclaim Defendant Michael Omidi has access

to NexTech in the ordinary course of business, and no restrictions have been imposed by Imperium on his use. Dec. 19, 2017 Tr. at 49:20-51:10. Thus, Counterclaim Defendants have been permitted to use NexTech when it is in their interest to do so. Counterclaim Defendants cannot, in good faith, take the position that information is in their "control" when it helps their interests, but not when Counterclaim Plaintiffs are seeking relevant information in discovery. This tactic is an example of a "sharp" or inequitable practice that courts must guard against in determining the issue of "control" in the discovery context.

12.     For purposes of this discovery issue, the Court finds that Imperium is a shell or sham company, whose alleged corporate separateness may be disregarded under alter ego factors. Imperium has no employees, no revenue, and no costs that are material. There is no evidence that it regularly generates financial statements or that it files tax returns. Its former CEO, Dr. Au, testified that Imperium's business function is to "manage" Salus Medical and Royalty Surgical, but when asked what that entails, Dr. Au said, "I'm not sure." Nov. 14, 2017 Tr. 85:6-11. As CEO of Imperium, he "answered to the lawyers," who were also lawyers for Counterclaim Defendants. Nov. 14, 2017 Tr. at 82:10-15, 60:9-63:11.

13.     The conclusion that Imperium is a shell or sham company is also strongly supported by the testimony of Janzen Hidalgo, its current CEO. In early 2017, Mr. Hidalgo began as Imperium's CEO, Secretary, Treasurer and sole Board member. Up to that time, Mr. Hidalgo's total business training and experience amounted to six months as an accounting assistant. He was asked to do these jobs (as well as to be the sole Trustee of the Medical Investment Trust – owner of Imperium) by "lawyers" all of whom also represent Counterclaim Defendants. Mr. Hidalgo is a full-time, active duty seaman in the U.S. Navy – stationed in San Diego, California. He typically works from sun up to sun down in his position in the Navy. He devotes only 3 hours per month to his duties as CEO, Secretary, Treasurer, and Board member at Imperium. And Imperium has no other

employees. Janzen Hidalgo has spent only 30 minutes learning about the NexTech system. He knows nothing regarding Imperium's assets, liabilities or documents. He is paid $2,500 per month by Imperium to review two pages of financial information associated with other companies that Imperium is supposed to manage. As discussed above in the findings of fact, Mr. Hidalgo is merely a figurehead in his positions at Imperium without substantial activities or responsibilities, and nothing regarding his selection, positions, duties, work or compensation at Imperium and Medical Investment Trust indicates functioning entities.

14. Courts have found a party to have control over another entity's records based on evidence of commonality of interest between the two entities. *See Super Film of Am., Inc. v. UCB Films, Inc.*, 219 F.R.D. 649, 655 (D. Kan. 2004). In *Super Film*, two entities did not share ownership or have a parent/subsidiary relationship, but they exchanged information, documents and employees. *Id.* In those circumstances, the court found that the moving party "sufficiently demonstrated a *commonality of interest*" between the two entities to impute control over the documents. *Id.* at 655 (emphasis added). In *Uniden*, the court similarly found that documents regularly exchanged (and requests not refused) "in the ordinary course of business" counseled in favor of a Rule 34 alter ego finding. 181 F.R.D. at 307. As in these cases, Imperium routinely provided access without charge to the NexTech system to various Counterclaim Defendants, did not reject requests from Counterclaim Defendants, and in numerous other ways demonstrated a commonality of interest with Counterclaim Defendants, as set forth in the findings of fact above.

15. The cases cited by Counterclaim Defendants hold that piercing the corporate veil can be difficult when imposing liability or when finding personal jurisdiction. *See, e.g., Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 2010 U.S. Dist. LEXIS 7381 (N.D. Cal. Jan. 29, 2010); *Hammond v. Monarch Invs., LLC*, 2010 U.S. Dist. LEXIS 66595 (S.D. Cal. July 2, 2010). But this is not the

issue now. The Court is currently considering only whether Imperium is an alter ego of the Counterclaim Defendants for purposes of discovery. The necessary showing for this purpose is substantially lower than that required for an alter-ego finding on the merits. *See Uniden*, 181 F.R.D. at 306 ("The definition of control under Rule 34 includes situations well beyond those which would permit a finding of *in personam* jurisdiction or liability based on an alter ego situation.").

16. Counterclaim Defendants and Imperium have not rebutted the showings made by Counterclaim Plaintiffs regarding control and alter-ego factors. Their proposed findings of fact rely heavily on the testimony of Mr. Oxman. As discussed in the findings of fact above, the Court has found that Mr. Oxman's testimony lacks credibility and was often based on second-hand information from his role as a litigation coordinator. Besides the Oxman testimony, Counterclaim Defendants rely mainly on documents reflecting board meetings, assignments and other transactions, as well as the purported actions of the figurehead CEOs (Dr. Au and Janzen Hidalgo). Those records have been discussed above, and most reflect only paper transactions – involving an undercapitalized company, directed by counsel for Counterclaim Defendants and lacking functioning officers, employees, board members, revenues, costs, tax returns or other real substance. The existence of these paper records, in the face of substantial real-world evidence to the contrary, does not establish Imperium as a separate entity beyond control of Counterclaim Defendants. Instead, Counterclaim Defendants – through the instructions and directions of their counsel – have used and controlled Imperium to improperly hinder the progress of discovery in this case. Counterclaim Defendants and Imperium have also presented inflated estimates of the time and expense that would have to be incurred to use the NexTech database in response to Counterclaim Plaintiffs' requests, again in an improper hindrance of discovery. [2]

---

[2] The Court has considered objections (ECF No. 722) by Counterclaim Defendants to certain evidence cited in the proposed findings of fact submitted by Counterclaim

### III. ORDER

For purposes of this discovery dispute only, the Court finds (i) that Imperium is an alter ego of one or more of the Counterclaim Defendants, (ii) that Imperium is within the control of the Counterclaim Defendants, (iii) that Counterclaim Defendants have control of the NexTech database, (iv) that Counterclaim Defendants have improperly used and controlled Imperium to hinder the progress of discovery in this case, and (v) that Counterclaim Defendants have a duty to preserve documents in the NexTech database while this litigation is pending. Accordingly, Counterclaim Defendants shall produce records from the NexTech database in response to Counterclaim Plaintiffs' first request for documents. Counterclaim Defendants shall also use the NexTech database as needed to prepare complete substantive responses to Counterclaim Plaintiffs' first set of interrogatories.

DATED: 3/2/2018

_____
ALEXANDER F. MacKINNON
UNITED STATES MAGISTRATE JUDGE

Plaintiffs. To the extent, the Court has cited herein any of the challenged evidence, the objections to that evidence are overruled. The remaining objections are denied as moot.